| | |
|---|---|
| THE CHEROKEE NATION,<br>a federally recognized Indian Tribe,<br>17675 S. Muskogee Ave.<br>Tahlequah, OK 74464, | )<br>)<br>)<br>)<br>) |
| THE CHICKASAW NATION,<br>a federally recognized Indian Tribe,<br>520 E. Arlington St.<br>Ada, OK 74820, | )<br>)<br>)<br>)<br>) |
| THE CHOCTAW NATION,<br>a federally recognized Indian Tribe,<br>1802 Chukka Hina Dr.<br>Durant, OK 74701,  and | )<br>)<br>)<br>)<br>) |
| THE CITIZEN POTAWATOMI NATION,<br>a federally recognized Indian Tribe,<br>1601 S. Gordon Cooper Dr.<br>Shawnee, OK 74801, | )<br>)<br>)<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | ) No. 1:20-cv-02167 (TJK)<br>) |
| UNITED STATES DEPARTMENT OF THE<br>INTERIOR, DAVID BERNHARDT, in his<br>official capacity as the Secretary of the<br>Interior, TARA KATUK MAC LEAN<br>SWEENEY, in her official capacity as the<br>Assistant Secretary of the Interior – Indian<br>Affairs, United States Department<br>of the Interior,<br>1849 C Street N.W.<br>Washington, DC 20240, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| J. KEVIN STITT, in his official capacity as<br>the Governor of the State of Oklahoma,<br>2300 N. Lincoln Blvd. #212<br>Oklahoma City, OK 73105, | )<br>)<br>)<br>)<br>) |

1

WILLIAM NELSON, SR., in his official )
capacity as the Chairman of the Business )
Committee of the Comanche Nation, )
584 NW Bingo Rd. )
Lawton, OK 73507, )
)
JOHN R. SHOTTON, in his official capacity )
as the Chairman of the Tribal Council )
of the Otoe-Missouria Tribe of Indians )
8151 Hwy 177 )
Red Rock, OK 74651, )
)
JOE BUNCH, in his official capacity as the )
Chief of the United Keetoowah Band of )
Cherokee Indians in Oklahoma )
18263 Keetoowah Cir. )
Tahlequah, OK 74464, and )
)
BRIAN GIVENS, in his official capacity as )
the Mekko of the Kialegee Tribal Town )
100 Kialegee Dr. )
Wetumka, OK 74883, )
)
     Defendants. )
_____)

## FIRST AMENDED AND SUPPLEMENTED COMPLAINT

## I.     NATURE OF THE ACTION

1.     The Plaintiff Nations file this lawsuit against the following Defendants: the

Department of the Interior ("Department"), under the Administrative Procedure Act

("APA"), 5 U.S.C. § 702; David Bernhardt, the Secretary of the Interior ("Secretary"), and

Tara Katuk Mac Lean Sweeney, the Assistant Secretary of the Interior – Indian Affairs

("Assistant Secretary"), both in their official capacities, and also under the APA, *id.*; and

against J. Kevin Stitt in his official capacity as Governor of the State of Oklahoma, William

Nelson, Sr. in his official capacity as Chairman of the Business Committee of the

164436-3

Comanche Nation, James R. Shotton in his official capacity as Chairman of the Tribal

Council of the Otoe-Missouria Tribe of Indians, Joe Bunch in his official capacity as Chief

of the United Keetoowah Band of Cherokee Indians in Oklahoma ("UKB"), and Brian

Givens in his official capacity as Mekko of the Kialegee Tribal Town ("KTT"), each under

the doctrine of *Ex parte Young*, 209 U.S. 123 (1908); *see generally Vann v. Kempthorne*,

534 F.3d 741, 750 (D.C. Cir. 2008) (*Ex parte Young* action is available against tribal

officials for violation of federal law); *Vann v. U.S. Dep't of Interior* ("*Vann II*"), 701 F.3d

927, 929 (D.C. Cir. 2012).

2. This lawsuit seeks reversal of the Defendant Secretary's arbitrary, capricious,

and unlawful "no action" approvals under the Indian Gaming Regulatory Act ("IGRA"),

*see* 25 U.S.C. § 2710(d)(8)(C), of Agreements signed by the Defendant Governor Stitt, and

the Defendants Chairman Nelson, Chairman Shotton, Chief Bunch, and Mekko Givens, on

behalf of the Comanche Nation, the Otoe-Missouria Tribe of Indians, UKB, and KTT,

respectively (collectively, the "Agreements").[1] The Agreements purport to be Tribal-State

gaming compacts entered into by the State of Oklahoma with the Comanche Nation, the

Otoe-Missouria Tribe, UKB, and KTT (collectively, the "Tribes") under the Indian

Gaming Regulatory Act ("IGRA"), and purport to make Class III gaming activity on the

---

[1] Where provisions of the Agreements are identically numbered, the Agreements are collectively cited herein as "Agreements," or, if some but less than all have identical numbering, together in the following format: "Comanche and Otoe-Missouria Agreements" or "UKB & KTT Agreements." Where provisions are not identically numbered, the Agreements are individually cited herein as "Comanche Agreement," "Otoe-Missouria Agreement," "UKB Agreement," or "KTT Agreement," respectively.

164436-3

lands of those Tribes "fully subject to the terms and conditions of the [Agreements]." 25 U.S.C. § 2710(d)(2)(C). The Agreements also purport to authorize those Tribes and the State itself to conduct various Class III gaming activities.

3. The Agreements are not compacts because IGRA requires that a compact have been legally entered into by both parties, *id.* § 2710(d)(1)(C), (d)(2)(C), and the Defendant Governor Stitt did not have authority to enter into the Agreements on behalf of the State of Oklahoma. The Agreements do not identify any source of the Defendant Governor Stitt's authority other than his own claim to hold such authority, which is patently insufficient, and the Supreme Court of Oklahoma has since squarely held that Governor Stitt does not have authority to bind the State to the Comanche & Otoe-Missouria Agreements because they are not the Model Compact that was approved by the State Legislature and people in the State-Tribal Gaming Act ("STGA"), Okla. Stat. tit. 3A, §§ 261-282. *Treat v. Stitt*, 2020 OK 64, 2020 WL 4185827. As IGRA requires that a compact be legally entered into by a State and a Tribe before the compact can go into effect, the Defendant Secretary was required to disapprove the Agreements under IGRA, and his failure to do so was arbitrary, capricious, and contrary to law, as was his decision not to issue an opinion, letter, or other ruling finding the Agreements to be void from inception and invalid under IGRA. The Defendant Secretary's no action approvals did not cure the invalidity of the Agreements because: (a) under IGRA the Secretary is only authorized to approve by inaction a compact that has been legally entered into by both parties, 25 U.S.C. § 2710(d)(8)(A), (d)(8)(C); and (b) a compact approved by the Secretary's inaction is considered to have been approved only to the extent that it is consistent with IGRA, *id.*

4

§ 2710(d)(8)(C).  Accordingly, the Agreements are not valid compacts under IGRA and neither the Defendant Governor Stitt, the Defendant Tribal Chairman Nelson, the Defendant Tribal Chairman Shotton, the Defendant Chief Bunch, nor the Defendant Mekko Givens may represent that the Agreements are valid compacts under IGRA, nor may they exercise authority or jurisdiction under the Agreements as if they were valid compacts under IGRA, or direct others to do so, and any such representation or exercise of authority or jurisdiction violates federal law.

4.      In addition, the Defendant Secretary was obligated by law to disapprove the Agreements because they contain multiple provisions that are invalid under IGRA, and his failure to do so was arbitrary, capricious, and contrary to law, as was his decision not to issue opinions, letters, or other rulings finding those provisions to be invalid under IGRA. The Comanche and Otoe-Missouria Agreements violate IGRA by purporting to authorize categories of games that are not permitted in Oklahoma "for any purpose by any person, organization, or entity . . . ." *Id.* § 2710(d)(1)(B).  Namely, the Comanche and Otoe-Missouria Agreements purport to authorize the signatory Tribes and State to conduct "Event Wagering," a category that includes sports betting and betting on the outcome of video games, and purport to authorize the signatory Tribes to conduct House-Banked Card Games, House-Banked Table Games, and any new games that the Defendant Governor Stitt approves.  All four Agreements violate IGRA because they purport to authorize conduct of the iLottery, which may include any form of electronic gaming that has the elements of consideration, chance, and prize, by the State.  The revenue sharing provisions of all four Agreements are invalid because those provisions were not agreed to in exchange

5

for a meaningful concession by the State of significant economic benefit to the Tribes, which the Secretary has long required for such payments to be lawful under IGRA. All four Agreements also violate IGRA by limiting the signatory Tribes' conduct of Class II gaming activities in order to increase revenue sharing payments to the State from the Tribes' conduct of Class III gaming. Finally, all four Agreements violate IGRA by committing the Governor of Oklahoma to concur in future off-reservation trust land acquisitions for gaming purposes. These purported commitments in the Comanche, Otoe-Missouria, and KTT Agreements specifically apply to off-reservation trust land acquisitions by the signatory Tribes within Chickasaw and Citizen Potawatomi territory, which threatens the Chickasaw Nation's and Citizen Potawatomi Nation's jurisdictional integrity and sovereignty, and jeopardizes their ability to generate gaming revenue within their own territory. For all of these reasons, the Defendant federal officials were required by law to disapprove the Agreements, and the Defendant state and tribal officials are violating federal law by representing that the Agreements are valid Class III gaming compacts and by exercising authority and jurisdiction under the Agreements as if they are valid Class III gaming compacts under IGRA, or directing others to do so.

5. The Defendant Secretary's no action approvals, and his decisions not to issue opinions, letters, or other rulings finding the Agreements to be void from inception and invalid under IGRA, deny the Plaintiff Nations their substantive and procedural rights to the Defendant Secretary's fulfillment of his statutory obligations to only authorize Indian tribes to conduct Class III gaming activities in accordance with IGRA, to make decisions under IGRA that place Indian tribes on an equal footing in relation to one another, *id.*

6

§ 5123(f), and to ensure that IGRA "provide[s] a statutory basis for the operation of gaming by [the Plaintiff Nations] as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments," *id.* § 2702(1). Under IGRA, the Secretary is only authorized to approve by inaction a compact that has been legally entered into by both parties, *id.* § 2710(d)(8)(A), (d)(8)(C), and is required to disapprove a compact that violates any provision of IGRA, other federal law, or the federal trust responsibility, *id.* § 2710(d)(8)(B)(i)-(iii). The Defendant Secretary's no action approval of the Agreements injures the Plaintiff Nations by allowing the Comanche Nation, Otoe-Missouria Tribe, UKB, and KTT to compete in the highly competitive Oklahoma gaming market notwithstanding that the Agreements entered into by the Defendant Governor Stitt and Defendants Chairman Nelson, Chairman Shotton, Chief Bunch, and Mekko Givens, on behalf of the Comanche Nation, the Otoe-Missouria Tribe, UKB, and KTT, respectively, are invalid under IGRA and contain terms that violate IGRA, including terms that afford the Comanche Nation, Otoe-Missouria Tribe, UKB, and KTT a significant competitive advantage over the Plaintiff Nations, which conduct Class II and Class III gaming on their Indian lands in compliance with IGRA. As a direct result of the Defendant Secretary's failure to fulfill his statutory obligations, and of Defendants Governor Stitt's, Chairman Nelson's, Chairman Shotton's, Chief Bunch's, and Mekko Givens's actions in furtherance of the Agreements, the Plaintiff Nations' own valid IGRA gaming activities face illegal competition from the actual, threatened, and imminent conduct of gaming under these void Agreements, which draws gaming revenues that the Plaintiff Nations use to fund essential

7

governmental programs for their citizens and to promote tribal self-sufficiency and economic development in accordance with IGRA.

6.     The Defendant Secretary's no action approvals of the Agreements represent a complete abdication of his statutory responsibilities under IGRA. In addition, the blatant illegality of the Agreements suggests that the Defendant Secretary will allow any agreement executed by the Defendant Governor Stitt with an Indian tribe that purports to be a compact to go into effect by inaction, whether lawful or not, without offering any opinion, letter, or other ruling explaining the basis for that action. The Defendant Governor Stitt intends to take full advantage of the Defendant Secretary's evident willingness to do so, as shown by his course of conduct since the Defendant Secretary failed to disapprove the Comanche and Otoe-Missouria Agreements.

7.     The Plaintiff Nations seek a declaratory judgment that the Defendant Governor Stitt did not validly enter into the Agreements under IGRA, that the Agreements are therefore void and have no legal effect, that the Secretary's no action approvals of the Agreements does not make the Agreements valid compacts and has no legal effect, and that the Agreements violate IGRA for the reasons stated in ¶ 4 above. The Plaintiff Nations also seek a declaration that the Defendants Chairman Nelson, Chairman Shotton, Chief Bunch, and Mekko Givens are violating federal law by representing that the Agreements are Tribal-State gaming compacts under IGRA and by exercising authority or jurisdiction under the Agreements as if they were valid compacts under IGRA, or directing others to do so.

## II.  PARTIES

8.     The Plaintiff Cherokee Nation is a federally-recognized Indian Tribe, *see* Indian Entities Recognized by and Eligible to Receive Services from the United States Bureau of Indian Affairs, 85 Fed. Reg. 5462, 5463 (Jan. 30, 2020), with a governing body duly recognized by the Department.

9.     The Plaintiff Chickasaw Nation is a federally-recognized Indian Tribe, *id.* at 5465, with a governing body duly recognized by the Department.

10.    The Plaintiff Choctaw Nation is a federally-recognized Indian Tribe, *id.*, with a governing body duly recognized by the Department.

11.    The Plaintiff Citizen Potawatomi Nation ("CPN") is a federally-recognized Indian tribe, *id.* at 5463, with a governing body duly recognized by the Department.

12.    The Defendant United States Department of the Interior is a Department of the United States Government.

13.    The Defendant David Bernhardt is Secretary of the Interior, with responsibility for overseeing the United States Department of the Interior.  Secretary Bernhardt is sued in his official capacity.

14.    The Defendant Tara Katuk Mac Lean Sweeney is the Assistant Secretary of the Interior – Indian Affairs, with the responsibility for overseeing the Bureau of Indian Affairs ("BIA").  BIA is an agency within the Department of the Interior.  Assistant Secretary Sweeney is sued in her official capacity.

15.    The Defendant J. Kevin Stitt is the Governor of the State of Oklahoma and is sued in his official capacity.

164436-3

16.     The Defendant William Nelson, Sr. is Chairman of the Business Committee of the Comanche Nation, which is a federally-recognized Indian Tribe, *id.* at 5463, and is sued in his official capacity.

17.     The Defendant James R. Shotton is Chairman of the Tribal Council of the Otoe-Missouria Tribe of Indians, which is a federally-recognized Indian Tribe, *id.* at 5464, and is sued in his official capacity.

18.     The Defendant Joe Bunch is Chief of the United Keetoowah Band of Cherokee Indians in Oklahoma, which is a federally-recognized Indian tribe, *id.* at 5466, and is sued in his official capacity.

19.     The Defendant Brian Givens is Mekko of the Kialegee Tribal Town, which is a federally-recognized Indian tribe, *id.* at 5463, and is sued in his official capacity.

## III.    JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331, which "gives a district court subject matter jurisdiction to decide any claim alleging a violation of IGRA," *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 787 n.2 (2014). The Court also has subject matter jurisdiction under 28 U.S.C. § 1362 because the Plaintiff Nations are federally-recognized Indian Tribes with governing bodies duly recognized by the Secretary, and this action is brought to protect and enforce rights held by the Plaintiff Nations under IGRA, 25 U.S.C. §§ 2701-2721, and under Compacts that were entered into and are in effect under IGRA.  The sovereign immunity of the United States is inapplicable to this action because it is brought under the APA, 5 U.S.C. § 702, which waives the sovereign immunity of the United States.  State and tribal sovereign immunity are also

inapplicable to this action because it is brought against the Defendant Governor and the Defendant Tribal Chairmen in their official capacities under the doctrine of *Ex parte Young*, which allows aggrieved parties to seek relief against state and tribal officials who are violating their federal law rights. *Vann*, 534 F.3d at 750; *Vann II*, 701 F.3d at 929.

21. Venue is proper in this district under 28 U.S.C. § 1391(e), because the federal defendants reside in this district and because a substantial part of the events giving rise to the claim occurred within this district.

## IV. FACT ALLEGATIONS

### A. IGRA's Purposes and Policies.

22. Enacted in 1988, IGRA "created a regulatory framework for tribal gaming intended to balance state, federal, and tribal interests." *Amador Cty., Cal. v. Salazar*, 640 F.3d 373, 376 (D.C. Cir. 2011) (citing 25 U.S.C. §§ 2701, 2702).

23. IGRA "provide[s] a statutory basis for [both] the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments," 25 U.S.C. § 2702(1), and "the regulation of gaming by an Indian tribe adequate to shield it from organized crime and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to assure that gaming is conducted fairly and honestly by both the operator and players," *id*. § 2702(2). These provisions are intended for the benefit of all Indian tribes, including the Plaintiff Nations.

24. Congress found in IGRA that tribes engage in gaming "as a means of generating tribal governmental revenue," *id*. § 2701(1), and that "a principal goal of

11

Federal Indian policy is to promote tribal economic development, tribal self-sufficiency, and strong tribal government," *id.* § 2701(4). In accord with that policy, IGRA requires that tribes be the primary beneficiaries of tribal gaming, *id.* § 2702(2); that tribes "have sole proprietary interest and responsibility for the conduct of any gaming activity," *id.* § 2710(b)(2)(A), (d)(1)(A)(ii); and that tribal gaming revenues be used only to fund tribal government operations and programs, to provide for the general welfare of the tribe, to promote tribal economic development, and for charitable and local governmental purposes, *id.* § 2710(b)(2)(B), (d)(1)(A)(ii). These provisions are also intended for the benefit of all Indian tribes, including the Plaintiff Nations.

25. Tribal gaming rights under IGRA are "privileges and immunities available to the Indian tribe" under 25 U.S.C. § 5123(f), which "prohibits federal agencies from promulgating 'any' regulations or making 'any' decisions, pursuant to the [Indian Reorganization Act] 'or any other' Act of Congress, 'with respect to a federally recognized Indian tribe that classifies, enhances, or diminishes the privileges and immunities available to the Indian tribe relative to other federally recognized tribes by virtue of their status as Indian tribes.'" *Koi Nation of N. Cal. v. U.S. Dep't of Interior*, 361 F. Supp. 3d 14, 51-52 (D.D.C. 2019) (quoting 25 U.S.C. § 5123(f)). As the legislative history of Section 5123(f) shows, its purpose is to "serve[] the broader goal of making 'clear' that 'it is and has always been Federal law and policy that Indian tribes recognized by the Federal Government stand on an equal footing to each other and to the Federal Government.'" *Id.* at 53 (quoting 140 Cong. Rec. S6144, S6147 (1994) (statement of Sen. Inouye)). Section 5123(f) is intended

164436-3

to place all Indian tribes, including the Plaintiff Nations, on an equal footing with respect to decisions made by the Secretary that affect their gaming rights under IGRA.

**B.     IGRA's Indian Lands Requirement and Its Exceptions**

26.     IGRA provides for gaming only on "Indian lands."  25 U.S.C. § 2710(d)(1) ("Class III gaming activities shall be lawful *on Indian Lands* . . . ." (emphasis added)); *Amador Cty.*, 640 F.3d at 376-77.  Under IGRA "Indian lands" are defined as follows

> (A) all lands within the limits of any Indian reservation; and (B) any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power.

25 U.S.C. § 2703(4).  Under IGRA, a tribe can only conduct IGRA gaming on lands that are not within the limits of "any Indian reservation" if those lands are held in trust by the United States or are subject to a restriction against alienation by the United States.  A further requirement applies if those lands were taken in trust by the Secretary after October 17, 1988.  IGRA generally prohibits gaming on lands acquired in trust for a tribe by the Secretary after October 17, 1988 ("after-acquired lands"), *id.* § 2719(a), subject to certain exceptions, *id.* § 2719(b).

27.     To conduct gaming on after-acquired lands, a tribe must satisfy one of the exceptions set forth in 25 U.S.C. § 2719(b).  Under the exception described in § 2719(b)(1), an Indian tribe can only conduct class III gaming on after-acquired lands located outside of its reservation or former reservation in Oklahoma if

> the Secretary, after consultation with the Indian tribe and appropriate State and local officials, including officials of other nearby Indian tribes, determines that a gaming establishment on newly acquired lands would be in

13

the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community, but only if the Governor of the State in which the gaming activity is to be conducted concurs in the Secretary's determination . . . .

*Id.* § 2719(b)(1)(A); *see id.* § 2719(a)(1), (a)(2)(A)(i).  Under Section 2719(b)(1)(A), the Secretary has two responsibilities: "(1) to evaluate whether gaming on the proposed trust land would be in the best interest of the applicant tribe and not detrimental to the surrounding community," and "(2) to ascertain whether the Governor of the State where the proposed trust land is located concurs with his or her favorable determination." *Lac Courte Oreille Band of Lake Superior Chippewa Indians of Wis. v. United States*, 367 F.3d 650, 656 (7th Cir. 2004).  By imposing these statutory responsibilities on the Secretary, 25 U.S.C. § 2719(b)(1)(A) provides procedural rights to the surrounding community, including Indian tribes (such as the Plaintiff Nations) that are part of the surrounding community, that must be complied with before an Indian tribe may conduct class III gaming on after-acquired lands located outside of its reservation or former reservation located in Oklahoma.  This is commonly known as a "Secretarial" or "two-part" determination.  25 C.F.R. § 292.2 (definition of "Secretarial Determination").

28.    Under Section 2719(b)(1)(A), the Governor's concurrence may be sought only if the Secretary makes a favorable determination, as it is the Secretary's determination in which the Governor is asked to concur.  This prevents state governors from usurping the Secretary's responsibility under § 2719(b)(1)(A) by acting first, and effectively requiring the Secretary to determine whether to concur in the Governor's determination on whether gaming on the proposed trust land would be detrimental to the surrounding community.

14

Any purported concurrence that precedes a favorable Secretarial determination is therefore legally meaningless.

29.     If the land on which an Indian tribe wishes to conduct gaming is not already in trust, the tribe must also apply to have the Secretary acquire the land in trust for the tribe under the procedures of 25 C.F.R. pt. 151.  Most tribes in Oklahoma may have land placed into trust for them by the Secretary under these procedures.  *See* 25 U.S.C. §§ 2202, 5105, 5108, 5203.  Federal regulations provide that, in Oklahoma, a "reservation" also includes "that area of land constituting the former reservation of the tribe as defined by the Secretary."  25 C.F.R. § 151.2(f).  And for purposes of determining whether Indian lands are eligible for IGRA gaming, the Secretary has defined "former reservation" as "lands in Oklahoma that are within the exterior boundaries of the last reservation that was established by treaty, Executive Order, or Secretarial Order for an Oklahoma tribe."  *Id.* § 292.2.

30.     When land is located outside of an Oklahoma tribe's reservation or former reservation, the Secretary may only take land into trust for the tribe when the Tribe already owns the land or when the Secretary determines that the acquisition in trust is "necessary to facilitate tribal self-determination, economic development, or Indian housing."  *Id.* § 151.3(a).  Federal regulations also prohibit one tribe from having land taken into trust for its benefit within a second tribe's reservation or former reservation in Oklahoma unless the second tribe consents in writing to the trust acquisition.  *Id.* § 151.8.  These regulations are intended for the benefit of all Indian tribes, including the Plaintiff Nations.

