# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE CHEROKEE NATION,                    )
a federally recognized Indian Tribe,    )
17675 S. Muskogee Ave.                  )
Tahlequah, OK 74464.                    )
                                        )          No. 1:20-CV-02167 (TJK)
THE CHICKASAW NATION,                   )
a federally recognized Indian Tribe,    )
520 E. Arlington St.                    )
Ada, OK 74820,                          )
                                        )
THE CHOCTAW NATION,                     )
a federally recognized Indian Tribe,    )
1802 Chukka Hina Dr.                    )
Durant, OK 74701, and                   )
                                        )
THE CITIZEN POTAWATOMI NATION,          )
a federally recognized Indian Tribe,    )
1601 S. Gordon Cooper Dr.               )
Shawnee, OK 74801                       )
                                        )
                Plaintiffs,             )
                                        )
v.                                      )
                                        )
UNITED STATES DEPARTMENT OF THE         )
INTERIOR, DAVID BERNHARDT, in his       )
official capacity as the Secretary of the   )
Interior, TARA KATUK MAC LEAN           )
SWEENEY, in her official capacity as the    )
Assistant Secretary of the Interior - Indian  )
Affairs, United States Department of the    )
Interior,                               )
1849 C Street N.W.                      )
Washington, DC 20240,                   )
                                        )
J. KEVIN STITT, in his official capacity as  )
the Governor of the State of Oklahoma,  )
2300 N. Lincoln Blvd. #212              )
Oklahoma City, OK 73105,                )
                                        )
WILLIAM NELSON, SR., in his official    )
capacity as the Chairman of the Business    )
Committee of the Comanche Nation,       )

584 NW Bingo Rd.                              )
Lawton, OK 73507,                             )
                                              )
JOHN R. SHOTTON, in his official capacity     )
as the Chairman of the Tribal Council of the  )
Otoe-Missouria Tribe of Indians               )
8151 Hwy 177                                  )
Red Rock, OK 74651,                           )
                                              )
JOE BUNCH, in his official capacity as the    )
Chief of the United Keetoowah Band of         )
Cherokee Indians in Oklahoma                  )
18263 Keetoowah Cir.                          )
Tahlequah, OK 74464, and                      )
                                              )
BRIAN GIVENS, in his official capacity as     )
the Mekko of the Kialegee Tribal Town         )
100 Kialegee Dr.                              )
Wetumka, OK 74883                             )
                                              )
                     Defendants.              )
                                              )
_____

**DEFENDANT WILLIAM NELSON'S MEMORANDUM OF LAW IN SUPPORT OF**

**MOTION TO DISMISS**

OF COUNSEL                                Vernle C. "Skip" Durocher Jr. #MI0006
                                          DORSEY & WHITNEY LLP
Forrest Tahdooahnippah                    50 South Sixth Street, Suite 1500
DORSEY & WHITNEY LLP                      Minneapolis, MN 55402
50 South Sixth Street, Suite 1500         (612) 340-2600 (telephone)
Minneapolis, MN 55402                     (612) 340-2868 (facsimile)
(612) 340-2600 (telephone)                Email:  durocher.skip@dorsey.com
(612) 340-2686 (facsimile)
Email:  forrest@dorsey.com


                                          Attorneys for Defendant WILLIAM
                                          NELSON, SR., in his official capacity as the
                                          Chairman of the Business Committee of the
                                          Comanche Nation

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ......................................................................................................1

BACKGROUND ......................................................................................................3

    A.    Comanche Nation is an Indian Tribe Indigenous to Western Oklahoma, but Federal Policies of Removal and Relocation Brought Many More Indian Tribes to Oklahoma..............................................................................3

    B.    Federal Policies Diminish the Land Base of Tribes, Impoverishing Them, Until the Advent of Tribally-Run Gaming in the 1980s Presents an Economic Development Opportunity for Tribes..........................................................6

    C.    Due to the Large Number of Indian Tribes In Oklahoma, There Are Many Casinos in the State, But the Plaintiff Tribes Dominate the Market...........................10

    D.    In 2020, Comanche Nation Negotiated, At Arm's Length, a New Gaming Compact With Four Small Variations From the Model Compact. .............................12

ARGUMENT .......................................................................................................17

    A.    Standard of Review.......................................................................................17

    B.    Plaintiffs Do Not Have Article III Standing—Any Alleged Competitive Injury Is Completely Speculative and Hypothetical..............................................18

    1.    The Definition of "Covered Games" in the 2020 Comanche Compact Will Not Harm Plaintiffs, the Comanche Nation Does Not Intend to Offer House Banked Games or Sports Betting, and it is Speculative That Players Would Prefer Such Games.....................................................................................19

    2.    The Exclusivity Fees Provisions Do Not Injure Plaintiff Tribes, and Are Not

Redressable Through This Action. ...........................................................................22

3.   The Mix of Class II and Class III Games Offered By the Comanche Nation

Does Not Injure the Plaintiffs. ......................................................................24

4.   Injury from Future Hypothetical Casinos in Future Hypothetical Locations Is

Speculative. ...................................................................................................24

5.   Plaintiffs Cannot Otherwise Allege Injury Sufficient to Establish Article III

Standing. .......................................................................................................29

C.   Plaintiff Tribes Have No Prudential Standing—Protecting Oligopolies is Not

Within IGRA's "Zone of Interest." .............................................................31

CONCLUSION .................................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Barona Grp. of Capitan Grande Band of Mission Indians v. Duffy*,
  694 F.2d 1185 (9th Cir. 1982) ............................................................................7, 9

*California v. Cabazon Band of Mission Indians*,
  480 U.S. 202 (1987)...........................................................................................9, 33

*Cherokee Nation v. Stitt*,
  Case No. CIV-19-1198-D (W.D. Okla. filed Dec. 31, 2019) ..................................12

*Cherokee Nation v. Stitt*,
  No. CIV-19-1198-D, 2020 U.S. Dist. LEXIS 134270 (W.D. Okla. July 28,
  2020) ......................................................................................................................22

*Chickasaw Nation v. United States*,
  94 Ct. Cl. 215 (Fed. Ct. Cl. 1941)............................................................................4

*Deutsche Bank Nat'l Trust Co. v. FDIC*,
  717 F.3d 189 (D.C. Cir. 2013) ...............................................................................18

*El Paso Natural Gas Co. v. FERC*,
  50 F.3d 23 (D.C. Cir. 1995)....................................................................................25

*Fiberlight, LLC v. Amtrak*,
  81 F. Supp. 3d 93 (D.D.C. 2015) ............................................................................18

*Finca Santa Elena, Inc. v. U.S. Army Corps of Eng'rs*,
  873 F. Supp. 2d 363 (D.D.C. 2012) ........................................................................17

*Forest County Potawatomi Cmty. v. United States*,
  317 F.R.D. 6 (D.D.C. 2016)...............................................................................30, 34

*In re Kaul*,
  933 P.2d 717 (Kan. 1997) .........................................................................................5

*Lac du Flambeau Band of Lake Superior Chippewa Indians v. Norton*,
  422 F.3d 490 (7th Cir. 2005) .......................................................................30, 31, 34

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992)................................................................................................18

*McGirt v. Oklahoma*,
  140 S. Ct. 2452 (2020) (Roberts, C.J., dissenting) ............................................5, 15

*Murphy v. NCAA,*
     138 S. Ct. 1461 (2018)........................................................................................................22

*NCUA v. First Nat'l Bank & Tr. Co.,*
     522 U.S. 479 (1998) (overruled on other grounds)..........................................................13, 31

*Oregonians for Floodplain Prot. v. U.S. DOC,*
     334 F. Supp. 3d 66 (D.D.C. 2018) ......................................................................................17

*Phoenix Consulting, Inc. v. Republic of Angola,*
     216 F.3d 36 (D.C. Cir. 2000) ..............................................................................................17

*Richards v. Duke Univ.,*
     480 F. Supp. 2d 222 (D.D.C. 2007) .....................................................................................17

*Sault Ste. Marie Tribe of Chippewa Indians v. United States,*
     288 F.3d 910 (6th Cir. 2002) ....................................................................................18, 26, 27

*Seminole Tribe of Fla. v. Butterworth,*
     658 F.2d 310 (5th Cir. 1981) .............................................................................................7, 9

*Sokaogon Chippewa Cmty. v. Babbitt,*
     214 F.3d 941 (7th Cir. 2000) ...................................................................................... *passim*

*Treat v. Stitt,*
     473 P.3d 43 (Okla. 2020).................................................................................................2, 19

*Woodruff v. United States,*
     No. 16-cv-1884, 2020 U.S. Dist. LEXIS 107761 (D.D.C. June 18, 2020).............................17

**Statutes, Regulations, and Rules**

25 U.S.C. § 2701.......................................................................................................................34

25 U.S.C. § 2702.................................................................................................................32, 34

25 U.S.C. § 2710(d) .........................................................................................................9, 31, 33

25 U.S.C. § 2719.................................................................................................................. *passim*

Indian Gaming Regulatory Act .......................................................................................... *passim*

Native American Graves Repatriation Act .................................................................................3

Okla. Stat. tit. 3A, 262 (2018).......................................................................................... 10, 23

Treaty With the Comanche, Etc., 7 Stat. 474, 2 KAPP 435 ........................................................4

Treaty With The Potawatomi, 12 Stat. 1191 (Nov. 15, 1861) ......................................................5

Treaty with the Kiowa and Comanche, Oct. 21 1867, 15 Stat. 581................................................6

25 C.F.R. § 151.8 ...............................................................................................................16

Fed. R. Civ. P. 24 ..............................................................................................................26

Fed. R. Civ. P. 12(b)(1)......................................................................................................17

**Other Authorities**

Indian Entities Recognized by and Eligible to Receive Services From the United
    States Bureau of Indian Affairs, 84 Fed. Reg. 1200 (Feb. 1, 2019) ....................................4, 5

*Cohen's Handbook of Federal Indian Law* (2019)................................................................3, 4, 6

