**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| THE CHEROKEE NATION, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:20-cv-02167 (TJK) |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| THE INTERIOR, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFF NATIONS' POINTS AND AUTHORITIES IN OPPOSITION TO MOTION
TO DISMISS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... iii

INTRODUCTION ..................................................................................................... 1

LEGAL AND FACTUAL BACKGROUND ........................................................... 3

A.     Statutory And Regulatory Background .............................................................. 4

B.     The Plaintiff Nations' Conduct Of Class III Gaming. ....................................... 7

C.     The Agreements. ................................................................................................. 9

D.     The Secretary's Inaction On The Agreements And Movants' Ongoing Representations And Actions Asserting That The Agreements Are Valid Compacts ........................................................................................................... 12

ARGUMENT ............................................................................................................ 14

A.     Standard Of Review. ......................................................................................... 14

B.     This Court Has Jurisdiction Under 28 U.S.C. §§ 1331 And 1362. ................... 17

C.     This Action Is Properly Brought Under The *Young* Doctrine, Which Provides An Exception To Tribal Sovereign Immunity. ................................... 20

      1.     Tribal Sovereign Immunity Does Not Bar This Action Because It Is Properly Brought Under the *Young* Doctrine. ................................... 21

      2.     *Young* Provides a Cause of Action to Remedy the Violations of Federal Law in This Case, Making a Private Right of Action Unnecessary. ........................................................................................ 26

      3.     Congress Has Not Displaced the Equitable *Young* Remedy for These Claims. .............................................................................. 31

           a.     IGRA does not foreclose the availability of *Young* to challenge a compact that was not validly entered into under IGRA. ............................................................................... 32

           b.     IGRA is limited to "Indian lands," and it does not limit relief from agreements that do not concern Indian lands. ......................... 34

           c.     There is no other indication in IGRA that Congress intended to foreclose the *Young* relief sought here. ................................. 37

D.     Plaintiffs' Allegations Meet Pleading Requirements. ....................................... 40

i

**CONCLUSION** ................................................................................................................. **45**

166117-1

# TABLE OF AUTHORITIES

## CASES

*Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052 (D.C. Cir.2007) ...................................17

*Alden v. Maine*, 527 U.S. 706 (1999) ........................................................................25

*Alexander v. Sandoval*, 532 U.S. 275 (2001)...............................................................27

*Am. Farm Bureau v. EPA*, 121 F. Supp. 2d 84 (D.D.C. 2000)......................................15

\* *Amador Cnty., Cal. v. Salazar*, 640 F.3d 373 (D.C. Cir. 2011)....................1, 2, 4, 6, 34

\* *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015).......................3, 26, 27, 28, 31

*Artichoke Joe's v. Norton*, 216 F. Supp. 2d 1084 (E.D. Cal. 2002) ..........................30, 39

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..............................................................16, 40-41

*Atherton v. D.C. Office of Mayor*, 567 F.3d 672 (D.C. Cir. 2009)..................................41

*Attias v. Carefirst, Inc.*, 865 F.3d 620 (D.C. Cir. 2017) .................................................45

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ...................................................16, 41

*Brugier v. Lac du Flambeau Band*, 237 F. Supp. 3d 867 (W.D. Wis. 2017) ..................43

*Bryant v. Pepco*, 730 F. Supp. 2d 25 (D.D.C. 2010)......................................................16

*Cherokee Nation v. Bernhardt*, No. 12-cv-493-GKF-JFJ, 2020 WL 1429946 (N.D. Okla. Mar. 24, 2020), *appeal filed*, Nos. 20-5054, 20-5055 (10th Cir. May 26, 2020) ......................................36

*Cherokee Nation v. Stitt*, No. CIV-19-1198-D, 2020 WL 4340549 (W.D. Okla. July 28, 2020...............................................................................8

*Coal. for Underground Expansion v. Mineta*, 333 F.3d 193 (D.C. Cir. 2003).............15

*Connecticut v. U.S. Dep't of Interior*, 344 F. Supp. 3d 279 (D.D.C. 2018) ..............................................................................16

*County of Santa Clara v. Trump*, 250 F. Supp. 3d 497 (N.D. Cal. 2017).............................................................................42

*Crosby Lodge, Inc. v. NIGC*, No. 3:06-CV-00657-LRH-RAM, 2007 WL 2318581 (D. Nev. Aug. 10, 2007) ..........................31

*Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140 (10th Cir. 2011) .........................21

*D.C. Ass'n of Chartered Pub. Schs. v. District of Columbia*, 930 F.3d 487 (D.C. Cir. 2019) ......................................................28

*Davids v. Coyhis*, 869 F. Supp. 1401 (E.D. Wis. 1994) .............................................31

*Dewberry v. Kulongoski*, 406 F. Supp. 2d 1136 (D. Or. 2005) ..............................29, 33

*Edelman v. Jordan*, 415 U.S. 651 (1974) .................................................................25

166117-1

*EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621 (D.C. Cir. 1997).........................17, 41

*Eppes v. U.S. Cap. Police Bd.*, 719 F. Supp. 2d 7 (D.D.C. 2010) ...............................14

\* *Ex parte Young*, 209 U.S. 123 (1908) ............................................................ passim

*FDIC v. Meyer*, 510 U.S. 471 (1994) ...............................................14

*Florida v. Seminole Tribe*, 181 F.3d 1237 (11th Cir. 1999) .....................................31

*Forest Cnty. Potawatomi Cmty. v. United States*, 330 F. Supp. 3d 269 (D.D.C. 2018) ................................................................................................5, 11

*Friends of Amador County v. Salazar*, No. CIV. 2:10-348, 2010 WL 4069473 (E.D. Cal. Oct. 18, 2010) ....................................30, 39

*Great Lakes Dredge & Dock Co. v. Huffman*, 319 U.S. 293 (1943) .........................................................................27

*Griffith v. Choctaw Casino of Pocola, Okla.*, 2009 OK 51, 230 P.3d 488 ..........................7

*Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169 (D.C. Cir. 2012) .......................................29

*Hartman v. Kickapoo Tribe Gaming Comm'n*, 176 F. Supp. 2d 1168 (D. Kan. 2001) ............................................29

*Hartman v. Kickapoo Tribe Gaming Commission*, 319 F.3d 1230 (10th Cir. 2003).........................................29

*Hein v. Capitan Grande Band*, 201 F.3d 1256 (9th Cir. 2000) .............................29, 31

*Hohri v. United States*, 782 F.2d 227 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987)....................................................16

*Hurd v. D.C., Gov't*, 864 F.3d 671 (D.C. Cir. 2017) ....................................41

*Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261 (1997)....................................21, 25

*In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46 (D.D.C. 2016) .....................17

*In re U.S. OPM Data Sec. Breach Litig.*, 928 F.3d 42 (D.C. Cir. 2019) ............................................42

*Jama v. Immigr. & Customs Enf't*, 543 U.S. 335 (2005)....................................29

*Jamul Action Comm. v. Simermeyer*, 974 F.3d 984 (9th Cir. 2020)..............................25

*Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249 (D.C. Cir. 2005) ...............................15-16

*Jimi Dev. Corp. v. Ute Mtn. Ute Indian Tribe*, 930 F. Supp. 493 (D. Colo. 1996) ...........................................20

*Johnson v. Comm'n on Pres. Debates*, 202 F. Supp. 3d 159 (D.D.C. 2106)...............................16

*Kennerly v. Dist. Ct.*, 400 U.S. 423 (1971)....................................................36

*Kialegee Tribal Town v. Zinke*, 330 F. Supp. 3d 255 (D.D.C. 2018) ........................ 15, 16, 35-36

*Kickapoo Tribe v. Babbitt*, 827 F. Supp. 37 (D.D.C. 1993), *rev'd on other grounds*, 43 F.3d 1491 (D.C. Cir. 1995)......................................31

iv

*Kirkham v. Soc'é Air Fr.*, 429 F.3d 288 (D.C. Cir. 2005) ............................................14

*Kodiak Oil & Gas (USA) Inc. v. Burr*, 932 F.3d 1125 (8th Cir. 2019)........................25

*Koutny v. Martin*, 530 F. Supp. 2d 84 (D.D.C. 2007)...................................................15

*Langley v. Dardenne*, 77 F.3d 479 (5th Cir. 1996) (per curiam)................................31

*Langley v. Edwards*, 872 F. Supp. 1531 (W.D. La. 1995)............................................31

*Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163 (1993)...............................................................................................................15

*Lipscomb v. Columbus Mun. Separate Sch. Dist.*, 269 F.3d 494 (5th Cir. 2001).........................25

*McGirt v. Oklahoma*, 140 S. Ct. 2452 (2020)..............................................................36

*McNutt v. GM Acceptance Corp.*, 298 U.S. 178 (1936).................................................15

*Mendoza v. Perez*, 754 F.3d 1002 (D.C. Cir. 2014) ......................................................41

*Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782 (2014) ....................................1, 3, 17, 34, 40

*Moghaddam v. Pompeo*, 424 F. Supp. 3d 104 (D.D.C. 2020) ......................................42

*Morgan v. U.S. Parole Comm'n*, 304 F. Supp. 3d 240 (D.D.C. 2016)........................14

*N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244 (D.C. Cir. 2020)............................ 16-17

*Narragansett Indian Tribe v. Rhode Island*, Nos. 94-0618-T, 94-0619-T, 95-0034-T, 1996 WL 97856 (D.R.I. Feb. 13, 1996) ...............................................................................................................31, 33

*Nat'l Audubon Soc'y, Inc. v. Davis*, 307 F.3d 835 (9th Cir. 2002), *opinion amended on denial of reh'g*, 312 F.3d 416 (9th Cir. 2002)........................25

*Nat'l Farmers Union Ins. Cos. v. Crow Tribe*, 471 U.S. 845 (1985)...............................................................................................................20

*Nat'l Mall Tours of Wash., Inc. v. U.S. Dep't of Interior*, 862 F.3d 35 (D.C. Cir. 2017)...............................................................................................29

*Nat'l Postal Prof'l Nurses v. USPS*, 461 F. Supp. 2d 24 (D.D.C. 2006)....................16

*Navajo Nation v. Dalley*, 896 F.3d 1196 (10th Cir. 2018).......................................36-37

*Nemariam v. Federal Democratic Republic of Ethiopia*, 491 F.3d 470 (D.C. Cir. 2007) ...............................................................................................................14

*New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324 (1983) ....................................................................................................... 3, 19-20

*Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320 (6th Cir. 1990) ...................15

*Ord v. District of Columbia*, 587 F.3d 1136 (D.C. Cir. 2009)....................................15

*Osborn v. Bank of U.S.*, 22 U.S. (9 Wheat.) 738 (1824).........................................26-27

*Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 105 (1984) ......................21

v

*Pueblo of Sandia v. Babbitt*, 47 F. Supp. 2d 49 (D.D.C. 1999) ................................................................................................31

\* *Pueblo of Santa Ana v. Kelly*, 104 F.3d 1546 (10th Cir. 1997) ............................................ passim

*Richards v. Duke Univ.*, 480 F. Supp. 2d 222 (D.D.C. 2007)..........................................15

*Rincon Band v. Schwarzenegger*, 602 F.3d 1019 (9th Cir. 2010) ..................................6

*Samuels v. Mackell*, 401 U.S. 66 (1971)........................................................................27

*Saratoga Cnty. Chamber of Com., Inc. v. Pataki*, 798 N.E.2d 1047 (N.Y. 2003) ........................................................................................33

*Scheuer v. Rhodes*, 416 U.S. 232 (1974) ......................................................................16

*Schmidt v. U.S. Cap. Police Bd.*, 826 F. Supp. 2d 59 (D.D.C. 2011) ..........................14

*Seminole Tribe v. Florida*, 517 U.S. 44 (1996) ........................................27, 37, 38, 40

*Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85 (1983)..........................................3, 19, 28

*Sheffer v. Buffalo Run Casino, PTE, Inc.*, 2013 OK 77, 315 P.3d 359..........................7

*Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111 (D.C. Cir. 2000) ........................................................................................15

*State ex rel. Clark v. Johnson*, 904 P.2d 11 (N.M. 1995) ..........................................33

*State ex rel. Stephan v. Finney*, 836 P.2d 1169 (Kan. 1992) ....................................33

*Steel Co. v. Citizens for Better Env't*, 523 U.S. 83 (1998)..........................................20

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)....................................................16

*Tamiami Partners, Ltd. ex rel. Tamiami Development Corp. v. Miccosukee Tribe*, 63 F.3d 1030 (11th Cir. 1995)..........................29

*Tamiami Partners, Ltd. ex rel. Tamiami Dev. Corp. v. Miccosukee Tribe*, 177 F.3d 1212 (11th Cir. 1999)....................................30

*Tohono O'odham Nation v. Ducey*, 130 F. Supp. 3d 1301 (D. Ariz. 2015) ........................................................................................30

*Tri-State Hosp. Supply Corp. v. United States*, 341 F.3d 571 (D.C. Cir. 2003) ..........................14

*United States ex rel. Folliard v. Synnex Corp.*, 798 F. Supp. 2d 66 (D.D.C. 2011) ........................................................................................29

*United States ex rel. Settlemire v. District of Columbia*, 198 F.3d 913 (D.C. Cir. 1999) ........................................................................................14

\* *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247 (2011) ....................21, 23, 24, 27

*Vann v. Kempthorne*, 534 F.3d 741 (D.C. Cir. 2008)....................................21, 24, 25

*Vann v. U.S. Dep't of Interior*, 701 F.3d 927 (D.C. Cir. 2010) ..........................24, 25

\* *Verizon Md., Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635 (2002) ................................................................................................ passim

166117-1

*Ward v. D.C. Dep't of Youth Rehab. Servs.*, 768 F. Supp. 2d 117 (D.D.C. 2011) ........................17

*Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 892 F.3d 332 (D.C. Cir. 2018) .............................................41

*Washington v. Confederated Bands*, 439 U.S. 463 (1979) ...............................33

*West Virginia ex rel. Dyer v. Sims*, 341 U.S. 22 (1951) ...............................32

*White v. Cent. Dispensary & Emerg. Hosp.*, 99 F.2d 355 (D.C. Cir. 1938)...............................43

*Whiteco Metrocom Div. v. Yankton Sioux Tribe*, 902 F. Supp. 199 (D.S.D. 1995) ...............................................20

*Willis v. Fordice*, 850 F. Supp. 523 (S.D. Miss. 1994), *aff'd*, 55 F.3d 633 (5th Cir. 1995) ...............................................33

*Wright v. Foreign Serv. Grievance Bd.*, 503 F. Supp. 2d 163 (D.D.C. 2007) .............................15

*Z St. v. Koskinen*, 791 F.3d 24 (D.C. Cir. 2015) ...............................15

