# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THE CHEROKEE NATION, *et al*., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:20-cv-02167 (TJK) |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| THE INTERIOR, *et al*., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFF NATIONS' MEMORANDUM OF POINTS AND AUTHORITIES IN
OPPOSITION TO MOTION TO DISMISS OF FEDERAL DEFENDANTS AND
MOTION TO DISMISS OF DEFENDANT WILLIAM NELSON**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. iv

INTRODUCTION ........................................................................................................... 1

LEGAL AND FACTUAL BACKGROUND ................................................................... 2

A.    The Plaintiff Nations Conduct Class III Gaming for Governmental
Purposes. ............................................................................................................. 3

B.    The Agreements. ................................................................................................. 5

STANDARD OF REVIEW. ............................................................................................ 7

A.    Standards Applicable To A Rule 12(b)(1) Motion To Dismiss For Lack Of
Standing. ............................................................................................................. 7

B.    Standards Applicable To Rule 12(b)(6) Motion To Dismiss. ............................. 9

ARGUMENT ................................................................................................................... 10

I.    PLAINTIFF NATIONS HAVE STANDING TO ASSERT THEIR CLAIMS
AGAINST THE SECRETARY AND THE DEFENDANT CHAIRMAN NELSON.
........................................................................................................................... 10

A.    Plaintiffs' Standing Is Properly Grounded In The Secretary's Failure To
Review And Disapprove The Agreements Under IGRA. ................................... 10

B.    Plaintiff Nations' Standing Properly Relies On The Secretary's Violation
Of Their Procedural Rights Under IGRA. ......................................................... 12

    1.    IGRA grants procedural rights that protect all Tribes and requires
equal treatment of all Tribes in their application, including the
Plaintiff Nations. ................................................................................... 13

    2.    Plaintiff Nations have a concrete interest in the Secretary's
fulfillment of his procedural responsibilities as gatekeeper of all
Tribes' Class III gaming rights. ............................................................ 16

    3.    The complaint properly alleges that the Secretary has committed
procedural violations of IGRA and 25 U.S.C. § 5123(f). ..................... 16

        a.    The Secretary committed substantive and procedural
violations of law by not disapproving Agreements that were
not validly entered into. ............................................................ 16

b. The Secretary committed a substantive and procedural violation of law by considering Agreements that do not concern Indian lands. ................................................................. 18

c. The Secretary committed a substantive and procedural violation of law by failing to disapprove the Agreements because the future concurrence provisions violate IGRA......................... 19

d. The Secretary committed a substantive and procedural violation of law by failing to disapprove the Agreements because they purport to authorize illegal games. ...................................... 20

e. The Secretary committed a substantive and procedural violation of law by failing to disapprove the Agreements because their revenue sharing provisions violate IGRA. .......................... 24

f. The Secretary committed a substantive and procedural violation of law by failing to disapprove the Agreements regulation of Class II gaming. .................................. 25

C. Plaintiffs Have Suffered Injuries In Fact Arising From The Secretary's Regulatory Failures Under IGRA and The Other Defendants' IGRA Violations. .................................................................................. 26

1. The Plaintiffs have suffered an injury in fact because they are unable to compete on an equal footing as a result of the Secretary's no-action approval. ................................................................. 26

2. The Plaintiff Nations have suffered an injury in fact under the competitive injury doctrine. ................................................. 28

3. The Secretary's and Defendant Tribal Officials' unlawful actions subject the Plaintiff Nations to a forced choice that constitutes an injury in fact. ................................................................. 39

D. Plaintiff Nations' Injuries Are Fairly Traceable To The Challenged Conduct Of Defendants And Are Redressable By A Favorable Decision Of This Court. ................................................................. 41

1. Causation and redressability standards applicable to Plaintiff Nations' claims. ................................................................. 41

2. Plaintiff Nations satisfy the causation and redressability elements of standing. ................................................................. 43

a. Unequal treatment injury. ........................................ 43

b. Competitive injuries. ............................................... 43

       c.       Forced choice injury. ............................................................................. 44

E.       Defendant Chairman Nelson's Prudential Standing Argument Has No Merit.................................................................................................................... 45

**II.       FEDERAL DEFENDANTS' RULE 12(B)(6) MOTION SHOULD BE DENIED.... 48**

A.       The Plaintiff Nations Have A Cause Of Action For Causes Of Action One To Three Because Defendant Secretary Was Required To Disapprove The Agreements. ............................................................................................................ 48

B.       The Plaintiff Nations Have A Cause Of Action For Causes Of Action Four To Seven. ............................................................................................................... 56

**CONCLUSION ..................................................................................................... 59**

# TABLE OF AUTHORITIES

## CASES

*ABA v. U.S. Dep't of Educ.*, 370 F. Supp. 3d 1 (D.D.C. 2019)........................................46

*Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052 (D.C. Cir. 2007) .......................................9, 50, 52

*Al-Aulaqi v. Panetta*, 35 F. Supp. 3d 56 (D.D.C. 2014) .........................................................5

\* *Amador Cnty., Cal. v. Salazar*, 640 F.3d 373 (D.C. Cir. 2011)............................................ *passim*

*Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015)..............................................47

*Arpaio v. Obama*, 797 F.3d 11 (D.C. Cir. 2015) ......................................................................29

*Ass'n of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150 (1970)....................................16, 48

*Bank of America v. City of Miami, Fla.*, 137 S. Ct. 1296 (2017) ...........................................48

*Barnhart v. Thomas*, 540 U.S. 20 (2003)..................................................................................21

*Bennett v. Spear*, 520 U.S. 154 (1997) .....................................................................................46

*Bentley v. State*, No. PC-2018-743 (Okla. Ct. Crim. App. Nov. 25, 2020) ...........................4

*Bosse v. State*, No. CF-2010-213 (Okla. Dist. Ct. Oct. 13, 2020) ..................................4

*Bryant v. Pepco*, 730 F. Supp. 2d 25 (D.D.C. 2010) ..............................................................9

*Cherokee Nation v. Stitt*, 475 F. Supp. 3d 1277 (W.D. Okla. 2020)........................................3

*Chesapeake Climate Action Network v. Ex. Imp. Bank of U.S.*, 78 F. Supp. 3d 208 (D.D.C. 2015) ..................................................................................43, 44

*Citizen Band Potawatomi Indian Tribe v. Collier*, 142 F.3d 1325 (10th Cir. 1998) ................................................................................................................................5

*Citizens Exposing Truth about Casinos v. Kempthorne*, 492 F.3d 460 (D.C. Cir. 2007) ..............................................................................................................48

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ..................................................13

*Clark v. Martinez*, 543 U.S. 371 (2005) ..................................................................................55

*Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388 (1987)..................................................................29

*Clinton v. City of New York*, 524 U.S. 417 (1998)....................................................32, 33, 37, 49

*Comcast Corp. v. FCC*, 579 F.3d 1 (D.C. Cir. 2009) ......................................................9

*Connecticut v. U.S. Dep't of Interior*, 344 F. Supp. 3d 279 (D.D.C. 2018) ......................9, 50, 56

*Cross v. Harris*, 418 F.2d 1095 (D.C. Cir. 1969) ...........................................................59

*Crossroads Grassroots Policy Strategies v. FEC*, 788 F.3d 312 (D.C. Cir. 2015)..................................................................................................................46, 47

*Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d 11 (D.D.C. 2020) .................................47

*Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152 (D.C. Cir. 2005)...........................13, 43

*Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 972 F.2d 453
(1st Cir. 1992) ..................................................................................................59

*DEK Energy Co. v. FERC*, 248 F.3d 1192 (D.C. Cir. 2001) ........................................29

*Delta Air Lines, Inc. v. Exp.-Imp. Bank*, 718 F.3d 974 (D.C. Cir. 2013) ...............58, 59

*Detroit Int'l Bridge Co. v. Gov't of Can.*, 133 F. Supp. 3d 70 (D.D.C.
2015) ..................................................................................................................11

*Detroit Int'l Bridge Co. v. Gov't of Can.*, 883 F.3d 895 (D.C. Cir. 2018) ............11, 54

*DTCC Data Repository (U.S.) LLC v. U.S. Commodity Futures Trading
Comm'n*, 25 F. Supp. 3d 9 (D.D.C. 2014) ......................................................58

*El Paso Nat. Gas Co. v. FERC*, 50 F.3d 23 (D.C. Cir. 1995)......................................29

*Estate of Boyland v. Department of Agric.*, 913 F.3d 117 (D.C. Cir. 2019)....................7

*Ex parte Young*, 209 U.S. 123 (1908)........................................................................47

*Ferrer v. CareFirst*, 265 F. Supp. 3d 50 (D.D.C. 2017)..........................................7, 8

*Finca Santa Elena, Inc. v. U.S. Army Corps of Engineers*, 873 F. Supp. 2d
363 (D.D.C. 2012) ............................................................................................

*Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658 (D.C. Cir. 1996).............................42, 43

*Floyd v. City of New York*, Nos. 08 Civ. 1034 (AT), 10 Civ. 0699 (AT), 12
Civ. 2274 (AT), 2020 WL 3819566 (S.D.N.Y. July 8, 2020) ................................5

*Food & Water Watch v. USDA*, 451 F. Supp. 3d 11 (D.D.C. 2020) ...........................43

*Food & Water Watch v. USDA*, 325 F. Supp. 3d 39 (D.D.C. 2018) ..........12, 13, 18, 27

*Food & Water Watch, Inc. v. Vislack*, 808 F.3d 905 (D.C. Cir. 2015)............................7

*Forest Cnty. Potawatomi Cmty. v. United States*, 317 F.R.D. 6 (D.D.C.
2016) .............................................................................................................39, 49

*Forest Cnty. Potawatomi Cmty. v. United States*, 330 F. Supp. 3d 269
(D.D.C. 2018) ....................................................................................................26

*Friends of Animals v. Jewell*, 828 F.3d 989 (D.C. Cir. 2016) .......................................7

*FW/PBS, Inc. v. Dallas*, 493 U.S. 215 (1990) ............................................................8

*Haase v. Sessions*, 835 F.2d 902 (D.C. Cir. 1987) .................................................7, 8

*Haitian Refugee Center v. Gracey*, 809 F.2d 794 (D.C. Cir. 1987) .......................42, 47

*Hendrick v. Walters*, 865 P.2d 1232 (Okla. 1993).....................................................51

*Hollinger v. Home State Mut. Ins. Co.*, 654 F.3d 564 (5th Cir. 2011)............................5

*In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46
(D.D.C. 2016) .................................................................................................9, 10

*In re Donahue*, No. U97-01, 1997 WL 33165851 (R.I.A.G. Nov. 13, 1997)................54

*In re Idaho Conservation League*, 811 F.3d 502 (D.C. Cir. 2016)..............................36

*In re Jansen*, 2009 Mich. A.G. No. 7225, 2009 WL 739961 (Mich. A.G. Feb. 27, 2009) ......................................................................................54

*In re Proposal C*, 185 N.W.2d 9 (Mich. 1971)..............................................54

*In re U.S. OPM Data Sec. Breach Litig.*, 928 F.3d 42 (D.C. Cir. 2019) ........................................7

*Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.*, 724 F.3d 206 (D.C. Cir. 2013) ....................................................................28, 29, 30

*Johnson v. Comm'n on Pres. Debates*, 202 F. Supp. 3d 159 (D.D.C. 2106)..................9

*Keating v. Edmondson*, 2001 OK 110, 37 P.3d 882 ......................................51

*KG Urban Enters., LLC v. Patrick*, 693 F.3d 1 (1st Cir. 2012)......................52

*Kialegee Tribal Town v. Zinke*, 330 F. Supp. 3d 255 (D.D.C. 2018) ........................7, 9

*Kickapoo Tribe of Indians v. Babbitt*, 827 F. Supp. 37 (D.D.C. 1993) *rev'd on other grounds*, 43 F.3d 1491 (D.C. Cir. 1995) ..................................53

*Koi Nation v. U.S. Dep't of Interior*, 361 F. Supp. 3d 14 (D.D.C. 2019) ....................................................................15, 27

*La. Energy & Power Auth. v. FERC*, 141 F.3d 364, 367 (D.C. Cir. 1998) ...........................29, 37

\* *Lac du Flambeau Band v. Norton*, 422 F.3d 490 (7th Cir. 2005).........................*passim*

*Langley v. Edwards*, 972 F. Supp. 1531 (W.D. La. 1995)..............................53

*LaRoque v. Holder*, 650 F.3d 777 (D.C. Cir. 2011) .....................................8, 9

*Lexmark Intern, Inc. v. Static Control Corp., Inc.*, 572 U.S. 118 (2014) ........................46

*Lockhart v. United States*, 136 S. Ct. 958 (2016) .......................................21

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992)..........................................*passim*

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990) .....................................8

*McGirt v. Oklahoma*, 140 S. Ct. 2452 (2020).............................................4

*McKoy v. Spencer*, No. CV 16-1313 (CKK), 2019 WL 400615 (D.D.C. Jan. 31, 2019) ....................................................................7, 8

*Mendoza v. Perez*, 754 F.3d 1002 (D.C. Cir. 2014) .....................................*passim*

*Menominee Indian Tribe v. EPA*, 947 F.3d 1065 (7th Cir. 2020)....................58

*Mich. Beer & Wine Wholesalers Ass'n v. Att'y Gen.*, 370 N.W.2d 328 (Mich. Ct. App. 1985)....................................................54

*Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782 (2014) .........................19

*Morongo Band v. FAA*, 161 F.3d 569 (9th Cir. 1998) ...................................60

*N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244 (D.C. Cir. 2020)......................9

*N.Y. Republican State Comm. v. SEC*, 927 F.3d 499 (D.C. Cir. 2019)......................59

*Nat'l Parks Conservation Ass'n v. Manson*, 414 F.3d 1 (D.C. Cir. 2005) ..................43

*Nat'l Wrestling Coaches Ass'n v. Dept. of Educ.*, 366 F.3d 930
(D.C. Cir. 2004) ...............................................................................8, 11, 12

*Navajo Nation v. Dalley*, 896 F.3d 1196 (10th Cir. 2018)................................................56

*Ne. Fla. Ch. of Assoc'd Gen. Contractors of Am. v. City of Jacksonville*, 508
U.S. 656 (1993)...................................................................................................28

*New Mexico v. Dept. of the Interior*, 854 F.3d 1207 (10th Cir. 2017).........................................41

*Oregonians for Floodplain Protection v. U.S. Dept. of Comm.*, 334 F. Supp.
3d 66 (D.D.C. 2018) ................................................................................................

*Perry Cap. LLC v. Mnuchin*, 864 F.3d 591 (D.C. Cir. 2017) ...............................................8

*Pine v. Charlestown Town Council*, C.A. No. 95-491, 1997 WL 839926
(R.I. Superior Ct. June 4, 1997) ..........................................................................54

*Pueblo of Santa Ana v. Kelly*, 104 F.3d 1546 (10th Cir. 1997) ............................................. *passim*

*Pueblo of Santa Ana v. Kelly*, 932 F. Supp. 1284 (D.N.M. 1996)................................................56

*Ramirez v. ICE*, 338 F. Supp. 3d 1 (D.D.C. 2018) ........................................................10

*Raney v. District of Columbia*, 892 F. Supp. 283 (D.D.C. 1995) .................................................59

*Rasure v. Sparks, 183 P. 495 (Okla. 1919)*.................................................................51

*Reg'l Rail Reorg. Act Cases*, 419 U.S. 102 (1974)................................................................40, 42

*Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978).........................................................28

*Renal Physicians Ass'n v. U.S. Dep't of Health & Human Servs.*, 489 F.3d
1267 (D.C. Cir. 2007) ..............................................................................................11, 12

*Rhode Island v. Narragansett*, 1995 WL 17017347 (D.R.I. Feb. 3, 1995) ............................53, 54

*Sanchez v. Office of State Superintendent of Educ.*, No. 18-975 (RC), 2019
WL 935330 (D.D.C. Feb. 26, 2019) .................................................................36, 37

*Sandoval v. U.S. Dep't of Justice*, 322 F. Supp. 3d 101 (D.D.C. 2018) .........................................25

*Sault St. Marie Tribe of Chippewa Indians v. United States*, 288 F.3d 910
(6th Cir. 2002).......................................................................................................39

*Scheuer v. Rhodes*, 416 U.S. 232 (1974) ......................................................................9

*Sherley v. Sebelius*, 610 F.3d 69 (D.C. Cir. 2010).........................................................15, 16, 29,

*Sierra Club v. Morton*, 405 U.S. 727 (1972) .................................................................9

*Sierra Club v. Trump*, 963 F.3d 874 (9th Cir.), *cert. granted*, 141 S.
Ct. 618 (2020) ......................................................................................................47

*Sokaogon Chippewa Cmty. v. Babbitt*, 214 F.3d 941 (7th Cir. 2000) ..................................38, 49

*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016) ................................................................. *passim*

*St. John's United Church of Christ v. FAA*, 520 F.3d 460 (D.C. Cir. 2008) ...............................43

*Stand Up for Cal.! v. U.S. Dep't of Interior*, 71 F. Supp. 3d 109 (D.D.C. 2014) ...........................................................................................................58

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101 (D.D.C. 2017) ......................................................................................60

*State ex rel. York v. Turpen*, 681 P.2d 763 (Okla. 1984) ............................51

*State v. Shriver*, No. CF-2015-394 (Okla. Dist. Ct. Nov. 12, 2020).............4

*State v. Sizemore*, No. CF-2016-593 (Okla. Dist. Ct. Oct. 28, 2020) ...........4

*Steel Co. v. Citizens for Better Environment*, 523 U.S. 83 (1998)...............46

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).......................................9

*Texas v. United States*, 497 F.3d 491 (5th Cir. 2007) .................................41

*Thomas v. Union Carbide Agric. Products Co.*, 473 U.S. 568 (1985) ............40, 41, 42

*Treat v. Stitt*, 2020 OK 64 ...........................................................6, 18, 31, 32

*Treat v. Stitt*, 2021 OK 3 ....................................................................7, 18

*United Transp. Union v. ICC*, 891 F.2d 908 (D.C. Cir. 1989) ....................29

*Vann v. Kempthorne* (*Vann I*), 534 F.3d 741 (D.C. Cir. 2008)....................47

*Verizon Md. Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635 (2002) .......46

*Village of Bensenville v. FAA*, 457 F.3d 52 (D.C. Cir. 2006).......................43

*Warth v. Seldin*, 422 U.S. 490 (1975) ......................................................8, 11

*Washington v. Confederated Bands*, 439 U.S. 463 (1979) ......................17, 50

