UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE CHEROKEE NATION et al.,

*Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF THE
INTERIOR et al.,

*Defendants*.

Civil Action No. 20-2167 (TJK)

## MEMORANDUM OPINION AND ORDER

Plaintiffs are four Native American tribes who each operate casinos in Oklahoma under a tribal-gaming compact with Oklahoma under the Indian Gaming Regulatory Act.  In their operative complaint, they seek to have set aside four tribal-gaming compacts for casino operations that four other Native American tribes in Oklahoma submitted to the Secretary of the Department of the Interior for approval and which were approved by inaction by operation of law.  Before the Court now and ripe for decision are two motions to dismiss the complaint, a motion to dismiss a counterclaim, a motion to strike portions of one of the pending motions to dismiss, and a motion to compel the production of the administrative record.  For the reasons explained below, the Court will grant in part and deny in part one of the motions to dismiss the complaint, deny the other motion to dismiss the complaint, grant the motion to dismiss the counterclaim, deny the motion to strike, and deny as moot the motion to compel the production of the administrative record.

I.      **Statutory Background**

A.      **Indian Gaming Regulatory Act**

In 1987, the Supreme Court held that states "lacked regulatory authority over gaming on Indian lands."  *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 794 (2014) (citing *California*

*v. Cabazon Band of Mission Indians*, 480 U.S. 202, 221–22 (1987)).  In response the next year, Congress enacted the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2701 *et seq.*, to give states "some measure of authority over gaming on Indian lands" within them under the auspices of a federal regulatory framework.  *See Bay Mills Indian Cmty.*, 572 U.S. at 795 (internal quotation marks omitted); *Amador Cnty. v. Salazar*, 640 F.3d 373, 376 (D.C. Cir. 2011) (citing 25 U.S.C. §§ 2701–02).

Generally, IGRA authorizes tribal gaming only on "Indian lands," defined as lands within the limits of an "Indian reservation" as well as lands held in trust by the United States "for the benefit of any Indian tribe."  25 U.S.C. § 2710(a)(1)–(2), (b)(1), (d)(1); *id.* § 2703(4); *Amador Cnty.*, 640 F.3d at 376–77.  For any land that the Secretary of the Department of the Interior ("Secretary") acquires after October 17, 1988 to hold in trust for an "Indian tribe," further restrictions apply.  *See* 25 U.S.C. § 2719(a).[1]  As relevant here, IGRA permits gaming on such land if the Secretary:

> after consultation with the Indian tribe and appropriate State and local officials, including officials of other nearby Indian tribes, determines that a gaming establishment on newly acquired lands would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community, but only if the Governor of the State in which the gaming activity is to be conducted concurs in the Secretary's determination.

*Id.* § 2719(b)(1)(A).  This is called the "two-part determination" or "Secretarial Determination." *See* 25 C.F.R. § 292.2.

IGRA also divides gaming into three classes.  *Amador Cnty.*, 640 F.3d at 376.  "Class I gaming" consists of "social games" played for nominal prizes and "traditional forms of Indian

---

[1] Ordinarily, such land may not be in another tribe's reservation unless that other tribe "consents in writing to the acquisition."  25 C.F.R. § 151.8.

gaming" occurring in connection with tribal ceremonies or celebrations.  *See* 25 U.S.C. § 2703(6).

"Class II gaming" consists of bingo, "games similar to bingo," and certain card games.  *Id.*

§ 2703(7)(A)–(B).  "Class III gaming" consists of "all forms of gaming that are not class I gaming

or class II gaming."  *Id.* § 2703(8).  Class III gaming includes most conventional casino games—

blackjack, roulette, slot machines, and the like.  *Amador Cnty.*, 640 F.3d at 376; 25 C.F.R. § 502.4.

"Class I gaming on Indian lands is within the exclusive jurisdiction of the Indian tribes,"

meaning that it is not regulated by IGRA and cannot be regulated by a state.  *See* 25 U.S.C.

§ 2710(a)(1); *Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n*, 466 F.3d 134, 135 (D.C.

Cir. 2006); *Cabazon Band of Mission Indians v. Nat'l Indian Gaming Comm'n*, 827 F. Supp. 26,

28 n.1 (D.D.C. 1993).  Class II gaming on "Indian lands" is also "within the jurisdiction of the

Indian tribes," though IGRA regulates it.  25 U.S.C. § 2710(a)(2), (b)–(c); *Seminole Tribe of Fla.*

*v. Florida*, 517 U.S. 44, 48 n.1 (1996); *Colo. River Indian Tribes*, 466 F.3d at 135–36.  Class III

gaming on "Indian lands" is subject to both IGRA and state regulation, and before commencing

class III gaming, "a tribe must satisfy three conditions."  *See Amador Cnty.*, 640 F.3d at 376; *see*

*also* 25 U.S.C. § 2710(d)(1).  First, "the gaming must be authorized by a tribal ordinance or reso-

lution that has been approved by the National Indian Gaming Commission."  *Amador Cnty.*, 640

F.3d 376 (citing 25 U.S.C. § 2710(d)(1)(A), (d)(2)(C)).  Second, "the Indian lands where the

gaming will take place must be located within a state that permits [such] gaming 'for any purpose

by any person, organization, or entity.'"  *Id.* (quoting 25 U.S.C. § 2710(d)(1)(B)).  Third, the gam-

ing must be "conducted in conformance with a tribal-state compact that has been approved by the

Secretary."  *Id.* (citing 25 U.S.C. § 2710(d)(1)(C)).

IGRA regulates the tribal-gaming compacting process in several ways pertinent here.  For

one, IGRA specifies the subjects that may be negotiated between the tribe and the state in the

compacting process.  *See* 25 U.S.C. § 2710(d)(3)(C)(i)–(vii).  Courts have interpreted this list as exclusive, meaning that IGRA compacts may not address other subjects besides those listed.  *See, e.g.*, *Forest Cnty. Potawatomi Cmty. v. United States*, 330 F. Supp. 3d 269, 275, 280 (D.D.C. 2018); *Chicken Ranch Rancheria of Me-Wuk Indians v. California*, 42 F.4th 1024, 1034–35 (9th Cir. 2022).  One permitted subject is "assessment[s] by the State of [class III gaming] activities in such amounts as are necessary to defray the costs of regulating [class III gaming] activity."  25 U.S.C. § 2710(d)(3)(C)(iii).  But these cost-related "assessment[s]" cannot amount to a "tax, fee, charge, or other assessment" on tribal gaming.  *See id.* § 2710(d)(4).

Once the tribe and the state have negotiated a compact, it then must be "legally entered into by both parties."  *See* 25 C.F.R. § 293.7; *see also* 25 U.S.C. § 2710(d)(3)(B), (d)(8)(A).  State law governs whether the state has "legally entered into" the compact.  *See, e.g.*, *Kickapoo Tribe of Indians v. Babbitt*, 827 F. Supp. 37, 46 (D.D.C. 1993), *rev'd on other grounds*, 43 F.3d 1491 (D.C. Cir. 1995); *accord Pueblo of Santa Ana v. Kelly*, 104 F.3d 1546, 1553, 1557–58 (10th Cir. 1997).  If a compact has not been legally entered into under state law, it is "invalid" under IGRA.  *See, e.g.*, *Kickapoo Tribe of Indians*, 827 F. Supp. at 46 (citing 25 U.S.C. § 2710(d)(8)(A)); *accord Pueblo of Santa Ana*, 104 F.3d at 1555, 1559.

After a tribe and a state have "entered into" a tribal-gaming compact, they must submit the compact to the Secretary for review.  *See* 25 C.F.R. § 2710(d)(8)(A); 25 C.F.R. § 293.7; *Amador Cnty.*, 640 F.3d at 377.  Once that happens, the Secretary "has three choices."  *Amador Cnty.*, 640 F.3d at 377.  First, she "may approve the compact."  *Id.* (citing 25 U.S.C. § 2710(d)(8)(A)).  Second, she "may disapprove the compact, but only if it violates IGRA or other federal law or trust obligations" of the United States to Native Americans.  *See id.* (citing 25 U.S.C. § 2710(d)(8)(B)).  Third, she "may choose to do nothing, in which case the compact is deemed approved after forty-

five days 'but only to the extent the compact is consistent with the provisions' of IGRA." *Id.*

(quoting 25 U.S.C. § 2710(d)(8)(C)). This third option is known as a "no-action approval." *See*

*id.* at 378. Importantly, the Secretary cannot no-action approve, but "must . . . disapprove" a

compact that violates IGRA, any other federal law, or the federal government's "trust obligations"

to Native Americans. *See Amador Cnty.*, 640 F.3d at 381 (discussing § 2710(d)(8)(B), (d)(8)(C)).

If the Secretary approves or no-action approves the compact, then the Secretary must publish in

the Federal Register a "notice of approval" of the compact. 25 U.S.C. § 2710(d)(3)(B), (d)(8)(D).

At that time, the compact becomes effective. *See id.* § 2710(d)(3)(B).

    **B.**    **Relevant Oklahoma Law**

Oklahoma regulates the type of casino-style games that can be operated in Oklahoma, per-

mitting some but prohibiting others. *See, e.g.*, Okla. Stat. tit. 3A, § 262(C)(2), (H); *id.* § 280.1(A);

*id.* § 281, pt. 3(5). And it has created two means by which the state may enter into a class III tribal-

gaming compact with tribes in Oklahoma. The first is through Oklahoma's "model tribal gaming

compact," a codified compact that the state enters into with a tribe basically whenever the tribe

accepts it. This model tribal gaming compact authorizes tribes to conduct class III gaming that is

permitted in the state. *See* Okla. Stat. tit. 3A, §§ 280–81; *see also Sheffer v. Buffalo Run Casino,*

*PTE, Inc.*, 315 P.3d 359, 361 (Okla. 2013). The second is by way of individualized negotiations

between a tribe and the Governor of Oklahoma, which a tribe would pursue if, for instance, it

wanted to conduct class III gaming but wanted compact terms other than those provided for in the

model tribal gaming compact. *See* Okla. Stat. tit. 74, § 1221(C)(1). Compacts negotiated this way

must be submitted for approval to the Oklahoma Joint Committee on State-Tribal Relations, a

committee of the Oklahoma legislature, as well as to the Secretary under IGRA, before they can

"become effective." *See id.* §§ 1221(C)(1)–(2), 1222(A); *Treat v. Stitt*, 481 P.3d 240, 242–43 (Okla. 2021).

## II.   Factual Background

Plaintiffs Cherokee Nation, Chickasaw Nation, Choctaw Nation, and Citizen Potawatomi Nation are federally recognized "Indian Tribes" that conduct class III gaming within Oklahoma under model tribal gaming compacts entered into with Oklahoma under IGRA.  *See* ECF No. 104 ¶¶ 5, 8–11, 52, 56, 60, 67–70; *see also Cherokee Nation v. Stitt*, 475 F. Supp. 3d 1277, 1279, 1281, 1283 (W.D. Okla. 2020).

