**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| THE CHEROKEE NATION et al., | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 20-2167 (TJK) |
| UNITED STATES DEPARTMENT | ) | |
| OF THE INTERIOR et al., | ) | |
| | ) | |
| *Defendants.* | ) | |

**OKLAHOMA ATTORNEY GENERAL'S MOTION TO CERTIFY QUESTION TO**
**THE OKLAHOMA SUPREME COURT**

Oklahoma Attorney General Gentner Drummond respectfully requests this Court certify a question of law—which is imperative to the orderly disposition of this matter—to the Oklahoma Supreme Court pursuant to the Revised Uniform Certification of Questions of Law Act ("Act"), OKLA. STAT. tit. 20, § 1601, *et seq.*  The Attorney General's authority to take and assume control of the defense of Oklahoma's interests herein is paramount for expedient resolution of matters in the above-entitled cause.  Oklahoma Governor, J. Kevin Stitt, defies such authority. Although the text of the law is clear, there is no controlling decision in Oklahoma interpreting OKLA. STAT. tit. 74, § 18b when the Governor challenges the Attorney General's complete dominion over litigation that involves the State's interests.

The Governor's challenge to the Attorney General's Section 18b authority is not limited to this matter.  In fact, since the Attorney General has entered his appearance herein and since counsel for the Governor and Attorney General submitted briefing on the Governor's pending Motion to Strike, ECF No. 178-80, the Governor has submitted some of the compacts at issue in this case for approval by the Joint Committee on Tribal-State Relations, which puts the question of who speaks for the State directly and clearly at issue.  The Governor has also recently suggested in other cases that only he speaks for the State in litigation.  These events, which occurred after the Attorney General

appeared in this case, further necessitate a resolution to this question of law in state court. Thus, the Attorney General, on behalf of Oklahoma's interests in this litigation, and out of concern that questions of state law be definitively resolved in state forums (as has already occurred with regard to the merits questions in this case), requests this Court certify to the Oklahoma Supreme Court the question of law asking:

> Whether the Oklahoma Attorney General can take and assume control of the prosecution or defense of Oklahoma's interests in any action, including where the Oklahoma Governor is a named party, in his or her official capacity, and where the Oklahoma Governor has previously employed counsel?

The Attorney General has consulted with counsel for the Governor on this issue. The Governor objects to the Attorney General's request for certification of this question of law.

In support of his Motion to Certify, the Attorney General shows as follows.

## I.  THE AUTHORITY AND PROCESS FOR CERTIFYING QUESTIONS TO THE OKLAHOMA SUPREME COURT

This Court must look to the process set forth in Oklahoma law in determining whether to exercise its discretion to certify the relevant question of law.  *See In re Vitamins Antitrust Litig.*, No. MISC99-197, 2000 WL 1524912, at *1 (D.D.C. July 14, 2000) ("Certification is only permitted to the extent authorized by state law.").  "The decision of a federal court to certify questions of law pursuant to state-established procedures . . . rests with the sound discretion of the court." *Tidler v. Eli Lilly & Co.*, 851 F.2d 418, 426 (D.C. Cir. 1988).  The D.C. Circuit has identified the factors relevant to whether to certify.  "The most important consideration guiding the exercise of this discretion . . .. is whether the reviewing court finds itself genuinely uncertain about a question of state law that is vital to a correct disposition of the case before it." *Owens v. Republic of Sudan*, 864 F.3d 751, 812 (D.C. Cir. 2017), *rev'd on other grounds sub nom. Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020) (quoting *Tidler*, 851 F.2d at 426).  In such cases, certification "save[s] time, energy, and resources and helps build a cooperative judicial federalism." *Eli Lilly & Co. v. Home Ins. Co.*, 764 F.2d 876, 884 (D.C. Cir. 1985) (quoting

