UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

------------------------------------------------------ x
THE CHEROKEE NATION, *et al.*,        :
                                      :
                Plaintiffs,           :
                                      :          No. 1:20-cv-02167 (TJK)
        v.                            :
                                      :
U.S. DEPARTMENT OF THE                :
INTERIOR, *et al.*,                   :
                                      :
                Defendants.           :
------------------------------------------------------ x

**DEFENDANT GOVERNOR J. KEVIN STITT'S MEMORANDUM
OF POINTS AND AUTHORITIES IN SUPPORT OF HIS
CROSS-MOTION FOR SUMMARY JUDGMENT AND IN
OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT ...................................................................................................1

    A.    Statutory Background ................................................................................3

    B.    Factual Background ....................................................................................6

          1.    Tribal Gaming In Oklahoma ........................................................6

          2.    The Compacts At Issue ................................................................7

          3.    Legal Challenges To The Compacts ............................................9

    C.    Procedural Background................................................................................10

I.    THE SECRETARY VALIDLY APPROVED THE CHALLENGED
    COMPACTS, AND THEY REMAIN IN EFFECT UNDER IGRA.................................12

    A.    The Secretary Did Not Violate IGRA By Allowing The Compacts To
        Take Effect Under Federal Law.................................................................12

          1.    The compacts were submitted and approved precisely as the statute
             and the regulations require ..........................................................13

          2.    The Secretary permissibly declined to disapprove the compacts
             during the 45-day review period ..................................................14

    B.    Subsequent State-Court Decisions Did Not Unwind The Compacts After
        They Had Already "Take[n] Effect" Under IGRA .................................22

II.    THE CHALLENGED PROVISIONS OF THE COMPACTS DO NOT RENDER
    THE COMPACTS INVALID UNDER IGRA .............................................................33

    A.    The Challenged Provisions Do Not Violate IGRA.................................33

          1.    The compacts do not authorize Class III gaming activities that are
             otherwise unlawful in Oklahoma.................................................34

          2.    The compacts' revenue-sharing provisions do not operate as a tax..........37

          3.    The revenue certification and reporting provisions address
             permissible topics and do not impermissibly regulate class II
             gaming.........................................................................................39

          4.    The compacts' concurrence provisions are permissible under
             IGRA and consistent with federal trust obligations...................41

B.    Even If Any Of The Challenged Provisions Were Unlawful, The Appropriate Remedy Would Be To Sever Them, Not Invalidate The Entire Compacts................................................................................................44

CONCLUSION................................................................................................45

# TABLE OF AUTHORITIES

*Page(s)*

CASES

*Amador County* v. *Salazar*,
640 F.3d 373 (D.C. Cir. 2011).........................................................................21

*\*Bank of New York* v. *FDIC*,
453 F. Supp. 2d 82 (D.D.C. 2006).....................................................................18

*Bates* v. *United States*,
522 U.S. 23 (1997) ............................................................................................17

*Booth* v. *Bowser*,
597 F. Supp. 3d 1  (D.D.C. 2022)......................................................................18

*California* v. *Cabazon Band of Mission Indians*,
480 U.S. 202 (1987)...................................................................................1, 3, 23

*Changji Esquel Textile Co. Ltd.* v. *Raimondo*,
573 F. Supp. 3d 104 (D.D.C. 2021) ..................................................................11

*Cherokee Nation* v. *Dep't of Interior*,
643 F. Supp. 3d 90 (D.D.C. 2022)........................................................10, 17, 22

*Cherokee Nation* v. *Dep't of Interior*,
2025 WL 1895837 (D.D.C. July 9, 2025)..........................................................16

*Cherokee Nation* v. *United States Dep't of the Interior*,
564 P.3d 58 (2025)............................................................................................22

*Citizen Potawatomi Nation* v. *Oklahoma*,
881 F.3d 1226 (10th Cir. 2018) ........................................................................44

*Cuyler* v. *Adams*,
449 U.S. 433 (1981)...........................................................................................29

*\*Detroit International Bridge Co.* v. *Government of Canada*,
192 F. Supp. 3d 54 (D.D.C. 2016) ...............................................................28, 29

*El Paso Nat. Gas Co.* v. *United States*,
750 F.3d 863 (D.C. Cir. 2014)...........................................................................42

*Forest Cnty. Potawatomi Cmty.* v. *United States*,
330 F. Supp. 3d 269 (D.D.C. 2018) ..................................................................40

*Idaho* v. *Shoshone-Bannock Tribes*,
    465 F.3d 1095 (9th Cir. 2006) ........................................................................37

*In re Indian Gaming Related Cases*,
    331 F.3d 1094 (9th Cir. 2003) ........................................................................37

*Kickapoo Tribe of Indians* v. *Babbitt*,
    827 F. Supp. 37 (D.D.C. 1993) .......................................................24, 27, 30, 31

*Lac Courte Oreilles Band of Lake Superior Chippewa Indians* v. *United States*,
    259 F. Supp. 2d 783 (W.D. Wis. 2003) ...........................................................43

*\*Langley* v. *Edwards*,
    872 F. Supp. 1531 (W.D. La. 1995) ................................................24, 27, 32

*Little Sisters of the Poor Saints Peter & Paul Home* v. *Pennsylvania*,
    591 U.S. 657 (2020) ........................................................................................18

*Marsh* v. *Oregon Nat. Res. Council*,
    490 U.S. 360 (1989) ........................................................................................25

*Michigan* v. *Bay Mills Indian Cmty.*,
    572 U.S. 782 (2014) ........................................................................................23

*Milner* v. *Dep't of Navy*,
    562 U.S. 562 (2011) ........................................................................................31

*Mississippi Band of Choctaw Indians* v. *Holyfield*,
    490 U.S. 30 (1989) ..........................................................................................18

*Mozilla Corp.* v. *FCC*,
    940 F.3d 1 (D.C. Cir. 2019) ...........................................................................11

*Narragansett Indian Tribe of R.I.* v. *State of R.I.*,
    1996 WL 97856 (D.R.I. Feb. 13, 1996) .........................................................32

*NTCH, Inc.* v. *FCC*,
    950 F.3d 871 (D.C. Cir. 2020) .......................................................................14

*Oliphant* v. *Schlie*,
    544 F.2d 1007 (9th Cir. 1976) .......................................................................25

*Omaha Tribe of Neb.* v. *Vill. of Walthill*,
    334 F. Supp. 823 (D. Neb. 1971) ...................................................................26

*Pueblo of Santa Ana* v. *Kelly*,
    104 F.3d 1546 (10th Cir. 1997) .......................................................24, 29, 30, 31

*Rhode Island* v. *Narragansett Indian Tribe*,
    1995 WL 17017347 (D.R.I. Feb. 3, 1995) ...........................................................17

*Russello* v. *United States*,
    464 U.S. 16 (1983)...............................................................................................19

*Seminole Tribe of Florida* v. *Florida*,
    517 U.S. 44 (1996)...............................................................................................23

*State ex rel. Dyer* v. *Sims*,
    341 U.S. 22 (1951)...............................................................................................29

*Treat* v. *Stitt*,
    473 P.3d 43 (Okla. 2020) .....................................................................................10

*Treat* v. *Stitt*,
    481 P.3d 240 (Okla. 2021) ...................................................................................10

*United States* v. *Brown*,
    334 F. Supp. 536 (D. Neb. 1971) .........................................................................26

*United States* v. *Lawrence*,
    595 F.2d 1149 (9th Cir. 1979) .............................................................................26

*United States Postal Serv.* v. *Postal Regul. Comm'n*,
    963 F.3d 137 (D.C. Cir. 2020) .............................................................................14

*Washington* v. *Confederated Bands & Tribes of the Yakima Indian Nation*,
    439 U.S. 463 (1979)...............................................................................................27

*West Flagler Assocs., Ltd.* v. *Haaland*,
    71 F.4th 1059 (D.C. Cir. 2023)................................................18, 22, 29, 33, 36, 44

*WildEarth Guardians* v. *U.S. Fish & Wildlife Serv.*,
    749 F. Supp. 3d 26 (D.D.C. 2024) ........................................................................11

*Willis* v. *Fordice*
    850 F. Supp. 523 (S.D. Miss. 1996)......................................................................32

**STATUTES**

5 U.S.C. § 706..............................................................................................................11

25 U.S.C. § 1323............................................................................................................6

25 U.S.C. § 2702.................................................................................................1, 4, 45

25 U.S.C. § 2703.......................................................................................................4, 19

25 U.S.C. § 2704 ...................................................................................................4

*25 U.S.C. § 2710 ...................................................................................... *passim*

25 U.S.C. § 2719 ........................................................................................38, 41, 42

33 U.S.C. § 535 ...................................................................................................28

Okla. Stat. tit. 3A, § 280 .......................................................................................6

Okla. Stat. tit. 3A, § 281 .......................................................................................6

Okla. Stat. tit. 74, § 1221 ...............................................................................1, 6, 14

Okla. Stat. tit. 74, § 1222 .......................................................................................6

**REGULATIONS**

25 C.F.R. § 151.2 ...............................................................................................43

25 C.F.R. § 151.7 ...............................................................................................43

25 C.F.R. § 292.22 .............................................................................................43

25 C.F.R. § 293.3 ............................................................................................5, 13

25 C.F.R. § 293.7 ...............................................................................................20

*25 C.F.R. § 293.8 ......................................................................1, 6, 11, 13, 19, 20

25 C.F.R. § 293.15 ...........................................................................................6, 13

*Class III Tribal State Gaming Compact Process,*
   73 Fed. Reg. 74,004 (Dec. 5, 2008) ...........................................................5, 20

*Indian Gaming; Tribal-State Class III Gaming Compacts Taking Effect in the
   State of Oklahoma,*
   85 Fed. Reg. 38,919 (June 29, 2020) ..................................................9, 12, 14, 22

**OTHER AUTHORITIES**

S. Rep. No. 100-446 (1988) ..........................................................................4, 25, 37

*In re Treat,*
   2020 WL 2304499 (Okla. A.G. May 5, 2020)..................................................9, 14

*In re Williamson,*
   2004 WL 2002612 (Okla. A.G. Aug. 26, 2004) .............................................6, 8, 15

Fed. R. Civ. P. 56................................................................................................................11

Antonin Scalia & Bryan A. Garner, *Reading Law* (2012).............................................17

## PRELIMINARY STATEMENT

After the Supreme Court made clear that States have no inherent sovereign authority to regulate gaming activity on Indian lands, *California* v. *Cabazon Band of Mission Indians*, 480 U.S. 202, 221-222 (1987), Congress enacted the Indian Gaming Regulatory Act (IGRA) to create a comprehensive federal framework that would authorize and regulate such gaming. Its goal was to promote tribal economic development, self-sufficiency, and strong tribal governments, while protecting gaming as a source of tribal revenue. *See* 25 U.S.C. § 2702(1), (3). Congress divided Indian gaming into three classes, with different standards and regulatory authority over each class. Only one of those classes of gaming—class III gaming—provides any role for States in that federal framework. And that role is a narrow one: IGRA authorizes States and Tribes to negotiate compacts describing the operations and parameters for class III gaming, but those compacts may become effective under federal law only upon approval by the Secretary of the Interior. *See* 25 U.S.C. § 2710.

At issue now in this case are two such compacts that the State of Oklahoma entered into with Defendants Comanche Nation and Otoe-Missouria Tribe. Governor Stitt negotiated and executed those compacts pursuant to his state statutory authority "to . . . enter into cooperative agreements . . . with federally recognized Indian tribes." Okla. Stat. tit. 74, § 1221(C)(1). The compacts were then submitted to the Secretary for approval in conformance with IGRA and its implementing regulations, along with the Governor's certification of his authority to enter into those agreements on behalf of Oklahoma. *See* 25 C.F.R. § 293.8 (2008). Because the Secretary did not disapprove the compacts within the 45-day review period prescribed by IGRA, the compacts were "considered to have been approved." 25 U.S.C. § 2710(d)(8)(C). The Secretary then published notice of the approval in the Federal Register, at which point the compacts took effect under federal law. *See id.* § 2710(d)(3)(B), (d)(8)(D).