15

## C. Class III Gaming and the Tribal-State Compacting Process.

31. "[IGRA] divides gaming into three classes." *Amador Cty.*, 640 F.3d at 376. Class I gaming comprises social games played for prizes of minimal value and traditional forms of Indian gaming. 25 U.S.C. § 2703(6). "'Class I gaming on Indian lands is within the exclusive jurisdiction of the Indian tribes,' and is not subject to [IGRA]." *Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n*, 466 F.3d 134, 135 (D.C. Cir. 2006) (quoting 25 U.S.C. § 2710(a)(1)). Class II gaming consists of bingo and similar games, 25 U.S.C. § 2703(7), over which "the [National Indian Gaming] Commission and the tribes share regulatory authority: the tribes must enact a gaming ordinance applying the Act's minimum regulatory requirements; and the Commission's Chairman must approve the tribal ordinance before gaming may occur," *Colo. River*, 466 F.3d at 135 (citing 25 U.S.C. § 2710(a)(2), (b)).

32. Class III gaming comprises "all forms of gaming that are not class I gaming or class II gaming," 25 U.S.C § 2703(8), and "includes most casino games such as blackjack and roulette as well as slot machines," *Amador Cty.*, 640 F.3d at 376. "Before commencing Class III gaming, a tribe must satisfy three conditions." *Id.* First, the gaming activities must be authorized by a tribal ordinance that meets the requirements of 25 U.S.C. § 2710(b) and has been approved by the Chairman of the National Indian Gaming Commission, "a regulatory body created by IGRA with rulemaking and enforcement authority." *Amador Cty.*, 640 F.3d at 376 (citing 25 U.S.C. § 2710(d)(1)(A), (d)(2)(C)). Second, "the Indian lands where the gaming will take place must be located within a state that permits gaming 'for any purpose by any person, organization, or entity.'" *Id.* (quoting

16

25 U.S.C. § 2710(d)(1)(B)).  Third, such gaming must be "conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State under [§ 2710(d)(3)] that is in effect."  25 U.S.C. § 2710(d)(1)(C).

33.    Section 2710(d) of IGRA "deal[s] exclusively with Class III gaming." *Forest Cty. Potawatomi Cmty. v. United States*, 330 F. Supp. 3d 269, 286 (D.D.C. 2018) (citing *Colo. River*, 466 F.3d at 138), *appeal voluntarily dismissed*, No. 18-5327, 2019 WL 2563220 (D.C. Cir. June 19, 2019).  And under 25 U.S.C. § 2710(d), Tribal-State compacts may "encompass[] only Class III gaming."  *Id.*

34.    Section 2710(d) provides that "[a]ny Indian tribe having jurisdiction over the Indian lands upon which a class III gaming activity is being conducted, or is to be conducted, shall request the State in which such lands are located to enter into negotiations for the purpose of entering into a Tribal-State compact governing the conduct of gaming activities.  Upon receiving such a request, the State shall negotiate with the Indian tribe in good faith to enter into such a compact."  *Id.* § 2710(d)(3)(A).

35.    Section 2710(d) prescribes the permissible subjects of compact negotiations in the following terms:

> Any Tribal-State compact negotiated under subparagraph (A) may include provisions relating to—
>
> > (i) the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of such activity;
> >
> > (ii) the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations;

164436-3

(iii) the assessment by the State of such activities in such amounts as are necessary to defray the costs of regulating such activity;

(iv) taxation by the Indian tribe of such activity in amounts comparable to amounts assessed by the State for comparable activities;

(v) remedies for breach of contract;

(vi) standards for the operation of such activity and maintenance of the gaming facility, including licensing; and

(vii) any other subjects that are directly related to the operation of gaming activities.

*Id.* § 2710(d)(3)(C).

36.    Section 2710(d) allows tribes and States to negotiate for only the application of state laws that are "directly related to, and necessary for, the licensing and regulation of such activity," and only for the application of state jurisdiction that is "necessary for the enforcement of such laws and regulations."  *Id.* § 2710(d)(3)(C)(i)-(ii).  The term "such activity" in Section 2710(d)(3)(C)(i) refers to "the licensing and regulation of [a class III gaming] activity," *see id.* § 2710(d)(3)(A), and "'class III gaming activity' means just what it sounds like—the stuff involved in playing class III games," that is, "what goes on in a casino—each roll of the dice and spin of the wheel," *Bay Mills*, 572 U.S. at 792 (alteration in original).

37.    Section 2710(d) also allows tribes and states to negotiate for "the assessment by the State of such [class III gaming] activities in such amounts as are necessary to defray the costs of regulating such activity."  25 U.S.C. § 2710(d)(3)(C)(iii).

18

38.     Section 2710(d) also permits negotiation of "any other subjects that are directly related to the operation of gaming activities," *id.* § 2710(d)(3)(C)(vii), which "ensures that states have an opportunity to engage with tribes as to legitimate regulatory concerns about the operation of gaming," *Forest Cty. Potawatomi*, 330 F. Supp. 3d at 283 (citing *Citizens Exposing Truth about Casinos v. Kempthorne*, 492 F.3d 460, 462 (D.C. Cir. 2007)).  It applies only to subjects that are "directly related to the operation of [Class III] gaming."  *Id.* at 287 (alteration in original).  "Class II gaming is not an authorized subject of negotiation for Class III compacts."  *Id.* at 286 (quoting Assistant Secretary of Indian Affairs, testimony before Congress).

39.     Section 2710(d) also provides that "[a]n Indian tribe may enter into a management contract for the operation of a class III gaming activity if such contract has been submitted to, and approved by, the Chairman [of the National Indian Gaming Commission ("NIGC")]."  25 U.S.C. § 2710(d)(9).  "The Chairman's review and approval of such contract shall be governed by the provisions of subsections (b), (c), (d), (f), (g), and (h) of [25 U.S.C. § 2711]."  *Id.*  Section 2711, in turn, provides that the Chairman may approve a management contract if he or she determines that it meets statutory requirements, *id.* § 2711(b), and if the contract limits the net revenues that may be paid to a management contractor, *id.* § 2711(c).  The Chairman must act to approve or disapprove the contract within 180 days of submission, *id.* § 2711(d), but the Chairman can require modifications to the contract if it violates Section 2711, *id.* § 2711(f).  Further, no management contract may give a contractor an interest in land unless expressly permitted by statute.  *Id.* § 2711(g).  The NIGC Chairman holds Section 2711 authority pursuant to IGRA's transfer

19

of the authority normally held by the Secretary of the Interior to approve or disapprove certain contracts with Indian tribes under 25 U.S.C. § 81.  *Id.* § 2711(h).  The NIGC's approval of a management contract is governed by 25 C.F.R. pt. 533, which provides that "[c]ontract approval shall be evidenced by a Commission document dated and signed by the Chairman.  No other means of approval shall be valid."  25 C.F.R. § 533.1(b).

40.     Section 2710(d) further provides that, except for state regulatory assessments that may be negotiated and agreed upon pursuant to Section 2710(d)(3)(C)(iii), the provisions of 25 U.S.C. § 2710 shall not be interpreted "as conferring upon a State . . . authority to impose any tax, fee, charge, or other assessment upon an Indian tribe . . . to engage in a class III activity."  *Id.* § 2710(d)(4).  As IGRA provides no such authority, state taxation of tribal gaming activities under a compact is barred under the settled rule that Indian tribes are exempt from state taxation unless Congress has authorized such taxation in terms that are "unmistakably clear."  *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 215 n.17 (1987) (quoting *Montana v. Blackfeet Tribe*, 471 U.S. 759, 765 (1985)).

41.     Notwithstanding the clear terms of 25 U.S.C. § 2710(d)(4), compact provisions that provide for a tribe to pay a state a share of the tribe's gaming revenue have been allowed in some circumstances under "[t]he theory" "that the parties *negotiated* a bargain permitting such payments in return for meaningful concessions from the state (such as a conferred monopoly or other benefits)."  *Idaho v. Shoshone-Bannock Tribes*, 465 F.3d 1095, 1101 (9th Cir. 2006) (citing *In re Indian Gaming Related Cases*, 331 F.3d 1094, 1111-14 (9th Cir. 2003)).  "Although the state d[oes] not have *authority* to exact such

20

payments, it could bargain to receive them in exchange for a quid pro quo conferred in the compact." *Id.*

42.     The Secretary determines whether revenue sharing payments to be made by a tribe to a state under a compact are lawful when the compact is submitted for approval under IGRA. *See* 25 U.S.C. § 2710(d)(3)(B). As the Assistant Secretary has explained,

> It is the position of the Department [of the Interior] to permit revenue-sharing payments in exchange for *quantifiable* economic benefits *over which the State is not required to negotiate under IGRA*, such as substantial exclusive rights to engage in Class III gaming activities. We have not, nor are we disposed to, authorize revenue-sharing payments in exchange for compact terms that are routinely negotiated by the parties as part of the regulation of gaming activities, such as duration, number of gaming devices, hour of operation, and wager limits.

*Rincon Band of Luiseno Mission Indians of Rincon Reservation v. Schwarzenegger*, 602 F.3d 1019, 1039 (9th Cir. 2010). As the *Rincon* court explained in approving this interpretation of IGRA, "[t]o hold otherwise would effectively mean that states could put gaming rights 'up for sale.' That would be inconsistent with IGRA's spirit, and its express refusal to allow states to use their right to engage in compact negotiations as a means to extract fees." *Id.* at 1040 (footnote omitted) (citing 25 U.S.C. § 2710(d)(4)).

**D.      The Secretary's Responsibilities to Determine Whether to Approve A Compact and His Legal Obligation to Disapprove a Compact That Violates IGRA.**

43.     Section 2710(d) requires that for a tribe to conduct Class III gaming activities under IGRA, it must have "entered into" a compact with the State, and that compact must be "in effect." 25 U.S.C. § 2710(d)(1)(C), (d)(2)(C). The "entered into" and "in effect" requirements are separate and independent requirements. *Pueblo of Santa Ana v. Kelly*, 104 F.3d 1546, 1553-55 (10th Cir. 1997); 25 U.S.C. § 2710(d)(6)(A)-(B) (separately

21

requiring that a compact has been "entered into," and that it "is in effect" to exempt gaming conducted under its terms from 15 U.S.C. § 1175). Whether a compact has been validly entered into by the parties "necessitates an interpretation of both federal and state law." *Kelly*, 104 F.3d at 1557. Whether a compact is in effect depends on the action taken by the Secretary when a compact that has been entered into by a Tribe and a State is submitted to him for review under 25 U.S.C. § 2710(d)(8). Under IGRA, a compact is in effect "only when notice of approval by the Secretary of such compact has been published by the Secretary in the Federal Register." 25 U.S.C. § 2710(d)(3)(B).

44. IGRA's regulations provide that "[t]he Indian tribe or State should submit the compact or amendment after it has been legally entered into by both parties." 25 C.F.R. § 293.7.

45. Section 2710(d) provides that the Secretary "is authorized to approve" a compact that has been "entered into between an Indian tribe and a State," 25 U.S.C. § 2710(d)(8)(A); that the Secretary may disapprove the compact if it violates IGRA or other federal law or trust obligations, *id.* § 2710(d)(8)(B); and "[i]f the Secretary does not approve or disapprove a compact" within forty-five days of its submission, the compact is deemed approved "but only to the extent the compact is consistent with the provisions" of IGRA, *id.* § 2710(d)(8)(C). Under these provisions, the Secretary is responsible for ensuring compliance with IGRA in the conduct of Class III gaming by all Indian tribes, and is obligated to do so on terms that fulfill the Secretary's obligations to all Indian tribes under IGRA and the federal trust responsibility. These provisions are intended for the benefit of all Indian tribes, including the Plaintiff Nations.

164436-3

46.     IGRA provides that the Secretary "may disapprove a compact . . . only if such compact violates—(i) any provision of [IGRA], (ii) any other provision of Federal law . . . , or (iii) the trust obligations of the United States to Indians." *Id.* § 2710(d)(8)(B)(i)-(iii).  "[S]ubsection (d)(8)(B)'s use of 'may' is best read to limit the circumstances in which disapproval is allowed.  The Secretary must, however, disapprove a compact if it would violate any of the three limitations in that subsection." *Amador Cty.*, 640 F.3d at 381.

47.     IGRA's "subsection (d)(8)(C), which governs approval by inaction, includes no exemption from this obligation to disapprove illegal compacts." *Id.*  "And just as the Secretary has no authority to affirmatively approve a compact that violates any of subsection (d)(8)(B)'s criteria for disapproval, he may not allow a compact that violates subsection (d)(8)(C)'s caveat to go into effect by operation of law." *Id.*

48.     Furthermore, because the requirement that a compact be "entered into" is separate and independent from the "in effect" requirement, a compact executed by a state governor who lacks authority to bind the state is void, even if the Secretary has approved the compact, or allowed it to go into effect by inaction. *See Kelly*, 104 F.3d at 1554-55.

E.     **The Plaintiff Nations Conduct Gaming Activities on Their Indian Lands in Compliance With IGRA.**

49.     Each of the Plaintiff Nations has enacted an ordinance authorizing Class II and Class III gaming activities on its Indian lands that satisfies IGRA's requirements and has been approved by the Chairman of the National Indian Gaming Commission.  *See*

Notice of Approved Class III Tribal Gaming Ordinances, 84 Fed. Reg. 13,314 (Apr. 4, 2019).

50.     Each of the Plaintiff Nations conducts Class II gaming on its Indian lands in accordance with tribal law, IGRA, and its regulations.

51.     Each of the Plaintiff Nations also conducts off-track pari-mutuel wagering on horse races, which is a Class III gaming activity, at specific sites on each Nation's Indian lands.  The Plaintiff Nations conduct this activity under Off-Track Wagering Compacts ("OTWCs") that were entered into with the State, approved by the Secretary, and are in effect under IGRA.  *See* Indian Gaming, 75 Fed. Reg. 61,511 (Oct. 5, 2010) (Cherokee); Indian Gaming, 69 Fed. Reg. 34,686 (June 22, 2004) (Chickasaw); Indian Gaming, 66 Fed. Reg. 30,748 (June 7, 2001) (Choctaw); Indian Gaming, 62 Fed. Reg. 5033 (Feb. 3, 1997) (CPN).

52.     In 2004, the State enacted the STGA, which was approved by Oklahoma voters in a referendum vote held November 2, 2004, Okla. State Question 712 (Nov. 2, 2004).  The STGA permits Indian tribes to conduct Class III gaming activities, including electronic gaming, and also permits horse racetracks to conduct electronic gaming.  Okla. Stat. tit. 3A, §§ 261-282.  In addition, the State earlier authorized pari-mutuel wagering on live horse racing and on simulcast races held out-of-state pursuant to the Oklahoma Horse Racing Act, Okla. Stat. tit. 3A, §§ 200-209.

53.     The STGA offered "to federally recognized tribes in the State of Oklahoma" a Model Compact under which accepting Tribes could, after approval by the Secretary and publication in the Federal Register, lawfully "engage in Class III gaming on tribal lands"

24

in accord with IGRA. *Sheffer v. Buffalo Run Casino, PTE, Inc.*, 2013 OK 77, ¶ 4, 315 P.3d 359 (citing *Griffith v. Choctaw Casino of Pocola, Okla.*, 2009 OK 51, ¶ 13, 230 P.3d 488, *overruled on other grounds by Sheffer*, 2013 OK 77, ¶ 25); *accord* Okla. Stat. tit. 3A, §§ 280-281; Okla. State Question 712 (Nov. 4, 2004).

54.     The STGA also authorizes "organization licensees"—i.e., horse racetracks— to conduct electronic gaming under licenses issued by the Oklahoma Horse Racing Commission ("OHRC"), Okla. Stat. tit. 3A, §§ 200.1(9), 205.2(C), 262(A)-(C), "[i]f at least four Indian tribes enter into the model [tribal gaming compact set forth in *id.* § 281], and such compacts are approved by the Secretary of the Interior," *id.* § 262(A).

55.     The Model Compact provides that "[t]his Compact, as an enactment of the people of Oklahoma, is deemed approved by the State of Oklahoma. No further action by the state or any state official is necessary for this Compact to take effect upon approval by the Secretary of the Interior and publication in the Federal Register." *Id.* § 281, Part 16.

56.     Each of the Plaintiff Nations accepted the State's offer as set forth in the Model Compact, and by so doing entered into a compact with the State under IGRA (the "Plaintiff Nations' Class III Compacts").

57.     The Comanche Nation, the Otoe-Missouria Tribe, and KTT also accepted the State's offer as set forth in the Model Compact, and by so doing entered into a compact with the State under IGRA. These Tribes' compacts are referred to herein as the "Former Compacts". The Comanche Nation, the Otoe-Missouria Tribe, and KTT purported to void their Former Compacts by signing their Agreements. *See* Comanche, Otoe-Missouria, & KTT Agreements Part 12.A.

25

58.     UKB accepted the Model Compact on December 27, 2019, but notice of the Secretary's approval of UKB's compact was not published in the Federal Register before the Model Compact's initial term expired on January 1, 2020, *see* Indian Gaming; Tribal-State Class III Gaming Compact Taking Effect in the State of Oklahoma, 85 Fed. Reg. 36,609 (June 17, 2020) (Federal Register Notice that Defendant Secretary took no action on UKB's Compact within forty-five days of submittal), and so it did not take effect.  Also on December 27, 2019, UKB purported to sign an agreement with the Governor that extended the Model Compact's term, *see id.*, but it was not approved before the Compact's initial term expired, and since the Governor did not have sole authority to enter into an IGRA Compact with an Indian tribe for the reasons discussed in ¶¶ 96-97, *infra*, the State did not enter into that extension and it never could have taken effect.  UKB contended in its Agreement that the Agreement was the "sole effective Compact" between it and the State.  UKB Agreement Part 12.A.

59.     Twenty-seven other Indian tribes in Oklahoma accepted the State's offer as set forth in the Model Compact, and by so doing entered into a compact with the State under IGRA, which was then approved and went into effect under IGRA.  *See* Okla. Office of Mgmt. & Enter. Servs., Compacted Tribes, https://omes.ok.gov/gaming-compliance-unit/compacted-tribes (listing thirty-five gaming compacts entered into by Indian tribes with the State that have been approved and published in the Federal Register).

60.     Each of the Plaintiff Nations' Class III Compacts has been approved or considered to have been approved by the Secretary, 25 U.S.C. § 2710(d)(8)(A), (d)(8)(C), notice of such approval by the Secretary was published in the Federal Register, and each

164436-3

Nation's Compact then went into effect under IGRA, *id.* § 2710(d)(3)(B), on or about January 27, 2005 (Cherokee Nation), February 8, 2005 (Chickasaw Nation), February 9, 2005 (Choctaw and CPN).[2] Those compacts automatically renewed for a fifteen-year term on January 1, 2020 and are in effect today. *See Cherokee Nation v. Stitt*, No. CIV-19-1198-D, 2020 WL 4340549, at *4 (W.D. Okla. July 28, 2020).

61.    In approving or allowing Plaintiff Nations' Class III Compacts to go into effect, the Secretary approved the revenue-sharing provisions of those Compacts. With respect to the Plaintiff Nations whose Compacts were approved, the Secretary determined that the State had made meaningful concessions that, as shown by an economic analysis provided by those Nations, had significant economic benefit to the Nations, in exchange for which revenue-sharing payments were to be made to the State. For those Plaintiff Nations that did not provide an economic analysis, the Secretary determined that their Compacts should be allowed to go into effect as they would otherwise be competitively disadvantaged in relation to the Nations with approved compacts.

62.    The Former Compacts were also approved (Comanche Nation and KTT) or considered to have been approved (Otoe-Missouria Tribe) by the Secretary, 25 U.S.C. § 2710(d)(8)(A), (d)(8)(C), notice of such approval by the Secretary was published in the

---

[2] *See* Indian Gaming, 70 Fed. Reg. 3942 (Jan. 27, 2005) (Cherokee); Indian Gaming, 70 Fed. Reg. 6725 (Feb. 8, 2005) (Chickasaw); Indian Gaming, 70 Fed. Reg. 6903 (Feb. 9, 2005) (Choctaw and CPN).

164436-3

Federal Register,[3] and those Compacts then went into effect under IGRA, *id.* § 2710(d)(3)(B). In approving the Comanche Nation's Former Compact, the Secretary stated that "[a]s part of the Department's review of the Compact, we sent a letter to the parties seeking clarification of various provisions of the Compact. The responses of the State and the Tribe, and the Tribe's Market Study and Impact Analysis, have resolved our questions, as explained below." Letter from Mike Olsen, Principal Deputy Assistant Sec'y-Indian Affairs, Dep't of Interior, to Wallace Coffey, Chairman, Comanche Nation (Dec. 23, 2004), https://www.bia.gov/sites/bia.gov/files/assets/as-ia/oig/oig/pdf/idc-038420.pdf ("Comanche Approval Letter"). The Secretary then explained the basis on which he had approved the revenue sharing provisions of the Comanche Nation's Former Compact, as follows:

> IGRA does not authorize states to impose a tax, fee, charge, or other assessment on Indian tribes to engage in class III gaming. *See* 25 U.S.C. 2710(d)(4). This section provides that "nothing in this section shall be interpreted as conferring upon a State or any of its political subdivisions authority to impose any tax, fee, charge or other assessment upon an Indian tribe . . . to engage in Class III gaming activity."

> To enforce this statutory prohibition, the Department has sharply limited the circumstances under which Indian tribes can make direct payments to a state for purposes other than defraying the costs of regulating Class III gaming activities. To determine whether a revenue-sharing provision is permissible under IGRA, we have required the state to offer significant or meaningful concessions over which it is not required to negotiate in good faith, resulting in substantial and quantifiable economic benefits to the Indian tribe. In addition, the payment to the state must be appropriate in light of the value of the economic benefits conferred on the tribe.

---

[3] *See* 70 Fed. Reg. at 3942 (Comanche); Indian Gaming, 70 Fed. Reg. 36,407 (June 23, 2005) (Otoe-Missouria); Indian Gaming, 76 Fed. Reg. 42,722, 42,722-23 (July 19, 2011) (KTT).

164436-3

Under the first prong of our analysis – significant or meaningful concessions – we believe that the State has made such concessions. It has authorized Class III gaming for Indian tribes, provided for a zone of exclusivity, and limited non-tribal gaming. Under the second prong of our analysis – substantial and quantifiable economic benefits – we believe that the economic analysis provided by the Tribe shows that the limitations on electronic games at three established racetracks and the limitations on non-tribal (charitable) gaming will help the Tribe generate significant additional revenues over the fifteen-year course of the Compact. . . . As a result, the revenue-sharing payment to the State cannot be characterized as a prohibited imposition of a tax, fee, charge, or other assessment pursuant to 25 U.S.C. 27109(d)(4).

*Id.* at 2.

63. Upon approval of the Plaintiff Nations' Class III Compacts, each of the Plaintiff Nations was authorized to conduct "covered games," Compact Parts 3.5., 4.A., namely

an electronic bonanza-style bingo game, an electronic amusement game, an electronic instant bingo game, nonhouse-banked card games; [and] any other game, if the operation of such game by a tribe would require a compact and if such game has been: (i) approved by the Oklahoma Horse Racing Commission for use by an organizational licensee, (ii) approved by state legislation for use by any person or entity, or (iii) approved by amendment of the [STGA]; . . . .