Franklin Ducheneaux, *Indian Gaming Regulatory Act Symposium: The Indian
    Gaming Regulatory Act: Background and Legislative History*, 42 Ariz. St. L.J.
    99 (2010-2011)................................................................................................................7, 33

Matthew L.M. Fletcher, *The Comparative Rights of Indispensable Sovereigns*, 40
    Gonz. L. Rev. 1, 112 (2004-2005) ...................................................................................6

Matthew L.M. Fletcher, *The Seminole Tribe and Origins of Indian Gaming:
    Symposium from War and Removal to Resurgence: The Legal and Political
    History of Florida Tribunal Governments* ...........................................................................7

Elizabeth McCormick, *The Oklahoma Taxpayer and Citizen Protection Act:
    Blowing Off Steam or Setting Wildfires*, 23 Geo. Immigr. L.J. 293 (2008-
    2009) ..............................................................................................................................5

Oklahoma Historical Society, *Unassigned Lands*,
    https://www.okhistory.org/publications/enc/entry.php?entry=UN001 (last
    visited Jan. 22, 2021) ......................................................................................................5

Carla D. Pratt, *Tribes and Tribulations: Beyond Sovereign Immunity and Toward
    Reparation and Reconciliation for the Estelusti* ..................................................................4

Mark Welliver, Article, *Allotment and Fractionation Within the citizen
    Potawatomi Nation* .......................................................................................................4, 5

U.S. Department of the Interior: Off-Reservation Gaming, available at
    https://www.doi.gov/ocl/reservation-gaming-0 (last viewed Jan. 25, 2021)....................16, 25

## INTRODUCTION

This case concerns a 2020 tribal-state compact (the "2020 Comanche Compact") under the Indian Gaming Regulatory Act ("IGRA") between the State of Oklahoma and the Comanche Nation of Oklahoma[1] ("Comanche Nation" or "Comanche").   Plaintiffs Cherokee Nation, Chickasaw Nation, Choctaw Nation, and Citizen Potawatomi Nation (collectively, "Plaintiff Tribes" or "Plaintiffs") dominate the Oklahoma gaming industry—largely due to the locations of their reservations close to large urban centers such as Oklahoma City, Norman, and Tulsa, Oklahoma, and Dallas, Texas.  Plaintiffs apparently fear that the Comanche Nation's new compact will impact their oligopoly (an approximately 69% joint market share), and bring this action seeking to invalidate the compact.

This Court lacks jurisdiction to invalidate the 2020 Comanche Compact, however, because Plaintiff Tribes have no standing to challenge the compact to which they are not a party.  Plaintiffs challenge four particular aspects of the 2020 Comanche Compact: (1) it authorizes house-banked games and sports betting, (2) it has a slightly different structure for the fees to be paid from the Comanche Nation to Oklahoma than the fee structure in the Model Compact to which the Plaintiffs are party, (3) it provides that the Comanche Nation will certify it has a 45%-55% split between "Class II" and "Class III" games, and (4) the Governor promises to provide his future concurrence for three off-reservation casinos within the Comanche Nation's traditional homelands in Oklahoma.  None of these provisions, however, will cause any redressable injury to Plaintiffs.

---

[1] This action names William Nelson, Sr. ("Nelson") as a Defendant in his official capacity as the Chairman of the Comanche Nation Business Committee. Accordingly, the Comanche Nation is the real-party-in-interest.  The same is true with respect to the other tribal official Defendants and their corresponding tribes.  Accordingly, rather than referring to the Defendant officials by name, Nelson will refer to those Defendants collectively as the "Defendant Tribes."

The Comanche Nation has no intent to offer house-banked games or sports betting (which were the subject of the Oklahoma Supreme Court's 2020 *Treat* decision). Even if the Comanche Nation did, Plaintiff Tribes already offer non-house-banked versions of table games (such as blackjack, craps, roulette, baccarat), which are virtually identical to the house-banked versions from a player's perspective, and there is no basis to assume these house-banked games will divert customers from Plaintiffs' casinos to the Comanche Nation's casinos. Moreover, Plaintiff Tribes do not offer sports betting, and have no market share that could be impacted. Similarly, the exclusivity fees or Class II-Class III gaming mix at Comanche casinos are internal matters that have no effect at all on Plaintiffs' market share. And, the Comanche Nation has not begun the lengthy administrative process to begin off-reservation gaming—making any imagined injury from a future hypothetical casino entirely speculative. Moreover, there are currently 142 casinos and thirty-nine federally recognized tribes in Oklahoma. Even if a future hypothetical casino did divert customers from other casinos, Plaintiffs cannot demonstrate that a hypothetical casino would necessarily divert their customers. And, in any event, the Comanche Nation could still apply for off-reservation gaming, and the Governor could still concur, even if the 2020 Comanche Compact was invalidated. For these reasons, Plaintiffs lack constitutional standing.

Plaintiffs lack prudential standing as well. IGRA was enacted to protect tribal sovereignty, protect tribes from corrupting influences such as organized crime, permit states to assert their interests through compacting, and protect players from being cheated. Insulating Plaintiff Tribes from competition is simply not within the "zone of interest" of IGRA, particularly where the Plaintiff Tribes already dominate the market in Oklahoma. Indeed, allowing Plaintiff Tribes to bring a claim against the Comanche Nation's Chairman in his official capacity to challenge the Comanche Nation's arm's-length bargained compact—a compact that largely concerns gaming on

the Comanche Nation's own reservation—would be completely antithetical to the sovereignty interests IGRA was enacted to protect.  For all of these reasons, and the others discussed below, Plaintiffs' claims against Defendant Nelson should be dismissed.

## BACKGROUND

### A. Comanche Nation is an Indian Tribe Indigenous to Western Oklahoma, but Federal Policies of Removal and Relocation Brought Many More Indian Tribes to Oklahoma.

This case concerns Indian gaming within the State of Oklahoma.  "Oklahoma is home to 38 federally recognized Indian tribes and nations, only a few of which occupied any part of the state before European contact."  1 *Cohen's Handbook of Federal Indian Law*  ("*Cohen's*") § 4.07(a) (2019).  "The remaining tribes were resettled there, most of them involuntarily and some of them forcibly, under the federal government's nineteenth century removal policy."  *Id.*

The Comanche Nation was one of those few Indian tribes that occupied Oklahoma prior to European contact.  *See* Lee Decl. ¶ 5.  Bands, or groups, of Comanches came to inhabit what would become Oklahoma, prior to their contact with Europeans, in about the seventeenth century, centuries before the Plaintiff Tribes came to Oklahoma.  *Id.*  These Comanches were drawn to Oklahoma by the abundant game, such as bison, that roamed the prairies in the western part of the state.  *Id.*  The Comanche homeland—referred to as the "Comancheria"—is vast and spans much of the North American Great Plains.  *Id.* ¶ 3.  Today, the Comanche Nation's area of consultation under the Native American Graves Repatriation Act includes all of western Oklahoma, and specifically includes Cleveland, Love, and Grady Counties.  *Id.* ¶ 4, Ex. 2.

In the nineteenth century, the United States government began a policy of "removal," by which the government forced Indian tribes living east of the Mississippi River to relocate west of the Mississippi. *Cohen's* § 1.03(4)(a).  "The first tribes removed to what is now Oklahoma were [Plaintiffs] Choctaw, Chickasaw, . . .,[and] Cherokee, and the [Muscogee (Creek) and] Seminole,

sometimes called the Five Civilized Tribes." *Id.* § 4.07(1)(a). The Cherokee, Chickasaw, and Choctaw have their ancestral homelands in the American South—Georgia, Alabama, Mississippi—and were relocated to eastern Oklahoma. *Id.* at § 3.02(2); Carla D. Pratt, *Tribes and Tribulations: Beyond Sovereign Immunity and Toward Reparation and Reconciliation for the Estelusti*, 11 Wash. & Lee Race & Ethnic Anc. L. J. 61, 76 (2005). The Cherokee, Chickasaw, and Choctaw signed treaties with the United States in the 1830s providing each of them lands in Oklahoma. *Cohen's* § 1.03(4)(a); *Chickasaw Nation v. United States*, 94 Ct. Cl. 215, 226 (Fed. Ct. Cl. 1941). [2]

Other tribes (or bands of tribes)—such as relevant here, Plaintiff Citizen Potawatomi Nation—were also forced to cede lands east of the Mississippi and move west. *Cohen's* § 1.03(4)(a). The Potawatomi's ancestral homelands are in the Great Lakes region—in present day Michigan, Illinois, and Wisconsin. *See* Mark Welliver, Article, *Allotment and Fractionation Within the citizen Potawatomi Nation*, 2 Tribal L.J. 2002. Several bands of Potawatomi remain in Michigan or Wisconsin today, and are recognized as Indian tribes by the Federal Government. Indian Entities Recognized by and Eligible to Receive Services From the United States Bureau of Indian Affairs, 84 Fed. Reg. 1200, 1201-03 (Feb. 1, 2019). In 1846, several bands of Potawatomi signed a treaty with the United States establishing a reservation in present-day

---

[2] Evidencing that the Comanches predate the Plaintiff Tribes in Oklahoma is the 1835 Treaty with the Comanche and Witcheta Indians and their associated Bands. Treaty With the Comanche, Etc., 7 Stat. 474, 2 KAPP 435. After tribes were removed to Oklahoma from the East, some members were drawn to the game on the prairies in Western Oklahoma, where they encountered Comanche bands that aggressively defended their traditional hunting grounds. *See id*. In 1835, the United States brokered a treaty between the Comanches and Wichitas on one hand and Plaintiff Choctaw Nation, Plaintiff Cherokee Nation, and several other tribes (Seminole, Muscogee, Osage, Seneca, and Quapaw) on the other hand. *Id*. In exchange for gifts from the United States, the Comanche agreed to permit these tribes, including the Choctaw and Cherokee Nations, to hunt on the land in present-day Western Oklahoma. *Id*. art. 4, 6, 8.