## CONSTITUTION AND STATUTES

15 U.S.C. § 1175 ...............................................32

25 U.S.C. § 1903(4) ...............................................1, 9, 18

25 U.S.C. § 2202 ...............................................5

25 U.S.C. § 2701 ...............................................4

25 U.S.C. § 2702 ...............................................4

25 U.S.C. § 2703(4) ...............................................4, 34

25 U.S.C. § 2706 ...............................................7

25 U.S.C. §§ 2701-2721 ...............................................1

25 U.S.C. § 2710 ...............................................5

25 U.S.C. § 2710(a)(2) ...............................................2

25 U.S.C. § 2710(a)(2)(A)(i) ...............................................5

25 U.S.C. § 2710(b) ...............................................passim

25 U.S.C. § 2710(b)(1) ...............................................11, 35

25 U.S.C. § 2710(b)(2)(A) ...............................................2, 18, 23

25 U.S.C. § 2710(d)(1) ...............................................1, 4, 18, 30, 39

25 U.S.C. § 2710(d)(1)(A) ...............................................4

25 U.S.C. § 2710(d)(1)(A)(i) ...............................................35

25 U.S.C. § 2710(d)(1)(A)(ii) ...............................................2, 18, 23

25 U.S.C. § 2710(d)(1)(B) ...............................................4

25 U.S.C. § 2710(d)(1)(C) ...............................................4, 6, 22, 32, 39

166117-1

25 U.S.C. § 2710(d)(2) ............................................................. passim

25 U.S.C. § 2710(d)(2)(C) ........................................................ passim

25 U.S.C. § 2710(d)(3) ............................................................. passim

25 U.S.C. § 2710(d)(3)(A) ............................................... 1, 5, 35, 37, 39

25 U.S.C. § 2710(d)(3)(B) ................................................... 6-7, 35

\* 25 U.S.C. § 2710(d)(3)(C) ....................................... 2, 5, 11, 18, 23

25 U.S.C. § 2710(d)(3)(C)(iii) ....................................................... 5

\* 25 U.S.C. § 2710(d)(4) ....................................... 2, 5, 18, 23, 39

25 U.S.C. § 2710(d)(6) ............................................................. 32

25 U.S.C. § 2710(d)(7) ......................................................... 37-40

25 U.S.C. § 2710(d)(7)(A)(i) ................................................... 37, 40

25 U.S.C. § 2710(d)(7)(A)(ii) ......................................................... 40

25 U.S.C. § 2710(d)(7)(A)(iii) ................................................... 38, 40

25 U.S.C. § 2710(d)(7)(B)(i) ......................................................... 37

25 U.S.C. § 2710(d)(7)(B)(ii) ......................................................... 37

25 U.S.C. § 2710(d)(7)(B)(iii) ......................................................... 37

25 U.S.C. § 2710(d)(7)(B)(iii)(I)-(II) ................................................ 37

25 U.S.C. § 2710(d)(7)(B)(iv)-(vi) .................................................. 38

25 U.S.C. § 2710(d)(7)(B)(vii) ....................................................... 38

25 U.S.C. § 2710(d)(8) ............................................................. passim

25 U.S.C. § 2710(d)(8)(A) ................................................... 2, 6, 7, 19

25 U.S.C. § 2710(d)(8)(B)(i)-(iii) ...................................................... 6

\* 25 U.S.C. § 2710(d)(8)(C) ................................................... 2, 6, 13, 19

25 U.S.C. § 2719(a) ................................................................... 5

25 U.S.C. § 2719(a)(1) ................................................................ 5

25 U.S.C. § 2719(b) ................................................................... 5

25 U.S.C. § 2719(b)(1) ................................................................ 9

25 U.S.C. § 2719(b)(1)(A) ................................................... 5, 10, 18, 22

25 U.S.C. § 5105 ....................................................................... 5

25 U.S.C. § 5108 ....................................................................... 5

25 U.S.C. § 5203 ....................................................................... 5

28 U.S.C. § 1331 ............................................................. 3, 17, 19-20

28 U.S.C. § 1362 ............................................................... 17, 19

42 U.S.C. § 1396a(a)(30)(A) .................................................................26

Pub. L. No. 83-280, 67 Stat. 588 (1953) (codified as amended at 25 U.S.C. §§ 1321-1324, 28 U.S.C. § 1360) ...............................................33

Pub. L. No. 79-715, 60 Stat. 976 (1946) ..............................................36

Okla. Stat. tit. 3A, §§ 261-282 ................................................... 7, 11-12

Okla. Stat. tit. 3A, §§ 280-281 ................................................................7

UKB Corporate Board Act of 2015, Res. No. 15-UKB-57

§ 106 ..............................................................................................43

§ 202(A)-(B) ...................................................................................43

§ 204(D) .........................................................................................43

§ 308(A) .........................................................................................43

U.S. Const.

District Clause, art. I, § 8, cl. 17 ...................................................28

Supremacy Clause, art. VI, cl. 2 ...................................................26

## RULES

Fed. R. Civ. P. 12(b)(1) ................................................................ passim

Fed. R. Civ. P. 12(b)(6) ................................................................ passim

Fed. R. Civ. P. 25 ...................................................................................3

## REGULATIONS

25 C.F.R. pt. 151 .....................................................................................5

25 C.F.R. § 151.8 ....................................................................................5

25 C.F.R. § 292.2 ....................................................................................5

25 C.F.R. § 293.7 .......................................................................12, 22, 39

25 C.F.R. § 501.2(a) ...........................................................................7, 40

70 Fed. Reg. 3942 (Jan. 27, 2005) .........................................................7

70 Fed. Reg. 6725 (Feb. 8, 2005) ...........................................................7

70 Fed. Reg. 6903 (Feb. 9, 2005) ...........................................................7

84 Fed. Reg. 13,314 (Apr. 4, 2019) ........................................................8

85 Fed. Reg. 5462 (Jan. 30, 2020) ..........................................................3

85 Fed. Reg. 55,472 (Sept. 8, 2020) .....................................................13

166117-1

## OTHER AUTHORITIES

Ben Felder, *Stitt Seeks Shift Away From 'One Size Fits All' Gaming Compacts*, Bartlesville Examiner-Enterprise (last updated May 4, 2020, 8:30 AM), https://www.examiner-enterprise.com/news/20200504/stitt-seeks-shift-away-from-one-size-fits-all-gaming-compacts ................................................................... 45

*Gov. Stitt Responds to Tribal Leaders Lawsuit Over Gaming Compact*, KJRH.com (last updated Jan. 1, 2020, 10:03 AM), https://www.kjrh.com/news/local-news/stitt-responds-to-tribal-leaders-lawsuit-over-gaming-compact .................................. 44

Jill R. Dorson, *'Sooner' Than Later? Sports Betting 'Approved' But Up for Debate in Oklahoma*, SportsHandle (Apr. 22, 2020), https://sportshandle.com/ok-comanche-otoe-tribal-sports-betting/ ................................................................... 44

Joe Bunch, *70 Years of Being Keetoowah Strong!*, Giduwa Cherokee News (Oct. 2020), https://62d6dc34-cf33-4373-a08b-3275bdfd7689.filesusr.com/ugd/b063c3_77c79a6dc72b475a9444b3a2c0becc26.pdf?index=true .......................... 13

Okla. Office of Mgmt. & Enter. Servs., Compacted Tribes, https://omes.ok.gov/gaming-compliance-unit/compacted-tribes ................................. 8

Press Release, Office of Okla. Gov., Governor Stitt Releases Statement Regarding U.S. District Court Ruling on Gaming Compacts (Oct. 23, 2020), https://www.governor.ok.gov/articles/press_releases/statement-regarding-ruling-on-gaming-compacts ............................................................................... 43-44

Press Release, Office of Okla. Governor, Kialegee Sign New Gaming Compacts (July 2, 2020), https://www.governor.ok.gov/articles/press_releases/state-of-oklahoma-kialegee-sign-new-gaming-compac .............................................. 12, 43

Press Release, Office of Okla. Governor, KTT and UKB Tribal Compacts Deemed Approved by the Department of Interior (Aug. 20, 2020), https://www.governor.ok.gov/articles/press_releases/ktt-and-ukb-tribal-gaming-compacts-deemed-approved .......................................................................... 12

Press Release, Office of Okla. Governor, United Keetoowah Band of Cherokee Indians Sign New Gaming Compacts (July 2, 2020), https://www.governor.ok.gov/articles/press_releases/state-of-oklahoma-ukb-sign-new-gaming-compacts ................................................................................ 12, 44

Press Release, UKB, UKB Signs Gaming Compact with Gov. Stitt (July 2, 2020), https://www.ukb-nsn.gov/post/ukb-signs-gaming-compact-with-gov-stitt ......................... 44

Press Release, UKB, Unique UKB Class III Gaming Compact Takes Effect, Sept. 13, 2020, https://www.ukb-nsn.gov/post/class-iii-gaming-compact ......................... 13, 42-43

Ray Carter, *Federal Government Approves New State-Tribal Compacts*, Okla. Council of Pub. Affairs (Aug. 20, 2020), https://www.ocpathink.org/post/federal-government-approves-new-state-tribal-compacts ................................................................................. 13-14

166117-1

**INTRODUCTION**

In this action, the Plaintiff Nations challenge the legality of agreements signed by Defendants Governor Stitt and tribal officials of the Comanche Nation, Otoe-Missouria Tribe, United Keetoowah Band of Cherokee Indians in Oklahoma ("UKB"), and Kialegee Tribal Town ("KTT"). Those agreements, including the UKB and KTT Agreements that are the subject of this motion ("Agreements"),[1] purport to be Tribal-State compacts entered into under the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701-2721.

The Agreements are not IGRA compacts, as the complaint plainly shows. First, Defendant Governor Stitt was not authorized to enter into the Agreements on behalf of the State of Oklahoma because he did not adhere to the process State law prescribes for entering into a Tribal-State compact, and the Agreements "were therefore never validly 'entered into' by the state and, as a result, do not comply with IGRA," and are void. *Pueblo of Santa Ana v. Kelly*, 104 F.3d 1546, 1559 (10th Cir. 1997); First Am. & Suppl'd Compl., ECF No. 26 ("Compl."), ¶¶ 43-48, 110-30, 266-67. Second, the Agreements do not concern gaming on "Indian lands" under IGRA, 25 U.S.C. § 1903(4), and therefore are not authorized by IGRA and are not IGRA compacts, as IGRA only authorizes Tribal-State compacts for gaming on Indian lands, *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 795 (2014); *Amador Cnty., Cal. v. Salazar*, 640 F.3d 373, 376-77 (D.C. Cir. 2011); 25 U.S.C. § 2710(d)(1), (d)(3)(A); Compl. ¶¶ 26, 111, 131, 204, 215-20. Instead, the Agreements invent a new definition of "Indian lands" that refers to to-be-identified lands that neither UKB nor KTT now owns. Agreements Part 2.20. Yet the Agreements purport to commit the Governor of Oklahoma to concur in future acquisitions of these unknown lands, *id.* Part 4.K., which is not an authorized subject for compact negotiations under IGRA, 25 U.S.C. § 2710(d)(3)(C), and those

---

[1] United Keetoowah Band of Cherokee Indians & State of Oklahoma Gaming Compact, ECF No. 29; Kialegee Tribal Town & State of Oklahoma Gaming Compact, ECF No. 29-1.

provisions of the Agreements are therefore invalid. *See* Compl. ¶¶ 201-31, 263. Third, the Agreements violate IGRA, 25 U.S.C. § 2710(d)(4), and settled federal law by imposing a tax on UKB and KTT gaming revenues. The tax is labeled a "Substantial Exclusivity Fee," but that ploy fails because the Agreements do not provide any exclusivity, Compl. ¶¶ 40-42, 155-60. The Agreements also violate IGRA by permitting state regulation of Class II gaming, 25 U.S.C. § 2710(a)(2), (d)(3)(C); Compl. ¶¶ 189, 191-92, 194, 197-98, and by purporting to authorize the State to conduct Class III gaming in the form of the "iLottery," notwithstanding that IGRA does not authorize States to conduct Class III gaming, *see* 25 U.S.C. § 2710(b)(2)(A), (d)(1)(A)(ii), (d)(3)(C). Compl. ¶¶ 183-85, 187, 248.

Defendant Secretary was required by law to disapprove the Agreements because their terms violate IGRA and federal law. *See Amador Cnty.*, 640 F.3d at 381; Compl. ¶¶ 46-47, 124, 125. But instead, Defendant Secretary allowed them to go into effect by inaction, *see* 25 U.S.C. 2710(d)(8)(C), Compl. ¶¶ 105-06, which also violates IGRA, *Amador Cnty.*, 640 F.3d at 381; Compl. ¶¶ 46-47, 127. Defendant Secretary's no action approvals did not cure the Agreements' invalidity because the Secretary is only authorized to approve by inaction a compact that has been legally entered into by both parties, 25 U.S.C. § 2710(d)(8)(A), (d)(8)(C), and because a compact approved by inaction is in effect only to the extent that it is consistent with IGRA, *id.* § 2710(d)(8)(C); Compl. ¶¶ 3, 45-48. Accordingly, Defendants Chief Bunch and Mekko Givens ("Movants") are violating federal law by representing that the Agreements are valid Class III gaming compacts and by exercising authority and jurisdiction under the Agreements as if they are valid Class III gaming compacts under IGRA or directing others to do so. Compl. ¶¶ 123, 266-67.

Movants seek dismissal of the Plaintiff Nations' claims, urging that there is no cause of action for those claims under Fed. R. Civ. P. 12(b)(6), Mem. in Supp. of Defs. Joe Bunch & Brian

Givens' Mot. to Dismiss First Am. Compl. at 6-10, ECF No. 40-1 ("Br."), that this Court lacks subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1), Br. at 11, and that tribal sovereign immunity bars those claims. Br. at 11-12.

These contentions have no merit. First, 28 U.S.C. § 1331 "gives a district court subject matter jurisdiction to decide any claim alleging a violation of IGRA," *Bay Mills*, 572 U.S. at 787 n.2; Compl. ¶ 20, and federal preemption, *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983); *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 329-30 (1983). Second, the Plaintiff Nations' claims are firmly grounded in the doctrine of *Ex parte Young*, 209 U.S. 123 (1908), which renders sovereign immunity inapplicable, and provides an equitable cause of action for those claims, as *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015), makes clear. Third, the specific allegations of the complaint plainly state a claim upon which relief can be granted, as just shown and as set forth *infra* at 40-45. Thus, Movants' motion should be denied.

## LEGAL AND FACTUAL BACKGROUND

The Plaintiff Nations are federally-recognized Indian Tribes, *see* 85 Fed. Reg. 5462, 5463, 5465 (Jan. 30, 2020). Compl. ¶¶ 8-11. The Defendants are the Department of the Interior, Compl. ¶ 12, and the following officers, in their official capacities: Scott de la Vega, Acting Secretary of the Interior, Darryl LaCounte, exercising the delegated authority of the Assistant Secretary of the Interior – Indian Affairs,[2] J. Kevin Stitt, Governor of Oklahoma, William Nelson, Sr., Chairman of the Business Committee of the Comanche Nation, a federally-recognized Indian Tribe, *see* 85 Fed. Reg. 5462, 5463 (Jan. 30, 2020), James R. Shotton, Chairman of the Tribal Council of the Otoe-Missouria Tribe of Indians, a federally-recognized Indian Tribe, *id.* at 5464, Joe Bunch,

---

[2] Mr. de la Vega and Mr. LaCounte are automatically substituted for their predecessors in office. *See* Fed. R. Civ. P. 25.