## STATUTES

5 U.S.C. § 701(a)(2).....................................................................................57

25 U.S.C. § 2702(1) ...............................................................................13, 48

25 U.S.C. § 2703(4) .....................................................................................19

25 U.S.C. § 2710(a)(2).................................................................................26

25 U.S.C. § 2710(b) .....................................................................................13

25 U.S.C. § 2710(b)(2)(A)............................................................................23

25 U.S.C. § 2710(d)(1) .................................................................................49

25 U.S.C. § 2710(d)(1)(A)(ii).......................................................................23

25 U.S.C. § 2710(d)(1)(B) .........................................................14, 20, 21, 59

25 U.S.C. § 2710(d)(1)(C) ...........................................12, 14, 45, 49, 54, 59

25 U.S.C. § 2710(d)(3) ...........................................................................12, 14

25 U.S.C. § 2710(d)(3)(B) .......................................................................3, 14

25 U.S.C. § 2710(d)(3)(C) .........................................15, 20, 23, 26, 60

25 U.S.C. § 2710(d)(3)(C)(iii) ..................................................................24

25 U.S.C. § 2710(d)(4) ......................................................................24, 25

25 U.S.C. § 2710(d)(8) ............................................................................49,

25 U.S.C. § 2710(d)(8)(A) ............................................................... *passim*

25 U.S.C. § 2710(d)(8)(B) ..............................................14, 15, 17, 58

25 U.S.C. § 2710(d)(8)(B)(i)-(iii) ....................................14, 18, 57

25 U.S.C. § 2710(d)(8)(C) ............................................................... *passim*

25 U.S.C. § 2719(a) ..................................................................................19

25 U.S.C. § 2719(a)(1) ............................................................................19

25 U.S.C. § 2719(a)(2)(A) ......................................................................19

25 U.S.C. § 2719(b)(1) ............................................................................19

25 U.S.C. § 2719(b)(1)(A) ........................................................20, 37, 48

25 U.S.C. § 5123(f) ............................................................................ *passim*

42 R.I. Gen. Laws § 42-9-6..................................................................54

State-Tribal Gaming Act, Okla. Stat. tit. 3A, §§ 261-282 ....................3

Okla. Stat. tit. 3A, § 262(C) ....................................................................3

Okla. Stat. tit. 3A, § 703(9) ..........................................................23, 24

Okla. Stat. tit. 74, § 18b(A)(18) ..........................................................51

H.B. 3538, 2018 Okla. Sess. Laws 125, *codified at* Okla. Stat. tit. 3A,
    § 724.5(A)-(B) ..................................................................................23

**RULES AND REGULATIONS**

25 C.F.R. § 151.2(f) ..................................................................................20

25 C.F.R. § 151.8 ......................................................................................20

25 C.F.R. § 293.2(b)(2) ............................................................................50

25 C.F.R. § 293.4(b) ................................................................................22

25 C.F.R. § 293.7 ............................................................................14, 54, 55

25 C.F.R. § 293.8(a) ................................................................................56

25 C.F.R. § 293.8(b)-(c) ..........................................................................55

25 C.F.R. § 293.8(d) ................................................................................55

70 Fed. Reg. 3942 (Jan. 27, 2005) ..........................................................3

70 Fed. Reg. 6725 (Feb. 8, 2005) ............................................................3

70 Fed. Reg. 6903 (Feb. 9, 2005) ............................................................3

73 Fed. Reg. 74,004 (Dec. 5, 2008) ..................................................................55

85 Fed. Reg. 38,919 (June 29, 2020) .................................................................6

85 Fed. Reg. 55,472 (Sept. 8, 2020) ...............................................................6, 7

86 Fed. Reg. 7554 (Jan. 29, 2021) .....................................................................2

Fed. R. Civ. P. 12(b)(1)..........................................................................1, 7, 47

Fed. R. Civ. P. 12(b)(6)..........................................................................1, 9, 49

Fed. R. Civ. P. 25(d) ...........................................................................................3

## TREATIES

1846 Treaty with the Cherokee, Aug. 6, 1846, 9 Stat. 871...............................4

1855 Treaty of Washington with the Choctaw and Chickasaw, 7 June 22, 1855, 11 Stat. 611 .................................................................................................3, 4

1866 Treaty of Washington with the Cherokee, July 19, 1866, 14 Stat. 799 ................4

1866 Treaty of Washington with the Choctaw and Chickasaw, Apr. 28, 1866, 14 Stat. 769 ......................................................................................................4

1867 Treaty of Washington with the Potawatomi, Feb. 27, 1867, 15 Stat. 531 ...........4

Treaty of Dancing Rabbit Creek, Sept. 27, 1830, 7 Stat. 333.............................3

Treaty of Doaksville, Jan. 17, 1837, 11 Stat. 573 ..............................................3

Treaty of New Echota, Dec. 29, 1835, 7 Stat. 478 ............................................4

## OTHER AUTHORITIES

Alec Karakatsanis, *The Punishment Bureaucracy: How to Think About "Criminal Justice Reform"*, 128 Yale L. J. Forum (2019).........................................5

Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* (2012)..................................................................................................21

*Black's Law Dictionary* (9th ed. 2009)...........................................................26

*Cherokee Nation Upgrades Criminal Codes, Redirects $10M for Law Enforcement, Courts, Prosecutors After McGirt Decision*, Anadisgoi (Dec. 15, 2020), https://anadisgoi.com/index.php/government-stories/477-cherokee-nation-upgrades-criminal-codes-redirects-10m-for-law-enforcement-courts-prosecutors-after-mcgirt-decision .............................................................4

*Hispanic or Latino Origin by Race*, Census Reporter, http://bit.ly/3s1oo5J ..................5

*Indian Gaming Compacts*, U.S. Dep't of Interior, https://www.bia.gov/as-ia/oig/gaming-compacts.................................................................................52

Joe Bunch, *70 Years of Being Keetoowah Strong!*, Giduwa Cherokee News (UKB), Oct. 2020..............................................................................................35

Order of Sept. 14, 2020, *Treat I*, 2020 OK 64, https://bit.ly/3bBLIRd ...........................................6

Press Release, *New Compacts Signed by Otoe-Missouria Tribe, Comanche Nation Will Improve Economic Support for Tribal Members*, Rosette, LLP (Apr. 22, 2020),  https://www.prnewswire.com/news-releases/new-compacts-signed-by-otoe-missouria-tribe-comanche-nation-will-improve-economic-support-for-tribal-members-301045093.html ...........................................................................22

Press Release, UKB, Unique UKB Class III Gaming Compact Takes Effect, Sept. 13, 2020............................................................................................................................35

*Report of the Commissioner of Indian Affairs for 1910* (1910), https://images.library.wisc.edu/History/EFacs/CommRep/AnnRep10/referenc e/history.annrep10.i0003.pdf .........................................................................................5

Taja-Nia Y. Henderson & Jamila Jefferson-Jones, *#Livingwhileblack: Blackness as Nuisance*, 69 Am. U. L. Rev. (2020) ........................................................................5

*Tribal Compacts and Agreements*, Okla. Sec'y of State, https://www.sos.ok.gov/gov/tribal.aspx....................................................................52

## INTRODUCTION

The Plaintiff Nations show below that the Federal Defendants'[1] motion to dismiss for lack of standing under Fed. R. Civ. P. 12(b)(1), Mem. Supp. Fed. Defs.' Mot. to Dismiss ("DOI Br.") at 14-35, ECF No. 56-1, and failure to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6), DOI Br. at 35-44, and Defendant Chairman Nelson's motion to dismiss for lack of Article III standing and prudential standing under Fed. R. Civ. P. 12(b)(1), Def. William Nelson's Mem. Supp. Mot. to Dismiss ("DCM Br."), ECF No. 54-1, should both be denied.

The Plaintiff Nations have standing here, and their complaint states a claim for relief, for three reasons. First, the Agreements at issue are not IGRA compacts because they were not lawfully entered into by the State of Oklahoma. The Secretary therefore had no authority to review the Agreements, which are void. In addition, the Agreements contain multiple terms that are plainly illegal under IGRA, and the Secretary was required to disapprove the Agreements for these reasons too. Second, the Secretary claims he did his job by allowing the Agreements to go into effect by inaction, notwithstanding the contrary law of this Circuit. And Defendant Governor and Tribal Officials continue to assert that the Agreements are valid compacts under IGRA, ignoring contrary rulings of the Oklahoma Supreme Court, and implementing the Agreements as if they were valid compacts. Third, as a result of these illegal actions the Plaintiff Nations have suffered injuries that are concrete, particularized, actual, and imminent. The Secretary's no-action approval frees the Comanche Nation, Otoe-Missouria Tribe, United Keetoowah Band ("UKB"), and Kialegee Tribal Town ("KTT") Agreements from IGRA's limits, to which Plaintiff Nations adhere, and in so doing denies Plaintiff Nations the ability to compete on an equal footing in

---

[1] We refer to the Federal Defendants collectively as the "Secretary," and to the Tribal Leader Defendants as the "Defendant Tribal Officials."

Oklahoma's highly competitive gaming market.  And Defendant Tribal Officials are now operating under the claimed authority of the Agreements, by conducting gaming at ten existing locations, implementing the terms by which Defendant Governor Stitt purportedly agreed to their establishing eight new gaming facilities, including facilities on lands within Plaintiff Nations' reservations or former reservations, and claiming that they can decide whether and when to conduct games that are not authorized by state law.  This effectively diminishes the Plaintiff Nations' gaming revenues and puts their share of the Oklahoma gaming market at immediate risk. As a result, the Plaintiff Nations are forced to choose between (a) letting the actions of Defendant Tribal Officials dictate the Plaintiff Nations' share of the Oklahoma gaming market, and acceding to Defendant Governor's hijacking of IGRA, and (b) seeking new agreements that will allow them to compete on terms that the Defendant Governor dictates and the Secretary permits.  That forced choice is an injury as well.  All of these injuries are a direct result of the Secretary's no-action approval of the Agreements, and of the other Defendants' implementation of the Agreements notwithstanding their invalidity and illegality.  And all of these injuries will be redressed by a declaration that the Agreements are invalid under IGRA.

## LEGAL AND FACTUAL BACKGROUND

The Plaintiff Nations are federally-recognized Indian Tribes.  86 Fed. Reg. 7554, 7555, 7557 (Jan. 29, 2021); 1st Am. & Suppl. Compl. ¶¶ 8-11 ("Compl."), ECF No. 26.  The Federal Defendants are the Department of the Interior, Compl. ¶ 12, and in their official capacities, Scott de la Vega, Acting Secretary of the Interior, and Darryl LaCounte, exercising the delegated authority of the Assistant Secretary of the Interior–Indian Affairs.  Compl. ¶¶ 13-14.  The Defendant State and Tribal Leaders are J. Kevin Stitt, Governor of Oklahoma, William Nelson, Sr., Chairman of the Business Committee of the Comanche Nation, a federally-recognized Indian Tribe, 86 Fed. Reg. at 7555, John R. Shotton, Chairman of the Tribal Council of the Otoe-

Missouria Tribe of Indians, a federally-recognized Indian Tribe, *id.* at 7556, Joe Bunch, Chief of

UKB, a federally-recognized Indian tribe, *id.* at 7557, and Brian Givens, Mekko of KTT, a

federally-recognized Indian tribe, *id.* at 7555.  Compl. ¶¶ 15-19.

## A.    The Plaintiff Nations Conduct Class III Gaming for Governmental Purposes.

In 2004, each Plaintiff Nation entered into an IGRA compact with the State.[2]  Compl. ¶ 56.

Each of those Compacts has been approved or is considered to have been approved by the

Secretary, 25 U.S.C. § 2710(d)(8)(A), (d)(8)(C), and went into effect under IGRA, *id.*

§ 2710(d)(3)(B).[3]  Each Plaintiff Nation conducts Class III gaming under the terms of its Compact,

which is in effect today.  *See Cherokee Nation v. Stitt*, 475 F. Supp. 3d 1277, 1283 (W.D. Okla.

2020); Compl. ¶¶ 60, 69.  Each Plaintiff Nation exclusively uses its revenues from IGRA gaming

to fund government operations and provide for the general welfare of the Plaintiff Nation and its

citizens on its Reservation lands,[4] consistent with the requirements of IGRA.  Compl. ¶ 70.

---

[2] The State-Tribal Gaming Act ("STGA"), Okla. Stat. tit. 3A, §§ 261-282, offered Oklahoma tribes a Model Compact under which they could, after approval by the Secretary, "engage in Class III gaming on tribal lands" in accord with IGRA, Compl. ¶ 53.  The games that the Plaintiff Nations' Compacts authorize them to conduct are expressly permitted in Oklahoma under the STGA, Okla. Stat. tit. 3A, § 262(C).  Compl. ¶¶ 52-54, 63.

[3] 70 Fed. Reg. 3942 (Jan. 27, 2005); 70 Fed. Reg. 6725 (Feb. 8, 2005); 70 Fed. Reg. 6903 (Feb. 9, 2005).

[4] *See* Treaty of Dancing Rabbit Creek art. 2, Sept. 27, 1830, 7 Stat. 333; Treaty of Doaksville art. 1, Jan. 17, 1837, 11 Stat. 573; 1855 Treaty of Washington with the Choctaw and Chickasaw arts. 1, 7, 7 June 22, 1855, 11 Stat. 611; 1866 Treaty of Washington with the Choctaw and Chickasaw art. III, Apr. 28, 1866, 14 Stat. 769 (establishing Chickasaw and Choctaw Reservation boundaries); Treaty of New Echota art. 2, Dec. 29, 1835, 7 Stat. 478; 1846 Treaty with the Cherokee art. 1, Aug. 6, 1846, 9 Stat. 871; 1866 Treaty of Washington with the Cherokee, July 19, 1866, 14 Stat. 799 (establishing Cherokee Reservation boundaries); 1867 Treaty of Washington with the Potawatomi arts. I, III, Feb. 27, 1867, 15 Stat. 531 (Citizen Potawatomi Nation ("CPN") Reservation).

Plaintiff Nations have substantial and recently enlarged responsibilities to provide governmental services within their Reservations.[5]  States lack criminal jurisdiction over many crimes committed by and against Indians within Reservations in Oklahoma, and so as a result of the *McGirt* decision, the Plaintiff Nations are the front line of law enforcement on their reservations.  *McGirt* has required the Nations to put additional substantial resources into their criminal justice systems.  *See, e.g.*, *Cherokee Nation Upgrades Criminal Codes, Redirects $10M for Law Enforcement, Courts, Prosecutors After McGirt Decision*, Anadisgoi (Dec. 15, 2020).[6] And part of this responsibility has been met through existing inter-governmental law enforcement agreements with local governments and the State.  *See McGirt*, 140 S. Ct. at 2481-82.

The unusually large number Indians living on Plaintiff Nations' Reservations, and the unusually large size of those reservations compared to other tribal jurisdiction in Oklahoma, place a disproportionate burden on the Plaintiff Nations, which they require gaming revenues to address. In 2019, the United States Census Bureau estimated that approximately 300,000 Indians and Native Alaskans lived in Oklahoma, approximately 260,000 of whom lived on and in reservations and former reservations in Oklahoma.[7]  Of those, approximately 23,000 lived on the Chickasaw

---

[5] Since the Supreme Court's decision in *McGirt v. Oklahoma*, 140 S. Ct. 2452 (2020), multiple Oklahoma district courts, acting on remand from the Oklahoma Court of Criminal Appeal, have determined that the Plaintiff Nations' reservations were never disestablished by Congress and exist to this day within their treaty boundaries.  *See, e.g.*, Ex. 1, *Bosse v. State*, No. CF-2010-213, slip. op. at 7-10 (Okla. Dist. Ct. Oct. 13, 2020); (Chickasaw Reservation); Ex. 2, *State v. Sizemore*, No. CF-2016-593, slip op. at 6-9 (Okla. Dist. Ct. Oct. 28, 2020) (Choctaw Reservation); Ex. 3, *State v. Shriver*, No. CF-2015-394, slip op. at 5-14 (Okla. Dist. Ct. Nov. 12, 2020) (Cherokee Reservation); *see also* Ex. 4, *Bentley v. State*, No. PC-2018-743, slip op. at 2-3 (Okla. Ct. Crim. App. Nov. 25, 2020) (remanding for evidentiary hearing on boundaries of CPN Reservation).

[6]   https://anadisgoi.com/index.php/government-stories/477-cherokee-nation-upgrades-criminal-codes-redirects-10m-for-law-enforcement-courts-prosecutors-after-mcgirt-decision.

[7] The Census Bureau's data on the ancestry of residents of tribal jurisdictions are available from the non-profit organization Census Reporter.  *See Hispanic or Latino Origin by Race*, Census Reporter, http://bit.ly/2ZoJ3o3 (last accessed Feb. 21, 2021) (sum of rows labeled "American Indian and Alaska Native alone" in Not Hispanic and Hispanic categories).  Census Reporter is a

4

Reservation, 87,000 on the Cherokee Nation, 27,000 on the Choctaw Reservation, and 9,100 on the Citizen Potawatomi Reservation. The combined area of the Plaintiff Nations' Reservations throughout which they offer governmental services is 16,657,984 acres—approximately a third of the State and over half of the area encompassed by tribal jurisdictions in Oklahoma. *See Citizen Band Potawatomi Indian Tribe v. Collier*, 142 F.3d 1325, 1333 (10th Cir. 1998) (quoting H.R. Rep. 51-3481, at 1 (1891)) (CPN acreage); *Report of the Commissioner of Indian Affairs for 1910* at 69 tbl.18 (1910) (Cherokee, Chickasaw, and Choctaw acreage);[8] *Hispanic or Latino Origin by Race Map Showing American Indian and Alaska Native alone*, Census Reporter, http://bit.ly/3s1oo5J (last accessed Feb. 21, 2021). IGRA gaming revenues are a major source of revenue to fund services on their Reservations and to their members. *See* Compl. ¶ 70.

## B.    The Agreements.

On April 21, 2020, Defendant Governor Stitt signed agreements with Defendants Chairman Shotton and Chairman Nelson that purport to be IGRA compacts that authorize the Comanche Nation and Otoe-Missouria Tribe to engage in Class III gaming under IGRA, Compl. ¶ 76, and they then submitted those Agreements to the Secretary on April 23, 2020. Compl. ¶ 81. On July 1, 2020, Defendant Governor Stitt signed agreements with Defendants Chief Bunch and Mekko

---

source of census data, relied on by courts and legal scholars, that can be judicially noticed. *E.g.*, *Floyd v. City of New York*, Nos. 08 Civ. 1034 (AT), 10 Civ. 0699 (AT), 12 Civ. 2274 (AT), 2020 WL 3819566, at *4 n.17 (S.D.N.Y. July 8, 2020); Alec Karakatsanis, *The Punishment Bureaucracy: How to Think About "Criminal Justice Reform"*, 128 Yale L. J. Forum 848, 850 n.11 (2019); Taja-Nia Y. Henderson & Jamila Jefferson-Jones, *#Livingwhileblack: Blackness as Nuisance*, 69 Am. U. L. Rev. 863, 912 n.283 (2020); *see Hollinger v. Home State Mut. Ins. Co.*, 654 F.3d 564, 571-72 (5th Cir. 2011) (per curiam) ("United States census data is an appropriate and frequent subject of judicial notice." (citations omitted)); *Al-Aulaqi v. Panetta*, 35 F. Supp. 3d 56, 67 (D.D.C. 2014) ("[J]udicial notice may be taken of public records and government documents available from reliable sources." (citations omitted)).