Defendant Mark Woommavovah is Chairman of the Business Committee of the Comanche Nation, a federally recognized "Indian Tribe."  ECF No. 104 ¶¶ 1 n.1, 16.  Defendant John R. Shotton is Chairman of the Tribal Council of the Otoe-Missouria Tribe of Indians, a federally recognized "Indian Tribe."  ECF No. 104 ¶ 17.  Defendant Joe Bunch is Chief of the United Kee-toowah Band of Cherokee Indians in Oklahoma, a federally recognized "Indian Tribe."  ECF No. 104 ¶ 18.  Defendant Brian Givens is Mekko of the Kialegee Tribal Town, a federally recognized "Indian Tribe."  ECF No. 104 ¶ 19.[2]  Until 2020, the Comanche Nation and the Otoe-Missouria Tribe operated class III gaming in Oklahoma under model tribal gaming compacts that each tribe had entered into with Oklahoma under IGRA.  *See* ECF No. 104 ¶¶ 57, 62, 62 n.4, 231.m, 231.q, 231.y.  Before that time, the Kialegee Tribal Town also entered into a model tribal gaming compact with Oklahoma under IGRA, but it has yet to operate any class III gaming in Oklahoma.  *See id.* ¶¶ 62, 62 n.4, 100–01, 105, 168, 231.f, 231.g, 231.k, 231.z.  The United Keetoowah Band tried to enter into a model tribal gaming compact with Oklahoma under IGRA in 2019, but that compact

---

[2] The Court refers to these defendants collectively as "Defendant Tribal Leaders."

allegedly never took effect, and the United Keetoowah Band has yet to operate any class III gaming in Oklahoma.  *See id.* ¶¶ 58, 100–01, 105, 168, 231.f, 231.g, 231.k, 231.l, 231.z.

Oklahoma's model tribal gaming compact contained a term specifying that it expired automatically on January 1, 2020, though that term also specified that any such compact would "automatically renew" for successive fifteen-year terms under certain conditions.  *See* Okla. Stat. tit. 3A, § 281, pt. 15(B).  As that 2020 deadline approached, a dispute arose between some Oklahoma tribes with model tribal gaming compacts and the state about whether the conditions existed for the compacts to automatically renew, and some Oklahoma tribes sued the state over this dispute. *See generally Cherokee Nation*, 475 F. Supp. 3d 1277.  Plaintiffs here were parties to that case. *See id.* at 1279.  For a time, the Comanche Nation and the Otoe-Missouria Tribe were also parties to that case.  *See* ECF No. 104 ¶ 74.[3]  But before the district court decided the merits, the Comanche Nation and the Otoe-Missouria Tribe moved for a stipulation of dismissal with prejudice because they had settled their claims.  *See Cherokee Nation*, No. 5:19-cv-1198-D (Apr. 21, 2020), ECF No. 120; *see also* Fed. R. Civ. P. 41(a)(2).  The district court granted that motion.  *See* ECF No. 104 ¶ 79.  Around the same time, the Comanche Nation and the Otoe-Missouria Tribe announced that they each had negotiated new, non-model tribal gaming compacts with the Governor of Oklahoma to govern their class III gaming.  *See id.* ¶¶ 75–77, 101, 122.  The case proceeded with Plaintiffs and without the Comanche Nation and the Otoe-Missouria Tribe, and the district court later ruled for Plaintiffs that their model compacts automatically renewed.  *See Cherokee Nation*, 475 F. Supp. 3d at 1279, 1281, 1283.

---

[3] The United Keetoowah Band and the Kialegee Tribal Town moved to intervene in it, but the district court denied those motions.  *See Cherokee Nation v. Stitt ex rel. Oklahoma*, No. 5:19-cv-1198-D, 2020 WL 963380, at *3 (W.D. Okla. Feb. 27, 2020).

Meanwhile, shortly after the Comanche Nation's and the Otoe-Missouria Tribe's new compacts were announced, the President Pro Tempore of the Oklahoma Senate and the Speaker of the Oklahoma House sent the Governor a letter expressing their view that the agreements had not been legally entered into under state law.  *See* ECF No. 104 ¶ 80.  Even so, the Comanche Nation and the Otoe-Missouria Tribe submitted these compacts to the Secretary for review under IGRA.  *Id.* ¶ 81.  During the forty-five-day review period, the Governor submitted a memorandum to the Secretary setting out his position on why the new compacts had been validly entered into by Oklahoma.  *Id.* ¶ 82.  Three of the four Plaintiffs also submitted comments during that period setting forth their positions on why those compacts were invalid under IGRA.  *Id.* ¶¶ 83–88.  Also during that period, the Oklahoma Attorney General submitted a letter to the Secretary, along with a memorandum he had prepared at the request of the Oklahoma President Pro Tempore and the Oklahoma Speaker of the House, explaining why the compacts had not been validly entered into by Oklahoma.  *See id.* ¶¶ 89–90 (citing ECF No. 72-7; *In re Treat*, 2020 OK AG 8, 2020 WL 2304499 (Okla. A.G. May 5, 2020)).  Toward the end of that period, the Oklahoma President Pro Tempore and the Oklahoma Speaker of the House filed an original-jurisdiction action in the Oklahoma Supreme Court to challenge the validity of these compacts under state law.  *See id.* ¶ 91.

The Secretary did not affirmatively act on the Comanche Nation and Otoe-Missouria compacts within the forty-five-day review period.  ECF No. 104 ¶ 92.  Thus, the Secretary no-action approved them, and notice of the same was published in the Federal Register soon after that.  *See id.* ¶ 93; *Indian Gaming; Tribal-State Class III Gaming Compacts Taking Effect in the State of Oklahoma*, 85 Fed. Reg. 38,919-01, 38,919 (June 29, 2020).

Less than one month later, the Oklahoma Supreme Court issued a decision in the original-jurisdiction action holding that they were "invalid" under state law.  *Treat v. Stitt*, 473 P.3d 43,

44–45 (Okla. 2020).  That said, the Comanche Nation and Otoe-Missouri Tribe, as "sovereign nations," had "not submitted to the jurisdiction" of the court and were not parties to that case.  *Id.* at 44.  And following it, they "have refused to recognize" it and are continuing to conduct class III gaming at five locations each under their new compacts.  ECF No. 104 ¶¶ 98, 231.m, 231.q.  Also, under its new compact, the Comanche Nation has opened a new class III gaming location.  *Id.* ¶ 231.r.  Through former counsel, these tribes have represented that their new compacts would provide a "competitive advantage over all other tribes" in their "market-area."  *Id.* ¶ 231.o.

Separately, the United Keetoowah Band and the Kialegee Tribal Town had been negotiating with the Governor of Oklahoma for non-model tribal gaming compacts, and they executed those compacts with the Governor in July 2020.  *See* ECF No. 104 ¶¶ 101, 122.  They then submitted their compacts to the Secretary for review.  *Id.* ¶ 101.  During the forty-five-day review period, some Plaintiffs submitted comments to the Secretary explaining why these compacts were invalid under IGRA.  *Id.* ¶ 102.  Also during that period, the Oklahoma President Pro Tempore and the Oklahoma Speaker of the House filed an original-jurisdiction action in the Oklahoma Supreme Court to challenge the validity of these compacts under state law.  *See id.* ¶ 103.

The Secretary did not affirmatively act on the United Keetoowah Band and Kialegee Tribal Town compacts within the forty-five-day review period.  ECF No. 104 ¶ 105.  Thus, the Secretary no-action approved these compacts, and notice of the same was published in the Federal Register soon after that.  *See id.* ¶ 106; *Indian Gaming; Tribal-State Class III Gaming Compacts Taking Effect in the State of Oklahoma*, 85 Fed. Reg. 55,472-01, 55,472 (Sept. 8, 2020).

Later, the Oklahoma Supreme Court issued a decision in the original-jurisdiction action filed about these compacts holding that they were "invalid" under state law.  *Treat v. Stitt*, 481 P.3d 240, 241, 243–44 (Okla. 2021).  Even so, the United Keetoowah Band and Kialegee Tribal

Town, as "sovereign nations," had not "submitted to the jurisdiction" of the court in that case and were not parties to it.  *Id.* at 241.  And following it, these two tribes have also "refuse[d] to recognize" it and "continue[] to exercise authority and jurisdiction" under their new compacts by starting to "plan for the[ir] implementation."  ECF No. 104 ¶¶ 231.j–l.

## III.   Procedural Background

Plaintiffs sued here in August 2020.  ECF No. 1.  Without opposition, they sought leave to file an amended complaint soon after that, which the Court granted.  *See* ECF No. 26; Minute Order of September 14, 2020.  The defendants each responded to that motion, some by answer and some by motion to dismiss.  *See* ECF No. 40; ECF No. 53; ECF No. 54; ECF No. 55; ECF No. 56. After extensive briefing on those and related motions, Plaintiffs again sought leave to file another amended complaint.  *See* ECF No. 96.  Over the defendants' oppositions, the Court granted that motion.  *See* ECF No. 97; ECF No. 99; ECF No. 100; ECF No. 101; ECF No. 102; Minute Order of September 22, 2021.

In their operative complaint, Plaintiffs sue three sets of defendants: (1) the Department of the Interior, along with the Secretary and the Assistant Secretary of the Interior in their official capacities ("Federal Defendants"); (2) the Governor of Oklahoma; and (3) Defendant Tribal Leaders.  *See* ECF No. 104 ¶¶ 12–19.  Plaintiffs allege that the new Comanche Nation, Otoe-Missouria Tribe, United Keetoowah Band, and Kialegee Tribal Town compacts are each illegal and invalid for several reasons.  *See generally* ECF No. 104.  Based on those reasons, they assert eight counts. The first seven are brought under IGRA through the Administrative Procedure Act ("APA") against Federal Defendants.  *See* ECF No. 104 ¶¶ 232–65.  The eighth count is a claim for declaratory relief under IGRA against Defendant Tribal Leaders.  *See id.* ¶¶ 266–68.

More specifically, in count one Plaintiffs allege that the Secretary's "consideration" of each compact violated IGRA under 5 U.S.C. § 706(2) of the APA because the compacts were not legally "entered into" when submitted.  *See* ECF No. 104 ¶¶ 232–35; *see also id.* ¶¶ 110–30.  In count two, Plaintiffs allege that the Secretary's failure to consider whether the compacts were not legally "entered into" or were otherwise contrary to IGRA before no-action approving them violated IGRA under § 706(2).  *See* ECF No. 104 ¶¶ 236–40; *see also id.* ¶¶ 110–30.  In count three, Plaintiffs allege that the Secretary's no-action approval of the compacts violated IGRA under § 706(2) because they were not legally "entered into" and so could not be approved in any way.  *See* ECF No. 104 ¶¶ 241–44; *see also id.* ¶¶ 110–30.  In count four, Plaintiffs allege that the Secretary's no-action approval of the compacts violated IGRA under § 706(2) because they authorize class III gaming that is not legal in Oklahoma.  *See* ECF No. 104 ¶¶ 245–50; *see also id.* ¶¶ 131–53.  In count five, Plaintiffs allege that the Secretary's no-action approval of the compacts violated IGRA under § 706(2) because they contain provisions requiring the tribes to share revenue with Oklahoma in a manner that makes the revenue sharing an impermissible tax rather than a permissible assessment.  *See* ECF No. 104 ¶¶ 251–56; *see also id.* ¶¶ 154–88.  In count six, Plaintiffs allege that the Secretary's no-action approval of the compacts violated IGRA under § 706(2) because they impermissibly regulate class II gaming.  *See* ECF No. 104 ¶¶ 257–61; *see also id.* ¶¶ 189–200.  In count seven, Plaintiffs allege that the Secretary's no-action approval of the compacts violated IGRA under § 706(2) because they contain provisions preemptively providing the Governor's "concurrence" to land acquisition by the Secretary via a two-part determination.  *See* ECF No. 104 ¶¶ 262–65; *see also id.* ¶¶ 201–31, 231.r–u.  In count eight, Plaintiffs request declaratory relief to the effect that Defendant Tribal Leaders' "efforts to implement" their tribes' compacts are contrary to IGRA.  ECF No. 104 ¶¶ 266–68.