*Lehman Bros. v. Schein*, 416 U.S. 386, 391 (1974)); *accord Walko Corp. v. Burger Chef Sys., Inc.*, 554 F.2d 1165, 1173 n.62 (D.C. Cir. 1977). Courts in this Circuit also consider whether the question is "a matter of public importance, in which the" jurisdiction to which the question will be certified "has a substantial interest," *Metz v. BAE Sys. Tech. Sols. & Servs. Inc.*, 774 F.3d 18, 24 (D.C. Cir. 2014) (citing *Schuchart v. La Taberna Del Alabardero, Inc.*, 365 F.3d 33, 37 (D.C. Cir. 2004)), or where the answer to a question will have "significant effects" within the jurisdiction, *id.* (quoting *DeBerry v. First Gov't Mortg. & Inv'rs Corp.*, 170 F.3d 1105, 1110 (D.C. Cir. 1999)); *cf. United States v. Old Dominion Boat Club*, 630 F.3d 1039, 1047 (D.C. Cir. 2011) (refusing to certify question "of no consequence to the state").

The Oklahoma Supreme Court "has the power to answer certified questions of law if the certified questions are presented in accordance with the provisions of the [Act], 20 O.S. 2011 §§ 1601-1611." *Odom v. Penske Truck Leasing Co.*, 2018 OK 23, ¶ 7, 415 P.3d 521, 525. Section 1602 of the Act specifically sets forth the Supreme Court's power to answer certified questions:

> The Supreme Court and the Court of Criminal Appeals may answer a question of law certified to it by a court of the United States, or by an appellate court of another state, or of a federally recognized Indian tribal government, or of Canada, a Canadian province or territory, Mexico, or a Mexican state, if the answer may be determinative of an issue in pending litigation in the certifying court and there is no controlling decision of the Supreme Court or Court of Criminal Appeals, constitutional provision, or statute of this state.

OKLA. STAT. tit. 20, § 1602. The Oklahoma Supreme Court addresses both factors mentioned in Section 1602 in deciding whether to answer a certified question of law: "1) would the answer be dispositive of an issue in pending litigation in the certifying court, and 2) is there established and controlling law on the subject matter?" *Siloam Springs Hotel, LLC v. Century Sur. Co.*, 2017 OK 14, ¶ 14, 392 P.3d 262, 266. Section 1602 "does not foreclose an answer to a question simply because this Court's response may not be dispositive of the cause." *Id.* at ¶ 16. "All that is required for [the Oklahoma Supreme Court] to answer a certified question is that the response be determinative of a single issue in the cause and that no controlling state law exist." *Id.*

3

The question certified may be reformulated by the Oklahoma Supreme Court. *Id.* at ¶ 15 (citing *McQueen, Rains & Tresch, LLP v. Citgo Petroleum Corp.*, 2008 OK 66, ¶ 1 & n.1, 195 P.3d 35, 37; *Tyler v. Shelter Mut. Ins. Co.*, 2008 OK 9, ¶ 1 & n.1, 184 P.3d 496, 496–97; *McClure v. ConocoPhillips Co.*, 2006 OK 42, ¶ 1 & n.1, 142 P.3d 390, 392). The Act specifically sets forth that authority. *See* OKLA. STAT. tit. 20, § 1602.1 ("[t]he Supreme Court of the state may reformulate a question of law certified to it").

## II. THE FACTS RELEVANT TO THE PROFFERED QUESTION OF LAW FOR CERTIFICATION

An order certifying a question of law to the Oklahoma Supreme Court must set forth "2. The facts relevant to the question, showing fully the nature of the controversy out of which the question arose . . . ." OKLA. STAT. tit. 20, § 1604(A)(2).[1] Assuming the parties cannot agree on the facts relevant to the question, "the certifying court must determine the relevant facts and state them as a part of its certification order." *Id.* at § 1604(B). "In answering a certified question, the Court does not presume facts outside those offered by the certification order." *Siloam Springs Hotel, LLC*, 2017 OK 14, ¶ 2. The relevant facts for the Oklahoma Supreme Court to consider in deciding the certified question of law are as follows:

A.       On April 23, 2020, the Governor submitted the compacts at issue in this case to the Secretary of the Interior for approval under IGRA. *See* ECF No. 104 ¶ 81. The compacts are not the Model Compact codified in the State-Tribal Gaming Act, nor were they approved by the Oklahoma Legislature or any legislative body. *See* ECF No. 157 at 7-8. The Governor was the only state official who claimed to approve the compacts. *See id.* at 8.