The Plaintiff Tribes object to those compacts.  During the statutory review period, Plaintiffs and others argued to the Secretary that the Governor lacked authority to enter into the compacts on behalf of the State.  The Secretary apparently was not persuaded by these objections, and allowed those compacts to go into effect under IGRA.  But the challenges continued in state court, culminating in decisions by the Oklahoma Supreme Court that were issued *after* the challenged compacts had already gone into effect under IGRA.  Those decisions address the Governor's authority under state law, but they did not—and could not—resolve whether the compacts remain valid and in effect under *federal* law.

Now in this federal lawsuit, Plaintiffs seek to unwind the compacts.  They argue that the Secretary should not have approved the compacts because the Oklahoma Supreme Court has since held that the Governor exceeded his authority under state law in agreeing to them.  And they ask this Court to hold that the federally approved compacts are void and invalid as a result.

This Court should put an end to Plaintiffs' challenge, which misunderstands the federal compact-approval framework established by IGRA.  The Tribes, the Governor, and the Secretary fully complied with the requirements of IGRA and its implementing regulations in the submission and approval of the compacts, and those compacts went into effect under federal law precisely as IGRA envisions.  Contrary to Plaintiffs' argument, nothing presented to the Secretary during the 45-day statutory review period compelled the Secretary to disapprove the compacts.  The most Plaintiffs can point to is a robust state-law dispute about whether the Governor did or did not act within his express statutory authority when negotiating or entering into the compacts.  By its plain text, IGRA did not require the Secretary to resolve that state-law dispute and confirm that the Governor in fact *does* possess the state-law authority before approving the compacts.  Plaintiffs' argument that the statute implicitly requires that the compact be "*validly* entered into" under state law impermissibly reads a requirement into the statute that Congress did not impose.  Here, as

provided in the implementing regulations, the Secretary relied on certifications of the Tribes' and the State's authority to enter into the compacts in order to confirm they were "entered into between an Indian tribe and a State" for purposes of IGRA.  25 U.S.C. § 2710(d)(8)(A).  The Secretary was well within his authority to make that finding and place the compacts into effect.

To be sure, after the compacts took effect under federal law, the Oklahoma Supreme Court held that the Governor had exceeded his authority under Oklahoma law.  But state-court decisions cannot unilaterally overrule the Secretary's action and render an approved compact ineffective under federal law.  Courts in multiple contexts have declined to allow changes in state law to override federally approved agreements without express direction from Congress.  There is no such direction here; if anything, IGRA does the opposite by establishing a federal framework for regulating tribal gaming with a narrow role for States.  The cases Plaintiffs cite to the contrary are inapposite or unpersuasive.  The Court should thus reject Plaintiffs' challenges to the compacts in Counts I-III and enter judgment in favor of Defendants.

Plaintiffs' grab-bag of challenges to individual provisions of the compacts in Counts IV-VII fare no better.  All of the challenged provisions fall within IGRA's broad authorization for Tribal-State compacts to address matters "directly related to the operation of gaming activities," including regulatory coordination, revenue sharing, and future contingencies based on potential changes in state law.  25 U.S.C. § 2710(d)(3)(C)(vii).  And even if any discrete provision were found inconsistent with IGRA, the compacts' severability clauses foreclose Plaintiffs' effort to invalidate the agreements wholesale.

## BACKGROUND

### A.    Statutory Background

In *California* v. *Cabazon Band of Mission Indians*, the Supreme Court held that States have no inherent authority to regulate gaming on Indian lands unless Congress authorizes them to do

so. 480 U.S. at 221. Congress responded the following year by enacting the Indian Gaming Regulatory Act. Among its goals was to "declare that the establishment of independent Federal regulatory authority for gaming on Indian lands, [and] the establishment of Federal standards for gaming on Indian lands . . . are necessary to meet congressional concerns regarding gaming and to protect such gaming as a means of generating tribal revenue." 25 U.S.C. § 2702(3). To achieve that purpose, IGRA created a comprehensive framework that gives States a limited, federally-circumscribed role—namely, the ability to negotiate and enter into Tribal-State gaming compacts. S. Rep. No. 100-446, at 6 (1988).

IGRA divides Indian gaming into three classes for the purposes of regulation. *See* S. Rep. No. 100-446, at 7. Class I gaming consists of traditional or ceremonial tribal games and small-stakes social play. Class I gaming is "within the exclusive jurisdiction of the Indian tribes"; it is not subject to IGRA and cannot be regulated by States. 25 U.S.C. §§ 2703(6), 2710(a)(1). Class II gaming includes bingo, bingo-related games, and certain card games. Class II gaming is also "within the jurisdiction of the Indian tribes," *id.* § 2710(a)(2), but subject to federal oversight by the National Indian Gaming Commission (a federal commission created by IGRA). *See id.* § 2704.

Class III gaming, which is the focus of this case, encompasses all other forms of gaming, including casino-style games such as blackjack, roulette, baccarat, craps, slot machines, and sports betting. *Id.* § 2703(7)(B), (8). Class III gaming activities are lawful on Indian lands only if they are: (i) "authorized by [a Tribal] ordinance or resolution" that is approved by the Chairman of the NIGC; (ii) conducted in a State that permits such gaming "for any purpose by any person, organization, or entity"; and (iii) "conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State . . . that is in effect." *Id.* § 2710(d)(1)(A)-(C). These compacts are negotiated agreements that set the terms under which a Tribe may offer class III gaming activities on Indian lands. And they are the *exclusive* mechanism under IGRA through which a

State may participate in regulating class III gaming. *Id.* § 2710(d)(3)(A). IGRA defines the scope of that participation, allowing the compacts to include provisions related to any of six topics enumerated in IGRA or "any other subjects that are directly related to the operation of gaming activities." *Id.* § 2710(d)(3)(C)(i)-(vii).

IGRA sets forth rules governing Tribal-State compacts. Before a compact may become effective under IGRA, it must be submitted to the Secretary of the Interior for review and approval. 25 U.S.C. § 2710(d)(3)(B). The Secretary "is authorized to approve any Tribal-State compact entered into between an Indian tribe and a State governing gaming on Indian lands of such Indian tribe." *Id.* § 2710(d)(8)(A). Conversely, the Secretary may disapprove a compact only if it violates IGRA, another provision of federal law, or "the trust obligations of the United States to Indians." *Id.* § 2710(d)(8)(B). If the Secretary does not either expressly approve or disapprove the compact within 45 days, "the compact shall be considered to have been approved . . . but only to the extent the compact is consistent with [IGRA]." *Id.* § 2710(d)(8)(C). Whether a compact has been expressly approved under § 2710(d)(8)(A) or "no-action" approved under § 2710(d)(8)(C), the compact "shall take effect" when the Secretary publishes "notice of [the] approval" in the Federal Register. *Id.* § 2710(d)(3)(B).

In 2008, the Department of the Interior promulgated regulations to implement the statutory scheme by setting out the process by which the Secretary would review Tribal-State compacts. *See* 25 C.F.R. pt. 293; 73 Fed. Reg. 74,004 (Dec. 5, 2008). The regulations acknowledge the Secretary's statutory authority to approve a compact that is "entered into" by a Tribe and a State, "as evidenced by the appropriate signature of both parties." *Id.* § 293.3 (2008). And they specify what materials the Secretary requires parties to submit with their proposed compact to enable the Secretary to make that determination: for the Tribe, "[a] tribal resolution or other document . . . that certifies that the Tribe has approved the compact or amendment in accordance with applicable

tribal law"; and, for the State, a "[c]ertification from the Governor or other representative of the State that he or she is authorized under State law to enter into the compact or amendment." *Id.* § 293.8 (2008). After the Secretary decides whether to approve, disapprove, or no-action approve a compact based on that documentation, an "approved or considered-to-have-been-approved compact" takes effect "on the date that notice of its approval is published in the Federal Register." *Id.* § 293.15 (2008).

### B.    Factual Background

#### 1.    Tribal Gaming In Oklahoma

In 2004, the Oklahoma Legislature enacted the State-Tribal Gaming Act, which offered every federally recognized Tribe in Oklahoma a "model" Tribal-State compact for class III gaming. Okla. Stat. tit. 3A, §§ 280-281. The model compact was offered "through the concurrence of the Governor after considering the executive prerogatives of that office and the power to negotiate the terms of a compact between the state and a tribe." *Id.* § 280.

Many Tribes—including the Plaintiffs Cherokee Nation, Chickasaw Nation, and Choctaw Nation—offer class III gaming based on that model. But the State-Tribal Gaming Act does not require that all Tribes do so or that every compact contain the same terms as the model compact. A Tribe instead may pursue a compact through negotiations with the State. Oklahoma law provides that the Governor "is authorized to negotiate and enter into cooperative agreements on behalf of this state with federally recognized Indian tribal governments within this state to address issues of mutual interest" and that "such agreements shall become effective upon approval by the Joint Committee on State-Tribal Relations," a committee of the Oklahoma Legislature responsible for overseeing and approving compacts. *See* Okla. Stat. tit. 74, §§ 1221(C)(1), 1222. A 2004 Oklahoma Attorney General Opinion expressly addressed whether the Governor can "compact with Indian tribes . . . and in doing so bind the State, without the approval of each compact by the

Legislature." *In re Williamson*, No. 2004-27, 2004 WL 2002612, at *1 (Okla. A.G. Aug. 26, 2004). That opinion concluded that legislative approval of the individual agreements negotiated by the Governor between the State and other sovereigns violates the separation-of-powers provisions of the Oklahoma Constitution. *Id.* at *2, *6.

### 2. The Compacts At Issue

In 2019, Plaintiffs Cherokee Nation, Choctaw Nation, and Chickasaw Nation brought suit against Governor Stitt in a dispute over whether their model compacts automatically renewed. *See Cherokee Nation* v. *Stitt*, No. 19-cv-01198 (W.D. Okla.). Defendants Comanche Nation and Otoe-Missouria Tribes intervened in that action to assert similar claims. *See* No. 19-cv-01198, ECF Nos. 43, 48 (motions to intervene); Second Amended and Supplemented Complaint ¶ 74, ECF No. 104 (SAC). As part of settlement discussions in that litigation, the Comanche Nation and Otoe-Missouria Tribe agreed to new, individualized compacts with Governor Stitt. SAC ¶¶ 75-77, 101, 122.

The two compacts differ in some respects from the model compact as a result of the parties' negotiations. Among other variations, the agreements contemplate authorization of event wagering and house-banked games "if such game has been approved by the [State Compliance Agency]" or "to the extent such wagers are authorized by law." A.R. 8 (Comanche Nation Compact pt. 2.A.7, 2.A.13); A.R. 41-42 (Otoe-Missouria Compact pt. 2.A.6, 2.A.12).[1]

The Comanche Nation and Otoe-Missouria Tribe compacts also contain provisions requiring the Tribes to certify that a set percentage of revenue generated from their gaming facilities be derived from class III gaming and requiring the Tribes to "report at least quarterly . . .

---

[1] Citations designated "A.R." refer to the administrative record, which Federal Defendants served on March 2, 2023. *See* ECF No. 164. Federal Defendants provided supplemental productions of the administrative record on April 8 and May 25, 2023. *See* ECF Nos. 165, 171.

the number of . . . class II and class III games" in each facility.  A.R. 29, 13, 19 (Comanche Nation Compact pt. 10.B.5, 4.K); A.R. 63, 48, 53 (Otoe-Missouria Compact pt. 10.B.5, 3.D, pt. 4.K).  In addition, the compacts provide for the Governor's concurrence in certain future trust-land acquisitions.  A.R. 19 (Comanche Nation Compact pt. 4.J.2.a), A.R. 53 (Otoe-Missouria Compact pt. 4.J.2.a).  Finally, both compacts contain severability clauses, which provide that, if any clause or provision is determined "to be invalid or unenforceable[,] . . . the remainder of this Compact shall not be affected thereby."  A.R. 32-33 (Comanche National Compact pt. 13.B); A.R. 66 (Otoe-Missouria Compact pt. 13.B).