*Id.* Part 3.5.

64. Upon approval of the Former Compacts, and those of the other Indian tribes that accepted the State's offer as set forth in the Model Compact, each of those tribes was authorized to conduct the same "covered games." *Id.* Parts 3.5., 4.A.

65. The Plaintiff Nation's Class III Compacts do not, and the Former Compacts did not, limit the geographic area in which the Plaintiff Nations, Comanche Nation, Otoe-

29

Missouria Tribes, or KTT could conduct gaming, except that such gaming can only take place on the signatory tribe's Indian lands. *Id.* Part 5.L.

66. Following the effective date of the Plaintiff Nations' Class III Compacts, the STGA permitted the OHRC to authorize organization licensees to conduct electronic gaming, specifically "electronic amusement games," "electronic bonanza-style bingo games," and "electronic instant bingo games," subject to limits on the number of locations that may be licensed to do so and the number of machines that may be used to play such games. Okla. Stat. tit. 3A, § 262(A), (C). Acting pursuant to the STGA, the OHRC first authorized horse racetracks to conduct electronic gaming on August 11, 2005, and it has continued to do so annually since then.

67. The gaming market in Oklahoma is highly competitive as a result of the various tribal and non-tribal gaming activities that are conducted within the State, including pari-mutuel wagering on horse racing, the state lottery, and electronic gaming. There is also constant inter-tribal competition in that market as a result of the number of IGRA-approved compacts with Indian tribes in the State and the number of tribal gaming facilities operating in the State under those compacts. This puts the Plaintiff Nations under constant competitive pressure to maintain their market share. The Plaintiff Nations depend on the Secretary to ensure that all tribal competitors in that market are conducting gaming in accordance with IGRA and thus on an equal footing.

68. In 2018, the State enacted a supplemental compact offer to authorize additional "covered games." 2018 Okla. Sess. Law Serv. ch. 11, § 2 (West) (codified at

30

Okla. Stat. tit. 3A, § 280.1). The Plaintiff Nations accepted this supplemental compact offer from the State, which was then approved by the Secretary for each of those Nations.[4]

69. The Plaintiff Nations and Defendant Governor Stitt adjudicated a dispute in the Western District of Oklahoma regarding the effect of the renewal provisions of Part 15.B. of the Plaintiff Nations' Class III Compacts. *Cherokee Nation v. Stitt*, 2020 WL 4340549. In that action, each Plaintiff Nation asserted that on January 1, 2020 the term of the Plaintiff Nations' Class III Compacts renewed automatically under Part 15.B. of those Compacts, and that they remain in full force and effect. On July 28, 2020, the Western District of Oklahoma ruled that the Plaintiff Nations' Class III Compacts did renew on January 1, 2020 and are in full force and effect until January 1, 2035. *See Id.* at *4.

70. Each Plaintiff Nation continues to conduct Class II gaming under Tribal law and Class III gaming under the terms of their OTWCs and Class III Compacts. The revenues generated by each Plaintiff Nation's conduct of Class II and III gaming are used exclusively by each Plaintiff Nation to fund government operations and programs, and to provide for the general welfare of the Plaintiff Nation and its citizens, consistent with the requirements of IGRA. These revenues support programs that provide health care, education, law enforcement, and youth and family services, among other areas.

---

[4] Indian Gaming; Approval of Tribal-State Class III Gaming Compact Amendments in the State of Oklahoma, 83 Fed. Reg. 41,101 (Aug. 17, 2018) (Cherokee, Chickasaw, and CPN); Indian Gaming; Approval of Tribal-State Class III Gaming Compact Amendments in the State of Oklahoma, 83 Fed. Reg. 41,102 (Aug. 17, 2018) (Choctaw).

164436-3

71.     Each Plaintiff Nation has a legally-protected interest in its conduct of Class II and Class III gaming activities on its Indian lands because these activities are authorized by and conducted in accordance with IGRA, Tribal law, and the terms of their OTWCs and Class III Compacts.  Pursuant to IGRA and an ordinance that has been approved by the Chairman of the National Indian Gaming Commission, each Plaintiff Nation has "the sole proprietary interest and responsibility for the conduct of [such] gaming activity," 25 U.S.C. § 2710(b)(2)(A) (requiring that ordinance authorizing Class II gaming so provide), (d)(1)(A)(ii) (imposing same requirement with respect to Class III gaming).  And the Plaintiff Nations' conduct of such gaming provides revenue for the operation of tribal governments and the delivery of tribal services, and thus furthers IGRA's purposes.  *Id.* § 2702(1).

72.     Each Plaintiff Nation also has a legally-protected interest in, and relies on, the Defendant Secretary's proper fulfillment of his statutory obligations to only authorize Indian tribes to conduct Class III gaming activities in accordance with IGRA, to fulfill the federal trust responsibility to all Indian tribes, to make decisions that do not diminish the Plaintiff Nations' rights under IGRA relative to other tribes, *id.* § 5123(f), and to ensure that IGRA "provide[s] a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments," *id.* § 2702(1).

164436-3

**F.      The Comanche Nation and Otoe-Missouria Tribe Agreements.**

     **1.      The *Cherokee Nation v. Stitt* litigation in the Western District of Oklahoma and the Defendants' announcement of the Comanche and Otoe-Missouria Agreements.**

73.      On February 10, 2020, the federal district court ordered the parties to *Cherokee Nation v. Stitt* in the Western District of Oklahoma, including the Plaintiff Nations in the instant action and Defendant Governor Stitt, to engage in mediation to attempt to resolve their dispute.  No. CIV-19-1198-D, ECF No. 31.

74.      On February 14, 2020, the Court granted the Comanche Nation and the Otoe-Missouria Tribe leave to intervene as plaintiffs in *Cherokee Nation v. Stitt*, and those tribes intervened on February 21, 2020.  *Id.*, ECF Nos. 43, 48, 49.  Thereafter, they participated in mediation in which representatives of Defendant Governor Stitt, the Plaintiff Nations in the instant action, and other plaintiffs-in-intervention in the *Cherokee Nation v. Stitt* action also participated.

75.      Without the prior knowledge of the Plaintiff Nations in this action, or other plaintiffs-in-intervention in the *Cherokee Nation v. Stitt* action, the Defendant Governor Stitt, the Comanche Nation, and the Otoe-Missouria Tribe engaged in separate negotiations for new compacts.

76.      On April 21, 2020, the Defendants Governor Stitt, Chairman Nelson, and Chairman Shotton announced that they had signed new agreements which they claimed would authorize the Comanche Nation and Otoe-Missouria Tribe to engage in Class III gaming under IGRA.  *See* Press Release, Office of Okla. Governor, *Gov. Stitt Signs Two New Gaming Compacts with the Otoe-Missouria Tribe and Comanche Nation* (Apr. 21,

2020), https://www.governor.ok.gov/articles/press_releases/governor-stitt-signs-two-new-gaming-compacts.

77.     On the same day, the Defendant Governor Stitt, the Comanche Nation, and the Otoe-Missouria Tribe filed a motion for voluntary dismissal with prejudice of their claims against one another in *Cherokee Nation v. Stitt*, representing that they had settled their dispute by negotiating an agreement resolving all claims and counterclaims against each other, and that the exchange of dismissals with prejudice was one term of that settlement. *See Cherokee Nation v. Stitt*, ECF No. 120.  The Defendant Governor Stitt, the Comanche Nation, and the Otoe-Missouria Tribe did not submit copies of their settlement agreements for review by the court; nor did they disclose the other terms of their settlement agreements.

78.     On April 24, 2020, the Plaintiff Nations and other plaintiffs-in-intervention in *Cherokee Nation v. Stitt* filed a response to that motion, stating that "[t]he failure of the Movants to fully describe the terms of their settlement, and to provide their settlement agreements, if any, to this Court and to the Nations makes it impossible for the Nations to evaluate the settlement terms and assess the extent to which the settlements may prejudice their interests." *Cherokee Nation v. Stitt*, ECF No. 123 at 4.  For that reason, the Nations argued that the Defendant Governor, Comanche Nation, and the Otoe-Missouria Tribe "should be required to set forth the terms of their settlement, and provide the settlement agreements, if any, to this Court and to the Nations, or explain why they decline to do so" before the Nations were required to respond to the motion.  In the alternative, the Nations requested "in the event Movants' motion is granted . . . that this Court make clear in its

164436-3

order that the settlement has not been reviewed or approved by this Court, either to determine its legality or for any other purpose . . . ." *Id.* at 6-7.

79.     Also on April 24, 2020, the federal district court for the Western District of Oklahoma granted the dismissal sought by the Defendant Governor Stitt, the Comanche Nation, and the Otoe-Missouria Tribe with prejudice. *Cherokee Nation v. Stitt*, ECF No. 124 at 3.  In that Order, the court further stated that "[a] dismissal with prejudice of the movants' respective claims and counterclaims against each other—without any review or approval of the settlement agreements (which the movants have not requested) and without any judicial action on the merits of the underlying claims—will have no legal effect on the issues presented for decision in this case." *Id.* at 2.  Thus, the Western District of Oklahoma did not make any ruling on the legal validity of the underlying Agreements on which the Defendant Governor Stitt, the Comanche Nation, and the Otoe-Missouria Tribes dismissed their claims with prejudice in the *Cherokee Nation v. Stitt* litigation before that court.

**2.     The submission of the Comanche and Otoe-Missouria Agreements to the Secretary, the Plaintiff Nations' objections, and the Secretary's approval by inaction.**

80.     On April 22, 2020, the day after the Defendants Governor Stitt, Chairman Nelson, and Chairman Shotton announced they had signed the Agreements, the President Pro Tempore of the Senate of Oklahoma and the Speaker of the Oklahoma House of Representatives sent the Governor a letter, which was concurrently released to the media and public, in which they informed him that the Governor of Oklahoma lacked authority to unilaterally enter into the Agreements under state law, because the Agreements purported to authorize additional gaming without legislative approval, and the STGA

35

defines the only covered games that can be included in an IGRA compact.  *See* Letter from Charles A. McCall, Speaker of the House, State of Oklahoma & Greg Treat, President Pro Tempore of the Senate, State of Oklahoma, to J. Kevin Stitt, Governor, State of Oklahoma at 2-3 (Apr. 22, 2020).  They also warned the Governor that this was one of only a "number of flaws" that the leadership had found in their "preliminary review" of the Agreements, and noted that "[w]hile we appreciate you making us aware of your intention to sign these documents just moments before your public announcement, had you consulted us earlier we could have provided this information to you earlier."  *Id.* at 3.

81.     On April 23, 2020, the Defendants Governor Stitt, Chairman Nelson, and Chairman Shotton submitted the Comanche and Otoe-Missouria Agreements to the Secretary of the Interior for review under IGRA.  *See* Ex. 1, Comanche Nation & State of Oklahoma Gaming Compact (April 21, 2020); Ex. 2, Otoe-Missouria Tribe & State of Oklahoma Gaming Compact (April 21, 2020).[5]  By doing so, the Defendants Governor Stitt, Chairman Nelson, and Chairman Shotton represented to the Secretary that the Comanche and Otoe-Missouria Agreements had been legally entered into by the State and the Tribes, and consented to the review of those Agreements by the Secretary under IGRA in accordance with 25 U.S.C. § 2710(d)(8).

---

[5] The only copies of the Comanche and Otoe-Missouria Agreements that have been made publicly available are unsigned, but the Defendant Governor has represented that these unsigned copies are the Comanche and Otoe-Missouria Agreements.  *See* Press Release, Office of Okla. Governor, Gov. Stitt Signs Two New Gaming Compacts with the Otoe-Missouria Tribe and Comanche Nation (Apr. 21, 2020), https://www.governor.ok.gov/ articles/press_releases/governor-stitt-signs-two-new-gaming-compacts (follow hyperlinks in third and fourth paragraphs of press release).

164436-3

82.     On April 24, 2020, Defendant Governor Stitt submitted to the Department a memorandum from his General Counsel setting forth the Governor's position on the validity of the Comanche and Otoe-Missouria Agreements, including the basis for his contentions that those Agreements were validly entered into by the State and that their terms comport with IGRA.  Memorandum from Office of Gen. Counsel, Okla. Governor's Office, to Paula Hart, Dir., Office of Indian Gaming, Bureau of Indian Affairs (Apr. 24, 2020), https://www.governor.ok.gov/static-assets/documents/gamingcompacts/ Memorandum_from_General_Counsel.pdf.

83.     The Plaintiff Nations obtained copies of the Comanche and Otoe-Missouria Agreements and submitted comments to the Secretary setting forth objections to the legality of those Agreements and explaining why they are invalid and should not be approved.  On April 28, 2020, CPN submitted comments to the Secretary and Assistant Secretary.  Letter from John A. Barrett, Tribal Chairman, Citizen Potawatomi Nation, to David Bernhardt, Sec'y of Interior, and Tara Katuk Mac Lean Sweeney, Assistant Sec'y-Indian Affairs, U.S. Dep't of Interior (Apr. 28, 2020) ("CPN Apr. 28 Comments").  On May 1, the Chickasaw Nation submitted comments to the Secretary.  Letter from Bill Anoatubby, Governor, Chickasaw Nation, to David Bernhardt, Sec'y of Interior, U.S. Dep't of Interior (May 1, 2020), *enclosing* Memorandum from Stephen Greetham, Undersec'y & Senior Counsel, Chickasaw Nation, to Bill Anoatubby, Governor, Chickasaw Nation (Apr. 30, 2020) ("Chickasaw May 1 Comments").  On May 7, the Cherokee Nation submitted comments to the Secretary.  Letter from Chuck Hoskin, Jr., Principal Chief, Cherokee Nation, to David Bernhardt, Sec'y of Interior, U.S. Dep't of

37

Interior (May 7, 2020), *enclosing* Memorandum from Sara Hill, Attorney Gen., Cherokee Nation, to Chuck Hoskin, Jr., Principal Chief, Cherokee Nation (May 7, 2020) ("Cherokee May 7 Comments"). Additionally, CPN and the Chickasaw Nation submitted supplemental comments on May 29, *see* Letter from John A. Barrett, Tribal Chairman, Citizen Potawatomi Nation, to David Bernhardt, Sec'y of Interior, U.S. Dep't of Interior, et al. (May 29, 2020) ("CPN Supp'l Comments"); Letter from Stephen Greetham, Senior Counsel, Chickasaw Nation, to Paula Hart, Dir., Office of Indian Gaming, Bureau of Indian Affairs (May 29, 2020) ("Chickasaw Supp'l Comments"), and the Cherokee Nation submitted supplemental comments on June 1, *see* Letter from Sara Hill, Attorney Gen., Cherokee Nation, to David Bernhardt, Sec'y of Interior, U.S. Dep't of Interior (June 1, 2020) ("Cherokee Supp'l Comments").

84. The Plaintiff Nations' comments asserted that the Comanche and Otoe-Missouria Agreements were not valid compacts and should not be approved, because the State of Oklahoma and the Comanche Nation and Otoe-Missouria Tribe had not "entered into" those Agreements under IGRA. CPN Apr. 28 Comments at 1, 3; Chickasaw May 1 Comments at 9-12; Cherokee May 7 Comments at 2-4. As the Plaintiff Nations explained, under state law, the State can enter into agreements or compacts with Indian tribes through the "codified offer of a model compact that was approved by a voter referendum [under Okla. Stat. tit. 3A, § 280]." Chickasaw May 1 Comments at 9 (footnote omitted);[6] *accord*

---

[6] The Chickasaw Nation also noted that the State may enter into Compacts with Indian tribes under Okla. Stat. tit. 74, § 1221, which requires that such compacts be approved by

164436-3

CPN Apr. 28 Comments at 4. The Plaintiff Nations further explained that the Comanche and Otoe-Missouria Agreements did not comport with that method of compacting and that therefore the State and Tribes had not "entered into" the Agreements under IGRA. *Id.*

85.    The Plaintiff Nations also asserted that the Comanche and Otoe-Missouria Agreements imposed an invalid state tax on those Tribes because the State is not making a meaningful concession of substantial benefit to the Comanche Nation and Otoe-Missouria Tribe in exchange for substantial exclusivity payments—in fact, if anything, the Comanche Nation and Otoe-Missouria Tribe make concessions to the State. CPN Apr. 28 Comments at 5-7; Chickasaw May 1 Comments at 13-20; Cherokee May 7 Comments at 6-7. Moreover, the Comanche and Otoe-Missouria Agreements purport to provide *ex ante* concurrence by the Oklahoma Governor to off-reservation land-into-trust acquisitions for the Comanche Nation and Otoe-Missouria Tribe for gaming purposes, but this promise is of illusory value because the Chickasaw Nation and CPN can object to the acquisition under federal regulations. CPN Apr. 28 Comments at 8-9; Chickasaw May 1 Comments at 19-20; Cherokee May 7 Comments at 7.

86.    The Chickasaw Nation and CPN also explained that, if the Secretary approved these provisions of the Comanche and Otoe-Missouria Agreements, it would violate their sovereignty and the United States' trust responsibility to the Nations. CPN Apr. 28 Comments at 8-9; Chickasaw May 1 Comments at 20-21.

---

the Oklahoma State Legislature's Joint Committee on State-Tribal Relations before they go into effect. Chickasaw May 1 Comments at 10.

164436-3

87.     The Plaintiff Nations further explained that the Agreements purport to regulate the Comanche Nation's and Otoe-Missouria Tribe's conduct of Class II gaming and that the Comanche and Otoe-Missouria Agreements are therefore invalid under IGRA, because the conduct of Class II gaming is not an area over which the parties may negotiate and agree in an IGRA compact.  CPN Apr. 28 Comments at 8.

88.     The Plaintiff Nations also explained that the Governor's position is opposed by the legal interpretations of Oklahoma Legislative leadership and the Oklahoma Attorney General.  Chickasaw Supp'l Comments at 1; CPN Supp'l Comments at 2; Cherokee Supp'l Comments at 2.

89.     On May 5, 2020, the Oklahoma Attorney General also submitted comments to the Secretary, explaining that the Governor lacked authority to enter into the Comanche and Otoe-Missouria Agreements under Oklahoma law.  *See* Letter from Mike Hunter, Okla. Attorney Gen., to David Bernhardt, Sec'y of Interior, U.S. Dep't of the Interior (May 5, 2020).  The Oklahoma Attorney General attached to his comments an official legal opinion issued by his office to the President Pro Tempore of the Oklahoma Senate and the Speaker of the Oklahoma House of Representatives, under his statutory authority to respond to such requests from state legislators, *see* Okla. Stat. tit. 74, § 18b(A)(5), in which he opined that the Governor lacked sole authority to enter into the Comanche and Otoe-Missouria Agreements on behalf of the State, *In re Treat*, 2020 OK AG 8, 2020 WL 2304499 (Okla. A.G. May 5, 2020).

90.     In particular, the Attorney General explained that the Governor of Oklahoma lacked authority to enter into the Comanche and Otoe-Missouria Agreements on behalf of

40

the State under the STGA, *id.* at *3-5, and therefore they were not compacts that the State had validly "entered into" under IGRA, *id.* at *6-8.

91.     On June 4, 2020, the President Pro Tempore of the Oklahoma Senate and the Speaker of the Oklahoma House of Representatives filed an application for an original action in the Oklahoma Supreme Court, challenging the Defendant Governor's actions purporting to "enter into" the Comanche and Otoe-Missouria Agreements under Oklahoma law.  *See* Appl. to Assume Original Juris. & Pet. for Decl'y Relief, *Treat v. Stitt*, 2020 OK 64 (No. O-118829) ("*Treat I*").

92.     The Defendant Secretary never issued an opinion, letter, or other ruling addressing whether the Defendant Governor Stitt had authority to enter into the Comanche and Otoe-Missouria Agreements, even though he is only authorized to approve a compact that has been lawfully entered into by a State and a tribe, even though he has no authority to allow those Agreements to go into effect by inaction if any provision of those Agreements is inconsistent with IGRA, *see Amador Cty.*, 640 F.3d at 381, and even though he had before him the legal positions of the Oklahoma Attorney General, the Oklahoma Legislative leadership, the Plaintiff Nations, and the Defendants Governor Stitt, Chairman Nelson, and Chairman Shotton with respect to whether those Agreements had been lawfully entered into by the State.  Nor did the Defendant Secretary approve the Comanche and Otoe-Missouria Agreements.  Instead, the Defendant Secretary took no action on the Agreements within the forty-five day period provided by 25 U.S.C. § 2710(d)(8)(C), as a result of which the Agreements are "considered to have been approved by the Secretary, but only to the extent [the Agreements are] consistent with [IGRA]."  *Id.*

41

93.     On June 29, 2020, the Defendant Assistant Secretary Sweeney announced that the Defendant Secretary had taken no action on the Comanche and Otoe-Missouria Agreements within forty-five days of their submission, and that accordingly, those Agreements "are considered to have been approved, but only to the extent they are consistent with IGRA.  *See* 25 U.S.C. § 2710(d)(8)(C)."  Indian Gaming; Tribal-State Class III Gaming Compacts Taking Effect in the State of Oklahoma, 85 Fed. Reg. 38,919 (June 29, 2020).

94.     The publication of no action approval of the Comanche Nation Agreement and the publication of no action approval of the Otoe-Missouria Tribe Agreement constitute final agency action within the meaning of the Administrative Procedure Act, 5 U.S.C. § 704.  *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1906-07 (2020) (action resulting from submission of information to agency and agency consideration of the material, which involves decision to confer protected status and benefits on applicant, is final agency action under APA).

95.     On July 1, 2020, during oral presentations before a court-appointed referee in the *Treat I* case, counsel for the Defendant Governor Stitt stated that the Governor intended to sign additional gaming compacts with interested tribes.

96.     On July 21, 2020, the Oklahoma Supreme Court issued an opinion in *Treat I*.  In that decision, the court assumed original jurisdiction over the case and, in an 8-1 merits opinion, determined that the Defendant Governor did not have authority under the Oklahoma Constitution and Oklahoma statutes to cause the State of Oklahoma to enter into the Comanche and Otoe-Missouria Agreements.  The court found that:

164436-3

The legislative branch sets the public policy of the State by enacting law not in conflict with the Oklahoma Constitution. The Governor has a role in setting that policy through his function in the legislative process, but the Governor's primary role is in the faithful execution of the law. Oklahoma's separation of powers doctrine is evident in the State's negotiation of tribal gaming compacts with Indian Tribes.

The Legislature, through the vote of the people, enacted those laws in the State-Tribal Gaming Act. The State-Tribal Gaming Act sets forth the terms and conditions under which the State's federally recognized tribes can engage in Class III gaming on tribal land through Model Gaming Compacts. The Governor has the statutory authority to negotiate gaming compacts with Indian tribes to assure the State receives its share of revenue. However, the Governor must negotiate the compacts within the bounds of the laws enacted by the Legislature, including the State-Tribal Gaming Act.

2020 OK 64, ¶¶ 4-5 (citations omitted).

97. Applying these principles, the court found that the Governor "exceeded his authority in entering into the tribal gaming compacts with the Comanche Nation and Otoe-Missouria Tribes that included Class III gaming prohibited by the State-Tribal Gaming Act." *Id.* ¶ 7. It therefore concluded that "[t]he State of Oklahoma is not and cannot be legally bound by these compacts until such time as the Legislature enacts laws to allow the specific Class III gaming at issue, and in turn, allowing the Governor to negotiate additional revenue." *Id.* ¶ 8.