Kansas.  *In re Kaul*, 933 P.2d 717, 728 (Kan. 1997).  This reservation became politically divided between two bands—the "Prairie Band" and the "Citizens Band"—and, in 1861, a new treaty divided the reservation between these two bands.  Treaty With The Potawatomi, 12 Stat. 1191 art. 2 (Nov. 15, 1861).  The Citizens Band's lands were alienable, and were soon lost.  Mark Welliver, Article, *Allotment and Fractionation Within the citizen Potawatomi Nation*, 2 TRIBAL L.J. 2002.  Therefore, in 1867, they negotiated a new treaty for a thirty square mile reservation in Oklahoma.  *Id.*[3]

Around the same time, the United States was engulfed in the Civil War.  Plaintiffs Chickasaw Nation, Cherokee Nation, and Choctaw Nation, along with non-parties Muscogee (Creek) and Seminole Nations, owned slaves and joined the Confederacy. *McGirt v. Oklahoma*, 140 S. Ct. 2452, 2483 (2020) (Roberts, C.J., dissenting).  After the conclusion of the Civil War, the Plaintiff Tribes entered into Reconstruction treaties with the United States that required them to free their slaves and required cessation of lands by these tribes.  *Id.*  For instance, the Seminole Nation and Muscogee (Creek) ceded lands in the central part of Oklahoma that became known as "unassigned lands" and were opened to white settlers.  Elizabeth McCormick, *The Oklahoma Taxpayer and Citizen Protection Act: Blowing Off Steam or Setting Wildfires*, 23 Geo. Immigr. L.J. 293, 306 n.75 (2008-2009).  These "unassigned lands" are now home to the present day Oklahoma City.  Oklahoma Historical Society, *Unassigned Lands*, https://www.okhistory.org/publications/enc/entry.php?entry=UN001 (last visited Jan. 22, 2021).

Shortly after the end of the Civil War, in 1867, the Comanche (and their allies the Kiowa) came under increasing pressure from American settlers, buffalo hunters, and railroads, Lee Decl.

--------

[3] The Prairie Band remained in Kansas, and continues to be a distinct federally recognized tribe. 84 Fed. Reg. 1200, 1203.

¶ 6, and entered into a treaty with the United States at Medicine Lodge Creek in Kansas (the "Treaty of Medicine Lodge").  Treaty with the Kiowa and Comanche, Oct. 21 1867, 15 Stat. 581. The Treaty of Medicine Lodge established a reservation for the Kiowas and Comanches (who were later joined by a band of Apaches known as the Plains Apache or Kiowa-Apache), the Kiowa Comanche Apache Reservation ("KCA Reservation"), which consisted of a small fraction of their aboriginal territory in southwestern Oklahoma.  *Id.*, art. 2; 15 Stat. 581, 589.  The KCA Reservation is adjacent to the Chickasaw Reservation—the two are separated by the 98th meridian, which runs north-south and serves as the border between the two reservations in Jefferson, Stephens, and Grady counties.  Lee Decl. ¶ 7.  In total, the Federal Government's policies of relocation and removal of tribes (such as Plaintiff Tribes), combined with the existence of tribes indigenous to the area (such as the Comanche Nation), have resulted in *thirty-eight* federally-recognized tribes based in Oklahoma today.  *Cohen's* § 4.07(a).

> **B.  Federal Policies Diminish the Land Base of Tribes, Impoverishing Them, Until the Advent of Tribally-Run Gaming in the 1980s Presents an Economic Development Opportunity for Tribes.**

The Reservation era in Oklahoma was short lived.  By the 1880s, a new policy of dividing Indian lands for private ownership, known as allotment, came into favor with the United States government.  *Cohen's* § 1.04.  Under this policy, reservation lands were "allotted" to individual Indians with "surplus" lands given to white settlers.  *Id.*  Although the policy of allotment ended in 1934, fifty years of allotment resulted in million acres of land being transferred from Indians to non-Indians (diminishing Indian land holdings over that time period from 138 million acres to 48 million acres).  *Id.* §§ 1.04, 16.03(2)(c).  As a result of this policy and the resulting loss of their land bases, most Indian tribes had few economic development opportunities and tribal members suffered severe poverty and unemployment.  *See* Matthew L.M. Fletcher, *The Comparative Rights of Indispensable Sovereigns*, 40 Gonz. L. Rev. 1, 112

(2004-2005) ("Indian gaming was preceded by decades of poverty and high unemployment on often geographically remote reservations.") (internal quotations omitted).

However, in 1976, the U.S. Supreme Court issued its decision in *Bryan v. Itasca County*, holding that states could not impose civil regulatory laws (in that case a personal property tax) on Indian lands.  426 U.S. 373, 379-92 (1976).  Tribes, and some individual Indians, then began to engage in certain forms of gaming, primarily bingo, on Indian lands.  Franklin Ducheneaux, *Indian Gaming Regulatory Act Symposium: The Indian Gaming Regulatory Act: Background and Legislative History*, 42 Ariz. St. L.J. 99, 108 (2010-2011). [4]   In 1979, the Seminole Tribe of Florida began operating the first-ever tribally-owned high stakes bingo hall.  Matthew L.M. Fletcher, *The Seminole Tribe and Origins of Indian Gaming: Symposium from War and Removal to Resurgence: The Legal and Political History of Florida Tribunal Governments*, FIU L. Rev., Vol. 9, Issue 2 (Spring 2014), pp. 255-276.  After the local sheriff threatened to make arrests pursuant to state gambling laws, the tribe brought a declaratory judgment action eventually resulting in the Fifth Circuit relying on the *Bryan* case to hold that the tribe could legally operate the bingo hall as the prohibition was civil-regulatory in nature as it was not against the public policy of the state.  *Seminole Tribe of Fla. v. Butterworth*, 658 F.2d 310, 311, 314-16 (5th Cir. 1981).   A year later, the Ninth Circuit came to a similar conclusion in *Barona Grp. of Capitan Grande Band of Mission Indians v. Duffy*, 694 F.2d 1185, 1189 (9th Cir. 1982).

Around the same time as these cases, Reagan-era budget cuts drastically reduced tribal federal funding.  Ducheneaux, 42 Ariz. St. L.J. at 111. Accordingly, "[a]s the implications of the

---

[4] The author of this article, Franklin Ducheneaux, was the primary drafter of IGRA.  Franklin Ducheneaux, *The Indian Gaming Regulatory Act: Background and Legislative History*, 42 Ariz. St. L.J. 99, 99.

two federal court decisions percolated through Indian country, gaming seemed an ideal source of revenue and there was a mini-explosion of tribal high stakes bingo and pull-tab operations." *Id.* However, as quickly as there was a gaming revolution in Indian country came a backlash. *Id.* "The rapid growth of gaming activities on Indian reservations and the perceived vacuum in legal authority at either the state or federal level caused political outcries from state and local authorities, representatives of the gaming industry, and from those morally opposed to gambling." *Id.* at 112. Federal legislation was quickly proposed, the purpose of which was "to provide some minimum Federal standards and some protection for tribes who are otherwise engaged in legal gambling activities." *Id.* at 116. This proposed legislation was opposed by tribes for infringing on tribal sovereignty. *Id.* at 122.

An anti-gaming backlash continued to grow, however, "State Attorney Generals and other state governmental officials, resentful of their inability to control, tax, and benefit from Indian gaming, continued their efforts in state and federal courts to stop it." *Id.* at 123. "As these efforts failed, they began to exert pressure on their congressional delegations to act." *Id.* at 123-24. At the same time, Indian gaming continued to expand with proposals for taking land into trust near large metropolitan areas. *Id.* at 123. Proposed legislation in the House separated gaming into three different classes: Class I gaming included tribal ceremonial gaming; Class II included bingo, pull-tabs, punchboards, and other games similar to bingo; Class III included all other forms of gaming. *Id.* at 135. An amendment to this legislation would have placed Class III gaming under the jurisdiction of each state. *Id.* at 142. More legislation was proposed in the Senate, and both the House and Senate bills provided for a national gaming commission to regulate Indian gaming to varying degrees. *Id.* at 146. The Senate bill also would have

prohibited Class III gaming altogether.  *Id.* at 148.  The proposed legislation had opposition from both sides of the issue and died.  *Id.* at 149.

During the next session of Congress, the U.S. Supreme Court decided a seminal Indian gaming case, *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987).  The Supreme Court adopted the reasoning of the prior *Seminole* and *Barona* cases, state gambling laws were civil-regulatory in nature and thus inapplicable to Indian lands because the state permitted gaming (and even promoted it in the case of the state lottery).  *Id.* at 207-14.  The *Cabazon* decision broke the logjam in Congress and IGRA was passed into law.  IGRA addressed state concerns over Indian gaming in several ways.  IGRA permits Class III gaming but only if the tribe enters into a gaming "compact" with the state.  25 U.S.C. § 2710(d)(1).  The state-tribal compacting procedure allows states an avenue to negotiate with tribes for concessions such as assessment of amounts paid to the state to defray costs of regulating gaming, allocation of jurisdiction, and standards of play for games, among other things.   25 U.S.C. § 2710(d)(3)(C).  IGRA also governs where gaming may occur.  IGRA prohibits gaming on Indian lands acquired after October 17, 1988, with several exceptions.  25 U.S.C. § 2719.  One such exception is where the Secretary of Interior determines (and the governor of the state concurs) "after consultation with the Indian tribe and appropriate State and local officials, including officials of other nearby Indian tribes" that "a gaming establishment on newly acquired lands would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community."  25 U.S.C. § 2719(b)(1)(a).  This is known as a "two-part determination."

9

**C. Due to the Large Number of Indian Tribes In Oklahoma, There Are Many Casinos in the State, But the Plaintiff Tribes Dominate the Market.**

Since the enactment of IGRA, gaming has become a cottage industry in Oklahoma, largely to the benefit of Plaintiff Tribes.  Because there are thirty-eight tribes in the state, with reservations that abut one another, casinos are found throughout the state.  M. Tahdooahnippah Decl. ¶ 9.  In addition, there are non-Indian gaming operations in the state such as horse racing, slots, and state lottery.  *Id.* ¶ 10.   In Plaintiffs' own words, the "gaming market in Oklahoma is highly competitive as a result of the various tribal and non-tribal gaming activities conducted within the State, including pari-mutuel wagering on horse racing, the state lottery, and electronic gaming."  Am Compl. ¶ 67.  In total, there are approximately 142 Indian casinos and some 71,000 slot machines in Oklahoma.  M. Tahdooahnippah Decl. ¶ 9.