166117-1

Chief of UKB, a federally-recognized Indian tribe, *id.* at 5466, and Brian Givens, Mekko of KTT, a federally-recognized Indian tribe, *id.* at 5463. Compl. ¶¶12-19.

A.  **Statutory And Regulatory Background.**

IGRA "created a regulatory framework for tribal gaming intended to balance state, federal, and tribal interests." *Amador Cnty.*, 640 F.3d at 376 (citing 25 U.S.C. §§ 2701, 2702); Compl. ¶ 22. That framework governs Class III gaming, 25 U.S.C § 2703(8), which "includes most casino games such as blackjack and roulette as well as slot machines," *Amador Cnty.*, 640 F.3d at 376. IGRA authorizes the tribal conduct of Class III gaming that is: authorized by a tribal ordinance that meets the requirements of 25 U.S.C. § 2710(b) and has been approved by the Chairman of the National Indian Gaming Commission ("NIGC"), *Amador Cnty.*, 640 F.3d at 376 (citing 25 U.S.C. § 2710(d)(1)(A), (d)(2)(C)), conducted on "Indian lands…located within a state that permits gaming 'for any purpose by any person, organization, or entity[,]'" *id.* (quoting 25 U.S.C. § 2710(d)(1)(B)), and "conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State under [§ 2710(d)(3)] that is in effect," *id.* § 2710(d)(1)(C).

IGRA governs gaming only on "Indian lands," *id.* § 2710(d)(1), defined as

(A) all lands within the limits of any Indian reservation; and (B) any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power.

25 U.S.C. § 2703(4); *Amador Cnty.*, 640 F.3d at 376-77; Compl. ¶ 26.

IGRA also prohibits a tribe from conducting gaming on lands taken in trust by the Secretary after October 17, 1988 ("after-acquired lands"), unless the lands are either within or contiguous to

4

the boundaries of the tribe's reservation or former reservation in Oklahoma, 25 U.S.C. § 2719(a),[3]

or satisfy one of the exceptions in 25 U.S.C. § 2719(b).  Under § 2719(b)(1)(A), an Indian tribe

may conduct Class III gaming on after-acquired lands if

> the Secretary, after consultation with the Indian tribe and appropriate State and local
> officials, including officials of other nearby Indian tribes, determines that a gaming
> establishment on newly acquired lands would be in the best interest of the Indian
> tribe and its members, and would not be detrimental to the surrounding community,
> but only if the Governor of the State in which the gaming activity is to be conducted
> concurs in the Secretary's determination ….

*Id.*; *see id.* § 2719(a)(1), (a)(2)(A)(i).  As IGRA does not provide a land-into-trust mechanism, a

tribe must separately apply to have the Secretary acquire the land in trust under 25 U.S.C. §§ 2202,

5105, 5108, and 5203 and 25 C.F.R. pt. 151.  Tribes cannot have land taken into trust within

another tribe's reservation or former reservation in Oklahoma unless the other tribe consents.  25

C.F.R. § 151.8.

IGRA requires a state to negotiate a compact upon a tribe's request, 25 U.S.C.

§ 2710(d)(3)(A), and prescribes the permissible subjects of compact negotiations, *id*.

§ 2710(d)(3)(C). "Class II gaming is not an authorized subject of negotiation for Class III

compacts." *Forest Cnty. Potawatomi Cmty. v. United States*, 330 F. Supp. 3d 269, 286 (D.D.C.

2018).  Nor does IGRA authorize states and tribes to negotiate for the conduct of Class III gaming

by the state.  *See* 25 U.S.C. § 2710(d)(3)(C).  IGRA further provides that, except for state

regulatory assessments that may be negotiated and agreed upon pursuant to § 2710(d)(3)(C)(iii),

25 U.S.C. § 2710 does not "confer[] upon a State…authority to impose any tax, fee, charge, or

other assessment upon an Indian tribe…to engage in a class III activity." *Id.* § 2710(d)(4).

---

[3] For these purposes, the Secretary has defined "former reservation" as "lands in Oklahoma that
are within the exterior boundaries of the last reservation that was established by treaty, Executive
Order, or Secretarial Order for an Oklahoma tribe." 25 C.F.R. § 292.2.

166117-1

Nevertheless, compact provisions that provide for a tribe to pay a share of its gaming revenue to a state have been allowed in some circumstances. Whether such payments are lawful is determined by the Secretary when the compact is submitted for approval. *See id.* § 2710(d)(3)(B). As the Assistant Secretary has explained,

> [i]t is the position of the Department [of the Interior] to permit revenue-sharing payments in exchange for *quantifiable* economic benefits *over which the State is not required to negotiate under IGRA*, such as substantial exclusive rights to engage in Class III gaming activities. We have not, nor are we disposed to, authorize revenue-sharing payments in exchange for compact terms that are routinely negotiated by the parties as part of the regulation of gaming activities, such as duration, number of gaming devices, hour of operation, and wager limits.

*Rincon Band v. Schwarzenegger*, 602 F.3d 1019, 1039 (9th Cir. 2010).

For a tribe to conduct Class III gaming, it must have "entered into" a compact with the state, and that compact must be "in effect." 25 U.S.C. § 2710(d)(1)(C), (d)(2)(C). Whether a compact has been validly entered into "necessitates an interpretation of both federal and state law." *Kelly*, 104 F.3d at 1557. Whether a compact is in effect depends on the action taken by the Secretary under 25 U.S.C. § 2710(d)(8), which provides that: the Secretary "is authorized to approve" a compact that has been "entered into between an Indian tribe and a State," 25 U.S.C. § 2710(d)(8)(A); the Secretary may disapprove the compact if it violates IGRA or other federal law or trust obligations, *id.* § 2710(d)(8)(B)(i)-(iii); and "[i]f the Secretary does not approve or disapprove a compact" within forty-five days of its submission, the compact is deemed approved "but only to the extent the compact is consistent with the provisions" of IGRA, *id.* § 2710(d)(8)(C). The Secretary must, however, disapprove a compact if it would violate any of the three limitations in [*id.* § 2710(d)(8)(B)(i)-(iii)]." *Amador Cnty.*, 640 F.3d at 381. IGRA's "subsection (d)(8)(C), which governs approval by inaction, includes no exemption from this obligation to disapprove illegal compacts." *Id.* "And just as the Secretary has no authority to affirmatively approve a

6

compact that violates any of subsection (d)(8)(B)'s criteria for disapproval, he may not allow a compact that violates subsection (d)(8)(C)'s caveat to go into effect by operation of law." *Id.*

A compact is in effect "only when notice of approval by the Secretary of such compact has been published by the Secretary in the Federal Register." 25 U.S.C. § 2710(d)(3)(B). The Secretary does not enforce the terms of compacts that have gone into effect – that authority is exercised by the NIGC, which has authority over gaming conducted by Indian tribes only on Indian lands. *Id.* § 2706; 25 C.F.R. § 501.2(a) (NIGC authority over "class II and class III gaming operations on Indian lands").

**B.     The Plaintiff Nations' Conduct Of Class III Gaming.**

In 2004, the State of Oklahoma ("State") enacted the State-Tribal Gaming Act ("STGA"), Okla. Stat. tit. 3A, §§ 261-282, which offered Oklahoma tribes a Model Compact under which they could, after approval by the Secretary, "engage in Class III gaming on tribal lands" in accord with IGRA. *Sheffer v. Buffalo Run Casino, PTE, Inc.*, 2013 OK 77, ¶ 4, 315 P.3d 359 (citing *Griffith v. Choctaw Casino of Pocola, Okla.*, 2009 OK 51, ¶ 13, 230 P.3d 488, *overruled on other grounds by Sheffer*, 2013 OK 77, ¶ 25); *accord* Okla. Stat. tit. 3A, §§ 280-281. Compl. ¶ 53. The Plaintiff Nations accepted the State's offer as set forth in the Model Compact, and by so doing entered into an IGRA compact with the State. Compl. ¶ 56. Each of the Plaintiff Nations' Class III Compacts has been approved or considered to have been approved by the Secretary, 25 U.S.C. § 2710(d)(8)(A), (d)(8)(C), notice of such approval by the Secretary was published in the Federal Register, and each Nation's Compact then went into effect under IGRA, *id.* § 2710(d)(3)(B).[4] The

---

[4] 70 Fed. Reg. 3942 (Jan. 27, 2005); 70 Fed. Reg. 6725 (Feb. 8, 2005); 70 Fed. Reg. 6903 (Feb. 9, 2005).

166117-1

Plaintiff Nations have also enacted ordinances authorizing Class III gaming that have been approved by the Chairman of the NIGC. *See* 84 Fed. Reg. 13,314 (Apr. 4, 2019). Compl. ¶ 49.

The Plaintiff Nations' Compacts automatically renewed for a fifteen-year term on January 1, 2020 and are in effect today. *See Cherokee Nation v. Stitt*, No. CIV-19-1198-D, 2020 WL 4340549, at *4 (W.D. Okla. July 28, 2020). Compl. ¶¶ 60, 69. And each Plaintiff Nation conducts Class III gaming under the terms of its Compact. The revenues generated by each Plaintiff Nation's Class II and III gaming are used exclusively by each Plaintiff Nation to fund government operations and programs, and to provide for the general welfare of the Plaintiff Nation and its citizens, consistent with the requirements of IGRA. These revenues support programs that provide health care, education, law enforcement, and youth and family services, among other services. Compl. ¶ 70.

The gaming market in Oklahoma is highly competitive. Various tribal and non-tribal gaming activities are conducted within the State, including pari-mutuel wagering on horse racing, the state lottery, and electronic gaming. There is also constant inter-tribal competition in that market due to the number of IGRA-approved compacts with Indian tribes in the State and the number of tribal gaming facilities operating in the State under those compacts. Compl. ¶ 67. Twenty-seven other Oklahoma tribes accepted the Model Compact and by so doing entered into a compact with the State under IGRA, which was then approved and went into effect under IGRA. *See* Okla. Office of Mgmt. & Enter. Servs., Compacted Tribes, https://omes.ok.gov/gaming-compliance-unit/compacted-tribes (listing thirty-five gaming compacts that have been approved and published in the Federal Register). Compl. ¶ 59. This puts the Plaintiff Nations under constant competitive pressure to maintain their market share. The Plaintiff Nations depend on the Secretary

8

to ensure that all tribal competitors in that market are conducting gaming in accordance with IGRA and thus on an equal footing.  Compl. ¶ 67.

## C.     The Agreements.

On July 1, 2020, Defendant Governor Stitt signed agreements with Movants that purport to be IGRA compacts and to authorize UKB and KTT to engage in Class III gaming under IGRA. Compl. ¶ 101.

The Agreements do not address the conduct of gaming on "Indian lands" as defined by IGRA, 25 U.S.C. § 1903(4).  While both Agreements state that "'Indian lands' shall mean Indian lands as defined by IGRA, 25 U.S.C. § 2719(b)(1)," Agreements Part 2.A.20., IGRA does not define "Indian lands" at § 2719(b)(1).  That provision instead provides an exception to the prohibition on the conduct of gaming on lands acquired in trust for a tribe after October 17, 1988. Nothing in the Agreements concerns "Indian lands" as defined by IGRA.

The Agreements instead purport to give Defendant Governor Stitt's consent to gaming by UKB and KTT at future gaming facilities to be located on land to be acquired in specified areas of counties named in each Agreement.  UKB Agreement Part 4.K.; KTT Agreement Part 4.J.  Each Agreement provides that it is "site specific" and that the Tribe may "establish and operate Covered Games" at its facility, within one mile of a state or federal highway or turnpike located in a specified county.  Agreements Part 4.L.  For UKB, that is Logan County, Oklahoma, UKB Agreement Part 4.L., which is not within the UKB reservation or former reservation in Oklahoma because UKB does not have a reservation or former reservation in Oklahoma.  Compl. ¶ 216.  For KTT, that is Oklahoma County, Oklahoma, east of Choctaw Road, KTT Agreement Part 4.L., which is not within KTT's reservation or former reservation in Oklahoma.  Compl. ¶ 219.

Part 4.K. of the Agreements provides that "the State through its Governor, in order to provide additional meaningful concessions to the Tribe, the adequacy of which is acknowledged

9

by the Tribe, hereby agrees to concur in any determination by the Secretary of the Interior that land relating to the single" facility in which each tribe may conduct Gaming pursuant to the 25 U.S.C. § 2719(b)(1)(A) concurrence process, and that "no other action from the State is required for approval of th[e] land's eligibility for Gaming." If UKB does not apply for § 2719 approval for lands in Logan County on or before July 1, 2024, "the Governor shall withdraw this Concurrence." UKB Agreement Part. 4.K.2. The KTT Agreement requires that KTT "enter into a [management] agreement, as authorized by IGRA, with a federally recognized Indian tribe to jointly manage or operate the Facility on or before June 30, 2021," and that "[a]ny such agreement shall be subject to approval by the State; such approval shall not be unreasonably withheld." *Id.* Part 4.K.2. KTT must also apply for § 2719 approval for the Oklahoma County lands on or before June 30, 2023. *Id.* Part 4.K.3. If KTT fails to do either of these things, "the Governor shall withdraw his Concurrence." *Id.* Part. 4.K.4.

Part 10.A. of the Agreements provides that "[t]he Parties acknowledge and agree that this Compact provides the Tribe with substantial exclusivity over class III covered games consistent with the goals of IGRA." Part 10.B. of the Agreements provides that "[i]n consideration of the Acknowledgement set forth in [Part 10.A.], the adequacy of which is hereby agreed to," UKB and KTT will pay to the State percentages of their "Adjusted Net Revenue" from gaming machines and from nonhouse-banked card and table games, according to schedules set forth in each Agreement. UKB Agreement Part 10.B.1.; KTT Agreement Part 10.B.1.a. In addition, Part 10.B.2. of both Agreements provides that UKB and KTT will pay 18% of their Adjusted Net Win from nonhouse-banked card and table games.

The Agreements do not define "substantial exclusivity," nor do they impose any limitations or restrictions on the State's authority to authorize others to conduct "class III Covered Games."

To the contrary, the Agreements recognize that electronic gaming has already been authorized by the State under the STGA, *see* Agreements Part 2.A.31., and require UKB and KTT to adhere to the Standards that apply to the conduct of such gaming, *id.* Part 2.A.6.  In addition, the Agreements expressly provide "that the substantial exclusivity provided for in this Compact shall not prohibit the operation of iLottery by the State," *id.* Part 3.B., which permits the State to offer electronically any game with the "elements of consideration, chance, and prize," and to authorize any such games to be played anywhere, including the Indian country of the signatory tribes and non-signatory tribes, after any such games have been electronically loaded at an authorized lottery retailer's physical location, *id.* Part 2.A.18.