[8] https://images.library.wisc.edu/History/EFacs/CommRep/AnnRep10/reference/history.annrep10.i0003.pdf.

Givens that also purport to be IGRA compacts that authorize UKB and KTT to engage in Class III gaming under IGRA, *id.* ¶ 101, and they submitted those Agreements to the Secretary on July 1, 2020. *Id.* ¶ 101.

On June 7, 2020, IGRA's forty-five-day window in which the Secretary must approve or disapprove the Comanche and Otoe-Missouria Agreements expired. *Id.* ¶ 92. The Secretary did not issue an opinion, letter, or other ruling on or by either day. *Id.* On June 29, 2020, the Secretary published approval of the Comanche and Otoe-Missouria Agreements in the Federal Register, 85 Fed. Reg. 38,919 (June 29, 2020), stating that they went into effect to the extent they are consistent with IGRA, 25 U.S.C. § 2710(d)(8)(C). On July 21, 2020, the Oklahoma Supreme Court issued an 8-1 opinion in *Treat I*, determining that Defendant Governor did not have authority under the Oklahoma Constitution and Oklahoma statutes to cause the State of Oklahoma to enter into the Comanche and Otoe-Missouria Agreements. Compl. ¶ 96. Rehearing was denied on September 14, 2020. *See* Order of Sept. 14, 2020, *Treat v. Stitt*, 2020 OK 64 ("*Treat I*").[9]

On August 15, 2020, the forty-five-day window for the UKB and KTT Agreements expired. *Id.* ¶ 105. The Secretary did not issue an opinion, letter, or other ruling on or by either day. *Id.* On September 8, 2020, Defendant Secretary published approval of the UKB and KTT Agreements in the Federal Register, 85 Fed. Reg. 55,472 (Sept. 8, 2020), stating that they went into effect to the extent they are consistent with IGRA, 25 U.S.C. § 2710(d)(8)(C). On January 26, 2021, the Oklahoma Supreme Court ruled that the UKB and KTT Agreements were not validly entered into under state law. *Treat v. Stitt*, ¶¶ 3, 6, 11, 2021 OK 3 ("*Treat II*").

---

[9] https://bit.ly/3bBLIRd.

## STANDARD OF REVIEW.

**A.    Standards Applicable To A Rule 12(b)(1) Motion To Dismiss For Lack Of Standing.**

As "standing is a jurisdictional requirement," Movants' motions are "properly evaluated under Rule 12(b)(1)." *McKoy v. Spencer*, No. CV 16-1313 (CKK), 2019 WL 400615, at *3 (D.D.C. Jan. 31, 2019) (citing *Friends of Animals v. Jewell*, 828 F.3d 989, 991 (D.C. Cir. 2016); *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015)).

Under Rule 12(b)(1), the court "must accept as true all factual allegations in the complaint and construe the complaint liberally, granting plaintiff the benefit of all inferences that can be drawn from the facts alleged." *Kialegee Tribal Town v. Zinke* ("*KTT*"), 330 F. Supp. 3d 255, 262 (D.D.C. 2018) (citations omitted).  In addition, "when considering whether a plaintiff has Article III standing, a federal court must assume, *arguendo*, the merits of his or her legal claim." *In re U.S. OPM Data Sec. Breach Litig.*, 928 F. 3d 42, 54 (D.C. Cir. 2019) (quoting *Estate of Boyland v. Dep't of Agric.*, 913 F.3d 117, 123 (D.C. Cir. 2019); *Amador Cnty., Cal. v. Salazar*, 640 F.3d 373, 378 (D.C. Cir. 2011)).

In evaluating a motion to dismiss for lack of standing "the plaintiff is protected from an evidentiary attack on his asserted theory by the defendant, just as the defendant is protected from compulsory discovery." *Ferrer v. CareFirst*, 265 F. Supp. 3d 50, 52 (D.D.C. 2017) (quoting *Haase v. Sessions*, 835 F.2d 902, 907 (D.C. Cir. 1987)).  At the motion to dismiss stage,

> A plaintiff can augment her pleading with an affidavit that contains specific facts to support standing. *See* [*Haase*, 835 F. 2d at 907].  [D]efendant, on the hand, "is barred *at this stage of the proceedings* from attacking the claims made [in the complaint]." *Id.*  [D]efendant, therefore, cannot put forward evidence outside the pleadings to challenge a plaintiff's standing. *See id.* at 908.  In short, the standing inquiry turns on the allegations in the complaint and any affidavits submitted by the plaintiff, not on evidence presented by [D]efendant. *See id.*

*Id.* (third alteration in original); *McKoy*, 2019 WL 400615, at *6 ("[W]hen deciding a motion to dismiss for lack of standing, 'the plaintiff is protected from an evidentiary attack on his asserted

theory by [D]efendant.'"   (quoting *Haase*, 835 F.2d at 907)).[10]   Accordingly, in this brief the Plaintiff Nations do not address the new evidence that Defendant Chairman Nelson introduced in the three declarations and supporting materials that he attached to his motion to dismiss.  See ECF Nos. 54-2 to 54-9.  As described in their Motion to Strike Declarations in Support of Defendant William Nelson's Motion to Dismiss, the Plaintiff Nations seek to strike most of these materials.

"The party invoking federal jurisdiction bears the burden of establishing the[] elements [of standing]."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (citing *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990); *Warth v. Seldin*, 422 U.S. 490, 508 (1975)).  "At the pleading stage, general factual allegations of injury resulting from [D]efendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'"  *Id.* (second alteration in original) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)); *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 938 (D.C. Cir. 2004), *recognized as abrogated on other grounds by Perry Cap. LLC v. Mnuchin*, 864 F.3d 591 (D.C. Cir. 2017).

"[I]f one party has standing in an action, a court need not reach the issue of the standing of other parties when it makes no difference to the merits of the case."  *LaRoque v. Holder*, 650 F.3d 777, 792 (D.C. Cir. 2011) (alteration in original) (quoting *Comcast Corp. v. FCC*, 579 F.3d 1, 6

---

[10] Defendant Chairman Nelson cites two cases in support of the contention that he may make a factual attack on standing at the pleading stage, DCN Br. at 17 (citing *Oregonians for Floodplain Protection v. U.S. Dept. of Comm.*, 334 F. Supp. 3d 66 (D.D.C. 2018) and *Finca Santa Elena, Inc. v. U.S. Army Corps of Engineers*, 873 F. Supp. 2d 363 (D.D.C. 2012)).  Neither is on point.  In the former, the Court decided whether plaintiff had standing based on the complaint, *Oregonians*, 334 F. Supp. 3d at 72-73, and then considered "supplemental facts submitted by defendants" in deciding a question of ripeness.  *Id.* at 74 & n.4.  In the latter, the court denied a motion to dismiss for lack of standing, *Finca Santa*, 873 F. Supp. 2d at 366, and then decided a question of prudential ripeness, in which the court considered defendants' declarations.  *Id.* at 370-71. No ripeness question is posed here, and *Haase* is the law of the Circuit on the question of standing that is presented here.

(D.C. Cir. 2009)).  Additionally, once a plaintiff shows injury sufficient to establish standing, it can assert violations of law that go against the "public interest" as a basis for overturning the government action, even when those illegal actions do not cause the injury giving rise to standing. *Sierra Club v. Morton*, 405 U.S. 727, 737 (1972) (citations omitted).

**B.      Standards Applicable To Rule 12(b)(6) Motion To Dismiss.**

"A motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the adequacy of a complaint on its face."  *Johnson v. Comm'n on Pres. Debates*, 202 F. Supp. 3d 159, 167 (D.D.C. 2016).  Such a motion "does not test a plaintiff's ultimate likelihood of success on the merits; rather, it tests whether a plaintiff has properly stated a claim."  *Connecticut v. U.S. Dep't of Interior*, 344 F. Supp. 3d 279, 295 (D.D.C. 2018) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).  "In evaluating a [Rule 12(b)(6)] motion to dismiss, the Court must accept the factual allegations in the complaint as true and draw all reasonable inferences in favor of plaintiff."  *KTT*, 330 F. Supp. 3d at 263 (internal quotation marks omitted). "It is not necessary for the plaintiff to plead all elements of a prima facie case in the complaint." *Connecticut*, 344 F. Supp. 3d at 295-96 (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511-14 (2002); *Bryant v. Pepco*, 730 F. Supp. 2d 25, 28-29 (D.D.C. 2010)).

On a Rule 12(b)(6) motion, the court can consider, in addition to the materials in the complaint and any materials incorporated into it or attached to it, matters of public record and other materials that are subject to judicial notice.  *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1249 (D.C. Cir. 2020); *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007).  The court may also consider "documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss."  *In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 54-55 (D.D.C. 2016) (internal quotation marks omitted).

## ARGUMENT

I.   **PLAINTIFF NATIONS HAVE STANDING TO ASSERT THEIR CLAIMS AGAINST THE SECRETARY AND THE DEFENDANT CHAIRMAN NELSON.**

"To establish Article III standing, a plaintiff must have '(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Ramirez v. ICE*, 338 F. Supp. 3d 1, 22 (D.D.C. 2018) (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)). Before addressing these elements, we consider two settled rules that modify these requirements in this case. First, the government's unlawful regulation of someone else can establish a plaintiff's standing if that unlawful regulation injures the plaintiff, *Lujan*, 504 U.S. at 562. Second, the procedural injury doctrine, which when satisfied relaxes the immediacy and redressability standards.

A.   **Plaintiffs' Standing Is Properly Grounded In The Secretary's Failure To Review And Disapprove The Agreements Under IGRA.**

Plaintiffs have standing to challenge the Secretary's unlawful regulation of Defendant Tribal Officials if it injuries Plaintiffs. *Lujan*, 504 U.S. at 562. The Secretary argues that the unlawful taxation and regulation authorized by the Agreements cannot establish Plaintiffs' standing because "one can not have standing in federal court by asserting an injury to someone else," DOI Br. at 24. But the Plaintiff Nations point to those provisions, *see* Compl. ¶¶ 154-200, to demonstrate that the Secretary had a legal obligation to disapprove the Agreements, not to establish an injury to someone else, and the cases on which the Secretary relies, DOI Br. at 24-25, are therefore inapposite. The Secretary's unlawful consideration and no-action approval of the Agreements injure Plaintiffs because the Defendant State and Tribal Officials rely on the Secretary's no-action approval to assert that the Agreements are compacts under IGRA that authorize their activities, which injures Plaintiffs. *See infra* at 48.

"[W]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded…." *Detroit Int'l Bridge Co. v. Gov't of Can.*, 133 F. Supp. 3d 70, 98 (D.D.C. 2015), *am. on den. of recons. on other grounds*, 189 F. Supp. 3d 85, *aff'd* 883 F.3d 895 (D.C. Cir. 2018).  However, it is more difficult to establish, *id.*, because where the "plaintiff[s'] asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone* else,…causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction," *Lujan*, 504 U.S. at 562, and "it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury." *Id.* (citing *Warth*, 422 U.S. at 505).

This case satisfies both of the "two categories of cases where standing exists to challenge government action though the direct cause of injury is the action of a third party."  *Renal Physicians Ass'n v. U.S. Dep't of Health & Human Servs.*, 489 F.3d 1267, 1275 (D.C. Cir. 2007) (citing *Nat'l Wrestling*, 366 F.3d at 940).

> First, standing exists where the challenged government action authorized conduct that would otherwise have been illegal.  In such cases, if the authorization is removed, the conduct will become illegal and therefore very likely cease.  Hence, "[c]ausation and redressability ... are satisfied in this category of cases, because the intervening choices of third parties are not truly independent of government policy....  [T]hey could only preclude redress if those third parties took the extraordinary measure of continuing their injurious conduct in violation of the law."
>
> Second, standing has been found "where the record presented substantial evidence of a causal relationship between the government policy and the third-party conduct, leaving little doubt as to causation and the likelihood of redress."

*Id.* (citing and quoting *Nat'l Wrestling*, 366 F.3d at 940-41).

The Secretary's no-action approval of the Agreements "authorized conduct that would otherwise have been illegal," *id.*, namely the operation and regulation of Class III gaming activities, which are "lawful on Indian lands only if such activities" are "conducted in conformance

with a Tribal-State compact entered into by the Indian tribe and the State under [§ 2710(d)(3)] that is in effect," 25 U.S.C. § 2710(d)(1)(C).  And as Defendant State and Tribal Officials submitted the Agreements to the Secretary for approval as compacts under IGRA in order to establish the legality of the activities purportedly authorized by their terms, Compl. ¶¶ 81, 101, Agreements pmbl., "[c]ausation and redressability ... are satisfied in this … case[], because the intervening choices of the [Defendant Tribal Officials] are not truly independent of government policy," *Renal Physicians*, 489 F.3d at 1275.  And "if the authorization is removed, the conduct will become illegal and therefore very likely cease."  *Id.*  For virtually the same reasons, the second category is also satisfied here, as the Secretary's no-action approval has a direct causal relationship to the Defendant Tribal Officials' conduct, "leaving little doubt as to causation and the likelihood of redress," *id.* (citing *Nat'l Wrestling*, 366 F.3d at 941).

**B.    Plaintiff Nations' Standing Properly Relies On The Secretary's Violation Of Their Procedural Rights Under IGRA.**

The Plaintiff Nations also properly rely on violations of their procedural rights to establish standing.  Compl. ¶¶ 5, 27, 127, 152, 186, 199, 230.  As the Court explained in *Lujan*, "[t]he person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy."  504 U.S. at 573 n.7.  "When plaintiffs challenge an action taken without required procedural safeguards, they must establish the agency action threatens their concrete interest.'"  *Food & Water Watch v. USDA*, 325 F. Supp. 3d 39, 53 (D.D.C. 2018) (quoting *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014)).  "Once the plaintiff has shown a 'concrete interest' that is more than 'a mere general interest in the alleged procedural violation common to all members of the public,'" *Food & Water*,

325 F. Supp. 3d at 53 (quoting *Mendoza*, 754 F. 3d at 1010) "the normal standards for immediacy and redressability are relaxed," *id.* (quoting *Mendoza*, 754 F.3d at 1010).[11]

The Secretary argues that Plaintiff Nations' injuries are not "certainly impending," and "rely on a highly attenuated chain of possibilities," DOI Br. at 15 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409-10 (2013)); *see id.* at 23, 33, without considering the relaxed standards that the procedural injury doctrine affords Plaintiffs here.  But "the violation of a procedural right granted by statute can be sufficient in some circumstances to constitute injury in fact." *Spokeo*, 136 S. Ct. at 1549.  It is here.

1. **IGRA grants procedural rights that protect all Tribes and requires equal treatment of all Tribes in their application, including the Plaintiff Nations.**

Congress enacted IGRA to "provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments[.]"  25 U.S.C. § 2702(1), and did so for the benefit of all Indian tribes, including the Plaintiff Nations.  Compl. ¶ 23.  IGRA authorizes a tribe to conduct Class III gaming if such gaming is: authorized by an approved tribal ordinance that meets the requirements of 25 U.S.C. § 2710(b); conducted on "Indian lands…located within a state that permits gaming 'for any purpose by any person, organization, or entity[,]'" *Amador Cnty.*, 640 F.3d at 376 (quoting 25

---

[11] Accordingly,

> the plaintiff "need not demonstrate that but for the procedural violation the agency action would have been different," [*Mendoza*, 754 F.3d at 1010] (citing *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1160 (D.C. Cir. 2005)), and does not need to "establish that correcting the procedural violation would necessarily alter the final effect of the agency's action on the plaintiff's interest," *id.*  "Rather, if the plaintiff[] can 'demonstrate a causal relationship between the final agency action and the alleged injuries,' the court will 'assume[] the causal relationship between the procedural defect and the final agency action'"

*Id.* (alteration in original) (quoting *Ctr. for Law & Educ.*, 396 F.3d at 1160).

U.S.C. § 2710(d)(1)(B)); and "conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State under [§ 2710(d)(3)] that is in effect," 25 U.S.C. § 2710(d)(1)(C).

The Secretary is the gatekeeper of all Indian tribes' rights to conduct Class III gaming, and has specific duties when compacts are submitted for his approval under *id.* § 2710(d)(3)(B).

First, the Secretary is only authorized to approve a compact that has been "entered into between an Indian tribe and a State," *id.* § 2710(d)(8)(A); 25 C.F.R. § 293.7. Additionally, § 2710(d)(8)(A) "authorizes approval only of compacts 'governing gaming on *Indian lands*.'" *Amador Cnty.*, 640 F.3d at 381 (quoting 25 U.S.C. § 2710(d)(8)(A)). And a compact executed by a state governor who lacks authority to bind the state is void. Compl. ¶¶ 43-48.

Second, the Secretary "may disapprove a compact…only if such compact violates—(i) any provision of [IGRA], (ii) any other provision of Federal law…, or (iii) the trust obligations of the United States to Indians." 25 U.S.C. § 2710(d)(8)(B)(i)-(iii). "[S]ubsection (d)(8)(B)'s use of 'may' is best read to limit the circumstances in which disapproval is allowed. The Secretary must, however, disapprove a compact if it would violate any of the three limitations in that subsection." *Amador Cnty.*, 640 F.3d at 381; Compl. ¶ 46.[12]

Third, "[i]f the Secretary does not approve or disapprove a compact" within forty-five days of its submission, the compact is deemed approved "but only to the extent the compact is consistent with the provisions" of IGRA, 25 U.S.C. § 2710(d)(8)(C). However, "nothing in subsection (d)(8)(C) actually creates an alternative mechanism to ensure compliance with the law. To be sure, it provides that only lawful compacts can become effective, but someone—i.e., the courts—must decide whether those provisions are in fact lawful." *Amador Cnty.*, 640 F.3d at 380. And "subsection (d)(8)(C),…includes no exemption from th[e] obligation to disapprove illegal

---

[12] Thus, the Secretary cannot rely on § 2710(d)(8)(c) to do his job. *See, e.g.,* DOI Br. at 20, 41.

compacts" set forth in § 2710(d)(8)(B).  *Id.* at 381.  "[J]ust as the Secretary has no authority to affirmatively approve a compact that violates any of subsection (d)(8)(B)'s criteria for disapproval, he may not allow a compact that violates subsection (d)(8)(C)'s caveat to go into effect by operation of law."  *Id.*; Compl. ¶ 47.