The Governor of Oklahoma as well as Chief Joe Bunch and Mekko Brian Givens answered the operative complaint. *See* ECF No. 108; ECF No. 110. Chairman Shotton answered and counterclaimed for a declaration that the Otoe-Missouria Tribe's new compact is valid under IGRA. *See* ECF No. 109. Federal Defendants move to dismiss the first seven counts both for lack of subject matter jurisdiction for want of standing under Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim under Rule 12(b)(6). *See* ECF No. 106; ECF No. 106-1 at 8–9, 15, 35–41. Chairman Woommavovah moves to dismiss all eight counts, insofar as they challenge the Comanche Nation compact, for lack of subject matter jurisdiction for want of standing. *See* ECF No. 107 at 1; ECF No. 107-1 at 8–10.[4] Plaintiffs oppose both motions to dismiss, move to strike parts of Chairman Woommavovah's motion as well as parts of the record on which he relies in that motion, and move to dismiss Chairman Shotton's counterclaim. *See* ECF No. 113; ECF No. 114; ECF No. 115. Plaintiffs also move to compel the production of the administrative record for purposes of resolving Federal Defendants' motion to dismiss counts one through three of the operative complaint for failure to state a claim. *See* ECF No. 128 at 1; ECF No. 128-1 at 5–6.[5]

---

[4] He also requests oral argument. *See* ECF No. 107 at 1. Whether to grant such a request is "within the discretion of the Court." LCvR 7(f). The Court denies this request because a hearing will not assist the Court's resolution of the motion, as the parties' filings sufficiently address the issues presented. *See Ndoromo v. Barr*, 486 F. Supp. 3d 388, 395 (D.D.C. 2020); *Borum v. Brentwood Vill., LLC*, No. 16-cv-1723 (RC), 2020 WL 1508906, at *15 n.25 (D.D.C. Mar. 30, 2020).

[5] With all these motions pending, Plaintiffs moved for partial summary judgment on counts one through three—representing that the "Court does not require the administrative record to decide this motion"—and Chief Joe Bunch and Mekko Brian Givens moved for summary judgment on all claims against them. *See* ECF No. 135; ECF No. 136. The Court stayed these motions. *See* Minute Order of March 17, 2022; Minute Order of March 19, 2022.

## IV.    Legal Standards

### A.    Motion to Dismiss for Lack of Subject Matter Jurisdiction

"When confronted with . . . a motion to dismiss under both Rule 12(b)(1) and Rule 12(b)(6), the Court must first consider whether it has subject-matter jurisdiction." *Hamilton v. United States*, 502 F. Supp. 3d 266, 272 (D.D.C. 2020) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998)); *see also Attias v. Carefirst, Inc.*, 865 F.3d 620, 624 (D.C. Cir. 2017).[6]

"Under Rule 12(b)(1), the plaintiff bears the burden of establishing [subject-matter] jurisdiction by a preponderance of the evidence." *Moran v. U.S. Capitol Police Bd.*, 820 F. Supp. 2d 48, 53 (D.D.C. 2011) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). "Broadly speaking, there are two types of Rule 12(b)(1) motions"—facial challenges and factual challenges. *Kursar v. TSA*, 581 F. Supp. 2d 7, 13–14 (D.D.C. 2008).

A "facial challenge asks whether the complaint alleges facts sufficient to establish the court's jurisdiction." *Tanner-Brown v. Haaland*, No. 21-cv-565 (RC), 2022 WL 2643556, at *4 (D.D.C. July 8, 2022). In a facial challenge, the Court "must accept the factual allegations of the complaint as true" and "draw all reasonable inferences in the plaintiff's favor," though the court "will not assume the truth of legal conclusions" or "accept inferences that are unsupported by the facts set out in the complaint." *Id.* (cleaned up); *see also Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 93 (D.C. Cir. 2002). In considering a facial challenge, "the court may consider the complaint standing alone or the complaint supplemented by undisputed facts evidenced in the record," but in either case it "must treat the undisputed facts within or outside the pleadings as true and draw all reasonable inferences in the plaintiff's favor." *PETA, Inc. v. Perdue*,

---

[6] In this "Legal Standards" section, the Court identifies only those legal standards relevant to its analysis of the motions before it.

464 F. Supp. 3d 300, 307 (D.D.C. 2020) (cleaned up); *see also Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987).  In reviewing such a challenge, the Court must "assess the 'plausibility' of the plaintiff's [jurisdictional] allegations in light of the relevant context and the Court's 'judicial experience and common sense.'"  *Public Citizen, Inc. v. Trump*, 361 F. Supp. 3d 60, 71 (D.D.C. 2019) (quoting *Humane Soc'y of the U.S. v. Vilsack*, 797 F.3d 4, 8 (D.C. Cir. 2015)).

A "factual challenge," as the term suggests, disputes the factual bases on which the plaintiff's jurisdictional allegations rely.  *See Kursar*, 581 F. Supp. 2d at 14.  Ordinarily, in a factual challenge, "the Court may not deny the motion to dismiss merely by assuming the truth of the facts alleged by the plaintiff and disputed by the defendant."  *Hamilton*, 502 F. Supp. 3d at 272 (internal quotation marks omitted).  Instead, the Court "must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary" to rule on the motion.  *Id.* (internal quotation marks omitted).

But in a standing challenge at the pleading stage in this Circuit, "the plaintiff is protected from an evidentiary attack on his asserted theory [of injury] by the defendant."  *Haase*, 835 F.2d at 907.  A defendant wishing to present such an attack can file "a motion for summary judgment for want of standing."  *Id.*  "Alternatively, the court can initiate this factual inquiry at the motion to dismiss stage" on its own, though if it does so it typically must permit jurisdictional discovery and then conduct evidentiary proceedings as needed.  *See id.*  But under *Haase*, a court commits error at the pleading stage if it relies on unsolicited facts provided by a defendant in resolving a motion to dismiss for lack of standing.  *See, e.g.*, *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1107 (D.C. Cir. 2005); *see also Haase*, 835 F.2d at 908 ("In considering standing under 12(b)(1), only the court, not the plaintiff (or defendant), can elicit information outside the pleadings.").

### B.     Motion to Dismiss for Failure to State a Claim

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of a plaintiff's complaint; it does not require a court to assess the truth of what is asserted or determine whether a plaintiff has any evidence to back up what is in the complaint.  *Herron v. Fannie Mae*, 861 F.3d 160, 173 (D.C. Cir. 2017).  In evaluating a Rule 12(b)(6) motion, the Court must construe the complaint in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged.  *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012).  While a court seldom considers matters beyond the pleadings for a motion to dismiss, it may consider the facts alleged in the complaint as well as documents attached as exhibits or incorporated by reference in the complaint, among other things.  *Wang v. Pompeo*, No. 18-cv-1732 (TSC), 2020 WL 1451598, at *3 (D.D.C. Mar. 25, 2020).

### C.     Motion to Strike

"The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  "The decision to grant or deny a motion to strike is vested in the Court's discretion."  *U.S. Telesis, Inc. v. Ende*, 297 F.R.D. 159, 161 (D.D.C. 2013).

## V.     Analysis

### A.     The Court Will Grant in Part and Deny in Part Federal Defendants' Motion to Dismiss Under Rule 12(b)(1), and It Will Deny Chairman Woommavovah's Motion to Dismiss Under Rule 12(b)(1), Because Plaintiffs Have Standing to Challenge the No-Action Approvals of the Comanche Nation's and Otoe-Missouria Tribe's Compacts but Lack Standing to Challenge the No-Action Approvals of the United Keetoowah Band's and Kialegee Tribal Town's Compacts

Both Federal Defendants and Chairman Woommavovah move to dismiss Plaintiffs' claims against them—for Federal Defendants, counts one through seven; and for Chairman

Woommavovah, counts one through eight to the extent they challenge the Comanche Nation's compact—for lack of standing. Federal Defendants facially challenge Plaintiffs' standing. *See* ECF No. 106-1 at 15 n.5, 17–35. Chairman Woommavovah mainly facially challenges Plaintiffs' standing, but he also tries to challenge it factually. *See* ECF No. 107-1 at 17–35. For the reasons explained below, Federal Defendants' facial challenge partly succeeds—Plaintiffs have failed to plausibly allege that they have standing to challenge the no-action approvals of the United Keetoowah Band's and Kialegee Tribal Town's compacts. But that challenge comes up short in part because Plaintiffs have plausibly alleged that they have standing to challenge the no-action approvals of the Comanche Nation's and the Otoe-Missouria Tribe's compacts. And for the same reasons that Federal Defendants' challenge partly does not succeed, Chairman Woommavovah's challenge also does not succeed.

### 1.    Legal Principles

Federal courts are not "ombudsmen of the general welfare." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 487 (1982). Thus, Article III requires a plaintiff to have "standing" to sue in federal court, meaning "a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Warth v. Seldin*, 422 U.S. 490, 498–99 (1975) (internal quotation marks omitted). The "irreducible constitutional minimum of standing" consists of "three elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

First, the plaintiff must have an "injury in fact," meaning the "invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Defs. of Wildlife*, 504 U.S. at 560 (cleaned up). The concreteness prong of this element requires that the injury be "real, and not abstract." *Spokeo, Inc. v. Robins*, 578 U.S. 330,

340 (2016) (internal quotation marks omitted).  A "real" injury can be "tangible," as with monetary harms, or it can be "intangible," as with reputational harms.  *Transunion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021).  But a mere "injury in law"—that is, the violation of some abstract legal right without real-world effect on the plaintiff—is not a "real" injury under standing's concreteness requirement.  *See id.* at 2205.  The "actual or imminent" prong, as those words suggest, requires that the injury be either already inflicted or at least likely to occur.  If a plaintiff seeks to establish standing at the pleading stage based on an "imminent" injury, she must plausibly allege either that the "threatened injury is certainly impending" or at least that "there is a substantial risk that the harm will occur."  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (internal quotation marks omitted).  A "substantial risk" of future harm is more than a "*possible* future injury" or even an "objectively reasonable likelihood" of future injury.  *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409–10, 414 n.5 (2013).