---

[1] The remaining three items the certification order must contain are, "1. The question of law to be answered; . . . 3. A statement acknowledging that the Supreme Court of Court of Criminal Appeals of this state, acting as the receiving court, may reformulated the question; and 4. The names and addresses of counsel of record and parties appearing without counsel." *Id.*

B.      On May 5, 2020, the Attorney General published a formal and binding legal opinion, 2020 OK AG 8, which he provided to the Secretary of Interior, and which concluded that the Governor lacked authority to enter into the compacts on behalf of the State. *Id.*

C.      On June 4, 2020, the President Pro Tempore of the Oklahoma Senate and the Speaker of the Oklahoma House filed an application for an original action in the Oklahoma Supreme Court, challenging the Governor's purported approval of the compacts on behalf of the State. *See id.* On July 21, 2020, the Oklahoma Supreme Court issued a decision holding the Governor did not have authority to sign the compacts on behalf of the State because they purported to authorize the conduct of games that were not authorized by state law and had not been approved by the Legislature through approval of the State-Tribal Gaming Act or under 74 O.S. § 1221(C). *Treat v. Stitt*, 2020 OK 64, 473 P.3d 43 ("*Treat I*"). That decision confirmed the Attorney General's opinion that the compacts are invalid.

D.      On July 2, 2020, the Governor submitted two additional compacts that he signed with the United Keetoowah Band of Cherokee Indians in Oklahoma ("UKB") and the Kialegee Tribal Town ("KTT"). *See* ECF No. 157 at 9. As with the compacts still at issue in this case, those compacts are not the Model Compact codified in the State-Tribal Gaming Act, nor were they approved by the Legislature or any legislative body. *Id.* The only state official who claimed to approve the compacts was the Governor. On July 14, 2020, the President Pro Tempore and the Speaker filed an application for an original action challenging the Governor's actions regarding those compacts. *See id.* On January 26, 2021, the Oklahoma Supreme Court ruled that both compacts were invalid because the compacts were not the Model Compact, and because, aside from his authority to renegotiate substantial exclusivity and fees paid to the State, the Governor can only enter into gaming compacts with different terms from the Model Compact with approval of the Joint Committee on State-Tribal Relations under 74 O.S. § 1221(C). *Treat v. Stitt*, 2021 OK 3, ¶¶ 7-10, 481 P.3d 240, 242-43. ("*Treat II*").

E.  On August 7, 2020, the Plaintiffs filed this action, naming the Governor as a defendant in his official capacity and challenging his authority to enter into the compacts and the validity of the compacts terms to which he agreed. *See* ECF No. 1. The Governor subsequently hired private counsel to represent him in this action and has several times added new private counsel to represent him. *See, e.g.,* ECF Nos. 55, 60-63, 65-68, 140. The Governor, through his outside counsel, has continued to defend the compacts as valid under IGRA, even though the State never entered into them.

F.  On July 25, 2023, the Attorney General was compelled, as an exercise of his own statutory power and at the request of the Oklahoma Legislature, *see* ECF Nos. 176 at 2; 176-1; and 176-2, to take the extraordinary action of assuming control of Oklahoma's interests in this litigation due to the Governor's failure to cause Oklahoma's laws to be faithfully executed. *See* ECF No. 176. The Governor, through counsel, then filed a motion to strike the appearance of the Attorney General and the Solicitor General of Oklahoma in this case. *See* ECF Nos. 178, 180.