On April 23, 2020, the Comanche Nation and Otoe-Missouria Tribe submitted their executed compacts to the Secretary of the Interior for approval pursuant to IGRA.  A.R. 1 (Email from M. Oakes to T. Woodward et al re: Incoming Oklahoma Gaming Compacts); A.R. 2 (Comanche Nation Compact); A.R. 35 (Otoe Missouria Compact).  The submissions included certifications that the Governor was authorized to negotiate and enter the compacts on behalf of Oklahoma.  A.R. 3 (Comanche Nation Compact), A.R. 36 (Otoe-Missouria Compact).  The next day, the Governor's general counsel submitted a memorandum to the Secretary more fully setting out the legal basis for the Governor's conclusion that he had authority to negotiate and execute the compacts on behalf of the State, and explaining why the compacts' provisions were permitted under Oklahoma law and IGRA.  *See* A.R. 72; A.R. 73-83 (Memorandum from Office of Gen. Counsel, Okla. Governor's Office to Paula Hart, Dir., Office of Indian Gaming, U.S. Dep't of the Interior (Apr. 24, 2020)).  The certifications and the memorandum quoted the 2004 opinion of the Oklahoma Attorney General, which states that "any requirement that individual agreements or compacts negotiated by the Governor on behalf of the State with other sovereigns, such as Indian tribes, be approved by the Legislature would violate the principles of separation of powers."  *See* A.R. 3; A.R. 36; A.R. 74-75 (quoting *Williamson*, 2004 WL 2002612, at *6).

During the 45-day review period, Plaintiffs and other interested parties submitted comments urging disapproval. On May 5, 2020, the Oklahoma Attorney General issued and submitted to the Secretary an "official Attorney General Opinion" that took the position that the "Governor lacks authority to enter into and bind the State to compacts with Indian tribes that authorize gaming activity prohibited by state law." A.R. 504; *see In re Treat*, 2020 WL 2304499 (Okla. A.G. May 5, 2020) (*Treat* AG Opinion). In a letter enclosing his opinion—which he described as being issued in a "quasi-judicial capacity" and binding state officers—the Attorney General asked the Secretary to disapprove the compacts based on his view that the Governor lacked authority to enter into them. A.R. 494. On May 14, 2020, Defendants Comanche Nation and Otoe-Missouria Tribe submitted a memorandum to the Secretary responding to the *Treat* AG Opinion. A.R. 695. The memorandum argued that the Governor had authority to enter into compacts on behalf of the State, and that the challenged compacts were consistent with state law. A.R. 699-701.

The Secretary did not take action within the 45-day period, which concluded on June 7, 2020. As a result, the compacts were "considered to have been approved," and notice of that approval was published in the Federal Register on June 29, 2020. *See* Indian Gaming; Tribal-State Class III Gaming Compacts Taking Effect in the State of Oklahoma, 85 Fed. Reg. 38,919 (June 29, 2020).

### 3.     Legal Challenges To The Compacts

On June 4, 2020, after the Comanche Nation and Otoe-Missouria Tribe's compacts were submitted to the Secretary but during the 45-day review period, certain Oklahoma legislators filed a petition in the Oklahoma Supreme Court challenging the Governor's authority to enter into those agreements under state law. While that case was pending, the 45-day review period expired. The

compacts were thus "deemed approved" by the Secretary and took effect under IGRA after notice was published in the Federal Register on June 29, 2020.

On July 21, 2020, after the compacts had taken effect under IGRA, the Oklahoma Supreme Court issued a ruling in the legislators' challenge. The Court held that the compacts were invalid under state law because they purported to authorize "types of Class III gaming expressly prohibited by the State-Tribal Gaming Act." *Treat* v. *Stitt*, 473 P.3d 43, 45 (Okla. 2020) (*Treat I*).

### C.    Procedural Background

In August 2020, Plaintiffs filed this action challenging the Secretary's no-action approvals of the challenged compacts and two similar compacts—entered with the United Keetoowah Band of Cherokee Indians (UKB) and the Kialegee Tribal Town (KTT)[2]—under the Administrative Procedure Act (APA). On November 23, 2022, this Court issued an opinion resolving various motions to dismiss. The Court dismissed all claims relating to the UKB and KTT compacts for lack of standing, *see supra* n.2, and denied Federal Defendants' and Defendant Chairman Woommavovah's motions to dismiss Plaintiffs' claims as to the Comanche Nation and Otoe-Missouria Tribe compacts. *Cherokee Nation* v. *Dep't of Interior*, 643 F. Supp. 3d 90, 111 (D.D.C.

---

[2]    On July 1, 2020, Governor Stitt signed similar compacts with the United Keetoowah Band of Cherokee Indians (UKB) and the Kialegee Tribal Town (KTT). The Secretary likewise took no action over those compacts within 45 days, so they too were deemed approved. On September 8, 2020, the Secretary published notice of the approval of the UKB and KTT compacts in the Federal Register, causing the compacts to take effect. *See* 85 Fed. Reg. 55,472 (Sept. 8, 2020). Plaintiffs challenged those compacts on the same grounds as the Comanche Nation and Otoe-Missouria compacts. *See* SAC, ECF No. 104. A subsequent Oklahoma Supreme Court decision held that the UKB and KTT compacts were invalid under state law, concluding that the Governor had exceeded his authority by negotiating terms "that differ from the Model Compact found in the State-Tribal Gaming Act." *Treat* v. *Stitt*, 481 P.3d 240, 243-44 (Okla. 2021) (*Treat II*). In its motion-to-dismiss decision, this Court dismissed Plaintiffs' claims related to the UKB and KTT compacts for lack of standing. ECF No. 157.

2022).  The Court also denied Governor Stitt's Rule 12(c) motion for judgment on the pleadings as moot in part and without prejudice in part.  *See* Minute Order of Nov. 23, 2022.

## STANDARD OF REVIEW

Summary judgment is appropriate where there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Under the Administrative Procedure Act, a court must "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Agency action is unlawful if it exceeds the scope of authority Congress granted in the governing statute.  *See Mozilla Corp.* v. *FCC*, 940 F.3d 1, 74 (D.C. Cir. 2019); *Changji Esquel Textile Co. Ltd.* v. *Raimondo*, 573 F. Supp. 3d 104, 112 (D.D.C. 2021).  And a court will hold an agency decision arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, . . . offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *WildEarth Guardians* v. *U.S. Fish & Wildlife Serv.*, 749 F. Supp. 3d 26, 52 (D.D.C. 2024) (citation omitted).

## ARGUMENT

Because the Governor, the Defendant Tribes, and the Secretary all fully complied with IGRA's requirements in the submission and approval of both of the challenged compacts, the compacts remain valid and in effect under federal law.  Plaintiffs seek to invalidate those compacts, but none of their arguments have merit.  First, Plaintiffs' challenges to the compacts in their entirety fail because IGRA did not require the Secretary to resolve the state-law dispute over the Governor's authority during the 45-day statutory review period, and the subsequent Oklahoma Supreme Court decisions could not unilaterally unwind a federally approved compact that had already gone into effect under IGRA.  Second, Plaintiffs' challenges to various individual

-11-

provisions of the agreements misread those provisions and ignore the wide latitude Congress gave parties in negotiating compact terms. This Court should reject Plaintiffs' arguments and enter summary judgment upholding the compacts as valid and in effect under federal law.

I.    **THE SECRETARY VALIDLY APPROVED THE CHALLENGED COMPACTS, AND THEY REMAIN IN EFFECT UNDER IGRA.**

In Counts I-III of the Complaint, Plaintiffs argue that the Secretary violated the APA by not disapproving the challenged compacts. *See* SAC ¶¶ 232-244; Pls.' Br. 13-39. Specifically, Plaintiffs contend that, because the Governor purportedly exceeded his authority under Oklahoma law when negotiating and signing the compacts on behalf of the State, the compacts were not "entered into" under IGRA and are thus void and invalid. *See also* Brief of Attorney General as *Amicus Curiae*, ECF No. 224 (AG Br.) at 4-6. That is incorrect. First, the Secretary fully complied with IGRA's requirements in causing the compacts to take effect under IGRA, and nothing required the Secretary to disapprove the compacts during the statutory 45-day review period. Second, once the compacts took effect under federal law, subsequent state-court decisions could not unwind that approval and render them void under IGRA.

A.    **The Secretary Did Not Violate IGRA By Allowing The Compacts To Take Effect Under Federal Law.**

The Comanche Nation and Otoe-Missouria Tribes submitted their executed compacts to the Secretary for approval on April 23, 2020. During the ensuing statutory 45-day review period, the parties and the Secretary followed the statutory and regulatory procedures governing the review and approval of Tribal-State compacts, and those compacts went into effect for purposes of IGRA when they were published in the Federal Register on June 29, 2020. 85 Fed. Reg. 38,919. Contrary to Plaintiffs' arguments, the Secretary did not violate the APA by failing to disapprove the compacts during the 45-day statutory review period.

-12-

### 1. The compacts were submitted and approved precisely as the statute and the regulations require.

The statutory process for the Secretary's review of Tribal-State gaming compacts is streamlined and straightforward. After the Secretary receives the signed compact, the Secretary may approve it, 25 U.S.C. § 2710(d)(8)(A), or disapprove it for one of only three specified reasons: if the compact violates "any provision of" IGRA, violates other federal laws, or violates the United States' trust obligations. *Id.* § 2710(d)(8)(B)(i)-(iii). If 45 days elapse without express approval or disapproval by the Secretary, the compact "shall be considered to have been approved" as of that date, but "only to the extent the compact is consistent with the provisions of" IGRA. *Id.* § 2710(d)(8)(C). Whether the approval occurs expressly or through inaction, the Secretary must publish notice of the approval in the Federal Register, *id.* § 2710(d)(8)(D), and the approved compact "take[s] effect" under IGRA as of that publication date. *Id.* § 2710(d)(3)(B).

The Secretary has issued regulations specifying how he will implement that streamlined statutory process. The regulations in place at the time relevant here provided that the Secretary may approve a compact "entered into" by a Tribe and a State "as evidenced by the appropriate signature of both parties." 25 C.F.R. § 293.3 (2008). To enable the Secretary to make that determination, the Secretary required parties to submit only a few documents in connection with their approval request, including the compact itself, a tribal resolution, a "[c]ertification from the Governor or other representative of the State that he or she is authorized under State law to enter into the compact," and any other documents the Secretary requests. *Id*. § 293.8. And like the statute, the regulations confirm that if the Secretary does not take action on the compact within 45 days of its submission, it will "take[] effect on the date that notice of its approval is published in the Federal Register." *Id.* § 293.15.

Plaintiffs do not dispute that the Comanche and Otoe-Missouri compacts were submitted and approved by the Secretary precisely in accordance with these statutory and regulatory requirements. *See* Pls.' Br. 26. The Tribes submitted the compacts to the Secretary for review, bearing the signature of the Chairmen and the Governor. *See* A.R. 34; A.R. 68. Those submissions contained certifications from the Governor that he was authorized to "enter into compacts" with Tribes on behalf of the State. *See* A.R. 3 (Comanche Nation Compact); A.R. 36 (Otoe-Missouria Compact). The certifications cited an Oklahoma statute providing that "[t]he Governor is authorized to negotiate and enter into cooperative agreements on behalf of [the] state." Okla. Stat. tit. 74, § 1221(C)(1); A.R. 3; A.R. 36. The Secretary took no express action on the compacts, so the compacts were "considered to have been approved" after the 45-day period elapsed. And the compacts then took effect on June 29, 2020, when the Secretary published notice of the approved compacts in the Federal Register. *See* Indian Gaming; Tribal-State Class III Gaming Compacts Taking Effect in the State of Oklahoma, 85 Fed. Reg. 38,919 (June 29, 2020).