98. Since the Oklahoma Supreme Court's decision in *Treat I*, Defendant Chairman Shotton and Defendant Chairman Nelson have refused to recognize the Oklahoma Supreme Court's opinion as invalidating their Agreements and are continuing to conduct Class III gaming. *See* Tres Savage, *OK Supreme Court: Two of Stitt's New*

43

*Compacts Invalid*, NonDoc (July 21, 2020 5:30 PM), https://nondoc.com/2020/07/21/ok-supreme-court-two-of-stitts-new-compacts-invalid/.

99.     The Defendant Governor filed a petition for rehearing of the *Treat I* decision on August 10, 2020.  The Oklahoma Supreme Court has not yet ruled on that petition, although it directed the Legislative Leaders to file a response by August 28, 2020 and authorized the Oklahoma Attorney General to file a response by the same date.

**G.     The KTT and UKB Agreements.**

100.     On February 14, 2020, UKB and KTT also sought to intervene in the *Cherokee Nation v. Stitt* case.  No. CIV-19-1198-D, ECF Nos. 56, 59.  The Plaintiff Nations objected to UKB's and KTT's proposed interventions on the ground that, based on those tribes' proposed pleadings, UKB and KTT did not appear to have valid compacts and the Defendant Governor Stitt was not attempting to interfere with their right to conduct gaming. *Id.*, ECF No. 60.  UKB and KTT replied that they should be allowed to intervene to take part in the mediation that the Court had ordered among the existing Plaintiffs and Plaintiffs-in-Intervention. *Id.*, ECF Nos. 80 at 7, 81 at 8.  The court denied their motions to intervene on the basis that UKB and KTT were simply seeking to participate in mediation over possible new compact terms, rather than seeking to adjudicate a live dispute with the Defendant Governor Stitt. *Id.*, ECF No. 86 at 6.

101.     On July 1, 2020—the day of the oral presentation in *Treat I* in which the Defendant Governor Stitt's counsel indicated that the Governor would sign additional compacts with tribes—the Defendant Governor Stitt signed new agreements with UKB and KTT that purport to be IGRA compacts, and that purport to authorize UKB and KTT to

44

engage in Class III gaming under IGRA.  *See* Ex. 3, United Keetoowah Band of Cherokee Indians & State of Oklahoma Gaming Compact; Ex. 4, Kialegee Tribal Town & State of Oklahoma Gaming Compact.  Both UKB and KTT submitted their Agreements to the Department on July 1.  *See* Press Release, Office of Okla. Governor, United Keetoowah Band Of Cherokee Indians Sign New Gaming Compacts (July 2, 2020), https://www.governor.ok.gov/articles/press_releases/state-of-oklahoma-ukb-sign-new-gaming-compacts; Press Release, Office of Okla. Governor, Kialegee Sign New Gaming Compacts (July 2, 2020), https://www.governor.ok.gov/articles/press_releases/state-of-oklahoma-kialegee-sign-new-gaming-compac.  Like the Comanche and Otoe-Missouria Agreements on which the Plaintiff Nations had previously submitted comments to the Defendant Secretary, the UKB and KTT Agreements are not the Model Compact and were not reviewed or approved by any Legislative body of the State, and the Defendant Governor Stitt purports to have entered into both the UKB and KTT Agreements on behalf of the State by his signature alone.  UKB & KTT Agreements Part 14.

102.  In additional comments submitted to the Defendant Secretary, CPN and Cherokee explained that he should disapprove the UKB and KTT Agreements because, like the Otoe-Missouria and Comanche Agreements, the UKB and KTT Agreements were signed unilaterally by the Governor and not approved by the Legislature, and therefore under the Oklahoma Supreme Court's decision in *Treat I*, the State had not entered into the UKB and KTT Agreements.  Letter from John A. Barrett, Tribal Chairman, Citizen Potawatomi Nation, to David Bernhardt, Sec'y, U.S. Dep't of Interior et al. at 4-6 (Aug. 3, 2020) ("CPN Aug. 3 Comments"); Letter from Sara Hill, Att'y Gen., Cherokee Nation, to

David Bernhardt, Sec'y, U.S. Dep't of Interior at 1-2 (Aug. 11, 2020) ("Cherokee Aug. 11 Comments").  CPN and Cherokee also explained that the UKB and KTT Agreements violate IGRA because: the revenue sharing provisions in those Agreements were not made in exchange for a meaningful concession by the State of significant economic benefit to the signatory tribes, CPN Aug. 3 Comments at 7-10; Cherokee Aug. 11 Comments at 2; the Agreements purport to regulate Class II gaming, which cannot be done in a Class III compact, *see* CPN Aug. 3 Comments at 10; Cherokee Aug. 11 Comments at 2-3; they purport to bind future Governors to concur in off-reservation land-into-trust acquisitions for IGRA gaming, which is an illusory promise and not a permissible subject of an IGRA compact, *see* CPN Aug. 3 Comments at 11; Cherokee Aug. 11 Comments at 3; and they purport to allow KTT to have land taken into trust within another tribe's reservation or former reservation in Oklahoma, CPN Aug. 3 Comments at 12.

103.   On July 14, 2020, the President Pro Tempore of the Oklahoma Senate and the Speaker of the Oklahoma House of Representatives filed an application for an original action in the Oklahoma Supreme Court, challenging the Defendant Governor's actions purporting to "enter into" the UKB & KTT Agreements under Oklahoma law.  *See Treat v. Stitt*, No. O-118913 (Okla. filed July 14, 2020) ("*Treat II*").  They noted that the Governor's action of signing the UKB and KTT Agreements during the pendency of *Treat I* "demonstrates disregard for our constitutional democracy and suggests a lack of respect for co-equal Branches of government: the Legislature, Petitioners here, and the Judiciary, this Court who had undertaken to review the separation of powers challenge presented." Br. In Supp. Of Appl. To Assume Original Juris., Pet. For Decl'y Relief & Request for

46

Extraordinary Relief at 1, *Treat II*, No. O-118913. The Legislative Leaders noted that the Defendant Governor Stitt had "accelerated his go-it-alone brand of compacting," making it urgent that the Oklahoma Supreme Court assume jurisdiction and strike down the UKB and KTT Agreements. *Id.* at 2-3.

104. The Oklahoma Supreme Court has not yet ruled in *Treat II*, although it assumed original jurisdiction on July 20, 2020.

105. On August 15, 2020, IGRA's forty-five-day window in which the Secretary must approve or disapprove the UKB and KTT Agreements expired. The Secretary did not issue an opinion, letter, or other ruling on or by that date. Since then, the Defendant Governor Stitt, Defendant Chief Bunch, and Defendant Mekko Givens have publicly represented that the UKB and KTT Agreements are valid IGRA compacts under which UKB and KTT can conduct gaming. Press Release, Office of Okla. Governor, KTT and UKB Tribal Compacts Deemed Approved by the Department of Interior (Aug. 20, 2020), https://www.governor.ok.gov/articles/press_releases/ktt-and-ukb-tribal-gaming-compacts-deemed-approved. Defendant Governor Stitt and his office have represented that "[t]he U.S. Department of Interior recognizes the State's good faith effort to negotiate with Oklahoma tribes in the approval of two new gaming compacts," *id.*, and that:

> [t]he compacts represent the new, modern approach to State-Tribal gaming and relationships . . . . Each new compact establishes clarity and certainty for each sovereign party; expands gaming opportunities for the KTT and UKB, keeping in mind the dynamic and evolving nature of the gaming industry; provides for meaningful consideration for the State's fee structure for class III games and table games for new locations; and strengthens compact transparency with clear auditing guidance and new dispute resolution provisions.

47

*Id.* The Defendant Governor Stitt's statements show that he intends to continue to negotiate compacts unilaterally that include provisions similar to those in the Agreements.

106. On September 8, 2020, the Defendant Secretary published approval of the UKB and KTT Agreements in the Federal Register, *see* Indian Gaming; Tribal-State Class III Gaming Compacts Taking Effect in the State of Oklahoma, 85 Fed. Reg. 55,472 (Sept. 8, 2020), under which they went into effect to the extent they are consistent with IGRA, 25 U.S.C. § 2710(d)(8)(C).

**H.     The Invalidity of the Agreements and the Secretary's Obligation to Disapprove the Agreements.**

107. The Defendant Governor Stitt's entry into the Agreements evidences a simple strategy:  (1) claim that he is authorized to enter into compacts on behalf of the State simply by signing an agreement saying so, (2) purport to authorize as many Indian tribes as he can reach agreement with to conduct any games he wishes to agree to, at as many locations as he wishes to agree to, and (3) secure a proprietary interest in the conduct of all such gaming at all such locations by controlling the games that may be played, basing revenue sharing on the terms he has agreed to, whether lawful or not, limiting the use of Class II games which do not generate revenue for the State, and pegging revenue sharing payments for any renewal term to the market value of the right to conduct gaming under the Agreement.  This strategy is, however, invalid under state and federal law, and cannot result in IGRA compacts.

108. The Defendant Secretary's no action approvals of the Agreements without issuing opinions, letters, or other rulings on whether the Defendant Governor Stitt had

48

authority to enter into the Agreements, and whether any of the provisions of the Agreements are invalid under IGRA, 25 U.S.C. § 2710(d)(8)(B), even after being informed by the Plaintiff Nations, the Oklahoma Attorney General, and Oklahoma Legislative leadership that the Governor lacked authority to enter into IGRA compacts unilaterally and that the terms of the Agreements violated IGRA, demonstrates that he is complicit in the Defendant Governor Stitt's strategy.

109.    The Defendant Governor Stitt's strategy, and the Defendant Secretary's complicity with that strategy—evidenced by his no action approvals of the Agreements—place the Plaintiff Nations in a competitive disadvantage by permitting the Comanche Nation, the Otoe-Missouria Tribe, UKB, and KTT to conduct gaming without a compact that was validly entered into by the State, under agreements that violate IGRA by, in the case of the Comanche and Otoe-Missouria Agreements, offering games not permitted by IGRA, and in the case of all four Agreements, offering gaming in new facilities on terms not authorized by IGRA, all of which increases competition for gaming revenue in Oklahoma. This strategy, and the Defendants' actions in furtherance of it, will cause economic injury to the Plaintiff Nations, which conduct gaming in accordance with IGRA, and will reduce the gaming revenue available to the Plaintiff Nations to fund government operations and programs and to provide for the general welfare of the Plaintiff Nations and their citizens consistent with IGRA.  And if Defendant Governor Stitt continues to execute that strategy—which, on information and belief, he intends to do—and the Secretary continues to be complicit in those actions, the Plaintiff Nations' economic injuries will be severe and lasting.

49

1. **The State did not enter into the Agreements under IGRA because the Defendant Governor Stitt lacked authority to do so.**

110.    Whether the Agreements were validly "entered into by the Indian tribe and the State" under § 2710(d)(1)(C) is an issue that "necessitates an interpretation of both federal and state law." *Kelly*, 104 F.3d at 1558.

111.    Under IGRA, if the Defendant Governor Stitt did not have authority to enter into the Agreements under state law, those Agreements are void from inception and have no legal effect.  The Defendant Secretary cannot make those Agreements valid by taking no action within forty-five days of their submission to him for two reasons.  First, IGRA only authorizes the Secretary to approve a compact that has been "entered into between an Indian tribe and a State governing gaming on Indian lands of such Indian tribe," 25 U.S.C. § 2710(d)(8)(A); and second, a compact that has been approved by the Secretary's inaction is "considered to have been approved by the Secretary, but only to the extent the compact is consistent with [IGRA]," *id.* § 2710(d)(8)(C).

112.    The Department of the Interior regulation implementing IGRA provides that "[t]he Indian tribe or State should submit the compact or amendment after it has been legally entered into by both parties." 25 C.F.R. § 293.7.  On April 23, 2020, the Defendants Governor Stitt, Chairman Nelson, and Chairman Shotton sent the Comanche and Otoe-Missouria Agreements to the Defendant Secretary for review under IGRA.  Then, on July 1, 2020, the Defendants Governor Stitt, Chief Bunch, and Mekko Givens sent the UKB and KTT Agreements to the Defendant Secretary for review under IGRA.  In submitting those Agreements to the Defendant Secretary, Defendants Governor Stitt, Chairman

164436-3

Nelson, Chairman Shotton, Chief Bunch, and Mekko Givens represented that the Agreements they had signed were compacts and had been legally entered into by both signatory parties. But under Oklahoma law, the Defendant Governor Stitt did not have legal authority to enter into the Agreements on behalf of Oklahoma, because he did not follow the legally prescribed process in Oklahoma for approving an IGRA compact with an Indian tribe.

113. The Oklahoma Governor's authority is defined by the Oklahoma Constitution. The Oklahoma Constitution provides for a separation of powers and describes how that separation is to be established. The Constitution establishes three departments, "Legislative, Executive, and Judicial," and provides that "*except as provided in this Constitution*, the Legislative, Executive, and Judicial departments of government shall be separate and distinct, and neither shall exercise the powers properly belonging to either of the others." Okla. Const. art. IV, § 1 (emphasis added).

114. The Oklahoma Constitution provides that the Governor and other executive officers "shall perform such duties as may be designated in this Constitution or prescribed by law." *Id.* art. VI, § 1(A). In Oklahoma, law is prescribed by the exercise of legislative power by the Legislature, or by the people through a public vote on a referendum on an enactment of the Legislature or on a popular initiative. *See id.* art. V, § 1. When an executive officer whose office was established by Article VI, Section 1(A) exercises a duty not expressly defined in the Oklahoma Constitution, legislative enactments determine the scope of that duty. *State ex rel. Cartwright v. Okla. Tax Comm'n*, 653 P.2d 1230, 1232-33 (Okla. 1982); *State ex rel. Howard v. Okla. Corp. Comm'n*, 614 P.2d 45, 48-49 (Okla.

51

1980); *State v. Cruce*, 122 P. 237, 239 (Okla. 1912); *see also Wentz v. Thomas*, 15 P.2d 65, 71 (Okla. 1932).

115.    The Oklahoma Constitution provides that the Governor must faithfully execute the laws passed by the Legislature or the people.  Okla. Const. art. VI, § 8.  The Oklahoma Constitution says nothing about the Governor's power to engage in business or commerce with Indian tribes.

116.    The Oklahoma Constitution also provides that the Governor "shall conduct in person *or in such manner as may be prescribed by law*, all intercourse and business of the State with other states and with the United States . . . ."  *Id*. (emphasis added).  Pursuant to this section, the Legislature has repeatedly prescribed the manner in which the Governor may enter into a compact with another State.  The Legislature has: required that an interstate compact dealing with petroleum production be approved by the Legislature before it can go into effect, Okla. Stat. tit. 52, § 202; preemptively approved and ratified an interstate compact governing fire control and prevention, *id.* tit. 2, § 16-35; and authorized the Oklahoma Tax Commission to enter into compacts with other states' tax commissions without the Governor's direct involvement, *id.* tit. 47, § 1123.  Even when it has not defined how the Governor should conduct business with other states in advance, the Legislature has consistently ratified interstate compacts before they have gone into effect.  *E.g., Id*. tit. 74, § 150.9b (ratifying National Crime Prevention and Privacy Compact, which itself required that it would go into effect only when ratified "in accordance with the laws of the executing State, *id.* art. VII"); *id.* tit. 3A, § 240 (ratifying Interstate Compact on Licensure of Participants in Live Horse Racing with Pari-mutuel

52

Wagering); *id.* tit. 82, §§ 526.1, 1401, 1421, 1431 (ratifying interstate water compacts); *id.* tit. 2, § 7-10 (providing the Southern Dairy Compact is "set forth and confirmed by the Oklahoma Legislature").

117.    The Legislature has prescribed by law the manner in which the Governor may enter into an agreement with an Indian tribe on behalf of the State.  *See* Okla. Stat. tit. 74, § 1221.  Section 1221 provides that the Governor "is authorized to negotiate and enter into cooperative agreements on behalf of this state with federally recognized Indian tribal governments within this state to address areas of mutual interest."  *Id.* § 1221(C)(1). Section 1221 further provides that "[e]xcept as otherwise provided by this subsection, such agreements shall become effective upon approval by the Joint Committee on State-Tribal Relations."  *Id.*  If such agreements involve trust responsibilities, then approval by the Secretary of the Interior is also required.  *Id.* § 1221(C)(2).

118.    However, the Joint Committee's approval power is constrained by other statutes that govern how the State enters into IGRA compacts.  As the Oklahoma Supreme Court ruled in *Treat I*: "Just as the Governor is constrained by the statutory limitations on Class III gaming, so too is the Joint Committee," and therefore any gaming compact must be approved under the provisions of the STGA, not just Okla. Stat. tit. 74, § 1221.  *See* 2020 OK 64, ¶ 7.

119.    Oklahoma law specifically authorizes the State to enter into an IGRA gaming compact with an Indian tribe through the process described in the STGA, *see Treat I*, 2020 OK 64, ¶ 5, which the Defendant Governor Stitt did not follow when he signed the Agreements.

53

120.   In the STGA, the State offered the Model Compact to Indian tribes, Okla. Stat. tit. 3A, § 280, and further provided that if the tribe accepted that offer, no further action by the State was necessary to enter into the compact, *id.*; *id.* § 281, Part 16.  This was done with the concurrence of the Governor and the State Legislature, as the STGA made clear by providing that

> [t]he State of Oklahoma *through the concurrence of the Governor after considering the executive prerogatives of that office and the power to negotiate the terms of a compact between the state and a tribe*, and by means of the execution of the State-Tribal Gaming Act, and with the concurrence of the State Legislature through the enactment of the State-Tribal Gaming Act, hereby makes the following offer of a model tribal gaming compact regarding gaming to all federally recognized Indian tribes as identified in the Federal Register within this state that own or are the beneficial owners of Indian lands as defined by the Indian Gaming Regulatory Act, 25 U.S.C., Section 2703(4), and over which the tribe has jurisdiction as recognized by the Secretary of the Interior and is a part of the tribe's "Indian reservation" as defined in 25 C.F.R., Part 151.2 or has been acquired pursuant to 25 C.F.R., Part 151, which, if accepted, shall constitute a gaming compact between this state and the accepting tribe for purposes of the Indian Gaming Regulatory Act.

*Id.* § 280 (emphasis added).   The Governor agreed to be bound by the STGA after consideration of his executive authority.  *Id.*  The State Legislature also agreed to be bound by the STGA.  *Id.*

121.   The Oklahoma Supreme Court ruled in *Treat I* that the STGA "sets forth the terms and conditions under which the State's federally recognized tribes can engage in Class III gaming on tribal land through Model Gaming Compacts," and "the Governor must negotiate the compacts within the bounds of the laws enacted by the Legislature, including the State-Tribal Gaming Act," 2020 OK 64, ¶ 5.

54

122. The Agreements with the Defendant Governor Stitt were not entered into pursuant to the STGA, nor do those Agreements recite the terms offered in the Model Compact set forth in the STGA.

123. The Defendants Governor Stitt's, Chairman Nelson's, Chairman Shotton's, Chief Bunch's and Mekko Givens's representations that the Agreements were validly entered into under state law and are valid compacts under IGRA, and their actions in furtherance of those representations, including their exercise of authority or jurisdiction under the Agreements, are therefore contrary to, and constitute a continuing violation of, federal law.

124. IGRA's regulations provide that "[t]he Indian tribe or State should submit the compact or amendment after it has been legally entered into by both parties." 25 C.F.R. § 293.7. And IGRA provides that the Secretary is only authorized to approve, disapprove, or approve by inaction a compact that has been entered into between an Indian tribe and a State. 25 U.S.C. § 2710(d)(8)(A)-(C). Because the Agreements were not validly entered into by the State, the Secretary's consideration of those Agreements under IGRA was improper and contrary to law.

125. For the same reason, namely that the Agreements were not validly entered into by the State, the Secretary's no action approvals of the Agreements under IGRA was arbitrary, capricious, and contrary to law.

126. The Plaintiff Nations' legally-protected interest in their conduct of Class II and Class III gaming in accordance with IGRA, tribal law, the OTWCs, and the Plaintiff Nations' Class III Compacts is injured by the Secretary's no action approvals of the

Agreements and by the Defendants Governor Stitt's, Chairman Nelson's, Chairman Shotton's, Chief Bunch's, and Mekko Givens's exercise of authority or jurisdiction under the Agreements as if they were valid IGRA compacts.

127. The Defendant Secretary's no action approvals deprive the Plaintiff Nations of the substantive and procedural protections that IGRA provides for the tribal gaming rights of all tribes by requiring that compacts be submitted to the Secretary for approval, 25 U.S.C. § 2710(d)(3)(B), and that the Secretary disapprove a compact that violates "(i) any provision of [IGRA], (ii) any other provision of Federal law . . . , or (iii) the trust obligations of the United States to Indians," *id.* § 2710(d)(8)(B)(i)-(iii); *Amador Cty.*, 640 F.3d at 381 ("The Secretary must . . . disapprove a compact if it would violate any of the three limitations in that subsection"). Had the Defendant Secretary complied with these statutory obligations, he would have disapproved the Agreements on the ground that those Agreements were not validly entered into by the State, as IGRA requires. 25 U.S.C. § 2710(d)(1)(C), (d)(2)(C).

128. The Secretary's statutory obligations under IGRA protect the rights of all Indian tribes, including the Plaintiff Nations, to conduct gaming under IGRA "as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments," *id.* § 2702(1), and ensure that no tribe, including the Comanche Nation, Otoe-Missouria Tribe, UKB, and KTT, may gain a competitive advantage over another, including the Plaintiff Nations, by failing to comply with IGRA. The Secretary is also prohibited from making decisions under IGRA that "classif[y], enhance[], or diminish[] the privileges and immunities available to the [Plaintiff Nations] relative to [the Comanche

164436-3

Nation, Otoe-Missouria Tribe, UKB, and KTT]. . . ." 25 U.S.C. § 5123(f). The Defendant Secretary's no action approvals of the Agreements violates § 5123(f) and deprives the Plaintiff Nations of the federal government's protection of their right to conduct gaming under IGRA on an equal footing, free from illegal competition, and in accordance with the federal trust responsibility. And for the same reasons, the Defendant Secretary's no action approvals benefit the Comanche Nation, Otoe-Missouria Tribe, UKB, and KTT by effectively lifting IGRA's restrictions on their conduct of Class III gaming and by authorizing them to compete in the Oklahoma gaming market without valid compacts and without complying with IGRA.