The size, number of machines and games, and types of games at each casino in Oklahoma vary.  Some "casinos" are nothing more than a few slot machines at a truck stop, as is the case with the Comanche Nation Travel Center, which has less than 100 total machines.  *Id.* ¶ 11.  Other casinos rival (or in some instances, surpass) the size and number of games offered in any Las Vegas casino.  *Id.*  These larger casinos often offer table games such as blackjack, roulette, craps, or baccarat.  *Id.*  Although house-banked table and card games are illegal under Oklahoma state law, Okla. Stat. tit. 3A, § 262(H), Oklahoma casinos offer these table games (games in which play would typically be against the house or dealer) by returning the house or dealer's winnings to players.  M. Tahdooahnippah Decl. ¶ 6.  In these games, the dealer's winnings go to a "player pool."  *Id.*  Casinos are reimbursed administrative costs from the "player pool" and return the remainder of the pool to players through promotions.  *Id.*

Plaintiff Tribes dominate the gaming industry in the state, together enjoying roughly a 69% share of the entire Oklahoma Indian gaming market compared to a paltry 3% for the

Comanche Nation.  M. Tahdooahnippah Decl. ¶ 12.  Plaintiffs Cherokee Nation, Chickasaw

Nation, and Choctaw Nation are the three largest gaming tribes in Oklahoma by revenue.  *Id.* ¶

13.  *Each* of these three tribes has revenues between four and eleven *times* the Comanche

Nation's revenue, and each has between about three to nine *times* the number of slot machines

that the Comanche Nation has.  *Id.* ¶¶ 5, 13-15, 17.  Plaintiff Tribes' dominance in gaming is

largely due to the historical circumstances discussed above that placed them adjacent to the

major urban centers within the state.  For instance, among its eleven casinos, Plaintiff Cherokee

Nation operates the Hard Rock Hotel & Casino, an urban casino in Tulsa.  *Id.* ¶ 15.  The

Cherokee Nation's casinos offer slots and table games such as blackjack, craps, roulette, and

baccarat.  *Id.*  All of its casinos are located in northeastern Oklahoma, more than 200 miles away

from the Comanche Nation's casinos.  *See id.* ¶¶ 4, 14, 18.  Plaintiff Choctaw Nation operates

twenty-two casinos with Las Vegas style games such as slot machines, horse race betting,

blackjack, craps, roulette, and baccarat.  *Id.* ¶ 15.  These casinos are in southeastern Oklahoma,

more than 150 miles away from the Comanche Nation's flagship casino.  *Id.* ¶¶ 15, 18.

Similarly, Plaintiff Citizen Potawatomi Nation operates four casinos—all in the metropolitan

area of Oklahoma City, the largest city in the state—and all over 100 miles away from the

Comanche Nation casinos.  *Id.* ¶¶ 4, 16, 18. The Potawatomi casinos also offer slots and table

games such as blackjack, craps, and roulette.  *Id.* ¶ 16.

   Of all the Plaintiff Tribes, however, none is as dominant in the gaming market as Plaintiff

Chickasaw Nation, which alone controls ***35%*** of the Indian gaming market in Oklahoma.  *Id.* ¶

12.  The Chickasaw Nation has twenty-three casinos in central and southern Oklahoma,

including two in Norman, Oklahoma (the state's third largest city) that are each less than twenty-

five miles from downtown Oklahoma City.  *Id.* ¶ 17.  The Chickasaw's gaming empire includes

*the world's largest* casino, the WinStar casino—located on I-35 a mere thirty miles from the Dallas, Texas metropolitan area. *Id.* ¶ 17.   Games offered by the Chickasaw Nation include slots and table games such as blackjack, craps, and roulette. *Id.*

In contrast to Plaintiff Tribes, the Comanche Nation's gaming business is quite modest. The Comanche Nation has five casinos: the Comanche Nation Casino, Red River Hotel Casino, Spur Casino, Star Casino, and Travel Plaza, with a total of approximately 2,200 Class II and III machines. *Id.* ¶¶ 4-5. The Red River Hotel Casino is the Comanche Nation's closest casino to the Dallas, Texas metropolitan area, a distance of over 100 miles. *Id.* ¶ 8. At its Red River and Comanche Nation Casinos, the Comanche Nation has offered non-house banked table games since 2004, including blackjack, roulette, and craps. *Id.* ¶ 5.

### D.  In 2020, Comanche Nation Negotiated, At Arm's Length, a New Gaming Compact With Four Small Variations From the Model Compact.

In 2019, a dispute arose between Oklahoma and all tribes in the state about whether their compacts (which all included the same relevant renewal language) would automatically renew in 2020; Plaintiff Tribes brought a declaratory judgment action against the Oklahoma Governor, in which the Comanche Nation intervened as a plaintiff. Am. Compl. ¶¶ 69, 74; *Cherokee Nation v. Stitt*, Case No. CIV-19-1198-D (W.D. Okla. filed Dec. 31, 2019). As part of a court-mandated settlement conference in that case, the Comanche Nation negotiated with the Governor, Defendant Stitt, for a new compact (the "2020 Comanche Compact"). Am. Compl. ¶ 74. The 2020 Comanche Compact was executed on April 18, 2020, and sent to the Bureau of Indian Affairs for approval on April 21, 2020. F. Tahdooahnippah Decl. Ex. 1. Between April 28 and May 29, 2020, Plaintiffs submitted numerous comments to the Department of Interior challenging the validity of the 2020 Comanche Compact. Am. Compl. ¶¶ 83-88. On June 29, 2020, the Department of Interior announced that it had taken no action on the 2020 Comanche

Compact, and therefore the compact was deemed approved under federal law.  Am. Compl. ¶ 93. This action ensued.

The gravamen of Plaintiffs' claims in this case is that the Governor of Oklahoma lacked authority to enter into the 2020 Comanche Compact because the terms of the 2020 Comanche Compact have several deviations from the terms of the "Model Compact" authorized by the Oklahoma state legislature.  Am. Compl. ¶¶ 120-122.   There are four particular differences between the 2020 Comanche Compact and Oklahoma Model Compact identified in the Amended Complaint.  Despite the fact that the 2020 Comanche Compact has a severability clause,[5] F. Tahdooahnippah Decl. Ex. 1 (2020 Comanche Compact) Part 13(B), based on these four discrete variations, Plaintiff Tribes seek the draconian relief that the entire compact be declared invalid and "not 'in effect.'"  Am. Compl. ¶ 268.  These four variations are as follows:

- *First*, the 2020 Comanche Compact adds to the definition of "covered games" in the Model Compact.  The 2020 Comanche Compact includes house-banked card games, house-banked table games, and event (i.e., sports) wagering.  Am. Compl. ¶ 135.  As discussed above, Plaintiff Tribes and the Comanche Nation already offer non-house banked version of these games—such as blackjack, craps, roulette, baccarat.  Moreover, as Plaintiffs concede, the Comanche Nation does not intend to offer any house-banked card games, house-banked table games, or

---

[5] "If any clause or provision of this Compact is subsequently determined by any federal court to be invalid or unenforceable under any present or future law, including but not limited to the scope of Covered Games, the remainder of this Compact shall not be affected thereby. It is the intention of the Parties that if any such provision is held to be illegal, invalid or unenforceable, there will be added in lieu thereof a provision as similar to such provision as is possible to be legal, valid and enforceable."  F. Tahdooahnippah Decl. Ex. 1 (2020 Comanche Compact) Part 13(B).

event (i.e., sports) wagering unless authorized by state law.  Am. Compl. ¶ 140; M. Tahdooahnippah Decl. ¶ 7.

- *Second*, Plaintiff Tribes complain about the exclusivity provisions in the 2020 Comanche Compact.   Under the terms of the Model Compact, tribes pay certain fees to the State of Oklahoma for "substantial exclusivity."  F. Tahdooahnippah Decl. Ex. 2.  The 2020 Comanche Compact makes minor adjustments to this fee schedule. F. Tahdooahnippah Decl. Ex. 1 (2020 Comanche Compact) Part 10(B)(1); Am. Compl. ¶¶ 176, 179.  In the 2020 Comanche Compact, the Comanche Nation also prospectively agreed that operation of iLottery (an electronic form of lottery) by Oklahoma would not violate this "substantial exclusivity" provision.  F. Tahdooahnippah Decl. Ex. 1 (2020 Comanche Compact) Part 3(B).  By definition, iLottery games cannot simulate any of the "Covered Games" (such as blackjack, slots, etc.) offered by the Comanche Nation at its casinos.  *Id.* Part 2(A)(25).

- *Third*, in the 2020 Comanche Compact, the Comanche Nation agrees to certify each year that at least 45% of its revenue is derived from "Covered Games" (i.e., Class III gaming).  Am Compl. ¶ 190; F, Tahdooahnippah Decl. Ex. 1 (2020 Comanche Compact) Part 3(D).

- *Fourth*, Plaintiff Tribes complain that, in the 2020 Comanche Compact, the Governor agrees to concur in a future, hypothetical two-part determination by the Department of Interior to take land into trust for gaming by the Comanche Nation at three contemplated casinos, one in each of Cleveland, Grady, and Love Counties.  Am. Compl. ¶¶ 205-206.  Notably, as Plaintiffs concede, the

14

Comanche's former compact did not limit the geographic scope in which the Comanche Nation could open a casino. Am. Compl. ¶ 65. Rather, the 2020 Comanche Compact merely includes a promise by the Governor to concur in a future, hypothetical two-part determination. As discussed above, the two-part determination process is for newly acquired *off*-reservation trust lands to be gaming eligible. Part of Grady County is within the boundaries of the KCA Reservation, and therefore the Comanche Nation could open a casino on land acquired there pursuant to 25 U.S.C. § 2719(a)(1),(2).[6] However, for Cleveland County and Love County and the portions of the Grady County not within the boundaries of the KCA Reservation, a two-part determination would likely be required. A two-part determination is so named because it requires both (1) a determination by the Secretary of Interior that "a gaming establishment on newly acquired lands would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community," *and* (2) concurrence by the Governor. 25 U.S.C. § 2719(b)(1)(A).