Part 3.D. of the Agreements requires that at least 80% of each of the Tribe's revenues from gaming facilities come from "Covered Game[s]," which under Part 2.A.6. of the Agreements expressly excludes Class II games.  Part 3.D. of the Agreements thus requires that UKB and KTT obtain not more than 20% of their revenue from Class II games.  In addition, Part 4.L. requires each Tribe to "report at least quarterly to the SCA, the number of Covered Games and class II devices in the Facility, by the name or type of each, its identifying number, and the denomination of bets accepted," and further provides that "[f]ailure to report in accordance herewith shall result in a penalty of $5,000 per report."  *Id.*  Class II gaming cannot be subject of IGRA compact negotiations or of IGRA compacts.  *See* 25 U.S.C. § 2710(b)(1), (d)(3)(C); *Forest Cnty.*, 330 F. Supp. 3d at 287 ("[T]ribal-state compacts [are] not required for the regulation of Class II gaming").

Movants submitted the Agreements to the Department for review by the Secretary on July 1, 2020.  *See* Press Release, Office of Okla. Governor, United Keetoowah Band of Cherokee

Indians Sign New Gaming Compacts (July 2, 2020);[5] Press Release, Office of Okla. Governor, Kialegee Sign New Gaming Compacts (July 2, 2020)[6] ("KTT Press Release"). Compl. ¶ 101. By so doing, Movants represented that the Agreements had been legally entered into by the Tribes and the State as required by 25 C.F.R. § 293.7. Compl. ¶ 112. However, the Agreements were not entered into pursuant to the STGA, nor do those Agreements recite the terms offered in the Model Compact. Compl. ¶ 122. Nor were the Agreements approved by the Oklahoma Legislature. Compl. ¶ 242. *See* Agreements Part 14.

**D.** **The Secretary's Inaction On The Agreements And Movants' Ongoing Representations And Actions Asserting That The Agreements Are Valid Compacts.**

On August 15, 2020, IGRA's forty-five-day window in which the Secretary must approve or disapprove the Agreements expired. The Secretary did not issue an opinion, letter, or other ruling on or by that date. Compl. ¶ 105. Since then, Movants have publicly represented that the Agreements are valid IGRA compacts under which UKB and KTT can conduct gaming. Press Release, Office of Okla. Governor, KTT and UKB Tribal Compacts Deemed Approved by the Department of Interior (Aug. 20, 2020).[7] Compl. ¶ 105.

On or about August 20, Defendant Chief Bunch stated, "[i]t is a great day as we prepare to partner with the State of Oklahoma in this Class III gaming compact that will be good for Logan County, the State and the United Keetoowah Band," and that "[o]ur compact will help provide much needed resources to our tribe and surrounding communities as we continue to develop a robust economy and exercise our tribal sovereignty." Ray Carter, *Federal Government Approves*

---

[5] https://www.governor.ok.gov/articles/press_releases/state-of-oklahoma-ukb-sign-new-gaming-compacts

[6] https://www.governor.ok.gov/articles/press_releases/state-of-oklahoma-kialegee-sign-new-gaming-compac

[7] https://www.governor.ok.gov/articles/press_releases/ktt-and-ukb-tribal-gaming-compacts-deemed-approved

166117-1

*New State-Tribal Compacts*, Okla. Council of Pub. Affairs (Aug. 20, 2020).[8]  Defendant Mekko Givens stated, "[t]he Kialegee Tribal Town would like to thank Governor Kevin Stitt, his administration, the Great State of Oklahoma and the U.S. Department of Interior for the good faith in producing our new gaming compact," and that "[t]his compact, which was approved by operation of law, will allow the Kialegee Tribal Town the same opportunities others have had and could improve the economic landscape for the Tribal Town and tribal members."  *Id.*

On September 8, 2020, the Defendant Secretary published approval of the Agreements in the Federal Register, 85 Fed. Reg. 55,472 (Sept. 8, 2020), stating that they went into effect to the extent they are consistent with IGRA, 25 U.S.C. § 2710(d)(8)(C).  On October 20, Defendant Chief Bunch informed the UKB membership that "[o]ur Class III Gaming Compact has taken effect.  On September 8, 2020 we received notice in the Federal Register that the Office of Indian Gaming has approved our compact for tribal gaming in Logan County, which is north of Oklahoma City."  Joe Bunch, *70 Years of Being Keetoowah Strong!*, Giduwa Cherokee News (UKB), Oct. 2020, at 2.[9]  "We now have the approval for gaming in Logan County due to our State Compact.  We have one more major step to place that land into trust with the federal government."  *Id.*  On or about September 13, 2020, Jamie Thompson, Assistant Chief of UKB and Chairman of the UKB Corporate Board, stated, "[t]he UKB Corporate Board will now work with its developer to select a casino site in Logan County, as specified in the Compact."  Press Release, UKB, Unique UKB Class III Gaming Compact Takes Effect, Sept. 13, 2020 ("UKB Sept. 13, 2020 Press Release").[10]

---

[8] https://www.ocpathink.org/post/federal-government-approves-new-state-tribal-compacts
[9] https://62d6dc34-cf33-4373-a08b-3275bdfd7689.filesusr.com/ugd/b063c3_77c79a6dc72b475a9444b3a2c0becc26.pdf?index=true
[10] https://www.muskogeephoenix.com/news/unique-class-iii-gaming-compact-takes-effect/article_d1aa6b7b-401f-5609-a886-82b9dffdcafa.html

166117-1

Defendants Governor Stitt's, Chairman Nelson's, Chairman Shotton's, and Movants' representations that the Agreements were validly entered into under state law and are valid compacts under IGRA, and their actions in furtherance of those representations, including their exercise of authority or jurisdiction under the Agreements, are contrary to, and constitute a continuing violation of, federal law. Compl. ¶ 123. Movants admit that "[u]nder tribal law, Chief Bunch and Mekko Givens were authorized to submit the Subject Compacts [the Agreements] to the Department of the Interior for approval, inform others that the Subject Compacts were signed by the Governor and approved pursuant to IGRA, and start to plan for the implementation of the Subject Compacts," Br. at 13.

## ARGUMENT

### A.    Standard Of Review.

Movants seek dismissal of the Plaintiff Nations' claims, urging that the claims lack a cause under Fed. R. Civ. P. 12(b)(6), Br. at 6-10, that this Court lacks subject matter jurisdiction for that same reason under Fed. R. Civ. P. 12(b)(1), Br. at 11, and that tribal sovereign immunity bars those claims. Br. at 11-12.[11]

When a movant brings a motion to dismiss under Rule 12(b)(1) and (6), the court must first consider the Rule 12(b)(1) contention. *Schmidt v. U.S. Cap. Police Bd.*, 826 F. Supp. 2d 59, 64 (D.D.C. 2011) (citing *United States ex rel. Settlemire v. District of Columbia*, 198 F.3d 913, 920 (D.C. Cir. 1999); *Eppes v. U.S. Cap. Police Bd.*, 719 F. Supp. 2d 7, 12 (D.D.C. 2010)).

---

[11] Movants' request for dismissal based on tribal sovereign immunity motion should be treated as a request for dismissal under Rule 12(b)(1) as in this Circuit sovereign immunity is jurisdictional, *Tri-State Hosp. Supply Corp. v. United States*, 341 F.3d 571, 575 (D.C. Cir. 2003) (quoting *FDIC v. Meyer*, 510 U.S. 471, 475 (1994)), and motions to dismiss for sovereign immunity are properly brought and considered under Rule 12(b)(1), *e.g.*, *Nemariam v. Federal Democratic Republic of Ethiopia*, 491 F.3d 470, 483 (D.C. Cir. 2007); *Kirkham v. Soc'é Air Fr.*, 429 F.3d 288, 291 (D.C. Cir. 2005); *Morgan v. U.S. Parole Comm'n*, 304 F. Supp. 3d 240, 245 (D.D.C. 2016).

166117-1

In evaluating a Rule 12(b)(1) motion, the court "must accept as true all factual allegations in the complaint and construe the complaint liberally, granting plaintiff the benefit of all inferences that can be drawn from the facts alleged."[12] *Kialegee Tribal Town v. Zinke* ("*KTT*"), 330 F. Supp. 3d 255, 262 (D.D.C. 2018) (citing *Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 164 (1993)); *accord Koutny v. Martin*, 530 F. Supp. 2d 84, 87 (D.D.C. 2007)); *Z St. v. Koskinen*, 791 F.3d 24, 28 (D.C. Cir. 2015); *Ord v. District of Columbia*, 587 F.3d 1136, 1140 (D.C. Cir. 2009); *Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005); *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000). It is "the plaintiff's burden to prove subject matter jurisdiction by a preponderance of the evidence." *KTT*, 330 F. Supp. 3d at 262 (citing *Am. Farm Bureau v. EPA*, 121 F. Supp. 2d 84, 90 (D.D.C. 2000)); *accord McNutt v. GM Acceptance Corp.*, 298 U.S. 178, 182-83 (1936). And "[a] plaintiff['s] factual allegations in the complaint...will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." *KTT*, 330 F. Supp. 3d at 262 (quoting *Wright v. Foreign Serv. Grievance Bd.*, 503 F. Supp. 2d 163, 170 (D.D.C. 2007)) (alterations and ellipsis in original). "In determining whether there is jurisdiction, the Court may 'consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.'" *Id.* (quoting *Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003); citing *Jerome Stevens*,

---

[12] For that reason, Movants' attempt to limit the relevant facts to those they recite and their statement that those facts are not admitted, Br. at 5-6, have no merit, particularly given Movants' admission elsewhere in significant part to the contrary, see Br. 12. Movants also assert "there is no presumption of truthfulness" "when reviewing a motion to dismiss for lack of subject matter jurisdiction," Br. at 11 (citing *Richards v. Duke Univ.*, 480 F. Supp. 2d 222, 231 (D.D.C. 2007)). *Richards* was referring to the standard applicable to "a complaint under factual attack for lack of jurisdiction," 480 F. Supp. 2d at 232 (quoting *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990)), which Movants have not advanced here.

402 F.3d at 1253); *accord Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987) (on Rule 12(b)(1) motion, "the court is not limited to the allegations in the complaint.").

"A motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the adequacy of a complaint on its face." *Johnson v. Comm'n on Pres. Debates*, 202 F. Supp. 3d 159, 167 (D.D.C. 2106). Such a motion "does not test a plaintiff's ultimate likelihood of success on the merits; rather, it tests whether a plaintiff has properly stated a claim." *Connecticut v. U.S. Dep't of Interior*, 344 F. Supp. 3d 279, 295 (D.D.C. 2018) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). "'In evaluating a [Rule 12(b)(6)] motion to dismiss, the Court must accept the factual allegations in the complaint as true and draw all reasonable inferences in favor of plaintiff.'" *KTT*, 330 F. Supp. 3d at 263 (quoting *Nat'l Postal Prof'l Nurses v. USPS*, 461 F. Supp. 2d 24, 27 (D.D.C. 2006)). "To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual allegations that, if accepted as true, 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). It is not necessary for the plaintiff to plead all elements of a prima facie case in the complaint. *Connecticut*, 344 F. Supp. 3d at 295-96 (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511-14 (2002); *Bryant v. Pepco*, 730 F. Supp. 2d 25, 28-29 (D.D.C. 2010)).

Moreover, on a Rule 12(b)(6) motion, the court can consider, in addition to the materials in the complaint and any materials incorporated into it or attached to it, matters of public record and other materials that are subject to judicial notice. *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d

1244, 1249 (D.C. Cir. 2020); *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007); *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997). The court may also consider "documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss." *In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 54-55 (D.D.C. 2016) (quoting *Ward v. D.C. Dep't of Youth Rehab. Servs.*, 768 F. Supp. 2d 117, 119 (D.D.C. 2011)).

**B.      This Court Has Jurisdiction Under 28 U.S.C. §§ 1331 And 1362.**

This Court has subject matter jurisdiction over this action because "28 U.S.C. § 1331 gives a district court subject matter jurisdiction to decide any claim alleging a violation of IGRA," Compl. ¶ 20 (quoting *Bay Mills*, 572 U.S. at 787 n.2), including "whether a Tribal-State compact is valid," *Kelly*, 104 F.3d at 1557, and the complaint alleges such claims.

The complaint alleges that under IGRA a compact executed by a state governor who lacks authority to bind the state is void, that Defendant Governor Stitt lacks such authority, that the Secretary was therefore obligated under IGRA to disapprove the Agreements, which are void, notwithstanding Defendant Secretary's no action approval of those Agreements. Compl. ¶¶ 43-48, 110-27. The complaint further alleges that Movants wrongly represented that those Agreements had been legally entered into by both signatory parties by submitting the Agreements to Defendant Secretary for review under IGRA, Compl. ¶ 112, and that Movants' representations that the Agreements were validly entered into and are valid compacts under IGRA, and their actions in furtherance of those representations, including their exercise of authority or jurisdiction under the Agreements, are contrary to, and constitute a continuing violation of, federal law. *See* Compl. ¶¶ 112, 123.

Additionally, the complaint alleges that IGRA permits gaming on "'Indian lands,' 25 U.S.C. § 2710(d)(1)," as defined by IGRA, 25 U.S.C. § 1903(4), Compl. ¶¶ 26, 131, 201, that the

17

Agreements are not authorized by and violate IGRA because they exclusively apply to lands that are not "Indian lands" under IGRA and violate IGRA in purporting to be IGRA compacts. Compl. ¶¶ 111, 204, 215-20; UKB Agreement Part 2.A.21., 4.K.; KTT Agreement Part 2.A.25., 4.K. Nevertheless, the Agreements purport to commit the Governor of Oklahoma to concur in any future determination by the Secretary that the lands to which the Agreements refer should be taken in trust for gaming purposes under 25 U.S.C. § 2719(b)(1)(A), Compl. ¶¶ 215, 218; Agreements Part 4.K., which is not an authorized subject of compact negotiations, 25 U.S.C. § 2710(d)(3)(C), and that those provisions are therefore invalid. *See* Compl. ¶¶ 221-26, 230, 263.

The complaint further alleges that the Agreements are invalid because the revenue sharing provisions of the Agreements were not agreed to in exchange for a meaningful concession by the State of significant economic benefit to the Tribes and therefore impose a "tax, fee, charge, or other assessment upon an Indian tribe" to conduct Class III gaming, which IGRA does not authorize, 25 U.S.C. § 2710(d)(4), and which therefore violates federal law, notwithstanding the Secretary's no action approval of the Agreements. Compl. ¶¶ 40-42, 46-47, 155-61, 168-78, 180-81, 185-86, 229. The Agreements also violate IGRA by purporting to authorize the State to conduct the "iLottery," as IGRA does not authorize States to negotiate for or to conduct Class III gaming, *see* 25 U.S.C. § 2710(b)(2)(A), (d)(1)(A)(ii), (d)(3)(C). Compl. ¶¶ 183-85, 187, 248. In addition, the Agreements violate IGRA by limiting the signatory Tribes' conduct of Class II gaming activities, and those provisions are invalid notwithstanding the Secretary's no action approval of the Agreements. Compl. ¶¶ 46-47, 189, 191-92, 194, 197-98.