These terms grant procedural rights to all Indian tribes.  Compl. ¶ 45.  In addition, Tribal gaming rights under IGRA are "privileges and immunities available to the Indian tribe" under 25 U.S.C. § 5123(f), which prohibits the Secretary "from…making 'any' decisions, pursuant to the [Indian Reorganization Act] 'or any other' Act of Congress, 'with respect to a federally recognized Indian tribe that classifies, enhances, or diminishes the privileges and immunities available to the Indian tribe relative to other federally recognized tribes by virtue of their status as Indian tribes.'"  *Koi Nation v. U.S. Dep't of Interior*, 361 F. Supp. 3d 14, 51-52 (D.D.C. 2019) (quoting 25 U.S.C. § 5123(f)).  Compl. ¶ 25.  This does not mean that all Indian tribes must conduct gaming under the same compact terms, *see* DOI Br. at 29, as IGRA leaves it to the tribe and state to negotiate the compact terms, within the limits IGRA prescribes, 25 U.S.C. § 2710(d)(3)(C).  IGRA then imposes an obligation on the Secretary to review all compacts, § 2710(d)(8)(a)-(c), which ensures that only tribes with compacts that comport with IGRA may compete for gaming revenue.  That is the meaning of the equal footing that the Secretary is obligated to provide under IGRA and 25 U.S.C. § 5173(f).  Compl. ¶¶ 25, 72.  Defendant Chairman Nelson argues that "IGRA is simply not a statute designed to insulate tribes from competition."  DCN Br. at 32.  But fair competition is guaranteed by compliance with IGRA.  Furthermore, "[t]he requirement of a protected competitive interest,…'goes to the merits' of a plaintiff's claim, not to his Article III standing."  *Sherley v. Sherley v. Sebelius*, 610 F.3d 69, 72 (D.C. Cir. 2010) (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970)).

> **2.      Plaintiff Nations have a concrete interest in the Secretary's fulfillment of his procedural responsibilities as gatekeeper of all Tribes' Class III gaming rights.**

Each Plaintiff Nation has a concrete and legally-protected interest in the conduct of Class III gaming under IGRA and its Compact, *see* Compl. ¶ 71, and continues to conduct Class III gaming under its Compact.  *Id.* ¶ 70.  Each Plaintiff Nation also has a concrete and legally-protected interest in the Secretary's proper fulfillment of his statutory obligations to only authorize Indian tribes to conduct Class III gaming activities in accordance with IGRA and the federal trust responsibility, and not to diminish the Plaintiff Nations' rights under IGRA relative to other tribes. Compl. ¶ 72.  25 U.S.C. § 5123(f).

> **3.      The complaint properly alleges that the Secretary has committed procedural violations of IGRA and 25 U.S.C. § 5123(f).**

The Secretary committed substantive and procedural violations of IGRA, 25 U.S.C. § 5123(f), and the federal trust responsibility by reviewing Agreements that had not been validly entered into by both parties, Compl. ¶¶ 232-35; by failing to disapprove the Agreements because they had not been legally entered into and because their terms violate IGRA and other federal law. Compl. ¶¶ 236-65.  The Secretary's procedural violations threaten Plaintiffs' concrete interest in conducting Class III gaming under their Compacts, and as we show *infra*, inflict injuries in fact on the Plaintiff Nations.  The substantive violations may also be considered as a basis for overturning the Secretary's actions, whether or not they cause injuries in fact, because Plaintiffs have standing. *See supra* at 8-9.

> **a.      The Secretary committed substantive and procedural violations of law by not disapproving Agreements that were not validly entered into.**

Under IGRA, the Secretary only has authority to consider a compact that was "entered into" by the tribe and state.  25 U.S.C. § 2710(d)(8)(A) (authorizing the Secretary to approve "any *Tribal-State compact entered into between an Indian tribe and a State*[.]") (emphasis added); *id.*

§ 2710(d)(8)(B) (disapproval of "a compact described in subparagraph (A)"); *id.* § 2710(d)(8)(C) (no-action approval of "a compact described in subparagraph (A)").  *See* Compl. ¶¶ 43, 45.

Whether a state validly entered into a compact is a question of federal law that also requires consideration of state law.  *See Pueblo of Santa Ana v. Kelly*, 104 F.3d 1546, 1557-58 (10th Cir. 1997).  "The plain language of IGRA makes it clear that Secretarial approval and publication places a compact 'into effect,'" while "[s]tate law must determine whether a state has validly bound itself to a compact."  *Id.* at 1557-58 (citing *Washington v. Confederated Bands*, 439 U.S. 463, 493 & n.39 (1979)).  A compact that was "never validly 'entered into' by the state...do[es] not comply with IGRA."  *Id.* at 1559.  And the Secretary has no authority to allow a compact to go into effect by inaction if any provision is inconsistent with IGRA, *see Amador Cnty.*, 640 F.3d at 381; Compl. ¶¶ 92, 105-06.

Defendant Governor Stitt did not have legal authority to enter into the Agreements on behalf of the State, because he did not follow the process prescribed by state law for approving an IGRA compact with an Indian tribe, Compl. ¶¶ 112-22.  Accordingly, the Secretary's consideration of the Agreements under IGRA and his failure to disapprove the Agreements under IGRA were improper and contrary to law.  Compl. ¶¶ 92, 105, 108, 123, 237-38.

The Secretary's no-action approvals deprive Plaintiff Nations of the procedural and substantive protections IGRA provides by requiring that the Secretary disapprove a compact that violates "(i) any provision of [IGRA], (ii) any other provision of Federal law…, or (iii) the trust obligations of the United States to Indians," *id.* § 2710(d)(8)(B)(i)-(iii); *Amador Cnty.*, 640 F.3d at 381.  These statutory obligations required the Secretary to disapprove the Agreements."  Compl. ¶ 127.  The Secretary's no-action approvals also violates 25 U.S.C. § 5123(f) and "deprives the

Plaintiff Nations of their right to conduct gaming under IGRA on an equal footing, free from illegal competition, and in accordance with the federal trust responsibility." *Id.* ¶ 128.

The Secretary urges that these violations are simply "a generalized grievance[.]" DOI Br. at 30 n.12 (internal quotation marks omitted). Not so. In this case, Plaintiffs have a concrete interest in the Secretary's procedural violations because they conduct gaming under Compacts that are in effect under IGRA, and rely on the Secretary to ensure that only Indian tribes with compacts that comport with IGRA may compete for gaming revenue, *see supra* at 12-16. And the Secretary's no-action approval of the Agreements has a causal relationship to the injuries shown *infra* at 26-42, which allows the court to "assume[] the causal relationship between the procedural defect and the final agency action." *Food & Water*, 325 F. Supp. 3d at 53 (quoting *Mendoza*, 754 F.3d at 1010) (alteration in original).

Defendant Chairman Nelson ignores the invalidity of the Agreements, construes *Treat I* to address only the legality of certain games in the Agreements, and does not consider Comanche to be bound by *Treat I*. DCN Br. at 19-20 n.7. But he offers no basis for disputing *Treat I*'s holding that the Defendant Governor did not have authority under State law to cause the State to enter into the Comanche and Otoe-Missouria Agreements. Compl. ¶ 96; *Treat I*, 2020 OK at 45. And the Oklahoma Supreme Court recently ruled that the UKB and KTT Agreements were also not validly entered into under state law. *Treat II*, ¶ 3, 2021 OK at 1. The Secretary contends that *Treat I* and *II* are not even relevant here, DOI Br. at 39, but those decisions confirm the merits of the Plaintiffs' claims (which the Secretary cannot contest on the instant motion, *see supra* at 7-8).

### b. The Secretary committed a substantive and procedural violation of law by considering Agreements that do not concern Indian lands.

As the Secretary concedes, DOI Br. at 31, IGRA only applies to "Indian lands," *see* 25 U.S.C. § 2703(4); Compl. ¶¶ 26, 201, and only authorizes compacts for gaming on Indian lands,

*Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 795 (2014). And the Secretary is only authorized to consider a compact entered into by a tribe and state that governs Class III gaming on Indian lands, *see* Compl. ¶¶ 43, 45, as the Secretary also concedes. DOI Br. at 42.

The UKB & KTT Agreements do not concern gaming on "Indian lands" under IGRA, 25 U.S.C. § 2703(4). They do state that "'Indian lands' shall mean Indian lands as defined by IGRA, 25 U.S.C. § 2719(b)(1)," UKB & KTT Agreements Part 2.A.20. But IGRA does not define "Indian lands" at § 2719(b)(1). And nothing in the Agreements concerns "Indian lands" as defined by IGRA. Accordingly, the Secretary was not authorized to consider those Agreements under IGRA and committed a substantive and procedural violation by doing so.

        **c.**    **The Secretary committed a substantive and procedural violation of law by failing to disapprove the Agreements because the future concurrence provisions violate IGRA.**

IGRA prohibits gaming on lands acquired in trust after October 17, 1988 ("after-acquired lands"), 25 U.S.C. § 2719(a), unless those lands are within or contiguous to the tribe's reservation, *id.* § 2719(a)(1), or if such lands are in Oklahoma, the lands are within or contiguous to the tribe's former reservation, *id.* § 2719(a)(2)(A). An Indian tribe can only conduct Class III gaming on after-acquired lands outside of its reservation or former reservation in Oklahoma if the Secretary consults with state and local officials, including nearby tribes, determines that such gaming would not be detrimental to the surrounding community, and the Governor of the State consents, *id.* § 2719(b)(1)(A), which provides procedural rights to the Plaintiff Nations. Compl. ¶ 27.

In the Agreements, Defendant Governor Stitt purports to preemptively consent to gaming by the Comanche, Otoe-Missouria, UKB, and KTT at eight new gaming facilities, to be located on land to be acquired in specified locations in certain counties. Compl. ¶¶ 204, 205-214, 215-229. These provisions are invalid. First, such provisions are not an authorized subject for compact negotiations, 25 U.S.C. § 2710(d)(3)(C); Compl. ¶ 226. Second, § 2719(b)(1)(A) requires the

Secretary's determination to precede the Governor's concurrence, as there in otherwise nothing for the Governor to concur in. Compl. ¶ 28. Third, an Indian tribe cannot have land taken into trust within another tribe's reservation or former reservation in Oklahoma unless the other tribe consents, 25 C.F.R. §§ 151.2(f), 151.8. The lands that are the subject of the future concurrence provisions include lands within Plaintiff Nations' Reservations or former reservations, *id.* ¶¶ 207, 208, and the Comanche Nation and Otoe-Missouria Tribe have not obtained the requisite consent. Compl. ¶ 214. The Secretary was required to disapprove the Agreements for these reasons, and committed a substantive and procedural violation of IGRA by failing to do so.

> **d.    The Secretary committed a substantive and procedural violation of law by failing to disapprove the Agreements because they purport to authorize illegal games.**

Under IGRA, Class III gaming activities are lawful on Indian lands only if "located in a State that permits such gaming for any purpose by any person, organization, or entity[.]" 25 U.S.C. § 2710(d)(1)(B). Furthermore, IGRA does not provide a means by which a compact may authorize a State to conduct Class III gaming. *See id.* § 2710(d)(3)(C); Compl. ¶¶ 131-32.

The Comanche and Otoe-Missouria Agreements violate IGRA because they purport to authorize Class III games that are not permitted in Oklahoma. Those Agreements define the "covered games" to include "Event Wagering," "House-banked Card Games," and "House-banked Table Games." Comanche Agreement Part 2.A.7.; Otoe-Missouria Agreement Part 2.A.6.; Compl. ¶ 135. These games are not lawful under IGRA, because they are not presently permitted in the State "for any purpose by any person, organization, or entity[.]" 25 U.S.C. § 2710(d)(1)(B); Compl. ¶¶ 139, 146. Accordingly, the terms of those Agreements that purport to authorize the signatory tribes to conduct these games violate federal law. Compl. ¶¶ 139-40, 145.

The Secretary challenges these contentions on the merits, stating that the Agreements only permit games "that have been approved by Oklahoma's State Compliance Agency ["SCA"]." DOI

Br. at 20 (quoting Comanche Agreement Part 2.A.7.).  Such a challenge is not available on their motion, *see supra* at 7-8.  Furthermore, the Agreements only require the SCA to approve games conducted in accordance with the "Standards," which refers to specifications applicable to three electronic games set forth in the STGA.  Comanche & Otoe-Missouri Agreements Part 2.38 (defining "Standards"); Part 3.C. (requiring SCA approval of Gaming Machines prior to their being placed in operation); Comanche Agreement Part 2.19. and Otoe-Missouria Agreement Part 2.18. (defining "Gaming Machine" to include electronic games).[13]

The Secretary also contends that the Agreements' "limit[s] wagering on sporting and similar events 'to the extent such wagers are authorized by law.'"  DOI Br. at 20-21 (quoting Comanche Agreement Part 2.A.13.).  But the Secretary fails to recognize that the Defendant Governor Stitt contends that such wagers are authorized by IGRA, as do Defendants Chairmen Nelson and Shotton, Compl. ¶¶ 82, 140, 146.  The day after the Agreements were signed counsel for the Comanche[14] and Otoe-Missouria stated "[u]nder Class III gaming, the tribes will be able to operate sportsbooks."  Press Release, *New Compacts Signed by Otoe-Missouria Tribe, Comanche Nation Will Improve Economic Support for Tribal Members*, Rosette, LLP (Apr. 22, 2020, 9:00 ET) ("Rosette LLP News Release").[15]

The Secretary also states that these provisions cannot be the source of an injury in fact because the Comanche and Otoe-Missouria Chairmen have stated that they do not intend to offer

---

[13] That conclusion is confirmed by the rule of the last antecedent.  *See Lockhart v. United States*, 136 S. Ct. 958, 963-64 (2016) ("a limiting clause or phrase...should ordinarily be read as modifying only the noun or phrase that it immediately follows.") (quoting *Barnhart v. Thomas*, 540 U.S. 20, 26, (2003), and *Black's Law Dictionary* 1532-33 (10th ed. 2014); citing Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 144 (2012)).

[14] Defendant Chairman Nelson was formerly represented by counsel quoted in this press release; he is now represented by different counsel.

[15] https://www.prnewswire.com/news-releases/new-compacts-signed-by-otoe-missouria-tribe-comanche-nation-will-improve-economic-support-for-tribal-members-301045093.html

the illegal games until they are lawful.  DOI Br. at 19 (quoting Compl. ¶ 140); DCN Br. at 14 (Comanche does not intend to do so "unless authorized by state law.").  However, those statements do not affect the procedural injury arising from the Secretary's no-action approval of the Agreements.  The Secretary cannot authorize illegal games on the excuse that "the tribe may later say it won't play them until they're legal."  In addition, "those statements and the Defendants' position are not binding and may change at any time."  Compl. ¶¶ 140, 146.

The Comanche and Otoe-Missouria Agreements also provide that the Defendant Governor Stitt may authorize Comanche and Otoe-Missouria to conduct "new forms of Covered Games [that] become available in the market following the Effective Date of this Compact" without amending the Agreements.  Comanche & Otoe-Missouria Agreements Part 3.F.; *see* Compl. ¶ 147.  Defendant Governor Stitt has no such authority.  *See* 25 C.F.R. § 293.4(b); Compl. ¶ 149.

The Comanche and Otoe-Missouria Agreements also purport to authorize the State to conduct Event Wagering, Comanche Agreement Part 2.A.13.b.; Otoe-Missouria Agreement Part 2.A.12.b.; Compl. ¶ 141, and all the Agreements purport to authorize the State to conduct the iLottery, Agreements Part 3.B., that is, electronic lottery games with the "elements of consideration, chance, and prize," Comanche Agreement Part 2.A.25.; Otoe-Missouria Agreement Part 2.A.23; UKB & KTT Agreements Part 2.A.18.  And yet these provisions are illegal because IGRA does not authorize States to conduct Class III gaming.  *See* 25 U.S.C. § 2710(b)(2)(A), (d)(1)(A)(ii), (d)(3)(C); Compl. ¶¶ 142, 183-85, 187, 248.

The Secretary and Chairman Nelson dispute this, DOI Br. at 21-22, DCN Br. at 21-22, but their attacks are unavailable now, as the standing analysis presumes the Plaintiffs' success on the merits, *see supra* at 7-8.  And whether or not the State is now offering sportsbook or the iLottery does not undo the procedural injury arising from the Secretary's failure to disapprove the

Agreements because they purport to authorize the State to conduct Class III gaming.  Defendant Chairman Nelson also contends that state law does not currently permit the State to conduct the iLottery, DCN Br. at 22, which is flatly wrong.  The Oklahoma Education Lottery Act allows the Oklahoma Lottery Commission ("OLC") to offer the Lottery, Okla. Stat. tit. 3A, § 703(9).  And in 2018, the Oklahoma Legislature amended Oklahoma law to allow the Oklahoma Lottery Commission to accept entries in "*lottery-sponsored promotions and second-chance drawing promotions offered by the Commission*" through "a web application provided or sponsored by the Commission."  H.B. 3538, 2018 Okla. Sess. Laws 125, § 1(A)-(B), *codified at* Okla. Stat. tit. 3A, § 724.5(A)-(B) (emphasis added).  That limited authorization exists, but it is a far cry from the iLottery authorized by the Agreements, which permit the State to offer electronically any lottery game with the "elements of consideration, chance, and prize," *see* Compl. ¶ 183; Comanche Agreement Part 2.A.25.; Otoe-Missouria Agreement Part 2.A.23; UKB & KTT Agreements Part 2.A.18.  That greatly expands what the State may do, which injures Plaintiffs.[16]

Accordingly, the Secretary was required to disapprove the Agreements because they purport to authorize illegal games and committed a procedural violation by failing to do so.[17]

---

[16] The Agreements provide that "[t]he definition of iLottery shall not include games that represent physical, Internet-based or monitor-based interactive lottery games which simulate Covered Games, specifically including, but not limited to, poker, roulette, slot machines, Event Wagering and blackjack," Compl. ¶ 183.  Defendant Chairman Nelson urges that eliminates any competitive threat from the iLottery.  DCN Br. at 22; *see* DOI Br. at 22-23.  It does not because the iLottery definition authorizes a wide array of games.  And as the Lottery Act already prohibits the games excluded by the definition in the Agreements, Okla. Stat. tit. 3A, § 703(9), the exclusions in the Agreements impose no new limits.