Second, the plaintiff must show a "causal connection between the injury and the conduct complained of," meaning that the injury is "fairly traceable to the challenged action of the defendant, and not . . . the result of the independent action of some third party not before the court."  *Defs. of Wildlife*, 504 U.S. at 560 (cleaned up).  Generally, this is a "but for" test—if some part of the alleged injury would not have occurred, or will not occur, but for the challenged action, then the injury is fairly traceable to the challenged action.  *See Am. Fed'n of Gov't Emps., AFL-CIO v. United States*, 104 F. Supp. 2d 58, 63 (D.D.C. 2000).  This test is met even if the challenged action is not "the most immediate cause, or even a proximate cause," of the injury.  *Attias*, 865 F.3d at 629; *see also Orangeburg v. FERC*, 862 F.3d 1071, 1080 (D.C. Cir. 2017).  But if the injury would occur regardless of the challenged action—say, because some separate action would independently

cause it in full—then the fair-traceability test is not met.  *See Delta Constr. Co. v. EPA*, 783 F.3d 1291, 1297 (D.C. Cir. 2015).

Third, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Defs. of Wildlife*, 504 U.S. at 561 (cleaned up).  This analysis is "virtually always the reciprocal" of the second, fair-traceability element.  *Vietnam Veterans of Am. v. Shinseki*, 599 F.3d 654, 658 (D.C. Cir. 2010).  Thus, if the defendant's challenged actions are a but for cause of the plaintiff's alleged injury, then that injury generally is likely redressable for standing purposes.  Typically, redressability is absent only when the Court's decision would have "no real effect" on the plaintiff's injury.  *See Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.*, 909 F.3d 446, 465 (D.C. Cir. 2018) (internal quotation marks omitted).  For instance, as with causation, redressability is absent when the independent action of some third party would still cause the entire injury.  *See LTMC/Dragonfly, Inc. v. Metro. Washington Airports Auth.*, 699 F. Supp. 2d 281, 292 (D.D.C. 2010); *see also Delta Constr. Co.*, 783 F.3d at 1297.  But the likelihood of even partial redress is enough to support standing.  *See, e.g.*, *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801 (2021).

A plaintiff's burden to establish these elements varies with the procedural posture of the case.  *See Defs. of Wildlife*, 504 U.S. at 561.  Generally, at the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice" because at the pleading stage the Court presumes "that general allegations embrace those specific facts that are necessary to support the claim."  *Id.* at 561 (internal quotation marks omitted).  And in assessing standing, the Court must assume that the plaintiff "would prevail on the merits of their claim" and avoid "conflating standing with the merits."  *Est. of Boyland v. U.S. Dep't of Agric.*, 913 F.3d 117, 123 (D.C. Cir. 2019) (cleaned up).  Thus, the Court assumes the validity of the plaintiff's interpretation

of statutes or regulations governing the claim.  *See Union of Concerned Scientists v. U.S. Dep't of Energy*, 998 F.3d 926, 930 (D.C. Cir. 2021); *Pub. Citizen, Inc. v. Nat'l Hwy. Traffic Safety Admin.*, 489 F.3d 1279, 1296 (D.C. Cir. 2007).

Also, standing "is not dispensed in gross."  *Town of Chester v. Laroe Ests., Inc.*, 137 S. Ct. 1645, 1650 (2017) (internal quotation marks omitted).  Thus, at least "one plaintiff must have standing to seek each form of relief requested in the complaint."  *Id.* at 1651.  In other words, standing "must be demonstrated for each claim against each defendant."  *Whitlock v. U.S. Dep't of Homeland Sec.*, No. 21-cv-807 (DLF), 2022 WL 424983, at *4 (D.D.C. Feb. 11, 2022).

When "a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*," standing "is not precluded, but it is ordinarily substantially more difficult to establish."  *Defs. of Wildlife*, 504 U.S. at 562 (internal quotation marks omitted).  That said, a plaintiff can establish standing in that case at the pleading stage by plausibly alleging that the third party's "choices" to the allegedly unlawful regulation or non-regulation injuring the plaintiff "have been made or will be made in such manner as to produce causation and to permit redressability of injury."  *Id.*; *see also Renal Phys. Ass'n v. U.S. Dep't of Health & Hum. Servs.*, 489 F.3d 1267, 1275 (D.C. Cir. 2007).  A plaintiff also can establish standing in that case by plausibly alleging at the pleading stage that the unlawful regulation or non-regulation of the third party causes the plaintiff to have to "compete with allegedly illegal commercial transactions."  *See Assoc. Gas Distribs. v. FERC*, 899 F.2d 1250, 1258 (D.C. Cir. 1990); *see also Air Line Pilots Ass'n, Int'l v. Chao*, 889 F.3d 785, 788 (D.C. Cir. 2018); *Nat'l Coal Ass'n v. Hodel*, 825 F.2d 523, 526 (D.C. Cir. 1987) (per curiam); *Glass Packaging Inst v. Regan*, 737 F.2d 1083, 1087–88 (D.C. Cir. 1984); *cf. Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'").

Finally, at the pleading stage a plaintiff's standing to pursue a claim typically turns on "the theory of injury presented in the complaint and the facts alleged in support of the claim." *Haase*, 835 F.2d at 907. Further, "the ordinary rules of forfeiture apply to standing." *Twin Rivers Paper Co. v. SEC*, 934 F.3d 607, 615 (D.C. Cir. 2019) (internal quotation marks omitted); *see also Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, 422 F.3d 490, 502 n.4 (7th Cir. 2005) ("Although a jurisdictional *defect* cannot be forfeited, jurisdiction itself may be."). Under those rules, a complaint "may not be amended by the briefs in opposition to a motion to dismiss," and "the Court need not consider the merits" of a legal theory that should have been presented in the complaint but is presented for the first time in such filings. *See Richardson v. Cap. One, N.A.*, 839 F. Supp. 2d 197, 202–03 (D.D.C. 2012) (cleaned up); *cf. Twin Rivers Paper Co.*, 934 F.3d at 615 (refusing to consider "an entirely new theory of standing" that was not raised in the party's initial petition for review).

### 2.    Analysis

Under the above legal principles, Plaintiffs must have plausibly alleged that at least one of them has standing to pursue each claim they have asserted in their operative complaint. They assert eight counts—the first seven against the Secretary and the eighth against Defendant Tribal Leaders. Complicating matters here is that each count contains within it four discrete claims for relief—one for each of the four no-action approvals in dispute. That said, explained below, these thirty-two distinct claims fall into two broad categories for standing purposes. In the first category are the sixteen claims included in counts one, two, three, and eight—four in each—that dispute the validity of the entire compacts because they were not legally "entered into" as IGRA requires.[7] In

---

[7] Count eight could just as easily be grouped with the second category because all Plaintiffs allege in it is that they are entitled to a declaratory judgment that the compacts are not valid and not in effect under IGRA "[f]or the reasons described above"—that is, for the reasons alleged in counts

the second category are the sixteen claims included in counts four, five, six, and seven—four in each—that dispute the legality of certain provisions in the compacts. So categorized, the analysis proceeds in two steps: (a) whether any Plaintiff has standing to challenge each of the four no-action approvals because the compacts were not legally "entered into" (counts one, two, three, and eight); and (b) whether any Plaintiff has standing to challenge each of the four no-action approvals because the compacts contain illegal provisions (counts four, five, six, and seven).

> **a.    At Least One Plaintiff Has Standing to Challenge the Comanche Nation and Otoe-Missouria Tribe Compacts in Counts One, Two, Three, and Eight, but No Plaintiff Has Standing to Challenge the United Keetoowah Band and Kialegee Tribal Town Compacts in These Counts**

To repeat, in counts one, two, three, and eight, Plaintiffs allege that the compacts are entirely illegal and invalid because they were not legally "entered into" as required by IGRA. To pursue these claims, Plaintiffs must plausibly allege that at least one of them suffered an injury in fact that is fairly traceable to the challenged action—the Secretary's no-action approval, in counts one through three; and Defendant Tribal Leaders' actions under the allegedly invalid compacts, in count eight—and that is likely redressable, assuming Plaintiffs prevail on each of these counts.

Comanche Nation Compact. Plaintiffs have plausibly alleged that at least one Plaintiff has standing to bring these "entered into" challenges against the Comanche Nation compact. As for injury in fact, Plaintiffs allege that the Comanche Nation is currently conducting class III gaming under its new compact in five locations in Oklahoma, creating illegal competition in the "gaming market in which the Plaintiff Nations compete." *See* ECF No. 104 ¶¶ 5, 67, 109, 128–29, 152, 231.q, 231.y. This illegal-competition injury is a cognizable injury-in-fact for standing purposes.

---

one through seven. *See* ECF No. 104 ¶ 268. For simplicity, the Court groups count eight with the "entered into" challenges in counts one through three.

*See, e.g.*, *Assoc. Gas Distribs.*, 899 F.2d at 1258.  As for causation and redressability, Plaintiffs allege that the Comanche Nation asserts that its new compact is valid because it was no-action approved by the Secretary, is continuing to conduct class III gaming under its auspices, and "believe[s that] only a federal court would have the authority to void" its compact.  *See* ECF No. 104 ¶¶ 98, 231.m, 231.q.  Thus, both the Secretary's failure to disapprove this compact and the Comanche Nation's conduct following that failure are but-for causes—the former begetting the latter— of Plaintiffs illegal-competition injuries.  And given that, those injuries are likely redressable by a favorable decision on counts one, two, three, and eight, declaring the Comanche Nation compact invalid because it was not legally "entered into" under IGRA and requiring it to be set aside and disapproved.

In moving to dismiss these counts asserted against the Comanche Nation compact, Chairman Woommavovah disputes factually that any Plaintiff actually competes for class III gaming with the Comanche Nation so as to suffer an illegal-competition injury flowing from the tribe's gaming operations under its current compact.  *See* ECF No. 107-1 at 9–15, 18, 31.  But at this stage Plaintiffs "are protected from an evidentiary attack on [their] asserted theory [of injury]" that is "presented in the complaint and the facts alleged in support of the claim."  *See Haase*, 835 F.2d at 907.[8]  At this point, Plaintiffs need only provide "general factual allegations" about their current

---

[8] Chairman Woommavovah disputes this point, arguing that it contradicts circuit law.  *See* ECF No. 121 at 8–9.  True, in *Coalition for Underground Expansion v. Mineta*, a panel of the D.C. Circuit, without discussing *Haase*, suggested that a defendant could mount a factual attack on plaintiff's theory of standing at the motion-to-dismiss stage.  *See* 333 F.3d 193, 198 (D.C. Cir. 2003).  But for several reasons, the Court follows *Haase* rather *Mineta* on this point.  First, although *Mineta* was framed in terms of standing, the issue there was that there was no "final federal agency action" on which a claim could be brought under the APA.  *Id.* at 196 & n.5, 198.  With no explanation, the *Mineta* court collapsed "final agency action" and standing into one.  But these are distinct doctrines, with the latter being jurisdictional and the former being merits related.  *See Racing Enthusiasts & Supplies Coal. v. EPA*, 45 F.4th 353, 358 & n.2, 359 n.3 (D.C. Cir. 2022); *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 76–83 (D.C. Cir. 2020).  *Compare Grocery Mfrs.*

illegal-competition injury to carry their burden to establish standing, as the Court must assume from such allegations those "specific facts that are necessary to support the claim." *Defs. of Wildlife*, 504 U.S. at 561 (internal quotation marks omitted).  As discussed above, they have done so.