G.  In this case, the Governor argued, purportedly on behalf of the State, that *Treat I* and *II* "have no relevance to the question whether these compacts remain 'in effect' under 25 U.S.C. § 2710(d)(1) as a matter of *federal law*." ECF No. 154-1 at 17. The Governor further argued that the compacts were entered into "consistent with the Oklahoma statute stating that '[t]he Governor is authorized to negotiate and enter into cooperative agreements on behalf of this state with federally recognized Indian tribal governments[,]'" *id.* at 12 (quoting OKLA. STAT. tit. 74, § 1221(C)(1)), and that "in any event, the Governor's submission (and the Secretary's approval) satisfied IGRA's requirement that the compact be 'entered into' by the State and Tribes." *Id.*. He also admitted that the compacts "*refer*[] *to* forms of gaming that are not currently permitted under Oklahoma law, such as event wagering, house-banked card games, and house-banked table games[,]" but he then added—without further explanation—that "the compacts do not *authorize* any of those things." *Id.* at 22.

6

H.     In later submissions to the Oklahoma Supreme Court and the Oklahoma Legislature,

he has made concessions that are inconsistent with his argument in this case. These inconsistencies

demonstrate that the Governor's argument in this case seeks to further his own interests, not those of

the State, which is the real party interest in this case. Most recently, on September 14, 2023, the

Governor announced that he is seeking the approval of the Joint Committee for Tribal-State Relations

of the compacts he purported to approve with UKB and KTT in order to comply with the decision

in *Treat II*. In letters transmitting each of the compacts to the Committee and legislative leaders, the

Governor said:

> We submit for your approval a gaming compact, which has been negotiated and
> entered into by the [UKB or KTT] and the Governor of the state of Oklahoma. . . .
>
> Although we maintain that the compact is valid as a matter of federal law following its
> publication in the Federal Register by the Secretary of the Department of Interior, in
> *Treat, et al. v. Stitt*, 2021 OK 3, the Oklahoma Supreme Court held that the compact,
> after having been negotiated and entered into by the Governor, must be submitted to
> the Joint Committee in accordance with 74 O.S. § 1221(C)(1) because the compact
> contains certain terms different than the Model Tribal Gaming Compact outlined in
> 3A O.S. § 281. To that end and as soon as practicable, we urge the Joint Committee
> to convene and endorse the compact.[2]

The Governor's reliance on *Treat II* as the basis for his action admits that the compacts he signed

without legislative approval were invalid at the time he submitted them to the Secretary of Interior.

*See Treat II*, 2021 OK 3, ¶ 10, 481 P.3d 240, 243 ("It is . . . necessary that the Executive branch and

the Tribe obtain the approval from the Joint Committee prior to submitting the compact to the

---

[2] Letter from Kevin Stitt, Governor, State of Okla., and Joe Buch, Chief, United Keetoowah Band of
Cherokee Indians, to Charles McCall, Speaker, Okla. House of Reps., and Greg Treat, President Pro
Tempore, Okla. Senate (undated), https://tinyurl.com/2by4jn6y; Letter from Kevin Stitt, Governor,
State of Okla., and Stephanie Yahola, Mekko, Kialegee Tribal Town, to Charles McCall, Speaker, Okla.
House of Reps., and Greg Treat, President Pro Tempore, Okla. Senate (undated),
https://tinyurl.com/385x97aj.  These letters are undated but on September 14 the Governor linked
to them from a press release that he posted on his official website. *See* Press Release, Kevin Stitt,
Governor,          State          of          Okla.          (Sept.          14,          2023),
https://oklahoma.gov/governor/newsroom/newsroom/2023/september2023/governor-stitt--
chief-bunch-and-mekko-yahola-send-letters-to-joi.html.

Department of Interior." (citing 74 O.S. § 1221(C)(1))); *cf.* ECF No. 154-1 at 12, 17. Because the

Comanche and Otoe-Missouria compacts were also only signed by the Governor without legislative

approval, this also admits that the Governor did not "enter into" either of those agreements before

they were submitted to the Secretary. This demonstrates that *Treat I* and *II* are relevant to this case,

and that the Governor did not enter into the compacts at issue in this case "consistent with the

Oklahoma statute stating that '[t]he Governor is authorized to negotiate and enter into cooperative

agreements on behalf of this state with federally recognized Indian tribal governments.' Okla. Stat. tit.

74, § 1221(C)(1)." ECF No. 154-1 at 12.