### 2. The Secretary permissibly declined to disapprove the compacts during the 45-day review period.

Plaintiffs nonetheless contend that the Secretary violated the APA by approving the compacts. Pls.' Br. 1; SAC ¶¶ 232-244. To make that showing, Plaintiffs must identify something that compelled the Secretary to disapprove the compacts during the 45-day statutory review period. *See U.S. Postal Serv.* v. *Postal Regul. Comm'n*, 963 F.3d 137, 142 (D.C. Cir. 2020) ("[W]e 'judge the reasonableness of an agency's decision on the basis of the record before the agency at the time it made its decision.'") (quoting *NTCH, Inc.* v. *FCC*, 950 F.3d 871, 881 (D.C. Cir. 2020)). The only hook Plaintiffs identify that even conceivably meets that requirement is the May 2020 *Treat* AG Opinion. *See* Pls.' Br. 36; A.R. 494. That opinion, which was issued and submitted to the Secretary during the 45-day review period, stated that the Governor "currently lacks the authority

-14-

to bind the State to the compacts" at issue.  *In re Treat*, 2020 WL 2304499, at \*4 (Okla. A.G. May 5, 2020); A.R. 500.   Plaintiffs claim that the *Treat* AG Opinion unambiguously caused the compacts to be "deemed invalid before the forty-five-day review period ended," Pls.' Br. 36, meaning that the compacts "were not legally entered [into] under state law," *id.* at 35; *see also* AG Br. at 7.  That argument fails to show that the Secretary violated the APA for several reasons.

1.    As an initial matter, Plaintiffs are wrong to suggest that the May 2020 *Treat* AG Opinion conclusively demonstrated to the Secretary that the Governor had exceeded his authority in entering into the compacts on behalf of the State.  At most, from the Secretary's vantage point in light of the other submissions, the *Treat* AG opinion simply created a state-law dispute as to the Governor's authority.

The submissions to the Secretary included certifications from the Governor that he had authority to enter into the compacts on behalf of the State, as required by the IGRA regulations. *See* A.R. 3 (Comanche Nation Compact); A.R. 36 (Otoe-Missouria Compact).  Those certifications cited constitutional provisions, case law, an Oklahoma statute, and a 2004 Oklahoma Attorney General opinion confirming the Governor's authority to do so.  *Id.*  The Secretary also had before him a legal memorandum submitted by the Governor's general counsel the day after the compacts were submitted.  That memorandum explained the basis for the Governor's determination that he had the authority to compact with Tribes on behalf of the State in response to "certain questions raised in [the] State by legislative leadership following the signing of the compacts"—*i.e.*, the questions that prompted the *Treat* AG Opinion.  A.R. 72- 73.  The memorandum explained that, under the Oklahoma Constitution, the State Tribal Gaming Act, and Oklahoma Supreme Court precedent, the Governor has "sole authority" to negotiate and execute compacts with Tribes in Oklahoma.  A.R. 74.  And the memorandum pointed to the earlier 2004 Oklahoma Attorney General opinion determining that "any requirement that individual agreements or compacts

negotiated by the Governor on behalf of the State . . . be approved by the Legislature would violate the principles of separation of powers." *In re Williamson*, No. 2004-27, 2004 WL 2002612, at *1 (Okla. A.G. Aug. 26, 2004).

Those submissions could readily support a determination by the Secretary that, contrary to the present Attorney General's view reflected in the *Treat* AG Opinion, the Governor acted within his state-law authority to enter into the compacts. As a result, the *Treat* AG Opinion did *not* unambiguously require the Secretary to disapprove the compacts.[3] At most, it presented the Secretary with a state-law dispute over the Governor's authority—one that, as Plaintiffs acknowledge, Pls.' Br. 19, 28, was being litigated in the Oklahoma Supreme Court beyond the conclusion of the 45-day period.

2.    In any event, even if Plaintiffs were right that, as a matter of Oklahoma law, the *Treat* AG Opinion was "binding" on the question of the Governor's authority to enter into the compacts, Pls.' Br. 37, that still would not make the Secretary's no-action approval unlawful. That is because nothing in IGRA, its implementing regulations, or elsewhere supports Plaintiffs' argument that the Secretary was required to resolve the state-law dispute and determine that the compacts in fact were "*validly* entered into" under state law during the 45-day period before

---

[3]    At the pleadings stage, this Court stated that "any state-law dispute between the Governor and others … was resolved—at least for the time being and for the Secretary's purposes—during the forty-five-day review period" by the *Treat* AG Opinion. 643 F. Supp. 3d at 116. But as the Court later made clear, that was not a final holding "that the Secretary was bound by the Attorney General's opinion"; it was instead a mere recognition "that, *based on the facts Plaintiffs alleged in their complaint*, the Secretary did not need to resolve any state-law dispute." *Cherokee Nation* v. *United States Dep't of Interior*, 2025 WL 1895837, at *4 (D.D.C. July 9, 2025) (emphasis added). Now at summary judgment, in view of the full administrative record, the Court need not and should not adopt Plaintiffs' view that the *Treat AG* Opinion unambiguously resolved the state-law dispute before the Secretary.

allowing them to take effect.  Pls.' Br. 13, 33 (internal citations and quotation marks omitted; emphasis added).

In its motion-to-dismiss decision, this Court stated that a "threshold requirement for compacts under IGRA is that they be validly 'entered into' under state law."  643 F. Supp. 3d at 117; *see id.* at 117 n.16 (suggesting that "a compact [would violate IGRA] if it were not validly 'entered into' under state law").  The Governor respectfully believes that view, which the Court expressed when evaluating whether Plaintiffs' allegations stated a claim and without considering the arguments set forth below, is incorrect.  For the following reasons, the Court should now hold that IGRA does not impose such a requirement.

a.    First, nothing in IGRA itself requires the Secretary to conclusively determine whether a compact is in fact valid under state law.  *See Rhode Island* v. *Narragansett Indian Tribe*, 1995 WL 17017347, at *2 (D.R.I. Feb. 3, 1995) (noting that "[n]othing in IGRA even suggests that Congress intended that the Secretary determine who is authorized to execute such compacts on behalf of states," and it would be "patently unreasonable to expect that potentially complex questions of that nature can be adequately addressed during the 45 day review period").  As explained above, IGRA simply provides that the Secretary may approve a compact "entered into" by a Tribe and a State, and it permits class III gaming in conformance with a compact "entered into" by a Tribe and a State.  25 U.S.C. § 2710(d)(1), (d)(8)(A).

Plaintiffs' argument that the statute implicitly requires that a compact be "*validly* entered into" under state law, Pls.' Br. 32, impermissibly supplies words that Congress omitted.  *See* Antonin Scalia & Bryan A. Garner, *Reading Law* 93 (2012); *see Bates* v. *United States*, 522 U.S. 23, 29 (1997) ("[W]e ordinarily resist reading words or elements into a statute that do not appear on its face.").  Congress could have chosen to require that a compact be "*lawfully* entered into *under state law,*" but it did not do so.  In fact, in a recent case Plaintiffs repeatedly cite, the D.C.

Circuit expressly rejected a similar invitation "to read [an] extraneous word" into a different provision of IGRA. *West Flagler Assocs., Ltd.* v. *Haaland*, 71 F.4th 1059, 1067 (D.C. Cir. 2023) (rejecting West Flagler's invitation to read "only" into the statutory requirement that a compact "govern[s] gaming on Indian lands"), *cert. denied*, 144 S. Ct. 2671 (2024). And in the context of other federal statutes, courts have rejected arguments that the plain meaning of "entered into" means "became a 'party' to under principles of state contract law." *Bank of New York* v. *FDIC*, 453 F. Supp. 2d 82, 93-94 (D.D.C. 2006) (internal quotations omitted), *aff'd*, 508 F.3d 1 (D.C. Cir. 2007). "By introducing a limitation not found in the statute," Plaintiffs are "alter[ing], rather than . . . interpret[ing]," IGRA. *Little Sisters of the Poor Saints Peter & Paul Home* v. *Pennsylvania*, 591 U.S. 657, 677 (2020).

Plaintiffs' argument also ignores the rule that, "in the absence of a plain indication to the contrary," Congress does not "mak[e] the application of [a] federal act dependent on state law." *Mississippi Band of Choctaw Indians* v. *Holyfield*, 490 U.S. 30, 43 (1989) (citation omitted). To depart from that general rule, courts must identify a "'plain indication' that Congress intended to make the [federal statute] dependent on state law." *Booth* v. *Bowser*, 597 F. Supp. 3d 1, 20 (D.D.C. 2022). No such indication, much less a plain one, exists here. To the contrary, IGRA, like the federal statute at issue in *Bank of New York*, "neither defines 'entered into' nor provides any indication that Congress intended the meaning of that term to depend on state law." *Bank of New York*, 453 F. Supp. 2d at 94.

Plaintiffs argue that this presumption does not apply here because, given that "[c]lass III gaming under IGRA works on a tribe-by-tribe, state-by-state basis," the "'entered into' requirement is *not* 'intended to have uniform nationwide application.'" Pls.' Br. 24. That conflates two separate points. Of course the compacts themselves, including the specific types of gaming they authorize, are negotiated "tribe-by-tribe" and "state-by-state." But IGRA's framework

establishes a "uniform nationwide" *process* for obtaining federal approval and regulation of those compacts. Making that federal framework beholden to state-law disputes about the extent of a Governor's authority would obviously undermine that uniform framework.

In fact, when Congress wanted to make other aspects of IGRA turn on state law, it said so expressly. For example, Section 2710(d)(5) says that IGRA does not impair the rights of Tribes to regulate class III gaming on Indian lands concurrently with the State, "except to the extent that such regulation is inconsistent with, or less stringent than, the *State laws* and regulations made applicable by any Tribal-State compact." 25 U.S.C. § 2710(d)(5) (emphasis added). Section 2703(E) makes the definition of "class II gaming" dependent on a particular state law— specifically, "any gaming . . . that was *legally operated on Indian lands in the State of Wisconsin* on or before May 1, 1988"—among other requirements. *Id.* § 2703(E) (emphasis added). Yet Congress did not refer to legality under state law in the provisions of IGRA relevant to the Secretary's approval or disapproval of Tribal-State compacts. *Id.* § 2710(d)(8)(A). The Court should presume that was an intentional choice and decline to read a requirement into the statute that Congress opted not to include. *See Russello* v. *United States*, 464 U.S. 16, 23 (1983).

b.      The regulations implementing IGRA's compact-approval process further refute Plaintiffs' contention that the Secretary must independently ensure that a compact was lawfully entered into under state law in order to find that it was "entered into" under IGRA. The Secretary specifically identified what parties must submit with their proposed compact in order to demonstrate that the compact had been entered into: (a) a compact "executed by both the tribe and the State"; (b) a "tribal resolution or other document . . . that certifies that the tribe has approved the compact . . . in accordance with applicable tribal law"; and (c) "[c]ertification from the Governor . . . that he or she is authorized under State law to enter into the compact." 25 C.F.R. § 293.8 (2008). Those documents are what the Secretary has deemed necessary to assess whether

a compact was "entered into" for purposes of IGRA—a signed compact and certifications from both parties that they were authorized under tribal and state law to enter it.  *See* 73 Fed. Reg. 74,004, 74,005 (Dec. 5, 2008) (explaining that the subject of submitting a compact "after it has been 'legally entered into'" is "addressed . . . at 293.8," which "requires documentation from both the tribe and the State certifying that their respective representatives were authorized to execute the proposed compact").    And the Secretary's retention of discretion to request "other documentation" he deems necessary to review the compacts does not on its face obligate him to make any such requests.  25 C.F.R. § 293.8(d) (2008).  In short, none of these provisions remotely suggest that the Secretary will look behind those certifications to independently confirm whether they were accurate under state—or even tribal—law, so the Secretary cannot have violated the APA by not doing so.

Plaintiffs do not challenge these regulations or argue that they misinterpret the statute. Instead, they misread other provisions to try to find support for their view.  Plaintiffs rely (at 25-26) on a regulation that says:  "When should the Indian Tribe or State submit a compact or amendment for review and approval?  The Indian tribe or State should submit the compact or amendment after it has been legally entered into by both parties."  25 C.F.R. § 293.7 (2008).  But by its terms, this regulation simply speaks to the *timing* of when parties should submit the proposed compact.  The use of the word "legally" in this timing provision does not suggest that the Secretary will attempt to independently verify the certifications' claims of legal authority under state and tribal law.  It instructs the *parties* to submit the compact after they have "legally entered into" it. And as noted above, the regulations address in Section 293.8 what the Secretary requires to determine whether an agreement has been "legally entered into."  *See* 73 Fed. Reg. at 74,005.