129. As a direct result of the Defendant Secretary's failure to disapprove the Agreements under IGRA, the Plaintiff Nations must compete with the Comanche Nation, Otoe-Missouria Tribe, UKB, and KTT for Class III gaming revenues in the highly competitive Oklahoma gaming market, which will cause the Plaintiff Nations economic injury. As described below, this economic injury is exacerbated by the fact that UKB and KTT can offer games in the highly competitive and lucrative Oklahoma City market, and the Comanche Nation and Otoe-Missouria Tribe can offer games under their Agreements that are not permitted under IGRA and that the Plaintiff Nations cannot offer under the Plaintiffs' Class III Compacts or through other lawful means, and because, on information and belief, the Comanche Nation and the Otoe-Missouria Tribe will pay significantly less money in exclusivity payments to the State under their Agreements than they paid under their Former Compacts. In other words, the Plaintiff Nations now must compete with tribes that are not constrained by the IGRA limitations that apply to the Plaintiff Nations, and

164436-3

which can use business practices or access geographic locations that give those tribes significant competitive advantages over Plaintiff Nations in what is already a highly competitive market. "Such an alteration in competitive conditions 'clearly amounts to a concrete injury.'" *Forest Cty. Potawatomi Cmty. v. United States*, 317 F.R.D. 6, 12 (D.D.C. 2016) (quoting *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, 422 F.3d 490, 497 (7th Cir. 2005)); *see also Clinton v. City of N.Y.*, 524 U.S. 417, 433 (1998) ("The [Supreme] Court routinely recognizes probable economic injury resulting from [governmental actions] that alter competitive conditions as sufficient to satisfy the [Article III 'injury-in-fact' requirement]." (second and third alteration in original) (quoting 3 Kenneth Culp Davis & Richard J. Pierce, *Administrative Law Treatise* 13-14 (3d ed. 1994))).

130. These injuries are directly traceable to: the Defendants Governor Stitt's, Chairman Nelson's, Chairman Shotton's, Chief Bunch's, and Mekko Givens's submission of the Agreements to the Defendant Secretary for review under IGRA and their representation to the Secretary that the Agreements had been validly entered into by both parties; the no action approvals of those Agreements by the Defendants the Department, Secretary Bernhardt, and Assistant Secretary Sweeney; and the Defendants Governor Stitt's, Chairman Nelson's, Chairman Shotton's, Chief Bunch's, and Mekko Givens's actions in furtherance of the Agreements, including their representations that the Agreements were validly entered into under state law and are valid compacts under IGRA, and their actions in furtherance of those representations, including their exercise of authority or jurisdiction under the Agreements. Those injuries will be redressed by a

164436-3

favorable decision of this Court declaring that the Agreements were not validly "entered into" under state law and therefore are not "in effect" under IGRA, reversing the Defendant Secretary's no action approvals of the Agreements and remanding to the Secretary for disapproval, and declaring that the Defendant tribal officials' exercise of authority or jurisdiction under the Agreements is therefore not authorized under IGRA.

**2.    In the Comanche and Otoe-Missouria Agreements, the Defendant Governor Stitt purports to authorize the Comanche Nation and Otoe-Missouria Tribe and the State to conduct Class III games that are not permitted in Oklahoma.**

131.    IGRA only authorizes Indian tribes to conduct Class III gaming, and then only on Indian lands.  Under IGRA, Class III gaming activities are lawful on Indian lands only if "located in a State that permits such gaming for any purpose by any person, organization, or entity."  25 U.S.C. § 2710(d)(1)(B).

132.    IGRA does not provide a means by which a State may authorize itself to conduct Class III gaming under a compact, nor is the conduct of such gaming by a State a proper subject of compact negotiations under IGRA.  *See id.* § 2710(d)(3)(C).

133.    In the STGA, the State, "through the concurrence of the Governor after considering the executive prerogatives of that office and the power to negotiate the terms of a compact between the state and a tribe . . . and with the concurrence of the State Legislature through the enactment of the [STGA]," Okla. Stat. tit. 3A, § 280, "agree[d] that the tribe is authorized to operate covered games only in accordance with this Compact," *id.* § 281, Part 4.A; *see also Treat I*, 2020 OK 64, ¶ 5.

164436-3

134.     The "covered games" that the Model Compact authorizes tribes to conduct are defined as:

>an electronic bonanza-style bingo game, an electronic amusement game, an electronic instant bingo game, nonhouse-banked card games; [and] any other game, if the operation of such game by a tribe would require a compact and if such game has been: (i) approved by the Oklahoma Horse Racing Commission for use by an organizational licensee, (ii) approved by state legislation for use by any person or entity, or (iii) approved by amendment of the [STGA]; . . . .

Okla. Stat. tit. 3A, § 281, Part 3.5.  Accordingly, in the STGA, the Governor agreed with the State Legislature that any additional games that would require a compact must be approved by the OHRC or the State Legislature.  *Id.*

135.     The Comanche Nation and Otoe-Missouria Tribe Agreements define the "covered games" that the signatory tribe may conduct by reference to the following categories of Class III games:

>*"Covered Game"* or any derivative thereof means all Gaming Machines, House-banked Card Games, Nonhouse-Banked Card Games, House-banked Table Games, Nonhouse-banked Table Games, and Event Wagering, which are conducted in accordance with the Standards, as applicable, if the operation of such game by the Tribe would require a Compact and if such game has been approved by the [State Compliance Agency ("SCA")].  Class II gaming, as defined by IGRA, is expressly excluded from this definition.

Comanche Agreement Part 2.A.7.; Otoe-Missouria Agreement Part 2.A.6. (emphasis added).  Each such category of Class III games is also specifically defined in those Agreements.  Comanche Agreement Part 2.A.13 (Event Wagering), 19. (Gaming Machine), 22. (House-Banked Card Game), 23. (House-Banked Table Game), 30. (Nonhouse-banked Card Game), 31. (Nonhouse-banked Table Game); Otoe-Missouria Agreement Part 2.A.12. (Event Wagering), 18. (Gaming Machine), 20. (House-Banked

60

Card Game), 21. (House-Banked Table Game), 29. (Nonhouse-banked Card Game), 30.

(Nonhouse-banked Table Game).

136. "Event Wagering" is defined in the Comanche and Otoe-Missouria

Agreements in relevant part as

> the placing of a wager on the outcome of a Sport event, including E-Sports, or any other events, to the extent such wagers are authorized by law, subject to the following terms and conditions:
>
> a. Type. Event Wagering shall not include either wagering on intercollegiate Sports for schools located in the State or intercollegiate Sports events occurring within the State.
>
> b. Reservation of State Licenses. At some future time, the State may license up to five (5) non-tribal Event Wagering locations, with the same requirements as those under this Compact; provided, however, that the Tribe's right to engage in Event Wagering shall in no way be subject to the State's conduct of Event Wagering. For the avoidance of doubt, even if it should be found that the State's conduct of Event Wagering is in violation of the State's obligations, if any, under compacts with other Oklahoma tribes, such a finding shall have no effect on the Tribe's right to engage in Event Wagering.
>
> c. Location. Event Wagering must be conducted by a Patron who is: (i) physically located at a Facility, or (ii) within 1,000 feet of the Facility, or (iii) within the Tribe's land-trust boundary, whichever is less. The Tribe may not conduct Event Wagering within the lands of the State.
>
> d. Manner and Form. Event Wagering transactions by Patrons may be conducted over-the-counter or electronically, subject to Geofencing of the Facility consistent with [the definition of Geofencing in] this Part.
>
> . . . .
>
> g. Licenses. The Tribe shall be permitted to conduct Event Wagering at no more than two (2) Facilities. Nothing shall prevent the Tribe from selling or leasing its right to conduct Event Wagering to any

164436-3

other compacting tribe who has entered into a valid compact with the State authorizing Event Wagering as of or subsequent to the Effective Date hereof; provided, however, the State shall receive notice of such a transaction within ten (10) days of the transaction. Notice to the State shall include the duration of such agreement and shall be delivered to the SCA.

Comanche Agreement Part 2.A.13.; Otoe-Missouria Agreement Part 2.A.12.

137.    The Comanche and Otoe-Missouria Agreements also define "'Sport' or any derivative thereof" to mean:

exclusive of E-Sports and daily fantasy sports, . . . a contest (i) having a defined set of rules, (ii) requiring participant skill, (iii) requiring physical skill, (iv) having a broad public appeal, and (v) having achieved institutional stability where social institutions have rules which regulate it, stabilizing it as an important social practice. This shall include, but not be limited to, football, basketball, baseball, golf, tennis, hockey, boxing, mixed martial arts, wrestling, athletic contests recognized by the Olympics, and car racing.

Comanche & Otoe-Missouria Agreements Part 2.A.37. Those Agreements further define "'E-Sport' or any derivative thereof" to mean:

any multiplayer video game played competitively, either in-person or via remote connection, in which success principally depends upon the superior knowledge, training, experience, and adroitness of the players.

Comanche Agreement Part 2.A.10.; Otoe-Missouria Agreement Part 2.A.9.

138.    The Comanche and Otoe-Missouria Agreements define "Event Wagering" to "mean[] the placing of a wager on the outcome of a Sport event, including E-Sports, or any other events, *to the extent such wagers are authorized by law*." Comanche Agreement Part 2.A.13.; Otoe-Missouria Agreement Part 2.A.12. (emphasis added). No legal basis for such authorization is referenced in the Agreements, other than the Defendant Governor Stitt's claimed authority to enter into the Agreements on behalf of the State. And that claim

62

of authority is invalid for the reasons shown *supra* at ¶¶ 110-24. Furthermore, in the STGA, the Governor agreed that any games in addition to those specifically defined as "covered games" in the STGA must be approved by the OHRC or the State Legislature, Okla. Stat. tit. 3A, § 281, Parts 3.5., 4.A., neither of which has approved Event Wagering. To the contrary, this category of gaming is presently prohibited by the STGA, which provides "the operation of . . . games where winners are determined by the outcome of a sports contest" is not permitted. *Id.* § 262(H). The Defendant Governor Stitt therefore cannot authorize by himself games in addition to those defined in the STGA.

139. Event Wagering is not lawful under IGRA, because Event Wagering is not presently permitted in the State "for any purpose by any person, organization, or entity." 25 U.S.C. § 2710(d)(1)(B).

140. The Defendants Governor Stitt's, Chairman Nelson's, and Chairman Shotton's representations that the Comanche and Otoe-Missouria Agreements authorize Event Wagering and their actions in furtherance thereof constitute a continuing violation of federal law. While the Defendants Chairman Nelson and Chairman Shotton have publicly admitted that Event Wagering is not lawful in Oklahoma and have stated that they do not intend to conduct Event Wagering until it is lawful, those statements and the Defendants' position are not binding and may change at any time.

141. The Comanche and Otoe-Missouria Agreements also purport to authorize the State to conduct Event Wagering on the same terms as the Comanche Nation and Otoe-Missouria Tribe, by providing as follows: "At some future time, the State may license up to five (5) non-tribal Event Wagering locations, with the same requirements as those under

63

this Compact; provided, however, that the Tribe's right to engage in Event Wagering shall in no way be subject to the State's conduct of Event Wagering." Comanche Agreement Part 2.A.13.b.; Otoe-Missouria Agreement Part 2.A.12.b.

142.    IGRA does not provide any means of authorizing a state to conduct gaming, nor is the conduct of non-tribal Class III gaming an authorized subject of compact negotiations under IGRA.  *See* 25 U.S.C. § 2710(d)(3)(C).  In addition, IGRA authorizes tribal gaming only on Indian lands.  *Id.* §§ 2703(4) (defining Indian lands), 2710(a)(1) (Class I gaming permitted on Indian lands), 2710(b)(1) (same for Class II gaming), 2710(d)(1) (same for Class III gaming).  Accordingly, the Comanche and Otoe-Missouria Agreements cannot authorize the State to conduct Event Wagering.  The terms of the Comanche and Otoe-Missouria Agreements that purport to do so therefore violate federal law, and any actions by the Defendant Governor Stitt to implement those terms constitutes a continuing violation of federal law.

143.    The Comanche and Otoe-Missouria Agreements define "'House-Banked Card Game' or any derivative thereof [to] mean[] any card game in which the Tribe has an interest in the outcome of the game." Comanche Agreement Part 2.A.22.; Otoe-Missouria Agreement Part 2.A.20.

144.    The Comanche and Otoe-Missouria Agreements define "'House-Banked Table Game' or any derivative thereof" to mean:

> any table game including, but not limited to, those table games involving a wheel, ball, or dice, which operate in a non-electronic environment and that the Tribe has interest in the outcome of the game.

Comanche Agreement Part 2.A.23.; Otoe-Missouria Agreement Part 2.A.21.

164436-3

145.   In the STGA, the Governor agreed that any games in addition to those specifically defined as "covered games" in the STGA must be approved by the OHRC or the State Legislature, Okla. Stat. tit. 3A, § 281, Parts 3.5., 4.A., neither of which have approved House-Banked Card Games or House-Banked Table Games.   To the contrary, these two categories of gaming are prohibited by the STGA, which provides that "the operation of . . . house-banked card games, [and] house-banked table games involving dice or roulette wheels" is not permitted by the Act.   *Id.* § 262(H).   Furthermore, while the STGA was subsequently amended to permit the conduct of Nonhouse-banked Table Games, it does so only for Indian tribes that sign the Model Compact Supplement, *id.* § 281, Part 3.5.; *see id.* § 262(H) (otherwise forbidding operation of "house-banked table games involving dice or roulette wheels").   The Comanche Nation and Otoe-Missouria Tribe have not signed the Model Compact Supplement.   Accordingly, the Comanche and Otoe-Missouria Agreements cannot authorize the Comanche Nation and Otoe-Missouria Tribe to conduct House-Banked Card Games or House-Banked Table Games, and the terms of those Agreements that purport to do so therefore violate federal law.

146.   Defendants Governor Stitt's, Chairman Nelson's, and Chairman Shotton's representations that the Comanche and Otoe-Missouria Agreements authorize House-Banked Card Games or House-Banked Table Games and their actions in furtherance thereof constitute a continuing violation of federal law.   While the Defendants Chairman Nelson and Chairman Shotton have publicly admitted that House-Banked Card Games and House-Banked Table Games are not lawful in Oklahoma and have stated that they do not intend to conduct House-Banked Card Games or House-Banked Table Games until they

65

are lawful, those statements and the Defendants' position are not binding and may change at any time.

147.    The Comanche and Otoe-Missouria Agreements further provide that if "new forms of Covered Games become available in the market following the Effective Date of this Compact," Defendant Governor Stitt may authorize the Comanche Nation and Otoe-Missouria Tribe to conduct such new games without amending the Agreements. *Id*. Part 3.F.  Accordingly, in the Defendant Governor Stitt's view, he can authorize a tribe to play any game that becomes available in the market.

148.    In the STGA, the Governor agreed that any games in addition to those specifically defined as "covered games" in the STGA must be approved by the OHRC or the State Legislature.  Okla. Stat. tit. 3A, § 281, Parts 3.5., 4.A.  The Governor therefore has no authority to himself allow the Comanche Nation and Otoe-Missouria Tribe to conduct new games.

149.    The Defendant Governor Stitt has no authority under IGRA to allow the Comanche Nation and Otoe-Missouria Tribe to conduct new games without amending the Comanche and Otoe-Missouria Agreements and securing the approval of the amendment by the Secretary.  *See* 25 C.F.R. § 293.4(b) ("All amendments, regardless of whether they are substantive amendments or technical amendments, are subject to review and approval by the Secretary.").

150.    Any representation by the Defendants Governor Stitt, Chairman Nelson, or Chairman Shotton that the Governor can authorize the Comanche Nation and Otoe-

164436-3

Missouria Tribe to conduct new games and any actions by them in furtherance of any such representation are contrary to federal law.

151.    The Plaintiff Nations' legally-protected interest in their conduct of Class II and Class III gaming in accordance with IGRA, tribal law, the OTWCs, and the Plaintiff Nations' Class III Compacts is injured: by the Defendant Secretary's failure to disapprove the Comanche Nation and Otoe-Missouria Tribe Agreements, which purport to authorize those Tribes to conduct Event Wagering, House-Banked Card Games, and House-Banked Table Games, and purport to authorize the State to conduct Event Wagering, all of which violates IGRA; and by the threatened or actual conduct of such gaming under those Agreements by Defendants Comanche Nation and Otoe-Missouria Tribe when they choose to do so, which places the Plaintiff Nations at a significant disadvantage in competing for gaming revenue in Oklahoma and will cause economic injury to the Plaintiff Nations.  A competitor who offers new games has a significant competitive advantage over competitors who cannot offer those games, especially when those games include sports betting, for which the market is enormous:  "Under-the-table NFL and college football wagers top $95 billion each year, according to the ESPN sports network.  Overall, up to $150 billion is wagered illegally on sports every year in the United States, according to the American Gaming Association, a tradegroup."[7]

---

[7] Elaine S. Povich, *Show Me the Money: Sports Betting Off and Running*, Pew Charitable Trusts (Sept. 10, 2018), https://www.pewtrusts.org/en/research-and-analysis/blogs/stateline/2018/09/10/show-me-the-money-sports-betting-off-and-running.

164436-3

152.     The Defendant Secretary's no action approval of the Comanche and Otoe-Missouria Agreements also deprives the Plaintiff Nations of the substantive and procedural protections from the unlawful conduct of Class III gaming that IGRA is intended to provide them by requiring that the Secretary disapprove a compact that violates "(i) any provision of [IGRA], (ii) any other provision of Federal law . . . , or (iii) the trust obligations of the United States to Indians."  25 U.S.C. § 2710(d)(8)(B)(i)-(iii); *Amador Cty.*, 640 F.3d at 381 ("[T]he Secretary must . . . disapprove a compact if it would violate any of the three limitations in that subsection . . . .").  Had the Defendant Secretary complied with this statutory obligation, he would have disapproved the Comanche Nation and Otoe-Missouria Tribe Agreements on the ground that those Agreements purport to authorize those Tribes to conduct Event Wagering, House-Banked Card Games, and House-Banked Table Games, and purport to authorize the State to conduct Event Wagering, all in violation of IGRA. The Defendant Secretary's no action approval deprived the Plaintiff Nations of the federal government's protection of all tribes' right to conduct gaming under IGRA on an equal footing, free from illegal competition, and in accordance with the federal trust responsibility.  And for the same reasons, the Defendant Secretary's no action approval benefits the Comanche Nation and the Otoe-Missouria Tribe by effectively lifting IGRA's restrictions on their conduct of Class III gaming and by authorizing them to compete in the Oklahoma gaming market without complying with IGRA.

153.     These injuries are directly traceable to the Defendants' conduct, specifically: the Defendants Governor Stitt's, Chairman Nelson's, and Chairman Shotton's submission of the Comanche and Otoe-Missouria Agreements to the Defendant Secretary for review

68

under IGRA and their representation to the Defendant Secretary that those Agreements had been validly entered into by both parties; the no action approval of those Agreements by the Defendants the Department, Secretary Bernhardt, and Assistant Secretary Sweeney; and Defendants Governor Stitt's, Chairman Nelson's, and Chairman Shotton's actions in furtherance of those Agreements, including the Defendant tribal officials' exercise of authority or jurisdiction under those Agreements. Those injuries will be redressed by a favorable decision of this Court declaring that the Agreements were not validly "entered into" under state law and therefore are not "in effect" under IGRA, reversing the Defendant Secretary's no action approval of the Agreements and remanding to the Secretary for disapproval, and declaring that the conduct of Event Wagering, House-Banked Card Games, and House-Banked Table Games under the Agreements violates IGRA.

### 3. The Agreements' revenue sharing provisions are invalid.

154. The Comanche Nation, the Otoe-Missouria Tribe, and KTT agreed to pay substantial exclusivity fees on covered games authorized by their Former Compacts in the following amounts:

> four percent (4%) of the first Ten Million Dollars ($10,000,000.00) of adjusted gross revenues received by [the] tribe in a calendar year from the play of electronic amusement games, electronic bonanza-style bingo games and electronic instant bingo games,

> five percent (5%) of the next Ten Million Dollars ($10,000,000.00) of adjusted gross revenues received by [the] tribe in a calendar year from the play of electronic amusement games, electronic bonanza-style bingo games and electronic instant bingo games,

> six percent (6%) of all subsequent adjusted gross revenues received by [the] tribe in a calendar year from the play of electronic amusement games,

69

electronic bonanza-style bingo games and electronic instant bingo games, and

ten percent (10%) of the monthly net win of the common pool(s) or pot(s) from which prizes are paid for nonhouse-banked card games. The Tribe is entitled to keep an amount equal to state payments from the common pool(s) or pot(s) as part of its cost of operating the games.

Former Compacts, Part 11.A.2. For purposes of this calculation, "Adjusted gross revenues" means "the total receipts received from the play of all covered games minus all prize payouts." *Id.* Part 3.1.

155. The Agreements change the amounts of the payments which a signatory tribe will make to the State. Specifically, they provide that the signatory tribe will pay a portion of their gaming revenues to the State pursuant to several formulas that determine the amount of fees to be paid based on the type of gaming the signatory tribes are conducting, where they are conducting it, and how long they have been conducting it. The terms on which this is done are contrary to the Secretary's longstanding position that revenue sharing payments are lawful under IGRA only if the State has made a meaningful concession of significant economic benefit to the Tribe in exchange for such payments, *see* Comanche Approval Letter at 2, violate IGRA's mandate that 25 U.S.C. § 2710(d) does not "confer[] upon a State . . . authority to impose any tax, fee, charge, or other assessment upon an Indian tribe . . . to engage in a class III activity," *id.* § 2710(d)(4), and breach IGRA's requirement that the Indian tribe have "the sole proprietary interest and responsibility for the conduct of [such] gaming activity," *id.* § 2710(b)(2)(A) (requiring that ordinance authorizing Class II gaming so provide), (d)(1)(A)(ii) (imposing same requirement with respect to Class III gaming).

164436-3

156. The Agreements state "[t]he Parties acknowledge and agree that this Compact provides the Tribe with substantial exclusivity over class III Covered Gaming consistent with the goals of IGRA." Agreements Part 10.A. "Covered Gaming" means all games purportedly authorized by the Agreements. Comanche Agreement Part 2.A.7.; Otoe-Missouria, UKB & KTT Agreements Part 2.A.6. "Substantial exclusivity" is not specifically defined in the Agreements, nor is it provided under the Agreements.

157. Instead, the Comanche and Otoe-Missouria Agreements recognize that electronic gaming is conducted in the State under the STGA, *id.* Part 2.A.38., authorize the State to "license up to five (5) non-tribal Event Wagering locations, with the same requirements as those under this Compact," *id.* Part 2.A.12.b.,

158. All the Agreements expressly provide "that the substantial exclusivity provided for in this Compact shall not prohibit the operation of iLottery by the State," *id.* Part 3.B., which permits the State to offer electronically any game with the "elements of consideration, chance, and prize," Comanche Agreement Part 2.A.25.; Otoe-Missouria Agreement Part 2.A.23. UKB & KTT Agreements Part 2.A.18. Nor do the Agreements place any limits on the additional gaming that the State may authorize without breaching the substantial exclusivity that it has promised to the signatory tribes.

159. In short, the term "substantial exclusivity" is meaningless because the Agreements neither define the signatory tribes' exclusivity in gaming, nor restrict the State from authorizing others to play any other form of gaming.

160. Nevertheless, in Part 10.B., the Agreements state that "[i]n consideration of the Acknowledgement set forth in subsection A of this Part, the adequacy of which is

71

hereby agreed to, and pursuant to the terms of this valid Compact, the Tribe agrees to pay the following Substantial Exclusivity Fees as provided for below . . . ." *Id.* Part 10.B.