The Comanche Nation does not currently have any trust lands in Grady, Love, or Cleveland County. Lee Decl. ¶ 8. The promise to concur by the Governor can only be

---

[6] 25 U.S.C. § 2719(a)(2) concerns tribes with no reservation in Oklahoma but with a "former" reservation or trust lands within the state. This statute was enacted many years prior to the Supreme Court's decision in *McGirt v. Oklahoma*, 140 S. Ct. 2452 (2020), at a time when many presumed that reservations within Oklahoma had been disestablished. By citing 25 U.S.C. § 2719(a)(2), the Comanche Nation does not concede that it has a "former" reservation. Whether or not the KCA Reservation has been disestablished is not an issue that the Court need to decide, because regardless of whether the KCA Reservation is an existing reservation or a "former" reservation in Oklahoma, an exception applies that would allow gaming on land within the historic boundaries of the KCA Reservation. 25 U.S.C. §§ 2719(a)(1),(2).

implicated in the event the Secretary of Interior first determines, pursuant to 25 U.S.C. § 2719(b)(1)(A), that an off-reservation would be in the best interest of the Comanche Nation and not detrimental to the surrounding community.  Nothing in the 2020 Comanche Compact purports to obligate the Secretary of Interior to make this determination, and there have only been *three* successful two-part determinations in the history of Indian gaming in the United States.  U.S. Department of the Interior: Off-Reservation Gaming, available at https://www.doi.gov/ocl/reservation-gaming-0 (last viewed Jan. 25, 2021).

Significantly, the portions of Love, Grady, and Cleveland Counties in which the Comanche Nation could even seek a two-part determination are limited and outside of any territory on which Plaintiff Tribes already have IGRA-authorized gaming.  The Bureau of Indian Affairs regulations do not permit a tribe to take land into trust within the reservation of another tribe *without* the written consent of "the governing body of the tribe having jurisdiction over such reservation."  25 C.F.R. § 151.8; *see also* Am. Compl. ¶ 30. Love County and parts of Grady County are within the reservation of Plaintiff Chickasaw Nation.  Am. Compl. ¶¶ 206, 207.  Plaintiff Tribes also allege that parts of Cleveland County are within the reservation of the Citizen Potawatomi Nation, Am. Compl. ¶ 209; however, the Citizen Potawatomi Nation does not currently have any casinos in Cleveland County, M. Tahdooahnippah Decl. ¶ 20.  Therefore, the Comanche Nation will not be able take land into trust to eventually open a casino in the portions of those counties within the Citizen Potawatomi Nation or Chickasaw's reservation absent that tribe's consent.

As described below, none of these four variations between the 2020 Comanche Compact and Model Compact will cause any injury to Plaintiff Tribes.  Accordingly, Plaintiffs have no constitutional standing to challenge the Compact.  Moreover, even if

they could show harm to their interests, Plaintiffs lack prudential standing, because their desire to protect their market share is not within the "zone of interest" of IGRA. Accordingly, Plaintiffs' claims against Defendant Nelson must be dismissed.

## ARGUMENT

### A.  Standard of Review

"A court must dismiss a case pursuant to Rule 12(b)(1) if it lacks subject-matter jurisdiction." *Woodruff v. United States*, No. 16-cv-1884, 2020 U.S. Dist. LEXIS 107761, at *4 (D.D.C. June 18, 2020).  Accordingly, under Federal Rule of Civil Procedure 12(b)(1), a defendant may challenge a plaintiff's basis for subject matter jurisdiction in one of two ways: a "defendant may make a factual attack" by raising facts to defeat plaintiff's purported basis for subject matter jurisdiction, or a defendant may assert a "facial attack based solely on the complaint." *Oregonians for Floodplain Prot. v. U.S. DOC*, 334 F. Supp. 3d 66, 74 n.4 (D.D.C. 2018) (citing *Finca Santa Elena, Inc. v. U.S. Army Corps of Eng'rs*, 873 F. Supp. 2d 363, 368 (D.D.C. 2012)).  In deciding a factual attack under Rule 12(b)(1), "the district judge is not obliged to accept the plaintiff's allegations as true and may examine the evidence to the contrary and reach his or her own conclusion on the matter." *Finca Santa Elena*, 873 F. Supp. 2d at 368.

In other words, when a defendant "challenge[s] the factual basis of the court's jurisdiction, the court may not deny the motion to dismiss merely by assuming the truth of the facts alleged by the plaintiff and disputed by the defendant." *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000); *see also Oregonians for Floodplain Prot.*, 334 F. Supp. 3d at 74 n.4; *Richards v. Duke Univ.*, 480 F. Supp. 2d 222, 231-32 (D.D.C. 2007). "Instead, the court must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss." *Phoenix Consulting*, 216 F.3d at 40.  Thus, to withstand a factual attack on subject matter jurisdiction, a "plaintiff

17

bears the burden of establishing jurisdiction by a preponderance of the evidence." *Fiberlight, LLC v. Amtrak*, 81 F. Supp. 3d 93, 106 (D.D.C. 2015).  Defendant Nelson brings a factual attack.

### B.  Plaintiffs Do Not Have Article III Standing—Any Alleged Competitive Injury Is Completely Speculative and Hypothetical.

In negotiating a new compact with Oklahoma, the Comanche Nation simply sought a better deal for its existing casinos and to *potentially* expand its footprint outside the confines of its reservation into its original homelands.  Perceiving a threat to their dominant market share, Plaintiff Tribes brought this action alleging that they will be harmed by increased competition from the Comanche Nation and other Defendant Tribes.  Am. Compl. ¶¶ 109, 129, 151, 186, 200, 230.   However, Plaintiff Tribes lack constitutional standing to challenge the 2020 Comanche Compact because any injury to their dominant market share is completely speculative.

A party has constitutional standing if (1) it has suffered the invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent; (2) its injury is "fairly traceable" to the challenged action of the defendant and not the result of independent action by a third party not before the court; and (3) a favorable decision would likely redress the injury.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  It is "axiomatic" that for a party to invoke the jurisdiction of the federal courts, it must have suffered an injury in fact, not some conjectural, hypothetical or speculative injury.  *Deutsche Bank Nat'l Trust Co. v. FDIC*, 717 F.3d 189, 193 (D.C. Cir. 2013); *see also Lujan*, 504 U.S. at 560 (explaining that a "conjectural or hypothetical" injury is not an injury-in-fact).

Significantly, in other cases considering whether *potential* competitive harm to an Indian tribe from another tribe's casino confers constitutional standing, several U.S. Courts of Appeals have held that it does not: any injury is too speculative.  *See Sault Ste. Marie Tribe of Chippewa*

*Indians v. United States*, 288 F.3d 910, 916-17 (6th Cir. 2002) (holding that plaintiff tribe lacked constitutional standing to challenge taking land into trust for another tribe's casino because plaintiff tribe presented no evidence that business had been diverted and mere fact that new casino was forty miles from plaintiff tribe's existing casino was insufficient); *Sokaogon Chippewa Cmty. v. Babbitt*, 214 F.3d 941, 947-48 (7th Cir. 2000) (holding that plaintiff tribe lacked standing to intervene in a suit concerning a potential new casino by other tribes).

The same result is required here: the injury to Plaintiffs' market share is entirely speculative—Plaintiffs dominate the market and offer no factual allegations from which to fairly infer that anything in the 2020 Comanche Compact will change that dominance. Moreover, this speculative injury would not be redressable in any event—even if the Court were to invalidate the 2020 Comanche Compact, the hypothetical competition from the Comanche Nation (and other tribes) would still exist in the marketplace due to their mere presence in Oklahoma. Each of the alleged deficiencies in the 2020 Comanche Nation Compact, and the lack of injury to Plaintiffs resulting therefrom, is discussed in turn below.

1. **The Definition of "Covered Games" in the 2020 Comanche Compact Will Not Harm Plaintiffs, the Comanche Nation Does Not Intend to Offer House Banked Games or Sports Betting, and it is Speculative That Players Would Prefer Such Games.**

The definition of "Covered Games" in the 2020 Comanche Compact cannot cause any form of competitive injury to Plaintiff Tribes for a simple reason—the Comanche Nation is not offering house-banked card games, house-banked table games, or event wagering and does not intend to do so unless[7] authorized by state law. M. Tahdooahnippah Decl. ¶ 7. Plaintiffs do not

---

[7] As alleged by Plaintiffs, the Oklahoma Supreme Court considered the issue of whether the Governor had authority to authorize the additional games in the compact, and concluded that he did not. Am. Compl. ¶ 96; *Treat v. Stitt*, 473 P.3d 43, 44-45 (Okla. 2020). The Comanche

dispute this fact.  Am. Compl. ¶¶ 140, 146.  Plaintiffs merely allege that these statements by the

Comanche Nation are "not binding and *may* change at any time."  *Id.* ¶¶ 140, 146.  Obviously,

this allegation is the pinnacle of speculation—Plaintiffs allege no facts to support an inference

that the Comanche Nation's position *will* change such that the alleged injury to Plaintiff Tribes is

"imminent."

Even more fundamentally, even if the Comanche Nation did change its position (which it

does not intend to do), any injury to Plaintiff Tribes is completely speculative.  Assuming

*arguendo* that the Comanche casinos began offering house-banked card and table games and

event wagering, there is no reason to conclude it would affect Plaintiffs' dominant market share.

As demonstrated above, Plaintiffs and the Comanche Nation do not compete in the same

geographic markets.  In fact, Plaintiffs Cherokee Nation's and Choctaw Nation's casinos are on

the complete opposite side of the state from the Comanche Nation's casinos—the Comanche

Nation's casinos are on its Indian lands in the Southwestern area of the state, whereas the

Cherokee Nation's casinos are on its Indian lands in the Northeastern area of the state and the

Choctaw Nation's casinos are on its Indian lands in the Southeastern area of the state.  As an

illustration, it is over 150 miles, and in some instances over 200 miles, to travel between the

Cherokee and Choctaw Nation's casinos to the Comanche Nation Casino, and any hypothetical

traveler of this distance would encounter numerous casinos owned by other tribes in between.