Defendant Secretary's no action approval of the Agreements did not cure their invalidity under IGRA because: (a) the Secretary is only authorized to approve by inaction a compact that has been legally entered into by both parties, 25 U.S.C. § 2710(d)(8)(A), (d)(8)(C); Compl. ¶ 124-

25, and a compact executed by a state governor who lacks authority to bind the state is void, even if the Secretary has approved the compact, or allowed it to go into effect by inaction, *see Kelly*, 104 F.3d at 1554-55, Compl. ¶ 48; (b) the Secretary was required by law to disapprove the Agreements, Compl. ¶¶ 46-47, 186, 199, 230; and (c) a compact approved by the Secretary's inaction is considered to have been approved only to the extent that it is consistent with IGRA, 25 U.S.C. § 2710(d)(8)(C); *see* Compl. ¶ 45. Accordingly, Movants' representations that the Agreements are valid compacts under IGRA, and their actions in furtherance of those representations, including their exercise of authority or jurisdiction under the Agreements are unlawful and constitute a continuing violation of federal law. Compl. ¶ 266-67.

This Court also has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1362 because the Plaintiff Nations are federally-recognized Indian Tribes with governing bodies duly recognized by the Secretary, Compl. ¶¶ 8-11. This action seeks to protect rights to conduct Class III gaming held by the Plaintiff Nations under IGRA and their Compacts, Compl. ¶¶ 20, 49-53, 55-56, 60-61, 63, 68-72, from interference by Movants under the Agreements, which are contrary to federal law, and provide a significant competitive advantage over the Plaintiff Nations' lawful conduct of Class III gaming under IGRA and their Compacts, Compl. ¶¶ 5, 109, 129, 169, 186, 230. Under 28 U.S.C. §§ 1331 and 1362, a federal court has jurisdiction to determine whether the exercise of state or tribal authority that interferes with an Indian tribe's sovereign rights is preempted by federal law. *Shaw*, 463 U.S. at 96 n.14 (federal question presented by claim that state regulation is pre-empted by a federal statute); *Mescalero Apache Tribe*, 462 U.S. at 329-30 (tribal regulatory authority preempts application of state hunting and fishing laws to on-reservation activity); *Nat'l Farmers Union Ins. Cos. v. Crow Tribe*, 471 U.S. 845, 852-53 (1985) (federal law determines the scope of tribal authority and "a federal court may

determine under § 1331 whether a tribal court has exceeded the lawful limits of its jurisdiction"). Furthermore, Movants admit that they are relying on Tribal law to engage in the activities that the complaint alleges violate federal law.  Br. at 13.

While ignoring these allegations, Movants urge that "Congress gave the United States district courts jurisdiction to hear only specific causes of action relating to IGRA," and that "[c]ourts have dismissed IGRA claims that are not authorized by [IGRA] under Rule 12(b)(1), rather than Rule 12(b)(6)."  Br. at 11 (citing *Jimi Dev. Corp. v. Ute Mtn. Ute Indian Tribe*, 930 F. Supp. 493, 498 (D. Colo. 1996); *Whiteco Metrocom Div. v. Yankton Sioux Tribe*, 902 F. Supp. 199, 202-03 (D.S.D. 1995)).  That is rejected by the Supreme Court's subsequent holding that "[i]t is firmly established in our cases that the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, i.e., the courts' statutory or constitutional power to adjudicate the case."  *Verizon Md., Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 642-43 (2002) (quoting *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 89 (1998)).  To the extent that *Jimi* and *Whiteco* may be read to hold otherwise, those holdings are no longer valid.  Furthermore, even assuming, only *arguendo*, that Movants' position had merit, the Plaintiff Nations' claims against Movants are properly based on the equitable remedy provided by *Young*.

**C.**     **This Action Is Properly Brought Under The *Young* Doctrine, Which Provides An Exception To Tribal Sovereign Immunity.**

Movants' contention that Plaintiffs lack a right of action, Br. at 7-11, and that tribal sovereign immunity bars the claims against them, Br. at 11-14, fails because the *Young* doctrine provides the Plaintiff Nations a cause of action for their claims against Movants and renders tribal sovereign immunity inapplicable to those claims.

20

1.    **Tribal Sovereign Immunity Does Not Bar This Action Because It Is Properly Brought Under the *Young* Doctrine.**

*Young* "established an important limit on the sovereign-immunity principle" which "has existed alongside our sovereign-immunity jurisprudence for more than a century," and is "accepted as necessary to 'permit the federal courts to vindicate federal rights.'" *Va. Off. for Prot. & Advoc. v. Stewart* ("*VOPA*"), 563 U.S. 247, 254-55 (2011) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 105 (1984)). *Young* "rests on the premise—less delicately called a 'fiction,' [*Pennhurst*, 465 U.S.] at 114, n.25—that when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes." *Id. Young* also provides a means of challenging *tribal* officials' actions that violate federal law, *Vann v. Kempthorne* (*Vann I*), 534 F.3d 741, 745 (D.C. Cir. 2008). *See Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1154-55 (10th Cir. 2011) (collecting cases).

To determine whether a complaint properly relies on *Young* to avoid the "[sovereign immunity] bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon*, 535 U.S. at 646 (quoting *Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261, 296 (1997) (O'Connor, J., concurring in part & concurring in judgment) and citing *id*. at 298-99 (Souter, J., dissenting)). The Plaintiff Nations' complaint meets that standard. The complaint alleges that each Plaintiff Nation lawfully conducts gaming activity on its Indian lands in accordance with IGRA and its Compact, and that this action was brought to protect their rights under IGRA and their Compacts, Compl. ¶¶ 20, 49-53, 55-56, 60-61, 63, 68-72, from interference by Movants under the terms of the Agreements, which are contrary to federal law, and afford UKB and KTT a significant competitive advantage over the Plaintiff Nations' conduct of gaming in the exercise of their federal rights. Compl. ¶¶ 5, 109, 129, 169, 186, 230.

21

The Plaintiff Nations have sued Movants and other tribal, state, and federal officials in their official capacities, Compl. ¶¶ 13-15, 18-19, and allege that Movants are engaged in ongoing violations of federal law, as follows:

To conduct Class III gaming activities under IGRA, a tribe must have "entered into" a compact with the State, and that compact must be "in effect," 25 U.S.C. § 2710(d)(1)(C), (d)(2)(C), which are separate requirements. Compl. ¶ 43. In addition, IGRA's regulations provide that "[t]he Indian tribe or State should submit the compact or amendment after it has been legally entered into by both parties." 25 C.F.R. § 293.7. A compact executed by a state governor who lacks authority to bind the state is void, Compl. ¶¶ 43-48, and as Defendant Governor Stitt lacks such authority, the Agreements are void, notwithstanding the Secretary's approval of them by inaction. Compl. ¶¶ 46-47, 110-27. Accordingly, Movants' representations that the Agreements were validly entered into under state law and are valid compacts under IGRA, and their actions in furtherance of those representations, including their exercise of authority or jurisdiction under the Agreements, are contrary to, and constitute a continuing violation of, federal law. *See* Compl. ¶¶ 112, 123, 266-67.

The complaint also alleges that the Agreements violate IGRA because they exclusively apply to lands that are not "Indian lands" and purport to be IGRA compacts, Compl. ¶¶ 111, 204, 215-20; UKB Agreement Part 2.A.21., 4.K.; KTT Agreement Part 2.A.25., 4.K., and also purport to commit the Governor of Oklahoma to concur in any future determination by the Secretary that such lands, if acquired, should be taken in trust for gaming purposes under 25 U.S.C. § 2719(b)(1)(A), Compl. ¶¶ 215, 218; Agreements Part 4.K. These terms are contrary to federal law, 25 U.S.C. § 2710(d)(3)(C), and those provisions are invalid under IGRA notwithstanding the Secretary's no action approval of the Agreements. *See* Compl. ¶¶ 46-47, 221-26, 230, 263.

22

The Agreements' revenue sharing provisions violate IGRA because they impose a "tax, fee, charge, or other assessment upon an Indian tribe…to engage in a class III activity" in violation of IGRA, 25 U.S.C. § 2710(d)(4), and settled federal law, which is so notwithstanding the Secretary's no action approval of the Agreements. Compl. ¶¶ 40-42, 46-47, 155-61, 168-78, 180-81, 185-86, 229. The Agreements also purport to authorize the State to conduct the "iLottery," and as IGRA does not authorize States to negotiate for or to conduct Class III gaming, *see* 25 U.S.C. § 2710(b)(2)(A), (d)(1)(A)(ii), (d)(3)(C), the iLottery provisions of the Agreements are invalid, Compl. ¶¶ 183-85, 187, 248, notwithstanding the Secretary's no action approval of the Agreements, *id.* at ¶ 46-47. In addition, the Agreements limit the signatory Tribes' conduct of Class II gaming in order to increase revenue sharing payments to the State, and are therefore invalid under IGRA, notwithstanding the Secretary's no action approval of the Agreements. Compl. ¶¶ 146-47, 89, 191-92, 194, 197-98. Accordingly, Movants' representations that the Agreements are valid compacts under IGRA, and their actions in furtherance of those representations, including their exercise of authority or jurisdiction under the Agreements, are unlawful and constitute a continuing violation of federal law. Compl. ¶¶ 112, 123, 266-67.[13]

To remedy these continuing violations of federal law, the Plaintiff Nations seek prospective equitable relief in the form of a declaratory judgment that: the Agreements were not validly "entered into" under IGRA, are not "in effect" under IGRA, and are therefore null and void, notwithstanding the Defendant Secretary's no action approvals of the Agreements; the Agreements

---

[13] Movants urge that their submission of the Agreements was "a one-time event" that cannot be "a continuing violation" of federal law under *Young*. Br. at 14. *VOPA* shows otherwise by holding that state officials' refusal to produce records that a state agency was entitled to obtain under federal law, *see* 563 U.S. at 250-52, was a continuing violation of federal law under *Young*, *id.* at 255-56. Accordingly, Movants' adherence to their position that the Agreements are compacts and their actions in furtherance of that position, Compl. ¶¶ 112, 123, 267, which Movants admit are ongoing, Br. at 13, plainly satisfy *Young*.

166117-1

violate IGRA by purporting to authorize the State to conduct the iLottery; the revenue sharing provisions of the Agreements violate IGRA's prohibition on state taxation, 25 U.S.C.§ 2710(d)(4), and settled federal law; the Agreements violate IGRA by regulating the conduct of Class II gaming; the provisions of the Agreements that purport to commit the Governor of Oklahoma to concur in future off-reservation trust land acquisitions for gaming purposes are not an authorized subject of negotiation or of a compact under IGRA, and are invalid under federal law; and that Defendant tribal officials' efforts to exercise authority or jurisdiction under the Agreements are unlawful and constitute a continuing violation of federal law. Compl. § VI(b)-(e), (g)-(*i*). The Plaintiff Nations' complaint therefore properly alleges claims under the *Young* doctrine.

Movants argue that *Young* does not apply because they have not "acted outside of their authority under *tribal* law." Br. at 13 (emphasis added). That contention confirms the availability of *Young*, not its inapplicability. *Young* establishes

> that because an unconstitutional legislative enactment is 'void,' a state official who enforces that law 'comes into conflict with the superior authority of [the] Constitution,' and therefore is 'stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct. The State has no power to impart to him any immunity from responsibility to the supreme authority of the United States.'

*VOPA*, 563 U.S. at 254 (quoting *Young*, 209 U.S. at 159-60). And as *Young* applies to tribal officials as well, *Vann I*, 534 F.3d at 745, their compliance with tribal law affords them no immunity from federal law. Rather, the point of *Young* is "that 'when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes.'" *Vann v. U.S. Dep't of Interior* (*Vann II*), 701 F.3d 927, 929 (D.C. Cir. 2010) (quoting *VOPA*, 563 U.S. at 255) (additional citations omitted). Accordingly, Movants' admission that "[u]nder tribal law, Chief Bunch and Mekko Givens were authorized to submit the Subject Compacts [the Agreements] to the Department of the Interior for approval, inform others

24

that the Subject Compacts were signed by the Governor and approved pursuant to IGRA, and start to plan for the implementation of the Subject Compacts," Br. at 13, confirms that *Young* applies to the Plaintiff Nations' claims.

Movants also contend that Plaintiffs' request for declaratory relief is insufficient under *Young*. Br. at 14 (citing *Vann I*, 534 F.3d at 750). Not so. *Young* permits a plaintiff to "obtain declaratory *or* injunctive relief with respect to a sovereign entity notwithstanding sovereign immunity," *Vann II*, 701 F.3d at 928 (emphasis added). Its availability depends on "a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks *relief properly characterized as prospective.*" *Verizon*, 535 U.S. at 645 (citation and quotation marks omitted) (emphasis added); *accord Coeur d'Alene*, 521 U.S. at 281. When that requirement is met, declaratory relief is available. *See Alden v. Maine*, 527 U.S. 706, 757 (1999); *Edelman v. Jordan*, 415 U.S. 651, 656, 664 (1974); *Jamul Action Comm. v. Simermeyer*, 974 F.3d 984 (9th Cir. 2020) (citing *Nat'l Audubon Soc'y, Inc. v. Davis*, 307 F.3d 835, 847-48 (9th Cir. 2002), *opinion amended on denial of reh'g*, 312 F.3d 416 (9th Cir. 2002)) ("[d]eclaratory relief may issue against tribal officers" under *Young*); *Kodiak Oil & Gas (USA) Inc. v. Burr*, 932 F.3d 1125, 1132 (8th Cir. 2019); *Lipscomb v. Columbus Mun. Separate Sch. Dist.*, 269 F.3d 494, 500-01 (5th Cir. 2001).[14]

---

[14] As *National Audubon Society* explained:

> The fact that only declaratory, rather than injunctive, relief may be available does not alter this conclusion. Under the principle of *Ex Parte Young*, private individuals may sue state officials for prospective relief against ongoing violations of federal law.… As subsequent cases have pointed out, *Ex Parte Young* itself was decided well before declaratory relief was available in the federal courts. Nevertheless, we have long held that the Eleventh Amendment does not generally bar declaratory judgment actions against state officers.… The only question is whether the declaratory action is seeking prospective, rather than retrospective, relief.

307 F.3d at 847 (citations omitted).

166117-1

2. ***Young* Provides a Cause of Action to Remedy the Violations of Federal Law in This Case, Making a Private Right of Action Unnecessary.**

Movants' argument that Plaintiff Nations state no cause of action because "IGRA does not provide a private cause of action for challenges to the validity of a compact," Br. at 6-7, fails because *Armstrong* establishes that the right to seek equitable relief in federal court from executive action that violates federal law does not depend on an implied right of action conferred by statute.