[17] The Secretary ascribes to Plaintiffs the view that "state lotteries violate IGRA and that Oklahoma could not authorize lotteries prior to the compacts."  DOI Br. at 22 (citing Compl. ¶¶ 158-59, 184).  The Plaintiffs instead allege that the Agreements violate IGRA because they permit the iLottery games, and "IGRA does not authorize states to conduct Class III gaming."  Compl. ¶ 184.

      e.      **The Secretary committed a substantive and procedural violation of law by failing to disapprove the Agreements because their revenue sharing provisions violate IGRA.**

IGRA provides that, except for state regulatory assessments that may be negotiated and agreed upon pursuant to § 2710(d)(3)(C)(iii), it does not "confer[] upon a State…authority to impose any tax, fee, charge, or other assessment upon an Indian tribe…to engage in a class III activity." *Id.* § 2710(d)(4). Nevertheless, the Secretary has approved compact provisions that provide for a tribe to make revenue sharing payments to a state in some circumstances, as the Secretary explained when he approved the Comanche Nation's Former Compact, as follows

> To determine whether a revenue-sharing provision is permissible under IGRA, we have required the state to offer significant or meaningful concessions over which it is not required to negotiate in good faith, resulting in substantial and quantifiable economic benefits to the Indian tribe. In addition, the payment to the state must be appropriate in light of the value of the economic benefits conferred on the tribe.

Ex. 5, Letter from Mike Olsen, Principal Deputy Assistant Sec'y-Indian Affairs, Dep't of Interior, to Wallace Coffey, Chairman, Comanche Nation at 2 (Dec. 23, 2004).[18]

"Substantial exclusivity" is neither defined, nor provided in the Agreements. Yet, the Agreements provide that "[t]he Parties acknowledge and agree that this Compact provides the Tribe with substantial exclusivity over class III Covered Gaming consistent with the goals of IGRA," *id.* Part 10.A., and that "[i]n consideration of the Acknowledgement set forth in [Part 10.A.], the adequacy of which is hereby agreed to, and pursuant to the terms of this valid Compact, the Tribe agrees to pay the following Substantial Exclusivity Fees as provided for below." *Id.* Part 10.B. Nothing in the Agreements limits the additional gaming that the State may authorize, and therefore the "substantial exclusivity" to which the Agreements refer is meaningless. That makes the revenue sharing provisions of the Agreements invalid under the analysis the Secretary normally

---

[18] Ex. 5 was incorporated into the Complaint by reference, Compl. ¶ 62, and so the Court can consider it here. *See Sandoval v. U.S. Dep't of Justice*, 322 F. Supp. 3d 101, 104 (D.D.C. 2018).

applies, and accordingly, those provisions impose a "tax, fee, charge, or other assessment" in violation of IGRA, 25 U.S.C. § 2710(d)(4), and settled federal law, Compl. ¶¶ 40-42, 46-47, 155-61, 168-78, 180-81, 185-86, 229.  The Secretary was required to disapprove the Agreements for these reasons and committed a procedural violation by failing to do so.[19]

The Secretary offers no response to this plain error, focusing instead on aspects of the revenue sharing provisions that do not unsettle the conclusion above, DOI Br. at 27-28, and offering views that confirm that the Secretary should have reviewed the Agreements earlier.

> **f.    The Secretary committed a substantive and procedural violation of law by failing to disapprove the Agreements regulation of Class II gaming.**

The Agreements also violate IGRA by permitting state regulation of Class II gaming, 25 U.S.C. § 2710(a)(2), (d)(3)(C); Compl. ¶¶ 46-47, 189, 191-92, 194, 197-98.  "Class II gaming is not an authorized subject of negotiation for Class III compacts."  *Forest Cnty. Potawatomi Cmty. v. United States*, 330 F. Supp. 3d 269, 286 (D.D.C. 2018) (citation omitted).  The Secretary earlier made that determination when he reviewed the Comanche Nation's Former Compact. Ex. 5 at 3 ("It is our view that Class III gaming compacts can only regulate Class III games, and cannot regulate Class II games under the IGRA.").

The Secretary and Chairman Nelson argue that standing cannot be based on that violation because it does not injure Plaintiff Nations.  DOI Br. at 26; DCN Br. at 24.  That misconstrues the complaint, which alleges that the Secretary was required to disapprove the Agreements because they purport to regulate Class II gaming and committed a procedural violation by failing to do so.

---

[19] Thus, Plaintiffs are not challenging the taxation of Comanche and Otoe-Missouria, *see* DOI Br. at 25, they are asserting that the Agreements should have been disapproved because the revenue sharing provisions violate IGRA and settled federal law.

Compl. ¶ 199.  Plaintiff Nations' injuries arise from the Secretary's failure to disapprove the Agreements for that reason, which allowed the Agreements to go into effect by inaction.  *Id.* ¶ 200.

**C.     Plaintiffs Have Suffered Injuries In Fact Arising From The Secretary's Regulatory Failures Under IGRA and The Other Defendants' IGRA Violations.**

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (quoting *Lujan*, 504 U.S. at 560), *as revised* (May 24, 2016).  "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'"  *Id.* (quoting *Lujan*, 504 U.S. at 560 n.1) (additional citations omitted).  "An injury in fact must also be 'concrete,'" which means it "must be '*de facto*'; that is, it must actually exist."  *Id.* (citing *Black's Law Dictionary* 479 (9th ed. 2009)).  As the injury in this case arises, *inter alia*, from the Secretary's denial of procedural rights to the Plaintiffs, and "the plaintiff[s] ha[ve] shown a 'concrete interest' that is more than 'a mere general interest in the alleged procedural violation common to all members of the public,' 'the normal standards for immediacy and redressability are relaxed.'"  *Food & Water*, 325 F. Supp. 3d at 53 (quoting *Mendoza*, 754 F.3d at 1010).  Plaintiffs have suffered an injuries in fact for the following reasons.

**1.     The Plaintiffs have suffered an injury in fact because they are unable to compete on an equal footing as a result of the Secretary's no-action approval.**

Under federal law, the Secretary has an obligation to apply IGRA's requirements to all compacts submitted for his review, which ensures that all Indian tribes conduct gaming on an equal footing.  The Secretary may not allow a compact that violates IGRA to go into effect.  *Amador Cnty.*, 640 F.3d at 381; Compl. ¶ 47.  In addition, federal law prohibits the Secretary from making decisions that "diminish[] the privileges and immunities available to the Indian tribe relative to other federally recognized tribes by virtue of their status as Indian tribes.'"  *Koi Nation*, 361 F. Supp. 3d at 51-52 (quoting 25 U.S.C. § 5123(f)); Compl. ¶ 25.

Each Plaintiff Nation has a legally protected interest in its conduct of Class III gaming because these activities are authorized by and conducted in accordance with IGRA and their Compacts.  Compl. ¶¶ 55-56, 60, 71.  Each Plaintiff Nation also has a legally protected interest in, and relies on, the Secretary's obligation to only authorize Indian tribes to conduct Class III gaming in accordance with IGRA, to fulfill the federal trust responsibility to all Indian tribes, and not to diminish the Plaintiff Nations' rights relative to other tribes.  25 U.S.C. § 5123(f); Compl. ¶ 72.

The Secretary denied the Plaintiff Nations equal treatment in violation of IGRA and § 5123(f) by permitting the Agreements to go into effect by inaction, notwithstanding that they were not validly entered into by the State, and that their terms violate IGRA.  *See supra* at 19-26 (describing violations).  "[T]he 'injury in fact' is the inability to compete on an equal footing." *Lac du Flambeau Band v. Norton*, 422 F.3d 490, 497 (7th Cir. 2005) (quoting *Ne. Fla. Ch. of Assoc'd Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993); citing *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 280 n.14 (1978)).

The Plaintiff Nations' unequal treatment injury is concrete and particularized because they conduct gaming in the Oklahoma gaming market under Compacts that comport with IGRA, and as a direct result of the Secretary's unequal treatment must now compete with Tribes that are conducting gaming without a valid Compact, under Agreements that violate IGRA.  The Plaintiffs' injury is concrete because it "actually exist[s]," *Spokeo*, 136 S. Ct. at 1548, as Comanche and Otoe-Missouria now hold a share of the Oklahoma gaming market due exclusively to the Secretary's no-action approvals of their Agreements.  Plaintiffs' injury is particularized because it "affect[s] the plaintiff[s] in a personal and individual way," *id.* (quoting *Lujan*, 504 U.S. at 560 n.1), namely, it reduces the market available to the Plaintiff Nations, each of whom rely on the revenue generated under their Compacts to fund governmental operations and programs, including their expanding

criminal justice responsibilities consistent with IGRA, Compl. ¶ 70; *supra* at 4-5.  These injuries are also actual and imminent as Comanche and Otoe-Missouria are conducting gaming in the Oklahoma gaming market under Agreements that are invalid and contain terms that are illegal, and the Secretary disclaims any responsibility for the unequal treatment that allows them to do so.

2.   **The Plaintiff Nations have suffered an injury in fact under the competitive injury doctrine.**

As a result of the Secretary's procedural violations of IGRA, specifically the no-action approval of the Agreements, and Defendant Tribal Officials' reliance on the Secretary's no-action approval to authorize their actions under the Agreements, the Plaintiffs have suffered an injury in fact under the competitor standing doctrine.  "[E]conomic actors suffer an injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition against them."  *Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.*, 724 F.3d 206, 211-12 (D.C. Cir. 2013) (quoting *Sherley*, 610 F.3d at 72); *accord Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 394 (1987)); *Mendoza v. Perez*, 754 F.3d at 1011; *La. Energy & Power Auth. v. FERC*, 141 F.3d 364, 367 (D.C. Cir. 1998).

A plaintiff alleging competitive injury "may claim predictable economic harms from the lifting of a regulatory restriction on a 'a direct and current competitor,' or regulatory action that enlarges the pool of competitors, which will 'almost certainly cause an injury in fact' to participants in the same market."  *Arpaio v. Obama*, 797 F.3d 11, 23 (D.C. Cir. 2015) (quoting *Mendoza*, 754 F.3d at 1013; *Sherley*, 610 F.3d at 73); *El Paso Nat. Gas Co. v. FERC*, 50 F.3d 23, 27 (D.C. Cir. 1995) ("The nub of the "competitive standing" doctrine is that when a challenged agency action authorizes allegedly illegal transactions that will almost surely cause petitioner to lose business, there is no need to wait for injury from specific transactions to claim standing.").  That injuries will arise from competition in the same market is "basic economic logic," and courts

accept such allegations of "future injury that are firmly rooted in the basic laws of economics." *United Transp. Union v. ICC*, 891 F.2d 908, 912 n.7 (D.C. Cir. 1989).  *Compare DEK Energy Co. v. FERC*, 248 F.3d 1192, 1196 (D.C. Cir. 2001) (finding only a "vague probability" of injury to a natural gas company in California from the sale of natural gas by a competitor in Oregon), *with Sherley*, 610 F.3d at 74 (distinguishing *DEK* from a regulatory change that would "no doubt" increase the number of applicants for a fixed number of government grants).

In this case, the Secretary's no-action approval allows the Comanche Nation, Otoe-Missouria Tribe, UKB, and KTT to compete in the highly competitive Oklahoma gaming market notwithstanding that the Agreements are invalid under IGRA and contain terms that violate IGRA, and afford the Comanche Nation, Otoe-Missouria Tribe, UKB, and KTT a significant competitive advantage.  Compl. ¶ 5.  The Secretary's inaction both "lift[s] regulatory restrictions on the[] [Plaintiff Nations'] competitors [and]…allow[s] increased competition against them," which constitutes an injury in fact.  *Teamsters*, 724 F.3d at 211-12.  Those injuries are exacerbated by the numerous tribal and non-tribal gaming activities conducted within the State, which include electronic gaming, the state lottery, and pari-mutuel wagering on horse racing, and by the inter-tribal competition resulting from the number of IGRA-approved compacts with Indian tribes in the State and the number of tribal gaming facilities in the State.  Compl. ¶¶ 59, 67.[20]  This puts the Plaintiff Nations under constant competitive pressure to maintain their market share.

---

[20] As the complaint alleges that the relevant market is the state-wide Oklahoma gaming market, and the allegations of the complaint are accepted as true and the merits are assumed in Plaintiffs favor on this motion, *see supra* at 7-8, Defendant Chairman Nelson's assertion that the Plaintiffs and Comanche "do not compete in the same geographic markets," DCN Br. at 20, is both incorrect and irrelevant.  That assertion is also barred by the rule that Movants may not mount an evidentiary attack on a motion to dismiss for lack of standing.  *See supra* at 7-8.

As a direct result of the Secretary's no-action approval of the Agreements and the Comanche Nation's and Otoe-Missouria Tribe's decisions to implement the Agreements, Comanche and Otoe-Missouria currently operate ten Class III gaming facilities in the Oklahoma gaming market. They do so "without a compact that was validly entered into by the State, under agreements that violate IGRA." Compl. ¶ 109. The Comanche Nation and the Otoe-Missouria Tribe each conduct gaming at five facilities in Oklahoma. DCM Br. at 12; Ex. 1 to Fed. Defs. Mem. in Supp. of Mot. to Dismiss at 16, ECF No. 56-2; Countercl. of Def. John R. Shotton, ¶ 14, ECF No. 53. The participation of Comanche and Otoe-Missouria in the Oklahoma gaming market under Agreements that are invalid and illegal causes a competitive injury to the Plaintiff Nations because it secures to Comanche and Otoe-Missouria a share of that market and of the gaming revenues generated by the limited number of gaming patrons who live, work, and visit Oklahoma. Their market share in turn reduces the market available to the Plaintiff Nations. And as the Defendant Chairman Nelson acknowledges, the KCA Reservation is right next to the Chickasaw Reservation, DCN Br. at 6, and Comanche thus draws patrons from the same local area as Chickasaw. In addition, Comanche and Otoe-Missouria pay less under the Agreements than they did under their Former Compacts: "[t]he new agreement will reduce the amount of revenue the tribes must pay the state—from 6% to 4.5%." Rosette LLP News Release. *Cf.* DOI Br. at 27. Increasing their profits gives these Tribes a competitive advantage—allowing them to spend more to increase their market share, and to develop the additional facilities they are planning. *See supra* 29-30.

Furthermore, it matters not whether Defendant State and Tribal Officials are now conducting the illegal games purportedly authorized by the Agreements. As the Agreements are void in their entirety, Compl. ¶¶ 48, 111-12, none of Defendant Tribal Officials' actions under the

Agreements are authorized by IGRA, including their conduct of gaming that would be lawful if they had a valid compact.  And absent Interior's no-action approval, neither the Comanche Nation nor the Otoe-Missouria Tribe would have a legal basis on which to conduct Class III gaming at their existing facilities.  The Otoe-Missouria Tribe, Comanche Nation, and KTT all renounced their Former Compacts when their chief executives signed their Agreements.  Comanche, Otoe-Missouria & KTT Agreements Part 12.A.; Compl. ¶ 57.  Accordingly, they may not claim rights under their Former Compacts.

Nor does it make a difference that Defendant Chairman Nelson has stated that the Comanche Nation does not intend to offer the illegal games "unless authorized by state law."  DCN Br. at 19; DOI Br. at 14 (making same argument).  First, as Defendant Chairman Nelson admits, the Comanche Nation does not consider itself bound by *Treat I*, DCN Br. at 19 n.7, which held that Event Wagering, House-banked card games, and house-banked table games are illegal, *Treat I*, 2020 OK 64, ¶ 7.  Second, the Comanche Nation has not disclaimed the right to conduct the illegal games, if and when it wishes to do so.  Comanche has simply "made the business decision not to offer" those games, DCN Br. at 20 n.7, and business decisions can change at any time, especially when doing so would improve a business's competitive position in the market.  Third, the new games plainly give Comanche and Otoe-Missouria a competitive advantage, will do so whenever they commence, and are an imminent threat now.  The day after the Agreements were signed, then-counsel for the Comanche Nation and counsel for the Otoe-Missouria Tribe stated:

> [u]nder Class III gaming, the tribes will be able to operate sportsbooks.  With that new authority, their casinos will no longer require patrons to pay an "ante" to play a hand of blackjack, and customers will be able to place a bet on the Dallas Cowboys—or other sports teams—on a Sunday afternoon.
>
> [Counsel] said these types of new games will provide both tribes with a competitive advantage over all other tribes in their respective market areas.

Rosette LLP News Release.  In sum, as alleged in the complaint, Defendant Chairman Nelson's

statements "are not binding and may change at any time."  Compl. ¶ 140.[21]

Finally, "the present impact of a future though uncertain harm may establish injury in fact

for standing purposes," *Lac du Flambeau*, 422 F.3d at 498.  As the *Lac du Flambeau* court

explained in *Clinton v. City of New York*, 524 U.S. 417 (1998), the "President had exercised a line

item veto to cancel a section of the Balanced Budget Act of 1997," which "[i]f valid,…would have

subjected the State of New York to potential liability to repay subsidies it had received from the

federal government."  422 F.3d at 498.  However, under "[t]he legal regime left in place following

the veto…the Department of Health and Human Services ("HHS") [had] the discretion to waive

that liability."  *Id.* at 498-99.  "The President argued among other things that the City lacked

standing to challenge the line item veto because HHS had yet to act on the State's pending waiver

request."  *Id.* at 499.  But the Court in *Clinton* disagreed: "[t]he State now has a multibillion dollar

contingent liability that had been eliminated by...the Balanced Budget Act of 1997.... [T]he State,

and [the City] 'suffered an immediate, concrete injury the moment that the President used the Line

Item Veto to cancel' the relevant section of the Balanced Budget Act."  *Id.* (alterations in original)

(quoting *Clinton*, 524 U.S. at 430).  Here, the Plaintiff Nations "'suffered an immediate, concrete

injury the moment that the [Secretary] used [IGRA] to" allow the Agreements to go into effect by

inaction notwithstanding the provisions that purport to authorize illegal games.  And Comanche's

and Otoe-Missouria's discretion whether to conduct those games, does not avoid the injury any

more than HHS's discretion to waive New York's liability did so in *Clinton*.

---

[21] Finally, even if those statements are treated as binding, it does not affect the injury in fact resulting from the Secretary's denial of equal treatment, nor does it affect the procedural injury arising from the Secretary's no-action approval, as Defendant Chairman Nelson's statements were made after the Secretary's no-action approval was published.  *See* DCN Br. at 19.