Of course, if these general factual allegations were not plausible, they would not establish standing at this stage.  *See Jibril v. Mayorkas*, 20 F.4th 804, 814 (D.C. Cir. 2021).  But here they are.  For one, the factual allegations are "firmly rooted in the basic laws of economics" that at least one Plaintiff would get at least a little more class III gaming business at its Oklahoma casinos if the Comanche Nation's Oklahoma casinos did not conduct class III gaming.  *See United Transp. Union v. ICC*, 891 F.2d 908, 912 n.7 (D.C. Cir. 1989); *W. Flagler Assocs. v. Haaland*, 573 F. Supp. 3d 260, 267–68 (D.D.C. 2021); *see also Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 488 n.4 (1998).  If that were not enough, Plaintiffs allege that both they and the Comanche Nation compete in the Dallas-area market.  *See* ECF No. 104 ¶¶ 231.o, 231.v, 231.y, 231.z.

Chairman Woommavovah also argues that Plaintiffs' illegal-competition injury is not even a "legally protected interest" the invasion of which can qualify as an injury-in-fact.  *See* ECF No. 107-1 at 33–35; *see also Defs. of Wildlife*, 504 U.S. at 560; *Judicial Watch, Inc. v. U.S. Senate*,

---

*Ass'n v. EPA*, 693 F.3d 169, 174 (D.C. Cir. 2012), *with Nat'l Ass'n of Home Builders v. EPA*, 786 F.3d 34, 40 n.6 (D.C. Cir. 2015), *and Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003).  Second, even if *Mineta* conflicted with *Haase* on this point, this Court must follow *Haase* as the earlier-in-time precedent.  *See, e.g.*, *Sierra Club v. Jackson*, 648 F.3d 848, 854 (D.C. Cir. 2011).  Chairman Woommavovah also argues that *Haase* should not be read as the Court reads it.  *See* ECF No. 121 at 9.  But the Court sees no way around *Haase*'s clear admonition that, if a defendant wants to mount a factual attack to standing, it cannot do so at the pleading stage but must move for summary judgment on this basis, thereby opening the door to jurisdictional discovery.  *See* 835 F.2d at 908.

432 F.3d 359, 364–65 (D.C. Cir. 2005) (Williams, J., concurring).   But binding precedent says

otherwise.   *See, e.g.*, *Assoc. Gas Distribs.*, 899 F.2d at 1258.

Relatedly, Chairman Woommavovah suggests that Plaintiffs are not within IGRA's zone

of interests given that they seek to "insulat[e] themselves from competition."   ECF No. 107-1 at

10, 33–35; *see also DePuy, Inc. v. Zimmer Holdings, Inc.*, 384 F. Supp. 2d 1237, 1240 (N.D. Ill.

2005) (Posner, J., sitting by designation) (explaining that *Lujan*'s "legally protected interest" lan-

guage has often been treated as a prudential-standing, "zone of interests" requirement rather than

an Article III requirement).   Not so.

The "zone of interests" test—long viewed as a "jurisdictional concept on par with Article

III standing" but now considered "a merits issue," *Crossroads Grassroots Pol'y Strategies v. FEC*,

788 F.3d 312, 319 (D.C. Cir. 2015) (cleaned up)—asks "whether . . . a legislatively conferred

cause of action encompasses a particular plaintiff's claim."   *Lexmark Int'l, Inc. v. Static Control

Components, Inc.*, 572 U.S. 118, 127 (2014).   This test "is not meant to be especially demanding,"

and the benefit of the doubt goes to the plaintiff.   *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399–

400 (1987).   Further, there need be no "indication of congressional purposes to benefit the would-

be plaintiff."   *Id.*   Instead, this "test forecloses suit only when a plaintiff's interests are so margin-

ally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be

assumed that Congress intended to permit the suit."   *Match-E-Be-Nash-She-Wish Band of Pota-

watomi Indians v. Patchak*, 567 U.S. 209, 225 (2012) (internal quotation marks omitted).

IGRA's purposes include, among other things, to provide for federal regulation of "Indian

tribe" gaming to protect it from pernicious influences and to prevent it from causing harmful ef-

fects.   *See* 25 U.S.C. § 2702(2)–(3).   Given these purposes, a party allegedly affected by the im-

proper federal regulation of "Indian tribe" gaming comes within its zone of interests.   *See, e.g.*,

*Amador Cnty.*, 640 F.3d at 378–79.  Such parties include market competitors, even one whose "objectives" in bringing suit "are not eleemosynary in nature."  *See First Nat'l Bank & Trust Co.*, 522 U.S. at 488–99, 499 n.8.

Moving on from Plaintiffs' injury in fact, Chairman Woommavovah also argues that Plaintiffs' illegal-competition injury is not likely redressable by a favorable decision, thus defeating standing.  *See* ECF No. 107-1 at 31–33.  Here, he advances two arguments, but neither are availing.  For one, he argues that the Comanche Nation's compact is severable and that severing any allegedly invalid provisions from the compact would leave undisturbed the tribe's ongoing class III gaming.  But for counts one, two, three, and eight, this is beside the point.  Plaintiffs allege that the compacts are wholly invalid for not being legally "entered into" as required by IGRA.  Thus, the possibility of severance is of no moment.

He also argues that, even assuming the compact is entirely void, the Comanche Nation's old compact would be revived because a term in the new compact specified that it superseded the old compact.  Thus, this argument goes, if the new compact is wholly invalid, then the old compact will no longer be considered superseded and would still be in effect.  And under its old compact, the Comanche Nation could continue class III gaming operations, meaning that Plaintiffs' injuries would remain unredressed even if they succeeded in this lawsuit.  But Plaintiffs have plausibly alleged that, purportedly under its new compact, the Comanche Nation has expanded its class III gaming to a new location.  *See* ECF No. 104 ¶ 231.r.  Thus, even assuming the Comanche Nation's old compact would spring back into life if the new compact were held invalid, at least some redress is plausibly and likely available here.  *See Uzuegbunam*, 141 S. Ct. at 801.

In sum, Plaintiffs have plausibly alleged that they suffer an illegal-competition injury fairly traceable to the Secretary's failure to disapprove the Comanche Nation's compact and from the

Comanche Nation's ongoing class III gaming under the compact and that is likely redressable by a favorable decision holding the compacts invalid for not being validly "entered into" under IGRA. Thus, they have established standing to pursue counts one, three, five, and eight with respect to the no-action approval of the Comanche Nation's compact.[9]

Otoe-Missouria Tribe Compact.  Similarly, Plaintiffs have plausibly alleged that at least one of them has standing to bring these "entered into" challenges against the Otoe-Missouria Tribe compact.  As for injury in fact, Plaintiffs allege that the Otoe-Missouria Tribe is currently conducting class III gaming under its new compact in five locations in Oklahoma, creating illegal competition in the "gaming market in which the Plaintiff Nations compete."  *See* ECF No. 104 ¶¶ 5, 67, 109, 128–29, 152, 231.q, 231.y.  This illegal-competition injury is a cognizable injury-in-fact for standing purposes.  *See, e.g.*, *Assoc. Gas. Distribs.*, 899 F.2d at 1258.  As for causation and re-dressability, Plaintiffs allege that the Otoe-Missouria Tribe asserts that its new compact is valid because it was no-action approved by the Secretary, is continuing to conduct class III gaming under its auspices, and "believe[s that] only a federal court would have the authority to void" its compact. *See* ECF No. 104 ¶¶ 98, 231.m, 231.q.  Thus, both the Secretary's failure to disapprove this compact and the Otoe-Missouria Tribe's conduct following that failure are but-for causes of Plaintiffs' illegal-competition injuries.  And given that, those injuries are likely redressable by a favorable decision on counts one, two, three, and eight, declaring the Otoe-Missouria Tribe compact invalid

---

[9] In their motion to dismiss, Federal Defendants basically ignored this alleged illegal-competition injury.  *See generally* ECF No. 106-1.  They addressed it in their reply, but their arguments were essentially duplicative of Chairman Woommavovah's.  *See* ECF No. 124 at 9–15.

because it was not legally "entered into" under IGRA and requiring it to be set aside and disapproved.[10]

        <u>United Keetoowah Band Compact</u>.  In contrast, Plaintiffs have not plausibly alleged that at least one of them has standing to bring these "entered into" challenges against the United Keetoowah Band's compact because they have failed to plausibly allege a sufficient injury in fact.

        To begin, unlike with respect to the Comanche Nation and the Otoe-Missouria Tribe, Plaintiffs do not allege that the United Keetoowah Band is currently engaged in class III gaming.  *See also* ECF No. 114 at 26–27, 29, 32 (acknowledging this tacitly).  Thus, they cannot rely on an "actual" illegal-competition injury to support standing.

        Instead, Plaintiffs' allegations suggest at most that they face an "imminent" injury from the no-action approval of this compact and Chief Joe Bunch's actions taken under it because they face a "substantial risk" of future illegal-competitive injury from class III gaming conducted by the United Keetoowah Band under this compact.  *See, e.g.*, ECF No. 104 ¶¶ 105, 129, 172, 204, 231.f–g, 231.w, 231.z; ECF No. 114 at 46–49; *see also Susan B. Anthony List*, 573 U.S. at 158.  As support, they point to their allegations that the United Keetoowah Band has "start[ed] to plan for the implementation" of that compact; that the tribe stated in September 2020 that it was "work[ing] with its developers to select a casino site" in a county just north of Oklahoma City; and that in October 2020 the tribe said that it has "one more major step to place . . . land into trust with the federal government" to conduct class III gaming pursuant to its new compact, implying that it had

---

[10] Although Federal Defendants move to dismiss these claims for lack of standing, they do not address Plaintiffs' alleged illegal-competition injuries until their reply, and the Court addressed those arguments in discussing Plaintiffs' standing to challenge the Comanche Nation compact.

selected a site in the interim.  *See* ECF No. 104 ¶¶ 231.k–l; ECF No. 114 at 46–47.  This is not enough to establish a "substantial risk" for standing purposes.

The Article III "requirement of imminence . . . necessarily compels a very strict understanding of what . . . count[s] as 'substantial'" in this context.  *Public Citizen*, 489 F.3d at 1296.  Thus, this "theory of standing is not easily satisfied."  *Public Citizen, Inc. v. Trump*, 435 F. Supp. 3d 144, 149 (D.D.C. 2019); *see also United Transp. Union*, 891 F.2d at 913.  As the Court noted above, a "substantial risk" is more than a "*possible*" one, and even an "objectively reasonable likelihood" of the injury occurring is not enough.  *See Clapper*, 568 U.S. at 409–10, 414 n.5.  Further, particularly relevant here, where "future competition remains indeterminable and amorphous pending future clarifying events that postdate the filing of the complaint," the imminence requirement is unmet.  *See Delta Air Lines, Inc. v. Export-Import Bank of United States*, 85 F. Supp. 3d 250, 267 (D.D.C. 2015).