I.  The Governor has also admitted in proceedings he commenced in the Oklahoma

Supreme Court regarding other tribal-state compacts that concern revenue sharing for tobacco sales

and the licensing and registration of vehicles owned by tribal citizens, that *Treat I* and *II* establish that

the Comanche and Otoe-Missouria compacts are invalid under state law, confirming again that *Treat

I* and *II* are relevant to this case. *See* Br. in Supp. of Appl. to Assume Original Jurisdiction at 9-10, *Stitt

v. Treat*, No. O-121497 (Okla. July 31, 2023) ("*Treat III*").[3] In addition, he has admitted that he could

not enter into compacts that violate state law and has invited judicial reversal of compacts that are

contrary to state law. His July 31 Brief in Support of Application to Assume Original Jurisdiction,

which initiated *Treat III*, characterized the rulings in *Treat I* and *II* as follows:

> In the *Treat* cases, this Court assumed original jurisdiction and declared that the
> Governor invalidly entered into gaming compacts authorizing certain forms of class
> III gaming. 2020 OK 64, ¶ 2; 2021 OK 3, ¶ 1. . . . [T]his Court reasoned that the
> compacts were invalid because the Governor, who relied upon 'the general authority'
> given to him pursuant to 74 O.S. § 1221, *Treat II*, 2021 OK 64 [sic], ¶ 10, negotiated
> and entered into compacts authorizing gaming prohibited by the plain text of the State-
> Tribal Gaming Act. *Id.* ¶ 11; *see also Treat I*, 2020 OK 64, ¶ 7. In other words, the
> agreements were deemed invalid not because the Governor negotiated them but
> because they purported to authorize gaming not sanctioned by state law.

---

[3]  All filings in *Treat III* are available from the Oklahoma Supreme Court's docket at
https://www.oscn.net/dockets/GetCaseInformation.aspx?db=appellate&number=O-
121497&cmid=135839.

*Id.* at 9-10; *cf.* ECF No. 154-1 at 22.

J.      In a filing in *Treat III* dated August 18, the Governor characterized *Treat I* and *II* in the same manner:

> *Treat I & II* . . . involved gaming compacts, which, unlike the tobacco and motor vehicle licensing/registration compacts implicated by the void bills at issue here, implicated federal law and distinct processes. In the *Treat* cases . . . [t]he question in each case was whether the product (*i.e.*, the gaming compacts with four tribes) of negotiations exceeded state law. . . .

> In *Treat I*, this Court found that the compacts with the Comanche Nation and Otoe-Missouria were invalid under state law because the compacts "included Class III gaming prohibited by the State-tribal Gaming Act." 2020 OK 64, ¶ 7. Later, in *Treat II*, this Court found the compacts with the UKB and KTT were invalid under Oklahoma law because they contained provisions different from those in the Model Compact and were not approved by the Joint Committee on State-Tribal Relations. *Treat II*, 2021 OK 3, ¶ 6.

Governor J. Kevin Stitt's Obj. to the Appl. of the Cherokee Nation, Chickasaw Nation, and Choctaw Nation at 2-3, *Treat III* (Okla. Aug. 18, 2023); *cf.* ECF No. 168 at 2; ECF No. 154-1 at 12.

K.      In an August 30 filing in *Treat III*, the Governor "incorporate[d] and adopt[ed] in full" his earlier Objection, Governor's Combined Reply Br. at 9 n.9, *Treat III* (Okla. Aug. 30, 2023), relied on the Attorney General's 2020 opinion as describing Oklahoma law, *id.* at 6-7 (quoting 2020 OK AG 8, ¶¶ 0, 11, 15, 21), and once again admitted *Treat I* and *II* held that the Comanche and Otoe-Missouria compacts are invalid under state law:

> The question in each case was whether the product (*i.e.*, the gaming compacts with four tribes) of negotiations exceeded state law . . . .