In short, the regulations confirm that the Secretary will rely on certifications from the Tribe and the State to determine whether the proposed compact was "entered into between an Indian

tribe and a State" for purposes of IGRA.  25 U.S.C. § 2710(d)(8)(A).  And that makes perfect sense—the Secretary obviously is not positioned to investigate and resolve other sovereigns' internal legal disputes.  Indeed, under Plaintiffs' view, the Secretary would be required to resolve disputes not only about state law, but also *tribal* law.  Nothing in IGRA or its implementing regulations suggests that the Secretary needs to look behind certifications from state and tribal officials and conduct that inquiry.  Here, the parties submitted fully executed compacts with the required certifications.  Because those submissions complied with the regulations, the Secretary permissibly declined to disapprove them.

c.    Finally, nothing in the D.C. Circuit's decision in *Amador County* v. *Salazar* supports Plaintiffs' argument that the Secretary was required to resolve the state-law dispute and independently verify the Governor's certification.  Under IGRA, the Secretary may disapprove a compact if it violates IGRA, other federal laws, or the United States' trust obligations.  25 U.S.C. § 2710(d)(8)(B)(i)-(iii).  *Amador County* simply holds that a Secretary's no-action approval is judicially reviewable under the APA—*i.e.*, there is "law to apply" by a court reviewing agency action—and can be vacated if a compact falls within the three grounds for disapproval under § 2710(d)(8)(B).  640 F.3d 373, 381 (D.C. Cir. 2011) (stating that "[t]he Secretary must . . . disapprove a compact if it would" fall into any of the three specified grounds for disapproval in 25 U.S.C. § 2710(d)(8)(B)).  In that case, the county's argument was that the challenged compact authorized gaming that was not even located "on Indian lands"—an issue of federal law that plainly would make the compact inconsistent with IGRA.  *Id.* (quoting 25 U.S.C. § 2710(d)(8)(A)).

Here, Plaintiffs seek to *extend Amador County* to require the Secretary to also review the compacts for compliance with state and tribal law.  Pls.' Br. at 30; *see also* AG Br. at 7-8.  But as explained above, unlike the federal "on Indian lands" requirement, nothing in IGRA imposes such a requirement.  Indeed, the D.C. Circuit has since read *Amador County* narrowly in light of the

specific context at issue in that case. *See West Flagler*, 71 F.4th at 1067. Although this Court previously read *Amador County* more broadly at the pleadings stage, *see Cherokee Nation*, 643 F. Supp. 3d at 116-117 & n.16, the Court did not have the benefit of the D.C. Circuit's decision in *West Flagler*, and in fact relied on the district-court decision that was *vacated* by the D.C. Circuit in that case. *See West Flagler*, 71 F.4th at 1067 (declining to extend *Amador County* in a way that would "read the extraneous word 'only'" into IGRA's statutory requirement that a compact "govern[s] gaming on Indian lands"). Applied here, *Amador County* holds that the question whether a compact was "entered into" under IGRA is subject to judicial review, but it does not require the Secretary to go beyond the requirements of IGRA and its implementing regulations and determine whether the compact was *validly* entered into under state (and tribal) law.

*    *    *    *    *

In sum, IGRA requires the Secretary to confirm that a submitted compact has been "entered into" between a Tribe and a State, but it does not require the Secretary to investigate and determine whether the compact was in fact lawful under state (and tribal) law before doing so. As the regulations provide, the Secretary received certifications that the State and Tribe acted within their authority when entering into the challenged compacts. Based on those certifications, the Secretary was well within his authority to determine that the compacts had been "entered into" as required by IGRA, decline to disapprove them, and place them into effect.

## B.    Subsequent State-Court Decisions Did Not Unwind The Compacts After They Had Already "Take[n] Effect" Under IGRA.

As explained earlier, the compacts took effect when the Secretary published notice of their approval in the Federal Register on June 29, 2020. 85 Fed. Reg. 38,919; *see* 25 U.S.C. § 2710(d)(3)(B). Plaintiffs nevertheless argue that the Oklahoma Supreme Court decisions in *Treat I* and *Treat II*, though issued after the compacts took effect, retroactively unwound the

Secretary's approval of the compacts and rendered them void.  Pls.' Br. 14-20, 27-35.  That is incorrect.  Indeed the Oklahoma Supreme Court's certification decision in this case recognized that "the very specific issue before the federal court goes one step further than [their validity under Oklahoma law]—it concerns the timing of the federal process and whether the Secretary of the Interior's approval of the compacts under the IGRA is affected by the subsequent state court holdings," and "[t]he *Treat* cases did not answer that question, as they dealt only with state law." *Cherokee Nation* v. *United States Dep't of the Interior*, 564 P.3d 58, 72 (2025).

Nothing in IGRA's text or purpose suggests that, once a compact is "in effect" under federal law, it can thereafter be invalidated and rendered ineffective by subsequent state-court decisions.  In other federal statutory contexts, courts have recognized that state law cannot operate to unwind an agreement that has been approved and gone into effect under federal law.  And neither of the two non-binding cases Plaintiffs cite supports invalidation of the compacts in this case.

1.    Indian gaming compacts are creatures of federal law.  In *Cabazon Band of Mission Indians*, the Supreme Court held that States lack the authority to regulate gaming on Indian lands within their borders.  480 U.S. at 202.  In response to that holding, Congress enacted IGRA to "grant[] the States a power that they would not otherwise have, viz., some measure of authority over gaming on Indian lands."  *Seminole Tribe of Florida* v. *Florida*, 517 U.S. 44, 58 (1996); *see Michigan* v. *Bay Mills Indian Cmty.*, 572 U.S. 782, 794-95 (2014).  IGRA sets up a federal process through which compacts can be approved and take effect as a matter of federal law.

IGRA unambiguously defines the moment when such a compact "take[s] effect" under federal law:  "when notice of approval by the Secretary . . . has been published by the Secretary in the Federal Register."  25 U.S.C. § 2710(d)(3)(B).  As discussed above, that approval may be either express or by inaction.  In either case, the process takes no longer than 45 days, and the Secretary thereafter "*shall publish* in the Federal Register notice" of that approval.  *Id.* § 2710(d)(8)(D) ("The

Secretary shall publish in the Federal Register" notice of any compact "that is approved, or considered to have been approved.") (emphasis added). The statute thus prescribes a tightly controlled and relatively accelerated scheme for placing Tribal-State compacts "in effect" under federal law. Nothing in the statute suggests that a compact that has "take[n] effect" under this congressionally prescribed process can thereafter be rendered ineffective by subsequent state-law developments. *See Langley* v. *Edwards*, 872 F. Supp. 1531, 1535 (W.D. La. 1995) (once a compact has taken effect, "[n]o substantive right exists to challenge the approval on the basis of alleged state law irregularities").

Reading the statute to implicitly allow the unwinding of compacts that have taken effect under federal law would undermine Congress's purposes in enacting IGRA. As the scheme demonstrates, Congress was focused on providing an expedient, final resolution of the compact-approval process. *See Langley*, 872 F. Supp. at 1535 ("IGRA expresses a congressional policy of putting compacts into force quickly."); *see also Kickapoo Tribe of Indians* v. *Babbitt*, 827 F. Supp. 37, 44 n.12 (D.D.C. 1993) (*Kickapoo I*), *rev'd on other grounds*, 43 F.3d 1491 (D.C. Cir. 1995) ("By including the forty-five day limitation, Congress clearly was attempting to ensure that the Secretary would not be able to delay approval of Tribal-State compacts indefinitely, thus frustrating Congress' intent."). And Congress had good reasons to prioritize finality, given that implementing gaming on Indian lands can be costly and time-consuming. Congress knew that Tribes would hardly be willing to undertake the expense of building and operating class III gaming facilities without assurance that they could rely on compacts once they had gone into effect under federal law.

It would be particularly incongruous to read IGRA to implicitly allow subsequent state-court decisions to retroactively invalidate a Tribal-State compact that has already gone into effect under federal law. As noted above, IGRA sets up the exclusive means by which States can exercise

any regulatory authority over gaming on tribal lands.  And Congress intended IGRA to "expressly preempt the field in the governance of gaming activities on Indian lands."  S. Rep. No. 100-446, at 6 (1988).  As part of what Congress determined was "the best mechanism to assure that the interests of both sovereign entities are met," Congress gave States a narrow, specifically defined role within a federal approval scheme that ultimately controls the legal status of a compact.  *Id.* at 13.  Allowing subsequent state-court decisions to then unravel that federal decision would turn that purpose on its head.

The Executive Branch, which has primary authority for implementing IGRA, has long agreed with this view.  When explaining the error in the Tenth Circuit's decision in *Pueblo of Santa Ana* v. *Kelly*—a decision on which Plaintiffs heavily rely and that is further addressed below—the Solicitor General explained that, notwithstanding subsequent state-court developments, a compact that has taken effect remains "in effect" for IGRA purposes unless the Secretary takes action under *federal* law to change that status.  *See* Br. for the Federal Respondents in Opposition 11, 13, *Pueblo of Santa Ana* v. *Kelly*, 522 U.S. 807 (1997) (No. 96-1617).  And that understanding is consistent with common sense and ordinary administrative-law principles. Agency action is assessed based on the record before the agency at the time it acts; later developments cannot retroactively render a decision arbitrary or capricious.  *See, e.g.*, *Marsh* v. *Oregon Nat. Res. Council*, 490 U.S. 360, 373-74 (1989) (explaining that "new information" coming to light does not require new agency action, because this "would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made"); *see also id.* at 373 n.19.

2.    Again, IGRA is not unusual in this respect.  In several other contexts, courts have declined to interpret statutes in a way that would allow federally approved agreements to be unilaterally unwound by later state-law decisions.

a.    First, in cases involving "jurisdictional retrocession" under Public Law 280, federal courts have held that certain agreements remain effective under federal law notwithstanding subsequent determinations that they violate state law.  Public Law 280 permits a State that previously assumed civil or criminal jurisdiction in Indian country to "retrocede"—that is, to return—some or all of that jurisdiction to the United States, but only upon acceptance of the agreement by the Secretary of the Interior.  25 U.S.C. § 1323.  The retrocession process operates in two steps:  the State requests to cede land back to the Federal Government, and the Secretary evaluates and accepts (or rejects) that retrocession agreement and publishes it in the Federal Register.  A series of disputes arose that resemble the fact pattern here:  a State requested to cede jurisdiction, the Secretary accepted that retrocession and published it in the Federal Register, but the State later determined that the retrocession agreement was invalid under state law.

Federal courts addressing those arguments held that, once the Secretary accepts a State's retrocession agreement, the retrocession is effective, even if the State later determines that the agreement is invalid under state law.  *See United States* v. *Brown*, 334 F. Supp. 536, 540 (D. Neb. 1971) ("the effect of noncompliance with" a Nebraska constitutional provision "has no effect upon the assumption of federal jurisdiction by the Secretary of Interior").  As one court explained, Secretarial acceptance of a retrocession agreement is effective "whether or not the Governor's proclamation was valid under [state] law." *United States* v. *Lawrence*, 595 F.2d 1149, 1151 (9th Cir. 1979) (quoting *Oliphant* v. *Schlie*, 544 F.2d 1007, 1012 (9th Cir. 1976)); *see Omaha Tribe of Neb.* v. *Vill. of Walthill*, 334 F. Supp. 823, 832 (D. Neb. 1971), *aff'd*, 460 F.2d 1327 (8th Cir. 1972) ("[O]nce the Secretary received from the state officials what appeared to be an official act of the state offering a retrocession, he was entitled to rely thereon for purposes of the acceptance authorized by the federal statute.").

Plaintiffs contend that these retrocession cases are "inapposite," pointing out that the district court in *Kickapoo I* declined to rely on them. Pls.' Br. 27-29 (citing *Kickapoo I*, 827 F. Supp. at 45-46). But that court distinguished the retrocession cases for reasons that do not apply here. In the retrocession cases, the court explained, the "Secretary of the Interior had *affirmatively accepted* the act of retrocession, however expressed." *Id.* at 46. In *Kickapoo I*, the Secretary had "postponed decision," *id.*, taking the position that, because of a pending state-law dispute over the Governor's authority to enter the compact, the challenged Tribal-State compact had not even been "submitted"—and therefore the 45-day review period had not been triggered. *Id.* at 39-40. And because the Secretary had "immediately informed" the State and Tribe of that decision, "neither the State of Kansas nor the Kickapoo Tribe ha[d] begun to operate under the terms of the compact." *Id.* at 46. Given the intent to avoid final agency action and lack of reliance on the compact, the *Kickapoo I* court declined to apply the principles set forth in the retrocession cases to those facts.