161. Part 10.B.1. provides methods of determining the amounts to be paid out of the "Adjusted Net Win" of Covered Games, except Event Wagering. "Adjusted Net Win" means "the win from Covered Game gaming activities, which is the difference between gaming wins and losses before deducting costs and expenses or deducting incentives or adjusting for changes in progressive jackpot liability accruals," including the cost of third-party vendor fees in excess of amounts necessary to fund progressive jackpots, minus the cash value of Free Play and Point Play, and minus the cost of an Annual Oversight Assessment that must be paid to the State by the Tribes. Comanche Agreement Parts 2.A.2., 2.A.28.; Otoe-Missouria Agreement Parts 2.A.2., 2.A.26; *see* UKB Agreement Parts 2.A.2., 2.A.22.; KTT Agreement Parts 2.A.2., 2.A.21.

      a.      **The Comanche and Otoe-Missouria Agreement Substantial Exclusivity Fee Provisions.**

162. Part 10.B. of the Comanche and Otoe-Missouria Agreements provide similar methods for calculating fees. First, Part 10.B.1. of those Agreements provides that for existing facilities—that is, gaming facilities "operated by the Tribe as of the Effective Date of this Compact," Comanche Agreement Part 2.A.14; Otoe-Missouria Agreement Part 2.A.13—the signatory tribe shall pay 4.5% of its Adjusted Net Win on Covered Games, except Event Wagering. Agreements Part 10.B.1.a. However, once the Secretary approves an application by the Tribe to take land into trust for gaming in one of the off-reservation areas described in Part 4.J.2., this amount rises to 6% of Adjusted Net Win on Covered

72

Games, except Event Wagering. *Id.* That provision is invalid because the action of the Secretary which increases revenue sharing—the taking of land in trust off-reservation—is not a valid subject of negotiation under IGRA, 25 U.S.C. § 2710(d)(3)(C), and therefore is not a valid compact term. IGRA does not authorize an Indian tribe to pay gaming revenues to a state in exchange for the state agreeing to allow the tribe to have presently unidentified land taken in trust for gaming purposes at some future time.

163. On information and belief, under Part 10.B.1.a., the Comanche Nation and Otoe-Missouria Tribe will pay less in substantial exclusivity fees to the State for conducting Covered Games in Existing Facilities under their new Agreements than they paid to conduct the same games in the same facilities under their Former Compacts. *See* Randy Ellis, *Two New Gaming Compacts Take Effect, But For How Long?*, Oklahoman (June 30, 2020), https://oklahoman.com/article/5665669/two-new-gaming-compacts-take-effect-but-for-how-long ("The tribes have said they expect the change to save each of them hundreds of thousands of dollars a year . . . ."). They will also pay a smaller percentage of their gaming revenues to the State than the Plaintiff Nations pay under the Plaintiff Nations' Class III Gaming Compacts to conduct the same games.

164. Second, Part 10.B.1.b. provides that for new facilities constructed in off-reservation areas described in Part 4.J.2. of the Agreements, the Comanche Nation and Otoe-Missouria Tribe will pay revenue sharing of between 8% and 13% of the Adjusted Net Win from those facilities, as follows:

| *New Facility: Tribe & Location* | *% Paid* | *Authorizing Section* |
|---|---|---|
| Comanche (Love County): | 13% | Comanche Agreement Part 10.B.1.b.i. |

73

| Comanche (Cleveland County): | 12% | *Id.* Part 10.B.1.b.ii. |
| Comanche (Grady County): | 8% | *Id.* Part 10.B.1.b.iii. |
| Otoe-Missouria (Logan County): | 12% | Otoe-Missouria Agreement Part 10.B.1.b.i. |
| Otoe-Missouria (Noble County): | 8% | *Id.* Part 10.B.1.b.ii. |
| Otoe-Missouria (Payne County): | 8% | *Id.* Part 10.B.1.b.iii. |

165. The provisions described in the immediately preceding paragraph are invalid because: IGRA does not authorize the Secretary to approve revenue sharing for facilities on land that has not been taken in trust, and therefore is not "Indian land[]," 25 U.S.C. § 2703(4); the negotiation of such payments in those circumstances is not a valid subject of negotiation under IGRA, *id.* § 2710(d)(3)(C); and the high rates of such payments are not justified by a meaningful concession by the State that has significant economic benefit to the Comanche Nation and Otoe-Missouria Tribe. The only evident justification is the Defendant Governor Stitt's agreement to the land being taken in trust, which is not a valid subject of negotiation under IGRA, *id.* § 2710(d)(3)(C), and therefore is not a valid compact term.

166. In addition, Part 10.B.2.a. of the Comanche and Otoe-Missouria Agreements provides that the Comanche Nation and Otoe-Missouria Tribe will pay 1.10% of each Patron's Event Wagering transaction total, "to be assessed in addition to the transaction total and calculated on a per wager basis." This provision imposes a tax on the Comanche Nation and Otoe-Missouria Tribe in violation of IGRA, 25 U.S.C. § 2710(d)(4), because it is not imposed to defray the costs of regulating such gaming activity, *id.* § 2710(d)(3)(C)(iii), and because it requires the imposition of a fee based on a percentage

74

of a patron's wager for the sole purpose of paying the State funds that the State may use for any purpose, Agreements Part 10.B.3. ("Nothing herein shall require the allocation of such fees to particular State purposes, including, but not limited to, the actual costs of performing the State's regulatory responsibilities hereunder.").

167.    On information and belief, the payment of 1.10% of each Patron's Event Wagering transaction total would constitute a payment of approximately 22% of the Comanche Nation's and Otoe-Missouria Tribe's net revenue from event wagering.  This is substantially higher than the fees that the Tribes paid to conduct covered gaming under the Former Compacts, or that the Plaintiff Nations pay to conduct covered gaming under the Plaintiff Nations' Class III Gaming Compacts.

### b.    The UKB and KTT Agreement Substantial Exclusivity Fee Provisions.

168.    Both the UKB and KTT Agreements place geographic restrictions on those Tribes' conduct of gaming.  Specifically, the UKB Agreement provides that it is "site specific" and only permits UKB to "establish and operate Covered Games at the Logan County Facility," UKB Agreement Part 4.J., which the UKB Agreement defines as:

> a single Facility to be developed, constructed, opened, and operated by the Tribe within the exterior boundaries of Logan County, a county lying within the State of Oklahoma, pursuant to a two-part determination under IGRA, 25 U.S.C. § 2719(b)(1).  This Facility shall be located within one (1) mile of a state or federal highway or turnpike running through Logan County.

*Id.* Part 2.A.21.  The KTT Agreement provides that it too is "site specific" and only permits KTT to "establish and operate Covered Games at the Oklahoma County Facility," KTT Agreement Part 4.J., which the KTT Agreement defines as:

75

a single facility to be developed, constructed, opened, and operated by the Tribe within the exterior boundaries of Oklahoma County, a county lying within the State of Oklahoma, pursuant to a two-part determination under IGRA, 25 U.S.C. § 2719(b)(1). This Facility shall be located east of Choctaw Road and within one (1) mile of a state or federal highway or turnpike running through Oklahoma County.

*Id.* Part 2.A.25.

169. Oklahoma City is the largest city in Oklahoma and the capital of the State. Oklahoma City proper is in Oklahoma County, and its suburbs extend into the adjoining counties of Canadian, Cleveland, and Logan Counties. These four counties are among the top ten counties in Oklahoma ranked by per capita income. Three major interstate highways—I-35, I-40, and I-44—intersect in Oklahoma County. The area also contains several universities, major sporting facilities, a convention center, and tourist attractions. For this reason, the Oklahoma City area is a highly lucrative and competitive gaming market, and the establishment of a new IGRA gaming facility in Oklahoma County or one of its suburb counties introduces significant new competition with Plaintiff Tribes for an important source of tribal gaming revenues for the Plaintiff Tribes.

170. KTT's Former Compact and the Model Compact do not place any restrictions on how many facilities in which, or where, a signatory tribe can conduct gaming, except that gaming must take place on Indian lands, and additional revenue sharing provisions apply if the tribe conducts gaming within twenty miles of an organization licensee. *See* Model Compact Parts 5.L., 11.F.

171. Part 10.B. of the UKB and KTT Agreements provide that UKB and KTT will pay to the State different percentages of their adjusted net revenue from gaming machines

and from nonhouse-banked card and table games than those provided by KTT's Former Compact and the Model Compact.

172. Part 10.B.1. of the UKB Agreement provides that UKB will pay substantial exclusivity fees according to the amount of revenue UKB earns from gaming machines at its proposed Logan County Facility, according to the following schedule:

| Adjusted Net Revenue from Gaming Machines at Logan County Facility | % of Adjusted Net Revenue Paid by UKB |
|---|---|
| $0.01 to $300,000,000.00 | 12% |
| $300,000,000.01 to $500,000,000.00 | 13% |
| $500,000,000.01 and above | 15% |

173. Part 10.B.1.a. of the KTT Agreement provides that KTT will pay substantial exclusivity fees of 12% of adjusted net revenue earned from gaming machines for the first two years after it obtains a certificate of occupancy for the Oklahoma County Facility. Part 10.B.1.b. provides that, after two years, KTT will pay increased exclusivity fees according to the following schedule:

| Adjusted Net Revenue from Gaming Machines at Oklahoma County Facility | % of Adjusted Net Revenue Paid by KTT |
|---|---|
| $0.01 to $300,000,000.00 | 13% |
| $300,000,000.01 to $500,000,000.00 | 14% |
| $500,000,000.01 and above | 15% |

174. Part 10.B.2. of both the UKB and KTT Agreements provides that UKB and KTT will pay 18% of their adjusted net win from nonhouse-banked card and table games.

164436-3

175.    These provisions are substantially higher than the amounts that a signatory tribe is required to pay from Covered Games under the Model Compact and that KTT was required to pay under its Former Compact.  *See* Model Compact Part 11.

### c.    Reevaluation of Fees Under All Agreements.

176.    In addition, the amounts the signatory tribes pay the State under Parts 10.B.1. and 10.B.2. of their Agreements is subject to reevaluation when the terms of the Agreements renew.  Part 10.B.5. of the Agreements states that "[t]he right of substantial exclusivity provided for under [Part 10.B.] will have a definite term, as provided for in Part [12.B.] of this Compact."  Part 12.B. states that the Agreements shall "begin on the Effective Date"—meaning the date on which the approval of the agreements by the Secretary is published in the Federal Register, Comanche Agreement Parts 2.A.11., 12.A.3.; Otoe-Missouria Agreement Parts 2.A.10., 12.A.3.; UKB & KTT Agreements Parts 2.A.9., 12.A.3.—"and end at 11:59 p.m. (CST) on December 31, 2035, unless otherwise agreed to in writing by the Parties."  Part 10.B.5. provides that, unless the parties agree in writing otherwise, the term of the Agreements will "renew by way of amendment" for an additional fifteen-year term, subject to a process for recalculating the amount of substantial exclusivity fees the tribes will pay to the State.

177.    The Agreements provide that within eighteen months prior to the expiration of the term of the Agreements, the parties will "meet and confer in good faith for the purpose of setting substantial exclusivity rates under the Compact to reflect the value of substantial exclusivity granted for the renewal term."  Agreements Part 10.B.5.a.

164436-3

178.   If the parties fail to agree on substantial exclusivity rates within twelve months prior to the expiration of the term, the Agreements provide that the parties will submit to the calculation of the value of substantial exclusivity by an independent panel, *id.* Part 10.B.5.b., which must be "based on an analysis of all data pertinent to assess market valuation of the substantial exclusivity granted for the renewal term," *id.* Part 10.B.5.b.vii. The State and the Tribe each selects a panel member, and then jointly select a third member. *Id.* Part 10.B.5.b.ii.  If the State and Tribe cannot agree on a third member, the first two panelists select the third member.  *Id.*  The panel then operates as an arbitration panel, "consistent with the rules of commercial arbitration," taking evidence, overseeing discovery including issuing subpoenas, accepting briefing from the parties, holding a hearing at which the parties submit argument and evidence, analyzing data, and then issuing a written opinion setting substantial exclusivity rates to be submitted to the Secretary as part of an amended compact.  *Id.* Part 10.B.5.b.i.-viii.

179.   If the Comanche Nation's or Otoe-Missouria Tribe's Adjusted Net Win goes above $300,000,000.00, then the parties agree to submit to the same dispute resolution procedures as described in ¶¶ 177-78, *supra*, except that the parties have sixty days to reach agreement before panel proceedings begin, and the panel must either issue new rates within ninety days or a longer period agreed to by the parties.  Comanche & Otoe-Missouri Agreements Part 10.B.1.c., 10.B.5.e.  It is unclear whether this provision requires recalculation of only substantial exclusivity fees paid under Part 10.B.1. or whether it also requires recalculation of exclusivity fees paid on Event Wagering under Part 10.B.2.

164436-3

180.    In all four Agreements, the parties "agree to be bound by the substantial exclusivity rates established by a majority of the Panel for the renewal term."  Agreements Part 10.B.5.c.    The Agreements further provide that "[t]he Panel's determination of revenue-sharing rates shall be based on an analysis of all data pertinent to *assess market valuation of the substantial exclusivity granted for the renewal term*."  *Id.* Part 10.B.5.b.vii. (emphasis added).  Nothing in Part 10.B.5. imposes a cap on the exclusivity fees that the arbitration panel may set, allows for appeal of its determination by the signatory tribes, or otherwise conditions the panel's authority to bind the signatory tribe to its decision.  Basing exclusivity fees on a market valuation is indistinguishable from "put[ting] gaming rights 'up for sale,'" which violates IGRA.  *Rincon Band of Luiseno Mission Indians of Rincon Reservation v. Schwarzenegger*, 602 F.3d 1019, 1040 (9th Cir. 2010).

181.    The revenue sharing provisions of the Agreements permit the State to impose a "tax, fee, charge, or other assessment upon an Indian tribe . . . to engage in a class III activity" in violation of IGRA, 25 U.S.C. § 2710(d)(4), and violate IGRA's requirement that the Indian tribe have "the sole proprietary interest and responsibility for the conduct of any gaming activity," *id.* § 2710(b)(2)(A), (d)(1)(A)(ii).  The high rates of such payments violate IGRA because the substantial exclusivity promised in exchange for those payments is meaningless, and plainly is not justified by a meaningful concession by the State that has significant economic benefit to the Comanche Nation, Otoe-Missouria Tribe, UKB, and KTT.  Those payments therefore constitute a tax.  The process by which those rates are to be determined for the renewal term grants the State a proprietary interest in the gaming activity conducted under the Agreements because the rates for the renewal term

80

are to be based on the market value of the right to conduct gaming under the Agreements, which acknowledges that the State has an ownership interest in those gaming rights which it can sell. Finally, these provisions also violate IGRA because only the Secretary can determine whether revenue sharing payments to be made by a tribe to a State under a compact are lawful under IGRA; an arbitration panel cannot make that determination.

182. In addition, the revenue sharing provisions of the Comanche and Otoe-Missouria Agreements violate IGRA because those payments are made in exchange for allowing the Comanche Nation and Otoe-Missouria Tribe to conduct Event Wagering, House-Banked Card Games, and House-Banked Table Games, and the conduct of those games is not authorized by IGRA or Oklahoma law. Thus, those Agreements' promise that the signatory tribes can conduct these games is illusory, and the revenue sharing provisions of those Agreements, which rely on those promises to justify revenue sharing payments, are therefore invalid under IGRA.

183. All four Agreements further provide that "[t]he Tribe agrees that the substantial exclusivity provided for in this Compact shall not prohibit the operation of iLottery by the State." Agreements Part 3.B. iLottery is

> a Gaming system that may be conducted by the Oklahoma Lottery Commission, subject to applicable law, that provides for the distribution of lottery products through numerous channels that include web applications, mobile applications, mobile web, tablets and social media platforms that allows players to interface through a portal for the purpose of obtaining lottery products and ancillary services, such as account management, game purchase, game play and prize redemption; provided, however, that the Gaming elements of consideration, chance and prize require persons playing iLottery to electronically load games at the physical location of an authorized lottery retailer, and not remotely. The elements of consideration and prize shall occur at the physical location of an authorized lottery retailer, but the

81

element of chance may occur on a mobile device, provided that each chance, including the associated result, occurs in no less than 120 second intervals. The definition of iLottery shall not include games that represent physical, Internet-based or monitor-based interactive lottery games which simulate Covered Games, specifically including, but not limited to, poker, roulette, slot machines, Event Wagering and blackjack.

Comanche Agreement Part 2.A.25.; Otoe-Missouria Agreement Part 2.A.23; *see* UKB & KTT Agreements Part 2.A.18. (not listing "Event Wagering" as an exception to definition of iLottery but otherwise identical).

184.    The definition of iLottery in the Agreements allows the State to authorize any form of electronic gaming that has the elements of consideration, chance, and prize, and to authorize any such games to be played anywhere, including the Indian country of the signatory tribes and non-signatory tribes, after any such games have been electronically loaded at an authorized lottery retailer's physical location.  This provision violates IGRA, which does not authorize States to conduct Class III gaming, nor does it authorize States and tribes to negotiate for the conduct of Class III gaming by the State.  *See* 25 U.S.C. § 2710(d)(3)(C).   The Defendant Governor Stitt therefore does not have authority to negotiate and agree to compact terms permitting the State to conduct the iLottery, and any such term is invalid under IGRA.

185.    The Defendant Secretary's no action approvals of the Agreements is invalid because the revenue sharing provisions of the Agreements violate IGRA.  Those provisions are also invalid because the Defendant Secretary failed to explain the change in policy with respect to the payment of revenue sharing under IGRA that is shown by comparing his approval of the revenue sharing provisions of the Former Compacts, *see supra* at ¶ 62, with

the Defendant Secretary's no action approvals of the Agreements. "When an agency changes course, as [the Secretary] did here, it must 'be cognizant that longstanding policies may have "engendered serious reliance interests that must be taken into account."' 'It would be arbitrary and capricious to ignore such matters.'" *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020) (first quoting *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016); then quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)); *see also Forest Cty. Potawatomi*, 330 F. Supp. 3d at 289 ("When an agency declines to follow past decisions, the agency must explain the change in policy." (citing *Hall v. McLaughlin*, 864 F.2d 868, 873 (D.C. Cir. 1989))). By failing to do so, the Defendant Secretary's no action approval was arbitrary, capricious, and contrary to law.

186. The Plaintiff Nations' legally-protected interest in their conduct of Class II and Class III gaming in accordance with IGRA, tribal law, the OTWCs, and the Plaintiff Nations' Class III Compacts is injured because the Defendant Secretary's no action approvals deprived the Plaintiff Nations of the substantive and procedural protections from the unlawful conduct of Class III gaming that IGRA is intended to provide them by requiring that compacts be submitted to the Secretary for approval, 25 U.S.C. § 2710(d)(3)(B), and by imposing an obligation on the Secretary to disapprove a compact that violates "(i) any provision of [IGRA], (ii) any other provision of Federal law . . . , or (iii) the trust obligations of the United States to Indians," *id.* § 2710(d)(8)(B)(i)-(iii); *Amador Cty.*, 640 F.3d at 381 ("The Secretary must . . . disapprove a compact if it would violate any of the three limitations in that subsection . . . ."). These statutory obligations

83

protect all Indian tribes' rights, including those of the Plaintiff Nations, to conduct Class III gaming "as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments," 25 U.S.C. § 2702(1), and ensure that no tribe may gain entry to the highly competitive gaming market in Oklahoma without complying with IGRA. Had the Defendant Secretary complied with these statutory obligations, he would have disapproved the Agreements on the ground that the revenue sharing provisions of the Agreements are invalid. The Defendant Secretary's failure to do so will cause economic injury to the Plaintiff Nations by requiring that they compete with the Comanche Nation, Otoe-Missouria Tribe, UKB, and KTT for gaming revenue in a highly competitive market, in which, as a further result of the Secretary's no action approval, the Plaintiff Nations' share will be reduced.

187.     In addition, the Plaintiff Nations' legally-protected interest in their conduct of such Class II and Class III gaming is injured by the Defendant Secretary's no action approvals of the Agreements, as the Agreements purport to authorize the State to conduct the iLottery. IGRA does not authorize States to conduct any form of Class III gaming, and furthermore, the State's conduct of the iLottery is not a valid subject of compact negotiations under 25 U.S.C. § 2710(d)(3)(C). Nevertheless, because the Defendant Secretary failed to disapprove the Agreements, the Plaintiff Nations will face increased competition for gaming revenue in violation of IGRA as a result of the State's operation of the iLottery.

188.     The injuries set forth above in ¶¶ 186-87 are directly traceable to the Defendants' conduct, specifically: the Defendants Governor Stitt's, Chairman Nelson's,

164436-3

Chairman Shotton's, Chief Bunch's, and Mekko Givens's submission of the Agreements to the Defendant Secretary for review under IGRA and their representation to the Defendant Secretary that the Agreements had been validly entered into by both parties; the no action approvals of those Agreements by the Defendants the Department, Secretary Bernhardt, and Assistant Secretary Sweeney; and Defendants Governor Stitt's, Chairman Nelson's, Chairman Shotton's, Chief Bunch's, and Mekko Givens's actions in furtherance of the Agreements. Those injuries will be redressed by a favorable decision of this Court declaring that the Agreements were not validly "entered into" under state law and therefore are not "in effect" under IGRA, reversing the Defendant Secretary's no action approval of the Agreements and remanding to the Secretary for disapproval, and declaring that the Defendant tribal officials' exercise of authority or jurisdiction under the Agreements is not authorized under IGRA and therefore violates federal law.

### 4. The Agreements violate IGRA by regulating Class II gaming.

189. All four Agreements contain provisions regulating Class II gaming.

190. The Comanche and Otoe-Missouria Agreements provide that:

On an annual basis, the Tribe shall certify by Tribal resolution that Forty-Five Percent (45.00%) of revenues from all Facilities is derived from Covered Games, until the Bureau of Indian Affairs has approved the first Section 20 application to establish Indian lands for a new Facility made by the Tribe (the "*Section 20 Approval Trigger*"), as more specifically described in Part [4.J.2.] of this Compact. Following the Section 20 Approval Trigger, the Tribe shall annually certify by Tribal resolution that Fifty Percent (50.00%) of revenues from all Facilities is derived from Covered Games.

Comanche & Otoe-Missouria Agreements Part 3.D. Those Agreements also provide that:

"*Covered Game*" or any derivate thereof means all Gaming Machines, House-banked Card Games, Nonhouse-Banked Card Games, House-banked

164436-3

Table Games, Nonhouse-banked Table Games, and Event Wagering, . . . *if the operation of such game by the Tribe would require a Compact . . . . Class II gaming, as defined by IGRA, is expressly excluded from this definition.*

Comanche Agreement Part 2.A.7.; Otoe-Missouria Agreement Part 2.A.6. (emphasis added). Those Agreements further provide that:

The Enterprise shall keep a record of, and shall report at least quarterly to the SCA, *the number of Covered Games and class II devices in each Facility, by the name or type of each and its identifying number, and denomination of bets accepted.* This list shall include both class II and class III games. *Failure to report in accordance herewith shall result in a penalty of $5,000 per each Facility per report to be remitted to the SCA for purposes of deposit and expenditure in connection with Part [10.C.] of this Compact.*

Comanche & Otoe-Missouria Agreements Part 4.K. (emphasis added).

191.      The UKB and KTT Agreements provide that

[f]rom July 1, 2020, through December 31, 2035, the Tribe shall certify annually by Tribal resolution that Eighty Percent (80.00%) of Gaming revenues from its Facility are derived from Covered Games.