M. Tahdooahnippah ¶ 18; *see also* Am. Compl. ¶¶ 208-209 n.9.

---

Nation was not a party to that case and is therefore not bound by it.  Nevertheless, the Comanche
Nation has made the business decision not to offer house-banked card games, house-banked table
games, or event wagering.  M. Tahdooahnippah Decl. ¶ 7

Even the Chickasaw and Citizen Potawatomi Nation casinos in the south and central areas of Oklahoma are far away from the Comanche Nation's casinos.  For instance, the Chickasaw's three largest casinos are all more than seventy miles from the Comanche Nation's flagship casino, the Comanche Nation Casino.  M. Tahdooahnippah Decl. ¶ 18.  The Comanche Nation Casino is over 100 miles away from the Citizen Potawatomi's casinos.  *Id.* ¶ 18. Accordingly, it is completely speculative that customers of any of the Plaintiffs' casinos would cease going to Plaintiffs' casinos in favor of the Comanche casinos, regardless of what games are offered.

And, even more fundamental than geography, each of the Plaintiffs *already* offer the same type of games that are traditionally "house-banked," such as blackjack, roulette, craps, and baccarat.  Tribes in Oklahoma have offered these games for years by adopting versions that are not house-banked – that is, the dealer's winnings are returned to players through promotions.  M. Tahdooahnippah Decl. ¶ 6.  While this may have some impact on the profitability of the games for casinos, it does not have a significant impact on the experience of a player.  Either way, a casino patron is playing the same game.  From the perspective of a blackjack, roulette, craps, or baccarat player, there would be no reason to go to a Comanche casino to play the same game merely because it is "house-banked" instead of "non-house-banked," particularly given the distances between casinos.  Similarly, for event wagering, Plaintiffs point to the large market for unlawful sports betting.  Am Compl. ¶ 151.  However, because Plaintiffs do not currently offer any event wagering, none of this market share is their own.  Therefore, there is no "market share" for sports betting that Plaintiffs stand to lose. For all these reasons, Plaintiffs lack constitutional standing to challenge the definition of "Covered Games" in the 2020 Comanche Compact.

2.  **The Exclusivity Fees Provisions Do Not Injure Plaintiff Tribes, and Are Not Redressable Through This Action.**

The next aspect of the 2020 Comanche Compact challenged by the Plaintiff Tribes is the amount of exclusivity fees that the Comanche Nation is required to pay to the State of Oklahoma.  Plaintiffs' allegations are unclear about exactly what injury they will suffer, other than to say it will be an "economic injury" due to their market share somehow being reduced, presumably from competition from iLottery. Am. Compl. ¶¶ 186-87.  Yet again, this is entirely speculative—Oklahoma is not currently offering iLottery, M. Tahdooahnippah Decl. ¶ 10, and it is speculative to assume that the patrons of Plaintiffs' casino would play iLottery to the exclusion of playing at Plaintiffs' casinos.  In fact, contrary to Plaintiffs' allegation that iLottery includes "any form of electronic gaming that has the elements of consideration, chance, and prize," Am. Compl. ¶¶ 4, 158, iLottery by definition *cannot* simulate any "Covered Game" (which is defined in the 2020 Comanche Compact to include every game in Plaintiffs' own compacts, Am. Compl. ¶¶ 134-135), such as poker, blackjack, roulette, or slot machines.  F. Tahdooahnippah Decl. Ex. Ex. 1 (2020 Comanche Compact) Part 2(A)(25).  Therefore, there is no reason to assume, as Plaintiffs do, that iLottery will divert any customers from Plaintiffs' casinos and reduce their market share.

Moreover, declaring the 2020 Comanche Compact invalid will not redress any supposed injury to Plaintiffs from iLottery.  The State of Oklahoma is, itself, a sovereign entity that has the power to legalize any form of gambling it chooses, and wherever it chooses, just as states like Nevada and New Jersey already have done.  *Murphy v. NCAA*, 138 S. Ct. 1461, 1468-70 (2018) (detailing the history of state laws authorizing gambling activities).  In fact, Oklahoma currently has authorized some forms of gaming outside of IGRA, such as on fee land at Remington Park in Oklahoma City.  M. Tahdooahnippah Decl. ¶ 10; *Cherokee Nation v. Stitt*, No. CIV-19-1198-D,

2020 U.S. Dist. LEXIS 134270, at *8 (W.D. Okla. July 28, 2020) (noting the Oklahoma Horse Racing Commission ("OHRC") has "promulgated rules and regulations to license organization licensees . . . to conduct authorized gaming," and that OHRC recently issued licenses for "Remington Park and Will Rogers Downs in 2020"); Okla. Stat. tit. 3A, 262(A) (2018) (authorizing gaming machines at horse tracks).  Completely independent of the 2020 Comanche Compact, the State of Oklahoma remains free to enact legislation authorizing iLottery at any time.

Indeed, Plaintiffs' characterization of the 2020 Comanche Compact as "purport[ing] to authorize the State to conduct iLottery" is a flagrant mischaracterization.  Am. Compl. ¶ 187.  In the 2020 Comanche Compact, the Comanche Nation merely agreed that the state's operation of iLottery would not violate the "substantial exclusivity" portions of its compact, i.e., that the operation of iLottery (which by definition cannot simulate "Covered Games") is an *in*substantial intrusion on tribes' exclusivity in gaming.  F. Tahdooahnippah Decl. Ex. 1 (2020 Comanche Compact) Part 3(B).  Plaintiff Tribes have their own compacts that include their own substantial exclusivity provisions.  If Plaintiff Tribes believe that iLottery (if and when it is ever authorized) would violate their own substantial exclusivity, they are free to follow the dispute resolution provisions in their own compacts with the state at that time.  Invalidating the 2020 Comanche Nation Compact will not provide them any relief.

In fact, the *sole* relevance of "substantial exclusivity" under any particular tribe's compact is its relation to the amount of fees that the tribe will have to pay the state.  There is no relationship between the fees that the Comanche Nation pays to Oklahoma (which under the 2020 Comanche Compact may be higher or lower than those paid by Plaintiff Tribes, depending on factors such as which facility generates that revenue), and Plaintiffs' casinos' market share.

Plaintiffs' purported injury is not just speculative—it strains credulity.  Accordingly, Plaintiffs

lack standing to challenge the exclusivity provisions of the 2020 Comanche Compact.

> **3.  The Mix of Class II and Class III Games Offered By the Comanche Nation Does Not Injure the Plaintiffs.**

The third basis Plaintiffs identify for challenging the 2020 Comanche Compact is the

Comanche Nation's agreement to certify that 45% of its revenue is from Class III, rather than

Class II, games.  F. Tahdooahnippah Decl., Ex. 1 (2020 Comanche Nation Compact) at Part

3(D).  Plaintiffs allege they will suffer some undescribed "economic injury" from this covenant.

Am. Compl. ¶ 200.  How this injury would occur is hardly evident.  Plaintiffs do not allege or

imply how a 45-55 split between Class III and Class II games, *agreed to between the Comanche*

*Nation and the State of Oklahoma*, will cause Plaintiffs economic injury.  Significantly, any such

injury could also be immediately redressed by Plaintiffs on their own without a lawsuit—

Plaintiffs can offer any mix of Class II and Class III games they believe is optimal, and nothing

in the 2020 Comanche Compact changes that.  Therefore, Plaintiffs lack constitutional standing

to challenge this provision of the 2020 Comanche Compact.

> **4.  Injury from Future Hypothetical Casinos in Future Hypothetical Locations Is Speculative.**

Plaintiffs' fourth basis for challenging the 2020 Comanche Compact relates to the

Governor's promise to concur in possible future two-part determinations by the Secretary of the

Interior for casinos in Grady, Love, and Cleveland Counties.  The injury plead by Plaintiffs from

this provision is "increase[d] competition for gaming revenue in the highly competitive gaming

market and reduc[tion] [in] the Plaintiff Nations' share of that market."  Am. Compl. ¶ 230.  This

injury is completely speculative.  The Comanche Nation cannot simply build a casino in any of

these three counties tomorrow.  They must first obtain approval by the Secretary of the Interior,

followed by construction of a hypothetical casino, followed by the hypothetical success of that casino to the hypothetical detriment of Plaintiffs.

First, although these counties are within the Comanche Nation's historic and aboriginal homelands, the Comanche Nation does not currently have any trust lands within Grady, Love, or Cleveland Counties.  The Comanche Nation will have to undergo the administrative process of having land taken into trust, including the two-part determination process under IGRA for any land outside of the KCA Reservation.  The success of two-part determination is highly speculative, evidenced by the fact that only three two-part determinations have ever been granted that resulted in the approval of land for gaming.  U.S. Department of the Interior: Off-Reservation Gaming, available at https://www.doi.gov/ocl/reservation-gaming-0 (last viewed Jan. 25, 2021).  The existence of additional layers of regulatory approval that exist before the Comanche Nation can begin gaming in these three counties means that there is no imminent injury to Plaintiffs.  *See El Paso Natural Gas Co. v. FERC*, 50 F.3d 23, 27 (D.C. Cir. 1995) (holding that "the hypothetical premise that [a state regulator] may some day promulgate regulations that favor [state]-regulated entities over [federal]-regulated entities" did not "portend sufficiently imminent injury to confer standing on the [natural-gas company]").