In *Armstrong*, the Supreme Court considered whether Medicaid providers could sue state officials to enforce § (30)(A) of the Medicaid Act (codified as amended at 42 U.S.C. § 1396a(a)(30)(A)), which requires a State's Medicaid plan to comport with § 30's general requirements to qualify for Medicaid funding. 575 U.S. at 322-23. The Ninth Circuit had held the Supremacy Clause, U.S. Const. art. VI, cl. 2, created an implied right of action for the claim. 575 U.S. at 324. The Court held otherwise, finding the Supremacy Clause does not create a right of action. *Id.* at 324-27.

The Court then made clear that the right to seek equitable relief in federal court from the actions of state officials who violate federal law does not depend on an implied right of action conferred by statute. "[I]f an individual claims federal law immunizes him from state regulation, the court may issue an injunction upon finding the state regulatory action preempted." *Id.* at 326 (citing *Young*). The Court explained that "we have long held that federal courts may in some circumstances grant injunctive relief against state officers who are violating, or planning to violate, federal law," *id.* at 326-27 (citing *Osborn v. Bank of U.S.*, 22 U.S. (9 Wheat.) 738, 838-39, 844 (1824); *Young*, 209 U.S. at 150-51), and that "[t]he ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England," *id.* at 327. *Armstrong* establishes that

26

the *Young* doctrine is "the creation of courts of equity," and that its availability does not depend on a statutory right of action. *Id.*[15]

The *Armstrong* Court then considered whether, "quite apart from any cause of action conferred by the Supremacy Clause, this suit can proceed against [state officials] in equity." *Id.* Recognizing that "unlawful executive action is subject to express and implied statutory limitations," *id.* (citing *Seminole Tribe v. Florida*, 517 U.S. 44, 74 (1996)), the Court held that "[t]wo aspects of § 30(A) establish Congress's 'intent to foreclose' equitable relief." *Id.* at 328 (quoting *Verizon*, 535 U.S. at 647). First, the "express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others"—and the sole remedy provided by Congress for "a State's failure to comply with Medicaid's requirements" was "the withholding of Medicaid funds by the Secretary of Health and Human Services." *Id.* at 328 (quoting *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001)). Second, while the availability of that remedy "might not, *by itself,* preclude the availability of equitable relief," *id.* (citing *VOPA*, 563 U.S. at 256), the Court held that "it does so when combined with the judicially unadministrable nature of § 30(A)'s text," emphasizing that "[i]t is difficult to imagine a requirement broader and less specific than § 30(A)'s mandate that state plans provide for payments that are 'consistent with efficiency, economy, and quality of care,' all the while 'safeguard[ing] against unnecessary utilization of...care and services.'" *Id.* In sum, *Armstrong* makes clear that the availability of a

---

[15] So too is the right to obtain declaratory relief, which is also available under *Young*, *see supra* at 25. It is "'essentially an equitable cause of action,' and was 'analogous to the equity jurisdiction in suits quia timet or for a decree quieting title.'" *Samuels v. Mackell*, 401 U.S. 66, 70 (1971) (quoting *Great Lakes Dredge & Dock Co. v. Huffman*, 319 U.S. 293, 300 (1943)). "In addition, the legislative history of the Federal Declaratory Judgment Act of 1934, 48 Stat. 955, as amended, 28 U.S.C. § 2201, showed that Congress had explicitly contemplated that the courts would decide to grant or withhold declaratory relief on the basis of traditional equitable principles. Accordingly,…'the district court [i]s as free as in any other suit in equity to grant or withhold the relief prayed, upon equitable grounds.'" *Id.* (quoting *Great Lakes*, 319 U.S. at 300).

166117-1

*Young* remedy does not depend on the existence of a private right of action in the first instance, but that *Young* may be unavailable where Congress has made clear its intent to foreclose *Young*'s availability by providing a statutory remedy to enforce the substantive rule at issue, and applying *Young* to the statute said to be violated would be "judicially unadministrable."

The D.C. Circuit has also recognized, after *Armstrong*, that "a cause of action routinely exists for" "[s]uits to enjoin official conduct that conflicts with the federal Constitution." *D.C. Ass'n of Chartered Pub. Schs. v. District of Columbia*, 930 F.3d 487, 493 (D.C. Cir. 2019) (citing *Verizon*, 535 U.S. at 642; *Shaw*, 463 U.S. at 96). Relying on *Armstrong*, the court first rejected the argument that an implied right of action existed under the Supremacy Clause or the District Clause, U.S. Const. art. I, § 8, cl. 17. 930 F.3d at 493. The court then acknowledged that "the cause of action for such claims does not arise under the Constitution itself. Rather, it exists as 'the creation of courts of equity.'" *Id.* (quoting *Armstrong*, 575 U.S. at 327).

*Armstrong* and *D.C. Association* establish that Movants' argument that this action must be dismissed under Rule 12(b)(6) because "IGRA does not provide a private cause of action for challenges to the validity of a compact" is exactly backwards, as *Armstrong* makes clear that the availability of equitable relief under *Young* does not depend on a statutory cause of action, and that the proper inquiry is instead whether Congress clearly intended to foreclose such relief, recognizing that the "express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others," particularly where the substantive rule sought to be enforced under *Young* is "judicially unadministrable." *Armstrong*, 575 U.S. at 328 (citation omitted). The cases on which the Movants rely to assert the Plaintiff Nations lack a cause of action—all of which pre-date *Armstrong*—are all off the mark because they assume that IGRA must provide a private right of action in order to enforce its terms. *See* Br. at 7-9.

28

Movants cite *Hein v. Capitan Grande Band*, 201 F.3d 1256 (9th Cir. 2000), *Hartman v. Kickapoo Tribe Gaming Commission*, 319 F.3d 1230 (10th Cir. 2003), and *Dewberry v. Kulongoski*, 406 F. Supp. 2d 1136 (D. Or. 2005). In those cases, plaintiffs only asserted claims directly under IGRA, pursuant to a supposed implicit statutory right of action, and they therefore do not bear on the Plaintiff Nations' *Young* claims.[16] Movants next rely on *Tamiami Partners, Ltd. ex rel. Tamiami Development Corp. v. Miccosukee Tribe*, 63 F.3d 1030 (11th Cir. 1995), in which plaintiffs sued tribal officials for violations of IGRA under a supposed statutory right of action, as well as under *Young, id.* at 1031, 1049-51. The Eleventh Circuit found no statutory right of action in IGRA, *id.* at 1049, but concluded that tribal officers were not protected from a *Young* claim by tribal sovereign immunity, *id.* at 1051. The court of appeals later determined that the plaintiffs could not sustain their *Young* action because they effectively sought specific performance of a contract that would have obligated the tribe to pay them gaming revenue. *Tamiami Partners,*

---

[16] The plaintiffs in *Hein* and *Hartman* could not have sustained their claims under *Young* due to the relief they sought. The plaintiffs in *Hein* sued tribal officials, an Indian tribe, unincorporated associations, the United States, and the Secretary, seeking to change tribal law to require the tribe to pay them a share of the tribe's governmental revenues from gaming. 210 F.3d at 1259. The plaintiff in *Hartman* was an employee of a tribal casino who sued tribal and state officials, a tribal agency, a tribe, the State of Kansas, and the NIGC, alleging that a one-week long temporary suspension of her gaming license by the tribal gaming commission violated federal and state law and seeking damages and other retrospective relief. *See* 319 F.3d at 1231-32; *Hartman v. Kickapoo Tribe Gaming Comm'n*, 176 F. Supp. 2d 1168, 1173 (D. Kan. 2001). The plaintiffs in *Dewberry* sued an Indian tribe and Oregon state officials for a declaratory judgment, again directly under IGRA, but they lacked standing. 406 F. Supp. 2d at 1138-39, 1142. Standing is jurisdictional, *Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169, 174 (D.C. Cir. 2012), and when a plaintiff lacks standing a court should not consider the merits, *see Nat'l Mall Tours of Wash., Inc. v. U.S. Dep't of Interior*, 862 F.3d 35, 45 (D.C. Cir. 2017) (vacating district court merits decision for lack of jurisdiction). So, aside from not dealing with *Young*, the portion of *Dewberry* that Movants cite was non-authoritative dictum. *United States ex rel. Folliard v. Synnex Corp.*, 798 F. Supp. 2d 66, 75 n.4 (D.D.C. 2011); *see Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 351 n.12 (2005) ("Dictum settles nothing, even in the court that utters it.").

166117-1

*Ltd. ex rel. Tamiami Dev. Corp. v. Miccosukee Tribe*, 177 F.3d 1212, 1225-26 (11th Cir. 1999). No such claims are at issue here.

Movants also cite *Friends of Amador County v. Salazar*, No. CIV. 2:10-348, 2010 WL 4069473, at *4-5 (E.D. Cal. Oct. 18, 2010). That court held that a claim against a state governor for alleged violations of IGRA, specifically the conduct of Class III gaming without a valid compact, *was* authorized by *Young*. *Id.* at *3. It also rejected the argument that Congress had precluded a *Young* action for enforcement of the IGRA provisions at issue in that case, finding that, unlike the IGRA remedies for tribal suits against states for violation of the good faith negotiation requirement discussed in *Seminole Tribe v. Florida*, *infra* at 37-38, "Congress did not create a detailed remedial scheme to enforce § 2710(d)(1), the section that permits class III gaming by tribes." *Id.* at *4 (citing *Artichoke Joe's v. Norton*, 216 F. Supp. 2d 1084, 1110 n.34 (E.D. Cal. 2002)); *see Tohono O'odham Nation v. Ducey*, 130 F. Supp. 3d 1301, 1311-13 (D. Ariz. 2015). However, the court then went on to dismiss the *Young* claims against the state governor on the ground that "[h]ad Congress intended for individuals to have a private cause of action to enforce the class III gaming requirements of IGRA, it would have provided for it explicitly, as it did for enforcement of other sections of the Act by tribes, states, and the federal government." *Id.* at *5. The court did not attempt to reconcile that ruling with the court's holding that *Young* applied to the plaintiffs' claims against the state governor and that *Seminole* did not make *Young* inapplicable to those claims. *Armstrong* makes them irreconcilable, and defeats reliance on this case.

Movants also cite, without argument or analysis, a series of cases brought under IGRA that they say were dismissed under Rule 12(b)(6). Br. at 9-10. These cases also pre-date *Armstrong*, are off point, and do not support dismissal. In these cases, *Florida v. Seminole Tribe*, 181 F.3d 1237, 1245 n.12, 1246 n.13, 1250 (11th Cir. 1999), *Crosby Lodge, Inc. v. NIGC*, No. 3:06-CV-

30

00657-LRH-RAM, 2007 WL 2318581, at *4 (D. Nev. Aug. 10, 2007) (citing *Hein*, 201 F.3d at

1258-60), and *Davids v. Coyhis*, 869 F. Supp. 1401, 1412 (E.D. Wis. 1994), the court reasoned or

assumed that to bring a *Young* claim, a plaintiff must establish the existence of a statutory right of

action wholly apart from the equitable right of action which *Young* provides.  That approach is

squarely rejected by *Armstrong*'s holding that "[t]he ability to sue to enjoin unconstitutional

actions by state and federal officers is the creation of courts of equity."  575 U.S. at 327.[17]  Finally,

*Langley v. Edwards*, 872 F. Supp. 1531 (W.D. La. 1995), *aff'd sub nom. Langley v. Dardenne*, 77

F.3d 479 (5th Cir. 1996) (per curiam), was decided on jurisdictional grounds not raised here and

its dictum has been rejected by this and other courts.[18]

**3.     Congress Has Not Displaced the Equitable *Young* Remedy for These Claims.**

The Plaintiff Nations' *Young* claims against Movants entitle them to equitable relief in the

form of a declaratory judgment, as those claims are neither "subject to express and implied

statutory limitations," nor are they "judicially unadministrable."  *Armstrong*, 575 U.S. at 327-28.

---

[17] The *Crosby Lodge* discussion of *Young* was also dictum.  It found that a claim against tribal officers who were attempting to enforce an apparently valid *federal regulation* was barred by sovereign immunity, 2007 WL 2318581, at *4—a jurisdictional holding.  The court then found that the plaintiff could not sue under *Young* because IGRA provides no private right of action.  *Id.* As with the dictum in *Dewberry*, this dictum is not authority in this court.  *See supra* 29 n.16.

[18] *Langley* found that dissident tribal members who challenged an IGRA compact between a tribe and Louisiana lacked standing, 872 F. Supp. at 1533-34, and that their challenge to the Secretary's decision to take land into trust was barred by the United States' sovereign immunity, *id.* at 1534-35.  *Langley* also found that "Compact approval by the Secretary cannot be invalidated on the basis of a governor's *ultra vires* action," 872 F. Supp. at 1535, but that view has been elsewhere rejected, *see Kelly*, 104 F.3d at 1557-58; *Pueblo of Sandia v. Babbitt*, 47 F. Supp. 2d 49, 53 & n.1 (D.D.C. 1999); *Narragansett Indian Tribe v. Rhode Island*, Nos. 94-0618-T, 94-0619-T, 95-0034-T, 1996 WL 97856, at *2 (D.R.I. Feb. 13, 1996); *see also Kickapoo Tribe v. Babbitt*, 827 F. Supp. 37, 44-46 (D.D.C. 1993), *rev'd on other grounds*, 43 F.3d 1491 (D.C. Cir. 1995).  The Fifth Circuit, in a non-precedential opinion, affirmed on only the standing ground.  77 F.3d 479.

166117-1

### a. IGRA does not foreclose the availability of *Young* to challenge a compact that was not validly entered into under IGRA.

IGRA does not limit the availability of equitable relief under *Young* when an agreement purporting to be a compact was not validly entered into by the State. Nor is a determination of that issue "judicially unadministrable," as shown by decisions that decide that very question.

IGRA requires that to conduct Class III gaming, a tribe must have "entered into" a compact with the State, and that compact must be "in effect." 25 U.S.C. § 2710(d)(1)(C). These are separate requirements, as 25 U.S.C. § 2710(d)(2)(C) confirms by providing that "class III gaming activity on the Indian lands of the Indian tribe shall be fully subject to the terms and conditions of the Tribal-State compact *entered into* under [§ 2710(d)(3)] that is *in effect*" once the tribal gaming ordinance authorizing Class III gaming has been approved by the Chairman of the NIGC.[19] In sum, as the Tenth Circuit held in *Kelly*, 104 F.3d at 1555, "the 'entered into' language imposes an independent requirement and the compact must be validly entered into by a state before it can go into effect, via Secretarial approval, under IGRA."

Whether IGRA's threshold requirement that a compact be validly entered into is met is a question of federal law that also requires the consideration of state law. *Id.* at 1557 (citing *West Virginia ex rel. Dyer v. Sims*, 341 U.S. 22, 28 (1951)). "The plain language of IGRA makes it clear that Secretarial approval and publication places a compact 'into effect,'" while "[s]tate law must determine whether a state has validly bound itself to a compact." *Id.* at 1557-58 (citing

---

[19] In addition, IGRA provides that the Johnson Act, 15 U.S.C. § 1175, which generally prohibits the possession and use of gambling devices in Indian country, "shall not apply to any gaming conducted under a Tribal-State compact that—(A) is *entered into* under [§ 2710(d)(3)] by a State in which gambling devices are legal, and (B) is *in effect*." 25 U.S.C. § 2710(d)(6) (emphasis added).