The Plaintiff Nations also suffer an injury in fact as a result of the future concurrence provisions of the Agreements, by which Defendant Governor Stitt purports to preemptively consent to gaming by the Comanche Nation, Otoe-Missouria Tribe, UKB, and KTT at eight future gaming facilities, to be located on trust land to be acquired in specified areas of counties named in each Agreement.  Compl. ¶¶ 204-27.  The Comanche Nation Agreement purports to authorize Comanche to establish three "New Facilities" to be located "within one (1) mile of a state or federal highway or turnpike running through" Cleveland, Grady, and Love Counties, Oklahoma. Comanche Agreement Parts 2.A.5., 2.A.21., 2.A.27., 4.J.2., 4.J.2.a.; Compl. ¶ 206.  The Otoe-Missouria Agreement purports to authorize Otoe-Missouria to establish three "New Facilities" to be located "within one (1) mile of a state or federal highway or turnpike running through" Logan, Noble, and Payne Counties, Oklahoma.   Otoe-Missouria Agreement Parts 2.A.25., 2.A.28., 2.A.32., 4.J.2., 4.J.2.a.; Compl. ¶ 210.  Both of these Tribes have already identified the location for all six of these facilities.  As their counsel explained, "[f]or Comanche, one site is near Will Rogers International Airport in Oklahoma City, the second is in Chickasha, along Interstate 44, and the third is located on the Texas border along Interstate 35."  Rosette LLP News Release.  And "[f]or Otoe, one site will be near Edmond and Guthrie on I-35 and two additional casinos will be located at points further north along I-35."  *Id.*

Furthermore, all three of the Comanche Nation's new facility locations are entirely or partly on the Chickasaw or CPN reservation or former reservation.  Compl. ¶¶ 207-209.  The pursuit of gaming locations within Chickasaw and CPN territory by the Comanche threatens the Chickasaw Nation's and CPN's jurisdictional integrity and sovereignty and jeopardizes their ability to generate gaming revenue within their own territory.  Compl. ¶¶ 4, 263.  And the Comanche Nation has already purchased land in Grady County that is within the Chickasaw

reservation or former reservation that fulfills all the requirements of the future concurrence provisions in its Agreement.  *See* Ex. 6, Decl. of Jared Easterling & Attach. A.

The threat that arises from the future concurrence provisions of the UKB & KTT Agreements is equally severe.  The UKB Agreement purports to permit UKB to "establish and operate Covered Games at the Logan County Facility," UKB Agreement Part 4.J., which is to be constructed "within one (1) mile of a state or federal highway or turnpike running through Logan County."  *Id.* Parts 2.A.21., 4.K.1.  The KTT Agreement purports to permit KTT to "establish and operate Covered Games at the Oklahoma County Facility," KTT Agreement Part 4.J., which is to "be located east of Choctaw Road and within one (1) mile of a state or federal highway or turnpike running through Oklahoma County."  *Id.* Part 2.A.25.  The Oklahoma City metropolitan area—the largest in Oklahoma—and its surrounding suburbs extend from Oklahoma County into the adjoining counties of Canadian, Cleveland, and Logan.  Compl. ¶ 169.  These four counties are among the top ten counties in Oklahoma ranked by per capita income.  *Id.*  Three major interstate highways—I-35, I-40, and I-44—intersect in Oklahoma County.  *Id.*  The area also contains several universities, major sporting facilities, a convention center, and tourist attractions.  *Id.*  For these reasons, the Oklahoma City area is a highly lucrative and competitive gaming market, and the establishment of new IGRA gaming facilities in or near Oklahoma County means significant new competition for Plaintiff Tribes.  *Id.*  And both UKB and KTT are now taking action to implement the Agreements.  On October 20, Defendant Chief Bunch informed the UKB membership that "[w]e now have the approval for gaming in Logan County due to our State Compact.  We have one more major step to place that land into trust with the federal government."  Joe Bunch, 70 Years of Being Keetoowah Strong!, Giduwa Cherokee News (UKB), Oct. 2020.  And on or about September 13, 2020, Jamie Thompson, Assistant Chief of UKB and Chairman of

the UKB Corporate Board, stated, "The UKB Corporate Board will now work with its developer to select a casino site in Logan County, as specified in the Compact." Press Release, UKB, Unique UKB Class III Gaming Compact Takes Effect, Sept. 13, 2020. And both UKB and KTT have admitted that "[u]nder tribal law, Chief Bunch and Mekko Givens were authorized to submit the Subject Compacts [the Agreements] to the Department of the Interior for approval, inform others that the Subject Compacts were signed by the Governor and approved pursuant to IGRA, and start to plan for the implementation of the Subject Compacts." Mem. in Supp. of Defs. Joe Bunch & Brian Givens' Mot. to Dismiss First Am. Compl. at 13, ECF No. 40-1.

The Federal Defendants deny that the future concurrence provisions cause an injury in fact, urging that they relate to future land acquisitions and are too speculative to support standing. DOI Br. at 30-34. That is not so for several reasons.

First, whether or not other requirements may prevent future gaming on the after-acquired lands, DOI Br. at 32, the Plaintiff Nations have standing to assert that the Secretary had a legal obligation to disapprove the Agreements because the future concurrence provisions are illegal under IGRA—which would have ended the threat arising from the Agreements. Standing to stop an imminent threat is not unattainable simply because the challenged activity is subject to more than one legal requirement.

Second, "the present impact of a future though uncertain harm may establish injury in fact for standing purposes," as *Clinton* shows. *Lac du Flambeau*, 422 F.3d at 498-99. As the D.C. Circuit explained in *In re Idaho Conservation League*, 811 F.3d 502, 509 (D.C. Cir. 2016), a plaintiff had standing to challenge EPA's failure to regulate hardrock mining where the future development of a proposed mine threatened his present aesthetic interests in the natural landscape and environment:

> Although the [challenged] project is still in the planning stage, the record establishes that the mine is likely to go forward even though it is not yet complete; the mining company has concrete plans to proceed, the mine would be profitable, and the mine continues to solicit financing to make the mine a reality.  The mine may not be completed for some time, but [plaintiff] has presented concrete evidence substantiating a significant risk he will be harmed by the proposed mine.

So too, here, where Comanche, Otoe-Missouria, UKB, and KTT will develop casinos in a highly desirable part of the Oklahoma tribal gaming market.  Otherwise, they would not have negotiated the future concurrence provisions.  And the present impact here is the severe threat that represents to the gaming that the Plaintiffs currently conduct under their own compacts, which necessarily requires anticipatory business and financial planning to meet.  *See Sanchez v. Office of State Superintendent of Educ.*, No. 18-975 (RC), 2019 WL 935330, at *1-2, *4-5 (D.D.C. Feb. 26, 2019) (plaintiffs had standing to challenge future changes in licensing regulations where they would need to begin education imminently to meet those licensing qualifications).  The fact that the Comanche Nation, Otoe-Missouria Tribe, UKB, and KTT are now implementing these terms, *see supra* at 34-35, makes that threat certainly impending, *Louisiana Energy*, 141 F.3d at 367 ("we have not required litigants to wait until increased competition actually occurs.").  And here, as in *Clinton*, 524 U.S. at 430, the fact that the Defendant Tribal Officials have discretion to decide not to pursue gaming at the additional sites does not undo that injury.  The Plaintiff Nations "suffered an immediate, concrete injury the moment that the [Secretary] used [IGRA] to" allow the Agreements to go into effect by inaction notwithstanding the illegal future concurrence provisions.  *Lac du Flambeau*, 422 F.3d at 499 (quoting *Clinton*, 524 U.S. at 430).

Third, the threat posed by the future concurrence provisions exceeds Defendant Governor Stitt's concurrence.  The Agreements explicitly recite that "the Tribe desires to offer the play of the Covered Games…, as a means of generating revenues for purposes authorized by [IGRA]," and that "the positive effects of this Compact will extend beyond the Tribe's lands to the Tribe's

neighbors and surrounding communities and will generally benefit all of Oklahoma."  Comanche and Otoe-Missouri Agreements, 5th & 7th whereas clauses; UKB and KTT Agreements, 5th and 7th whereas clauses; *cf.* 25 U.S.C. § 2719(b)(1)(A).  And those recitals "form a material part of this Compact and are hereby incorporated by reference."  Agreements Part 1.A.

Fourth, while Defendant Chairman Nelson points to the "additional layers of regulatory approval" that Comanche must secure to complete the new facilities, DCN Br. at 25, the future concurrence provisions give Comanche an edge in getting those approvals.  Defendant Governor Stitt's purported concurrence provides the Comanche Nation, Otoe-Missouria Tribe, UKB, and KTT with immediate support in the political and financial sectors whose participation in developing the new facilities is critical, and that support will accelerate the selection, funding, and purchase of the lands needed for these projects, the land in trust process, and the construction phase.  These immediate impacts constitute injury in fact.

Defendant Chairman Nelson argues that it is speculative whether any new facilities would divert customers from the Plaintiff Nations' facilities.  DCM Br. at 21.  But the location of these new facilities, *see supra* at 34, belies that suggestion.  And the Plaintiffs' complaint pleads that the new facilities would indeed divert market share, Compl. ¶¶ 5, 169, 230, which is sufficient at this stage of the proceedings, *see supra* at 7-8.  Defendant Chairman Nelson also relies on *Sokaogon Chippewa Community v. Babbitt*, 214 F.3d 941 (7th Cir. 2000).  But *Sokaogon* only decided whether a tribe could intervene in the case, without deciding standing, *id.* at 946.  And the court expressly declined to decide whether a tribe's interest in being free from economic competition was protectable because there was "a deeper flaw with the [tribe's] argument," namely that the administrative process had "barely" begun, "it [wa]s anyone's guess what the Secretary's final decision w[ould] be," and the tribe asserted only a generalized interest in the procedures that would

be used to make that decision. *Id.* at 947-48. By contrast, here, the Secretary has already taken final action and the Plaintiff Nations have more than a generalized interest in the Secretary's procedures. *See supra* at 16.

Defendant Chairman Nelson also relies on *Sault St. Marie Tribe v. United States*, 288 F.3d 910 (6th Cir. 2002). In that case, the tribe opposing Interior's decision to take land in trust for another tribe's casino asked the court to take judicial notice that its casino was forty miles further north of the other tribe's casino, and stated that if the other tribe's casino was not present, some gaming patrons might drive forty miles further north to the casino operated by the tribe opposing the project. *Id.* at 915. On appeal, the tribe opposing the project took the position that it had shown a competitive injury simply by pleading that "it has been injured, and that the injury was caused by Defendant." *Id.* at 916 (quoting opposing tribe's brief). The Circuit court held otherwise. *Id.* In contrast, here the Plaintiff Nations' injury in fact is asserted under both the procedural injury and competitive injury doctrines and is supported by the specific allegations of the complaint.

As the Secretary admits, "tribes have standing to challenge compacts that impose anti-competitive conditions aimed at frustrating IGRA's purpose of promoting economic development for all tribes." DOI Br. at 29 (citing *Lac du Flambeau*, 422 F.3d 490 and *Forest Cnty. Potawatomi Cmty*. v. *United States*, 317 F.R.D. 6 (D.D.C. 2016)). The Agreements do just that as a result of the Secretary's no-action approval: they permit the Comanche Nation, Otoe-Missouria Tribe, UKB, and KTT to compete for gaming revenue in the Oklahoma gaming market free from IGRA's restraints. Nothing is more anti-competitive than lifting regulatory restrictions for some, while holding others to them. As in *Lac du Flambeau*, "the harm lies in the denial of equal treatment," 422 F.3d at 498 (internal quotation marks omitted), and in the "alteration in competitive conditions" resulting from the Secretary's no-action approval, which "clearly amounts to a

concrete injury." *Forest Cnty. Potawatomi*, 317 F.R.D. at 12 (quoting *Lac du Flambeau*, 422 F.3d at 497. The Secretary's effort to distinguish these cases, DOI Br. at 28-29, therefore fails.

The Plaintiff's competitive injury is concrete, as Comanche and Otoe-Missouria are conducting gaming at ten facilities in Oklahoma, which reduces the market available to the Plaintiff Nations and therefore the Plaintiff Nations' injury "actually exist[s]." *Spokeo*, 136 S. Ct. at 1548. And it is particularized because it "affect[s] the plaintiff[s] in a personal and individual way," *id.* (quoting *Lujan*, 504 U.S. at 560 n.1), as each Plaintiff Nation lawfully conducts gaming under its Compact to generate governmental revenue, Compl. ¶ 70, and must compete for revenue in the Oklahoma market with Comanche and Otoe-Missouria's present operations. These injuries are also actual and imminent, as that gaming is going on now and so Comanche and Otoe-Missouria are holding a share of the market that is therefore unavailable to the Plaintiff Nations. In addition, the Comanche Nation, Otoe-Missouria Tribe, UKB, and KTT are all implementing the Agreements, including planning additional gaming facilities in the Oklahoma gaming market. "One does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough." *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 581-82 (quoting *Reg'l Rail Reorg. Act Cases*, 419 U.S. 102, 143 (1974); *Lac du Flambeau*, 422 F.3d at 498 ("the present impact of a future though uncertain harm may establish injury in fact for standing purposes."). The Plaintiff Nations' injury is therefore not hypothetical.

### 3. The Secretary's and Defendant Tribal Officials' unlawful actions subject the Plaintiff Nations to a forced choice that constitutes an injury in fact.

The Plaintiff Nations have suffered a forced-choice injury as a result of the following three factors: (a) Defendant Governor Stitt's strategy of negotiating "compacts" that allocate the Oklahoma gaming market among willing tribes, focusing especially on locations that are highly desirable because of the population and per capita income of the surrounding area, and the

location's accessibility by existing transportation corridors, (b) Defendant Tribal Officials' willing participation in executing that strategy, by signing Agreements that allocate high-value locations to them; and (c) the Secretary's complicity in that strategy as shown by his no-action approval of the Agreements despite their flagrant illegality. These factors put the Plaintiff Nations' future in the Oklahoma gaming market at severe risk. *See* Compl. ¶¶ 107-09.

And that risk imposes a forced-choice injury on the Plaintiff Nations. They must choose one of two untenable options. One is to do nothing and suffer illegal competition from Defendant Tribal Officials' actions, including their development of new facilities at highly desirable locations. The other is to accede to Defendant Governor Stitt's wrongful claim of authority to negotiate "compacts" on his own and seek to improve their competitive position by submitting to a negotiating process in which Defendant Governor Stitt illegally demands: the payment of revenue sharing without promising substantial exclusivity; recognition of the State's rights to conduct the Event Wagering and the iLottery; and regulation of Class II gaming. Compl. ¶¶ 107, 183-84. That forced choice is an injury in fact. *Thomas*, 473 U.S. at 582 (EPA's unlawful conduct established an injury in fact—"the injury of being forced to choose between relinquishing any right to compensation from a follow-on registrant" by declining to participate in the process for determining such compensation which the injured party considered to be illegal, "or engaging in an unconstitutional adjudication" and abandoning their objections to it); *New Mexico v. Dep't of Interior*, 854 F.3d 1207, 1218 (10th Cir. 2017) (a state required to participate in an allegedly illegal regulatory process in order to have a say in gaming procedures for a tribe in the state "suffer[s] a cognizable injury for standing purposes"); *Texas v. United States*, 497 F.3d 491, 497 (5th Cir. 2007) (same forced choice.)

That injury is concrete, as the factors that force that choice on the Plaintiff Nations "actually exist." *Spokeo*, 136 S. Ct. at 1548. And it is particularized because it "affect[s] the plaintiff[s] in a personal and individual way," *id.* (quotation omitted), as each Plaintiff Nation lawfully conducts gaming under its Compact to generate revenue for governmental purposes, and must continue to generate that revenue in the future in order to "fund government operations and programs,…, consistent with the requirements of IGRA," Compl. ¶ 70.  The forced-choice injury is also actual and imminent, as the Comanche Nation, Otoe-Missouria Tribe, UKB, and KTT are all developing additional gaming facilities in the Oklahoma gaming market under the Agreements.  And finally, here too, "the present impact of a future though uncertain harm may establish injury in fact for standing purposes." *Lac du Flambeau*, 422 F.3d at 498.  "One does not have to await the consummation of threatened injury to obtain preventive relief.  If the injury is certainly impending, that is enough." *Thomas*, 473 U.S. at 581-82 (quoting *Reg'l Rail*, 419 U.S. at 143).  The Plaintiff Nations' injury is therefore not hypothetical.

**D.     Plaintiff Nations' Injuries Are Fairly Traceable To The Challenged Conduct Of Defendants And Are Redressable By A Favorable Decision Of This Court.**

Plaintiff Nations' injuries are caused by actions of Defendants State and Tribal Officials and Secretary.  And those injuries will be redressed by a favorable decision of this Court declaring that the Agreements were not validly "entered into" under state law and therefore are not "in effect" under IGRA, reversing Defendant Secretary's no-action approvals of the Agreements and remanding to the Secretary for disapproval, and declaring that Defendant Tribal Officials' exercise of authority or jurisdiction under the Agreements is therefore not authorized under IGRA.

**1.     Causation and redressability standards applicable to Plaintiff Nations' claims.**

"Causation, or 'traceability,' *see Haitian Refugee Center v. Gracey*, 809 F.2d 794, 801 (D.C. Cir. 1987) (Bork, J.), examines whether it is substantially probable that the challenged acts

of Defendant, not of some absent third party, will cause the particularized injury of the plaintiff." *Fla. Audubon*, 94 F.3d at 663 (citations omitted).

"Redressability examines whether the relief sought, assuming that the court chooses to grant it, will likely alleviate the particularized injury alleged by the plaintiff."  *Fla. Audubon*, 94 F.3d at 664 (citations omitted).  "[T]he court must decide whether the practical consequence of [vacating the agency's decision] would amount to a significant increase in the likelihood that [plaintiffs'] would obtain relief that directly redresses the injury suffered."  *Chesapeake Climate Action Network v. Ex. Imp. Bank of U.S.*, 78 F. Supp. 3d 208, 224 (D.D.C. 2015) (quoting *Village of Bensenville v. FAA*, 457 F.3d 52, 69 (D.C. Cir. 2006) (some quotation marks omitted) (second and third alteration by *Chesapeake* court)).  And "[i]n cases involving procedural violations such as this one, '[t]he person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability.'"  *Food & Water Watch v. USDA*, 451 F. Supp. 3d 11, 29 (D.D.C. 2020) (quoting *Lujan*, 504 U.S. at 572 n.7).  "The plaintiff does not need to 'establish that correcting the procedural violation would necessarily alter the final effect of the agency's action on the plaintiff['s] interest.'"  *Id.* (quoting *Mendoza*, 754 F.3d at 1010).  "Rather, if the plaintiff[] can demonstrate a causal relationship between the final agency action and the alleged injuries, the court will assume[] the causal relationship between the procedural defect and the final agency action."  *Id.* (quoting *Mendoza*, 754 F.3d at 1010 (quoting *Ctr. for Law & Educ.*, 396 F.3d at 1160) (quotation marks omitted) (second alteration in original). However, "plaintiffs must satisfy normal redressability standards as to the third party whose actions are directly causing the plaintiff's injuries."  *Chesapeake*, 78 F. Supp. 3d at 224 (citing *St. John's United Church of Christ v. FAA*, 520 F.3d 460, 463 (D.C. Cir. 2008); *Nat'l Parks Conservation Ass'n v. Manson*, 414 F.3d 1, 5 (D.C. Cir. 2005)).