According to Plaintiffs' own allegations, the United Keetoowah Band faces at least "one more major step" before it can engage in class III gaming.  And this "major step" is a complicated one, the results of which are uncertain—getting the Secretary to take land into trust for the tribe.  *See, e.g.*, *Yocha Dehe v. U.S. Dep't of the Interior*, 3 F.4th 427, 431 (D.C. Cir. 2021).  Thus, Plaintiffs have not plausibly alleged a substantial risk of a future illegal-competition injury here.  *See Delta Air Lines*, 85 F. Supp. 3d at 267.

In their opposition to the motions to dismiss, Plaintiffs also assert that they have an "actual" injury in fact here because of the breach of "substantial exclusivity" gaming rights, with accompanying monetary loss, that they have under their own compacts.  *See* ECF No. 114 at 14, 33–38.  But this "theory of injury" was not presented in Plaintiffs' operative complaint—its third in this

28

case—and it is not supported by the "facts alleged" in it. *See Haase*, 835 F.2d at 907.[11] Thus, the Court will not now consider this "entirely new theory of standing." *See Twin Rivers Paper Co.*, 934 F.3d at 615; *see also Lac Du Flambeau Band of Lake Superior Chippewa Indians*, 422 F.3d at 502 n.4.[12]

Kialegee Tribal Town Compact. Finally, with respect to counts one, two, three, and eight, Plaintiffs have also not plausibly alleged that at least one of them has standing to bring these "entered into" challenges against the Kialegee Tribal Town's compact because they have failed to plausibly allege a sufficient injury in fact for standing purposes.

As with the United Keetoowah Band's compact, Plaintiffs do not allege that the Kialegee Tribal Town is currently engaged in class III gaming. *See also* ECF No. 114 at 26–27, 29, 32 (acknowledging this tacitly). Thus, they cannot rely on an "actual" illegal-competition injury to support standing.

---

[11] For example, this theory of injury turns on "Part 11.A" and "Part 11.E" of Plaintiffs' compacts. ECF No. 114 at 35–36. But the only reference in the complaint to any such provision is "Part 11.A.2" of the Comanche Nation's, Otoe-Missouria Tribe's, and Kialegee Tribal Town's former compacts, and this passing reference does not discuss substantial exclusivity rights. *See* ECF No. 104 ¶ 154. Further, every time "substantial exclusivity" appears in the operative complaint, it refers to provisions in one of the disputed compacts, not Plaintiffs' compacts. *See* ECF No. 104 ¶¶ 85, 154, 156, 158–60, 163, 172–73, 176–81, 183, 229. And every time some form of "breach" is mentioned, it refers to IGRA, violations of IGRA, or violations of the disputed compacts, not violations of Plaintiff's purported substantial-exclusivity rights. *See id.* ¶¶ 35, 155, 158.

[12] Similarly, in their opposition filing, Plaintiffs assert another theory of standing premised on the idea that all four new compacts, including the United Keetoowah Band's, allegedly deprive them of a "zone of exclusivity" they have under their own compacts. ECF No. 114 at 44. But the operative complaint references a "zone of exclusivity" only once, and that is a passing reference to the Comanche Nation's former compact. ECF No. 104 ¶ 62. Granted, the operative complaint also alleges that a portion of the area of Oklahoma in which the United Keetoowah Band might be able to obtain land under its compact for class III gaming through the trust-acquisition process is "within the territory of the Iowa Tribe of Oklahoma." ECF No. 104 ¶ 217. But the Iowa Tribe is not a plaintiff, and the Court cannot discern from this factual allegation how one of Plaintiffs' "zone of exclusivity" rights are violated in a concrete way by this.

Instead, Plaintiffs' allegations suggest at most that they face an "imminent" injury from the no-action approval of this compact and Mekko Brian Givens's actions taken under it because they face a "substantial risk" of future illegal-competitive injury from class III gaming conducted by the Kialegee Tribal Town under this compact.  *See, e.g.*, ECF No. 104 ¶¶ 105, 129, 173, 204, 224, 228, 230, 231.f–g, 231.w, 231.z; ECF No. 114 at 46–49; *see also Susan B. Anthony List*, 573 U.S. at 158.  As to this "substantial risk," Plaintiffs allege that Mekko Givens has represented that the Kialegee Tribal Town had "start[ed] to plan for the implementation" of its compact and that Mekko Givens "continues to exercise authority and jurisdiction" under it.  ECF No. 104 ¶¶ 231.j–k; *see also id.* ¶¶ 105, 126, 130, 267.  These vague allegations do not quite make plausible a "substantial risk" of future illegal-competitive injury.  *See Public Citizen*, 489 F.3d at 1296; *Delta Air Lines*, 85 F. Supp. 3d at 267.

Plaintiffs' allegations also suggest that at least one of them has suffered or will imminently suffer a concrete violation of their "zone of exclusivity" compact rights.  On this score, Plaintiffs allege that a portion of Oklahoma in which the Kialegee Tribal Town might be able to obtain land under its compact for class III gaming through the trust-acquisition process is in the Citizen Potawatomi Nation's territory.  *See* ECF No. 104 ¶ 4; *see also id.* ¶¶ 102, 168, 220, 225; ECF No. 114 at 42–44.  And they allege that this possibility "threatens" the Citizen Potawatomi Nation's "jurisdictional integrity and sovereignty."  *See* ECF No. 104 ¶ 4.

Granted, an "actual infringement[]" of a tribe's "sovereignty" can constitute a "concrete injury sufficient to confer standing."  *See Mashantucket Pequot Tribe v. Town of Ledyard*, 722 F.3d 457, 463 (2d Cir. 2013); *cf. Okla. Dep't of Envtl. Quality v. EPA*, 740 F.3d 185, 189–90 (D.C. Cir. 2014) (holding that Oklahoma had standing to challenge an EPA regulation that divested it of "regulatory authority over areas otherwise within its [regulatory] purview" (cleaned up)).  But an

"abstract injury" to such sovereignty "is not sufficient to confer standing." *See West Virginia v. U.S. Dep't of Health & Human Servs.*, 145 F. Supp. 3d 94, 102 (D.D.C. 2015) (citing *Massachusetts v. Mellon*, 262 U.S. 447, 484–85 (1923)); *cf. Mashantucket Pequot Tribe*, 722 F.3d at 463 (observing that standing is not established "by mere assertions of trespass to tribal sovereignty").

The Citizen Potawatomi Nation's alleged injury here falls on the abstract side of the line. The provision at issue—one that preemptively provides the Governor's "concurrence" to land acquisition by the Secretary via a two-part determination—does not require the Citizen Potawatomi Nation "to do or to yield anything." *See Mellon*, 262 U.S. at 482.  It simply clears one hurdle in the complicated land-acquisition process that the Kialegee Tribal Town would have to pursue successfully to obtain land for class III gaming within the Citizen Potawatomi Nation's territory. *See, e.g.*, *Yocha Dehe*, 3 F.4th at 431.  And regardless of the outcome of other aspects of that process, the Citizen Potawatomi Nation has a trump card—it can refuse to "consent[] in writing to the acquisition" of land within its territory and thus prevent the Kialegee Tribal Town from obtaining it.  *See* 25 C.F.R. § 151.8; *see also* ECF No. 104 ¶¶ 30, 202.  And of course, given the thrust of Plaintiffs' lawsuit, it is unlikely that such consent would be given.[13]  Thus, any injury here to the Citizen Potawatomi Nation's sovereignty is too abstract to support standing.[14]

> **b. At Least One Plaintiff Has Standing to Challenge the Comanche Nation and Otoe-Missouria Tribe Compacts in Counts Four, Five, Six, and Seven, but No Plaintiff Has Standing to Challenge the**

---

[13] If Citizen Potawatomi Nation were to give this consent, then its sovereignty-related injury would be "self-inflicted" and thus not fairly traceable to any other action.  *See Petro-Chem Processing, Inc. v. EPA*, 866 F.2d 433, 438, 438 n.5 (D.C. Cir. 1989).

[14] To the extent that Plaintiffs also assert their "substantial exclusivity" theory of injury to support standing here, the Court again declines to consider it.  *See Twin Rivers Paper Co.*, 934 F.3d at 615; *Lac Du Flambeau Band of Lake Superior Chippewa Indians*, 422 F.3d at 502 n.4.

### United Keetoowah Band and Kialegee Tribal Town Compacts in These Counts

In counts four, five, six, and seven, Plaintiffs allege that the compacts each contain certain illegal provisions that required the Secretary to disapprove them. For these counts as well, Plaintiffs must have plausibly alleged that at least one of them has standing to challenge the no-action approval of each compact with respect to each count. As discussed below, once again they have for the Comanche Nation and Otoe-Missouria compacts, but they have not for the United Keetoowah Band and the Kialegee Tribal Town compacts.

Comanche Nation Compact. Plaintiffs once again allege an illegal-competition injury because the alleged illegalities identified in counts four, five, six, and seven required the Secretary to disapprove the entire compact, thus rendering current class III gaming competition posed by the Comanche Nation illegal. *See* ECF No. 104 ¶¶ 4, 132, 135, 141–42, 151–52, 184, 187; *see also* ECF No. 114 at 23–24; ECF No. 119 at 3 & n.3. As the Court found above, Plaintiffs have plausibly alleged standing based on this illegal-competition injury. The only distinction between the discussion above and the analysis here is that, for these counts, Plaintiffs' redressability hinges on the premise that the partial illegality of a compact requires its entire disapproval or invalidation.

Plaintiffs assert that this premise is correct given how *Amador County* interpreted § 2710(d)(8) of IGRA. *See* 640 F.3d at 380–81. And—as explained below—at the Rule 12(b)(1) stage, the Court must assume as much. The "Article III requirement of remediable injury in fact . . . (except with regard to entirely frivolous claims) has nothing to do with the text of the statute relied upon" for the claim. *Steel Co. v. Citizens for a Better Envmt.*, 523 U.S. 83, 97 n.2 (1998).[15]

---

[15] Plaintiffs' position here is plainly not frivolous. *See, e.g.*, *W. Flagler Assocs.*, 573 F. Supp. 3d at 276 n.8 (concluding that, under *Amador County*, the court must set aside an illegal IGRA compact in full rather than going "line-by-line" and sifting the legal from the illegal).

That is, the scope of "the remedial *powers* of the court" granted by a statute under which a plaintiff brings a claim generally does not present a "jurisdictional" issue but rather a merits-related issue. *See id.* at 89–93. This is true for IGRA as it is for other federal statutes. *See, e.g.*, *Lac Du Flambeau Band of Lake Superior Chippewa Indians*, 422 F.3d at 501–02. Thus, whether IGRA requires the Secretary to treat compacts as inseverable and invalidate them entirely, even if only illegal in part, is a merits question, not a standing question. And at the Rule 12(b)(1) stage here, the Court must assume "the merits" of Plaintiffs' claims. *See Estate of Boyland*, 913 F.3d at 123. For this reason, Plaintiffs have shown that their illegal-competition injuries flowing from the Comanche Nation compact on which counts four, five, six, and seven are based are likely redressable by a favorable decision on these counts.