> In *Treat I*, this Court found that the compacts with the Comanche Nation and Otoe-Missouria were invalid under state law because the compacts "included Class III gaming prohibited by the State-Tribal Gaming Act." 2020 OK 64, ¶ 7. Later, in *Treat II*, this Court found the compacts with the UKB and KTT were invalid under Oklahoma law because they contained provisions different from those in the Model Compact and were not approved by the Joint Committee on State-Tribal Relations. *Treat II*, 2021 OK 3, ¶ 6. . . .

> Those cases were about the outer limits of the Governor's role in the context of gaming compacts . . . . As this Court has said, the Governor's role includes the authority to negotiate and enter into compacts not inconsistent with the law.

*Id.* at 9-11; *cf.* ECF No. 154-1 at 12. The Governor further stated that "if the Governor at any point

negotiates and enters . . . compacts containing terms inconsistent with state law, the *Treat* cases will be

squarely on point, and the Governor will fully anticipate a check by [the Oklahoma Supreme] Court."

Governor's Combined Reply Br. at 10 n.11, *Treat III* (Okla. Aug. 18, 2023); *cf.* ECF No. 154-1 at 12.

      L.      The Governor's contentions, set forth in paragraphs H to K above, are plainly

inconsistent with the argument the Governor has made in this case, purportedly on behalf of the State,

as set forth in paragraph G. above.

## III. THE PROFFERED QUESTION OF LAW SHOULD BE CERTIFIED TO THE OKLAHOMA SUPREME COURT

      To be clear, the Attorney General believes that he has authority to assume control of the

defense of the State's interests in this litigation. *See* ECF No. 176, 179. The Governor argues that the

Attorney General's assumption of control of the State's defense in this litigation will result in his

having "counsel he affirmatively does not want . . . ." ECF No. 180 at 4. In this case, however, the

Governor was sued in his official capacity, *see* ECF. No. 179 at 8. Accordingly, as the Governor

represented to the Court, ECF No. 110 at 2, the State, and not the Governor, is the real party in

interest.

      The Governor heavily relies on—and inflates—his executive status to generally undermine

circumstances in which his authority would be subordinate to the Attorney General's. *See* ECF No.

180 at 2 ("[N]o court has suggested that [OKLA. STAT. tit. 74, § 18b] somehow authorizes the Attorney

General to override the *Governor*, the State's highest executive officer."); *see also* ECF No. 178 at 3 ("It

would make no sense to read Section 18b(A)(3) to authorize the Attorney General to take over

litigation from the Chief Executive of the State . . . ."). This argument is logically deficient and ignores

the broad powers of the Oklahoma Legislature to enact laws and the shared executive power set forth

under Oklahoma's Constitution. *See e.g.*, *Wentz v. Thomas*, 1932 OK 636, ¶¶ 27-29, 41, 15 P.2d 65, 69,

71. Moreover, this Court has already recognized another legislative grant of authority, which allows the Oklahoma Attorney General to issue legal opinions that state officials, including the Governor, are bound to follow. *See* ECF No. 157 at 36 ("In Oklahoma, an official legal opinion from the state Attorney General . . . is legally binding on all state officials whom it affects until it is overruled judicially. . . . These officials include the Governor of Oklahoma.").

The Governor's actions over the past two months confirm he does not represent the interests of the State. That is shown by the assertions he has advanced in the more recently filed *Treat III*, dealing with major constitutional and policy questions regarding other tribal-state compacts. Those positions constitute admissions which this Court should consider when evaluating the Governor's commitment, or lack thereof, in upholding state law and the rulings of the Oklahoma Supreme Court. *See In re UMWA Empl. Ben. Plans Litig.*, 782 F. Supp. 658, 674 (D.D.C. 1992). The Governor's positions in *Treat III* concede that, in fact, the compacts are invalid because he could not "enter into" them on behalf of the State. Therefore, the compacts were not "entered into" by the State under IGRA and are invalid under federal law, as well. 25 U.S.C. § 2710(d)(8)(A); *see also Cherokee Nation v. U.S. Dep't of Interior*, 643 F. Supp. 3d 90, 116 at \*16 (D.D.C. 2022) ("A threshold requirement for compacts under IGRA is that they be validly 'entered into' under state law."). And the Governor's recent actions with regard to the UKB and KTT compacts, acknowledging that they have not been "entered into" by the State in the manner that the Oklahoma Supreme Court determined *must* be done by the State before compacts are submitted to the Secretary of the Interior for approval, and extremely belatedly seeking such approval from the Joint Committee on Tribal-State Relations, provide further evidence that the Governor knows all the agreements he signed without legislative approval are invalid under state law and IGRA. Yet he continues to defend them in this case. Therefore, he does not represent the interests of the State as the real party in interest in this case.