Here, by contrast, it is undisputed that there *was* final agency action: the Secretary allowed the compacts to "take effect" under IGRA by permitting the 45-day review period to lapse and publishing notice in the Federal Register. The concerns that *Kickapoo I* deemed absent there—finality of federal action and settled reliance on an accepted agreement—are fully present here, where the parties have operated for years under compacts that IGRA deems "in effect."

Plaintiffs also cite *Washington* v. *Confederated Bands & Tribes of the Yakima Indian Nation*, 439 U.S. 463 (1979), *see* Pls.' Br. 29, but that decision likewise does not undermine the relevance of the fundamental principles articulated in the retrocession cases. *Yakima* held that state law governs the procedures a State must follow before its request for retrocession can take legal effect under a federal statute. *Id.* at 482-84, 493. But nothing in that decision remotely

suggests that a State may later unwind, on its own initiative, an agreement that has already taken effect under federal law by virtue of approval from a federal agency.

b.    IGRA's scheme is also consistent with how courts have treated federally approved agreements under the International Bridge Act (IBA), 33 U.S.C. §§ 535-535i.  Under the IBA, Congress provided its consent to States to "enter into agreements" with Canada or Mexico to construct and maintain international bridges.  *Id.* § 535a.  Similar to compacts under IGRA, the IBA provides that the "effectiveness of such agreement shall be conditioned on its approval by the Secretary of State."  *Id.*  In *Detroit Int'l Bridge Co.* v. *Government of Canada*, a plaintiff challenged one of those approved bridge agreements, contending that it was void under the IBA because Michigan's governor lacked authority under state law to sign it.  192 F. Supp. 3d 54 (D.D.C. 2016), *aff'd*, 883 F.3d 895 (D.C. Cir. 2018).  The district court rejected that argument, relying in part on cases "interpreting the highly similar [IGRA]."  *Id.* at 75.  The court concluded that "[c]ompact approval by the Secretary cannot be invalidated on the basis of a governor's *ultra vires* action."  *Id.* at 76-77 (quoting *Langley*, 872 F. Supp. at 1535).  Affirming that decision, the D.C. Circuit noted that "[n]either the plain text of Section 3 nor other provisions of the IBA appear to require the Secretary to inquire into state law."  883 F.3d at 899.

Plaintiffs primarily respond to *Detroit International Bridge* by rehashing their argument—based on *Amador County* and *West Flagler*—that the Secretary has an affirmative duty under IGRA to disapprove compacts that were "not validly entered into by the State."  Pls.' Br. 30, 32.  As explained above, *supra* 20-21, that argument misreads IGRA.  Like the IBA, the "plain text" of IGRA's compact-approval provisions does not "require the Secretary to inquire into state law."  *Detroit Int'l Bridge*, 883 F.3d at 899.  In any event, that does not address the separate question of how a state-law decision can unwind an agreement that is in effect under federal law.  *Detroit Int'l*

*Bridge* confirms that courts should not read federal statutes to allow federally approved agreements to be unwound based on arguments that state law did not authorize them.

Plaintiffs also observe (at 31) that, in *Detroit Int'l Bridge*, the Secretary of State consulted the Michigan Attorney General and no Michigan Supreme Court decision had held the agreement invalid. Pls.' Br. 31. But the D.C. Circuit did not treat those circumstances as legal prerequisites for approval; the court cited them only to confirm that the Secretary had not acted arbitrarily or capriciously in approving the bridge agreement. *See* 883 F.3d at 900. And here, of course, the Secretary relied on legal submissions from the Governor and his general counsel, and no state court had held the compacts invalid during the 45-day review period.

c.    Finally, interpreting IGRA not to permit federally approved and effective Tribal-State compacts to be unwound by state-law decisions is also consistent with the framework for interstate compacts. Once Congress consents to an interstate compact, it is "transform[ed] . . . into a law of the United States," *Cuyler* v. *Adams*, 449 U.S. 433, 438 (1981), and cannot subsequently be invalidated by a later state-court decision. *State ex rel. Dyer* v. *Sims*, 341 U.S. 22, 28 (1951). In *Dyer*, the Supreme Court held that an interstate compact could not be invalidated based on a later determination by the West Virginia Supreme Court that the compact violated West Virginia law, explaining that "an agreement solemnly entered into between States" cannot be "unilaterally nullified, or given final meaning by an organ of one of the contracting States." *Id.* at 28.

Plaintiffs argue that *Dyer* is inapposite because, unlike interstate compacts, IGRA compacts are not "instrument[s] of federal law." Pls.' Br. 33 (quoting *West Flagler*, 71 F.4th at 1067). But *Dyer* did not rely on the federal-law status of interstate compacts; it simply relied on the fact that the "agreement" had been "solemnly entered into between States" and thereafter approved by Congress. As Justice Jackson put it in his concurrence, "West Virginia assumed a contractual obligation with equals by permission of another government that is sovereign in the

field." *Dyer*, 341 U.S. at 36 (Jackson, J., concurring). In those circumstances, the Supreme Court unanimously held that the decision of the West Virginia Supreme Court that the compact violated West Virginia law could not "unilaterally nullif[y]" the compact. IGRA compact approvals are analogous: they are agreements between independent sovereigns (Tribes and States) that are approved by the Federal Government through a federally prescribed process that is "a prerequisite for the compact to have legal effect." *West Flagler*, 71 F.4th at 1068. Once the Secretary allowed the compacts here to become "in effect" under § 2710(d), subsequent state-court decisions cannot unilaterally unwind those agreements.

3.    The only cases Plaintiffs can point to in support of the notion that a Tribal-–State compact that has gone into effect under federal law can be unwound by state-law decisions are the 1993 decision by a court in this District in *Kickapoo I* and the Tenth Circuit's 1997 decision in *Pueblo of Santa Ana*. Pls.' Br. 15-20. Those cases are inapposite and unpersuasive.

First, as noted above, *see supra* 27, *Kickapoo I* was reversed on other grounds. Even assuming that decision were still good law, the court based its reasoning in large part on the fact that the Secretary of the Interior had attempted to "postpone" the 45-day statutory review period to allow the Kansas Supreme Court to decide whether the governor had properly exercised his authority in entering into the challenged compact. 827 F. Supp. at 46. Because the Secretary had sought to avoid approving (or disapproving) the compacts, he never published notice of that approval in the Federal Register, as directed by 25 U.S.C. § 2710(d)(8)(D). As a result, the compact never "t[ook] effect" under IGRA, *id.* § 2710(d)(3)(B), and neither the Tribe nor the State had begun to operate under the compact, 827 F. Supp. at 46. *Kickapoo I* thus had no occasion to address whether or how a compact that had already taken effect under IGRA, like the two challenged compacts at issue in this case, could suddenly cease to be "in effect" as a result of a state-court decision.

Second, both *Kickapoo I* and *Santa Ana* proceed from the same flawed premise:  that IGRA's phrase "entered into" silently includes an independent requirement that the compact must be *lawfully* entered into under state law in order for a compact to take effect under federal law.  *See Kickapoo I*, 827 F. Supp. at 40-41; *Santa Ana*, 104 F.3d at 1555.  As explained above, *supra* 16-20, IGRA contains no such prerequisite, and neither case purported to identify anything in IGRA's text indicating otherwise.  Indeed, *Santa Ana* acknowledged that IGRA "arguably says nothing about whether a state has validly entered into a compact," but treated that statutory silence as a license to find such a requirement in the legislative history.  104 F.3d at 1553-54, 1557-58.  And after reviewing that legislative history, the court could only conclude that, in addition to Congress's undisputed interest in promoting federally supervised tribal gaming, "respect for state interests relating to class III gaming was also of great concern to Congress."  *Id.* at 1554.  True as that may be in the abstract, it is no justification for adopting a new requirement of state-law validity that Congress did not include IGRA's text.  *See Milner* v. *Dep't of Navy*, 562 U.S. 562, 572 (2011) (refusing to "allow[] ambiguous legislative history to muddy clear statutory language").

Third and relatedly, both *Kickapoo I* and *Santa Ana* were decided before the Department issued regulations in 2008 prescribing what the Secretary requires in order to decide whether to approve a compact.  Those regulations require that a compact be "evidenced by the appropriate signature of both parties" and be accompanied by "certifications" from both State and tribal officials about their authority to compact.  73 Fed. Reg. 74,009 (Dec. 5, 2008).  Consistent with the statutory text, nothing in these regulations supports the idea that the Secretary must look behind the certifications and conclusively determine whether the Governor in fact acted within his state-law authority.  They instead reflect the showing required for the Secretary to reach the determination that a compact has in fact been "entered into" by both the Tribe and a State.

Finally, even putting aside the *Santa Ana* court's misreading of IGRA's "entered into" requirement, the decision is unpersuasive. The court did not address the question of how a compact that has gone into effect under federal law can be rendered ineffective by subsequent state-law decisions. After surveying legislative history and three district-court opinions, the court simply concluded that a "compact must be validly entered into by a state *before it can go into effect*, via Secretarial approval, under IGRA." 104 F.3d at 1555 (emphasis added). But the challenged compacts had *already* gone into effect under IGRA when the New Mexico Supreme Court ruled that they were not "validly entered into." And although the *Santa Ana* court acknowledged the United States's "argument that the only way to challenge an approved compact is to ask the Secretary to withdraw his approval," it declined even to address that argument on the ground that it had "held that, under IGRA, the existence of a valid compact is a requirement for conducting class III gaming." *Id.* at 1556. That circular reasoning simply does not explain how a state-law decision issued *after* an agreement has become effective under federal law can render that agreement ineffective.

The district-court opinions cited by *Santa Ana* are no more convincing. It cited *Kickapoo I*, but as discussed above, the compact challenged in that case never became effective under federal law because it was never published in the Federal Register. And in *Narragansett*, the court did not even mention whether the challenged compact had gone into effect pursuant to 25 U.S.C. § 2710(d)(3)(B) in the course of concluding that the compact was "void." *Narragansett Indian Tribe of R.I.* v. *State of R.I.*, 1996 WL 97856, at *2 (D.R.I. Feb. 13, 1996). The other two cases the court cited *rejected* challenges to compacts approved by the Secretary. *See Willis* v. *Fordice*, 850 F. Supp. 523, 532-33 (S.D. Miss. 1996); *Langley*, 872 F. Supp., at 1536. This Court should thus decline to follow the unconsidered result reached by *Santa Ana* and hold that state-law

decisions cannot have the effect of unwinding agreements that have already taken effect under federal law.

## II.    THE CHALLENGED PROVISIONS OF THE COMPACTS DO NOT RENDER THE COMPACTS INVALID UNDER IGRA.

In addition to their wholesale challenge to the compacts, Plaintiffs also assert in Counts IV-VII that the Secretary's approval of each compact was arbitrary and capricious because the compacts contain terms that violate IGRA.  Specifically, Plaintiffs contend that the compacts are inconsistent with IGRA—thus requiring the Secretary to disapprove them—insofar as they:

- Purport to authorize class III gaming activities that are not permitted under Oklahoma law, SAC ¶¶ 245-250 (Count IV);
- Contain revenue-sharing provisions that constitute an unlawful tax, SAC ¶¶ 251-256 (Count V);
- Regulate class II gaming activities impermissibly, SAC ¶¶ 257-261 (Count VI); and
- Provide for the Governor's concurrence on future off-reservation trust acquisitions, SAC ¶¶ 262-265 (Count VII).

For the reasons explained below, those provisions are consistent with IGRA and do not render the Secretary's approvals arbitrary and capricious.  And even if any of the compact provisions did violate IGRA, the compacts' severability clauses make clear that any offending provision must be severed rather than result in invalidation of the entire compacts.