UKB & KTT Agreements Part 3.D. Those Agreements also provide that:

"*Covered Game*" or any derivative thereof means all Gaming Machines, Nonhouse-Banked Card Games, and Nonhouse-banked Table Games . . . *if the operation of such game by the Tribe would require a Compact . . . . Class II gaming, as defined by the Indian Gaming Regulatory Act, is expressly excluded from this definition.*

*Id.* Part 2.A.6 (emphasis added). Those Agreements further provide that:

[t]he Enterprise shall keep a record of, and shall report at least quarterly to the SCA, *the number of Covered Games and class II devices in the Facility, by the name or type of each, its identifying number, and the denomination of bets accepted.* This list shall include both class II and class III games. *Failure to report in accordance herewith shall result in a penalty of $5,000 per report to be remitted to the SCA for purposes of deposit and expenditure in connection with Part [10.C.] of this Compact.*

*Id.* Part 4.L. (emphasis added).

86

192. Class II gaming cannot be subject of IGRA compact negotiations or of IGRA compacts themselves. *See* 25 U.S.C. § 2710(b)(1), (d)(3)(C); *Forest Cty. Potawatomi*, 330 F. Supp. 3d at 287 ("[T]ribal-state compacts [are] not required for the regulation of Class II gaming"). The Secretary earlier made that determination in approving the Comanche Nation's Existing Compact. Comanche Approval Letter at 3.

193. Part 3.D. of the Comanche and Otoe-Missouria Agreements, by requiring that at least 45% of each of the signatory tribe's revenues from gaming facilities come from "Covered Games" before the "Section 20 Approval Trigger," necessarily requires that the Comanche Nation and Otoe-Missouria Tribe obtain not more than 55% of their revenue from Class II games. Similarly, by requiring that at least 50% of each of the signatory tribe's revenues from gaming facilities come from "Covered Games" after the "Section 20 Approval Trigger," Part 3.D. necessarily requires that the Comanche Nation and Otoe-Missouria Tribe obtain not more than 50% of their revenue from Class II games once that trigger is activated.

194. Part 3.D. of the UKB and KTT Agreements, by requiring that at least 80% of each of the signatory tribe's revenues from gaming facilities come from "Covered Games," necessarily requires that UKB and KTT obtain not more than 20% of their revenue from Class II games.

195. Part 3.D. of the Agreements therefore regulates the Comanche Nation's, Otoe-Missouria Tribe's, UKB's, and KTT's conduct of Class II games, in violation of IGRA. In addition, Part 3.D. violates IGRA because it limits the Comanche Nation's,

Otoe-Missouria Tribe's, UKB's, and KTT's conduct of Class II gaming in order to increase the revenue sharing paid to the State for their conduct of Class III gaming.

196.    Part 4.K. of the Comanche and Otoe-Missouria Agreements, by requiring that the tribe "report at least quarterly to the SCA, the number of Covered Games and class II devices in each Facility, by the name or type of each and its identifying number, and denomination of bets accepted," and that "[f]ailure to report in accordance herewith shall result in a penalty of $5,000 per each Facility per report" also regulates the Comanche Nation's and Otoe-Missouria Tribe's conduct of Class II games in violation of IGRA.

197.    Part 4.L. of the UKB and KTT Agreements, by requiring that the tribe "report at least quarterly to the SCA, the number of Covered Games and class II devices in the Facility, by the name or type of each, its identifying number, and the denomination of bets accepted," and that "[f]ailure to report in accordance herewith shall result in a penalty of $5,000 per report" also regulates UKB's and KTT's conduct of Class II games in violation of IGRA.

198.    The Defendant Secretary's no action approvals of the Agreements are invalid for the reasons set forth *supra* at ¶¶ 192-96, and for the additional reason that he failed to explain the change in policy with respect to the regulation of Class II games that is shown by comparing his recognition that Class II games cannot be the subject of IGRA compacts, Comanche Approval Letter at 3, and his no action approvals of the Agreements.

199.    The Plaintiff Nations' legally-protected interest in their conduct of Class II and Class III gaming in accordance with IGRA, tribal law, the OTWCs, and the Plaintiff Nations' Class III Compacts is injured by the Defendant Secretary's no action approvals

164436-3

of the Agreements, because they deprive the Plaintiff Nations of the substantive and procedural protections that 25 U.S.C. § 2710(d)(8) is intended to provide them by requiring that the Secretary disapprove a compact that violates "(i) any provision of [IGRA], (ii) any other provision of Federal law . . . , or (iii) the trust obligations of the United States to Indians." *Id.* § 2710(d)(8)(B)(i)-(iii); *Amador Cty.*, 640 F.3d at 381 ("[T]he Secretary must . . . disapprove a compact if it would violate any of the three limitations in that subsection . . . ."). Had the Defendant Secretary complied with these statutory obligations, he would have disapproved the Agreements on the ground that those Agreements regulate Class II gaming, in violation of IGRA, for purposes of increasing the amount of revenue sharing to be paid to the State, also in violation of IGRA.

200. The Plaintiff Nations are injured by the Defendant Secretary's failure to fulfill that responsibility, as a direct result of which the Plaintiff Nations must compete for Class III gaming revenues with the Comanche Nation, Otoe-Missouria Tribe, UKB, and KTT and will suffer economic injury as a result. These injuries are directly traceable to the Defendants' conduct, and will be redressed by a favorable decision of this Court in this action declaring that the Agreements were not validly "entered into" under state law and therefore are not "in effect" under IGRA, reversing the Defendant Secretary's no action approvals of the Agreements and remanding to the Secretary for disapproval, and declaring that the Defendant tribal officials' exercise of authority or jurisdiction under the Agreements is not authorized under IGRA and therefore violates federal law.

164436-3

**5.  The Defendant Governor's purported future concurrence in the Agreements in future off-reservation trust land acquisitions violates IGRA.**

201.  Under 25 U.S.C. § 2710(d)(1), Class III gaming is lawful only on "Indian lands." "Indian lands" are

> (A) all lands within the limits of any Indian reservation; and (B) any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power.

*Id.* § 2703(4).  The Secretary has clarified that, for purposes of IGRA, an Indian reservation is a tribe's reservation or its former reservation in Oklahoma.  25 C.F.R. § 292.2.  Thus, a tribe may conduct gaming on land outside of its reservation or former reservation in Oklahoma when it is held in trust for the tribe by the United States or restricted against alienation by the United States.  Under current law, the way for a tribe in Oklahoma to obtain land that meets these requirements is by an acquisition of land into trust for the tribe by the Secretary.

202.  Most tribes in Oklahoma may have land placed into trust for them by the Department.  *See* 25 U.S.C. §§ 2202, 5105, 5108, 5203.  When land is located outside of the tribe's reservation or former reservation in Oklahoma, that may be done when the tribe already owns the land or when the Secretary determines that the acquisition in trust is "necessary to facilitate tribal self-determination, economic development, or Indian housing."  25 C.F.R. § 151.3(a).  Federal regulation further prohibits one tribe from having land taken into trust for its benefit within a second tribe's reservation or former reservation in Oklahoma unless the second tribe consents in writing to the trust acquisition.  *Id.* § 151.8;

*id.* § 151.2(f) ("reservation" includes a former reservation in Oklahoma as defined by the Secretary); *id.* § 292.2 (defining the boundaries of former reservations in Oklahoma for IGRA gaming purposes).

203.    Under 25 U.S.C. § 2719, an Indian tribe can only conduct class III gaming on after-acquired lands located outside of its reservation or former reservation in Oklahoma if

> the Secretary, after consultation with the Indian tribe and appropriate State and local officials, including officials of other nearby Indian tribes, determines that a gaming establishment on newly acquired lands would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community, but only if the Governor of the State in which the gaming activity is to be conducted concurs in the Secretary's determination . . . .

*Id.* § 2719(b)(1)(A); *see id.* § 2719(a)(1), (a)(2)(A)(i); 25 C.F.R. § 292.2 (defining "reservation" as including a tribe's former reservation in Oklahoma and defining their boundaries for IGRA purposes).

204.    In the Agreements, the Defendant Governor Stitt purports to preemptively give such consent to gaming by the Comanche Nation, Otoe-Missouria Tribe, UKB, and KTT at future gaming facilities, to be located on trust land to be acquired in specified areas of counties named in each Agreement, large portions of which are outside of the signatory Tribes' reservations or former reservations in Oklahoma.[8]

---

[8] UKB, which was federally-recognized in 1946, does not have a reservation or former reservation in Oklahoma, *see Cherokee Nation v. Bernhardt*, No. 12-cv-493-GKF-JFJ, 2020 WL 1429946, at \*1, \*9-12 (N.D. Okla. Mar. 24, 2020), *appeal filed*, Nos. 20-5054, 20-5055 (10th Cir. May 26, 2020), so all trust acquisitions for UKB are by definition off-reservation trust acquisitions.

164436-3

a.    **The Comanche and Otoe-Missouria Agreements' Future Concurrence Provisions.**

205.    Part 4.J.2. of the Comanche and Otoe-Missouria Agreements provides:

New Facilities.  In addition to its Existing Facilities, the Tribe may establish and operate [three new facilities] (collectively the "*New Facilities*"), subject to the land being taken into trust pursuant to 25 U.S.C. § 2719(b)(1)(A). . . .

a.    Section 20 Concurrence.  By entering into this Compact, the State through its Governor, in order to provide a meaningful concession to the Tribe, the adequacy of which is acknowledged and by which the Tribe was materially induced to enter into this Compact, hereby agrees to concur in any determination by the Secretary of the Interior that lands relating to the [three new facilities], should be taken into trust for gaming purposes, and such lands are eligible for gaming under 25 U.S.C. § 2719(b)(1)(A).  The Parties agree that no other action from the State is required for approval of those lands' eligibility for gaming.

206.    The Comanche Nation Agreement purports to provide that the Comanche Nation's "New Facilities" can be located "within one (1) mile of a state or federal highway or turnpike running through" Cleveland, Grady, and Love Counties, Oklahoma.  Comanche Agreement Parts 2.A.5., 2.A.21., 2.A.27., 4.J.2., 4.J.2.a.  Most of the areas described by these Parts of the Agreement are outside of the Comanche Nation's reservation or former reservation in Oklahoma and are within other federally-recognized Indian tribes' reservations or former reservations in Oklahoma.

207.    Love County is located entirely within the territory of the Chickasaw Nation, which is a federally-recognized Indian tribe.  Part of the area of Grady County defined in the Comanche Nation Agreement is within the Chickasaw Nation's reservation or "former reservation," 25 C.F.R. § 292.2, over which the Chickasaw Nation exercises jurisdiction.

92

208.     The portion of Grady County defined in the Comanche Nation Agreement not within the Chickasaw Nation's reservation or "former reservation," *id.*, or the Comanche Nation's territory is located within the territory of the Wichita and Affiliated Tribes, the Caddo Nation, and the Delaware Nation, or within the territory of the Kiowa Tribe of Oklahoma and the Apache Tribe of Oklahoma.  The Wichita and Affiliated Tribes, the Caddo Nation, the Delaware Nation, the Kiowa Nation, and the Apache Tribe are federally-recognized Indian tribes, and the lands within their territories constitute their reservations or former reservations in Oklahoma, with boundaries recognized by the Secretary, over which these tribes exercise jurisdiction.

209.     A portion of the area of Cleveland County defined in the Comanche Nation Agreement is located within the territory of CPN.  CPN is a federally-recognized Indian tribe, and the lands within its territory constitute its reservation or "former reservation," 25 C.F.R. § 292.2, in Oklahoma, with boundaries recognized by the Secretary, over which CPN exercises jurisdiction.[9]

210.     The Otoe-Missouria Agreement purports to provide that the Otoe-Missouria Tribe's "New Facilities" can be located "within one (1) mile of a state or federal highway or turnpike running through" Logan, Noble, and Payne Counties, Oklahoma.  Otoe-

---

[9] The Absentee Shawnee Tribe, a federally-recognized Indian tribe, holds trust parcels and other parcels within a portion of the area of Cleveland County defined in the Comanche Nation Agreement, though the Absentee Shawnee Tribe has no reservation or former reservation there.  *See Citizen Band Potawatomi Indian Tribe of Okla. v. Collier*, 17 F.3d 1292, 1294 (10th Cir. 1994); *Citizen Band Potawatomi Indian Tribe of Okla. v. Collier*, 142 F.3d 1325, 1334 (10th Cir. 1998).

164436-3

Missouria Agreement Parts 2.A.25., 2.A.28., 2.A.32., 4.J.2., 4.J.2.a. Many of the areas described by these Parts of the Agreement are outside of the Otoe-Missouria Tribe's former reservation in Oklahoma and are within other federally-recognized Indian tribes' reservations or former reservations in Oklahoma.

211. The portion of Logan County defined in the Otoe-Missouria Agreement is partially within the territory of the Iowa Tribe of Oklahoma. The Iowa Tribe of Oklahoma is a federally-recognized Indian tribe, and the lands within its territory constitutes its reservation or former reservation in Oklahoma, with boundaries recognized by the Secretary, over which it exercises jurisdiction.

212. The portion of Noble County defined in the Otoe-Missouria Agreement not within the Otoe-Missouria Tribe's territory is partially within the territory of the Ponca Tribe of Indians of Oklahoma. The Ponca Tribe is a federally-recognized Indian tribe, and the lands within its territory constitutes its reservation or former reservation in Oklahoma, with boundaries recognized by the Secretary, over which it exercises jurisdiction.

213. The portion of Payne County defined in the Otoe-Missouria Agreement is partially within the territory of the Pawnee Nation of Oklahoma and partially within the territory of the Sac and Fox Nation of Oklahoma. The Pawnee Nation and the Sac and Fox Nation are federally-recognized Indian tribes, and the lands within their territories constitute their reservations or former reservations in Oklahoma, with boundaries recognized by the Secretary, over which the Pawnee Nation and the Sac and Fox Nation exercise jurisdiction.

94

214.    The Comanche Nation and Otoe-Missouria Tribe have not obtained consent

from the Chickasaw Nation or CPN to acquire land in trust within their reservations or

former reservations in Oklahoma.  On information and belief, the Comanche Nation and

Otoe-Missouria Tribe have not obtained consent from any other tribe to acquire land in

trust within that tribe's reservation or former reservation in Oklahoma.

> **b.    The Future Concurrence Provisions of the UKB and KTT Agreements.**

215.    Part 4.K. of the UKB Agreement provides:

> Section 20 Concurrence. By entering into this Compact, the State through its
> Governor, in order to provide additional meaningful concessions to the Tribe,
> the adequacy of which is acknowledged by the Tribe, hereby agrees to concur
> in any determination by the Secretary of the Interior that land relating to the
> single Logan County Facility that the Tribe may propose, as defined in Part
> [2.A.21.], should be taken into trust for Gaming purposes, and such lands are
> eligible for Gaming under 25 U.S.C. § 2719(b)(l)(A), (the "*Concurrence*").
> The Parties agree that no other action from the State is required for approval
> of that land's eligibility for Gaming.

As described *supra* at ¶ 168, the "Logan County Facility" is a gaming facility to be

constructed in Logan County, Oklahoma within one mile of a state or federal highway or

turnpike running through Logan County.  *Id.* Parts 2.A.21., 4.K.1.  If UKB does not apply

for a Section 20 determination of Indian land status for lands in Logan County on or before

July 1, 2024, then the UKB Agreement provides that "the Governor shall withdraw this

Concurrence.  [UKB] may submit a written request for reconsideration to the Governor."

*Id.* Part. 4.K.2.

164436-3

216.    The portion of Logan County defined in the UKB Agreement is not within the UKB reservation or former reservation in Oklahoma because UKB does not have a reservation or former reservation in Oklahoma.

217.    The portion of Logan County defined in the UKB Agreement is partially within the territory of the Iowa Tribe of Oklahoma.  The Iowa Tribe of Oklahoma is a federally-recognized Indian tribe, and the lands within its territory constitute its reservation or former reservation in Oklahoma, with boundaries recognized by the Secretary, over which it exercises jurisdiction.  On information and belief, UKB has not obtained consent from the Iowa Tribe of Oklahoma to acquire land in trust within that tribe's reservation or former reservation in Oklahoma.

218.    Part 4.K. of the KTT Agreement provides:

> Section 20 Concurrence.  By entering into this Compact, the State through its Governor, in order to provide additional meaningful concessions to the Tribe, the adequacy of which is acknowledged by the Tribe, hereby agrees to concur in any determination by the Secretary of the Interior that land relating to the single Oklahoma County Facility that the Tribe may propose, as defined in Part [2.A.25.], should be taken into trust for Gaming purposes, and such lands are eligible for Gaming under 25 U.S.C. § 2719(b)(1)(A), (the "*Concurrence*").  The Parties agree that no other action from the State is required for approval of those land's [sic] eligibility for Gaming.

As described *supra*, ¶ 168, the "Oklahoma County Facility" is a gaming facility to be constructed within Oklahoma County, Oklahoma, east of Choctaw Road and within one mile of a state or federal highway or turnpike running through Oklahoma County.  KTT Agreement Parts 2.A.25., 4.K.1.  KTT must "enter into a[ management] agreement, as authorized by IGRA, with a federally recognized Indian tribe to jointly manage or operate the Facility on or before June 30, 2021," and "[a]ny such agreement shall be subject to

approval by the State; such approval shall not be unreasonably withheld." *Id.* Part 4.K.2.

KTT must also apply for a Section 20 determination for the Oklahoma County Facility on

or before June 30, 2023. *Id.* Part 4.K.3. If KTT fails to do either of these things, "the

Governor shall withdraw his Concurrence. The Tribe may submit a written request for

reconsideration by the Governor." *Id.* Part. 4.K.4.

219. The portion of Oklahoma County described in the KTT Agreement is not

within the KTT's reservation or former reservation in Oklahoma.

220. The portion of Oklahoma County described in the KTT Agreement falls

within the territories of the Iowa Tribe of Oklahoma, the Kickapoo Tribe of Oklahoma,

and CPN. The Iowa Tribe, the Kickapoo Tribe, and CPN are federally-recognized Indian

tribes, and the lands within their territories constitutes their reservation or former

reservation in Oklahoma, with boundaries recognized by the Secretary, over which they

exercise jurisdiction. KTT has not obtained consent from CPN to acquire land into trust

within CPN's reservation or former reservation in Oklahoma. On information and belief,

KTT has not obtained consent from the Iowa Tribe or Kickapoo Tribe to acquire land in

trust within these tribes' reservations or former reservations in Oklahoma.

c.     **The Legal Invalidity of the Future Concurrence Provisions.**

221. Federal regulations require the Secretary to contact local governments having

regulatory jurisdiction over off-reservation lands that a tribe proposes to have taken into

trust, and give those local governments an opportunity to submit "written comment as to

the acquisition's potential impacts on regulatory jurisdiction, real property taxes and

special assessments." 25 C.F.R. § 151.11(d).

164436-3

222. Nothing in the Oklahoma Constitution, statutes, or case law authorizes Defendant Governor Stitt to bind future Governors to make discretionary decisions like concurring in a land-into-trust acquisition for gaming purposes under 25 U.S.C. § 2719(b)(1)(A). Nothing in the Oklahoma Constitution, statutes, or case law authorizes Defendant Governor Stitt to bind future Governors to withdraw such concurrences if they are given. Nothing in the Oklahoma Constitution, statutes, or case law authorizes Defendant Governor Stitt to bind future Governors to a procedure for considering or reconsidering whether to issue such concurrences or withdraw them.

223. Under 25 U.S.C. § 2710(d)(9), an Indian tribe "may enter into a management contract for the operation of a class III gaming activity if such contract has been submitted to, and approved by, the Chairman [of the NIGC.]" Any such management contract is subject to approval under 25 U.S.C. § 2711. *See* 25 U.S.C. § 2710(d)(9) (providing the NIGC Chairman's review of a management agreement "shall be governed by the provisions of subsections (b), (c), (d), (f), (g), and (h) of section 2711 of this title") Nothing in Sections 2710 or 2711 requires a tribe to enter into a management contract to conduct Class III gaming once it has entered into a Compact under 25 U.S.C. § 2710(d)(3).

224. The KTT Agreement only allows KTT to conduct Class III gaming in Oklahoma County. No part of that county is within KTT's reservation or former reservation in Oklahoma, so KTT will need to obtain a Section 20 concurrence in order to game under the Compact. Thus, by making the Section 20 concurrence dependent on the State's approval of a management contract, the KTT Agreement makes KTT's conduct of gaming reliant on the State's approval of a management agreement. This gives the State a

veto power over tribal gaming and the effectiveness of an existing IGRA compact, in violation of the State's obligation to negotiate with a tribe over the terms on which IGRA gaming is conducted and the Tribe's right to conduct gaming pursuant to the valid terms of a negotiated compact. *See Rincon*, 602 F.3d at 1030 ("while IGRA was designed to give states a voice in Indian gaming, it was not designed to give states complete power over tribal gaming" (citing *Cheyenne River Sioux Tribe v. South Dakota*, 3 F.3d 273, 281 (8th Cir. 1993); *Dalton v. Pataki*, 835 N.E.2d 1180, 1189 (N.Y. 2005))).

225. The federal government owes special obligations to Indian tribes, including the Plaintiff Nations, under federal common law, and pursuant to IGRA. The acquisition of trust land and the conduct of IGRA gaming by the Comanche Nation, Otoe-Missouria Tribe, UKB, and KTT within the reservation or former reservation of one of the Plaintiff Nations without the consent of the affected Plaintiff Nation would violate the United States' trust responsibility to protect the Plaintiff Nations' self-government and ability to govern its territory. Thus, a decision by the Secretary to take land into trust for the Comanche Nation, the Otoe-Missouria Tribe, UKB, or KTT within the boundaries of one of the Plaintiff Nations' reservations or former reservations without the consent of the affected Plaintiff Nation would be invalid under federal law.

226. A gubernatorial concurrence in an Indian lands determination is not a proper subject of negotiation under 25 U.S.C. § 2710(d)(3)(C). Although IGRA authorizes states and tribes to negotiate compact terms dealing with "any other subjects that are directly related to the operation of gaming activities," *id.* § 2710(d)(3)(C)(vii), a gubernatorial concurrence in an Indian lands determination lies outside the scope of such provision. As

99

the Supreme Court has explained, "'class III gaming activity' means just what it sounds like—the stuff involved in playing class III games . . . each roll of the dice and spin of the wheel." *Bay Mills*, 572 U.S. at 792. A concurrence in a determination that land is eligible for gaming under 25 U.S.C. § 2719(b)(1)(A) is not "gaming activity" subject to negotiation under 25 U.S.C. § 2710(d)(3)(C)(vii). Therefore, the Defendants Governor Stitt, Chairman Nelson, Chairman Shotton, Chief Bunch, and Mekko Givens lacked authority to negotiate over an Indian lands concurrence by the Governor of Oklahoma or include terms relating to such a concurrence in an IGRA compact, and those terms are invalid.

227. For the same reasons, the Defendant Governor Stitt's purported promise to concur in future land-into-trust determinations is illusory and does not provide a meaningful concession to the Comanche Nation, Otoe-Missouria Tribe, UKB, or KTT, nor does it confer substantial benefits to those Tribes, and that promise therefore cannot support the revenue sharing provisions of the Agreements. Likewise, Defendant Governor Stitt's purported promises to withdraw his purported concurrence to UKB and KTT if certain events to do not occur and to permit UKB and KTT to seek reconsideration of any such withdrawal of a concurrence are illusory and do not provide a meaningful concession to UKB and KTT.