Second, even if the Comanche Nation were to have any land taken into trust in those three counties, it is entirely speculative that any of those hypothetical casinos would divert customers from Plaintiffs.  On this point the Seventh Circuit's decision in *Sokaogon* is instructive.  In *Sokaogon*, three out-of-area tribes sought to purchase a greyhound race track in Hudson, Wisconsin (close to Minneapolis, Minnesota) for the purpose of having the land taken into trust for a casino.  214 F.3d at 943.  The three out-of-area tribes brought suit against the Department of Interior after a denial of their application based on *ex parte* political pressure, and

another tribe with a casino on its nearby reservation, the St. Croix Chippewa Indians of

Wisconsin, sought to intervene to prevent a settlement.  *Id.* at 945.  The Seventh Circuit held that

the St. Croix tribe did not have a sufficient interest to intervene under Fed. R. Civ. P. 24 (an

interest that would have also conferred Article III standing).  *Id.* at 946-49.  The Seventh Circuit

noted that "St. Croix asks us to assume that if and when the [proposed Hudson] casino is built it

will necessarily destroy the St. Croix's gaming business. But as all businesspeople are acutely

aware, in a competitive market, success is never sure. Maybe the [proposed Hudson] casino will

dominate, or maybe it will be a flop." *Id.* at 947.

The Sixth Circuit's decision *Sault Ste. Marie* is also instructive.  In that case a plaintiff

tribe challenged the Department of Interior's approval of another tribe's ("LTB") application to

place fee land into trust to operate a casino.  288 F.3d at 914.  LTB had purchased a five-acre

tract of land in Northern Michigan approximately 40 miles away from a gaming facility operated

by the plaintiff tribe.  *Id.* at 912.  After Interior approved LTB's application to place the fee land

into trust and operate a gaming facility, the plaintiff tribe sued to challenge that decision.  *Id.* at

913.   The Sixth Circuit held that the plaintiff tribe lacked standing. *Id.* at 917.   In particular,

instead of submitting "affidavits or similar evidence supporting its claim of competitive injury,"

the plaintiff tribe asked the court to take judicial notice of the fact that its casino was only forty

miles away from LTB's casino.  *Id.* at 915.  The Sixth Circuit held that this fact, without more,

was not enough to support a finding that the two tribes' casinos shared the same market or that

the LTB casino would divert business from the plaintiff tribe's casino.  *Id.* at 916.

The same is true here.  Plaintiff Tribes have specifically alleged that the gaming market

in Oklahoma is not only competitive (as in *Sokaogon*), but "highly competitive."  Am. Compl. ¶

230.  Indeed, Plaintiffs allege that there are already many tribes with lands in or near to Love,

Grady, and Cleveland Counties.  Am. Compl. ¶¶ 207-209 & n.9.  These tribes already operate

casinos in or near Love, Grady, and Cleveland Counties.  M. Tahdooahnippah Decl. ¶¶ 19-22.

As in *Sokaogon*, Plaintiffs merely ask the Court to assume that a hypothetical future Comanche

casino will dominate, but given the established nature and brand and customer loyalty of patrons

of the existing casinos, it is hardly assured that a hypothetical future casino would be able to

divert customers from existing casinos.

      This is particularly true because both the size and location of any hypothetical future

casino is currently unknown.  If the Comanche Nation's hypothetical casino ends up being a few

slot machines in a truck stop (like the Comanche  Nation's current Travel Center), it is hardly

clear how that casino will divert customers from Plaintiffs' large casino operations offering

thousands of slot machines, table games, or horse betting.  Likewise, it is unlikely that a casino

in any of these three counties could impact Plaintiffs Cherokee Nation or Choctaw Nation, who

do not have casinos in or near Cleveland, Love, or Grady Counties.  M. Tahdooahnippah Decl.

¶¶ 14-15.

      Even for Plaintiffs Chickasaw and Citizen Potawatomi Nation who have casinos near

Cleveland County and in Love and Grady Counties, is not clear at all that a new Comanche

casino would divert their customers, just as was true in *Sault Ste. Marie*.  Even assuming

*arguendo* that a future Comanche casino would be successful and divert customer from other

casinos, Plaintiffs' Complaint fails to explain how that hypothetical casino would divert

*Plaintiffs'* customers rather than customers from the casinos of one of the other thirty-plus Indian

tribes in Oklahoma.  To the contrary, Plaintiffs themselves allege that there are many non-

Plaintiff tribes near these counties where the Comanche Nation may eventually open a new

casino.  Am. Compl. ¶¶ 207-209 & n.9.

To use Cleveland County as an example, both Plaintiffs Chickasaw and Citizen Potawatomi Nation have casinos outside of Cleveland County but that are near the western and eastern edges of Cleveland County.  M. Tahdooahnippah Decl. ¶ 20.  However, a non-party tribe, the Absentee Shawnee, has a casino that is actually *in* Cleveland County.  *Id.*  Because a future possible Comanche Casino in Cleveland County is entirely hypothetical and has no fixed location, Plaintiffs cannot demonstrate that any diverted customers would necessarily come from their market share rather than the market share of the Absentee Shawnee.  Similarly, because any future casino is entirely hypothetical, it could hypothetically be in northern Cleveland County, far from existing casinos, and primarily attract new gamers from a geographic location that was previously untapped.  The same can be said for Grady County, which is in close proximity to casinos operated by several non-party tribes such as the Kiowa, Apache, and Delaware.  *See* Am. Compl. ¶ 208; M. Tahdooahnippah Decl. ¶ 21.[8]

Finally, even if Plaintiffs could demonstrate that a hypothetical Comanche casino in one of those three counties would cause an injury to any of the Plaintiff Tribes, that injury would not be redressable through this action.  As Plaintiffs themselves allege, even under the Comanche's old compact, or the Model Compact, the Comanche Nation is not limited in the geographic scope in which it may conduct gaming.  Am. Compl. ¶ 65; *see generally* F. Tahdooahnippah Decl. Ex. 2.  In other words, even if the 2020 Comanche Compact is invalidated, the Comanche Nation will still be entitled to apply for a two-part determination anywhere in Oklahoma.  Moreover, it

---

[8] Plaintiff Chickasaw Nation is currently the only tribe with casinos in Love County.  However, as Plaintiffs themselves acknowledge, the Comanche Nation would not be able to obtain trust land in Love County for gaming purposes absent the Chickasaw's consent.  Am. Compl. ¶¶ 202, 207.  Obviously, if the Chickasaw Nation believes such a casino would be detrimental to its interests, it can withhold that consent.

is the Governor's prerogative to consent to land being taken into trust for gaming by the Comanche Nation anywhere in Oklahoma (if event the Secretary of Interior determines it will benefit the Comanche Nation and not be detrimental to the surrounding community).  25 U.S.C. § 2719(b)(1)(A).  Accordingly, even if the Court were to invalidate the 2020 Comanche Compact – and it should not – the Comanche Nation would still pose the same (hypothetical) competitive injury to Plaintiffs because it can still apply for land to be taken into trust in Oklahoma outside of its reservation.  Accordingly, Plaintiffs cannot demonstrate any concrete, imminent, or redressable injury, and they lack standing to challenge the provisions of the 2020 Comanche Compact concerning the Governor's consent to hypothetical future two-part determinations.

> **5.  Plaintiffs Cannot Otherwise Allege Injury Sufficient to Establish Article III Standing.**

Plaintiffs also generally allege that they were deprived of "the substantive and procedural protections that IGRA provides for the tribal gaming rights of all tribes by requiring that compacts be submitted to the Secretary for approval . . . and that the Secretary disapprove a compact that violates" IGRA, other federal law, or trust responsibility.  Am. Compl. ¶ 127; *see also id.* ¶¶ 5, 152, 186, 199; 230.  Through this allegation, Plaintiffs are simply asserting injury based on "the common interest of all citizens in ensuring that their government agencies follow the law." It is well-established, however, that "such a generalized interest is insufficient to support standing."  *Sokaogon*, 214 F.3d at 948.  Plaintiffs must show that they "specifically would be adversely affected in some way, shape, or form, by the [Secretary's] alleged failure" to follow "IGRA, other federal law, or trust responsibility."  *Id.*  (citations omitted).  Alleging general violations of law is no substitute for Article III standing, and as shown above, Plaintiffs fail to allege any particularized injury resulting from any alleged violation of law concerning the 2020 Comanche Compact.

Plaintiffs also allege that they are suffering from an injury by being deprived of an opportunity to compete on "equal footing" with the Comanche Nation.  Am. Compl. ¶¶ 5, 25, 67, 128.  The reference to equal footing is from *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, 422 F.3d 490, 497-98 (7th Cir. 2005), a case that Plaintiffs cite in their pleadings, Am. Compl. ¶ 129.[9]  *Lac du Flambeau* stands for the proposition that a tribe and the Governor cannot use the IGRA compacting process to engage in anticompetitive conduct directed towards another tribe.  422 F.3d at 496-97.  In *Lac du Flambeau*, one tribe (the Ho Chunk Nation) entered into a tribal-state compact with Wisconsin that would have required Wisconsin to indemnify the Ho Chunk Nation if the Governor concurred in a pending two-part determination for another tribe (the Lac du Flambeau).  *Id.* at 494-95.  Therefore, the Lac du Flambeau Tribe had standing to challenge the Ho Chunk compact *because* the compact directly deprived the Lac du Flambeau of an equal opportunity to compete in the market.  *Id.* at 502.

Here, however, Plaintiff Tribes *are* competing on equal footing with the Comanche Nation (actually, as discussed below, Plaintiff Tribes have a competitive advantage due to location) because all tribes had an equal opportunity to negotiate with the Governor.  The litigation that lead to the 2020 Comanche Compact was commenced by Plaintiff Tribes, and they had an equal opportunity to use the court-mandated settlement conference to negotiate a new compact.  Indeed, they could even negotiate for a new compact today.  Plaintiff Tribes could

---

[9] Plaintiffs also cite *Forest County Potawatomi Cmty. v. United States*, 317 F.R.D. 6 (D.D.C. 2016), which concerned a very similar fact pattern as *Lac du Flambeau* and relied on *Lac du Flambeau* to reach the same result.  *See id.* at 12 ("The requested relief, if granted, would, as a practical matter, impede the Menominee [tribe]'s efforts to obtain a gubernatorial concurrence and would thereby impede their efforts to develop a[n off-reservation] gaming facility in Kenosha").  Therefore, *Forest County* is distinguishable for the same reasons as *Lac du Flambeau*.

likely even negotiate compacts substantially similar to the 2020 Comanche Compact if they were willing to agree (as did the Comanche Nation) that their new compacts would have a termination date without renewal (the dispute over termination was the subject of the lawsuit that lead to the 2020 Comanche Compact).  Unlike the defendant tribe's compact in *Lac du Flambeau*, **nothing** whatsoever in the 2020 Comanche Compact constrains the ability of Plaintiff Tribes to game, to seek additional land into trust for gaming, or to negotiate new compacts with Oklahoma. Accordingly, Plaintiff Tribes do compete on "equal footing" with the Comanche Nation, and have no Article III standing.