*Washington v. Confederated Bands*, 439 U.S. 463, 493 & n.39 (1979)).[20]  And a compact that was "never validly 'entered into' by the state...do[es] not comply with IGRA."  *Id.* at 1559.

IGRA does not limit the availability of equitable relief under *Young* when a tribal official has tendered an agreement to the Secretary and represented that the agreement was validly entered into by the State in order to obtain the agreement's approval as a Tribal-State compact, but the state official who signed the agreement lacked authority to do so.  Nor is the question whether a state has validly entered into a compact "judicially unadministrable."  To the contrary, courts have often considered whether a state official has authority to enter into a Tribal-State compact.  Courts hold that a compact was validly entered into when a governor had legislative authority to do so.  *See, e.g.*, *Dewberry*, 406 F. Supp. 2d at 1154-56; *Willis v. Fordice*, 850 F. Supp. 523, 532-33 (S.D. Miss. 1994), *aff'd*, 55 F.3d 633 (5th Cir. 1995).  By contrast, courts have invalidated compacts entered into by a governor who lacked legislative authority to do so.  *See, e.g.*, *Kelly*, 104 F.3d at 1559; *Narragansett*, 1996 WL 97856, at *2; *Saratoga Cnty. Chamber of Com., Inc. v. Pataki*, 798 N.E.2d 1047, 1061 (N.Y. 2003); *State ex rel. Clark v. Johnson*, 904 P.2d 11, 25 (N.M. 1995); *State ex rel. Stephan v. Finney*, 836 P.2d 1169, 1178-79 (Kan. 1992).

---

[20] The decision in *Confederated Bands* is instructive, as the Supreme Court there construed Pub. L. No. 83-280, 67 Stat. 588, 588-90 (1953) (codified as amended at 25 U.S.C. §§ 1321-1324, 28 U.S.C. § 1360) ("Public Law 280"), which imposed federal law requirements that were to be satisfied by action taken by the State under state law, similar to IGRA.  That statute allowed certain states, including Washington, to amend their laws or constitutions to authorize them to assume civil and criminal jurisdiction in Indian country.  439 U.S. at 478-82.  In 1963, Washington "assum[ed] civil and criminal jurisdiction over Indians and Indian territory within the State," subject to some qualifications.  *Id.* at 465.  At issue in *Confederated Bands* was whether the State's "assumption of jurisdiction by legislative action fully complie[d] with the requirements of" Public Law 280.  *Id.* at 484.  The Court held that whether the procedural requirements of Public Law 280 had been satisfied was to be determined by applying *state law*.  Applying that principle, the Court held that "the State of Washington ha[d] satisfied the procedural requirements" based on the determination by the Washington Supreme Court that the State's legislative action had been sufficient for the purpose.  *Id.* at 493.

166117-1

The complaint alleges just such a claim. That Movants tendered the Agreements to the Secretary and represented that those Agreements were validly entered into by the State in order to obtain their approval as Tribal-State compacts and secure the right to engage in activities authorized under those Agreements. But Defendant Governor Stitt, who signed the Agreements, lacked authority to unilaterally enter into a Tribal-State compact, and the Agreements therefore were not then, and are not now, compacts under IGRA, even though Defendant Secretary allowed them to go into effect by inaction. Compl. ¶¶ 43-48, 110-30. Accordingly, Movants' representations that the Agreements were validly entered into and are valid compacts, and their actions in furtherance of those representations, including their exercise of authority or jurisdiction under the Agreements, are contrary to, and constitute a continuing violation of, federal law. *See* Compl. ¶¶ 123, 266-67.

> **b.** **IGRA is limited to "Indian lands," and it does not limit relief from agreements that do not concern Indian lands.**

IGRA is strictly limited to "Indian lands." *See* 25 U.S.C. § 2703(4). "Everything—literally everything—in IGRA affords tools (for either state or federal officials) to regulate gaming on Indian lands, and nowhere else." *Bay Mills*, 572 U.S. at 795; *Amador Cnty.*, 640 F.3d at 381 (25 U.S.C. § 2710(d)(8) "authorizes approval only of compacts 'governing gaming on *Indian lands*…'"). IGRA cannot foreclose a remedy for a subject outside its scope. Nor does IGRA purport to limit the availability of equitable relief under *Young* when a tribal official has tendered an agreement to the Secretary that does not concern "Indian lands." Nor is the question of whether a compact provides for gaming on Indian lands "judicially unadministrable." It simply requires application of IGRA definition of "Indian lands" to the terms of the agreement.

That IGRA's scope is limited to "Indian lands" is made clear by its text. It provides that "[a]ny Indian tribe *having jurisdiction over the Indian lands upon which a class III gaming activity*

34

*is being conducted, or is to be conducted*, shall request the State in which such lands are located to enter into negotiations for the purpose of entering into a Tribal-State compact governing the conduct of gaming activities." 25 U.S.C. § 2710(d)(3)(A) (emphasis added). IGRA further provides that "[a]ny State and any Indian tribe may enter into *a Tribal-State compact governing gaming activities on the Indian lands of the Indian tribe*, but such compact shall take effect only when notice of approval by the Secretary of such compact has been published by the Secretary in the Federal Register." *Id.* § 2710(d)(3)(B) (emphasis added). And even when a compact has been approved, it is effective only to authorize "class III gaming *activities on the Indian lands of the Indian tribe*." *Id.* § 2710(d)(2)(C) (emphasis added). Finally, a tribe can only conduct class II or III gaming on Indian lands within its jurisdiction. *Id.* § 2710(b)(1), (d)(1)(A)(i).

By contrast, the Agreements only purport to authorize the signatory tribes to conduct gaming on land that may be purchased and taken into trust in portions of Logan and Oklahoma Counties. *See* UKB Agreement Parts 2.A.21., 4.K.1.; KTT Agreement Parts 2.A.25., 4.K.1. Because those lands would be taken into trust *in the future*, UKB and KTT do not *now* exercise governmental authority over them—and those lands are not otherwise within UKB and KTT's jurisdiction because they are not within UKB or KTT's reservations or former reservations in Oklahoma,[21] Compl. ¶¶ 216, 219, and in some instances are within other tribes' reservations or

---

[21] In *KTT*, KTT sought to establish that it had jurisdiction over all lands within the Creek Reservation. 330 F. Supp. 3d at 258-59. That claim was dismissed for failure to state a claim. *Id.* at 258, 268. In so ruling, the court stated that KTT had "refer[red] to three specific instances where Defendants [the Secretary of the Interior and federal officials] have failed to recognize Kialegee as a Creek successor having jurisdiction over its lands," *id.* at 268, which were as follows:

> (1) a pending appeal before the Indian Board of Indian Appeals ("IBIA") of an April 26, 2017 decision by the Bureau of Indian Affairs, Eastern Oklahoma Regional Director, declining to approve a resolution of the Kialegee Tribal Town Business Committee on grounds that Kialegee lacks jurisdiction over any area of Indian Country over which it could enact and apply a liquor ordinance; (2) a 1991

35

former reservations in Oklahoma.[22]  In short, the Agreements purport to authorize UKB and KTT to conduct gaming in parts of Oklahoma that are not Indian lands on which UKB and KTT can conduct gaming.

Thus, the Agreements are not compacts authorized by IGRA and cannot authorize IGRA gaming.  *See Kennerly v. Dist. Ct.*, 400 U.S. 423, 425-29 (1971) (per curiam) (purported tribal consent to state jurisdiction on the Reservation void *ab initio* where it did not comply with federal law setting conditions on which state may exercise such jurisdiction); *Navajo Nation v. Dalley*, 896 F.3d 1196, 1205 (10th Cir. 2018) (when federal law establishes a "threshold requirement that must be met" for an agreement, provisions of an agreement that conflict with those requirements,

---

IBIA decision captioned Kialegee Tribal Town of Oklahoma v. Muskogee Area Dir., Bureau of Indian Affairs, 19 IBIA 296, 303 (1991), upholding a decision by the Regional Director that Plaintiff did not exercise jurisdiction over the Muscogee (Creek) Nation lands; and (3) a May 24, 2012 Memorandum regarding review by the National Indian Gaming Commission ("NIGC") of a proposed gaming facility in Broken Arrow, Oklahoma (the "proposed Site"), which concludes that the facility "does not qualify as Kialegee's Indian lands eligible for gaming because Kialegee has not established that it has legal jurisdiction over the Proposed Site for purposes of [the Indian Gaming Regulatory Act]," and expressly stating that "the Department of the Interior (DOI), Office of the Solicitor, concurs with this opinion."

*Id.* (citations omitted).  In *McGirt v. Oklahoma*, 140 S. Ct. 2452 (2020), the Supreme Court held that Congress had established a Reservation for the Creek Nation by Treaty, *id.* at 2460-62, 2474-76, and that the Creek Reservation continues to exist, *id.* at 2462-74, 2478-82.

[22] The portion of Logan County defined in the UKB Agreement is partially within the territory of the Iowa Tribe of Oklahoma, and the portion of Cherokee County described in the KTT Agreement is within the territories of the Iowa Tribe of Oklahoma, the Kickapoo Tribe of Oklahoma and Plaintiff Citizen Potawatomi Nation.  Compl. ¶¶ 217, 220.  UKB lacks a reservation entirely, since the federal government has never set aside land for UKB over which it exercises governmental power, and until 2020 the federal government held no land in trust for it at all.  *See Cherokee Nation v. Bernhardt*, No. 12-cv-493-GKF-JFJ, 2020 WL 1429946, at *1, *9-12 (N.D. Okla. Mar. 24, 2020), *appeal filed*, Nos. 20-5054, 20-5055 (10th Cir. May 26, 2020); Compl. ¶ 204 n.8. Congress recognized UKB as an Indian tribe in Oklahoma by statute in 1946, Pub. L. No. 79-715, 60 Stat. 976 (1946), long after Congress had stopped establishing new Indian reservations in Oklahoma, *see McGirt*, 140 S. Ct. at 2464-65.

including portions of IGRA compacts, are void). Therefore, the Agreements are beyond IGRA's regulatory scope, and any actions the Defendants take to implement the Agreements are necessarily beyond the scope of remedies that IGRA establishes to enforce its terms.

      **c.**      **There is no other indication in IGRA that Congress intended to foreclose the *Young* relief sought here.**

Third, even if IGRA did govern the implementation of the Agreements, there is no indication that Congress, in IGRA, intended to foreclose Plaintiffs' claims under *Young*. That is shown by contrast to the cases in which courts have found that Congress did foreclose the equitable *Young* remedy. In *Seminole*, the Court held that a tribe cannot rely on *Young* to sue a state official for failing to negotiate a compact in good faith as required by IGRA, 25 U.S.C. § 2710(d)(3)(A). 517 U.S. at 73-75. The Court reasoned that "where Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right, a court should hesitate before casting aside those limitations and permitting an action against a state officer based upon *Ex parte Young*." *Id.* at 74. The Court found that Congress had created such a detailed remedial scheme for relief against states that violate § 2710(d)(3), in 25 U.S.C. § 2710(d)(7). *Id.*

That paragraph of IGRA provides "intricate procedures…show[ing] that Congress intended therein not only to define, but also to limit significantly, the duty imposed by § 2710(d)(3)." *Id.* at 74. Those provisions allow a Tribe to sue a State for failing to negotiate in good faith, 25 U.S.C. § 2710(d)(7)(A)(i), provide that such a suit can only be brought 180 days after the Tribe requests negotiations, *id.* § 2710(d)(7)(B)(i), impose evidentiary standards for a finding of good faith, *id.* § 2710(d)(7)(B)(ii), (d)(7)(B)(iii)(I)-(II), limit the court's remedial authority to "order[ing] the State and the Indian Tribe to conclude such a compact within a 60-day period," *id.* § 2710(d)(7)(B)(iii), provide for a mediated compact negotiation process if the State and Tribe cannot agree, *id.* § 2710(d)(7)(B)(iv)-(vi), and if the State refuses to accept the results

of the mediation, allow the Secretary to prescribe gaming procedures under which the Tribe may conduct gaming, *id.* § 2710(d)(7)(B)(vii). The Secretary may file an action in federal court to enforce those procedures. *Id.* § 2710(d)(7)(A)(iii). Reviewing these provisions, the Court noted:

> By contrast with this quite modest set of sanctions, an action brought against a state official under *Ex parte Young* would expose that official to the full remedial powers of a federal court, including, presumably, contempt sanctions. If § 2710(d)(3) could be enforced in a suit under *Ex parte Young*, § 2710(d)(7) would have been superfluous; it is difficult to see why an Indian tribe would suffer through the intricate scheme of § 2710(d)(7) when more complete and more immediate relief would be available under *Ex parte Young.*

*Seminole*, 517 U.S. at 75.

As the Court later explained in *Verizon*, the mere fact that a statute establishes a cause of action to enforce its terms does not displace *Young* relief unless that statutory cause of action creates a remedy against the state officer "significantly more limited than would be the liability imposed upon the state officer under *Ex parte Young*." 535 U.S. at 647-48 (quoting *Seminole*, 517 U.S. at 75-76). *Verizon* found Congress did not displace a *Young* right of action for state officials' violations of the Telecommunications Act, despite a provision of the Act allowing private parties to bring suit to challenge "determinations" by state commissions in federal court. *Id.* at 647. The Act's remedial provision was unlike the intricate scheme in *Seminole* because it "places no restriction on the relief a court can award" and did not specify "whom the suit is to be brought against…." *Id.*

Similarly, in *Friends of Amador County*, the Central District of California held that *Young* was not foreclosed in an action challenging a governor's approval of a compact on lands that were allegedly not Indian lands. *Id.* at *1. The court concluded that Congress had not displaced *Young* because

> [u]nlike the provisions at issue in *Seminole Tribe*, [25 U.S.C. § 2710(d)(3), (d)(7),] Congress did not create a detailed remedial scheme to enforce § 2710(d)(1), the

section that permits class III gaming by tribes. IGRA does not provide a specific method for citizens to challenge the legitimacy of determinations of eligibility for class III gaming and the State Defendants do not identify any section of IGRA that contains the sort of detailed remedial scheme provided in § 2710(d)(7).

2010 WL 4069473, at *4.[23] *Accord Artichoke Joe's*, 216 F. Supp. 2d at 1110 n.34 ("Congress did not create a detailed remedial scheme to enforce [25 U.S.C. §] 2710(d)(1).").