**2.      Plaintiff Nations satisfy the causation and redressability elements of standing.**

      **a.      Unequal treatment injury.**

The Plaintiff Nations' unequal treatment injury is directly traceable to the Secretary, as the Secretary treated the Plaintiffs unequally by allowing the Agreements to go into effect by inaction, notwithstanding that those Agreements had not been validly entered into by the State and contain multiple terms that violate IGRA, and notwithstanding the Secretary's obligation to disapprove a compact that violates IGRA and to make decisions under IGRA that enable Indian tribes to conduct gaming on an equal footing.  Compl. ¶¶ 128, 130.  As the injury in fact is the denial of equal treatment, *Lac du Flambeau*, 422 F.3d 497, [t]he "causal connection between the injury and the conduct complained of," *Chesapeake*, 78 F. Supp. 3d at 224, could not be clearer.  The Plaintiffs' unequal treatment injury is plainly redressable by a decision of this Court declaring that the Agreements were not validly "entered into" under state law and therefore are not "in effect" under IGRA, reversing Defendant Secretary's no-action approvals of the Agreements and remanding to the Secretary for disapproval.  Compl. ¶ 130.

      **b.      Competitive injuries.**

The Plaintiffs' competitive injuries satisfy the traceability requirement because those injuries are a direct result of the Defendants' actions.  More specifically, had the Secretary complied with his obligations under IGRA and 25 U.S.C. § 5123(f) to make decisions that permit the Plaintiff Nations to compete in gaming in the Oklahoma gaming market on an equal footing, he would have disapproved the Agreements.  Instead, the Secretary allowed the Agreements to go into effect based on his inaction.  Relying on the Secretary no-action approval, without which the regulation and operation of gaming under the Agreements would be illegal, Defendant Governor and Tribal Officials represent that the Agreements were compacts, that the Agreements authorize their actions under IGRA, and are implementing the Agreements.  The Plaintiff Nations'

competitive injuries are therefore directly traceable to the Secretary and Defendant State and Tribal Officials, as the complaint alleges. Compl. ¶¶ 130, 153, 188, 199-200, 231.

The Plaintiffs' competitive injuries are also plainly redressable by a decision of this Court declaring that the Agreements were not validly "entered into" under state law and therefore are not "in effect" under IGRA, reversing Defendant Secretary's no-action approvals of the Agreements and remanding to the Secretary for disapproval. Such a ruling will halt the illegal competition the Plaintiff Nations now face from Comanche Nation, Otoe-Missouria Tribe, UKB, and KTT. Compl. ¶¶ 130, 188, 199-200, 231. None of Defendant Tribal Officials have indicated that they would continue to claim that the Agreements are compacts under IGRA and that their activities under those Agreements are authorized by IGRA if this Court, or the Secretary on remand, determines that the Agreements are not compacts under IGRA because they were not validly entered into by the State, and that the Agreements must be disapproved because their terms violate IGRA. Nor could they make such a claim, as to conduct Class III gaming, a tribe must have "entered into" a compact with the State, that is "in effect." 25 U.S.C. § 2710(d)(1)(C).

### c. Forced choice injury.

The Plaintiff Nations' forced choice injury satisfies the traceability requirement because that injury is a direct result of Defendant State and Tribal Officials' submission of the Agreements to the Secretary for review under IGRA; the Secretary's no-action approvals; and Defendant State and Tribal Officials' implementation of the Agreements. These actions force the Plaintiff Nations to choose between allowing the Defendant Tribal Officials to cause severe injury to the Plaintiff Nations' competitive, and acceding to Defendant Governor Stitt's claim of unlimited authority to negotiate compacts on his own in order to improve their competitive position.

The Plaintiffs' forced choice injury is plainly redressable by a decision of this Court declaring that the Agreements were not validly "entered into" under state law and therefore are not

"in effect" under IGRA, reversing Defendant Secretary's no-action approvals of the Agreements and remanding to the Secretary for disapproval.  In that event, the Defendant Tribal Officials will have no legal basis to claim that the Agreements are compacts or that their regulation and operation of gaming and related activities is lawful under the Agreements.

**E.**      **Defendant Chairman Nelson's Prudential Standing Argument Has No Merit.**

Defendant Chairman Nelson's argument that the Plaintiff Nations lack prudential standing, asserting they are not within IGRA's "zone of interest," DCN Br. at 31-35, fails thrice over.

First, as the Supreme Court recently made clear, the zone of interests test no longer measures "prudential standing." *Lexmark Int'l, Inc. v. Static Control Corp.*, 572 U.S. 118, 127 (2014).  That test instead applies to "statutorily created causes of action[,]" *id.* at 129, by providing a "tool for determining who may invoke the cause of action.…" *Id.* at 130; *see id.* at 129 ("[A] statutory cause of action extends only to plaintiffs whose interests fall within the zone of interests protected by the law invoked"); *ABA v. U.S. Dep't of Educ.*, 370 F. Supp. 3d 1, 18 (D.D.C. 2019) ("The 'zone-of-interests limitation' is a 'requirement of general application' for 'all statutorily created causes of action.'") (quoting *Lexmark*, 572 U.S. at 129 (quoting *Bennett v. Spear*, 520 U.S. 154, 163 (1997))).  Nor does the zone of interest test determine the existence of subject matter jurisdiction, as the settled rule is "the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, i.e., the court's statutory or constitutional power to adjudicate the case." *Lexmark*, 572 U.S. at 128 n.4 (quoting *Verizon Md. Inc. v. Public Serv. Comm'n*, 535 U.S. 635, 642-43 (2002) (quoting *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 89 (1998)) (additional citations omitted).  As this Circuit recently held, *Lexmark* "makes plain the zone of interests test no longer falls under the prudential standing umbrella.  [*Lexmark*, 134 S. Ct. at 1386-87.]  Nor is it a jurisdictional requirement.  *Id.* at 1387 n. 4.  Instead, the zone of interest test is now 'a merits issue.'" *Crossroads Grassroots Policy Strategies v. FEC*, 788 F.3d 312, 319

(D.C. Cir. 2015) (quotation omitted).  Thus, the zone of interests test has no application to Defendant Chairman Nelson's jurisdictional Rule 12(b)(1) motion.  DCN Br. at 17.

Second, the zone of interests test does not apply here, as Plaintiff Nations' claims against the Defendant State and Tribal Officials are brought under *Ex parte Young*, 209 U.S. 123 (1908), which provides an equitable cause of action for those claims.  *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015).  The right to seek equitable relief in federal court from the actions of state or tribal officials who violate federal law does not depend on an implied right of action conferred by statute.  It is instead "a judge-made remedy," *id.* at 327, that applies to "state officers who are violating, or planning to violate, federal law," *id.* at 326-27; *see Vann v. Kempthorne*, 534 F.3d 741, 745 (D.C. Cir. 2008) (*Young* available against tribal officers).  *Armstrong* establishes that the availability of *Young* does not depend on a statutory right of action.  575 U.S. at 327.

*Young* applies here as the Plaintiff Nations seek prospective equitable relief in the form of a declaratory judgment.  Compl. § VI, ¶¶ 1(a)-(i), 2.  And the zone of interests test therefore has no application to this case.  Indeed, the D.C. Circuit made clear long ago that in an *ultra vires* case, a "litigant's interest normally will not fall within the zone of interests of the very statutory or constitutional provision that he claims does not authorize action concerning that interest." *Haitian Refugee Ctr.*, 809 F.2d at 811 n.14.  For that reason, plaintiffs challenging executive conduct as *ultra vires* "need not…show that their interests fall within the zones of interests of the constitutional and statutory powers invoked by the President.…" *Id.*; *Sierra Club v. Trump*, 963 F.3d 874, 893-95 (9th Cir.), *cert. granted*, 141 S. Ct. 618 (2020); *Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d 11, 49 (D.D.C. 2020) (The court's observation in *Haitian Refugee Ctr.*, 809 F.2d at 811 n.14, while dicta, is "persuasive.").  That applies with equal force to *Young* claims

brought under an equitable cause of action to vindicate statutory violations by government officials.

Third, even if the zone of interests test were applicable here—and even if it applied to an *Ex parte Young* claim at the pleadings stage—it would be satisfied because "[t]o use the language of *Data Processing*, the [Plaintiffs'] claims of injury [they] suffered as a result of the statutory violations are, at the least, '*arguably* within the zone of interests' that the [IGRA] protects." *Bank of America v. City of Miami, Fla.*, 137 S. Ct. 1296, 1303 (2017). *Id.* (quoting *Ass'n of Data Processing Serv. Orgs. v. Camp*, 397 U.S. at 153). The Plaintiff Nations' claim that the Defendant Tribal Officials' "representations that the Agreements are valid compacts under IGRA, and their actions in furtherance of those representations," Compl. ¶ 267, injure Plaintiffs, Compl. ¶¶ 130, 153, 188, 199-200, 231, are clearly within the zone of interests that IGRA protects. That is so because "the Secretary's statutory obligations under 25 U.S.C. §§ 2710(d)(8)(a)-(c) and 5123(f) protect the rights of the Plaintiff Nations to conduct gaming under IGRA "as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments," *id.* § 2702(1), and ensure that no tribe, including the Comanche Nation, Otoe-Missouria Tribe, UKB, and KTT, may gain a competitive advantage over another, including the Plaintiff Nations, by failing to comply with IGRA." Compl. ¶ 128. In *Amador Cnty.*, this Circuit held that a county, "whose alleged injury flows from its proximity to the gambling operation, is 'arguably protected' and is a proper party to enforce the limitations IGRA imposes on the Secretary," notwithstanding that "*the statute directly protects only tribes and states*." *Amador Cnty.*, 640 F.3d at 379 (emphasis added); *see Citizens Exposing Truth about Casinos v. Kempthorne*, 492 F.3d 460, 464 (D.C. Cir. 2007) (Private citizens challenging tribal gaming fell within IGRA's zone of interests); *see* 25 U.S.C. § 2719(b)(1)(A) (nearby Indian tribes are affected communities). Clearly then, the Plaintiffs, who

are protected by and hold rights under IGRA that are threatened by competition not authorized by IGRA, *see supra* at 28-30, fall within IGRA's zone of interests.

Defendant Chairman Nelson relies on *Sokaogon Chippewa Community v. Babbitt*, 214 F.3d 941 (7th Cir. 2000) to argue that IGRA does not protect Indian tribes from competition. DCN Br. at 32. But IGRA plainly does in one respect that makes all the difference here: it imposes specific requirements that must be met by all tribes seeking to conduct Class III gaming, § 2710(d)(1), and it assigns responsibility to the Secretary to ensure that a compact submitted for review under § 2710(d)(8) complies with IGRA. *See supra* at 14-15. In addition, a tribe establishes an injury in fact for standing purposes when it alleges that it has been denied the ability to compete on an equal footing under IGRA, *Lac du Flambeau*, 422 F.3d at 497-98, and when it alleges "an alteration in competitive conditions." *Forest Cnty.*, 317 F.R.D. at 12 (quoting *Clinton*, 524 U.S. at 433). Nothing in *Sokaogon* suggests, much less holds otherwise. Indeed, in that case, the court expressly declined to decide whether a tribe's interest in being free from economic competition was protectable, because the administrative process had barely begun, "and it [wa]s anyone's guess what the Secretary's final decision [would] be." *Sokaogon*, 214 F.3d at 947. By contrast, here the Secretary has already taken final action in the form of his no-action approval of the Agreements, Compl. ¶¶ 93, 106, on which Plaintiffs claims are based. Compl. ¶ 129.

## II.   FEDERAL DEFENDANTS' RULE 12(B)(6) MOTION SHOULD BE DENIED.

### A.   The Plaintiff Nations Have A Cause Of Action For Causes Of Action One To Three Because Defendant Secretary Was Required To Disapprove The Agreements.

IGRA requires that to conduct Class III gaming, a tribe must have "entered into" a compact with the State, and that compact must be "in effect." 25 U.S.C. § 2710(d)(1)(C); Compl. ¶¶ 43, 48. "The plain language of IGRA makes it clear that Secretarial approval and publication places a compact 'into effect,'" while "[s]tate law must determine whether a state has validly bound itself

to a compact." *Kelly*, 104 F.3d at 1557-58 (citing *Washington v. Confederated Bands*, 439 U.S. 463, 493 & n.39 (1979)).  And a compact that was "never validly 'entered into' by the state...do[es] not comply with IGRA."  *Id.* at 1559.

Under IGRA, the Secretary has authority to consider a compact only if it was "entered into" by the tribe and state.  25 U.S.C. § 2710(d)(8)(A)-(C).  *See* Compl. ¶¶ 43, 45.  And Defendant Department's own regulations provide that a compact is "an 'intergovernmental agreement executed between Tribal and State governments under'" IGRA.  *Connecticut*, 344 F. Supp. 3d at 309 (quoting 25 C.F.R. § 293.2(b)(2)).  Under the text of IGRA and its governing regulations, the Secretary has no authority to consider a compact unless it is an intergovernmental agreement that has been entered into by the tribe and the state.  Accordingly, the Secretary must determine whether a compact was "entered into" by the tribe and the state before considering it.

In spite of these requirements, the Secretary argues that "IGRA does not require the Secretary to resolve a dispute about gubernatorial authority, nor to disapprove a compact because such a dispute exists."  DOI Br. at 36.  But here, Defendant Secretary was not required to resolve a purported dispute.  Rather, his decision was arbitrary and capricious because, instead of determining whether the Agreements met the definition of a "compact," *see* 25 U.S.C. § 2710(d)(8)(A); 25 C.F.R. § 293.2(b)(2), he allowed them to go into effect, ignoring controlling authority that the State never "entered into" them.

That controlling legal authority is the Oklahoma Attorney General opinion that the Oklahoma Attorney General himself submitted to Defendant Secretary while he was considering the Comanche and Otoe-Missouria Agreements.  *See* Compl. ¶¶ 89-90; Ex. 7.[22]  The Attorney

---

[22] The Attorney General's letter and opinion were incorporated by reference into the Complaint and so the Court can consider them here.  *Chao*, 508 F.3d at 1059.

General concluded that the Governor did not have authority to unilaterally bind the State to a Compact where the terms of the Compact were not consistent with state law because they purported to allow gaming on terms other than those permitted in the State-Tribal Gaming Act and the Model Compact.  Ex. 7 at 7-8.  The Attorney General explained in his cover letter to Defendant Secretary that

> Governor Stitt was without legal authority to bind the State of Oklahoma to these agreements and therefore it cannot be said that the State has entered into a new gaming compact with these tribal nations…[i]n issuing the attached Opinion on the permissibility of the Governor's actions under state law, I act in a quasi-judicial capacity and 'state officers are bound by these Attorney General opinions until relieved of that duty' by the courts of Oklahoma.  *State ex rel. York v. Turpen*, 681 P.2d 763, 767 (Okla. 1984).

Ex. 7 at 1.

That opinion answered whether the Governor had authority without any need for the Secretary to resolve any "dispute" regarding state law.  The Attorney General noted his official opinions are binding on the State's officers.  Ex. 7 at 1; *see* Okla. Stat. tit. 74, § 18b(A)(18) (Oklahoma Attorney General opinion issued in response to request by state legislator is "determinative of the law regarding such subject matter"); *Hendrick v. Walters*, 865 P.2d 1232, 1243 (Okla. 1993) (Oklahoma Attorney General opinion is "binding upon the state officials whom it affects.  Public officers have the duty to follow those opinions until they are judicially relieved of compliance." (footnotes omitted); *Turpen*, 681 P.2d at 767; *Rasure v. Sparks*, 183 P. 495, 498 (Okla. 1919).  That includes the Governor.  *Keating v. Edmondson*, ¶ 4 & n.8, 2001 OK 110, 37 P.3d 882.

The pendency of *Treat I* and *Treat II* did not affect the binding nature of the Attorney General's opinion, as the Governor has a "duty to follow the Attorney General's opinion *until overturned by a court of competent jurisdiction*," including during the court's consideration of

lawsuits challenging the Attorney General's Opinion.  *See id.* ¶ 4 (emphasis added).[23]   The

Oklahoma Supreme Court confirmed the Attorney General's conclusion in its opinions in *Treat I*

and *Treat II*, but had it instead upheld the Governor's actions, he could have resubmitted the

Agreements with a new certification.  *See KG Urban Enters., LLC v. Patrick*, 693 F.3d 1, 26 n.28

(1st Cir. 2012) ("[T]here is no explicit requirement as to when a compact must be submitted after

it has been agreed on by the state and the tribe….").

Even if the controlling nature of the Attorney General's opinion was not pellucid, his 2020

opinion was consistent with the Secretary's prior understanding of how Oklahoma enters into

IGRA compacts.  As the Secretary noted in the approval letters he issued when he approved the

Plaintiff Nations' current compacts, Exs. 8-11, and Comanche's, Otoe-Missouria's, and KTT's

Former Compacts, Exs. 5, 12-13, "*[t]he Compact is authorized by recent legislation enacted by

the State of Oklahoma.*  Prior to this legislation, Indian tribes in the State of Oklahoma could only

operate Class II gaming machines and engage in pari-mutuel wagering."  *Id.* at 1 (emphasis

added).[24]  *See* Compl. ¶ 60.

Therefore, it was not necessary for the Secretary to "resolve" a question of state law to

disapprove the Agreements.  It was only necessary for him to determine that the Attorney General's

opinion provided to him definitively decided the question of the Governor's authority, consistent

with the Secretary's prior understanding of how Oklahoma enters into IGRA compacts.  Such an

---

[23] In *Keating*, after the Oklahoma Attorney General issued an opinion finding the Governor had
violated Oklahoma law, the Governor filed suit in state court, seeking a stay of the opinion.  *Id.*
Here, nobody sought to stay the Attorney General's opinion.