Otoe-Missouria Tribe Compact. At this point, the Court need not say much more about Plaintiffs' standing to pursue counts four, five, six, and seven against the Otoe-Missouria Tribe's compact. Again, Plaintiffs have plausibly alleged standing based on illegal-competition injuries flowing from the no-action approval of the Otoe-Missouria Tribe's compact. And for the reasons just discussed, they have likely redressability for those injuries under counts four, five, six, and seven.

United Keetoowah Band Compact. The Court found above that Plaintiffs had failed to plausibly allege standing to challenge the United Keetoowah Band's compact under counts one, two, three, and eight. Those counts assert that the compact is wholly and inherently invalid. So too, counts four, five, six, and seven assert that the compact is wholly invalid—the only difference is the way those counts get there. For standing purposes, that difference is immaterial. Thus, the Court's prior conclusion applies here as well.

Kialegee Tribal Town Compact.  Finally, the Court found above that Plaintiffs had failed to plausibly alleged standing to challenge the Kialegee Tribal Town's compact under counts one, two, three, and eight.  For the reasons just discussed regarding the United Keetoowah Band's compact, that conclusion applies with equal force here.

### 3.    Summary

Plaintiffs have plausibly alleged standing to bring counts one through eight of their operative complaint insofar as those counts challenge the Comanche Nation's compact and the Otoe-Missouria Tribe's compact.  But they have not plausibly alleged standing to bring counts one through eight of their operative complaint insofar as those counts challenge the United Keetoowah Band's compact or the Kialegee Tribal Town's compact.  For these reasons, the Court will grant in part and deny in part Federal Defendants' motion to dismiss under Rule 12(b)(1) for lack of standing, and the Court will deny Chairman Woommavovah's motion to dismiss under Rule 12(b)(1) for lack of standing.

### B.    The Court Will Deny Federal Defendants' Motion to Dismiss Under Rule 12(b)(6) Because Plaintiffs Have Adequately Stated Claims Under Counts One Through Seven with Respect to the Comanche Nation Compact and the Otoe-Missouria Tribe Compact

Because Plaintiffs have plausibly alleged standing for counts one through eight insofar as those counts assert claims challenging the Comanche Nation's compact and the Otoe-Missouria Tribe's compact, the Court has subject-matter jurisdiction over them at this stage.  Thus, the Court may consider Federal Defendants' Rule 12(b)(6) challenge to counts one through seven insofar as Plaintiffs assert those claims against Federal Defendants relating to the Comanche Nation's and Otoe-Missouria Tribe's compacts.  *See Attias*, 865 F.3d at 624.  That said, Federal Defendants' Rule 12(b)(6) challenge is a limited one, and their arguments fail.  Thus, the Court will deny Federal Defendants' motion to dismiss these claims under Rule 12(b)(6).

### 1.   Count One

In count one, Plaintiffs assert that the Secretary's "consideration" of the Comanche Nation's and Otoe-Missouria Tribe's compacts was arbitrary, capricious, and contrary to IGRA, and without observance of procedure required by IGRA, "because the agreements had not been legally entered into by both parties when considered by the Secretary."  ECF No. 104 ¶¶ 232–35 (citing 5 U.S.C. § 706(2)(A), (D); 25 U.S.C. § 2710(d)(8)(A)–(C); 25 C.F.R. § 293.7).  Federal Defendants argue that Plaintiffs failed to state this claim because the Secretary has no obligation during the forty-five-day review period under IGRA to "resolve a dispute" about whether a compact submitted to the Secretary for review was validly "entered into" under state law.  *See* ECF No. 106-1 at 36–38.  And they assert that according to Plaintiffs' own allegations, such a dispute existed here throughout the forty-five-day review period for the Comanche Nation's and Otoe-Missouria Tribe's compacts.  *See id.*  This argument presents no reason—as a matter of law or fact—to conclude that Plaintiffs have failed to state a claim.

First, under *Amador County*, the Secretary must determine whether a compact submitted for review complies with IGRA during the forty-five-day review period because she has an affirmative duty to disapprove any compacts that do not comply with IGRA before that period expires.  *See* 640 F.3d at 381.  A threshold requirement for compacts under IGRA is that they be validly "entered into" under state law.  That this review might "embroil the Secretary" in investigations into whether the compact was legally entered into under state law is of no moment, under *Amador County*.  As noted in that case, although Congress gave the Secretary only forty-five days to review

compacts, "Congress had no intention of trading compliance with IGRA's requirements for efficiency in agency proceedings." *See id.* (internal quotation marks omitted).[16]

Second, even if Federal Defendants were right on the law, Plaintiffs allege in their complaint that any state-law dispute that existed at the start of the review period for these compacts was resolved for the Secretary before the period ended. During that review period, the Oklahoma Attorney General submitted a letter and official legal opinion to the Secretary explaining that the Governor lacked authority to enter into these compacts under Oklahoma law. *See* ECF No. 104 ¶¶ 88–90 (citing *In re Treat*, 2020 OK AG 8, 2020 WL 2304499 (Okla. A.G. May 5, 2020)). In Oklahoma, an official legal opinion from the state Attorney General such as this is legally binding on all state officials whom it affects until it is overruled judicially. *See State ex rel. York v. Turpen*, 681 P.2d 763, 765 (Okla. 1984); Okla. Stat. tit. 74, § 18b(A)(18). These officials include the Governor of Oklahoma. *See Keating v. Edmondson*, 37 P.3d 882, 885 & n.8 (Okla. 2001). Thus, any state-law dispute between the Governor and others about whether the compacts were validly "entered into" was resolved—at least for the time being and for the Secretary's purposes—during the forty-five-day review period.

## 2.  Count Two

In count two, Plaintiffs assert that the Secretary acted arbitrarily, capriciously, and contrary to IGRA, as well as without observance of procedure required by IGRA, in three ways: (1) by failing to consider whether the Comanche Nation's and Otoe-Missouria Tribe's compacts were

---

[16] Courts in other jurisdictions have reasoned that IGRA does not require the Secretary to resolve "state law issues" to this effect in the forty-five-day review period. *See Pueblo of Santa Ana*, 104 F.3d at 1556–57; *accord Rhode Island v. Narragansett Indian Tribe*, No. Civ. A. 94-0619-T, 1995 WL 17017347, at *2 (D.R.I. Feb. 3, 1995). But of course, this Court must follow *Amador County*, which dictates that the Secretary may not no-action approve a compact that violates IGRA, as such a compact would if it were not validly "entered into" under state law. *See* 640 F.3d at 381.

validly "entered into" before no-action approving them; (2) by failing to consider whether any provisions in these compacts violated IGRA; and (3) by failing to issue a ruling of some kind disapproving these compacts.  *See* ECF No. 104 ¶¶ 236–40 (citing 5 U.S.C. § 706(2)(A), (D); 25 U.S.C. § 2710(d)(8)(B)).  Federal Defendants raise the same arguments to dismiss this count that they raised for count one.  *See* ECF No. 106-1 at 36–38.  Thus, the analysis above applies here, and the Court will not dismiss this count.

### 3. Count Three

In count three, Plaintiffs assert that the Secretary's no-action approvals of the Comanche Nation's and Otoe-Missouria Tribe's compacts were arbitrary, capricious, and contrary to IGRA because these compacts were not validly "entered into" under state law.  *See* ECF No. 104 ¶¶ 241–44 (citing 5 U.S.C. § 706(2)(A)).  Federal Defendants raise the same arguments to dismiss this count that they raised for count one.  *See* ECF No. 106-1 at 36–38.  Thus, the analysis for count one applies here, and the Court will not dismiss this count.

### 4. Count Four

In count four, Plaintiffs assert that the Secretary's no-action approvals of the Comanche Nation's and Otoe-Missouria Tribe's compacts were arbitrary, capricious, and contrary to IGRA because those compacts purport to authorize class III gaming that is not permitted in Oklahoma and because they include provisions about Oklahoma's ability to conduct class III gaming even though this is not a valid subject of IGRA compacts.  *See* ECF No. 104 ¶¶ 245–50 (citing 5 U.S.C. § 706(2)(A); 25 U.S.C. § 2710(d)(1)(B), (d)(3)(C)).  Federal Defendants argue that this count should be dismissed because these compacts were no-action approved "only to the extent" that they are "consistent" with IGRA, meaning that any IGRA-violative provisions were not approved and thus the Secretary could not have acted arbitrarily, capriciously, or otherwise contrary to

IGRA. *See* 25 U.S.C. § 2710(d)(8)(C); ECF No. 106-1 at 38–41. Once again, Federal Defendants identify no reason for the Court to conclude that Plaintiffs have failed to state a claim.

Again, in *Amador County*, the Circuit held that the Secretary "must . . . disapprove a compact if it would violate any of the three limitations" in 25 U.S.C. § 2710(d)(8)(B). *See* 640 F.3d at 381; *see also W. Flagler Assocs.*, 573 F. Supp. 3d at 273. One of those "limitations" envisions disapproval if a compact violates "any provision" of IGRA. *See* § 2710(d)(8)(B)(i). In count four, Plaintiffs allege that the Comanche Nation's and Otoe-Missouria Tribe's compacts violate two separate provisions of IGRA, and Federal Defendants do not contest this allegation. Thus, Plaintiffs allege, the Secretary had an affirmative obligation to disapprove these compacts, and the Secretary violated IGRA by failing to do so.

Federal Defendants suggest that the Court should not follow *Amador County* here because its holding is "dictum" in this context given that in *Amador County* the alleged illegality was with the entire compact rather than just a discrete provision of it. *See* ECF No. 106-1 at 39–40. The Court declines this invitation. For one, the Court considers it "a good rule of thumb" to conclude that, in decisions from the Circuit, "what they say and what they mean are one and the same." *See Mathis v. United States*, 579 U.S. 500, 514 (2016). Further, later decisions applying or referencing *Amador County* confirm the propriety of following this rule here, as those cases have taken this holding at its word by applying it outside the confines of the specific facts of that case. *See, e.g.*, *W. Flagler Assocs.*, 573 F. Supp. 3d at 273, 276, 276 n.8; *see also DTCC Data Repository (U.S.) LLC v. U.S. CFTC*, 25 F. Supp. 3d 9, 17 (D.D.C. 2014); *Menominee Indian Tribe of Wisc. v. EPA*, 947 F.3d 1065, 1073 (7th Cir. 2020).