At the same time, however, the Attorney General also recognizes that there is no controlling decision in Oklahoma's highest state courts specifically answering whose authority controls in litigation involving interests of the State when (1) the Governor has already hired counsel and appeared, (2) the Attorney General then appears to defend the interests of the State, and (3) the Governor refuses to acknowledge the Attorney General's representation of those interests or litigate in defense of state law. The Attorney General is therefore aware that the Court may find itself "genuinely uncertain" about how to resolve that question in this instance. The Attorney General also recognizes that resolution of that question is "vital to a correct disposition of the case" because it will determine who represents the State's interests in a case involving agreements that seek to bind the State. *See Owens*, 864 F.3d at 812 (quoting *Tidler*, 851 F.2d at 426). Therefore, out of an abundance of caution, the Attorney General asks that the Court certify the question described above to the Oklahoma Supreme Court.

The other factors that guide the Court's discretion also weigh in favor of certification here. Unfortunately, the Governor's assertion of supreme (and sometimes sole) power to litigate on behalf of the State's interests requires the Oklahoma Supreme Court to consider the scope of the Governor's power to act and to speak on behalf of the State, and his assertions in the context of those cases will inform the state Supreme Court's evaluation of the issue in light of local conditions. In *Treat III*, the Governor asserts that the case is about "more than a Governor suffering from a constitutional inferiority complex," Combined Reply Br. at 1, while arguing that the case is controlled by separation of powers principles under which the Governor is "Chief Magistrate" who "possesses '[t]he Supreme Executive Power,'" Br. In Supp. of App. at 9. The Governor further asks the Oklahoma Supreme Court to determine he has sole power to negotiate any agreement with an Indian tribe to the exclusion of the Legislature, *id.* at 10. In recent rehearing proceedings in *In re S.J.W.*, No. J-119,404 (Okla. filed Mar. 11, 2021), the Governor has attempted to wrest representation of the State's interests away from

the District Attorney and Attorney General, asserting that "[a]s 'special guardian of the state's rights,' *State v. Huston*, 1908 OK 157, 97 P. 982, 984, and the official in whom the law vests 'the supreme executive authority,' *Ex parte Kelly*, 1915 OK 92, 146 P. 444, 446, the Governor is uniquely situated to supervise the welfare of the state and to advocate for the state's interests . . . ." Gov. J. Kevin Stitt's Mot. for Leave to File *Amicus Curiae* Br. at 1-2 (Aug. 4, 2023).[4] And in a recent original jurisdiction case in the Oklahoma Court of Criminal Appeals, *State ex rel. Ballard v. Crosson*, No. MA-2023-623 (Okla. Crim. App. filed July 27, 2023), the Governor has purported to name a special prosecutor based on his claim that "[a]s 'special guardian of the state's rights,' *State v. Huston*, 1908 OK 157, 97 P. 982, 984, and the official in whom the law vests 'the supreme executive authority,' *Ex parte Kelly*, 1915 OK 92, 146 P. 444, 446, the Governor is uniquely situated to advocate for and protect the State's interests, including through the 'power to employ counsel to . . . prosecute offenses against the law of the state . . . .' 74 O.S. § 6; *see also* Okla. Const. art. VI, §§ 2, 8." Gov. J. Kevin Stitt's Not. of App't of Special Counsel at 2 (Aug. 24, 2023).[5] And the Governor's submission of the UKB and KTT compacts to the Joint Committee, without changing one word of them from the versions that were already struck down by the Oklahoma Supreme Court, may well spark additional litigation in which the Governor will again assert sole authority to speak for—and litigate for—the State.