### A.    The Challenged Provisions Do Not Violate IGRA.

IGRA gives Tribes and States wide latitude as to what kinds of provisions they may address in Tribal-State compacts.  The statute specifies a "litany" of topics covering "vast ground" that a compact may address, *West Flagler*, 71 F.4th at 1065-66, including six examples of the types of provisions that compacts may include, 25 U.S.C. § 2710(d)(3)(C)(i)-(vi), followed by a broad catch-all provision allowing compacts to address "any other subjects that are directly related to the

operation of gaming activities." *Id.* § 2710(d)(3)(C)(vii).  All of the individual provisions Plaintiffs challenge are within this broad authority.

>     **1.    The compacts do not authorize class III gaming activities that are otherwise unlawful in Oklahoma.**

Plaintiffs claim that the compacts violate IGRA by purporting to authorize class III games that are prohibited under Oklahoma law, in violation of IGRA's requirement that the State permit such games "for any purpose by any person, organization, or entity."  25 U.S.C. § 2710(d)(1)(B).  But Plaintiffs misunderstand the relevant compact terms.  It is true that the Comanche and Otoe-Missouria compacts *refer* to forms of gaming—such as event wagering and house-banked games—that Oklahoma law did not allow at the time the compacts were executed and approved.  A.R. 8 (Comanche Nation Compact pt. 2.A.7); A.R. 41 (Otoe-Missouria Compact pt. 2.A.6).  But the compacts do not *authorize* those gaming activities.  The compacts permit the Tribes to offer certain types of class III gaming only "*if such game has been approved* by the [State Compliance Agency]."  A.R. 8 (Comanche Nation Compact pt. 2.A.7) (emphasis added); A.R. 41 (Otoe-Missouria Compact pt. 2.A.6) (emphasis added); *see* A.R. 699.  If Oklahoma law does not permit others to offer a game, the compacts do not authorize the Tribes to offer it either.

Despite this clear language, Plaintiffs nonetheless argue that four compact provisions authorize class III gaming that is illegal under Oklahoma law in violation of IGRA.  Pls.' Br. 39-54.  None of those arguments is persuasive.  First, Plaintiffs contend that the compacts actually *do* permit event wagering, house-banked card games, and house-banked table games absent approval by the State Compliance Agency (SCA).  Pls.' Br. 43-46.  The argument goes as follows:  (i) the compacts define the relevant "Covered Game[s]" to include "games conducted in accordance with

'Standards;'"[4] (ii) the term "Standards" refers to the State Tribal Gaming Act (STGA) and three specific games set forth therein, *i.e.*, electronic amusement games, electronic bonanza-style bingo games, and electronic instant-bingo games; and (iii) because event wagering, house-banked card games, and house-banked tables games are not games set forth in the STGA, the compacts do not require approval of the SCA for those games.  Pls.' Br. 43-44 (quoting A.R. 8, A.R. 41).  That logic misreads the plain text of the definition.  The clause referencing "Standards" is immediately followed by "*as applicable,*" which contemplates that some of the listed games are not subject to Standards under the STGA.  And the definition then separately requires that "such game has been approved by the SCA," independent of the reference to the "Standards."  A.R. 8, A.R. 41.  In short, the reference to "Standards" plainly does not limit the separate requirement that the State approve any class III games before they will be covered by the compacts.

Second, Plaintiffs contend (at 45) that the compact "terms and conditions" include "guarantees" that the Tribes will be permitted to conduct event wagering "without further action by the State."  That is simply incorrect.  The compacts unambiguously permit event wagering only "to the extent such wagers are authorized by law."  A.R. 8 (Comanche Nation Compact).  Such event wagering would only be "*subject to*" the "terms and conditions" Plaintiffs highlight in the event it becomes lawful under Oklahoma law.

Third, Plaintiffs argue (at 46) that the compacts purport to authorize the *State* to conduct event wagering and iLottery.  That is also wrong.  The compacts do not authorize event wagering

---

[4]    The compacts define "Covered Game[s]" as "all Gaming Machines, House-banked Card Games, Nonhouse-Banked Card Games, House-banked Table Games, Nonhouse-banked Table Games, and Event Wagering, which are conducted in accordance with the Standards, as applicable, if the operation of such game by the Tribe would require a Compact and if such game has been approved by the SCA.  Class II gaming, as defined by IGRA, is expressly excluded from this definition."  A.R. 8 (Comanche Nation Compact pt. 2.A.7); A.R. 41 (Otoe Missouria Compact pt. 2.A.6).

for the reasons explained above:  the compacts authorize event wagering only "to the extent such wagers are authorized by law."   A.R. 8, A.R. 42.   The compacts say that the "substantial exclusivity" the agreements give the Tribes over "covered games" does not prohibit the operation of iLottery—which is not a "covered game"—by the State.  *See, e.g.*, A.R. 11, A.R. 13 (Comanche Nation Compact pts. 2.A.25, 3.B).  That does not purport to authorize the State to conduct iLottery in the first place.  Indeed, the compacts define "iLottery" as a game that "*may* be conducted by the Oklahoma Lottery Commission, *subject to applicable law*."  A.R. 11, (Comanche Nation Compact pt. 2.A.25) (emphasis added).

Finally, Plaintiffs challenge (at 46) a clause providing that "[a]t some future time, the State may license up to five (5) non-tribal Event Wagering locations, with the same requirements as those under this Compact."  A.R. 9 (Comanche Nation Compact pt. 2.A.13.b.); A.R. 42-43 (Otoe-Missouria Compact pt. 2.A.12.b.).  But Plaintiffs take that language out of context:  the clause is expressly conditional.  It simply clarifies how tribal event wagering would be treated *if* Oklahoma law someday authorizes non-tribal event wagering outside of Indian lands.  And again, the compacts permit event wagering only "to the extent . . . authorized by law."  *See, e.g.*, A.R. 8.

In the end, Plaintiffs' argument appears to be that the compacts cannot conditionally refer to forms of gaming that are not yet authorized in Oklahoma.  But nothing in IGRA prohibits Tribes and States from including such conditional provisions; as noted, the statute expressly permits compacts to address "any other subjects that are directly related to the operation of [class III] gaming."   25 U.S.C. § 2710(d)(3)(C)(vii).   Compact terms allowing a Tribe to offer event wagering, house-banked card games, and house-banked table games in the event those activities become legal elsewhere in Oklahoma, or reserving certain rights for the State, easily fall within the broad scope of that catch-all provision.  Indeed, the D.C. Circuit has all but said so already.  The court in *West Flagler* explained that, although a compact cannot provide independent legal

authority for gaming outside of Indian lands where that activity would otherwise violate state law, 71 F.4th at 1068, IGRA does not prohibit a compact from *discussing* those topics as long as "the activity is 'directly related to' gaming." *Id.* at 1062 (emphasis added) (quoting 25 U.S.C. § 2710(d)(3)(C)(vii)).  The court accordingly declined to disturb the Secretary's no-action approval of the compact at issue because it "'discussed' online sports betting off of tribal lands, [but] it did not 'authorize' it." *Id.* at 1065.  For the same reasons, nothing in IGRA prevents the two challenged compacts from addressing whether and how certain activities will be offered by the Tribes should those activities become authorized more generally under Oklahoma law.

## 2. The compacts' revenue-sharing provisions do not operate as a tax.

Plaintiffs next contend that the compacts' revenue-sharing provisions violate IGRA's bar on imposing "any tax . . . upon an Indian tribe . . . to engage in a class III activity." *See* 25 U.S.C. § 2710(d)(4).  That is wrong because the revenue-sharing provisions in these compacts are not a tax at all; they are negotiated consideration exchanged for meaningful concessions, which has long been understood to be permissible in Tribal-State compacts.

Importantly, IGRA prohibits only *unilateral exactions* by a State.  It does not bar Tribes and States from negotiating payments as part of a compact.  Indeed, Congress understood that "both State and tribal governments have significant governmental interests in the conduct of class III gaming" and expected them to negotiate "mutual benefits."  S. Rep. No. 100-446, at 13 (1988). Consistent with that structure, courts have long held that when a State provides "meaningful concessions" in return for payments, the State is not "impos[ing]" anything—it is simply exercising its authority to *negotiate*.  *In re Indian Gaming Related Cases*, 331 F.3d 1094, 1112 (9th Cir. 2003); *see Idaho* v. *Shoshone-Bannock Tribes*, 465 F.3d 1095, 1101 (9th Cir. 2006) ("Although the state did not have *authority* to exact such payments, it could bargain to receive them in exchange for a quid pro quo conferred in the compact.").  Consistent with that principle,

the Secretary has determined that revenue-sharing in a compact does *not* amount to an impermissible tax where the State offers a concession with "substantial and quantifiable economic benefits," and payments are "appropriate in light of the value" of that concession.  Letter from Mike Olsen, Principal Deputy Assistant Sec'y Indian Affs., Dep't of Interior, to Wallace Coffey, Chairman, Comanche Nation 2 (Dec. 23, 2004).[5]

Here, the State provided several meaningful concessions to the Tribes in the compacts that render the revenue-sharing provisions permissible.  First and foremost, each compact expressly provides the Tribe with "substantial exclusivity over class III Covered Gaming consistent with the goals of IGRA."  A.R. 27 (Comanche Nation Compact pt. 10.A); A.R. 61 (Otoe-Missouria Compact pt. 10.A).  Substantial exclusivity is the Department's paradigmatic "meaningful concession" supporting revenue sharing because it gives a Tribe a protected market position—that is, the "right to conduct Class III gaming activities that are on more favorable terms than . . . non-Indians."  Letter from Aurene M. Martin, Deputy Assistant Sec'y Indian Affs., Dep't of Interior, to Ernie Jones, Sr., President, Yavapai-Prescott Tribe 2 (Aug. 11, 2003).[6]

And the compacts also provide additional meaningful concessions, including provisions addressing not-yet-authorized forms of class III gaming and the Governor's agreement to concur in future tribal determinations concerning gaming on lands "newly" acquired and held in trust by the Secretary.  *See* A.R. 19 (Comanche Nation Compact pt. 4.J.2.a); A.R. 53 (Otoe-Missouria Compact pt. 4.J.2.a); 25 U.S.C. § 2719(b)(1)(A) (outlining exceptions to a general prohibition to gaming on lands acquired and held in trust by the Secretary for the benefit of an Indian tribe).  Even Plaintiffs describe these concessions as giving the Tribes "significant competitive

---

[5]    https://www.bia.gov/sites/bia.gov/files/assets/as-ia/oig/oig/pdf/idc-038420.pdf.

[6]    https://www.bia.gov/sites/default/files/dup/assets/as-ia/oig/pdf/508_compliant_2003.08.21_yavapai-prescott_tribe_tribal_state_gaming_compact.pdf.

advantages," SAC ¶¶ 5, 129, 151, which is an admission that they carry real economic value for the Tribes and thus justify revenue sharing.

Plaintiffs nonetheless claim (at 48) that these provisions are "meaningless" because the State can also authorize itself or others to conduct event wagering and iLottery. But IGRA does not require a concession of *absolute* exclusivity to justify revenue sharing. It requires a meaningful concession that provides substantial economic benefit. The substantial exclusivity provided by the compacts readily satisfies that requirement.

### 3. The revenue certification and reporting provisions address permissible topics and do not impermissibly regulate class II gaming.

Next, Plaintiffs contend (at 49-50) that the compacts impermissibly regulate class II gaming by requiring the Tribes to certify that a certain percentage of facility revenue is derived from class III games, necessarily limiting the percentage of facility revenue that can be derived from class II games, *e.g.*, A.R. 14 (Comanche Nation Compact pt. 3.D), and to report the total number of gaming devices for both class III and class II games in each facility, *e.g.*, A.R. 19 (Comanche Nation Compact pt. 4.K). Those are permissible subjects of an IGRA compact. IGRA authorizes provisions concerning the "maintenance of the gaming facility" and "any other subjects that are directly related to the operation of [class III] gaming activities." 25 U.S.C. § 2710(d)(3)(C). The revenue provisions require Tribes to "certify . . . that [45% or, following the approval for a new facility, 50%] of revenues from all Facilities is derived from [class III] Games." A.R. 14 (Comanche Nation Compact pt. 3.D). The amount of revenue a Tribe derives from class III games indisputably is "directly related" to the operation of class III gaming. 25 U.S.C. § 2710(d)(3)(C)(vii). Similarly, the provision requiring the Tribes to record and "report . . . at least quarterly to the [State Compliance Agency], the number of [class III games] and class II devices in each Facility" relates to the "maintenance of the gaming facility." 25 U.S.C.