228. Additionally, as the process for the approval of gaming management contracts is provided by IGRA and does not give the state power to effectively invalidate a compact by refusing to approve such a contract, the Defendants Governor Stitt and Mekko Givens lacked authority to negotiate for provisions making KTT's conduct of

100

gaming under the KTT Agreement contingent on the State's approval of a gaming management contract.

229. Accordingly, the substantial exclusivity fee payments required by Part 10.B. of the Agreements are a "tax, fee, charge, or other assessment" on the Comanche Nation, Otoe-Missouria Tribe, UKB, and KTT by the State, not made in such amounts necessary to defray the costs of regulating such gaming activity, that is prohibited by IGRA. 25 U.S.C. § 2710(d)(3)(C)(iii), (d)(4).

230. The Plaintiff Nations' legally-protected interest in their conduct of Class II and Class III gaming in accordance with IGRA, tribal law, the OTWCs, and the Plaintiff Nations' Class III Compacts is injured by the Defendant Secretary's no action approvals of the Agreements because that action deprives them of the substantive and procedural protections from the unlawful conduct of Class III gaming that IGRA is intended to provide to the Plaintiff Nations by requiring that the Secretary disapprove a compact that violates "(i) any provision of [IGRA], (ii) any other provision of Federal law . . . , or (iii) the trust obligations of the United States to Indians." *Id.* § 2710(d)(8)(B)(i)-(iii); *Amador Cty.*, 640 F. 3d at 381 ("The Secretary must . . . disapprove a compact if it would violate any of the three limitations in that subsection . . . ."). Had the Defendant Secretary complied with these statutory obligations, he would have disapproved the Agreements on the ground that the Defendant Governor Stitt's purported future concurrence in the Agreements in future off-reservation trust land acquisitions violates IGRA. The Plaintiff Nations are injured by the Defendant Secretary's failure to fulfill these responsibilities, as a direct result of which the Plaintiff Nations' rights of self-government and ability to govern their territories are

164436-3

threatened by future off-reservation trust land acquisitions. In addition, the Plaintiff Nations' right to conduct Class II and Class III gaming "as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments," 25 U.S.C. § 2702(1), is severely threatened by the Comanche Nation's, Otoe-Missouria Tribe's, UKB's, and KTT's planned future off-reservation trust land acquisitions and the Defendant Governor Stitt's purported future concurrence in those acquisitions because it will further increase competition for gaming revenue in the highly competitive gaming market in Oklahoma and reduce the Plaintiff Nations' share of that market.

231. These injuries are directly traceable to the Defendants' conduct, specifically: the Defendants Governor Stitt's, Chairman Nelson's, Chairman Shotton's, Chief Bunch's, and Mekko Givens's submission of the Agreements to the Defendant Secretary for review under IGRA and their representation to the Defendant Secretary that the Agreements had been validly entered into by both parties; the no action approvals of those Agreements by the Defendants the Department, Secretary Bernhardt, and Assistant Secretary Sweeney; and Defendants Governor Stitt's, Chairman Nelson's, Chairman Shotton's, Chief Bunch's, and Mekko Givens's actions in furtherance of the Agreements. Those injuries will be redressed by a favorable decision of this Court in this action declaring that the Agreements were not validly "entered into" under state law and therefore are not "in effect" under IGRA, reversing the Defendant Secretary's no action approvals of the Agreements and remanding to the Secretary for disapproval, and declaring that the Defendant tribal officials' exercise of authority or jurisdiction under the Agreements is not authorized under IGRA and therefore violates federal law.

164436-3

# V.    CAUSES OF ACTION

## FIRST CAUSE OF ACTION:

## THE DEFENDANT SECRETARY'S CONSIDERATION OF THE AGREEMENTS WAS ARBITRARY, CAPRICIOUS, AND CONTRARY TO LAW BECAUSE THE AGREEMENTS HAD NOT BEEN LEGALLY ENTERED INTO BY BOTH PARTIES WHEN CONSIDERED BY THE SECRETARY.

232.    The Plaintiff Nations incorporate all previous allegations of fact and law into this Cause of Action as if fully set forth herein.

233.    IGRA's regulations provide that "[t]he Indian tribe or State should submit the compact or amendment after it has been legally entered into by both parties." 25 C.F.R. § 293.7. And IGRA provides that the Secretary is only authorized to approve, disapprove, or approve by inaction a compact that has been entered into between an Indian tribe and a State. 25 U.S.C. § 2710(d)(8)(A)-(C).

234.    When the Defendant Governor Stitt, the Comanche Nation, the Otoe-Missouria Tribe, UKB, and KTT submitted the Agreements to the Defendant Secretary, those Agreements had not been legally entered into by both parties. Shortly after the Comanche and Otoe-Missouria Agreements were submitted to the Defendant Secretary for review under IGRA, the Defendant Secretary was informed by the leadership of the Oklahoma Legislature, the Oklahoma Attorney General, and the Plaintiff Nations that the Defendant Governor Stitt's and the Comanche Nation and Otoe-Missouria Tribe Agreements had not been legally entered into by both parties, and that the Governor could not unilaterally enter into Compacts on behalf of the State. The UKB and KTT Agreements were then submitted to the Defendant Secretary for review under IGRA, without legislative

103

consent or approval. The Defendant Secretary's subsequent consideration of the Agreements therefore violated 25 C.F.R. § 293.7, and was arbitrary, capricious, and contrary to law, 5 U.S.C. § 706(2)(A), and without observance of procedure required by law, *id.* § 706(2)(D).

235. The Plaintiff Nations are therefore entitled to a judgment "hold[ing] unlawful and set[ting] aside" the Defendant Secretary's "no action" approvals of the Agreements pursuant to 5 U.S.C. § 706(2)(A) and remanding them to the Defendant Secretary for disapproval pursuant to 5 U.S.C. § 706(1), and declaring that the Secretary's no action approvals of the Agreements do not make the Agreements valid compacts and have no legal effect.

## SECOND CAUSE OF ACTION:

**THE DEFENDANT SECRETARY'S FAILURE TO CONSIDER WHETHER THE AGREEMENTS WERE VALIDLY ENTERED INTO BY THE STATE AND WHETHER ANY OF THE PROVISIONS OF THE AGREEMENTS WERE INVALID, AND HIS FAILURE TO ISSUE AN OPINION OR LETTER DISAPPROVING THE AGREEMENTS, RENDERS HIS NO ACTION APPROVAL ARBITRARY, CAPRICIOUS, AND CONTRARY TO LAW.**

236. The Plaintiff Nations incorporate all previous allegations of fact and law into this Cause of Action as if fully set forth herein.

237. Under IGRA, if any provision of a purported compact submitted to the Secretary violates IGRA, other provisions of federal law, or the federal trust responsibility to Indian tribes, the Secretary is obligated to issue an opinion, letter or other ruling disapproving that purported compact or the provisions that violate those authorities. *Amador Cty.*, 640 F.3d at 381.

104

238.    The Defendant Secretary's failures to issue such opinions, letters or other rulings, and his decisions to allow the Agreements to go into effect under IGRA without considering whether the Agreements were validly entered into and whether any of their provisions violate IGRA, therefore violate IGRA and were arbitrary, capricious, and contrary to law, 5 U.S.C. § 706(2)(A), and without observance of procedure required by law, *id.* § 706(2)(D); *Physicians for Soc. Responsibility v. Wheeler*, 956 F.3d 634, 644 (D.C. Cir. 2020) ("It is axiomatic that the APA requires an agency to explain its basis for a decision.").

239.    The Defendant Secretary's failures to issue such opinions, letters or other rulings even after receiving comments from State Legislative leaders, the Oklahoma Attorney General, and the Plaintiff Nations, asserting that provisions of the Agreements were invalid under IGRA, 25 U.S.C. § 2710(d)(8)(B), and state law, also show that his "no action" approvals were arbitrary, capricious, and contrary to law, 5 U.S.C. § 706(2)(A), and without observance of procedure required by law, *id.* § 706(2)(D).

240.    The Plaintiff Nations are therefore entitled to a judgment "hold[ing] unlawful and set[ting] aside" the Defendant Secretary's "no action" approvals of the Agreements pursuant to 5 U.S.C. § 706(2)(A), and declaring that the Secretary's no action approvals of the Agreements do not make the Agreements valid compacts and have no legal effect.

164436-3

## THIRD CAUSE OF ACTION:

## THE DEFENDANT SECRETARY'S NO ACTION APPROVAL OF THE AGREEMENTS WAS ARBITRARY, CAPRICIOUS, AND CONTRARY TO LAW BECAUSE THOSE AGREEMENTS WERE NOT VALIDLY ENTERED INTO BY THE STATE.

241. The Plaintiff Nations incorporate all previous allegations of fact and law into this Cause of Action as if fully set forth herein.

242. The Agreements were not validly "entered into" under IGRA, 25 U.S.C. § 2710(d)(1)(C), because those Agreements are not the Model Compact and were not approved by the Legislature through any other means, *see Treat I*, 2020 OK 64.

243. For the reasons described above, the Defendant Secretary's "no action" approvals of the Agreements are arbitrary, capricious, and contrary to law. 5 U.S.C. § 706(2)(A).

244. The Plaintiff Nations are therefore entitled to a judgment "hold[ing] unlawful and set[ting] aside" the Defendant Secretary's "no action" approvals of the Agreements pursuant to 5 U.S.C. § 706(2)(A), and remanding them to the Defendant Secretary for disapproval pursuant to 5 U.S.C. § 706(1).

## FOURTH CAUSE OF ACTION:

## THE DEFENDANT SECRETARY'S NO ACTION APPROVAL OF THE AGREEMENTS WAS ARBITRARY, CAPRICIOUS, AND CONTRARY TO LAW BECAUSE THOSE AGREEMENTS PURPORT TO AUTHORIZE CLASS III GAMES THAT ARE NOT PERMITTED IN OKLAHOMA FOR ANY PURPOSE BY ANY PERSON, ORGANIZATION, OR ENTITY.

245. The Plaintiff Nations incorporate all previous allegations of fact and law into this Cause of Action as if fully set forth herein.

164436-3

246.     Under IGRA, Class III gaming activities are lawful only if "located in a State that permits such gaming for any purpose by any person, organization, or entity."  25 U.S.C. § 2710(d)(1)(B).

247.     The Comanche and Otoe-Missouria Agreements violate IGRA by purporting to authorize the Comanche Nation and Otoe-Missouria Tribe to conduct Event Wagering, House-Banked Card Games, and House-Banked Table Games  because those Class III gaming activities are not permitted in the Model Compact or other Oklahoma statute, nor are they otherwise permitted in Oklahoma "for any purpose by any person, organization, or entity."  *Id.* § 2710(d)(1)(B).

248.     The Agreements violate IGRA by purporting to authorize the State to conduct iLottery, and the Comanche and Otoe-Missouria Agreements violate IGRA by purporting to authorize the State to conduct Event Wagering, because IGRA does not authorize states to conduct any form of Class III gaming, and the State's conduct of the iLottery or Event Wagering is not a valid subject of compact negotiations under 25 U.S.C. § 2710(d)(3)(C).

249.     For the reasons described above, the Defendant Secretary's "no action" approvals of the Agreements are arbitrary, capricious, and contrary to law.  5 U.S.C. § 706(2)(A).

250.     The Plaintiff Nations are therefore entitled to a judgment "hold[ing] unlawful and set[ting] aside" the Defendant Secretary's "no action" approvals of the Agreements pursuant to 5 U.S.C. § 706(2)(A) and remanding them to the Defendant Secretary for disapproval pursuant to 5 U.S.C. § 706(1).

164436-3

## FIFTH CAUSE OF ACTION:

## THE DEFENDANT SECRETARY'S NO ACTION APPROVAL OF THE AGREEMENTS WAS ARBITRARY, CAPRICIOUS, AND CONTRARY TO LAW BECAUSE THE REVENUE SHARING PROVISIONS OF THOSE AGREEMENTS ARE INVALID AND CONSTITUTE AN UNLAWFUL TAX IN VIOLATION OF IGRA.

251. The Plaintiff Nations incorporate all previous allegations of fact and law into this Cause of Action as if fully set forth herein.

252. The revenue sharing provisions of all four Agreements violate IGRA's prohibition on state taxation by seeking to impose revenue sharing obligations without offering a meaningful concession of significant economic benefit to the Comanche Nation, Otoe-Missouria Tribe, UKB, or KTT and by providing for the amount of such payments to be determined by a third party based on the market value of the gaming authorized by the Agreements.

253. The revenue sharing provisions of the Comanche Nation and Otoe-Missouria Agreements violate IGRA's prohibition on state taxation by requiring that the Comanche Nation and Otoe-Missouria Tribe each pay 1.10% of each Patron's Event Wagering transaction total, "to be assessed in addition to the transaction total and calculated on a per wager basis." Agreements, Part 10.B.2.a.

254. The revenue sharing provisions of the Agreements violate IGRA's requirement that the Indian tribe have "the sole proprietary interest and responsibility for the conduct of [such] gaming activity," 25 U.S.C. § 2710(b)(2)(A), (d)(1)(A)(ii), by providing for the amount of the revenue sharing payments to be determined by a third party based on the market value of the gaming authorized by the Agreements.

108

255.   For the reasons described above, the Defendant Secretary's "no action" approvals of the Agreements are arbitrary, capricious, and contrary to law.  5 U.S.C. § 706(2)(A).

256.   The Plaintiff Nations are therefore entitled to a judgment "hold[ing] unlawful and set[ting] aside" the Defendant Secretary's "no action" approvals of the Agreements pursuant to 5 U.S.C. § 706(2)(A) and remanding them to the Defendant Secretary for disapproval pursuant to 5 U.S.C. § 706(1).

## SIXTH CAUSE OF ACTION:

### THE DEFENDANT SECRETARY'S NO ACTION APPROVAL OF THE AGREEMENTS WAS ARBITRARY, CAPRICIOUS, AND CONTRARY TO LAW BECAUSE THOSE AGREEMENTS REGULATE THE CONDUCT OF CLASS II GAMING.

257.   The Plaintiff Nations incorporate all previous allegations of fact and law into this Cause of Action as if fully set forth herein.

258.   The Agreements regulate the Comanche Nation's, Otoe-Missouria Tribe's, UKB's, and KTT's conduct of Class II gaming by requiring that a minimum percentage of their gaming revenues be generated by Class III games, which imposes a ceiling on the percentage of revenue that may be generated by Class II games, and by requiring that the tribe report at least quarterly the number of Class II devices in each Facility and fining the tribe if it fails to do so.

259.   The Agreements therefore violate IGRA, which does not permit Class II games to be the subject of IGRA compact negotiations or of IGRA compacts themselves. *See* 25 U.S.C. § 2710(b)(1), (d)(3)(C).  In addition, the Agreements violate IGRA because

164436-3

they limit the conduct of Class II gaming by the Comanche Nation, Otoe-Missouria Tribe, UKB, and KTT in order to increase the amount of revenue paid to the State for the conduct of Class III gaming by the Comanche Nation, Otoe-Missouria Tribe, UKB, and KTT.

260.    For the reasons described above, the Defendant Secretary's "no action" approvals of the Agreements are arbitrary, capricious, and contrary to law.  5 U.S.C. § 706(2)(A).

261.    The Plaintiff Nations are therefore entitled to a judgment "hold[ing] unlawful and set[ting] aside" the Defendant Secretary's "no action" approvals of the Agreements pursuant to 5 U.S.C. § 706(2)(A) and remanding them to  the Defendant Secretary for disapproval pursuant to 5 U.S.C. § 706(1).

## SEVENTH CAUSE OF ACTION:

**THE DEFENDANT SECRETARY'S NO ACTION APPROVAL OF THE AGREEMENTS WAS ARBITRARY, CAPRICIOUS, AND CONTRARY TO LAW BECAUSE THE DEFENDANT GOVERNOR'S CONCURRENCE ON FUTURE OFF-RESERVATION TRUST ACQUISITIONS VIOLATES THE FEDERAL TRUST RESPONSIBILITY AND IGRA.**

262.    Plaintiff Nations incorporate all previous allegations of fact and law into this Cause of Action as if fully set forth herein.

263.    The provisions of the Agreements committing the Governor of Oklahoma to concur in future off-reservation trust land acquisitions for gaming purposes within the reservations or former reservations of other Tribes threaten those Tribes' jurisdictional integrity and sovereignty, violate the federal trust obligation contrary to IGRA, and are not an authorized subject of negotiation under IGRA, and are therefore invalid and must be disapproved under 25 U.S.C. § 2710(d)(8)(B)(iii).

110

264.    For the reasons described above, the Defendant Secretary's "no action" approvals of the Agreements are arbitrary, capricious, and contrary to law.  5 U.S.C. § 706(2)(A).

265.    Plaintiff Nations are therefore entitled to a judgment "hold[ing] unlawful and set[ting] aside" the Defendant Secretary's "no action" approvals of the Agreements pursuant to 5 U.S.C. § 706(2)(A) and remanding them to the Defendant Secretary for disapproval pursuant to 5 U.S.C. § 706(1).

## EIGHTH CAUSE OF ACTION:

## THE DEFENDANT TRIBAL CHAIRMENS' EFFORTS TO IMPLEMENT THE AGREEMENTS ARE CONTRARY TO IGRA.

266.    The Plaintiff Nations incorporate all previous allegations of fact and law into this Cause of Action as if fully set forth herein.

267.    The Defendants Chairman Nelson's, Chairman Shotton's, Chief Bunch's, and Mekko Givens's representations that the Agreements are valid compacts under IGRA, and their actions in furtherance of those representations, including their exercise of authority or jurisdiction under the Agreements, are unlawful and constitute a continuing violation of federal law.

268.    For the reasons described above, the Plaintiff Nations are entitled to a declaratory judgment that the Agreements are not valid compacts and are not "in effect" under IGRA.

164436-3

# VI.    PRAYER FOR RELIEF

WHEREFORE, the Plaintiff Nations respectfully pray for a judgment in their favor as follows:

1.    The Plaintiff Nations seek a declaration that:

(a) The Defendant Secretary violated IGRA and the APA by considering the Agreements notwithstanding that they had not been legally entered into by both parties.

(b) The Defendant Secretary violated IGRA and the APA when he did not issue opinions, letters or other rulings disapproving the Agreements because they were not validly "entered into" under state law and because they contain multiple provisions that are invalid under IGRA.

(c) The Agreements were not validly "entered into" under state law because those Agreements are not the Model Compact and were not approved by the Oklahoma Legislature's Joint Committee on Tribal-State Relations, or by the Legislature through other means, and therefore were not validly "entered into" under IGRA and are not "in effect" under IGRA.  25 U.S.C. § 2710(d)(1)(C).  The Agreements are therefore null and void, and the Defendant Secretary's no action approvals of the Agreements have no legal effect.

(d) The Comanche and Otoe-Missouria Agreements violate IGRA by purporting to authorize Event Wagering and House-Banked Card Games, which are not permitted to be conducted in Oklahoma "for any purpose by any person, organization, or entity," *id.* § 2710(d)(1)(B), and by purporting to authorize Non-House-Banked Table Games without the Supplemental Compact required by Oklahoma statutes.

112

(e)   The Agreements violate IGRA by purporting to authorize the State to conduct iLottery, and the Comanche and Otoe-Missouria Agreements violate IGRA by purporting to authorize the State to conduct Event Wagering, because IGRA does not authorize states to conduct any form of Class III gaming, and furthermore, the State's conduct of the iLottery or Event Wagering is not a valid subject of compact negotiations under 25 U.S.C. § 2710(d)(3)(C).   The revenue sharing provisions of the Agreements violate IGRA's prohibition on state taxation, *id.* § 2710(d)(4), by seeking to impose revenue sharing obligations without offering a meaningful concession of significant economic benefit to the Comanche Nation, the Otoe-Missouria Tribe, UKB, and KTT, by providing for the amount of such payments to be determined by a third party, by granting the State a proprietary interest in the conduct of gaming under the Agreements, and in the case of the Comanche and Otoe-Missouria Agreements, by imposing a tax on Event Wagering.

(g) The Agreements violate IGRA because those Agreements regulate those Tribes' conduct of Class II gaming by requiring that a minimum percentage of their gaming revenues be generated by Class III games, which imposes a ceiling on the percentage of revenue that may be generated by Class II games, for the purpose of increasing revenue sharing payments to the State for the conduct of Class III gaming.

(h) The provisions of the Agreements purporting to commit the Governor of Oklahoma to concur in future off-reservation trust land acquisitions for gaming purposes, or to withdraw such concurrences if certain conditions are not met, within the territories of other tribes threaten those tribes' jurisdictional integrity and sovereignty, violate the federal

113

trust obligation contrary to IGRA, are not an authorized subject of negotiation or of a compact under IGRA, and are invalid under federal law.

(i) The Defendant tribal officials' efforts to exercise authority or jurisdiction under the Agreements, including by engaging in Class III gaming without a Tribal-State compact that has been validly "entered into" by the State under IGRA, are unlawful and constitute a continuing violation of federal law.

2.     The Plaintiff Nations seek an order reversing the Defendant Secretary's "no action" approvals of the Agreements and remanding the matters to the Defendant Secretary for disapproval of the Agreements.

Respectfully submitted,

Dated: September 11, 2020          By:   */s/ Frank S. Holleman*
                                         Frank S. Holleman, Bar # 1011376
                                         Sonosky, Chambers, Sachse,
                                            Endreson & Perry, LLP
                                         1425 K Street, NW, Suite 600
                                         Washington DC 20005
                                         Phone no.: 202-682-0240
                                         Fax no.: 202-682-0249
                                         E-mail:  fholleman@sonosky.com

                                         Colin Cloud Hampson, Bar # 448481
                                         Sonosky, Chambers, Sachse,
                                            Endreson & Perry, LLP
                                         145 Willow Road, Suite 200
                                         Bonita, CA 91902
                                         Phone no.: 619-267-1306
                                         Fax no.: 619-267-1388
                                         E-mail:  champson@sonoskysd.com

                                         *Additional Counsel on Following Page*

114

Lead Counsel for the Cherokee,
Chickasaw, Choctaw, and Citizen
Potawatomi Nations

Sara Hill, Okla. Bar # 20072 (admitted *pro
 hac vice*)
P.O. Box 1533
Tahlequah, OK 74465
Counsel for Cherokee Nation
Phone no.: 918-207-3836
Fax no.: 918-458-6142
E-mail: sara-hill@cherokee.org

Stephen Greetham, Okla. Bar # 21510
 (admitted *pro hac vice*)
4001 N. Lincoln Blvd
Oklahoma City, OK 73105
Counsel for Chickasaw Nation
Phone no. 580-272-5236
E-mail: stephen.greetham@chickasaw.net

Bradley Mallett, Okla. Bar # 15810
 (admitted *pro hac vice*)
P.O. Box 1210
Durant, OK 74702
Counsel for Choctaw Nation
Phone no.: 580-380-3024
E-mail: bmallett@choctawnation.com

Gregory M. Quinlan, NM Bar # 4450,
 Colo. Bar # 21605 (admitted *pro hac
 vice*)
George J Wright, Okla. Bar # 21873
 (admitted *pro hac vice*)
1601 S Cooper Dr
Shawnee, OK 74801
Counsel for Citizen Potawatomi Nation
Phone no. 405-275-3121
Email: george.wright@potawatomi.org

164436-3