### C. Plaintiff Tribes Have No Prudential Standing—Protecting Oligopolies is Not Within IGRA's "Zone of Interest."

In addition to lack of injury, Plaintiff Tribes lack prudential standing because protection of their dominant (69%) market position is not within the "zone of interest" of IGRA.  A plaintiff challenging agency action, as Plaintiffs do here, must satisfy "a prudential standing requirement *in addition* to the requirement, imposed by Article III of the Constitution, that a plaintiff have suffered a sufficient injury-in-fact."  *NCUA v. First Nat'l Bank & Tr. Co.*, 522 U.S. 479, 488 (1998) (emphasis added) (overruled on other grounds).  This means that "the interest sought to be protected by the complainant [must be] arguably within the zone of interests to be protected or regulated by the statute . . . in question."  *Id.* (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 152 (1970)).  The "zone of interests" test "denies a right of review if the plaintiff's interests are . . . marginally related to or inconsistent with the purposes implicit in the statute."  *Id.* at 491 (quoting *Clarke v. Sec. Industry Ass'n*, 479 U.S. 388, 399 (1987)).  Here, the substantive statute under which the Department of Interior approved the 2020 Comanche Compact was 25 U.S.C. § 2710(d)(8)(C).  Protection of Indian tribes from competition from other tribes is not within the "zone of interest" of IGRA.

IGRA is simply not a statute designed to insulate tribes from competition—particularly where that competition is coming from other tribes.  The Seventh Circuit recognized this principle in *Sokaogon*: the Court in that case noted that the profitability of the plaintiff tribe's casino was not an interest that "resemble[d] any that the law normally protects." In that regard, the court concluded that "[a]lthough the IGRA requires the Secretary to consider the economic impact of proposed gaming facilities on the surrounding communities, it is hard to find anything in that provision that suggests an affirmative right for nearby tribes to be free from economic competition." 214 F.3d at 947.  This rationale applies with additional force to Plaintiff Tribes, who already have the lion's share of the gaming market in Oklahoma.  Protecting their dominant market position does not resemble any interest that the law normally protects, and is certainly not an interest that is found anywhere within the text or legislative history of IGRA.

Plaintiffs attempt to avoid this result by alleging that the Secretary of Interior is "obligat[ed] under IGRA . . . [to] ensure that that no tribe . . . may gain a competitive advantage over another."  Am. Compl. ¶ 128.  This allegation, which is a legal conclusion, is simply untrue.  The stated purpose of IGRA is not to "protect" Plaintiff Tribes from competition at the expense of other tribes like the Comanche Nation.  Instead, Congress specifically declared the policy objectives of IGRA as (1) protecting tribes' ability to run gaming enterprises by providing a statutory basis to do so, (2) protecting tribes from organized crime and other corrupting influences, and (3) protecting players by establishing a federal regulatory agency.  25 U.S.C. § 2702.  Nothing in these stated purposes suggests an intent by Congress to insulate tribes from competition from other tribes.

Likewise, the text in § 2710(d) does not evince a congressional intent to protect the market share of third-party tribes to the detriment of a compacting tribe.  Instead, the text

envisions only protection for the compacting tribe itself, without reference to third-party tribes. Section 2710(d) repeatedly refers to "any [or an] Indian tribe" wishing to conduct Class III gaming on its own "Indian lands." *See* 25 U.S.C. § 2710(d)(2)(A), 25 U.S.C. § 2710(d)(2)(D)(i), 25 U.S.C. § 2710(d)(3)(A), 25 U.S.C. § 2710(d)(8)(A).  In this context, the Department of Interior's trust responsibility is to supervise conduct of *the* Indian tribe whose Class III gaming is under consideration and protect it from outside influence.  In fact, the text of the statute makes clear that the role of federal government is to ensure the tribe complies with its own laws and is free from corrupting influences.  25 U.S.C. § 2710(d)(2).

Nor does the legislative history indicate any congressional purpose to insulate tribes from competition.  The primary congressional purpose of IGRA was to provide *states* a means of asserting their own interests, particularly after the Supreme Court's *Cabazon* decision solidified the ability of tribes to engage in gaming without regard to state regulatory laws.  Franklin Ducheneaux, *The Indian Gaming Regulatory Act: Background and Legislative History*, 42 Ariz. St. L.J. at 116, 123, 146 (2010).  This purpose found its way into IGRA through the requirements that Class III gaming be permitted by state law and that tribes negotiate with states for Class III compacts.  25 U.S.C. § 2710(d)(1)(B),(C); 25 U.S.C. § 2710(d)(3)(C)(i),(ii),(iii),(v),(vi).

In other words, IGRA's statutory scheme largely envisions regulation of Class III gaming as shared among the NIGC, the compacting tribe itself, and the state, with competition between casinos left to the same free market principles that govern the rest of American society.  IGRA does *not* impose on the federal government the role of market regulator to ensure an absence of competition between tribes.  Due to Oklahoma's history as the former Indian Territory, were the federal government some sort of Indian gaming super regulator, tribes in Oklahoma would have standing to challenge nearly every aspect of their competitor's gaming operations—from the

location of on-reservation casinos to the price paid for syrup in soda machines—because any small change in a competitor's operation approved by the Department of Interior might allegedly "alter[] competitive conditions."  Am. Compl. ¶ 129.[10]  Indeed, Plaintiffs' claims against the Comanche Chairman largely concern the Comanche Nation's gaming on its *own* reservation.[11] To the extent that Plaintiffs suffer any competitive injury due to the proximity of their own casinos to the KCA Reservation (which is an entirely speculative proposition), it is merely the result of the Federal Government's removal of Plaintiff Tribes to the Comanche Nation's aboriginal homeland.  To allow Plaintiffs standing to bring suit for such on-reservation conduct is an encroachment on the Comanche Nation's own sovereignty.  Accordingly, to permit a plaintiff tribe to challenge a defendant tribe's conduct on the defendant tribe's own reservation is completely antithetical to IGRA's express purpose of promoting tribal sovereignty through "strong tribal government."  25 U.S.C. §§ 2701, 2702.

Not only is Plaintiff Tribes' argument antithetical to the purposes of IGRA, but is also the height of irony.  First, as a legal matter, Plaintiffs cite cases such as *Lac du Flambeau* and *Forest County Potawatomi*, Am. Compl. ¶ 129, in which the courts held that defendant tribes could not enter into anticompetitive compacts that would prevent the plaintiff tribes from acquiring off-

---

[10] This problem would be most acute in Oklahoma due to its history, but there are other areas of the country where there are multiple federally-recognized tribes within close proximity such as near San Diego, California, the Puget Sound region of Washington, and the area around Albuquerque, New Mexico, to name just a few.

[11] In the context of off-reservation gaming, IGRA contemplates a small role for "nearby Indian tribes" in that they must be consulted during the two-part determination process.  25 U.S.C. § 2719(b)(1)(A).  However, this section of IGRA is not implicated in this case because the Department of Interior has made no decision to take land into trust.  *If* the Department of Interior approves such land into trust, and the Governor provides his concurrence, then Plaintiff Tribes may arguably have prudential standing for that discrete issue *if* they are, in fact, "nearby" to the land taken into trust.

reservation land in trust in certain geographical areas.  The situation here is the precise opposite.

Here it is the Plaintiff Tribes who are attempting to use IGRA for an anticompetitive purpose,

such as to prevent potential future off-reservation gaming by the Comanche Nation in certain

geographical areas.  Accordingly, those cases lend no support to Plaintiff Tribes, but instead

support Chairman Nelson and the Comanche Nation.

Finally, as a factual matter, Plaintiff Tribes have all the competitive advantage in

Oklahoma—they have locations in close proximity to the largest gaming markets such as

Oklahoma City, Tulsa, and Norman, Oklahoma (the three largest cities in the state), and even

Dallas, Texas (the fourth largest metropolitan area in the country).  As a result, Plaintiffs have a

combined market share of 69% and Plaintiffs Chickasaw, Cherokee, and Choctaw are the three

single largest gaming tribes in the state by revenue, each with revenue many multiples (up to

eleven times) larger than that of the Comanche Nation.  If the Secretary of Interior had an

obligation to ensure that one tribe did not gain a competitive advantage over another, the

Secretary of the Interior had an obligation to disapprove of Plaintiffs Tribes' compacts and has

an obligation to suspend gaming by Plaintiffs until the Comanche Nation and other tribes are

able to acquire trust land in similar proximity to large urban centers.  Obviously, Plaintiffs will

resist such a suggestion and that is because the IGRA compacting process does not concern intra-

tribal competition at all.  Accordingly, Plaintiff Tribes lack prudential standing to challenge the

2020 Comanche Compact.

## CONCLUSION

For the foregoing reasons, Defendant Chairman William Nelson respectfully requests that

the Court dismiss all claims against him.


 Dated:  January 25, 2021                        Respectfully submitted,

OF COUNSEL

Forrest Tahdooahnippah
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
(612) 340-2600 (telephone)
(612) 340-2686 (facsimile)
Email:  forrest@dorsey.com

/s/ Vernle C. "Skip" Durocher Jr.
Vernle C. "Skip" Durocher Jr. #MI0006
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
(612) 340-2600 (telephone)
(612) 340-2868 (facsimile)
Email:   durocher.skip@dorsey.com


Attorneys for Defendant WILLIAM NELSON,
SR., in his official capacity as the Chairman of the
Business Committee of the Comanche Nation