The Supreme Court has also explained that Congress may implicitly foreclose *Young* relief by establishing a statutory scheme that is not amenable to judicial resolution. *See supra* at 26-28. That is not the case here. Plaintiff's claims at issue in this motion arise against tribal officials. They challenge those officials' representations that the Agreements constitute compacts, alleging that the Agreements: were not validly entered into, *see* 25 U.S.C. § 2710(d)(1)(C), (d)(2)(C); 25 C.F.R. § 293.7; do not concern gaming on "Indian lands," *see* 25 U.S.C. § 2710(d)(2)(C), (d)(3)(A)-(B); and do not comply with IGRA and its implementing regulations, *see id.* § 2710(d)(1)-(d)(4), (d)(8). Congress did not create a detailed scheme for relief against tribal officers who violate those provisions by asserting that a void agreement which violates IGRA gives their tribes the right to conduct gaming. And those provisions all provide judicially manageable standards to judge the legal status of the Agreements, the legality of gaming conducted pursuant to those Agreements, and the validity of assertions that the Agreements are IGRA compacts.

Moreover, bringing a *Young* claim against *tribal* officials for the violations at issue in this lawsuit does not interfere with or render superfluous the limited remedial scheme Congress created against *states* for violations of 25 U.S.C. § 2710(d)(3). *See Friends of Amador Cnty.*, 2010 WL 4069473, at *4. Plaintiff Nations' claims do not trigger the "intricate procedures" in 25 U.S.C. § 2710(d)(7) at issue in *Seminole*. That is because Plaintiff Nations' claims against Movants are

---

[23] As noted *supra* at 30, the court's subsequent finding that there was no cause of action against the Governor has been rejected by *Armstrong*.

166117-1

not good faith negotiation claims against state officials pursuant to 25 U.S.C. § 2710(d)(3), for which Congress created the detailed remedial scheme enforced by the cause of action established in 25 U.S.C. § 2710(d)(7)(A)(i) and (iii).[24]  *See Seminole*, 517 U.S. at 75.  Nor do Plaintiff Nations' claims interfere with the remedy in 25 U.S.C. § 2710(d)(7)(A)(ii), which allows an Indian tribe or state to sue in federal court to "enjoin a class III gaming activity located on Indian lands and conducted in violation of" a compact that is "in effect."  The Plaintiff Nations do not seek an injunction against gaming activities, no Indian lands are at issue in the claims against Movants, and the Agreements are not compacts that are in effect.[25]  And the cause of action in 25 U.S.C. § 2710(d)(7)(A)(ii) is not limited to claims against a particular class of defendants, so it lacks one of the indicia of a "detailed remedial scheme" for relief against tribal officials that might displace *Young*.  *See Verizon*, 535 U.S. at 647.  Accordingly, IGRA does not provide more limited relief for the claims against Movants than does *Young*.  This confirms that Congress has not displaced *Young*.

### D.     Plaintiffs' Allegations Meet Pleading Requirements.

Movants also seek dismissal under Rule 12(b)(1) and 12(b)(6), asserting that the complaint "fails to include any specific allegations of any facts necessary to support the position that Chief Bunch or Mekko Givens are actually exercising authority or jurisdiction under the Subject Compacts," and so Plaintiff Nations lack a *Young* cause of action.  Br. at 10 (citing *Iqbal*, 556 U.S. at 678); *id.* at 11 ("[r]ecognizing that the arguments made under Rule 12(b)(6) above apply equally

---

[24] Indeed, Plaintiff Nations make no good faith negotiation claims against any Defendant in this case, so 25 U.S.C. § 2710(d)(7)(A)(i) and (iii) have no connection to the case.

[25] For these reasons, the Plaintiff Nations' *Young* claims also do not frustrate NIGC enforcement of IGRA *on Indian lands*.  *See* Br. at 14; *see* 25 C.F.R. § 501.2(a); *Bay Mills*, 572 U.S. at 795.

166117-1

to Rule 12(b)(1)…."). First, Movants have admitted that they are doing just that. *See supra* at 20 (quoting Br. at 13). Second, even if they had not, their argument would fail.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "So long as the pleadings suggest a 'plausible' scenario to 'sho[w] that the pleader is entitled to relief,' a court may not dismiss." *Atherton v. D.C. Office of Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009) (citation omitted).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). Such "factual content" may include "'facts found outside of the complaint' which '[the court is] permitted' to 'consider…on a Rule 12(b)(1) motion to dismiss for lack of jurisdiction," *Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 892 F.3d 332, 340 (D.C. Cir. 2018) (quoting *Mendoza v. Perez*, 754 F.3d 1002, 1016 n.9 (D.C. Cir. 2014)), and "matters of which [the court] may take judicial notice" on a Rule 12(b)(6) motion, *Hurd v. D.C., Gov't*, 864 F.3d 671, 678 (D.C. Cir. 2017) (quoting *St. Francis*, 117 F.3d at 624). The Court must make reasonable inferences based on those facts in favor of the Plaintiffs to determine whether the claim is plausible. *See In re U.S. OPM Data Sec. Breach Litig.*, 928 F.3d 42, 57 (D.C. Cir. 2019).

Plaintiff Nations have made sufficient allegations here, and when those sufficient allegations are supported by all the reasonable inferences drawn in their favor, they clearly have a cause of action under *Young* for continuing violations of their federal law rights that require prospective relief in the form of a declaratory judgment. Plaintiff Nations have alleged that they conduct gaming pursuant to IGRA, tribal law, and gaming compacts with the State of Oklahoma

41

and have a legally protected interest the conduct of that gaming.  Compl. ¶¶ 50-56, 60, 69-72.
They have further alleged that Oklahoma is a highly competitive gaming market as the result of
the numerous Indian tribes who conduct gaming there, as well as non-Indian gaming in the form
of pari-mutuel wagering on horse racing, the state lottery, and electronic gaming, and that the
Oklahoma City area is a particularly lucrative and competitive portion of that market.  *Id.* ¶¶ 59,
67, 169.  They have alleged that UKB and KTT entered into the Agreements, which Movants claim
are effective IGRA compacts, *id.* ¶¶ 101, 105, and that Defendant Secretary allowed them to go
into effect, *id.* ¶ 106.  Thus, the Plaintiff Nations have sufficiently alleged the existence of rights
protected by federal law from Movants' interference.

   The Plaintiff Nations have also sufficiently alleged ongoing actions by Movants that violate
those rights.  Movants have asserted that the Agreements give them the right to conduct gaming.
*Id.* ¶ 105.  They have never renounced that position, and every indication from the allegations in
the complaint and facts that the Court may review on a motion to dismiss is that they are continuing
to take actions to implement the Agreements.[26]  After the Secretary decided to allow the
Agreements to go to into effect, Defendant Chief Bunch and UKB officials under his supervision
announced that plans are moving forward to develop a casino:

> "As a former gaming regulator, I can appreciate the importance of a strong gaming
> code," said Chief Joe Bunch.  "This Class III Compact will take gaming and gaming
> regulation to a new level in Oklahoma."

> "We are very pleased with this federal approval," said Jamie Thompson, Chairman
> of the UKB Corporate Board.  "The UKB Corporate Board will now work with its
> developers to select a casino site in Logan County, as specified in the Compact."

---

[26] The court can judicially notice statements by government officers published on government
websites or by mainstream media.  *See Moghaddam v. Pompeo*, 424 F. Supp. 3d 104, 118-19 &
n.5 (D.D.C. 2020); *County of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 520 n.4, 522 nn.6, 7
(N.D. Cal. 2017).

166117-1

UKB Sept. 13, 2020 Press Release.[27]

The KTT Agreement requires KTT to enter into a management agreement with another federally recognized tribe to manage or operate the proposed Oklahoma County facility "on or before June 30, 2021," or KTT will lose the Governor's concurrence. Compl. ¶ 218. It is reasonable to infer that Defendant Mekko Givens is actively recruiting such a partner, since such a complicated commercial undertaking would likely take substantial time to consummate. And Defendant Governor Stitt suggested that process had begun when he and Defendant Mekko Givens signed the KTT Agreement: "The Kialegee Tribal Town is pursuing a sound business plan for its first gaming location in Oklahoma with their compact commitment to partner with another Tribe on this venture." *See* KTT Press Release.

Additionally, Defendants' participation in, and support for, Defendant Governor Stitt's strategy to use agreements with tribes to obtain a proprietary interest in Indian gaming continues to threaten the Tribes' lawful operation of gaming. Compl. ¶ 107. The Defendant Governor Stitt still has an interest in acquiring a proprietary interest in gaming and increasing the State's share of tribal gaming revenue and continues to denounce the Plaintiff Nations' existing compacts. *See* Press Release, Office of Okla. Gov., Governor Stitt Releases Statement Regarding U.S. District

---

[27] The UKB Corporate Board is an agency of the UKB government which operates the UKB Federal Corporation, an entity that is wholly owned by the UKB Tribe. *See* UKB Corporate Board Act of 2015, Res. No. 15-UKB-57, § 202(A)-(B), https://www.ukb-nsn.gov/ukb-corporate-board. Defendant Chief Bunch is an ex officio member of the UKB Corporate Board. *Id.* § 204(D). The UKB Corporate Board reports on its operations to the Chief, *id.* § 308(A), and the Chief is authorized to provide to the UKB Corporate Board, out of UKB tribal resources, "such administrative and other assistance as may be useful or necessary for the proper functioning and growth of the UKB Federal Corporation," including "the provision of services of attorneys [and] accountants," *id.* § 106. The court may take judicial notice of the UKB Corporate Board Act and the Defendant Chief Bunch's authority under that Act. *See White v. Cent. Dispensary & Emerg. Hosp.*, 99 F.2d 355, 359 (D.C. Cir. 1938); *Brugier v. Lac du Flambeau Band*, 237 F. Supp. 3d 867, 872 n.1 (W.D. Wis. 2017).

166117-1

Court Ruling on Gaming Compacts (Oct. 23, 2020);[28] Jill R. Dorson, *'Sooner' Than Later? Sports Betting 'Approved' But Up for Debate in Oklahoma*, SportsHandle (Apr. 22, 2020) ("Oklahoma tribes and the state have long been at odds, and Stitt may be trying to exert pressure on other tribes by negotiating one tribe at a time").[29]

Movants have an interest in cooperating with Defendant Governor Stitt's efforts, as they have done to date, because it lends political credence to their respective Agreements and lends their tribes political weight with the Governor's administration. That is shown by Defendant Governor Stitt's own statements on the process of negotiating the Agreements,

> "I appreciate the honesty and boldness of [KTT] and [UKB].... [T]he parties [can now] negotiate a compact that better accounts for the differing needs of tribes throughout the state and the State's interests in preserving the substantial exclusivity without a cloud of legal uncertainty...." said Gov. Stitt.

*Gov. Stitt Responds to Tribal Leaders Lawsuit Over Gaming Compact*, KJRH.com (last updated Jan. 1, 2020, 10:03 AM),[30] and statements by a representative of UKB when they were signed,

> "This is a monumental day for Keetoowahs. I wanted to thank Governor Stitt and his council that's worked to put this compact together with our Attorney General Klint Cowan and our council," said [Assistant Chief Jamie] Thompson. "We're trying to create a win-win situation for all Oklahomans and certainly for our tribal members. We're looking forward to a long relationship with the state that benefits not only our tribe, but our citizens of the great state of Oklahoma."

Press Release, UKB, UKB Signs Gaming Compact with Gov. Stitt (July 2, 2020).[31]

Moreover, these Agreements provide income for the Movants' tribes, so they have a continuing and significant economic motivation to seek to implement the Agreements as quickly

---

[28] https://www.governor.ok.gov/articles/press_releases/statement-regarding-ruling-on-gaming-compacts

[29] https://sportshandle.com/ok-comanche-otoe-tribal-sports-betting/

[30] https://www.kjrh.com/news/local-news/stitt-responds-to-tribal-leaders-lawsuit-over-gaming-compact

[31] https://www.ukb-nsn.gov/post/ukb-signs-gaming-compact-with-gov-stitt

166117-1

as possible.  As counsel for another Defendant said regarding the Otoe-Missouria and Comanche Nations' Agreements: "This new compact will provide badly needed money to those tribal government coffers.  This was a business decision."  Ben Felder, *Stitt Seeks Shift Away From 'One Size Fits All' Gaming Compacts*, Bartlesville Examiner-Enterprise (last updated May 4, 2020, 8:30 AM).[32]  The same considerations apply to any tribe, and the most reasonable inference to be drawn from the allegations of the complaint is that Movants' efforts to implement that business decision are active and ongoing.  *See Attias v. Carefirst, Inc.*, 865 F.3d 620, 628 (D.C. Cir. 2017) (making reasonable inference of person's motivation from alleged past conduct).

Thus, the allegations of the complaint, materials that the Court may consider outside of the pleadings, and the reasonable inferences that may be drawn from them, all make clear that the Plaintiff Nations have stated a facially plausible claim for relief and the Court should not dismiss under Rule 12(b)(1) or Rule 12(b)(6).

## CONCLUSION

For the foregoing reasons, Movants' Motion to Dismiss should be denied.

Respectfully submitted,

Dated: January 25, 2021            By:   */s/ Frank S. Holleman*
                                         Frank S. Holleman, D.C. Bar # 1011376
                                         Sonosky, Chambers, Sachse,
                                            Endreson & Perry, LLP
                                         1425 K Street, NW, Suite 600
                                         Washington DC 20005
                                         Phone no.: 202-682-0240
                                         Fax no.: 202-682-0249
                                         E-mail:  fholleman@sonosky.com

                                         *Additional Counsel on Following Page*

---

[32] https://www.examiner-enterprise.com/news/20200504/stitt-seeks-shift-away-from-one-size-fits-all-gaming-compacts

166117-1

Colin Cloud Hampson, D.C. Bar # 448481
Sonosky, Chambers, Sachse,
    Endreson & Perry, LLP
145 Willow Road, Suite 200
Bonita, CA 91902
Phone no.: 619-267-1306
Fax no.: 619-267-1388
E-mail:  champson@sonoskysd.com

Lead Counsel for the Cherokee, Chickasaw,
Choctaw, and Citizen Potawatomi Nations

Sara Hill, OK Bar # 20072, *pro hac vice*
P.O. Box 1533
Tahlequah, OK 74465
Counsel for Cherokee Nation
Phone no.: 918-207-3836
Fax no.: 918-458-6142
E-mail: sara-hill@cherokee.org

Stephen Greetham, OK Bar # 21510, *pro hac vice*
4001 N. Lincoln Blvd
Oklahoma City, OK 73105
Counsel for Chickasaw Nation
Phone no. 580-272-5236
E-mail: stephen.greetham@chickasaw.net

Bradley Mallett, OK Bar # 15810, *pro hac vice*
P.O. Box 1210
Durant, OK 74702
Counsel for Choctaw Nation
Phone no.: 580-380-3024
E-mail: bmallett@choctawnation.com

Gregory M. Quinlan, NM Bar # 4450, CO Bar #
21605, *pro hac vice*
George J Wright, OK Bar # 21873, *pro hac vice*
1601 S Cooper Dr
Shawnee, OK 74801
Counsel for Citizen Potawatomi Nation
Phone no. 405-275-3121
Email: george.wright@potawatomi.org

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 25, 2021, I electronically filed the above and foregoing

document and attachments with the Clerk of Court via the ECF System for filing.

*/s/ Frank S. Holleman*
Frank S. Holleman

166117-1