[24] All the approval letters are public government documents.  *See Tribal Compacts and
Agreements*, Okla. Sec'y of State, https://www.sos.ok.gov/gov/tribal.aspx (last accessed Feb. 4,
2021); *Indian Gaming Compacts*, U.S. Dep't of Interior, https://www.bia.gov/as-ia/oig/gaming-
compacts (last accessed Feb. 4, 2021).  The court may take judicial notice of them here.  *Chao*,
508 F.3d at 1059.

inquiry falls well within the Secretary's practice, noted in *Narragansett* and *Kelly* (to which the Secretary cites), not to defer to a Governor who clearly lacks authority.  If a Governor lacked authority to enter into an IGRA compact, then "consequences should...flow, such as a determination that the compact is invalid," *Kelly*, 104 F.3d at 1557, and the compact "would be a nullity," *Rhode Island v. Narragansett Indian Tribe*, No. Civ. A. 94-0619-T, 1995 WL 17017347, at *2 (D.R.I. Feb. 3, 1995).  Both cases cited with approval the Interior Solicitor's statement that "[this Department] defer[] to the representations of Governors,...*unless* it is clear beyond cavil that a Governor lacks the authority to sign a compact."  *Kelly*, 104 F.3d at 1557; *Narragansett*, 1995 WL 17017347, at *3 (emphasis added).[25]

Here, the Governor clearly lacked such authority, the Secretary was not required to undertake the "extensive" inquiry that he warns against, *see* DOI Br. at 38, yet the Secretary wrongly chose to allow the Agreements to go "into effect."  Nor could the forty-five-day deadline excuse the Secretary from making a straightforward inquiry into whether the compact was "entered into" according to state law.  *See Amador Cnty.*, 650 F.3d at 381 (rejecting notion that forty-five day timeline excused Secretary from disapproving compact that violates IGRA); *see also Kickapoo Tribe v. Babbitt*, 827 F. Supp. 37, 44 (D.D.C. 1993) *rev'd on other grounds*, 43 F.3d 1491 (D.C. Cir. 1995) (Secretary could not toll forty-five day period, but "[i]f the Secretary wanted to hold that [the state governor's] approval was insufficient to form a compact" in light of state supreme court ruling, "he could have done so").

---

[25] *Langley v. Edwards*, 972 F. Supp. 1531 (W.D. La. 1995), which Federal Defendants also cite, reasoned after disposing of the case on jurisdictional grounds that the court should not inquire into the merits of state law because the Governor's inability to enter into a compact under state law is not a basis to invalidate an IGRA compact.  *Id.* at 1535.  That out-of-circuit dictum is unconvincing and should not be followed here, as the Plaintiff Nations have already shown.  *See* Pl. Nations' Points & Auths. in Opp. to Mot. to Dismiss at 31 & n.18, ECF No. 57 ("Nations' Resp.").

Federal Defendants rely on *Detroit International Bridge Co. v. Government of Canada*, 883 F.3d 895 (D.C. Cir. 2018), to argue otherwise.  DOI Br. at 36.  But that case demonstrates why Defendant Secretary acted arbitrarily and capriciously.  In *International Bridge*, the court found the Secretary of State was not required to consider state law when determining whether to recommend approval of a bridge to Canada, as his function was to consider the impacts of the proposed bridge on the United States' foreign policy.  883 F.3d at 899.  In contrast, IGRA requires a Compact be "entered into" by a State, 25 U.S.C. § 2710(d)(1)(C), (d)(8)(A), and the Secretary is required to disapprove a compact that violates IGRA, *Amador Cnty.*, 640 F.3d at 381. Nevertheless, in *International Bridge* the Circuit found the Secretary of State properly evaluated state law by relying on an opinion by the Office of the Michigan Attorney General.  883 F.3d at 900.  As in Oklahoma, Michigan state officials are required to adhere to the Attorney General's opinions, *see* Mich. Comp. Laws § 14.32; *In re Proposal C*, 185 N.W.2d 9, 17 n.2 (Mich. 1971); *Mich. Beer & Wine Wholesalers Ass'n v. Att'y Gen.*, 370 N.W.2d 328, 331 (Mich. Ct. App. 1985); *In re Jansen*, 2009 Mich. A.G. No. 7225, 2009 WL 739961, at *2 n.7 (Mich. A.G. Feb. 27, 2009).[26]

For the same reason, contrary to the Secretary's representation otherwise, DOI Br. at 37, Defendant Secretary could not solely rely on the Governor's certification as a basis on which to approve the Agreements or decide to allow them to go into effect and ignore the controlling evidence that they were invalid.  IGRA regulations require that an Indian tribe or State "should submit the compact…*after it has been legally entered into by both parties*."  25 C.F.R. § 293.7

---

[26] In *Narragansett*, the Secretary and the court did not rely on an opinion by the state Attorney General, *see* 1995 WL 17017347, at *3, *5, but Rhode Island Attorney General opinions are advisory and aid agencies or officers in decision making; they are not binding on public officials as in Oklahoma.  *See* 42 R.I. Gen. Laws § 42-9-6; *Pine v. Charlestown Town Council*, C.A. No. 95-491, 1997 WL 839926, at *3 n.4 (R.I. Super. Ct. June 4, 1997); *In re Donahue*, No. U97-01, 1997 WL 33165851, at *3 (R.I.A.G. Nov. 13, 1997).

(emphasis added).  As the Bureau of Indian Affairs explained when it promulgated this rule, 25 C.F.R. § 293.7 requires that "a compact or amendment may only be submitted to the Secretary after it has been legally entered into…."  73 Fed. Reg. 74,004, 74,006 (Dec. 5, 2008).  The Secretary requires that the tribe and State submit certification that they both actually entered into the compact, 25 C.F.R. § 293.8(b)-(c), but the regulation does not provide that the mere submission of any certification is determinative or that this is the only information that establishes whether the State has entered into a compact.  Indeed, the Secretary may request "[a]ny other documentation…that is necessary to determine whether to approve or disapprove the compact," *id.* § 293.8(d).

It follows that even if the Governor submitted a certification, it would does not establish that the Agreements had been "entered into" for purposes of IGRA.  Nor should the Secretary have relied on the Governor's certification to the exclusion of an authoritative opinion from the Attorney General finding that the Governor lacked authority to enter into the Agreements on behalf of the State and which the Governor himself was bound to follow.  The only basis for Defendant Governor Stitt's certification was his own assertion of authority.  By ignoring patently controlling authority to the contrary, Defendant Secretary arbitrarily and capriciously aided Defendant Governor Stitt's scheme to push unilateral and void "compacts" on other tribes in Oklahoma.

IGRA clearly does not allow such a result.[27]  As the Tenth Circuit explained in *Kelly*, "to permit a state actor to purport to bind the state when in fact he or she lacks the authority to do so undermines the significance of the compact process as a means of providing meaningful state involvement if a state so desires."  104 F.3d at 1556.  That significance is confirmed by the IGRA

---

[27] Assuming only *arguendo* IGRA were not clear, its text should be read to avoid the constitutional problems of Federal Defendants' approach.  *See Clark v. Martinez*, 543 U.S. 371, 381-82 (2005).

regulations, which provide the "Secretary will not consider a proposed tribal-state compact for approval until it has been 'executed,'" *Connecticut*, 344 F. Supp. 3d at 315 (quoting 25 C.F.R. § 293.8(a)), by "both the tribe and *the State*," 25 C.F.R. § 293.8(a).  Nowhere does IGRA allow an individual state official to hijack the IGRA process, use IGRA negotiations to pursue his own independent policy preferences, and bind a State to a compact, without complying with the process that the State has developed to govern its participation in the compacting process.  As importantly, IGRA nowhere requires tribes to surrender their sovereignty to states pursuant to compact provisions that violate IGRA.  *See Navajo Nation v. Dalley*, 896 F.3d 1196, 1206-10 (10th Cir. 2018) (Tribes can only negotiate and agree to state jurisdiction in IGRA compacts as expressly authorized by IGRA).

The arbitrariness and capriciousness of the Secretary's decisions is further highlighted by the fact he has bound Oklahoma to Agreements which the Oklahoma Supreme Court have ruled are invalid.  The Secretary argues that despite the Oklahoma Supreme Court's rulings, the court could conclude that the State can be bound to the Agreements without violating state sovereignty. DOI Br. 39-40 n.14.  That is wrong.  These Agreements, like many IGRA compacts, impose regulatory and contractual obligations on the State.  *See, e.g.*, Agreements Parts 4.A., 4.C., 4.F.6., 4.F.7., 7.A., 7.B., 7.C., 7.D., 9.A.3., 9.A.6., 13.E., 13.G., 13.H.; 25 U.S.C. § 2710(d)(3)(C)(i)-(ii). If the Secretary could force Oklahoma to take on regulatory and contractual obligations, he would surely offend state sovereignty.  *See Pueblo of Santa Ana v. Kelly*, 932 F. Supp. 1284, 1296 (D.N.M. 1996), *aff'd*, 104 F.3d 1546 ("The Court questions whether the United States has the power to require a state to affirmatively regulate gaming pursuant to an agreement never consented to by the state.").

**B.    The Plaintiff Nations Have A Cause Of Action For Causes Of Action Four To Seven.**

The Federal Defendants assert that the Plaintiff Nations lack a cause of action to bring

Causes of Action Four to Seven, challenging the Secretary's decision to allow the Agreements to

go into effect, on the basis that if "certain compact provisions are contrary to IGRA, then, under

Plaintiffs' own theory, those provisions were not actually deemed approved.  As a result, the

Secretary could not have made the allegedly unlawful approvals that form the basis of Counts Four

through Seven."  DOI Br. at 41.  Obviously 25 U.S.C. § 2710(d)(8)(C) limits the extent to which

a compact is lawful, but that does not mean there is no cause of action to challenge the Secretary's

decision to allow the compact to go into effect, unlawful provisions and all.  As *Amador County*,

640 F.3d at 830, explained:

> To be sure, [25 U.S.C. § 2710(d)(8)(C)] provides that only lawful compacts can
> become effective, but someone—i.e., the courts—must decide whether those
> provisions are in fact lawful.  *Cf. Lac Du Flambeau Band of Lake Superior
> Chippewa Indians*, 422 F.3d at 501 (explaining that 25 U.S.C. § 2710(d)(8)(C) only
> prevents "offending provisions from becoming effective in some academic sense").
> Indeed, as we explain below, subsection (d)(8)(C)'s caveat invites judicial review
> by setting out a clear standard for reviewing courts to apply.

The Secretary argues that *Amador County* does not control here and was limited to cases

in which the compact deals with land that is not "Indian lands" under IGRA.  DOI Br. at 42.[28]

*Amador County*'s holding is not so limited.  In *Amador County*, the Secretary argued that his

decision to allow a compact to go into effect via inaction was not reviewable by the federal courts

because, *inter alia*, his decision was "committed to agency discretion."  640 F.3d at 379 (citing 5

U.S.C. § 701(a)(2)).  The Secretary argued that, because the Secretary "may" disapprove a

compact if it meets one of the disapproval criteria in 25 U.S.C. § 2710(d)(8)(B)(i)-(iii), "he is never

---

[28] The KTT and UKB Agreements do not deal with "Indian lands," *see supra* at 19, so even if
Federal Defendants were correct, that would not justify dismissal of the claims as to those
Agreements.

obligated to disapprove a compact and thus approval—either affirmative approval pursuant to

subsection (d)(8)(A) or, by extension, no-action approval pursuant to subsection (d)(8)(C)—falls

solely within his discretion."  640 F.3d at 381.  The court rejected this interpretation of "may,"

holding that "subsection (d)(8)(B)'s use of 'may' is best read to limit the circumstances in which

disapproval is allowed.  The Secretary must, however, disapprove a compact if it would violate

any of the three limitations in that subsection, and those limitations provide the 'law to apply.'"

*Id.*  The court went on to find that:

> subsection (d)(8)(C), which governs approval by inaction, includes no exemption
> from this obligation to disapprove illegal compacts.  Like subsection (d)(8)(B)'s
> list of conditions that require disapproval, subsection (d)(8)(C)'s caveat—that the
> compact is deemed approved "but only to the extent the compact is consistent with
> the provisions of [IGRA]"—provides "law to apply."  And just as the Secretary has
> no authority to affirmatively approve a compact that violates any of subsection
> (d)(8)(B)'s criteria for disapproval, he may not allow a compact that violates
> subsection (d)(8)(C)'s caveat to go into effect by operation of law.

*Id.* (alteration in opinion).  That reasoning clearly applies to Plaintiff Nations' claims.

That *Amador County* should control here is also confirmed by subsequent decisions,

interpreting *Amador County* to have found that IGRA places mandatory obligations on the

Secretary, without limitation to compacts that do not deal with "Indian lands."  *DTCC Data*

*Repository (U.S.) LLC v. U.S. Commodity Futures Trading Comm'n*, 25 F. Supp. 3d 9, 16-18

(D.D.C. 2014) ("[T]he [*Amador County*] court concluded that...Congress had imposed a duty on

the Secretary of the Interior to disapprove any compacts that would violate the IGRA."); *Stand Up*

*for Cal.! v. U.S. Dep't of Interior*, 71 F. Supp. 3d 109, 120 (D.D.C. 2014) (Under *Amador County*,

"[d]isapproval of…a compact is warranted if it violates a provision of IGRA"); *see Menominee*

*Indian Tribe v. EPA*, 947 F.3d 1065, 1073 (7th Cir. 2020) (*Amador County* found IGRA "obligated

the Secretary to disapprove of compacts that violated the regulatory scheme…."); *Delta Air Lines,*

*Inc. v. Exp.-Imp. Bank*, 718 F.3d 974, 977 (D.C. Cir. 2013) (In *Amador County*, review was

available under the APA "because [the] statute imposes mandatory obligations on [the] agency….").[29]

The *Amador County* court acknowledged that "even if disapproval were otherwise discretionary, subsection (d)(8)(A) authorizes approval only of compacts 'governing gaming on *Indian lands*,' suggesting that disapproval is obligatory where that particular requirement is unsatisfied." 640 F.3d at 381. The court's ruling on the meaning of "may" and its impact on (d)(8)(C) made this discussion about the possible meaning of (d)(8)(A) unnecessary to support the court's holding, and thus this passage is actually the dictum of the case. That dictum is certainly less well considered than the court's holding and cannot supersede or limit it. *N.Y. Republican State Comm. v. SEC*, 927 F.3d 499, 511 (D.C. Cir. 2019) (rejecting argument that relied on dicta from cases while disregarding their holdings); *see Dedham Water*, 972 F.2d at 459 (considered dictum is given particular weight "as opposed to casual" dictum).

Federal Defendants argue that the Fourth Cause of Action should be dismissed for an additional reason. DOI Br. at 42-43. They argue that Plaintiff Nations' allegations that the Agreements authorize otherwise-illegal gaming by the signatory Tribes, Compl. ¶ 247, fails to state a claim because "having an approved tribal-state compact under (d)(1)(C) does not authorize a tribe to conduct gaming activities that would otherwise be contrary to the limitations of (d)(1)(B)." DOI Br. at 42-43. Precisely. The Agreements purport to provide such authorization, which cannot be the subject of a compact. Compl. ¶¶ 135-140, 144-150. They therefore include

---

[29] Even if *Amador County*'s conclusions were dicta, they are well considered dicta by the Court of Appeals and should be followed. *Raney v. District of Columbia*, 892 F. Supp. 283, 286 (D.D.C. 1995); *see Cross v. Harris*, 418 F.2d 1095, 1104 n.60 (D.C. Cir. 1969) (rejecting position that district courts could ignore circuit court's well-considered dicta); *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 972 F.2d 453, 459 (1st Cir. 1992) ("courts often, quite properly, give considerable weight to dictum—particularly to dictum that seems considered as opposed to casual").

invalid terms, and Defendant Secretary should have disapproved them.  Moreover, as the Plaintiff Nations further allege in the Fourth Cause of Action, the Agreements violate IGRA because they purport to authorize the State to engage in iLottery and Event Wagering, and a state's conduct of gaming is not a legal subject of compact negotiations.  *See* 25 U.S.C. § 2710(d)(3)(C); Compl. ¶¶ 141-143, 184, 248.  Federal Defendants do not address the Agreements' purported authorization of gaming by the State, which independently supports the count in the Fourth Cause of Action.  So even if Federal Defendants' limited punch against the Fourth Cause of Action landed, the Court could still not dismiss that count.

Finally, Federal Defendants argue that the Seventh Cause of Action should also be dismissed because the Secretary did not violate the trust responsibility to the Plaintiff Nations. DOI Br. at 43-44.  That, they claim, is because IGRA does not establish a special trust responsibility to the Plaintiff Nations.  *Id*.  Federal Defendants elide the fact that the Seventh Cause of Action also alleges that the future concurrence provisions of the Agreements "are not an authorized subject of negotiation under IGRA, and are therefore invalid and must be disapproved under 25 U.S.C. § 2710(d)(8)(B)(iii)."  Compl. ¶ 263.  Federal agencies owe a general trust responsibility to Indian tribes, and "this responsibility is discharged by the agency's compliance with general regulations and statutes not specifically aimed at protecting Indian tribes."  *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 144 (D.D.C. 2017) (quoting *Morongo Band v. FAA*, 161 F.3d 569, 574 (9th Cir. 1998)).  For that reason, because the Secretary failed to comply with his statutory obligation to disapprove the Agreements for including provisions that cannot be part of a compact under IGRA, he ipso facto violated his trust responsibility to the Plaintiff Nations.

## CONCLUSION

For the foregoing reasons, the Defendants' Motions to Dismiss should be denied.

Respectfully submitted,

Dated: February 22, 2021      By:   */s/ Colin Cloud Hampson*
Frank S. Holleman, D.C. Bar # 1011376
Sonosky, Chambers, Sachse,
     Endreson & Perry, LLP
1425 K Street, NW, Suite 600
Washington DC 20005
Phone no.: 202-682-0240
Fax no.: 202-682-0249
E-mail:  fholleman@sonosky.com

Colin Cloud Hampson, D.C. Bar # 448481
Sonosky, Chambers, Sachse,
     Endreson & Perry, LLP
145 Willow Road, Suite 200
Bonita, CA 91902
Phone no.: 619-267-1306
Fax no.: 619-267-1388
E-mail:  champson@sonoskysd.com

Lead Counsel for the Cherokee, Chickasaw,
Choctaw, and Citizen Potawatomi Nations

Sara Hill, OK Bar # 20072, *pro hac vice*
P.O. Box 1533
Tahlequah, OK 74465
Counsel for Cherokee Nation
Phone no.: 918-207-3836
Fax no.: 918-458-6142
E-mail: sara-hill@cherokee.org

Stephen Greetham, OK Bar # 21510, *pro hac vice*
4001 N. Lincoln Blvd
Oklahoma City, OK 73105
Counsel for Chickasaw Nation
Phone no. 580-272-5236
E-mail: stephen.greetham@chickasaw.net

*Additional counsel on next page*

60

Bradley Mallett, OK Bar # 15810, *pro hac vice*
P.O. Box 1210
Durant, OK 74702
Counsel for Choctaw Nation
Phone no.: 580-380-3024
E-mail: bmallett@choctawnation.com

Gregory M. Quinlan, NM Bar # 4450, CO Bar #
21605, *pro hac vice*
George J Wright, OK Bar # 21873, *pro hac vice*
1601 S Cooper Dr
Shawnee, OK 74801
Counsel for Citizen Potawatomi Nation
Phone no. 405-275-3121
Email: george.wright@potawatomi.org

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on February 22, 2021, I electronically filed the above and foregoing document and attachments with the Clerk of Court via the ECF System for filing.

*/s/ Colin Cloud Hampson*
Colin Cloud Hampson