### 5.   Count Five

In count five, Plaintiffs assert that the Secretary's no-action approvals of the Comanche Nation's and Otoe-Missouria Tribe's compacts were arbitrary, capricious, and contrary to IGRA because these compacts contain certain "revenue sharing provisions" that impose an impermissible tax, rather than a permissible assessment, on class III gaming under IGRA.  *See* ECF No. 104 ¶¶ 251–56 (citing 5 U.S.C. § 706(2)(A); 25 U.S.C. § 2710(b)(2)(A), (d)(1)(A)(ii).  Federal Defendants do not dispute that the compacts contain such provisions or that these provisions violate IGRA in the manner alleged, instead raising the same arguments to dismiss this count that they raised for count four.  *See* ECF No. 106-1 at 38–41.  Thus, the analysis for count four applies here, and the Court will not dismiss this count.

### 6.   Count Six

In count six, Plaintiffs assert that the Secretary's no-action approvals of the Comanche Nation's and Otoe-Missouria Tribe's compacts were arbitrary, capricious, and contrary to IGRA because these compacts purport to regulate the conduct of class II gaming, which is not a permissible subject of an IGRA compact and may not be regulated by Oklahoma under IGRA.  *See* ECF No. 104 ¶¶ 257–61 (citing 5 U.S.C. § 706(2)(A); 25 U.S.C. § 2710(b)(1), (d)(3)(C)).  Federal Defendants do not dispute that the compacts contain such provisions or that these provisions violate IGRA in the manner alleged, instead raising the same arguments to dismiss this count that they raised for count four.  *See* ECF No. 106-1 at 38–41.  Thus, the analysis for count four applies here, and the Court will not dismiss this count.

### 7.   Count Seven

In count seven, Plaintiffs assert that the Secretary's no-action approvals of the Comanche Nation's and Otoe-Missouria Tribe's compacts were arbitrary, capricious, and contrary to IGRA.

They so allege because the provisions in these compacts that preemptively provide the Governor's concurrence to future land acquisitions by the Secretary under a two-part determination violate the "federal trust obligation" contrary to IGRA and also are not a permissible subject of IGRA compacts.  *See* ECF No. 104 ¶¶ 262–65 (citing 5 U.S.C. § 706(2)(A); 25 U.S.C. § 2710(d)(8)(B)(iii)); *see also id.* ¶¶ 205–14.

Federal Defendants make two arguments for dismissal.  First, they raise the same argument that they asserted with respect to counts four, five, and six.  *See* ECF No. 106-1 at 38–41.  For the reasons explained in the analysis of count four, that argument fails.  Second, they also argue that Plaintiffs have failed to "identify a statute or regulation that imposes an enforceable trust obligation" and so failed to state this claim for this reason as well.  *See* ECF No. 106-1 at 40–41.  Plaintiffs argue otherwise.  *See* ECF No. 114 at 67.  Regardless, Federal Defendants have not contested Plaintiffs' allegation that these provisions are an invalid subject of IGRA compacts, which required the Secretary to disapprove the compacts for that reason.  Thus, at least for now, the Court will not dismiss this count.

### C.  The Court Will Grant Plaintiffs' Motion to Dismiss Chairman Shotton's Counterclaim Because It Is Barred by Plaintiffs' Tribal Immunity

In response to Plaintiffs' operative complaint, Chairman Shotton of the Otoe-Missouria Tribe counterclaimed, seeking a declaration that the Tribe's compact was validly entered into and complies with IGRA.  *See* ECF No. 109 at 46–65.  Plaintiffs move to dismiss this counterclaim under Rule 12(b)(1) and Rule 12(b)(6), arguing that tribal immunity bars it and that it fails to state a viable claim in any event.  The counterclaim is barred by tribal immunity, so the Court will dismiss it for that reason.

"The doctrine of tribal immunity . . . protects tribes from suits in federal . . . courts."  *Wichita & Affiliated Tribes of Okla. v. Hodel*, 788 F.2d 765, 771 (D.C. Cir. 1986) (citing *United States*

*v. U.S. Fid. & Guar. Co.*, 309 U.S. 506, 512–13 (1940)).  The only exceptions to it are "where Congress has authorized the suit" or where "the tribe has waived its immunity."  *Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 754 (1998).  Here, Plaintiffs seek declaratory relief against Chairman Shotton to the effect that the Otoe-Missouria Tribe's compact is illegal and invalid.  *See* ECF No. 104 ¶¶ 266–68.[17]  Chairman Shotton seeks mirror-image relief in his counterclaim—he wants a declaration that the Tribe's compact is legal and valid.  But he asserts this counterclaim against tribes ordinarily protected by tribal immunity.  Thus, he must overcome this immunity under one of the two exceptions identified above to pursue that counterclaim.

To do so, he argues that a "waiver-by-litigation exception" applies so as to permit his declaratory counterclaim.  *See* ECF No. 123 at 2, 10.  Not so.

Tribal immunity can be waived if the tribe "consent[s] to be sued."  *Wichita & Affiliated Tribes*, 788 F.2d at 773.  That said, "such consent 'cannot be implied but must be unequivocally expressed.'"  *Id.* (quoting *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 59 (1978)).  For this reason, a "tribe does not automatically open itself up to counterclaims simply by virtue of filing a suit."  *Id.*  To the contrary, an "Indian tribe" does not lose that immunity "by instituting an action, even when the defendant files a compulsory counterclaim" in that case.  *Id.* at 773–74; *accord Ute Indian Tribe of the Uintah & Ouray Rsrv. v. Utah*, 790 F.3d 1000, 1009 (10th Cir. 2015) (Gorsuch, J.) (citing *Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe*, 498 U.S. 505, 509–10 (1991)).  Chairman Shotton argues that Plaintiffs waived their tribal immunity to his counterclaim by instituting this action.  But as just discussed, binding precedent forecloses this argument.

---

[17] Under *Ex parte Young*, 209 U.S. 123 (1908), tribal immunity does not bar a claim against a tribal officer for prospective relief.  *See Vann v. Kempthorne*, 534 F.3d 741, 749–56 (D.C. Cir. 2008).

Chairman Shotton contends otherwise, asserting that these cases do not foreclose the approach taken by a 2016 district court decision out of the Ninth Circuit that held that counterclaims against a plaintiff tribe mirroring the plaintiff tribe's own claims in the case were not barred by tribal immunity. *See Tohono O'odham Nation v. Ducey*, 174 F. Supp. 3d 1194, 1204–05 (D. Ariz. 2016).[18] Even if *Wichita & Affiliated Tribes* did not foreclose this approach, the Court still would not follow it. Importantly, the Ninth Circuit has since repudiated the waiver principle identified in *Tohono* and expressly held that a plaintiff tribe does not waive tribal immunity even for a counterclaim that "mirrors the merits" of the tribe's claims. *See Quinault Indian Nation v. Pearson for Estate of Comenout*, 868 F.3d 1093, 1098–99 (9th Cir. 2017); *see also Ak-Chin Indian Cmty. v. Maricopa-Stanfield Irr. & Drainage Dist.*, No. CV-20-00489-PHX-JJT, 2021 WL 2805609, at *4 & n.3 (D. Ariz. July 6, 2021).

The Court sees no reason to disagree with *Quinault Indian Nation*, particularly considering that it is consistent with the clear implications—at the very least—of the D.C. Circuit's decision in *Wichita & Affiliated Tribes*. Thus, Plaintiffs' tribal immunity bars Chairman Shotton's counterclaim, and the Court will grant Plaintiffs' motion to dismiss it for this reason.

---

[18] Chairman Shotton, following the *Tohono O'odham Nation* court, also relies on several other appellate and district court authorities, none of which are from this Circuit, to argue for this "mirror-image" exception to tribal immunity. *Compare Tohono O'odham Nation*, 174 F. Supp. 3d at 1204–05, *with* ECF No. 123 at 3–9. For the reasons explained in this section, even assuming Chairman Shotton characterizes these decisions correctly, the Court declines to follow them.

### D.    The Court Will Deny Plaintiffs' Motion to Strike

Plaintiffs also move to strike certain assertions in Chairman Woommavovah's motion to dismiss along with certain materials that Chairman Woommavovah submitted and relied on in that motion.  *See* ECF No. 115.  The Court will deny this motion.

"The decision to grant or deny a motion to strike is vested in the Court's discretion."  *U.S. Telesis, Inc. v. Ende*, 297 F.R.D. 159, 161 (D.D.C. 2013).  One of the main purposes of a motion to strike is to permit the court to "avoid wasting time or effort on spurious or improperly presented matters."  *Id.*  In part for that reason, "[m]otions to strike are disfavored," as they "often proliferate pages and burden the court unnecessarily" and thus resolving them often runs contrary to their purpose.  *See Tyson v. DeJoy*, No. 21-5279, 2022 WL 3568046, at *1 (D.C. Cir. Aug. 11, 2022) (per curiam) (citing *Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine Distributors Pty. Ltd.*, 647 F.2d 200, 201 (D.C. Cir. 1981) (per curiam)).  As discussed above, the Court will deny Chairman Woommavovah's motion to dismiss, thereby providing Plaintiffs with the main underlying relief they seek in moving to strike.  *See* ECF No. 115-1 at 8–11.  Thus, the Court in its discretion will deny the motion to strike.  *See Tyson*, 2022 WL 3568046, at *1.[19]

### E.    The Court Will Deny as Moot Plaintiffs' Motion to Compel Production of the Administrative Record

Finally, Plaintiffs move to compel the production of the administrative record to assist them in opposing Federal Defendants' motion to dismiss counts one through three under Rule 12(b)(6).  *See* ECF No. 128 at 1–2; ECF No. 128-1 at 5–6.  As discussed above, the Court will deny Federal

---

[19] In opposing Plaintiffs' motion to strike, Chairman Woommavovah argued that the Court should sanction them under 28 U.S.C. § 1927 for filing it.  *See* ECF No. 122 at 14–15, 19–20.  The Court declines to do so, given the high bar for that relief.  *See Hall v. Dep't of Homeland Sec.*, 219 F. Supp. 3d 112, 119 (D.D.C. 2016).

Defendants' motion to dismiss these counts under Rule 12(b)(6).  Thus, the Court will deny Plaintiffs' motion to compel as moot.

## VI.     Conclusion and Order

For all these reasons, it is hereby **ORDERED** that:

1.   Federal Defendants' Motion to Dismiss, ECF No. 106, is **GRANTED IN PART** and **DENIED IN PART**, and the claims based on the United Keetoowah Band's compact and the Kialegee Tribal Town's compact in counts one through eight of Plaintiffs' First Amended and Supplemented Complaint, ECF No. 104, are **DISMISSED**;

2.   Chairman Woommavovah's Motion to Dismiss, ECF No. 107, is **DENIED**;

3.   Plaintiffs' Motion to Dismiss Defendant Chairman Shotton's Counterclaim, ECF No. 113, is **GRANTED**, and Chairman Shotton's counterclaim is **DISMISSED**;

4.   Plaintiffs' Motion to Strike Declarations in Support of and Assertions in Defendant Chairman Woommavovah's Motion to Dismiss, ECF No. 115, is **DENIED**; and

5.   Plaintiffs' Motion to Compel Production of Administrative Record, ECF No. 128, is **DENIED AS MOOT**.

/s/ Timothy J.  Kelly
TIMOTHY J.  KELLY
United States District Judge

Date: November 23, 2022