The issue of who the Governor can speak for, and whether he can displace the appropriate representatives of the State, therefore continues to come before the Oklahoma courts and is likely to do so again. Cooperative federalism and judicial efficiency call for these questions to be centralized before the Oklahoma Supreme Court, which is the tribunal in the best position to evaluate those questions, determine how they may affect all the ongoing cases in which the Governor continues to

---

[4] Because this case involves a minor, the docket is not publicly available, but filings can be provided to the court upon request.
[5] The Oklahoma Court of Criminal Appeals docket is available at https://www.oscn.net/dockets/GetCaseInformation.aspx?db=appellate&number=MA-2023-623&cmid=135811.

press these arguments, and develop answers to them. *See Eli Lilly*, 764 F.2d at 884; *Lehman Bros.*, 416 U.S. at 391 (when out-of-state federal judges attempt to predict state court resolution of questions of state law, "they act, as we have referred to ourselves on this Court in matters of state law, as 'outsiders' lacking the common exposure to local law which comes from sitting in the jurisdiction").

The resolution of who will speak on behalf of the State in this case will also determine how and whether the precedential effect of the Oklahoma Supreme Court's decisions in *Treat I* and *II* will be acknowledged and argued to this Court. The Oklahoma Supreme Court is best situated to resolve the Governor's selective use of its precedents. *See Lehman Bros.*, 416 U.S. at 391. And, consistent with principles of comity, the Oklahoma Supreme Court is also best situated to address the constitutional, common-law, and statutory distribution of executive authority among state officials, which continues to be submitted to state courts, *see Eli Lilly*, 764 F.2d at 884; *Walko*, 554 F.2d at 1173 n.62; *Schuchart*, 365 F.3d at 37 ("likely recurring" questions of state common law "are appropriately resolved" by the state's highest court); *State ex rel. Derryberry v. Kerr-McGee Corp.*, 1973 OK 132, ¶27, 516 P.2d 813, 819 ("the Attorney General's powers are as broad as the common law unless restricted or modified by statute . . . .").

Finally, the Attorney General did not decide to litigate the question of his authority in this Court. Others sought to do that, as (1) the case was brought here by the Plaintiffs against the Governor as nominal defendant, (2) the Governor asserted that he appeared on behalf of Oklahoma and that the State "adopts and ratifies the allegations, denials and admissions" he made in his answer, ECF No. 110 at 2, and (3) the Governor then challenged the Attorney General's right to appear in the case, ECF No. 178, 180.

The Governor's and Attorney General's views regarding the proper defense of the State's interests are at odds—the former attempts to thwart established Oklahoma law by relying on Federal bureaucracy, while the latter seeks to uphold State law. Thus, the Attorney General is not "abandoning

the defense of the party he seeks to represent," ECF No. 178 at 2, but instead seeks to advance a defense of the State's interests by honoring settled Oklahoma law. Resolution of this dispute between the Governor and Attorney General is certainly one of "public importance" in which Oklahoma has a "substantial interest." *Metz*, 774 F.3d at 24.

## CONCLUSION

WHEREFORE, Oklahoma Attorney General Gentner Drummond respectfully requests certification of the question of law specified herein to the Oklahoma Supreme Court. Moreover, if this Court grants this Motion, the Attorney General requests this Court stay J. Kevin Stitt's Motion to Strike or Otherwise Refuse to Recognize Notices of Appearance Filed by Gentner F. Drummond and Garry M. Gaskins, II [ECF No. 178], pending the Oklahoma Supreme Court's review of the certified question of law.

*s/ Garry M. Gaskins, II*
GENTNER F. DRUMMOND, OBA #16645
  *Attorney General*
GARRY M. GASKINS, II, OBA #20212
  *Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
STATE OF OKLAHOMA
313 NE 21st Street
Oklahoma City, OK 73105
(405) 521-3921
(405) 522-4534 (fax)
garry.gaskins@oag.ok.gov

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of September, 2023, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the ECF registrants with entries of appearance filed of record.

*s/ Garry M. Gaskins, II*