§ 2710(d)(3)(C)(vi).  That these provisions also incidentally affect class II gaming does not make them improper subjects of an IGRA compact.

Plaintiffs wrongly contend that IGRA bars compacts from containing any reference or requirement touching on class II gaming.  The statute contains no such prohibition.  Plaintiffs point to *Forest Cnty. Potawatomi Cmty.* v. *United States*, but the court there acknowledged that, in disapproving the compact amendment at issue, the Assistant Secretary did not "conclude that Class II gaming and ancillary activities could *never* be a permissible subject for compacting under the catchall provision."  330 F. Supp. 3d 269, 288 (D.D.C. 2018) (emphasis added).  Rather, IGRA broadly allows compact terms that are "directly related" to class III gaming, and those provisions are not rendered unlawful simply because they also have an incidental effect on class II gaming.  For example, in 2021 the Secretary approved agreements between the State of Arizona and Tribes that limited the total number of gaming devices—including class II gaming devices—that each Tribe could operate.  *See, e.g.*, Amended and Restated Compact Between the Gila River Indian Community and the State of Arizona § 3(c) (approved May 21, 2021).[7]  The Secretary has also approved compacts that contemplate some regulatory authority over certain class II games to the extent they are "conducted or intermingled in such a way that they are inseparable" from class III games.  *See, e.g.*, Amended and Restated Compact Between the Confederated Tribes of the Grand Ronde Community of Oregon and the State of Oregon, § 4(B)(4) (approved Feb. 2, 2023).[8]  As the Secretary has concluded, provisions of this kind are "directly related" to class III gaming, even if they have an indirect impact on class II gaming.  The same conclusion applies here:  the

---

[7]  https://www.bia.gov/sites/default/files/dup/assets/as-ia/oig/pdf/508_compliant_ 2021.05.24_gila_river_indian_community_tribal_state_gaming_compact.pdf.

[8]  https://www.bia.gov/sites/default/files/dup/assets/as-ia/oig/pdf/508_compliant_ 2023.02.08_confederated_tribes_of_the_grand_ronde_community_tribal_state_gaming_compact .pdf.

provisions controlling gaming revenues are integral to how gaming is monetized; and the reporting provisions relate to the "maintenance of the gaming facility" insofar as gaming locations house both class II and class III devices.

Were there any doubt regarding the scope of the compacts, the Comanche and Otoe-Missouria compacts—like other compacts that have been approved by the Secretary—expressly provide that "[c]lass II gaming, as defined by IGRA, is expressly excluded" from the set of games authorized by the compact, and that "nothing in this Compact shall limit the Tribe's right to operate any game that is class II under IGRA." A.R. 13 (Comanche Nation Compact, pt. 3.A.).

### 4. The compacts' concurrence provisions are permissible under IGRA and consistent with federal trust obligations.

Finally, Plaintiffs' challenge to the compacts' concurrence provisions is also meritless. Under IGRA, Tribes generally cannot offer gaming "on lands acquired by the Secretary in trust for the benefit of an Indian tribe after October 17, 1988" unless the Secretary determines, with the Governor's concurrence, "that a gaming establishment on newly acquired lands would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community." 25 U.S.C. § 2719(a), (b)(1)(A). The Comanche and Otoe-Missouria compacts provide that the Tribes "may establish and operate" new facilities "subject to the land being taken into trust" and that the Governor "agrees to concur in any determination by the Secretary" relating to any such process. *See* A.R. 19 (Comanche Nation Compact pt. 4.J.2), A.R. 53 (Otoe-Missouria Compact pt. 4.J.2). In other words, like previously discussed compact provisions, these conditional provisions address what will happen in the event that land is taken into trust in the future. Plaintiffs put forth a grab bag of arguments (at 51-53) that the concurrence provisions are inconsistent with IGRA and also (at 54) violate the trust obligations of the United States, but those arguments also fall short.

-41-

First, Plaintiffs argue (at 51-52) that these provisions do not address permissible compact subjects and threaten to circumvent Section 2719's protections.  That is incorrect.  The locations where gaming activities may be conducted "directly relate[s] to the operation of [class III] gaming."  25 U.S.C. § 2710(d)(3)(C)(vii).  And the concurrence provisions do not authorize gaming on any lands *now*, as Plaintiffs suggest; they simply identify general areas where future class III gaming might be pursued and memorialize the Governor's intent to concur if the Secretary later makes the required determination under Section 2719(b)(1)(A) that the land may be used for gaming.  For that reason, the Secretary has repeatedly approved compacts with similar language.  *See, e.g.*, Compact Between the Confederated Tribes of the Warm Springs Reservation of Oregon and the State of Oregon art. II.I (deemed approved Mar. 1, 2011) ("[T]he Governor will concur in taking the Cascade Locks Land into trust.");[9] Compact Between the Fort Mojave Indian Tribe and the State of California pmbl. (approved Nov. 5, 2004) (providing that "the Governor intends to grant his concurrence").[10]  Plaintiffs try to distinguish these examples as making their respective Governors' concurrence contingent on other events or determinations by the Secretary or other actors, but the same is true of the challenged provisions here.

Second, Plaintiffs argue that Section 2719(b)(1)(A) and its implementing regulations require the Secretary to seek the Governor's concurrence only *after* making a formal determination and then consulting with state and local officials and nearby Tribes, because the Governor purportedly cannot "concur[] with a Secretarial determination that does not exist."  Pls.' Br. 52-53 (citing 25 C.F.R. § 292.22).  But the Governor has not concurred with anything.  The Governor

---

[9]  https://www.bia.gov/gaming-compact/confederated-tribes-warm-springs-reservation-tribal-state-gaming-compact-13.

[10]  https://www.bia.gov/gaming-compact/fort-mojave-indian-tribe-tribal-state-gaming-compact-0.

has simply *agreed* to concur with any future determination, which will have to adhere to all the steps set forth in Section 2719(b)(1). Nothing in the text or purpose of Section 2719 or the implementing regulations prohibits the Governor from making that agreement.

Third, Plaintiffs contend (at 53) that the concurrence provisions in the Comanche compact unlawfully authorize gaming on lands within other Tribes' reservations without those Tribes' consent, in violation of 25 C.F.R. §§ 151.2, 151.7. Yet again, that misreads a conditional provision as unconditional. The Comanche compact provides that "New Facilities" may be located within certain corridors in Cleveland, Grady, and Love Counties, but only "subject to the land being taken into trust pursuant to 25 U.S.C. § 2719(b)(1)(A)." A.R. 19. The compact does not authorize any trust acquisition, nor does it override any requirement that land within another Tribe's reservation or former reservation be taken into trust only with that Tribe's consent.

Finally, the concurrence provisions do not violate the United States' trust obligations. To establish a breach of trust, a plaintiff must identify a "specific trust dut[y]" imposed by statute, regulation, or treaty that was supposedly breached. *El Paso Nat. Gas Co.* v. *United States*, 750 F.3d 863, 892 (D.C. Cir. 2014). Plaintiffs fail to do so. Instead, Plaintiffs recast their arguments that the compacts violate IGRA as a generalized claim that they also violate the trust obligations of the United States to Indians. *See* Pls.' Br. 54. But IGRA "does not create a fiduciary duty; it is a regulatory scheme that balances the competing interests of the states, the federal government and Indian tribes." *Lac Courte Oreilles Band of Lake Superior Chippewa Indians* v. *United States*, 259 F. Supp. 2d 783, 790 (W.D. Wis. 2003). Because Plaintiffs cannot show that the concurrence provisions violate IGRA or the federal trust obligation, the concurrence provisions are not invalid.

**B.**    **Even If Any Of The Challenged Provisions Were Unlawful, The Appropriate Remedy Would Be To Sever Them, Not Invalidate The Entire Compacts.**

Even assuming that any of the challenged provisions were inconsistent with IGRA, the proper remedy would be to sever that provision—not to invalidate the compacts in their entirety. Both compacts contain severability clauses stating that if any provision "is subsequently determined by any federal court to be invalid or unenforceable under any present or future law," "the remainder of this Compact shall not be affected thereby" and an equivalent lawful term shall be substituted.  A.R. 32-33 (Comanche Nation Compact pt. 13.B); A.R. 66 (Otoe-Missouria Compact pt. 13.B).

Just like other contracts, courts apply such severability clauses in Tribal-State compacts. *See Citizen Potawatomi Nation* v. *Oklahoma*, 881 F.3d 1226, 1240-41 (10th Cir. 2018) (severing an invalid clause pursuant to severability provision).  Plaintiffs try to distinguish *Citizen Potawatomi* because it involved severance of a remedy provision concerning arbitration rather than a supposedly "essential," substantive compact term.  *See* Pls.' Br. 40-41 n.26.  But that distinction misses the point:  *Citizen Potawatomi* confirms that IGRA compacts are subject to ordinary severability principles and that individual provisions may be severed without disturbing the remainder of the agreement.

Plaintiffs also suggest (at 40-41 n.26) that *Amador County* counsels against applying the severability provisions by their terms, but the opposite is true.  Indeed, the provision of IGRA at the heart of *Amador County* supports severing unlawful provisions.  Section 2710(d)(8)(C) provides that when the Secretary takes no action within 45 days, "the compact shall be considered to have been approved . . . but only to the extent [it] is consistent with the provisions of this chapter."  In other words, the statute itself allows for severance by making the Secretary's approval

-44-

extend only to lawful terms. *See West Flagler*, 71 F.4th at 1063-64 (Secretary's approval "extends only to the extent the compact is consistent with IGRA").

The Secretary has long endorsed that practice, severing unlawful provisions and allowing the remainder of a compact to stand—including in some of Plaintiffs' own compacts. *See, e.g.*, Letter from Michael D. Olson, Principal Deputy Assistant Sec'y Indian Affs., Dep't of Interior, to Governor Anoatubby, Chickasaw Nation (Jan. 12, 2005) (severing one provision of the Chickasaw Nation compact while approving the rest).[11]  Plaintiffs' assertion that this practice applies only to express approvals, and not no-action approvals, does not make sense.  Of course the *Secretary* does not sever provisions when the Secretary takes no action at all.  In that circumstance, the *statute* requires severability by providing that a compact is "approved . . . only to the extent [it] is consistent with" IGRA, and inconsistent terms can be severed without invalidating the whole.

In the end, wholesale invalidation would undermine IGRA's central purpose to "promot[e] tribal economic development, self-sufficiency, and strong tribal governments," 25 U.S.C. § 2702(1), and would disrupt ongoing, lawful gaming operations.  Severance, by contrast, preserves the valid provisions that define the parties' ongoing relationship while permitting correction of any isolated inconsistency.  Accordingly, even if the Court were to find any individual provision inconsistent with IGRA, the appropriate course would be to sever that term and uphold the remainder of the compacts.

## CONCLUSION

For the foregoing reasons, Defendant Governor Stitt respectfully requests that the Court grant summary judgment in his favor.

---

[11] https://www.bia.gov/sites/default/files/dup/assets/as-ia/oig/pdf/508%20Compliant%202005.02.08%20Chickasaw%20Nation%20Tribal%20State%20Gaming%20Compact.pdf.

Respectfully submitted,

Phillip G. Whaley

/s/ Jeffrey B. Wall

RYAN WHALEY

Jeffrey B. Wall

400 North Walnut Avenue

Judson O. Littleton

Oklahoma City, OK 73104

Daniel A. Mejia-Cruz (*admission pending*)

(405) 239-6040

SULLIVAN & CROMWELL LLP

pwhaley@ryanwhaley.com

1700 New York Avenue, N.W., Suite 700

Washington, D.C. 20006

(202) 956-7500

wallj@sullcrom.com

Paulena B. Prager (*pro hac vice pending*)

SULLIVAN & CROMWELL LLP

125 Broad Street

New York, New York 10004

(212) 558-4000

*Attorneys for Defendant Governor J. Kevin Stitt*

January 23, 2026