**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

THE CHEROKEE NATION, *et al.*,       )
                                     )
    Plaintiffs,              )
                                     )
v.                                   )    No. 1:20-cv-02167 (TJK)
                                     )
UNITED STATES DEPARTMENT OF          )
THE INTERIOR, *et al.*,              )
                                     )
    Defendants.              )
                                     )

**JOINT APPENDIX OF ADMINISTRATIVE RECORD CITATIONS IN BRIEFING ON
CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 7(n), Plaintiffs Cherokee Nation, Chickasaw Nation, Choctaw Nation of Oklahoma, and Citizen Potawatomi Nation hereby submit this appendix of documents from the Administrative Record cited in the briefs and statements of fact in support of and in opposition to the parties' Cross-Motions for Summary Judgment, *see* ECF Nos. 223, 226-230, 233, 239, 244-246, 249.  Counsel for defendants have reviewed and consented to this appendix.

Respectfully submitted,

Dated: May 8, 2026

By:  */s/ Frank S. Holleman*

Frank S. Holleman, D.C. Bar # 1011376
Sonosky, Chambers, Sachse,
  Endreson & Perry, LLP
1425 K St. NW, Suite 600
Washington, DC 20005
Tel: 202-682-0240
E-mail: fholleman@sonosky.com

Colin Cloud Hampson, D.C. Bar # 448481
Sonosky, Chambers, Sachse,
  Endreson & Perry, LLP
145 Willow Road, Suite 200
Bonita, CA 91902
Tel: 619-267-1306
E-mail: champson@sonoskysd.com

Lead Counsel for the Cherokee, Chickasaw, Choctaw, and Citizen Potawatomi Nations

1

Chad Harsha, OK Bar # 31579, *pro hac vice*
*Attorney General*
Cherokee Nation
Office of Attorney General
P.O. Box 948
Tahlequah, OK 74466
Counsel for Cherokee Nation
Tel: 918-453-5369
E-mail: chad-harsha@cherokee.org

Stephen Greetham, OK Bar # 21510, *pro hac vice*
Greetham Law, P.L.L.C.
621 Greenwood Road
Chapel Hill, NC 27514-5921
Counsel for Chickasaw Nation
Tel: 984-261-7240
E-mail: sgreetham@greethamlaw.net

Meredith Turpin, OK Bar # 22690, *pro hac vice*
Office of Executive Council
2021 Arlington St.
Ada, OK 74820
Counsel for Chickasaw Nation
Tel: 580-272-5748
E-mail: meredith.turpin@chickasaw.net

Brian Danker, OK Bar # 16638, *pro hac vice*
1802 Chukka Hina Drive
Durant, OK 74701
Counsel for Choctaw Nation
Tel: 580-924-8280
E-mail: bdanker@choctawnation.com

George Wright, OK Bar # 21873, *pro hac vice*
Citizen Potawatomi Nation
1601 S. Gordon Cooper Drive
Shawnee, OK 74801
Counsel for Citizen Potawatomi Nation
Tel: 405-275-3121
Email: george.wright@potawatomi.org

*Attorneys for Plaintiff Nations*

2

**CERTIFICATE OF SERVICE**

I hereby certify that on May 8, 2026, I electronically filed the above and foregoing document with the Clerk of Court via the ECF System for filing.


*/s/ Frank S. Holleman*
Frank S. Holleman

4900-0214-7752, v. 4

**JOINT APPENDIX OF ADMINISTRATIVE RECORD CITATIONS**
*Cherokee Nation, et al. v. U.S. Dep't of the Interior, et al.*
**(Case No.: 1-20-cv-02167)**

| Pages Included in Appendix | Description |
|---|---|
| AR 1 | Email dated April 23,2020 from Oakes, Morgan A to Woodward, Troy; Deleon, Debra A; Hart, Paula; Shepard, Eric N; Ervin, Femila N; Scherer, Kyle; Kelly, Matthew; Myers, Richard G; Caulum, Andrew S |
| AR 2-34 | Letter dated April 21, 2020 to Director Paula Hart from William Nelson Sr., Comanche Nation, Chairman [AR2]<br><br>Letter dated April 21, 2020 from J. Kevin Stitt, Governor to Paula Hart, Director, Office of Indian Gaming [AR3]<br><br>Comanche Nation Resolution No. 56-2020 dated April 18, 2020 [AR4]<br><br>Proposed Comanche Nation and State of Oklahoma Gaming Compact signed April 18, 2020 [AR5-34] |
| AR 35-68 | Letter dated April 21, 2020 to Director Paula Hart from John Shotton, Chairman, Otoe-Missouria Tribe of Indians [AR35]<br><br>Letter dated April 21, 2020 from J. Kevin Stitt, Governor to Paula Hart, Director, Office of Indian Gaming [AR36]<br><br>Otoe-Missouria Tribe Resolution #0415036 dated April 15, 2020 [AR37-38]<br><br>Proposed Otoe-Missouria Tribe and State of Oklahoma Gaming Compact signed April 18, 2020 [AR39-68] |
| AR 69 | Email dated April 23, 2020 from Caulum, Andrew S to Oakes, Morgan A, Woodward, Troy, Deleon, Debra, Hart, Paula, Shepard, Eric N, Ervin, Femila N, Scherer, Kyle, Kelly, Matthew, Myers, Richard G |
| AR 71 | Email dated April 23, 2020 from Oakes, Morgan A to Woodward, Troy; Deleon, Debra A; Hart, Paula; Shepard, Eric N; Ervin, Femila N; Scherer, Kyle; Kelly, Matthew; Myers, Richard G; Caulum, Andrew S |
| AR 72 | Email dated April 24, 2020 from Mark Burget to Paula Hart |
| AR 73-83 | Memorandum dated April 24, 2020 from Office of the General Counsel, Oklahoma Governor's Office to Director Paula Hart, Office of Indian Gaming, U.S. Department of the Interior |
| AR 85-95 | Memorandum dated April 24, 2020 from Office of the General Counsel, Oklahoma Governor's Office to Director Paula Hart, Office of Indian Gaming, U.S. Department of the Interior |

4

**JOINT APPENDIX OF ADMINISTRATIVE RECORD CITATIONS**
*Cherokee Nation, et al. v. U.S. Dep't of the Interior, et al.*
**(Case No.: 1-20-cv-02167)**

| Pages Included in Appendix | Description |
|---|---|
| AR 96-97 | Email dated April 24, 2020 from Paula Hart, Director, Office of Indian Gaming, to Mark Burget, General Counsel, Office of Governor J. Kevin Stitt |
| AR 98-99 | Email dated April 24, 2020 from Mark Burget, General Counsel, Office of Governor J. Kevin Stitt, to Paula Hart, Director, Office of Indian Gaming |
| AR 104-106 | Letter dated April 22, 2020 from Charles A. McCall, Speaker of the House, and Greg Treat, President Pro Tempore, House of Representatives, Office of the Speaker State of Oklahoma to Kevin J. Stitt, Governor, State of Oklahoma |
| AR 156 | Email dated April 28, 2020 from counsel to Otoe-Missouria Tribe and Comanche Nation, stating that he mailed copies of the Agreements to the Office of Indian Gaming |
| AR 188 | Proposed Otoe-Missouria Tribe and State of Oklahoma Gaming Compact signed April 18, 2020 |
| AR 209-232 | Letter dated May 1, 2020 from Bill Anoatubby, Governor, The Chickasaw Nation, to David Bernhardt, Office of the Secretary [AR209-10]<br><br>Memorandum dated April 30, 2020 from Undersecretary and Senior Counsel Stephen Greetham, to Governor Bill Anoatubby [AR211-32] |
| AR 233-258 | Email dated May 1, 2020 from Stephen Greetham to Tara Sweeney; John Tahsuda; Paula Hart [AR233]<br><br>Letter dated May 1, 2020 from Bill Anoatubby, Governor, The Chickasaw Nation, to The Honorable David Bernhardt, Office of the Secretary, U.S. Department of the Interior [AR235-36]<br><br>Memorandum dated April 30, 2020 from Stephen Greetham, Undersecretary and Senior Counsel to Governor Bill Anoatubby[AR237-58] |
| AR 493 | Email dated May 5, 2020 from Hart, Paula to Wiseman, Maria K; Woodward, Troy; Oakes, Morgan A |
| AR 494-504 | Letter dated May 5, 2020 from Mike Hunter, Oklahoma Attorney General, to The Honorable David Bernhardt, Office of the Secretary, U.S. Department of the Interior [AR494-95]<br><br>Oklahoma Attorney General Opinion 2020-8 dated May 5, 2020 [AR496-504] |

5

**JOINT APPENDIX OF ADMINISTRATIVE RECORD CITATIONS**
*Cherokee Nation, et al. v. U.S. Dep't of the Interior, et al.*
**(Case No.: 1-20-cv-02167)**

| Pages Included in Appendix | Description |
|---|---|
| AR 508-516 | Oklahoma Attorney General Opinion 2020-8 dated May 5, 2020 |
| AR 518-519 | Letter dated May 5, 2020 from Mike Hunter, Oklahoma Attorney General, to The Honorable David Bernhardt, Office of the Secretary, U.S. Department of the Interior |
| AR 520-528 | Oklahoma Attorney General Opinion 2020-8 dated May 5, 2020 |
| AR 529 | Email dated May 5, 2020 from Cardinale, Richard to Tahsuda, John |
| AR 544 | Hobbs Straus Dean & Walker, LLP, Compact Terms |
| AR 590 | Email dated May 6, 2020 from Andrew S. Caulum, Office of Solicitor, Dep't of Interior, to Troy Woodward, BIA |
| AR 591 | Email dated May 7, 2020 from Kim Teehee to Tara Sweeney, Assistant Secretary-Indian Affairs |
| AR 592-601 | Letter dated May 7, 2020 from Chuck Hoskin, Jr., Principal Chief, Cherokee Nation to The Honorable David Bernhardt, Office of the Secretary, U.S. Department of the Interior [AR592-93]<br><br>Memorandum dated April 7, 2019 from Attorney General Sara Hill to Principal Chief Chuck Hoskin, Jr., Cherokee Nation [AR594-601] |
| AR 607-608 | Memorandum dated April 7, 2019 from Attorney General Sara Hill to Principal Chief Chuck Hoskin, Jr., Cherokee Nation |
| AR 695-704 | Letter dated May 14, 2020 from William Nelson, Sr., Chairman, Comanche Nation and John Shotton, Chairman, Otoe-Missouria Tribe, to The Honorable David Bernhardt, Secretary of the Interior, U.S. Department of the Interior |
| AR 819-828 | Letter dated May 22, 2020 from William Nelson, Sr., Chairman, Comanche Nation and John Shotton, Chairman. Otoe-Missouria Tribe, to The Honorable David Bernhardt, Secretary of the Interior, U.S. Department of the Interior |
| AR 2525-2551 | Email dated June 4, 2020 from Hart, Paula to Oakes, Morgan A [AR 2522]<br><br>Letter dated June 4, 2020 from V. Glenn Coffee, Glenn Coffee & Assocs., to David Bernhardt, Sec'y of Interior [AR 2526] |

4900-0214-7752, v. 4

**JOINT APPENDIX OF ADMINISTRATIVE RECORD CITATIONS**
*Cherokee Nation, et al. v. U.S. Dep't of the Interior, et al.*
**(Case No.: 1-20-cv-02167)**

| Pages Included in Appendix | Description |
|---|---|
| | Application to Assume Original Jurisdiction and Petition for Declaratory Relief in *Treat, et al. v. Stitt* in the Supreme Court of the State of Oklahoma dated June 4, 2020 [AR2527-31] |
| | Brief in Support of Application to Assume Original Jurisdiction and Petition for Declaratory Relief in *Treat, et al. v. Stitt* in the Supreme Court of the State of Oklahoma dated June 4, 2020 [AR2532-51] |
| AR 2612 | Letter dated June 4, 2020 from V. Glenn Coffee to The Honorable David Bernhard, Office of the Secretary, U.S. Department of the Interior |
| AR 2638 | Email dated June 4, 2020 from Tahsuda, John to Kelly, Matthew; Cruz, Mark A |
| AR 2697-2705 | Letter dated April 28, 2020 from John A. Barrett, Tribal Chairman, Citizen Nation Potawatomi to Secretary David Bernhardt and Assistant Secretary Tara Katuk Mac Lean Sweeney |
| AR 2832-2834 | Press Release dated April 21, 2020, *Gov. Stitt Signs Two New Gaming Compacts with the Otoe-Missouria Tribe and Comanche Nation Oklahoma Governor Stitt* |
| AR 2866 | Letter dated April 28, 2020 from John A. Barrett, Tribal Chairman, Citizen Nation Potawatomi to Secretary David Bernhardt and Assistant Secretary Tara Katuk Mac Lean Sweeney |

7

**From:** "Oakes, Morgan A" <Morgan.Oakes@bia.gov>
**To:** "Woodward, Troy" <Troy.Woodward@bia.gov>, "Deleon, Debra A" <Debra.Deleon@bia.gov>, "Hart, Paula" <Paula.Hart@bia.gov>, "Shepard, Eric N" <eric.shepard@sol.doi.gov>, "Ervin, Femila N" <femila.ervin@sol.doi.gov>, "Scherer, Kyle" <Kyle.Scherer@sol.doi.gov>, "Kelly, Matthew" <Matthew.Kelly@bia.gov>, "Myers, Richard G" <RichardG.Myers@bia.gov>, "Caulum, Andrew S" <Andrew.Caulum@sol.doi.gov>
**Subject:** Incoming Oklahoma Gaming Compacts
**Date:** 2020-04-23 14:29:14 -0400
**Attachments:** 4.21.2020_Comanche_Nation_Gaming_Compact.pdf; 4.21.2020_Otoe_Missouria_Tribe_Gaming_Compact.pdf

---

Hi All,
I have attached the two incoming Oklahoma Gaming compacts from Otoe-Missouria and Comanche, the 45th day is **Sunday**, June 7th.

Thanks,
Morgan

AR_0000001

# C⬤MANCHE

April 21, 2020

**RECEIVED**

By Office of Indian Gaming at 12:09 pm, Apr 23, 2020

Director Paula Hart
Office of Indian Gaming
Assistant Secretary – Indian Affairs
U.S. Department of Interior
1849 C Street N.W.
MS-3543-MIB
Washington, D.C. 20240

Director Hart,

You will find enclosed the Comanche Nation ("Nation") and the State of Oklahoma gaming compact executed between the Comanche Business Committee on behalf of the Nation, and Oklahoma Governor J. Kevin Stitt (the "Comanche Compact"), which has been submitted for approval as required by the Indian Gaming Regulatory Act.

On February 10, 2020, the United States District Court for the Western District of Oklahoma (the "Court") ordered mediation in the case of *Cherokee Nation et al. v. Stitt*, No. 19-cv-1198 (W.D. Okla.). The Court ordered a February 14, 2020 deadline to file a motion to intervene for any nonparty who wishes to participate in court-ordered mediation. The Nation decided to join the case to take part of the mediation proceedings. During the course of mediation, the parties exchanged proposals and negotiated in good faith, reaching agreement on April 18, 2020. The parties met at the Oklahoma State Capitol on April 21, 2020 to sign the Comanche Compact. As a result of the signed Comanche Compact, the Nation withdrew from the case.

If you need any additional information or further assistance, please do not hesitate to contact me at william.nelson@comanchenation.com with a copy to the Nation's attorney, Robert Rosette at rosette@rosettelaw.com. I thank you in advance for your prompt attention to this matter.

Sincerely,

*William Nelson, Sr.*

William Nelson Sr.,
Comanche Nation, Chairman

Enclosed:
Resolution
Comanche Compact

AR_0000002



**J. Kevin Stitt**
**Office of the Governor**
**State of Oklahoma**

April 21, 2020

Director Paula Hart
Office of Indian Gaming
U.S. Department of the Interior
1849 C Street NW, Mail Stop 3543
Main Interior Building
Washington, D.C. 20240

Re: 25 C.F.R. § 293.8 Certification

Director Hart,

25 C.F.R. § 293.8(c) requires a certification from the governor that he is empowered under the laws of the State to enter into a compact or amendment.

In Oklahoma, the Governor, as Chief Magistrate, is constitutionally vested with Supreme Executive power, including the power to negotiate and enter into compacts with federally recognized Indian tribes.[1]

If you have any questions please contact Mark Burget, General Counsel, at Mark.Burget@gov.ok.gov.

Sincerely,

J. Kevin Stitt
Governor

---

[1] *See* Okla. Const. art. VI, §§ 1,2 & 8; and <u>Sheffer v. Buffalo Run Casino, Inc.</u>, 2013 OK 77, ¶ 12. *See also* 74 O.S. § 1221(C)(1) ("The Governor is authorized to negotiate and enter into cooperative agreements on behalf of this state with federally recognized Indian tribal governments..."); and 2004 OK AG 27 ("[A] any requirement that individual agreements or compacts negotiated by the Governor on behalf of the State with other sovereigns, such as Indian tribes, be approved by the Legislature would violate the principles of separation of powers.").

AR_0000003

Comanche Nation
Resolution No. <u>56-2020</u>



# COMANCHE

## A RESOLUTION APPROVING THE TRIBAL-STATE GAMING COMPACT BETWEEN THE COMANCHE NATION AND THE STATE OKLAHOMA, PENDING SIGNING IN THE PRESENCE OF GOVERNOR & BUSINESS COMMITTEE

**WHEREAS,** the Comanche Nation is a federally-recognized Indian Tribe with a Constitution approved by the Secretary of the Interior on January 9, 1967, to safeguard tribal rights, powers, and privileges to improve the economic, moral, educational, and health status of its members; and

**WHEREAS,** the Comanche Nation Constitution, Article 6, Section 7, establishes the Comanche Business Committee as the duly elected official body designated to conduct business for and on behalf of the Comanche Nation in a legal quorum; and

**WHEREAS,** the Comanche Nation entered into a Tribal-State Compact with the State of Oklahoma on November 6, 2004; and

**WHEREAS,** since 2004, the Comanche Nation has engaged in Class III gaming pursuant to the Indian Gaming Regulatory Act and Tribal-State Compact; and

**WHEREAS,** the Comanche Nation has engaged in good-faith negotiations with the State of Oklahoma to enter into a class III gaming compact which supersedes the 2004 Tribal-State Compact; and

**WHEREAS,** the Comanche Business Committee has received and reviewed the proposed class III gaming compact between the Comanche Nation and the State of Oklahoma and finds it would benefit the Comanche Nation and its members; and

**NOW, THEREFORE BE IT RESOLVED,** the Comanche Business Committee, hereby approves and adopts this Resolution approving the Compact between the Comanche Nation and the State of Oklahoma and authorizes the entire Comanche Nation Business Committee, to take whatever actions are necessary to enter into such compact including, but not limited to, signing a compact in the presence of the Governor and the seven (7) member body of the Comanche Nation Business Committee as dictated by the Comanche Nation Constitution, (substantially the same form as the attached class III gaming compact).

## CERTIFICATION

The foregoing resolution was adopted at a regular meeting of the Comanche Business Committee held on April 18, 2020, at the Comanche Tribal Complex, Lawton, Oklahoma, by a majority vote of ___7__ for, __0__ against and __0__ abstaining, a legal quorum being present.

_____
William Nelson Sr., Chairman

ATTEST:

_____
Robert Tippeconnie, Secretary Treasurer

COMANCHE NATION        PO BOX 908/LAWTON, OK 73502
PHONE: (580) 492-3240        TOLL FREE: 1 (877) 492-4988        FAX: (580) 492-3796

AR_0000004

## THE COMANCHE NATION AND STATE OF OKLAHOMA GAMING COMPACT

As of the Effective Date, the **COMANCHE NATION**, a federally-recognized Indian tribe (the "*Tribe*" or "*Party*"), and the **STATE OF OKLAHOMA** (the "*State*" or "*Party*"), a state of the United States of America, collectively the "*Parties*," hereby enter into the Tribal-State Gaming Compact (the "*Compact*") for the purpose of authorizing and regulating the operation of Covered Games (as defined herein) on the Tribe's Indian lands, as defined by the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2703(4) and 2719.

### RECITALS

**WHEREAS**, the Tribe is a federally recognized Indian tribe with a governing body duly recognized by the United States, possessing sovereign powers and rights of self-government; and

**WHEREAS**, the State is a state of the United States of America, possessing the sovereign powers and rights of a state; and

**WHEREAS**, the Tribe and the State maintain a government-to-government relationship, and this Compact will help to foster mutual respect and understanding among the two (2) sovereigns; and

**WHEREAS**, the United States Supreme Court and the Congress of the United States have long recognized the general right of an Indian tribe to regulate activity on lands within its jurisdiction; and

**WHEREAS**, the Tribe desires to offer the play of Covered Games, as defined in Part 2(A)(6) of this Compact, as a means of generating revenues for purposes authorized by the Indian Gaming Regulatory Act, 25 U.S.C. § 2701, *et seq.*; and

**WHEREAS**, the State recognizes that the positive effects of this Compact will extend beyond the Tribe's lands to the Tribe's neighbors and surrounding communities and will generally benefit all of Oklahoma.

**NOW, THEREFORE**, in consideration of the mutual undertakings and agreements hereinafter set forth, the Tribe and the State agree as follows:

**PART 1:    RECITALS**

A.    The Parties agree that the recitals set forth above form a material part of this Compact and are hereby incorporated by reference.

**PART 2:    DEFINITIONS**

A.    As used in this Compact, the following terms shall be specially defined:

1.    "*AAA*" means the American Arbitration Association.

AR_0000005

## THE COMANCHE NATION AND STATE OF OKLAHOMA GAMING COMPACT

**2.** "*Adjusted Net Win*" or any derivative thereof means the combined Net Win from all Covered Games in Facilities, with the following adjustments:

**a.** Account for the amounts paid for wide-area progressive Gaming Machines as set forth in subsection A(2)(d)(i) of this Part;

**b.** Deduct Free Play and Point Play; *and*

**c.** On the month the Annual Oversight Assessment is paid by the Tribe to the State pursuant to Part 10(C) of this Compact, deduct that amount paid by the Tribe to the State.

**d.** The following applies when calculating the Adjusted Net Win:

    **i.** Pro-rata Portion of Wide-Area Progressive System Fees. Similar to the proprietary (in-house) progressive gaming device, the top jackpots for wide-area progressive Gaming Machines increment with the level of play. However, in the case of wide-area progressive Gaming Machines, a third-party vendor operates the system. The system spans multiple casinos. The top jackpots increment as each of the Gaming Machines in the system is played, regardless of the casino in which the Gaming Machine is located. The third-party vendor administers the system. In return, the casinos make periodic payments to the third-party vendor. The vendor payments provide for the progressive jackpot and a fee to the third-party vendor. The casinos collect the cash or cash equivalents from these Gaming Machines as drop. When a progressive jackpot is won, the third-party vendor pays the jackpot from funds collected from the casinos. If in calculating Net Win, fees to the third-party vendor in excess of those amounts necessary to fund the progressive jackpots have been applied to reduce Net Win, then for purposes of calculating Adjusted Net Win, the Tribe shall add back those amounts that did not fund the progressive jackpots. The third-party vendor shall inform the Tribe in writing as to the specific amount of the vendor payments that are contributed to the progressive system payouts (*i.e.*, jackpots).

    **ii.** Participation Fees. Broadly, participation fees are any contractual payments made by casinos that are set at the minimum or maximum amount per day or are tied to the total coin-in, or drop generated by the gaming devices being operated, or other financial measures related to the operation of the gaming devices. An example of participation fees is the periodic payments casinos make to the third-party vendor for the use of a Covered Game. Participation fees can also be royalty payments, lease payments, or payments for other contractual arrangements. The participation fee

Page **2** of **30**

AR_0000006

## THE COMANCHE NATION AND STATE OF OKLAHOMA GAMING COMPACT

is an expense and is not deductible for the purposes of calculating Adjusted Net Win and should be treated accordingly.

**iii.**     Free Play and Point Play.  Under the terms of this Compact, the dollar amount of Free Play and Point Play may be deducted from the Net Win.

**iv.**     Promotions, Players' Clubs, Non-Cash Prizes and Complimentaries.  Any rewards, awards or prizes, in any form, received by or awarded to a Patron under any form of a players' club program (however denominated), or promotion, or as a result of Patron-related activities, are not deductible from Net Win. The Value of any complimentary given to Patrons in any form, is not deducible from Net Win.  If the Tribe chooses to use non-cash prizes in connection with play on Covered Games, Net Win is reduced by the amount of the Tribe's actual cost of a non-cash prize awarded as a direct result of a win on a Covered Game.

**v.**     Void and Expired Tickets.  Voided tickets are tickets unredeemed by Patrons and later voided by a Covered Game Employee. Expired tickets are tickets unredeemed prior to expiration and later voided by a Central Computer. Voided and expired tickets are deductible from revenue when issued for purposes of calculating Adjusted Net Win. If not paid (redeemed by a Patron) within the specified date on the voided or expired ticket, add the value of the voided or expired ticket back in to revenue for purposes of calculating Adjusted Net Win. If the Tribe elects to honor a voided or expired ticket, value of the voided or expired ticket may be deductible from revenue for purposes of calculating Adjusted Net win.

**3.**     *"Annual Oversight Assessment"* means the assessment paid by the Tribe to defray the costs associated with oversight of this compact by the State, as more fully described in Part 10(C) of this Compact.

**4.**     *"Central Computer"* or any derivative thereof means a computer to which all Gaming Machines are linked, also known as a back-of-house system.

**5.**     *"Cleveland County Facility"* means a Facility to be developed, constructed, opened and operated by the Tribe within the exterior boundaries of Cleveland County, a county lying within the State of Oklahoma, pursuant to a two-part determination under IGRA, 25 U.S.C. § 2719(b)(1), which such Facility shall be located within one (1) mile of a state or federal highway or turnpike running through Cleveland County.

**6.**     *"Compact"* means this Gaming Compact between the State and the Tribe.

AR_0000007

**THE COMANCHE NATION AND STATE OF OKLAHOMA GAMING COMPACT**

      **7.**     *"Covered Game"* or any derivative thereof means all Gaming Machines, House-banked Card Games, Nonhouse-Banked Card Games, House-banked Table Games, Nonhouse-banked Table Games, and Event Wagering, which are conducted in accordance with the Standards, as applicable, if the operation of such game by the Tribe would require a Compact and if such game has been approved by the SCA. Class II gaming, as defined by IGRA, is expressly excluded from this definition.

      **8.**     *"Covered Game Employee"* or any derivative thereof means any individual employed by the Enterprise or a third party providing management services to the Enterprise, whose responsibilities include the rendering of services with respect to the operation, maintenance or management of Covered Games. The term Covered Game Employee includes, but is not limited to, the following: managers and assistant managers; accounting personnel; surveillance and security personnel; cashiers, supervisors, and floor personnel; cage personnel; and any other person whose employment duties require or authorize access to areas of the Facility related to the conduct of Covered Games or the maintenance or storage of Covered Game components. This shall not include the Tribe's elected officials so long as such individuals are not directly involved in the operation, maintenance, or management of Covered Game components. The Enterprise may, at its discretion, include other persons employed at or in connection with the Enterprise within the definition of Covered Game Employee.

      **9.**     *"Document"* or any derivative thereof means books, records, electronic, magnetic and computer media and other writings and materials, copies thereof, and information contained therein.

      **10.**     *"E-Sport"* or any derivative thereof means any multiplayer video game played competitively, either in-person or via remote connection, in which success principally depends upon the superior knowledge, training, experience, and adroitness of the players.

      **11.**     *"Effective Date"* means the date on which the last of the conditions set forth in Part 12(A) of this Compact occurs.

      **12.**     *"Enterprise"* means: **(i)** the Tribe or the Tribal agency or section of tribal management with direct responsibility for conducting Covered Games; **(ii)** the tribal business enterprise that conducts Covered Games; or **(iii)** a person, corporation or other entity that has entered into a management contract with the Tribe to conduct Covered Games, in accordance with IGRA. In any event, the Tribe shall have the ultimate and final responsibility for ensuring that the Tribe or Enterprise fulfills the responsibilities created and agreed to under this Compact. For purposes of enforcing the terms and conditions of this Compact, the Tribe is deemed to have made all promises for on and behalf of the Enterprise.

      **13.**     *"Event Wagering"* means the placing of a wager on the outcome of a Sport event, including E-Sports, or any other events, to the extent such wagers are authorized by law, subject to the following terms and conditions:

AR_0000008

**THE COMANCHE NATION AND STATE OF OKLAHOMA GAMING COMPACT**

      **a.**     <u>Type</u>.  Event Wagering shall not include either wagering on intercollegiate Sports for schools located in the State or intercollegiate Sports events occurring within the State.

      **b.**     <u>Reservation of State Licenses</u>.  At some future time, the State may license up to five (5) non-tribal Event Wagering locations, with the same requirements as those under this Compact; provided, however, that the Tribe's right to engage in Event Wagering shall in no way be subject to the State's conduct of Event Wagering.  For the avoidance of doubt, even if it should be found that the State's conduct of Event Wagering is in violation of the State's obligations, if any, under compacts with other Oklahoma tribes, such a finding shall have no effect on the Tribe's right to engage in Event Wagering.

      **c.**     <u>Location</u>.  Event Wagering must be conducted by a Patron who is: **(i)** physically located at a Facility, or **(ii)** within 1,000 feet of the Facility, or **(iii)** within the Tribe's land-trust boundary, whichever is less.  The Tribe may not conduct Event Wagering within the lands of the State.

      **d.**     <u>Manner and Form</u>.  Event Wagering transactions by Patrons may be conducted over-the-counter or electronically, subject to Geofencing of the Facility consistent with subsection (A)(20) of this Part.

      **e.**     <u>Vendor Approval</u>.  Any vendor who contracts with the Enterprise to provide Event Wagering risk management software services must be mutually agreed upon by the State and the Tribe, which such agreement shall not be unreasonably withheld, and such vendor shall also be subject to regulation by the State through the SCA.

      **f.**     <u>Vendor Restrictions</u>.  The Tribe, Tribally owned or operated businesses, non-Tribally owned businesses where the Tribe has more than a One Percent (1.00%) interest, and/or Tribal officials, whether elected or unelected, shall be prohibited from having any pecuniary interest in third-party vendors providing Event Wagering risk management software services to an Enterprise

      **g.**     <u>Licenses</u>.  The Tribe shall be permitted to conduct Event Wagering at no more than two (2) Facilities.  Nothing shall prevent the Tribe from selling or leasing its right to conduct Event Wagering to any other compacting tribe who has entered into a valid compact with the State authorizing Event Wagering as of or subsequent to the Effective Date hereof; provided, however, the State shall receive notice of such a transaction within ten (10) days of the transaction.  Notice to the State shall include the duration of such agreement and shall be delivered to the SCA.

    **14.**   *"Existing Facilities"* or any derivative thereof means those Facilities operated by the Tribe as of the Effective Date of this Compact.

AR_0000009

## THE COMANCHE NATION AND STATE OF OKLAHOMA GAMING COMPACT

**15.**    *"FAA"* means the Federal Arbitration Act, Pub. L. 68-401, 43 Stat. 883, as amended, 9 U.S.C. §§ 1-16.

**16.**    *"Facility"* or any derivative thereof means any building, or collection of buildings where Covered Games authorized by this Compact are conducted by the Enterprise, located on Indian lands as defined by IGRA. The Tribe shall have the ultimate responsibility for ensuring that a Facility conforms to the Compact as required herein.

**17.**    *"Free Play"* means play on any Covered Game with points or credits used by Patrons without monetary consideration, and which have no cash redemption value.

**18.**    *"Gaming"* means the conduct of any game containing the elements of consideration, chance and prize.

**19.**    *"Gaming Machine"* or any derivative thereof means a Covered Game that is a mechanical, electromechanical or an electronic contrivance or machine that uses a random number generator for outcome that, upon insertion of a coin, token or similar object, or upon payment of any consideration in any manner, is available to play or operate a game of chance in which the outcome depends to a material degree on an element of chance, notwithstanding that some skill may be a factor, whether the payoff is made automatically from the Gaming Machine or in any other manner.  For purposes of this Compact, Gaming Machine shall not include any machine used to conduct class II gaming, as defined by IGRA.

**20.**    *"Geofencing"* means the practice of using global positioning system (*"GPS"*) or radio frequency identification (*"RFID"*) to define a geographic boundary. Geofencing may include automatic Wi-Fi configuration as a device moves in and out of geofence boundaries, restriction on game and social apps in geofenced area, and disabling of camera and other device settings to protect sensitive data, as allowed by applicable law

**21.**    *"Grady County Facility"* means a Facility to be developed, constructed, opened and operated by the Tribe within the exterior boundaries of Grady County, a county lying within the State of Oklahoma, pursuant to a two-part determination under IGRA, 25 U.S.C. § 2719(b)(1), which such Facility shall be located within one (1) mile of a state or federal highway or turnpike running through Grady County.

**22.**    *"House-Banked Card Game"* or any derivative thereof means any card game in which the Tribe has an interest in the outcome of the game.

**23.**    *"House-Banked Table Game"* or any derivative thereof means any table game including, but not limited to, those table games involving a wheel, ball, or dice, which operate in a non-electronic environment and that the Tribe has interest in the outcome of the game.

**24.**    *"IGRA"* means the Indian Gaming Regulatory Act, Pub. L. 100-497, Oct. 17, 1988, 102 Stat. 2467, codified at 25 U.S.C., § 2701 *et seq.*, which the Parties hereby adopt and incorporate into this Compact by reference.

Page 6 of 30

AR_0000010

## THE COMANCHE NATION AND STATE OF OKLAHOMA GAMING COMPACT

25. *"iLottery"* means a Gaming system that may be conducted by the Oklahoma Lottery Commission, subject to applicable law, that provides for the distribution of lottery products through numerous channels that include web applications, mobile applications, mobile web, tablets and social media platforms that allows players to interface through a portal for the purpose of obtaining lottery products and ancillary services, such as account management, game purchase, game play and prize redemption; provided, however, that the Gaming elements of consideration, chance and prize require persons playing iLottery to electronically load games at the physical location of an authorized lottery retailer, and not remotely. The elements of consideration and prize shall occur at the physical location of an authorized lottery retailer, but the element of chance may occur on a mobile device, provided that each chance, including the associated result, occurs in no less than 120 second intervals. The definition of iLottery shall not include games that represent physical, Internet-based or monitor-based interactive lottery games which simulate Covered Games, specifically including, but not limited to, poker, roulette, slot machines, Event Wagering and blackjack.

26. *"Independent Testing Laboratory"* means a laboratory of national reputation that is demonstrably competent and qualified to scientifically test and evaluate devices for compliance with this Compact and to otherwise perform the functions assigned to it in this Compact. An Independent Testing Laboratory shall not be owned or controlled in whole or in part by the Tribe, the Enterprise, an organizational licensee as defined in the State-Tribal Gaming Act, the State, or any manufacturer, supplier or operator of gaming devices. The selection of an Independent Testing Laboratory for any purpose under this Compact shall be made from a list of one or more laboratories approved by the SCA, which such approval shall not be unreasonably withheld.

27. *"Love County Facility"* means a Facility to be developed, constructed, opened and operated by the Tribe within the exterior boundaries of Love County, a county lying within the State of Oklahoma, pursuant to a two-part determination under IGRA, 25 U.S.C. § 2719(b)(1), which such Facility shall be located within one (1) mile of a state or federal highway or turnpike running through Love County.

28. *"Net Win"* means the win from Covered Game gaming activities, which is the difference between gaming wins and losses before deducting costs and expenses or deducting incentives or adjusting for changes in progressive jackpot liability accruals. Generally, Net Win is the difference between Patron wagers and payouts made on winning wagers.

29. *"NIGC"* means the National Indian Gaming Commission.

30. *"Nonhouse-banked Card Game"* or any derivative thereof means any card game in which the Tribe has no interest in the outcome of the game, including games played in tournament formats and games in which the Tribe collects a fee from the player for participating, and all bets are placed in a common pool or pot from which all player winnings, prizes and direct costs are paid. As provided herein, administrative fees may be charged by the Tribe against any common pool in an amount equal to any amount paid to the State; provided that the Tribe may seed the pool as it determines necessary from time to time.

Page **7** of **30**

AR_0000011

**THE COMANCHE NATION AND STATE OF OKLAHOMA GAMING COMPACT**

**31.** *"Nonhouse-banked Table Game"* or any derivative thereof means any table game, including, but not limited to those table games involving a wheel, ball, or dice, operated in a nonelectronic environment in which the Tribe has no interest in the outcome of the game, including games played in tournament formats and gaming in which the Tribe collects a fee from the Patron for participating and all bets are placed in a common pool or pot from which all play winnings, prizes, and direct costs are paid.

**32.** *"Patron"* or any derivative thereof means any person who is on the premises of a Facility for the purpose of utilizing or experiencing the amenities offered by the Facility.

**33.** *"Point Play"* means play on a Covered Game with points earned or accrued by a Patron through previous Covered Games play, players' clubs, or any other method, and which have no cash redemption value.

**34.** *"Principal"* or any derivative thereof means, with respect to any entity, its sole proprietor or any partner, trustee, beneficiary or shareholder holding Five Percent (5.00%) or more of its beneficial or controlling ownership, either directly or indirectly, or any officer, director, principal management employee, or key employee thereof.

**35.** *"Prize Disputes"* means any dispute by and between the Enterprise and Patrons concerning a Patron's play of any Covered Game, including the amount of any prize which has been awarded, the failure to be awarded a prize, or the right to receive a refund or other compensation from the Enterprise.

**36.** *"Rules and Regulations"* means the rules and regulations promulgated by the federal government, TCA, or the SCA for implementation of this Compact.

**37.** *"Sport"* or any derivative thereof, exclusive of E-Sports and daily fantasy sports, means a contest **(i)** having a defined set of rules, **(ii)** requiring participant skill, **(iii)** requiring physical skill, **(iv)** having a broad public appeal, and **(v)** having achieved institutional stability where social institutions have rules which regulate it, stabilizing it as an important social practice. This shall include, but not be limited to, football, basketball, baseball, golf, tennis, hockey, boxing, mixed martial arts, wrestling, athletic contests recognized by the Olympics, and car racing.

**38.** *"Standards"* means the descriptions and specifications of electronic amusement games, electronic bonanza-style bingo games and electronic instant bingo games or components thereof as set forth in Sections 11 through 18 of the State-Tribal Gaming Act as enacted in 2004 or as amended pursuant to this Compact, including technical specifications for component parts, requirements for cashless transaction systems, software tools for security and audit purposes, and procedures for operation of such games.

**39.** *"State"* means the State of Oklahoma.

AR_0000012

## THE COMANCHE NATION AND STATE OF OKLAHOMA GAMING COMPACT

**40.**    *"State Compliance Agency"* (*"SCA"*) means the State agency that has the authority to carry out the state's responsibilities under this Compact, which shall be the Office of Management and Enterprise Services or its successor agency as determined by the Office of the Governor. Nothing herein shall supplant the role or duties of the Oklahoma State Bureau of Investigation under State law. The Oklahoma Horse Racing Commission and the Oklahoma Tax Commission shall have no role in regulating or oversight of any covered gaming conducted by a Tribe.

**41.**    *"Substantial Exclusivity Fee"* or any derivative thereof means that definition provided in Part 10(B)(1) of this Compact.

**42.**    *"Tort Claims"* means any dispute by and between the Enterprise and a Patron concerning a Patron's claim that he or she is entitled to just and reasonable compensation from the Enterprise for injury to his or her person or property arising or deriving from an act, omission, or condition at the Facility, whether the act, omission, or condition was directly, indirectly, or vicariously caused or contributed to by the Enterprise.

**43.**    *"Tribal Compliance Agency"* (*"TCA"*) means the tribal governmental agency that has the authority to carry out the Tribe's regulatory and oversight responsibilities under this Compact. Unless and until otherwise designated by the Tribe, the TCA shall be the Comanche Nation Gaming Commission. No Covered Game Employee may be a member or employee of the TCA. The Tribe shall have the ultimate responsibility for ensuring that the TCA fulfills its responsibilities under this Compact. The members of the TCA shall be subject to background investigations and licensed to the extent required by any tribal or federal law, and in accordance with this Compact. The Tribe shall ensure that all TCA officers and agents are qualified for such position and receive ongoing training to obtain and maintain skills that are sufficient to carry out their responsibilities in accordance with industry standards.

**44.**    *"Tribal Law Enforcement Agency"* means a police or security force established and maintained by the Tribe pursuant to the Tribe's powers of self-government to carry out law enforcement duties at or in connection with a Facility.

**45.**    *"Tribe"* or *"Tribal"* means the Comanche Nation, a federally recognized tribe.

## PART 3:    AUTHORIZATION OF COVERED GAMES

**A.**    Scope. The Tribe and State agree that the Tribe is authorized to operate Covered Games only in accordance with this Compact. However, nothing in this Compact shall limit the Tribe's right to operate any game that is class II under IGRA, and no class II games shall be subject to Substantial Exclusivity Fees. Furthermore, the State acknowledges that it is the current policy of Oklahoma that the Tribe has the right to conduct class III Covered Games in Oklahoma for an indefinite duration.

**B.**    iLottery. The Tribe agrees that the substantial exclusivity provided for in this Compact shall not prohibit the operation of iLottery by the State.

Page **9** of **30**

AR_0000013

**THE COMANCHE NATION AND STATE OF OKLAHOMA GAMING COMPACT**

**C.**    Certification of Gaming Machines.    The Tribe shall not operate a Gaming Machine pursuant to this Compact until such game has been certified by an SCA approved Independent Testing Laboratory and the TCA as meeting the Standards, which such certification shall not be unreasonably withheld.

**D.**    Annual Certification of Class III Revenue.    On an annual basis, the Tribe shall certify by Tribal resolution that Forty-Five Percent (45.00%) of revenues from all Facilities is derived from Covered Games, until the Bureau of Indian Affairs has approved the first Section 20 application to establish Indian lands for a new Facility made by the Tribe (the "*Section 20 Approval Trigger*"), as more specifically described in Part 4(J)(2) of this Compact.  Following the Section 20 Approval Trigger, the Tribe shall annually certify by Tribal resolution that Fifty Percent (50.00%) of revenues from all Facilities is derived from Covered Games.

**E.**    Violations.    A violation of Part 4 of this Compact that is not cured within thirty (30) days shall constitute a material breach, which may result in termination of this Compact, unless otherwise agreed to by the Parties.

**F.**    New Games.    If and when new forms of Covered Games become available in the market following the Effective Date of this Compact, the Tribe may propose such games be authorized pursuant to this Compact, and such new games may be authorized in an appendix approved by the Governor of the State, which such approval shall not be unreasonably withheld, without requiring amendment of the Compact.

**PART 4:**    **RULES AND REGULATIONS; AUDITING; MINIMUM OPERATIONAL REQUIREMENTS**

**A.**    Regulations.    At all times during the Term of this Compact, the Tribe shall be responsible for all duties which are assigned to it, the Enterprise, the Facility, and the TCA under this Compact. The Tribe shall promulgate any Rules and Regulations necessary to implement this Compact.  Nothing in this Compact shall be construed to affect the Tribe's right to amend its Rules and Regulations, provided that any such amendment shall be in conformity with this Compact. The SCA may propose, in writing, additional Rules and Regulations related to implementation of this Compact to the TCA at any time. The TCA shall give good faith consideration to such suggestions and shall notify the SCA, in writing, within ninety (90) days of its response or action with respect thereto.

**B.**    Compliance; Internal Control Standards.    The Enterprise and all Facilities shall comply with, and all Covered Games approved under the procedures set forth in this Compact shall be operated in accordance with the requirements set forth in this Compact, including, but not limited to, those set forth in this Part.  In addition, the Enterprise and all Facilities shall comply with Tribal internal control standards that equal or exceed those set forth in the NIGC's minimum internal control standards, 25 C.F.R. Part 542.

**C.**    Records.    The Enterprise shall maintain all records relevant to this Compact in permanent form and as written or entered, whether manually or by computer.  These records

Page **10** of **30**

AR_0000014

## THE COMANCHE NATION AND STATE OF OKLAHOMA GAMING COMPACT

shall be maintained by the Enterprise, and be available for inspection by the SCA, for no less than five (5) years from and after the date generated. Those records shall include:

**1.**    A log recording all surveillance activities in the monitoring room of the Facility, including, but not limited to, surveillance records kept in the normal course of business operations and in accordance with industry standards; provided, notwithstanding anything to the contrary herein, surveillance records may, at the discretion of the Enterprise, be destroyed if no incident has been reported within one (1) year following the date such records were made. Records, as used in this Compact, shall include video tapes and any other storage media;

**2.**    Payout from the conduct of Gaming Machines;

**3.**    Maintenance logs for all Covered Games gaming equipment used by the Enterprise;

**4.**    Security logs as kept in the ordinary course of conducting and maintaining security at the Facility, which at a minimum shall conform to industry practices for such reports. The security logs shall document any unusual or nonstandard activities, occurrences or events at or related to the Facility or in connection with the Enterprise. Each incident, without regard to materiality, shall be assigned a sequential number for each such report. At a minimum, the security logs shall consist of the following information, which shall be recorded in a reasonable fashion noting:

**a.**    The assigned number of the incident;

**b.**    The date of the incident;

**c.**    The time of the incident;

**d.**    The location of the incident;

**e.**    The nature of the incident;

**f.**    The identity, including identification information, of any persons involved in the incident and any known witnesses to the incident; *and*

**g.**    The tribal compliance officer making the report and any other persons contributing to its preparation.

**5.**    Books and records on all Covered Game activities of the Enterprise shall be maintained in accordance with generally accepted accounting principles ("*GAAP*"); *and*

**6.**    All Documents generated in accordance with this Compact, unless protected by the attorney-client privilege and/or doctrine of work product.

Page **11** of **30**

AR_0000015

## THE COMANCHE NATION AND STATE OF OKLAHOMA GAMING COMPACT

D.    Confidentiality. Any information or Document provided to the SCA by the Tribe, TCA or Enterprise or prepared from information obtained from the Tribe, TCA or Enterprise are confidential. If the SCA is in receipt of such confidential information from the Tribe, TCA or Enterprise, it: **(i)** may release or disclose the same only with the prior written consent of the Tribe; **(ii)** shall use the same degree of care that the SCA uses to protects its own confidential information, but in no event less than a reasonable amount of care; and **(iii)** shall not use confidential information for purposes other than those necessary to further the purpose of the Compact.

1.    The prohibitions set forth in Part 4(D) of this Compact shall not be construed to prohibit:

a.    The furnishing of any information to a law enforcement or regulatory agency of the State or Federal Government;

b.    The SCA from making known the names of persons, firms, or corporations conducting class II Gaming pursuant to the terms of this Compact, locations at which such activities are conducted, or the dates on which such activities are conducted;

c.    Disclosure of the terms of this Compact;

d.    Disclosing information as necessary to audit, investigate, prosecute or arbitrate violations of this Compact or other applicable laws or to defend suits against the State;

e.    Disclosures to other State agencies as required by State law, provided that the confidentiality provisions of this subsection C of this Part shall apply to the agencies receiving such information; *and*

f.    Complying with subpoenas or court orders issued by a state or federal court with jurisdiction over the Parties and in matters related to Covered Games.

2.    Notwithstanding the foregoing, the Tribe agrees that:

a.    The following Documents may be released by the SCA to the public: **(i)** the gaming ordinance of the Tribe or TCA; **(ii)** other Documents of the Tribe, TCA or Enterprise ordinarily available to the public; **(iii)** amounts of Substantial Exclusivity Fees made pursuant to this Compact; and **(iv)** correspondence between the Tribe, TCA or Enterprise and the SCA, unless such correspondence is specifically labeled "Confidential"; *and*

b.    The SCA may release to the public aggregate figures compiled by totaling comparable figures from the annual financial statements of all compacting Indian tribes.

AR_0000016

## THE COMANCHE NATION AND STATE OF OKLAHOMA GAMING COMPACT

**E.** Responsible Gambling Requirements. The Enterprise agrees to craft a corporate policy that makes a clear commitment to responsible gambling including associated policies for **(i)** staff training, **(ii)** informed decision-making by Patrons, and **(iii)** Patron assistance.

**F.** Annual Independent Financial Audit. Consistent with 25 C.F.R., Section 571.12, Audit Standards, the TCA shall ensure that an annual independent financial audit of the Enterprise's conduct of Covered Games subject to this Compact is secured. The audit shall examine revenues and expenses in connection with the conduct of Covered Games in accordance with generally accepted auditing standards and shall include, but not be limited to, those matters necessary to verify the determination of Adjusted Net Win and the basis of Substantial Exclusivity Fees.

**1.** Auditor Selection. The auditor selected by the TCA shall be a firm of known and demonstrable experience, expertise and stature in conducting audits of this kind and scope.

**2.** Timing. The audit shall be concluded within five (5) months following the close of each calendar year, provided that extensions may be requested by the Tribe and shall not be refused by the State where the circumstances justifying the extension request are beyond the Tribe's control.

**3.** Scope. The audit of the conduct of Covered Games may be conducted as part of or in conjunction with the audit of the Enterprise, but if so conducted shall be separately stated for the reporting purposes required herein.

**4.** Conformance. The audit shall conform to generally-accepted auditing standards. The audit must demonstrate the validity of revenue and expenses by utilizing the data from the machine system to verify coin in, coin out, actual drop, bonus activity, net win, and expired and void ticket information. As part of the audit report, the auditor shall certify to the TCA that, in the course of the audit, the auditor discovered no matters within the scope of the audit which were determined or believed to be in violation of any provision of this Compact or the NIGC's Minimum Internal Control Standards Agreed upon Procedures ("*MICS AUP*").

**5.** Costs. The Enterprise shall assume all costs incurred in connection with the annual independent financial audit.

**6.** Submission of Audit. The audit report, management letter(s) and MICS AUP report for the conduct of Covered Games shall be submitted to the SCA within thirty (30) days of completion. The auditors' work papers concerning Covered Games and verifying all information described in this Part shall be made available to the SCA upon submission of the audit report.

**7.** SCA Involvement. Representatives of the SCA may meet with the auditors to discuss the work papers, the audit or any matters in connection therewith; provided, such discussions are limited to Covered Games information and pursue legitimate State Covered Games interests.

AR_0000017

**THE COMANCHE NATION AND STATE OF OKLAHOMA GAMING COMPACT**

**G.**    Sale of Alcoholic Beverages.  The sale and service of alcoholic beverages in a Facility shall be in compliance with federal and Tribal law, including such rules and regulations concerning the licensing and sale of such beverages, as well as the rules, regulations, and enforcement mechanisms promulgated by the Oklahoma Alcoholic Beverage Laws Enforcement Commission ("*ABLE*"), including the statutory provisions set forth in the Oklahoma Alcoholic Beverage Control Act, 37A O.S. § 1-101 *et seq.*

**H.**    Facility Age Restriction.    No person under the age of eighteen (18) shall be admitted into, or within 25 feet of, any area in a Facility where Covered Games are played, nor be permitted to operate or obtain a prize from or in connection with the operation or conducting of any Covered Game, whether directly or indirectly.

**I.**    Destruction of Documents.  Enterprise books, records and other materials documenting the conduct of Covered Games shall be destroyed only in accordance with Rules and Regulations adopted by the TCA, which at a minimum shall provide as follows:

**1.**    Tort Claims.  Material that might be utilized in connection with a potential Tort Claim pursuant to Part 5 of this Compact, including, but not limited to, incident reports, surveillance records, statements, and the like, shall be maintained at least one (1) year beyond the time which a claim can be adjudicated under Part 5 of this Compact or, if a Tort Claim is made, beyond the final disposition of such Tort Claim;

**2.**    Prize Disputes.  Material that might be utilized in connection with a Prize Dispute, including but not limited to incident reports, surveillance records, statements, and the like, shall be maintained at least one hundred eighty (180) days beyond the time which a Prize Dispute can be adjudicated under Part 5 of this Compact or, if a Prize Dispute is made, beyond the final disposition of such Prize Dispute; *and*

**3.**    Operational Materials.  Unless otherwise provided herein, all Enterprise books and records with respect to the conduct of Covered Games or the operation of the Enterprise, including, but not limited to, all interim and final financial and audit reports and materials related thereto which have been generated in the ordinary course of business, shall be maintained for the minimum period of five (5) years.

**J.**    Location.  The Tribe may establish and operate Enterprises and Facilities that operate Covered Games only on its Indian lands as defined by IGRA, 25 U.S.C. §§ 2703(4) and 2719.

**1.**    Existing Facilities. Within thirty (30) days from and after the Effective Date of this Compact, the Tribe shall forward to the SCA all necessary documents reflecting the status of the land. This documentation shall include, but is not limited to, any application to place the land into trust status and all documents associated therewith, any and all responses from the Bureau of Indian Affairs regarding such application, and a copy of the deed filed of record in the county where the Existing Facility is located. The Tribe may operate Facilities at all locations existing as of the Effective Date of this Compact.

Page **14** of **30**

**THE COMANCHE NATION AND STATE OF OKLAHOMA GAMING COMPACT**

      **2.**     New Facilities. In addition to its Existing Facilities, the Tribe may establish and operate the Cleveland County Facility, the Grady County Facility and the Love County Facility (collectively the "*New Facilities*"), subject to the land being taken into trust pursuant to 25 U.S.C. § 2719(b)(1)(A). The Tribe shall notify the SCA of the operation of any New Facility following the Effective Date of this Compact at least ninety (90) days prior to the opening of such New Facility. Such notification shall include all documents referenced in subsection (J)(1) of this Part.

      **a.**     Section 20 Concurrence. By entering into this Compact, the State through its Governor, in order to provide a meaningful concession to the Tribe, the adequacy of which is acknowledged and by which the Tribe was materially induced to enter into this Compact, hereby agrees to concur in any determination by the Secretary of the Interior that lands relating to the Cleveland County Facility, the Grady County Facility and the Love County Facility, should be taken into trust for gaming purposes, and such lands are eligible for gaming under 25 U.S.C. § 2719(b)(1)(A). The Parties agree that no other action from the State is required for approval of those lands' eligibility for gaming.

      **3.**     Failure to Notify. Failure to notify in accordance herewith shall result in a penalty of $5,000.00 per each thirty (30) day increment to be remitted to the SCA for purposes of deposit and expenditure in connection with Part 10(C) of this Compact, unless otherwise agreed to by the Parties. Such penalty shall be in addition to the Annual Oversight Assessment amount set forth in Part 10(C) of this Compact.

      **4.**     Limitation. Nothing herein shall be construed as expanding or otherwise altering the term Indian lands, as that term is defined in the IGRA, nor shall anything herein be construed as altering the federal process governing the tribal acquisition of Indian lands for gaming purposes.

      **K.**     Record of Games. The Enterprise shall keep a record of, and shall report at least quarterly to the SCA, the number of Covered Games and class II devices in each Facility, by the name or type of each and its identifying number, and denomination of bets accepted. This list shall include both class II and class III games. Failure to report in accordance herewith shall result in a penalty of $5,000 per each Facility per report to be remitted to the SCA for purposes of deposit and expenditure in connection with Part 10(C) of this Compact.

      **L.**     Health Reporting. The Enterprise agrees to implement at its Facilities standards and guidelines relating to public health as promulgated or issued by the U.S. Centers for Disease Control and Prevention ("*CDC*").

**PART 5:**     **DISPUTE RESOLUTION – THE ENTERPRISE AND PATRONS**

      **A.**     Scope. Part 5 of the Compact shall apply to Prize Disputes and Tort Claims.

      **B.**     Procedure. The goal of the Enterprise and Patrons should be to resolve Prize Disputes and Tort Claims amicably and voluntarily whenever possible through private

AR_0000019

## THE COMANCHE NATION AND STATE OF OKLAHOMA GAMING COMPACT

negotiation. Unless otherwise agreed to in writing by the Enterprise and the Patron, private negotiation shall be deemed to have failed if the Enterprise and the Patron cannot reach a settlement within ninety (90) days from and after the Enterprise receives notice by the Patron of a claim. When private negotiations are deemed to have failed, the following procedure applies:

      **1.**     AAA. Either the Enterprise or the Patron may refer Prize Disputes or Tort Claims to arbitration pursuant to the applicable rules of the AAA for the category of dispute, subject to enforcement as provided for by this Part by a federal district court.

      **2.**     Oklahoma Law. The claims, remedies, affirmative defenses, counterclaims, third-party claims, and cross-claims available through arbitration are limited to those arising under Oklahoma common-law; provided, however, that in no event shall a Tort Claim be permitted unless such Tort Claim is filed within one (1) year of the date of the event which allegedly caused the claimed loss, and provided further that in no event shall any Prize Dispute be permitted unless such Prize Dispute is filed within ten (10) days of the event which is the basis of the Prize Dispute. Failure to timely file a Tort Claim or Prize Dispute shall forever bar such claims.

      **3.**     Jurisdiction; Waiver. The Enterprise consents to the jurisdiction of such arbitration forum and court for such limited purposes and no other, and waives immunity with respect thereto.

      **4.**     Selection of Arbitrator. One (1) arbitrator shall be chosen by the Enterprise and the Patron from a list of qualified arbitrators to be provided by the AAA. If the parties cannot agree on an arbitrator, then the arbitrator shall be named by the AAA.

      **5.**     Expenses of Arbitration. The expenses of arbitration, including filing fees and fees charged by the arbitrator, shall be equally borne between the Patron and the Enterprise.

      **6.**     Enforcement. The arbitration procedures described herein are subject to, and any decision or arbitration award issued by the arbitrator under to this agreement, is enforceable under, and otherwise subject to, the provisions of the FAA.

      **7.**     Appellate Rights. An order or final decision issued by the arbitrator under the FAA is subject to appeal, as provided in the FAA. Accordingly, the Enterprise waives immunity and consents to suit therein for such limited purposes, and agrees not to raise the United States Constitution, sovereign immunity, or comparable defense to the validity of such waiver.

      **8.**     Limited Consent – Tort Claims. For Tort Claims, the consent to waive sovereign immunity provided for in this Part is granted only to the extent such claim or any award or judgment rendered thereon does not exceed the limit of available insurance coverage required under subsection (D) of this Part. Under no circumstances shall any consent to suit be effective as to any award which exceeds such applicable amounts. This consent shall only extend to the Patron actually claiming to be injured. Tort Claims shall not be assignable. In the event any assignment of the Tort Claim is made in violation of this Compact, or any person other than the Patron claiming the injury becomes a party to any action hereunder, this consent shall be

AR_0000020

deemed revoked for all purposes. Notwithstanding the foregoing, this consent shall not be revoked if an action on a Tort Claim is filed by (i) a court-appointed representative of a claimant's estate, (ii) an indispensable party, or (iii) a health provider or other party subrogated to the claimant's rights by virtue of any insurance policy; provided, that nothing herein is intended to, or shall constitute a consent to suit against the Enterprise as to such party except to the extent such party's claim is:

> **a.**    In lieu of and identical to the claim that would have been made by the claimant directly but for the appointment of said representative or indispensable party, and participation of such other party is in lieu of and not in addition to pursuit of the claim by the Patron, *and*

> **b.**    The claim of such other party would have been subject to the consent provided for herein if it had been made by the claimant directly.

**C.**    Notice to Patrons. Notices explaining the procedure set forth in subsections A and B of this Part shall be prominently posted in the Facility. Such notices shall explain the method and places for making a claim, including to whom the notice should be made (*e.g.*, the "registered agent" or legal equivalent for the Enterprise).

**D.**    Commercial General Liability Insurance for Tort Claims. During the term of this Compact, the Enterprise shall maintain commercial general liability insurance for the express purposes of covering and satisfying Tort Claims. The insurance shall have liability limits of not less than Five Hundred Thousand Dollars ($500,000.00) for any one person and Five Million Dollars ($5,000,000.00) for any one occurrence for personal injury, and One Million Dollars ($1,000,000.00) for any one occurrence for property damage. No Tort Claim shall be paid, or be the subject of any award, in excess of the limit of liability. The Enterprise's commercial general liability insurance policy shall include an endorsement providing that the insurer may not invoke tribal sovereign immunity in connection with any claim made within the limit of liability. Copies of all such insurance policies shall be forwarded to the SCA.

**E.**    Remedies in the Event of No or Inadequate Insurance for Tort Claims. In the event a tort claim is made and there is no insurance, or inadequate insurance in effect, as required under this Compact, the Enterprise shall be deemed to be in default hereunder unless, within ten (10) days of a demand by the SCA or a claimant to do so, the Enterprise has posted in an irrevocable escrow account at a state or federally chartered bank which is not owned or controlled by the Tribe, sufficient cash, a bond or other security sufficient to cover any award that might be made within the limits set forth in subsection D of this Part, and informs the claimant and the state of:

> **1.**    The posting of the cash or bond;

> **2.**    The means by which the deposit can be independently verified as to the amount and the fact that it is irrevocable until the matter is finally resolved;

> **3.**    The right of the claimant to have this claim satisfied from the deposit if

AR_0000021

**THE COMANCHE NATION AND STATE OF OKLAHOMA GAMING COMPACT**

the claimant is successful on the claim; and

**4.**    Consent to suit in federal district court for the judicial district in which the Patron's claim arose.

**PART 6:    DISPUTE RESOLUTION – THE TRIBE AND THE STATE**

**A.**    Scope. This Part shall apply to disputes between the Tribe and the State arising under the Compact, including: **(i)** compliance with the Compact; **(ii)** performance required by the Compact; and/or **(iii)** interpretation of the Compact's terms, conditions, and provisions; provided, however, that this Part shall not apply to the market evaluation of Substantial Exclusivity Fees.

**B.**    Process. For disputes arising hereunder, the following two (2) step process shall apply:

**1.**    Mediation. The State and the Tribe shall be required to first mediate the dispute, using a mutually agreeable mediator, unless one party reasonably believes that irreparable harm will result thus necessitating an action, in whole or in part, for injunctive relief to be filed directly in federal court.

**2.**    Federal Court. If injunctive relief to prevent irreparable harm is sought, or if mediation fails, the dispute shall be litigated in federal court, requiring the State and the compacting Tribe to provide limited waivers of sovereign immunity, including for purposes of enforcing any ruling or judgment entered by the federal court regarding such dispute, as well as any resulting appeal.

**C.**    Jurisdiction; Venue. Subject to subsection (B) of this Part, the Tribe and the State consent to the jurisdiction of federal district court. Suit shall be filed in the federal judicial district where a substantial part of the events or omissions giving rise to the claim(s) asserted by either party occurred.

**D.**    Controlling Law. The Tribe and the State consent to applicable federal and state law, whether arising by statute, ordinance, regulation, common-law, and/or in equity. The Parties acknowledge and agree that subsection D of this Part shall apply to claims, counterclaims, remedies, and affirmative defenses, whether arising at law or in equity.

**E.**    Limited Waiver of Sovereign Immunity. The Tribe and the State waive sovereign immunity for the limited purpose described in this Part. By extension, the Tribe and the State agree not to raise the United States Constitution, sovereign immunity, or comparable defense to the validity of such waiver.

**F.**    Exclusive Authority to Settle and Negotiate – State. The Tribe and the State expressly acknowledge and agree that the Governor for the State shall have exclusive authority to settle and negotiate any dispute arising under the Compact pursuant to Article 6, Section 8 of the Oklahoma Constitution. Such authority may be delegated to authorized agent(s) or

Page **18** of **30**

AR_0000022

THE COMANCHE NATION AND STATE OF OKLAHOMA GAMING COMPACT

representative(s), in whole or in part, except with respect to final approval of and executing the Compact on behalf of the State.

PART 7:    STATE MONITORING OF COMPACT COMPLIANCE

A.    SCA Authority. The SCA shall, pursuant to the provisions of this Compact, have the authority to monitor the conduct of Covered Games to ensure that the Covered Games are conducted in compliance with the provisions of this Compact. In order to properly monitor the conduct of Covered Games, agents of the SCA shall have reasonable access to all areas of the Facility related to the conduct of Covered Games as provided herein:

1.    Facility Access. Access to the Facility by the SCA shall be during the Facility's normal operating hours only; provided that to the extent such inspections are limited to areas of the Facility where the public is normally permitted, SCA agents may inspect the Facility without giving prior notice to the Enterprise.

2.    Compact Violations. Any suspected or claimed violations of this Compact or of law shall be directed in writing to the TCA; SCA agents shall not interfere with the functioning of the Enterprise.

3.    SCA Identification. Before SCA agents may enter any nonpublic area of the Facility, they shall provide proper photographic identification to the TCA. SCA agents shall be accompanied in nonpublic areas of the Facility by a TCA agent. A one (1) hour notice by SCA to the TCA may be required to assure that a TCA officer is available to accompany SCA agents at all times while in nonpublic areas.

B.    Central Computer Monitoring. The Enterprise will ensure all Gaming Machines will be connected to a central computerized monitoring and control system, which shall collect on a continual basis the unaltered activity of each Covered Game in use at the Facility, and that the wager and payout data of each Covered Game, electronically captured by the Enterprise's Central Computer, is capable of generating reports evidencing calculations of Adjusted Net Win and expired and void ticket information. The Enterprise shall produce reports, including any revisions, no later than the 20th of each month, substantiating the revenues received by the Enterprise in the preceding month upon which Substantial Exclusivity Fees paid to the State are based. Such reports shall be generated by the Central Computer and electronically submitted to the SCA. If the Enteprise uses a third party vendor to generate reports on gaming revenue, then in addition to the aforementioned reporting requirements, the monthly report shall also reconcile the Net Win reported by the Central Computer and the Net Win reported by the third party vendor used by the Tribe to calculate Substantial Exclusivity Fees.

C.    SCA Annual Review. The SCA, at its own cost, shall be authorized to conduct an annual review of the Enterprise's conduct of Covered Games subject to this Compact. The review shall examine revenues in connection with the conduct of Covered Games and shall include, but not be limited to, those matters necessary to verify the determination of Adjusted Net Win and the basis of Substantial Exclusivity Fees. The Enterprise shall provide all documentation and information reasonably requested by the SCA in connection with the annual

Page **19** of **30**

AR_0000023

## THE COMANCHE NATION AND STATE OF OKLAHOMA GAMING COMPACT

review within sixty (60) days of such written request by the SCA. The Tribe, Enterprise, and TCA shall cooperate fully and not interfere with said annual review.

D.    SCA Document Review. Subject to provisions herein, agents of the SCA shall, at its own cost, have the right to review and copy Documents of the Enterprise related to its conduct of Covered Games. The review and copying of such Documents shall be during normal business hours or hours otherwise at Enterprise's discretion. However, the SCA shall not be permitted to copy those portions of any Documents of the Enterprise related to its conduct of Covered Games that contain business or marketing strategies or other proprietary and confidential information of the Enterprise, including, but not limited to, Patron lists, business plans, advertising programs, marketing studies, and Patron demographics or profiles. No Documents of the Enterprise related to its conduct of Covered Games or copies thereof shall be released to the public by the SCA under any circumstances. For the avoidance of doubt, the right to review and copy Documents is subject to Part 4(D) of this Compact.

E.    SCA Reporting. Upon completion of any SCA inspection or investigation, the SCA shall forward a written report thereof to the TCA. The TCA shall be apprised on a timely basis of all pertinent, non-confidential information regarding any violation of Federal, State, or Tribal laws, the Rules or Regulations, or this Compact. Nothing herein prevents the SCA from contacting Tribal or federal law enforcement authorities for suspected criminal wrongdoing involving the TCA. TCA may interview SCA inspectors upon reasonable notice and examine work papers and SCA in the same fashion that SCA inspectors may examine auditor's notes and make auditor inquiry unless providing such information to the TCA will compromise the interests sought to be protected. If the SCA determines that providing the information to the TCA will compromise the interests sought to be protected, then the SCA shall provide such information to the Tribe in accordance with this Compact.

F.    Limitation. Nothing in this Compact shall be deemed to authorize the State to regulate the Tribe's government, including the TCA, or to interfere in any way with the Tribe's selection of its governmental officers, including members of the TCA.

## PART 8:    JURISDICTION

A.    Subject to Parts 5 and 6 of this Compact, this Compact shall not be construed to alter Tribal, Federal or State civil adjudicatory or criminal jurisdiction.

## PART 9:    LICENSING

A.    Covered Game Employees. Except as otherwise provided for herein, no Covered Game Employee shall be employed at a Facility or by an Enterprise unless such person is licensed in accordance with this Compact. In addition to the provisions of this Part which are applicable to the licensing of all Covered Game Employees, the requirements of 25 C.F.R., Part 556, background investigations for primary management officials and employees, and 25 C.F.R., Part 558, gaming licenses for employees and primary management officials, apply to employees and primary management officials of the Facility and Enterprise.

Page **20** of **30**

AR_0000024

## THE COMANCHE NATION AND STATE OF OKLAHOMA GAMING COMPACT

**1.** <u>Application</u>. All prospective Covered Game Employees shall apply to the TCA for a license. Licenses shall be issued for periods of no more than two (2) years, after which they may be renewed only following review and update of the information upon which the license was based; provided, the TCA may extend the period in which the license is valid for a reasonable time pending the outcome of any investigation being conducted in connection with the renewal of such license. In the event the SCA contends that any such extension is unreasonable, it may seek resolution of that issue pursuant to Part 9(A)(6) of this Compact.

**2.** <u>Background Investigation</u>. The application process shall require the TCA to obtain sufficient information and identification from the applicant to permit a background investigation to determine if a license should be issued in accordance with this Part and the Rules and Regulations. The TCA shall obtain information about a prospective Covered Game Employee that includes: **(i)** full name, including any aliases by which applicant has ever been known; **(ii)** social security number; **(iii)** date of birth; **(iv)** place of birth; **(v)** residential addresses for the past five (5) years; **(vi)** employment history for past five (5) years: **(vii)** driver's license number; **(viii)** all licenses issued and disciplinary charges filed, whether or not discipline was imposed, by any State, Federal, or Tribal regulatory authority; **(ix)** all criminal arrests and proceedings, except for minor traffic offenses, to which the applicant has been a party; **(x)** a set of fingerprints, which shall be used to conduct a criminal background check; **(xi)** current photograph; **(xii)** military service history; and **(xiii)** any other information the TCA determines is necessary to conduct a thorough background investigation.

**3.** <u>SCA Notification</u>. Upon obtaining the information set forth in Part 9(A)(2) above from a prospective Covered Game Employee, the TCA shall forward a copy of such information to the SCA, along with any determinations made with respect to the issuance or denial of a temporary or permanent license. The SCA may conduct its own background investigation of the applicant at SCA expense, shall notify the TCA of such investigation within a reasonable time from initiation of the investigation, and shall provide a written report to the TCA of the outcome of such investigation within a reasonable time from the receipt of a request from the TCA for such information. SCA inspector field notes and the SCA inspector shall be available upon reasonable notice for TCA review and inquiry.

**4.** <u>Temporary Licensure</u>. The TCA may issue a temporary license for a period not to exceed ninety (90) days, and the Enterprise may employ on a probationary basis, any prospective Covered Game Employee who represents in writing that he or she meets the standards set forth in this Part, provided the TCA or Enterprise is not in possession of information to the contrary. The temporary license shall expire at the end of the ninety-day period or upon issuance or denial of a permanent license, whichever event occurs first. Provided that the temporary license period may be extended at the discretion of the TCA so long as good faith efforts are being made by the applicant to provide required information, or the TCA is continuing to conduct its investigation or is waiting on information from others, and provided further that in the course of such temporary or extended temporary licensing period, no information has come to the attention of the TCA which, in the absence of countervailing information then in the record, would otherwise require denial of license. A permanent license shall be issued or denied within a reasonable time following the completion of the applicant's background investigation.

AR_0000025

**THE COMANCHE NATION AND STATE OF OKLAHOMA GAMING COMPACT**

      **5.**     Prohibited Persons. In Covered Gaming, the Tribe shall not employ and shall terminate, and the TCA shall not license and shall revoke a license previously issued to, any Covered Game Employee who: **(i)** has been convicted of any felony or an offense related to any Covered Games or other gaming activity; **(ii)** has knowingly and willfully provided false material, statements or information on his or her employment application; or **(iii)** is a person whose prior activities, criminal record, or reputation, habits, and associations pose a threat to the public interest or to the effective regulation and control of the conduct of Covered Games, or create or enhance the dangers of unsuitable, unfair, or illegal practices, methods, and activities in the conduct of Covered Games or the carrying on of the business and financial arrangements incidental thereto; provided, however, that members of the Tribe or other federally recognized tribes, shall not be disqualified from employment based on a prior felony conviction so long as the person is not seeking to be employed as a Covered Game Employee, and provided further that any person who has a felony conviction or offense involving alcohol or drugs shall not be employed in any position requiring operation of a vehicle.

      **6.**     SCA Right to Object. The SCA may object to the employment of any individual by the Enterprise based upon the criteria set forth in paragraph 2 of subsection A of this Part. Such objection shall be in writing setting forth the basis of the objection. The SCA inspectors work papers, notes and exhibits which formed the SCA conclusion shall be available upon reasonable notice for TCA review. Within a reasonable time after such notification, the TCA shall report to the SCA on the outcome of its investigation and of any action taken or decision not to take action.

      **7.**     Additional Background Investigation. The TCA shall have the discretion to initiate or continue a background investigation of any licensee or license applicant, and to take appropriate action with respect to the issuance or continued validity of any license at any time, including suspending or revoking such license.

      **8.**     Identification. The TCA shall require all Covered Game Employees to wear, in plain view, identification cards issued by the TCA which include a photograph of the employee, his or her first name, a four-digit identification number unique to the license issued to the employee, a Tribal seal or signature verifying official issuance of the card, and a date of expiration, which shall not extend beyond such employee's license expiration date.

      **9.**     Prohibition. The Enterprise shall not enter into, or continue to make payments pursuant to, any contract or agreement for the provision of goods or services with any person or entity who does not meet the requirements of this part including, but not limited to, any person or entity whose application to the TCA for a license has been denied, or whose license has expired or been suspended or revoked.

      **B.**     Management Contracts. Pursuant to 25 C.F.R., Part 533, all management contracts must be approved by the Chair of the NIGC. The SCA shall be notified in writing by the TCA promptly after any such approval.

      **C.**     Financing Agreements. Any person or entity extending financing, directly or indirectly, to the Facility or Enterprise in excess of Fifty Thousand Dollars ($50,000.00) in any

AR_0000026

## THE COMANCHE NATION AND STATE OF OKLAHOMA GAMING COMPACT

twelve-month period shall be licensed prior to providing such financing. Principals thereof shall be subjected to background investigations and determinations in accordance with the procedures and standards set forth in subsection A of this Part. Licenses issued under this section shall be reviewed at least every two (2) years for continuing compliance, and shall be promptly revoked if the licensee is determined to be in violation of the standards set forth in subsection A of this Part. In connection with such a review, the TCA shall require the person or entity to update all information provided in the previous application.

        **1.**     SCA Notification. The SCA shall be notified of all financing and loan transactions with respect to Covered Games or supplies in which the amount exceeds Fifty Thousand Dollars ($50,000.00) in any twelve (12) month period, and shall be entitled to review copies of all agreements and Documents in connection therewith.

        **2.**     Exception. Financing provided by a federally regulated or State-regulated bank, savings and loan, or trust, or other federally or State-regulated lending institution; any agency of the federal, State, Tribal or local government; or any person or entity, including, but not limited to, an institutional investor who, alone or in conjunction with others, lends money through publicly or commercially traded bonds or other commercially traded instruments, including but not limited to the holders of such bonds or instruments or their assignees or transferees, or which bonds or commercially traded instruments are underwritten by any entity whose shares are publicly traded or which underwriter, at the time of the underwriting, has assets in excess of One Hundred Million Dollars ($100,000,000.00), shall be exempt from the licensing and background investigation requirements in subsections A and B of this Part, as well as this subsection.

        **D.**     TCA Reporting. The TCA shall report to SCA all issued licenses by Licensee name and whether temporary no less than quarterly and shall only include those licenses issued since the TCA's most recent report.

        **E.**     Violations of Part 9. Violations of this Part shall result in a penalty of Five Thousand Dollars ($5,000.00) per violation to be remitted to the SCA for purposes of deposit and expenditure in connection with Part 10(C) of this Compact, unless otherwise agreed to by the Parties. Such penalty shall be in addition to the Annual Oversight Assessment amount set forth in Part 10(C) of this Compact.

## PART 10: SUBSTANTIAL EXCLUSIVITY; ASSOCIATED FEES AND ASSESSMENTS

        **A.**     Acknowledgment. The Parties acknowledge and agree that this Compact provides the Tribe with substantial exclusivity over class III Covered Gaming consistent with the goals of IGRA.

        **B.**     Substantial Exclusivity Fees. In consideration of the Acknowledgement set forth in subsection A of this Part, the adequacy of which is hereby agreed to, and pursuant to the terms of this valid Compact, the Tribe agrees to pay the following Substantial Exclusivity Fees as provided for below:

AR_0000027

## THE COMANCHE NATION AND STATE OF OKLAHOMA GAMING COMPACT

1.    Amount – Covered Games Less and Except Event Wagering. The Tribe shall remit Substantial Exclusivity Fees to the State on Covered Games, less and except Event Wagering, as follows:

a.    Existing Facilities. For Existing Facilities, the Tribe shall remit Substantial Exclusivity Fees to the State on Covered Games, less and except Event Wagering, in the amount of Four and One Half Percent (4.50%) of the Adjusted Net Win, until the Section 20 Approval Trigger, as defined in Part 3(D) of this Compact. Following the Section 20 Approval Trigger, the Tribe shall remit Substantial Exclusivity Fees to the State on Covered Games, less and except Event Wagering, in the amount of Six Percent (6.00%) of the Adjusted Net Win for Existing Facilities.

b.    New Facilities. For the New Facilities described in Part 4(J)(2) of this Compact, the Tribe shall remit Substantial Exclusivity Fees to the State on Covered Games, less and except Event Wagering, as follows:

i.    For the Love County Facility, Substantial Exclusivity Fees in the amount of Thirteen Percent (13.00%) of the Adjusted Net Win;

ii.    For the Cleveland County Facility, Substantial Exclusivity Fees in the amount of Twelve Percent (12.00%) of the Adjusted Net Win; and

iii.    For the Grady County Facility, Substantial Exclusivity Fees in the amount of Eight Percent (8.00%) of the Adjusted Net Win.

c.    Reevaluation Trigger. Should the Tribe's annual Adjusted Net Win revenue exceed $300,000,000.00, the Parties shall reevaluate the Substantial Exclusivity Fees by utilizing the procedure provided for under subsection (B)(5)(e) of this Part, subject to the terms provided for therein.

2.    Amounts – Event Wagering. In addition to the Substantial Exclusivity Fees, the Tribe shall remit fees to the State on Event Wagering as follows:

a.    For Event Wagering, 1.10% of the Patron's Event Wagering transaction total, to be assessed in addition to the transaction total and calculated on a per wager basis.

3.    Manner; Form. Such fees shall be paid no later than the twentieth (20th) day of each calendar month for revenues received by the Tribe in the preceding month. Payment of such fees shall be made to the Treasurer of the State. Nothing herein shall require the allocation of such fees to particular State purposes, including, but not limited to, the actual costs of performing the State's regulatory responsibilities hereunder.

Page **24** of **30**

AR_0000028

## THE COMANCHE NATION AND STATE OF OKLAHOMA GAMING COMPACT

**4.**     Violation for Failure to Remit.  A single failure to remit exclusivity fees as provided for in subsection B of this Part shall result in a penalty of Five Thousand Dollars ($5,000.00) to be remitted to the SCA for purposes of deposit and expenditure in connection with subsection C of this Part for each thirty (30) day period the fee(s) remain outstanding. Such penalty shall be in addition to the Annual Oversight Assessment amount set forth in subsection C of this Part.  Multiple uncured violations in a single calendar year shall constitute a material breach, which may result in termination of this Compact, unless otherwise agreed to in writing by the Parties.

**5.**     Market Valuation of Substantial Exclusivity.  The right of substantial exclusivity provided for under subsection (B) of this Part will have a definite term, as provided for in Part 12(B) of this Compact.  Subject to a written agreement between the Parties, such term may renew by way of amendment for another fifteen (15) year term pursuant to the following:

      **a.**     Good Faith Meet and Confer.  Within eighteen (18) months prior to expiration of the Compact, the Parties shall meet and confer in good faith for the purpose of setting substantial exclusivity rates under the Compact to reflect the value of substantial exclusivity granted for the renewal term.

      **b.**     Panel Composition and Valuation.  If, following the good faith meet and confer described in subsection (B)(5)(a) of this Part, but not later than twelve (12) months prior to expiration of the Compact, no agreement is reached between the Parties, then the following binding procedure shall apply for the purpose of setting substantial exclusivity rates under the Compact to reflect the value of substantial exclusivity for the renewal term of the Compact:

           **i.**     Rules.  Revenue-sharing rates shall be determined by an independent Panel, comprised of three (3) panelists to determine the substantial exclusivity rates.  The proceeding shall be conducted consistent with the rules of commercial arbitration.

           **ii.**     The Panel.  The State shall select one (1) panelist who is an economist or who has judicial experience (the *"State Member"* or *"Panelist"*).  The Tribe shall select one (1) panelist who is an economist or who has judicial experience (the *"Tribe Member"* or *"Panelist"*).  The State and the Tribe shall jointly select one (1) panelist with business and Indian law experience (the *"Jointly Selected Member"* or *"Panelist"*).  In the event the State and the Tribe cannot agree on the Jointly Selected Member, then the State Member and the Tribe Member shall select the Jointly Selected Member.  The State Member, the Tribe Member, and the Jointly Selected Member shall collectively comprise the *"Panel."*  Once a Panelist is selected, the Parties shall be prohibited from engaging in *ex parte* communications with that Panelist.

AR_0000029

**THE COMANCHE NATION AND STATE OF OKLAHOMA GAMING COMPACT**

    **iii.**      Evidence. Each Party shall have the right to present evidence as relevant and material to support their position, including through expert testimony. The Panel may determine the admissibility, relevance, and materiality of evidence, and may exclude evidence deemed to be cumulative or irrelevant.

    **iv.**      Discovery. The Parties shall have the opportunity to conduct reasonable discovery, including through the use of interrogatories, depositions, requests for production, and similar tools of discovery. Discovery disputes shall be resolved by the Panel. At the request of any Party, the Panel may subpoena witnesses or documents. All principles of legal privilege, including but not limited to the attorney–client privilege, shall apply.

    **v.**      Briefing. The Parties shall simultaneously submit opening briefs on a date agreed to by the Parties. If the Parties cannot agree to a date for the submission of opening briefs, the Panel shall determine the date. Each Party shall have the right to file a response brief within ten (10) days of the opposing Party's opening brief. There shall be no page limit to the submission of briefs.

    **vi.**      Hearing. Following the submission of briefs, the Panel shall hold a hearing and allow each Party to provide legal argument, present evidence and examine and cross-examine witnesses. At least ten (10) days prior to the hearing, the Parties shall exchange copies of exhibits and witness lists.

    **vii.**      Analysis of Data. The Panel's determination of revenue-sharing rates shall be based on an analysis of all data pertinent to assess market valuation of the substantial exclusivity granted for the renewal term.

    **viii.**      Written Opinion. The Panel shall issue its decision in a written and reasoned opinion. If the Panel rules that substantial exclusivity rates should be revised, its opinion may be cited and relied upon if and when the Parties seek approval of the new rates from the Department of the Interior.

    **c.**      The State and the Tribe agree to be bound by the substantial exclusivity rates established by a majority of the Panel for the renewal term.

    **d.**      The process described in subsection (B)(5) of this Part shall take into account the Existing Facilities, as well as the Logan County Facility, the Noble County Facility, and the Payne County Facility, and there shall be no

AR_0000030

## THE COMANCHE NATION AND STATE OF OKLAHOMA GAMING COMPACT

requirement that the Facilities all be subject to a uniform substantial exclusivity rate.

  **e.** <u>Substantial Exclusivity Rate Reevaluation</u>.  Should the Tribe's annual Adjusted Net Win exceed $300,000,000.00, the Parties agree that new substantial exclusivity fees shall be established. The Parties agree to the procedure provided for under subsection (B)(5) of this Part, subject to the exception that the good faith meet and confer described therein between the Parties shall be limited to sixty (60) days.  Should the Parties fail to reach an agreement within sixty (60) days, then they shall proceed to the Panel valuation procedure provided for pursuant to subsection (B)(5) of this Part, and that process shall be concluded by the Panel within ninety (90) days, or such longer time as agreed to by the Parties.

  **f.** <u>Panel Fees and Costs</u>.  The State shall be responsible for paying the State Member's costs and fees.  The Tribe shall be responsible for paying the Tribe Member's costs and fees.  The remaining costs and fees incurred by the Panel, including the Jointly Selected Member's costs and fees, shall be equally divided between the State and the Tribe.

  **C.** <u>Annual Oversight Assessment</u>.  In addition to Substantial Exclusivity Fees, the State shall be entitled to payment for its costs incurred in connection with the oversight of Covered Games to the extent provided herein, Annual Oversight Assessment. The Annual Oversight Assessment, as more particularly described below, shall be paid in advance on a fiscal year basis for each twelve (12) months ending on June 30 of each year, in accordance with the Schedule set forth below.

  **1.** <u>Schedule</u>.  The Annual Oversight Assessment Schedule shall be:

  **i.** $25,000.00 Annual Oversight Assessment: $0.01 to $15,000,000.00 in annual revenue from the play of Covered Games.

  **ii.** $50,000.00 Annual Oversight Assessment: $15,000,001.00 to $50,000,000.00 in annual revenue from the play of Covered Games.

  **iii.** $75,000.00 Annual Oversight Assessment: $50,000,001.00 to $100,000,000.00 in annual revenue from the play of Covered Games.

  **iv.** $100,000.00 Annual Oversight Assessment: $100,000,001.00 to $150,000,000.00 in annual revenue from the play of Covered Games.

  **v.** $125,000.00 Annual Oversight Assessment: $150,000,001.00 to $750,000,000.00 in annual revenue from the play of Covered Games.

  **vi.** $250,000.00 Annual Oversight Assessment: equal to or in excess of $750,000,001.00 in annual revenue from the play of Covered Games.

AR_0000031

## THE COMANCHE NATION AND STATE OF OKLAHOMA GAMING COMPACT

**PART 11:    NOTICES**

**A.**    Manner and Form.    All notices required under this Compact shall be given by certified mail, return receipt requested, commercial overnight courier service, to the Governor of the State and Chairperson (or Chief Executive designee) of the Tribe.

**PART 12:    DURATION & TERMINATION**

**A.**    Effective Date.    The previous gaming compact entered into by and between the Tribe and the State, which was approved by the Department of the Interior and published in the *Federal Register*, is hereby agreed and stipulated by the Parties to be superseded by this Compact, and this Compact is the sole effective Compact between the Parties, constituting the entire agreement between the Parties, from and after the Effective Date hereof.    This Compact will become effective upon the occurrence of all of the following:

**1.**    The Compact is approved by action of the Tribe necessary to authorize the signing of the Compact on behalf of the Tribe and render the signature effective, including any tribal resolution or other action by the Tribe conducted in compliance with tribal procedures;

**2.**    The Compact is executed by the Governor on behalf of the State; *and*

**3.**    The Compact is approved as a Tribal-State compact within the meaning of IGRA by the Secretary of the Department of the Interior and notice of that approval is published in the *Federal Register*.

**B.**    Term.    The term of this Compact shall be begin on the Effective Date and end at 11:59 p.m. (CST) on December 31, 2035, unless otherwise agreed to in writing by the Parties.

**C.**    Effect of Termination on Class III Gaming.    The Tribe may continue to operate Covered Games after expiration of the term described in subsection (B) of this Part.    However, in the absence of an effective gaming compact, the State shall no longer be required to provide the Tribe with substantial exclusivity for class III Covered Games.

**D.**    Termination by Mutual Consent.    The Compact may be terminated before the end of a term of the Compact by the mutual written consent of the Parties.

**PART 13:    ADDITIONAL TERMS & CONDITIONS**

**A.**    Amendments.    This Compact shall not be amended or modified except by a writing executed by all the Parties.

**B.**    Entire Agreement; Severability.    This Compact constitutes the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior and contemporaneous oral and written negotiations.    If any clause or provision of this Compact is subsequently determined by any federal court to be invalid or unenforceable under any present or future law, including but not limited to the scope of Covered Games, the remainder of this

Page **28** of **30**

AR_0000032

## THE COMANCHE NATION AND STATE OF OKLAHOMA GAMING COMPACT

Compact shall not be affected thereby. It is the intention of the Parties that if any such provision is held to be illegal, invalid or unenforceable, there will be added in lieu thereof a provision as similar to such provision as is possible to be legal, valid and enforceable.

      **C.**      No Construction Against the Drafter. Both the Tribe and the State have cooperated in the drafting and preparation of this Compact. Hence, in any construction to be made of this Compact, the same shall not be construed for or against either the Tribe or the State.

      **D.**      Section Headings. The titles and headings of any provision herein exist for convenience and clarity only and in no way shall restrict or modify this Compact.

      **E.**      Agreement to Defend. Each Party hereto agrees to defend the validity of this Compact against challenges or attacks from non-signatories hereto.

      **F.**      Survival. This Compact shall constitute a binding agreement between the parties and shall survive any repeal or amendment of the State-Tribal Gaming Act, 3A O.S. § 260 *et seq.*

      **G.**      Federal Approval. The Parties shall cooperate in seeking approval of this Compact from an appropriate federal agency as a tribal-state compact under IGRA.

      **H.**      Delay in Compliance for Existing Facilities. For Existing Facilities, the insurance requirements imposed by Part 5(D) and the Central Computer monitoring requirements set forth under Part 7(B) shall not take effect until thirty (30) days from and after the Effective Date of this Compact.

      **I.**      Most Favored Nation. With the exception of Part 3(D) of this Compact, Part 4(J)(2) of this Compact, and Part 10(B) of this Compact, any concessions, privileges, or other contractual rights granted in Tribal-State gaming compacts to other Oklahoma tribes must be made available to the Tribe.

## PART 14:    EXECUTION

This Compact, when signed by the Governor of the State of Oklahoma, is approved by the State of Oklahoma. No further action by the State or any State official is necessary for this Compact to take effect upon approval by the Secretary of the Interior. The undersigned represent that they are duly authorized and have the authority to execute this Compact on behalf of the Party for whom they are signing.

**[NEXT PAGE FOR SIGNATURES]**

Page **29** of **30**

AR_0000033

**THE COMANCHE NATION AND STATE OF OKLAHOMA GAMING COMPACT**

**IN WITNESS WHEREOF,** the Parties have caused this Compact to be executed by their authorized representatives, who are deemed to have set their hand as of the Effective Date.

**EXECUTED BY AND BETWEEN:**

**THE STATE OF OKLAHOMA**

_____
Governor J. Kevin Stitt

This the 18 of April, 2020.

**THE COMANCHE NATION**

_____
William Nelson Sr., Chairman

This the 18Th of April, 2020.

_____
LaNora J. Parker, Vice-Chairwoman

_____
Robert B. Tippeconnie, Secretary-Treasurer

_____
June E. Sovo, Business Committee Member #1

_____
Diana G. Doyebi-Sovo, Business Committee Member #2

_____
Ronald F. Redelk, Business Committee Member #3

_____
Clyde R. Narcomey, Business Committee Member #4

Page **30** of **30**

AR_0000034



# OTOE·MISSOURIA
## TRIBE OF INDIANS

8151 HIGHWAY 177
RED ROCK, OK 74651-0348

April 21, 2020

**RECEIVED**
*By Office of Indian Gaming at 12:02 pm, Apr 23, 2020*

Director Paula Hart
Office of Indian Gaming
Assistant Secretary – Indian Affairs
U.S. Department of Interior
1849 C Street N.W.
MS-3543-MIB
Washington, D.C. 20240

Director Hart,

You will find enclosed the Otoe-Missouria Tribe of Indians ("Tribe") and the State of Oklahoma gaming compact executed between the Tribe and Oklahoma Governor J. Kevin Stitt (the "Otoe-Missouria Compact"), which has been submitted for approval as required by the Indian Gaming Regulatory Act.

On February 10, 2020, the United States District Court for the Western District of Oklahoma (the "Court") ordered mediation in the case of *Cherokee Nation et al. v. Stitt*, No. 19-cv-1198 (W.D. Okla.). The Court ordered a February 14, 2020 deadline to file a motion to intervene for any nonparty who wishes to participate in court-ordered mediation. The Tribe decided to join the case to take part of the mediation proceedings. During the course of mediation, the parties exchanged proposals and negotiated in good faith, reaching agreement on April 18, 2020. The parties met at the Oklahoma State Capitol on April 21, 2020 to sign the Otoe-Missouria Compact. As a result of the signed Otoe-Missouria Compact, the Tribe withdrew from the case.

If you need any additional information or further assistance, please do not hesitate to contact me at jshotton@omtribe.org with a copy to the Tribe's attorney, Robert Rosette at rosette@rosettelaw.com. I thank you in advance for your prompt attention to this matter.

Sincerely,

John Shotton, Chairman
Otoe-Missouria Tribe of Indians

Enclosed:
Resolution
Otoe-Missouria Compact

PHONE: 580.723.4466  •  TOLL FREE: 877.692.6863  •  FAX: 580.723.4273  •  www.omtribe.org

AR_0000035



J. Kevin Stitt
Office of the Governor
State of Oklahoma

April 21, 2020

Director Paula Hart
Office of Indian Gaming
U.S. Department of the Interior
1849 C Street NW, Mail Stop 3543
Main Interior Building
Washington, D.C. 20240

Re: 25 C.F.R. § 293.8 Certification

Director Hart,

25 C.F.R. § 293.8(c) requires a certification from the governor that he is empowered under the laws of the State to enter into a compact or amendment.

In Oklahoma, the Governor, as Chief Magistrate, is constitutionally vested with Supreme Executive power, including the power to negotiate and enter into compacts with federally recognized Indian tribes.[1]

If you have any questions please contact Mark Burget, General Counsel, at Mark.Burget@gov.ok.gov.

Sincerely,

J. Kevin Stitt
Governor

---

[1] See Okla. Const. art. VI, §§ 1,2 & 8; and Sheffer v. Buffalo Run Casino, Inc., 2013 OK 77, ¶ 12. See also 74 O.S. § 1221(C)(1) ("The Governor is authorized to negotiate and enter into cooperative agreements on behalf of this state with federally recognized Indian tribal governments..."); and 2004 OK AG 27 ("[A] any requirement that individual agreements or compacts negotiated by the Governor on behalf of the State with other sovereigns, such as Indian tribes, be approved by the Legislature would violate the principles of separation of powers.").

AR_0000036



**OTOE-MISSOURIA**
**TRIBE OF INDIANS**

8151 HIGHWAY 177
RED ROCK, OK 74651-0348

OMTC# <u>0415036</u> FY 2020

## RESOLUTION

### A RESOLUTION APPROVING THE TRIBAL–STATE GAMING COMPACT BETWEEN THE OTOE-MISSOURIA TRIBE OF INDIANS AND THE STATE OF OKLAHOMA

**NOW, THEREFORE, BE IT RESOLVED BY THE TRIBAL COUNCIL OF THE OTOE-MISSOURIA TRIBE OF INDIANS.**

**WHEREAS,** the Otoe-Missouria Tribal Council, the governing body of the Otoe-Missouria Tribe of Indians, in accordance with the Tribal Constitution, Article VIII-Powers, Section 1, duly convened to discuss, review, and approve tribal business; and

**WHEREAS,** the Constitution and By-Laws of the Otoe-Missouria Tribe of Indians provides that the Otoe-Missouria Tribal Council is the supreme governing body and shall have the power to act on behalf of the Tribe in all matters on which the Tribe is empowered to act; and

**WHEREAS,** since 2005, the Tribe has engaged in Class III gaming pursuant to the Indian Gaming Regulatory Act and a Compact between the Tribe and the State of Oklahoma; and

**WHEREAS,** the Tribe has engaged in good-faith negotiations with the State of Oklahoma to enter into a compact that supersedes the 2005 Compact; and

**WHEREAS,** the Otoe-Missouria Tribal Council has received and reviewed the proposed compact between the State of Oklahoma and the Tribe and finds that it would benefit the well-being of the Tribe and its members; and

**WHEREAS,** the Tribal Council has approved the Compact in substantial form and has authorized the Chairman to sign the Compact on behalf of the Tribe, subject to certain agreed-upon changes to be incorporated prior to signature.

**SO, THEREFORE, BE IT RESOLVED,** that the Otoe-Missouria Tribal Council hereby approves and adopts this Resolution approving in substantial form the Compact between the Tribe and the State of Oklahoma.

**BE IT FURTHER RESOLVED,** that this Compact shall supersede the 2005 Compact.

PHONE: 580.723.4466 • TOLL FREE: 877.692.6863 • FAX: 580.723.4273 • www.omtribe.org
PHON... ibe.org

**OMTC# <u>0415036</u> FY 2020**

## CERTIFICATION

We, the undersigned, Chairman and Secretary of the Otoe-Missouria Tribal Council, do hereby certify by signature, that the above and foregoing Resolution was acted and adopted upon this 15th day of April, 2020 as an official act by quorum with a quorum present, and a vote of: ___*6*___ for, ___*0*___ against, ___*0*___ absent, and ___*1*___ abstaining.

Thereby:      {  ✓ } Approving this Resolution
              {     } Disapproving this Resolution
              {     } Tabling this Resolution until _____.

(SEAL)

John R. Shotton, Chairman

Attest: _____
Darrell Kihega, Secretary

AR_0000038

## THE OTOE-MISSOURIA TRIBE AND STATE OF OKLAHOMA GAMING COMPACT

As of the Effective Date, the **OTOE-MISSOURIA TRIBE OF INDIANS**, a federally-recognized Indian tribe (the "*Tribe*" or "*Party*"), and the **STATE OF OKLAHOMA** (the "*State*" or "*Party*"), a state of the United States of America, collectively the "*Parties*," hereby enter into the Tribal-State Gaming Compact (the "*Compact*") for the purpose of authorizing and regulating the operation of Covered Games (as defined herein) on the Tribe's Indian lands, as defined by the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2703(4) and 2719.

## RECITALS

**WHEREAS**, the Tribe is a federally recognized Indian tribe with a governing body duly recognized by the United States, possessing sovereign powers and rights of self-government; and

**WHEREAS**, the State is a state of the United States of America, possessing the sovereign powers and rights of a state; and

**WHEREAS**, the Tribe and the State maintain a government-to-government relationship, and this Compact will help to foster mutual respect and understanding among the two (2) sovereigns; and

**WHEREAS**, the United States Supreme Court and the Congress of the United States have long recognized the general right of an Indian tribe to regulate activity on lands within its jurisdiction; and

**WHEREAS**, the Tribe desires to offer the play of Covered Games, as defined in Part 2(A)(6) of this Compact, as a means of generating revenues for purposes authorized by the Indian Gaming Regulatory Act, 25 U.S.C. § 2701, *et seq.*; and

**WHEREAS**, the State recognizes that the positive effects of this Compact will extend beyond the Tribe's lands to the Tribe's neighbors and surrounding communities and will generally benefit all of Oklahoma.

**NOW, THEREFORE**, in consideration of the mutual undertakings and agreements hereinafter set forth, the Tribe and the State agree as follows:

**PART 1:    RECITALS**

**A.**    The Parties agree that the recitals set forth above form a material part of this Compact and are hereby incorporated by reference.

**PART 2:    DEFINITIONS**

**A.**    As used in this Compact, the following terms shall be specially defined:

**1.**    "*AAA*" means the American Arbitration Association.

Page 1 of 30

AR_0000039

## THE OTOE-MISSOURIA TRIBE AND STATE OF OKLAHOMA GAMING COMPACT

**2.** *"Adjusted Net Win"* or any derivative thereof means the combined Net Win from all Covered Games in Facilities, with the following adjustments:

**a.** Account for the amounts paid for wide-area progressive Gaming Machines as set forth in subsection A(2)(d)(i) of this Part;

**b.** Deduct Free Play and Point Play; *and*

**c.** On the month the Annual Oversight Assessment is paid by the Tribe to the State pursuant to Part 10(C) of this Compact, deduct that amount paid by the Tribe to the State.

**d.** The following applies when calculating the Adjusted Net Win:

**i.** Pro-rata Portion of Wide-Area Progressive System Fees. Similar to the proprietary (in-house) progressive gaming device, the top jackpots for wide-area progressive Gaming Machines increment with the level of play. However, in the case of wide-area progressive Gaming Machines, a third-party vendor operates the system. The system spans multiple casinos. The top jackpots increment as each of the Gaming Machines in the system is played, regardless of the casino in which the Gaming Machine is located. The third-party vendor administers the system. In return, the casinos make periodic payments to the third-party vendor. The vendor payments provide for the progressive jackpot and a fee to the third-party vendor. The casinos collect the cash or cash equivalents from these Gaming Machines as drop. When a progressive jackpot is won, the third-party vendor pays the jackpot from funds collected from the casinos. If in calculating Net Win, fees to the third-party vendor in excess of those amounts necessary to fund the progressive jackpots have been applied to reduce Net Win, then for purposes of calculating Adjusted Net Win, the Tribe shall add back those amounts that did not fund the progressive jackpots. The third-party vendor shall inform the Tribe in writing as to the specific amount of the vendor payments that are contributed to the progressive system payouts (*i.e.*, jackpots).

**ii.** Participation Fees. Broadly, participation fees are any contractual payments made by casinos that are set at the minimum or maximum amount per day or are tied to the total coin-in, or drop generated by the gaming devices being operated, or other financial measures related to the operation of the gaming devices. An example of participation fees is the periodic payments casinos make to the third-party vendor for the use of a Covered Game. Participation fees can also be royalty payments, lease payments, or payments for other contractual arrangements. The participation fee

Page **2** of 30

AR_0000040

**THE OTOE-MISSOURIA TRIBE AND STATE OF OKLAHOMA GAMING COMPACT**

is an expense and is not deductible for the purposes of calculating Adjusted Net Win and should be treated accordingly.

iii.<u>Free Play and Point Play</u>.  Under the terms of this Compact, the dollar amount of Free Play and Point Play may be deducted from the Net Win.

iv.<u>Promotions, Players' Clubs, Non-Cash Prizes and Complimentaries</u>.  Any rewards, awards or prizes, in any form, received by or awarded to a Patron under any form of a players' club program (however denominated), or promotion, or as a result of Patron-related activities, are not deductible from Net Win. The Value of any complimentary given to Patrons in any form, is not deducible from Net Win.  If the Tribe chooses to use non-cash prizes in connection with play on Covered Games, Net Win is reduced by the amount of the Tribe's actual cost of a non-cash prize awarded as a direct result of a win on a Covered Game.

v.<u>Void and Expired Tickets</u>.  Voided tickets are tickets unredeemed by Patrons and later voided by a Covered Game Employee. Expired tickets are tickets unredeemed prior to expiration and later voided by a Central Computer. Voided and expired tickets are deductible from revenue when issued for purposes of calculating Adjusted Net Win. If not paid (redeemed by a Patron) within the specified date on the voided or expired ticket, add the value of the voided or expired ticket back in to revenue for purposes of calculating Adjusted Net Win. If the Tribe elects to honor a voided or expired ticket, value of the voided or expired ticket may be deductible from revenue for purposes of calculating Adjusted Net win.

3.    "*Annual Oversight Assessment*" means the assessment paid by the Tribe to defray the costs associated with oversight of this compact by the State, as more fully described in Part 10(C) of this Compact.

4.    "*Central Computer*" or any derivative thereof means a computer to which all Gaming Machines are linked, also known as a back-of-house system.

5.    "*Compact*" means this Gaming Compact between the State and the Tribe.

6.    "*Covered Game*" or any derivative thereof means all Gaming Machines, House-banked Card Games, Nonhouse-Banked Card Games, House-banked Table Games, Nonhouse-banked Table Games, and Event Wagering, which are conducted in accordance with the Standards, as applicable, if the operation of such game by the Tribe would require a Compact and if such game has been approved by the SCA.  Class II gaming, as defined by IGRA, is expressly excluded from this definition.

AR_0000041

## THE OTOE-MISSOURIA TRIBE AND STATE OF OKLAHOMA GAMING COMPACT

7.    *"Covered Game Employee"* or any derivative thereof means any individual employed by the Enterprise or a third party providing management services to the Enterprise, whose responsibilities include the rendering of services with respect to the operation, maintenance or management of Covered Games. The term Covered Game Employee includes, but is not limited to, the following: managers and assistant managers; accounting personnel; surveillance and security personnel; cashiers, supervisors, and floor personnel; cage personnel; and any other person whose employment duties require or authorize access to areas of the Facility related to the conduct of Covered Games or the maintenance or storage of Covered Game components. This shall not include the Tribe's elected officials so long as such individuals are not directly involved in the operation, maintenance, or management of Covered Game components. The Enterprise may, at its discretion, include other persons employed at or in connection with the Enterprise within the definition of Covered Game Employee.

8.    *"Document"* or any derivative thereof means books, records, electronic, magnetic and computer media and other writings and materials, copies thereof, and information contained therein.

9.    *"E-Sport"* or any derivative thereof means any multiplayer video game played competitively, either in-person or via remote connection, in which success principally depends upon the superior knowledge, training, experience, and adroitness of the players.

10.    *"Effective Date"* means the date on which the last of the conditions set forth in Part 12(A) of this Compact occurs.

11.    *"Enterprise"* means: **(i)** the Tribe or the Tribal agency or section of tribal management with direct responsibility for conducting Covered Games; **(ii)** the tribal business enterprise that conducts Covered Games; or **(iii)** a person, corporation or other entity that has entered into a management contract with the Tribe to conduct Covered Games, in accordance with IGRA. In any event, the Tribe shall have the ultimate and final responsibility for ensuring that the Tribe or Enterprise fulfills the responsibilities created and agreed to under this Compact. For purposes of enforcing the terms and conditions of this Compact, the Tribe is deemed to have made all promises for on and behalf of the Enterprise.

12.    *"Event Wagering"* means the placing of a wager on the outcome of a Sport event, including E-Sports, or any other events, to the extent such wagers are authorized by law, subject to the following terms and conditions:

    a.    Type.  Event Wagering shall not include either wagering on intercollegiate Sports for schools located in the State or intercollegiate Sports events occurring within the State.

    b.    Reservation of State Licenses.  At some future time, the State may license up to five (5) non-tribal Event Wagering locations, with the same requirements as those under this Compact; provided, however, that the Tribe's right to engage in Event Wagering shall in no way be subject to the State's conduct of Event Wagering.  For the avoidance of doubt, even if it should be

Page 4 of 30

AR_0000042

found that the State's conduct of Event Wagering is in violation of the State's obligations, if any, under compacts with other Oklahoma tribes, such a finding shall have no effect on the Tribe's right to engage in Event Wagering.

      **c.**     <u>Location</u>. Event Wagering must be conducted by a Patron who is: **(i)** physically located at a Facility, or **(ii)** within 1,000 feet of the Facility, or **(iii)** within the Tribe's land-trust boundary, whichever is less. The Tribe may not conduct Event Wagering within the lands of the State.

      **d.**     <u>Manner and Form</u>. Event Wagering transactions by Patrons may be conducted over-the-counter or electronically, subject to Geofencing of the Facility consistent with subsection (A)(19) of this Part.

      **e.**     <u>Vendor Approval</u>. Any vendor who contracts with the Enterprise to provide Event Wagering risk management software services must be mutually agreed upon by the State and the Tribe, which such agreement shall not be unreasonably withheld, and such vendor shall also be subject to regulation by the State through the SCA.

      **f.**     <u>Vendor Restrictions</u>. The Tribe, Tribally owned or operated businesses, non-Tribally owned businesses where the Tribe has more than a One Percent (1.00%) interest, and/or Tribal officials, whether elected or unelected, shall be prohibited from having any pecuniary interest in third-party vendors providing Event Wagering risk management software services to an Enterprise

      **g.**     <u>Licenses</u>. The Tribe shall be permitted to conduct Event Wagering at no more than two (2) Facilities. Nothing shall prevent the Tribe from selling or leasing its right to conduct Event Wagering to any other compacting tribe who has entered into a valid compact with the State authorizing Event Wagering as of or subsequent to the Effective Date hereof; provided, however, the State shall receive notice of such a transaction within ten (10) days of the transaction. Notice to the State shall include the duration of such agreement and shall be delivered to the SCA.

      **13.**    *"Existing Facilities"* or any derivative thereof means those Facilities operated by the Tribe as of the Effective Date of this Compact.

      **14.**    *"FAA"* means the Federal Arbitration Act, Pub. L. 68-401, 43 Stat. 883, as amended, 9 U.S.C. §§ 1-16.

      **15.**    *"Facility"* or any derivative thereof means any building, or collection of buildings where Covered Games authorized by this Compact are conducted by the Enterprise, located on Indian lands as defined by IGRA. The Tribe shall have the ultimate responsibility for ensuring that a Facility conforms to the Compact as required herein.

AR_0000043

## THE OTOE-MISSOURIA TRIBE AND STATE OF OKLAHOMA GAMING COMPACT

**16.**    *"Free Play"* means play on any Covered Game with points or credits used by Patrons without monetary consideration, and which have no cash redemption value.

**17.**    *"Gaming"* means the conduct of any game containing the elements of consideration, chance and prize.

**18.**    *"Gaming Machine"* or any derivative thereof means a Covered Game that is a mechanical, electromechanical or an electronic contrivance or machine that uses a random number generator for outcome that, upon insertion of a coin, token or similar object, or upon payment of any consideration in any manner, is available to play or operate a game of chance in which the outcome depends to a material degree on an element of chance, notwithstanding that some skill may be a factor, whether the payoff is made automatically from the Gaming Machine or in any other manner.  For purposes of this Compact, Gaming Machine shall not include any machine used to conduct class II gaming, as defined by IGRA.

**19.**    *"Geofencing"* means the practice of using global positioning system (*"GPS"*) or radio frequency identification (*"RFID"*) to define a geographic boundary. Geofencing may include automatic Wi-Fi configuration as a device moves in and out of geofence boundaries, restriction on game and social apps in geofenced area, and disabling of camera and other device settings to protect sensitive data, as allowed by applicable law

**20.**    *"House-Banked Card Game"* or any derivative thereof means any card game in which the Tribe has an interest in the outcome of the game.

**21.**    *"House-Banked Table Game"* or any derivative thereof means any table game including, but not limited to, those table games involving a wheel, ball, or dice, which operate in a non-electronic environment and that the Tribe has interest in the outcome of the game.

**22.**    *"IGRA"* means the Indian Gaming Regulatory Act, Pub. L. 100-497, Oct. 17, 1988, 102 Stat. 2467, codified at 25 U.S.C., § 2701 *et seq.*, which the Parties hereby adopt and incorporate into this Compact by reference.

**23.**    *"iLottery"* means a Gaming system that may be conducted by the Oklahoma Lottery Commission, subject to applicable law, that provides for the distribution of lottery products through numerous channels that include web applications, mobile applications, mobile web, tablets and social media platforms that allows players to interface through a portal for the purpose of obtaining lottery products and ancillary services, such as account management, game purchase, game play and prize redemption; provided, however, that the Gaming elements of consideration, chance and prize require persons playing iLottery to electronically load games at the physical location of an authorized lottery retailer, and not remotely. The elements of consideration and prize shall occur at the physical location of an authorized lottery retailer, but the element of chance may occur on a mobile device, provided that each chance, including the associated result, occurs in no less than 120 second intervals. The definition of iLottery shall not include games that represent physical, Internet-based or

Page **6** of **30**

AR_0000044

monitor-based interactive lottery games which simulate Covered Games, specifically including, but not limited to, poker, roulette, slot machines, Event Wagering and blackjack.

**24.** *"Independent Testing Laboratory"* means a laboratory of national reputation that is demonstrably competent and qualified to scientifically test and evaluate devices for compliance with this Compact and to otherwise perform the functions assigned to it in this Compact. An Independent Testing Laboratory shall not be owned or controlled in whole or in part by the Tribe, the Enterprise, an organizational licensee as defined in the State-Tribal Gaming Act, the State, or any manufacturer, supplier or operator of gaming devices. The selection of an Independent Testing Laboratory for any purpose under this Compact shall be made from a list of one or more laboratories approved by the SCA, which such approval shall not be unreasonably withheld.

**25.** *"Logan County Facility"* means a Facility to be developed, constructed, opened and operated by the Tribe within the exterior boundaries of Logan County, a county lying within the State of Oklahoma, pursuant to a two-part determination under IGRA, 25 U.S.C. § 2719(b)(1), which such Facility shall be located within one (1) mile of a state or federal highway or turnpike running through Logan County.

**26.** *"Net Win"* means the win from Covered Game gaming activities, which is the difference between gaming wins and losses before deducting costs and expenses or deducting incentives or adjusting for changes in progressive jackpot liability accruals. Generally, Net Win is the difference between Patron wagers and payouts made on winning wagers.

**27.** *"NIGC"* means the National Indian Gaming Commission.

**28.** *"Noble County Facility"* means a Facility to be developed, constructed, opened and operated by the Tribe within the exterior boundaries of Noble County, a county lying within the State of Oklahoma, pursuant to a two-part determination under IGRA, 25 U.S.C. § 2719(b)(1), which such Facility shall be located within one (1) mile of a state or federal highway or turnpike running through Noble County.

**29.** *"Nonhouse-banked Card Game"* or any derivative thereof means any card game in which the Tribe has no interest in the outcome of the game, including games played in tournament formats and games in which the Tribe collects a fee from the player for participating, and all bets are placed in a common pool or pot from which all player winnings, prizes and direct costs are paid. As provided herein, administrative fees may be charged by the Tribe against any common pool in an amount equal to any amount paid to the State; provided that the Tribe may seed the pool as it determines necessary from time to time.

**30.** *"Nonhouse-banked Table Game"* or any derivative thereof means any table game, including, but not limited to those table games involving a wheel, ball, or dice, operated in a nonelectronic environment in which the Tribe has no interest in the outcome of the game, including games played in tournament formats and gaming in which the Tribe collects a fee from the Patron for participating and all bets are placed in a common pool or pot from which all play winnings, prizes, and direct costs are paid.

AR_0000045

**THE OTOE-MISSOURIA TRIBE AND STATE OF OKLAHOMA GAMING COMPACT**

**31.**    "*Patron*" or any derivative thereof means any person who is on the premises of a Facility for the purpose of utilizing or experiencing the amenities offered by the Facility.

**32.**    "*Payne County Facility*" means a Facility to be developed, constructed, opened and operated by the Tribe within the exterior boundaries of Payne County, a county lying within the State of Oklahoma, pursuant to a two-part determination under IGRA, 25 U.S.C. § 2719(b)(1), which such Facility shall be located within one (1) mile of a state or federal highway running through Payne County.

**33.**    "*Point Play*" means play on a Covered Game with points earned or accrued by a Patron through previous Covered Games play, players' clubs, or any other method, and which have no cash redemption value.

**34.**    "*Principal*" or any derivative thereof means, with respect to any entity, its sole proprietor or any partner, trustee, beneficiary or shareholder holding Five Percent (5.00%) or more of its beneficial or controlling ownership, either directly or indirectly, or any officer, director, principal management employee, or key employee thereof.

**35.**    "*Prize Disputes*" means any dispute by and between the Enterprise and Patrons concerning a Patron's play of any Covered Game, including the amount of any prize which has been awarded, the failure to be awarded a prize, or the right to receive a refund or other compensation from the Enterprise.

**36.**    "*Rules and Regulations*" means the rules and regulations promulgated by the federal government, TCA, or the SCA for implementation of this Compact.

**37.**    "*Sport*" or any derivative thereof, exclusive of E-Sports and daily fantasy sports, means a contest **(i)** having a defined set of rules, **(ii)** requiring participant skill, **(iii)** requiring physical skill, **(iv)** having a broad public appeal, and **(v)** having achieved institutional stability where social institutions have rules which regulate it, stabilizing it as an important social practice.  This shall include, but not be limited to, football, basketball, baseball, golf, tennis, hockey, boxing, mixed martial arts, wrestling, athletic contests recognized by the Olympics, and car racing.

**38.**    "*Standards*" means the descriptions and specifications of electronic amusement games, electronic bonanza-style bingo games and electronic instant bingo games or components thereof as set forth in Sections 11 through 18 of the State-Tribal Gaming Act as enacted in 2004 or as amended pursuant to this Compact, including technical specifications for component parts, requirements for cashless transaction systems, software tools for security and audit purposes, and procedures for operation of such games.

**39.**    "*State*" means the State of Oklahoma.

**40.**    "*State Compliance Agency*" ("*SCA*") means the State agency that has the authority to carry out the state's responsibilities under this Compact, which shall be the Office of

AR_0000046

THE OTOE-MISSOURIA TRIBE AND STATE OF OKLAHOMA GAMING COMPACT

Management and Enterprise Services or its successor agency as determined by the Office of the Governor. Nothing herein shall supplant the role or duties of the Oklahoma State Bureau of Investigation under State law. The Oklahoma Horse Racing Commission and the Oklahoma Tax Commission shall have no role in regulating or oversight of any covered gaming conducted by a Tribe.

**41.** *"Substantial Exclusivity Fee"* or any derivative thereof means that definition provided in Part 10(B)(1) of this Compact.

**42.** *"Tort Claims"* means any dispute by and between the Enterprise and a Patron concerning a Patron's claim that he or she is entitled to just and reasonable compensation from the Enterprise for injury to his or her person or property arising or deriving from an act, omission, or condition at the Facility, whether the act, omission, or condition was directly, indirectly, or vicariously caused or contributed to by the Enterprise.

**43.** *"Tribal Compliance Agency"* ("*TCA*") means the tribal governmental agency that has the authority to carry out the Tribe's regulatory and oversight responsibilities under this Compact. Unless and until otherwise designated by the Tribe, the TCA shall be the Otoe-Missouria Gaming Commission. No Covered Game Employee may be a member or employee of the TCA. The Tribe shall have the ultimate responsibility for ensuring that the TCA fulfills its responsibilities under this Compact. The members of the TCA shall be subject to background investigations and licensed to the extent required by any tribal or federal law, and in accordance with this Compact. The Tribe shall ensure that all TCA officers and agents are qualified for such position and receive ongoing training to obtain and maintain skills that are sufficient to carry out their responsibilities in accordance with industry standards.

**44.** *"Tribal Law Enforcement Agency"* means a police or security force established and maintained by the Tribe pursuant to the Tribe's powers of self-government to carry out law enforcement duties at or in connection with a Facility.

**45.** *"Tribe"* or *"Tribal"* means the Otoe-Missouria Tribe of Indians, a federally recognized tribe.

## PART 3:    AUTHORIZATION OF COVERED GAMES

**A.**    Scope. The Tribe and State agree that the Tribe is authorized to operate Covered Games only in accordance with this Compact. However, nothing in this Compact shall limit the Tribe's right to operate any game that is class II under IGRA, and no class II games shall be subject to Substantial Exclusivity Fees.    Furthermore, the State acknowledges that it is the current policy of Oklahoma that the Tribe has the right to conduct class III Covered Games in Oklahoma for an indefinite duration.

**B.**    iLottery. The Tribe agrees that the substantial exclusivity provided for in this Compact shall not prohibit the operation of iLottery by the State.

AR_0000047

**THE OTOE-MISSOURIA TRIBE AND STATE OF OKLAHOMA GAMING COMPACT**

  **C.** Certification of Gaming Machines.  The Tribe shall not operate a Gaming Machine pursuant to this Compact until such game has been certified by an SCA approved Independent Testing Laboratory and the TCA as meeting the Standards, which such certification shall not be unreasonably withheld.

  **D.** Annual Certification of Class III Revenue.  On an annual basis, the Tribe shall certify by Tribal resolution that Forty-Five Percent (45.00%) of revenues from all Facilities is derived from Covered Games, until the Bureau of Indian Affairs has approved the first Section 20 application to establish Indian lands for a new Facility made by the Tribe (the "*Section 20 Approval Trigger*"), as more specifically described in Part 4(J)(2) of this Compact.  Following the Section 20 Approval Trigger, the Tribe shall annually certify by Tribal resolution that Fifty Percent (50.00%) of revenues from all Facilities is derived from Covered Games.

  **E.** Violations.  A violation of Part 4 of this Compact that is not cured within thirty (30) days shall constitute a material breach, which may result in termination of this Compact, unless otherwise agreed to by the Parties.

  **F.** New Games.  If and when new forms of Covered Games become available in the market following the Effective Date of this Compact, the Tribe may propose such games be authorized pursuant to this Compact, and such new games may be authorized in an appendix approved by the Governor of the State, which such approval shall not be unreasonably withheld, without requiring amendment of the Compact.

**PART 4:** **RULES AND REGULATIONS; AUDITING; MINIMUM OPERATIONAL REQUIREMENTS**

  **A.** Regulations.  At all times during the Term of this Compact, the Tribe shall be responsible for all duties which are assigned to it, the Enterprise, the Facility, and the TCA under this Compact. The Tribe shall promulgate any Rules and Regulations necessary to implement this Compact.  Nothing in this Compact shall be construed to affect the Tribe's right to amend its Rules and Regulations, provided that any such amendment shall be in conformity with this Compact. The SCA may propose, in writing, additional Rules and Regulations related to implementation of this Compact to the TCA at any time. The TCA shall give good faith consideration to such suggestions and shall notify the SCA, in writing, within ninety (90) days of its response or action with respect thereto.

  **B.** Compliance; Internal Control Standards.  The Enterprise and all Facilities shall comply with, and all Covered Games approved under the procedures set forth in this Compact shall be operated in accordance with the requirements set forth in this Compact, including, but not limited to, those set forth in this Part.  In addition, the Enterprise and all Facilities shall comply with Tribal internal control standards that equal or exceed those set forth in the NIGC's minimum internal control standards, 25 C.F.R. Part 542.

  **C.** Records.  The Enterprise shall maintain all records relevant to this Compact in permanent form and as written or entered, whether manually or by computer.  These records

Page **10** of **30**

AR_0000048

## THE OTOE-MISSOURIA TRIBE AND STATE OF OKLAHOMA GAMING COMPACT

shall be maintained by the Enterprise, and be available for inspection by the SCA, for no less than five (5) years from and after the date generated. Those records shall include:

1.     A log recording all surveillance activities in the monitoring room of the Facility, including, but not limited to, surveillance records kept in the normal course of business operations and in accordance with industry standards; provided, notwithstanding anything to the contrary herein, surveillance records may, at the discretion of the Enterprise, be destroyed if no incident has been reported within one (1) year following the date such records were made. Records, as used in this Compact, shall include video tapes and any other storage media;

2.     Payout from the conduct of Gaming Machines;

3.     Maintenance logs for all Covered Games gaming equipment used by the Enterprise;

4.     Security logs as kept in the ordinary course of conducting and maintaining security at the Facility, which at a minimum shall conform to industry practices for such reports. The security logs shall document any unusual or nonstandard activities, occurrences or events at or related to the Facility or in connection with the Enterprise. Each incident, without regard to materiality, shall be assigned a sequential number for each such report. At a minimum, the security logs shall consist of the following information, which shall be recorded in a reasonable fashion noting:

a.     The assigned number of the incident;

b.     The date of the incident;

c.     The time of the incident;

d.     The location of the incident;

e.     The nature of the incident;

f.     The identity, including identification information, of any persons involved in the incident and any known witnesses to the incident; *and*

g.     The tribal compliance officer making the report and any other persons contributing to its preparation.

5.     Books and records on all Covered Game activities of the Enterprise shall be maintained in accordance with generally accepted accounting principles ("*GAAP*"); *and*

6.     All Documents generated in accordance with this Compact, unless protected by the attorney-client privilege and/or doctrine of work product.

Page 11 of 30

AR_0000049

**THE OTOE-MISSOURIA TRIBE AND STATE OF OKLAHOMA GAMING COMPACT**

      **D.**     Confidentiality. Any information or Document provided to the SCA by the Tribe, TCA or Enterprise or prepared from information obtained from the Tribe, TCA or Enterprise are confidential. If the SCA is in receipt of such confidential information from the Tribe, TCA or Enterprise, it: **(i)** may release or disclose the same only with the prior written consent of the Tribe; **(ii)** shall use the same degree of care that the SCA uses to protects its own confidential information, but in no event less than a reasonable amount of care; and **(iii)** shall not use confidential information for purposes other than those necessary to further the purpose of the Compact.

      **1.**     The prohibitions set forth in Part 4(D) of this Compact shall not be construed to prohibit:

      **a.**     The furnishing of any information to a law enforcement or regulatory agency of the State or Federal Government;

      **b.**     The SCA from making known the names of persons, firms, or corporations conducting class III Gaming pursuant to the terms of this Compact, locations at which such activities are conducted, or the dates on which such activities are conducted;

      **c.**     Disclosure of the terms of this Compact;

      **d.**     Disclosing information as necessary to audit, investigate, prosecute or arbitrate violations of this Compact or other applicable laws or to defend suits against the State;

      **e.**     Disclosures to other State agencies as required by State law, provided that the confidentiality provisions of this subsection C of this Part shall apply to the agencies receiving such information; *and*

      **f.**     Complying with subpoenas or court orders issued by a state or federal court with jurisdiction over the Parties and in matters related to Covered Games.

      **2.**     Notwithstanding the foregoing, the Tribe agrees that:

      **a.**     The following Documents may be released by the SCA to the public: **(i)** the gaming ordinance of the Tribe or TCA; **(ii)** other Documents of the Tribe, TCA or Enterprise ordinarily available to the public; **(iii)** amounts of Substantial Exclusivity Fees made pursuant to this Compact; and **(iv)** correspondence between the Tribe, TCA or Enterprise and the SCA, unless such correspondence is specifically labeled "Confidential"; *and*

      **b.**     The SCA may release to the public aggregate figures compiled by totaling comparable figures from the annual financial statements of all compacting Indian tribes.

Page <strong>12</strong> of <strong>30</strong>

AR_0000050

## THE OTOE-MISSOURIA TRIBE AND STATE OF OKLAHOMA GAMING COMPACT

**E.**    Responsible Gambling Requirements. The Enterprise agrees to craft a corporate policy that makes a clear commitment to responsible gambling including associated policies for **(i)** staff training, **(ii)** informed decision-making by Patrons, and **(iii)** Patron assistance.

**F.**    Annual Independent Financial Audit. Consistent with 25 C.F.R., Section 571.12, Audit Standards, the TCA shall ensure that an annual independent financial audit of the Enterprise's conduct of Covered Games subject to this Compact is secured. The audit shall examine revenues and expenses in connection with the conduct of Covered Games in accordance with generally accepted auditing standards and shall include, but not be limited to, those matters necessary to verify the determination of Adjusted Net Win and the basis of Substantial Exclusivity Fees.

**1.**    Auditor Selection. The auditor selected by the TCA shall be a firm of known and demonstrable experience, expertise and stature in conducting audits of this kind and scope.

**2.**    Timing. The audit shall be concluded within five (5) months following the close of each calendar year, provided that extensions may be requested by the Tribe and shall not be refused by the State where the circumstances justifying the extension request are beyond the Tribe's control.

**3.**    Scope. The audit of the conduct of Covered Games may be conducted as part of or in conjunction with the audit of the Enterprise, but if so conducted shall be separately stated for the reporting purposes required herein.

**4.**    Conformance. The audit shall conform to generally-accepted auditing standards. The audit must demonstrate the validity of revenue and expenses by utilizing the data from the machine system to verify coin in, coin out, actual drop, bonus activity, net win, and expired and void ticket information. As part of the audit report, the auditor shall certify to the TCA that, in the course of the audit, the auditor discovered no matters within the scope of the audit which were determined or believed to be in violation of any provision of this Compact or the NIGC's Minimum Internal Control Standards Agreed upon Procedures ("*MICS AUP*").

**5.**    Costs. The Enterprise shall assume all costs incurred in connection with the annual independent financial audit.

**6.**    Submission of Audit. The audit report, management letter(s) and MICS AUP report for the conduct of Covered Games shall be submitted to the SCA within thirty (30) days of completion. The auditors' work papers concerning Covered Games and verifying all information described in this Part shall be made available to the SCA upon submission of the audit report.

**7.**    SCA Involvement. Representatives of the SCA may meet with the auditors to discuss the work papers, the audit or any matters in connection therewith; provided, such discussions are limited to Covered Games information and pursue legitimate State Covered Games interests.

Page **13** of **30**

AR_0000051

**THE OTOE-MISSOURIA TRIBE AND STATE OF OKLAHOMA GAMING COMPACT**

**G.**    Sale of Alcoholic Beverages. The sale and service of alcoholic beverages in a Facility shall be in compliance with federal and Tribal law, including such rules and regulations concerning the licensing and sale of such beverages, as well as the rules, regulations, and enforcement mechanisms promulgated by the Oklahoma Alcoholic Beverage Laws Enforcement Commission ("*ABLE*"), including the statutory provisions set forth in the Oklahoma Alcoholic Beverage Control Act, 37A O.S. § 1-101 *et seq*.

**H.**    Facility Age Restriction.    No person under the age of eighteen (18) shall be admitted into, or within 25 feet of, any area in a Facility where Covered Games are played, nor be permitted to operate or obtain a prize from or in connection with the operation or conducting of any Covered Game, whether directly or indirectly.

**I.**    Destruction of Documents. Enterprise books, records and other materials documenting the conduct of Covered Games shall be destroyed only in accordance with Rules and Regulations adopted by the TCA, which at a minimum shall provide as follows:

**1.**    Tort Claims. Material that might be utilized in connection with a potential Tort Claim pursuant to Part 5 of this Compact, including, but not limited to, incident reports, surveillance records, statements, and the like, shall be maintained at least one (1) year beyond the time which a claim can be adjudicated under Part 5 of this Compact or, if a Tort Claim is made, beyond the final disposition of such Tort Claim;

**2.**    Prize Disputes. Material that might be utilized in connection with a Prize Dispute, including but not limited to incident reports, surveillance records, statements, and the like, shall be maintained at least one hundred eighty (180) days beyond the time which a Prize Dispute can be adjudicated under Part 5 of this Compact or, if a Prize Dispute is made, beyond the final disposition of such Prize Dispute; *and*

**3.**    Operational Materials. Unless otherwise provided herein, all Enterprise books and records with respect to the conduct of Covered Games or the operation of the Enterprise, including, but not limited to, all interim and final financial and audit reports and materials related thereto which have been generated in the ordinary course of business, shall be maintained for the minimum period of five (5) years.

**J.**    Location. The Tribe may establish and operate Enterprises and Facilities that operate Covered Games only on its Indian lands as defined by IGRA, 25 U.S.C. §§ 2703(4) and 2719.

**1.**    Existing Facilities. Within thirty (30) days from and after the Effective Date of this Compact, the Tribe shall forward to the SCA all necessary documents reflecting the status of the land. This documentation shall include, but is not limited to, any application to place the land into trust status and all documents associated therewith, any and all responses from the Bureau of Indian Affairs regarding such application, and a copy of the deed filed of record in the county where the Existing Facility is located. The Tribe may operate Facilities at all locations existing as of the Effective Date of this Compact.

AR_0000052

**THE OTOE-MISSOURIA TRIBE AND STATE OF OKLAHOMA GAMING COMPACT**

        **2.**     New Facilities. In addition to its Existing Facilities, the Tribe may establish and operate the Logan County Facility, the Noble County Facility and the Payne County Facility (collectively the "*New Facilities*"), subject to the land being taken into trust pursuant to 25 U.S.C. § 2719(b)(1)(A). The Tribe shall notify the SCA of the operation of any New Facility following the Effective Date of this Compact at least ninety (90) days prior to the opening of such New Facility. Such notification shall include all documents referenced in subsection (J)(1) of this Part.

        **a.**     Section 20 Concurrence. By entering into this Compact, the State through its Governor, in order to provide a meaningful concession to the Tribe, the adequacy of which is acknowledged and by which the Tribe was materially induced to enter into this Compact, hereby agrees to concur in any determination by the Secretary of the Interior that lands relating to the Logan County Facility, the Noble County Facility and the Payne County Facility, should be taken into trust for gaming purposes, and such lands are eligible for gaming under 25 U.S.C. § 2719(b)(1)(A). The Parties agree that no other action from the State is required for approval of those lands' eligibility for gaming.

        **3.**     Failure to Notify. Failure to notify in accordance herewith shall result in a penalty of $5,000.00 per each thirty (30) day increment to be remitted to the SCA for purposes of deposit and expenditure in connection with Part 10(C) of this Compact, unless otherwise agreed to by the Parties. Such penalty shall be in addition to the Annual Oversight Assessment amount set forth in Part 10(C) of this Compact.

        **4.**     Limitation. Nothing herein shall be construed as expanding or otherwise altering the term Indian lands, as that term is defined in the IGRA, nor shall anything herein be construed as altering the federal process governing the tribal acquisition of Indian lands for gaming purposes.

        **K.**     Record of Games. The Enterprise shall keep a record of, and shall report at least quarterly to the SCA, the number of Covered Games and class II devices in each Facility, by the name or type of each and its identifying number, and denomination of bets accepted. This list shall include both class II and class III games. Failure to report in accordance herewith shall result in a penalty of $5,000 per each Facility per report to be remitted to the SCA for purposes of deposit and expenditure in connection with Part 10(C) of this Compact.

        **L.**     Health Reporting. The Enterprise agrees to implement at its Facilities standards and guidelines relating to public health as promulgated or issued by the U.S. Centers for Disease Control and Prevention ("*CDC*").

**PART 5:**     **DISPUTE RESOLUTION – THE ENTERPRISE AND PATRONS**

        **A.**     Scope. Part 5 of the Compact shall apply to Prize Disputes and Tort Claims.

        **B.**     Procedure. The goal of the Enterprise and Patrons should be to resolve Prize Disputes and Tort Claims amicably and voluntarily whenever possible through private

AR_0000053

## THE OTOE-MISSOURIA TRIBE AND STATE OF OKLAHOMA GAMING COMPACT

negotiation. Unless otherwise agreed to in writing by the Enterprise and the Patron, private negotiation shall be deemed to have failed if the Enterprise and the Patron cannot reach a settlement within ninety (90) days from and after the Enterprise receives notice by the Patron of a claim. When private negotiations are deemed to have failed, the following procedure applies:

> 1.      AAA. Either the Enterprise or the Patron may refer Prize Disputes or Tort Claims to arbitration pursuant to the applicable rules of the AAA for the category of dispute, subject to enforcement as provided for by this Part by a federal district court.

> 2.      Oklahoma Law. The claims, remedies, affirmative defenses, counterclaims, third-party claims, and cross-claims available through arbitration are limited to those arising under Oklahoma common-law; provided, however, that in no event shall a Tort Claim be permitted unless such Tort Claim is filed within one (1) year of the date of the event which allegedly caused the claimed loss, and provided further that in no event shall any Prize Dispute be permitted unless such Prize Dispute is filed within ten (10) days of the event which is the basis of the Prize Dispute. Failure to timely file a Tort Claim or Prize Dispute shall forever bar such claims.

> 3.      Jurisdiction; Waiver. The Enterprise consents to the jurisdiction of such arbitration forum and court for such limited purposes and no other, and waives immunity with respect thereto.

> 4.      Selection of Arbitrator. One (1) arbitrator shall be chosen by the Enterprise and the Patron from a list of qualified arbitrators to be provided by the AAA. If the parties cannot agree on an arbitrator, then the arbitrator shall be named by the AAA.

> 5.      Expenses of Arbitration. The expenses of arbitration, including filing fees and fees charged by the arbitrator, shall be equally borne between the Patron and the Enterprise.

> 6.      Enforcement. The arbitration procedures described herein are subject to, and any decision or arbitration award issued by the arbitrator under to this agreement, is enforceable under, and otherwise subject to, the provisions of the FAA.

> 7.      Appellate Rights. An order or final decision issued by the arbitrator under the FAA is subject to appeal, as provided in the FAA. Accordingly, the Enterprise waives immunity and consents to suit therein for such limited purposes, and agrees not to raise the United States Constitution, sovereign immunity, or comparable defense to the validity of such waiver.

> 8.      Limited Consent – Tort Claims. For Tort Claims, the consent to waive sovereign immunity provided for in this Part is granted only to the extent such claim or any award or judgment rendered thereon does not exceed the limit of available insurance coverage required under subsection (D) of this Part. Under no circumstances shall any consent to suit be effective as to any award which exceeds such applicable amounts. This consent shall only extend to the Patron actually claiming to be injured. Tort Claims shall not be assignable. In the event any assignment of the Tort Claim is made in violation of this Compact, or any person other than the Patron claiming the injury becomes a party to any action hereunder, this consent shall be

Page **16** of 30

## THE OTOE-MISSOURIA TRIBE AND STATE OF OKLAHOMA GAMING COMPACT

deemed revoked for all purposes. Notwithstanding the foregoing, this consent shall not be revoked if an action on a Tort Claim is filed by **(i)** a court-appointed representative of a claimant's estate, **(ii)** an indispensable party, or **(iii)** a health provider or other party subrogated to the claimant's rights by virtue of any insurance policy; provided, that nothing herein is intended to, or shall constitute a consent to suit against the Enterprise as to such party except to the extent such party's claim is:

      **a.**      In lieu of and identical to the claim that would have been made by the claimant directly but for the appointment of said representative or indispensable party, and participation of such other party is in lieu of and not in addition to pursuit of the claim by the Patron, *and*

      **b.**      The claim of such other party would have been subject to the consent provided for herein if it had been made by the claimant directly.

      **C.**      <u>Notice to Patrons</u>. Notices explaining the procedure set forth in subsections A and B of this Part shall be prominently posted in the Facility. Such notices shall explain the method and places for making a claim, including to whom the notice should be made (*e.g.*, the "registered agent" or legal equivalent for the Enterprise).

      **D.**      <u>Commercial General Liability Insurance for Tort Claims</u>. During the term of this Compact, the Enterprise shall maintain commercial general liability insurance for the express purposes of covering and satisfying Tort Claims. The insurance shall have liability limits of not less than Five Hundred Thousand Dollars ($500,000.00) for any one person and Five Million Dollars ($5,000,000.00) for any one occurrence for personal injury, and One Million Dollars ($1,000,000.00) for any one occurrence for property damage. No Tort Claim shall be paid, or be the subject of any award, in excess of the limit of liability. The Enterprise's commercial general liability insurance policy shall include an endorsement providing that the insurer may not invoke tribal sovereign immunity in connection with any claim made within the limit of liability. Copies of all such insurance policies shall be forwarded to the SCA.

      **E.**      <u>Remedies in the Event of No or Inadequate Insurance for Tort Claims</u>. In the event a tort claim is made and there is no insurance, or inadequate insurance in effect, as required under this Compact, the Enterprise shall be deemed to be in default hereunder unless, within ten (10) days of a demand by the SCA or a claimant to do so, the Enterprise has posted in an irrevocable escrow account at a state or federally chartered bank which is not owned or controlled by the Tribe, sufficient cash, a bond or other security sufficient to cover any award that might be made within the limits set forth in subsection D of this Part, and informs the claimant and the state of:

      **1.**      The posting of the cash or bond;

      **2.**      The means by which the deposit can be independently verified as to the amount and the fact that it is irrevocable until the matter is finally resolved;

      **3.**      The right of the claimant to have this claim satisfied from the deposit if

AR_0000055

**THE OTOE-MISSOURIA TRIBE AND STATE OF OKLAHOMA GAMING COMPACT**

the claimant is successful on the claim; and

      **4.**      Consent to suit in federal district court for the judicial district in which the Patron's claim arose.

**PART 6:**      **DISPUTE RESOLUTION – THE TRIBE AND THE STATE**

      **A.**      <u>Scope</u>. This Part shall apply to disputes between the Tribe and the State arising under the Compact, including: **(i)** compliance with the Compact; **(ii)** performance required by the Compact; and/or **(iii)** interpretation of the Compact's terms, conditions, and provisions; provided, however, that this Part shall not apply to the market evaluation of Substantial Exclusivity Fees.

      **B.**      <u>Process</u>. For disputes arising hereunder, the following two (2) step process shall apply:

      **1.**      <u>Mediation</u>. The State and the Tribe shall be required to first mediate the dispute, using a mutually agreeable mediator, unless one party reasonably believes that irreparable harm will result thus necessitating an action, in whole or in part, for injunctive relief to be filed directly in federal court.

      **2.**      <u>Federal Court</u>. If injunctive relief to prevent irreparable harm is sought, or if mediation fails, the dispute shall be litigated in federal court, requiring the State and the compacting Tribe to provide limited waivers of sovereign immunity, including for purposes of enforcing any ruling or judgment entered by the federal court regarding such dispute, as well as any resulting appeal.

      **C.**      <u>Jurisdiction; Venue</u>. Subject to subsection (B) of this Part, the Tribe and the State consent to the jurisdiction of federal district court. Suit shall be filed in the federal judicial district where a substantial part of the events or omissions giving rise to the claim(s) asserted by either party occurred.

      **D.**      <u>Controlling Law</u>. The Tribe and the State consent to applicable federal and state law, whether arising by statute, ordinance, regulation, common-law, and/or in equity. The Parties acknowledge and agree that subsection D of this Part shall apply to claims, counterclaims, remedies, and affirmative defenses, whether arising at law or in equity.

      **E.**      <u>Limited Waiver of Sovereign Immunity</u>. The Tribe and the State waive sovereign immunity for the limited purpose described in this Part. By extension, the Tribe and the State agree not to raise the United States Constitution, sovereign immunity, or comparable defense to the validity of such waiver.

      **F.**      <u>Exclusive Authority to Settle and Negotiate – State</u>. The Tribe and the State expressly acknowledge and agree that the Governor for the State shall have exclusive authority to settle and negotiate any dispute arising under the Compact pursuant to Article 6, Section 8 of the Oklahoma Constitution. Such authority may be delegated to authorized agent(s) or

AR_0000056

## THE OTOE-MISSOURIA TRIBE AND STATE OF OKLAHOMA GAMING COMPACT

representative(s), in whole or in part, except with respect to final approval of and executing the Compact on behalf of the State.

**PART 7:**    **STATE MONITORING OF COMPACT COMPLIANCE**

A.    SCA Authority. The SCA shall, pursuant to the provisions of this Compact, have the authority to monitor the conduct of Covered Games to ensure that the Covered Games are conducted in compliance with the provisions of this Compact. In order to properly monitor the conduct of Covered Games, agents of the SCA shall have reasonable access to all areas of the Facility related to the conduct of Covered Games as provided herein:

1.    Facility Access. Access to the Facility by the SCA shall be during the Facility's normal operating hours only; provided that to the extent such inspections are limited to areas of the Facility where the public is normally permitted, SCA agents may inspect the Facility without giving prior notice to the Enterprise.

2.    Compact Violations. Any suspected or claimed violations of this Compact or of law shall be directed in writing to the TCA; SCA agents shall not interfere with the functioning of the Enterprise.

3.    SCA Identification. Before SCA agents may enter any nonpublic area of the Facility, they shall provide proper photographic identification to the TCA. SCA agents shall be accompanied in nonpublic areas of the Facility by a TCA agent. A one (1) hour notice by SCA to the TCA may be required to assure that a TCA officer is available to accompany SCA agents at all times while in nonpublic areas.

B.    Central Computer Monitoring. The Enterprise will ensure all Gaming Machines will be connected to a central computerized monitoring and control system, which shall collect on a continual basis the unaltered activity of each Covered Game in use at the Facility, and that the wager and payout data of each Covered Game, electronically captured by the Enterprise's Central Computer, is capable of generating reports evidencing calculations of Adjusted Net Win and expired and void ticket information. The Enterprise shall produce reports, including any revisions, no later than the 20th of each month, substantiating the revenues received by the Enterprise in the preceding month upon which Substantial Exclusivity Fees paid to the State are based. Such reports shall be generated by the Central Computer and electronically submitted to the SCA.

C.    SCA Annual Review. The SCA, at its own cost, shall be authorized to conduct an annual review of the Enterprise's conduct of Covered Games subject to this Compact. The review shall examine revenues in connection with the conduct of Covered Games and shall include, but not be limited to, those matters necessary to verify the determination of Adjusted Net Win and the basis of Substantial Exclusivity Fees. The Enterprise shall provide all documentation and information reasonably requested by the SCA in connection with the annual review within sixty (60) days of such written request by the SCA. The Tribe, Enterprise, and TCA shall cooperate fully and not interfere with said annual review.

Page **19** of **30**

AR_0000057

## THE OTOE-MISSOURIA TRIBE AND STATE OF OKLAHOMA GAMING COMPACT

**D.**     SCA Document Review.  Subject to provisions herein, agents of the SCA shall, at its own cost, have the right to review and copy Documents of the Enterprise related to its conduct of Covered Games. The review and copying of such Documents shall be during normal business hours or hours otherwise at Enterprise's discretion. However, the SCA shall not be permitted to copy those portions of any Documents of the Enterprise related to its conduct of Covered Games that contain business or marketing strategies or other proprietary and confidential information of the Enterprise, including, but not limited to, Patron lists, business plans, advertising programs, marketing studies, and Patron demographics or profiles. No Documents of the Enterprise related to its conduct of Covered Games or copies thereof shall be released to the public by the SCA under any circumstances. For the avoidance of doubt, the right to review and copy Documents is subject to Part 4(D) of this Compact.

**E.**     SCA Reporting.  Upon completion of any SCA inspection or investigation, the SCA shall forward a written report thereof to the TCA. The TCA shall be apprised on a timely basis of all pertinent, non-confidential information regarding any violation of Federal, State, or Tribal laws, the Rules or Regulations, or this Compact. Nothing herein prevents the SCA from contacting Tribal or federal law enforcement authorities for suspected criminal wrongdoing involving the TCA. TCA may interview SCA inspectors upon reasonable notice and examine work papers and SCA in the same fashion that SCA inspectors may examine auditor's notes and make auditor inquiry unless providing such information to the TCA will compromise the interests sought to be protected. If the SCA determines that providing the information to the TCA will compromise the interests sought to be protected, then the SCA shall provide such information to the Tribe in accordance with this Compact.

**F.**     Limitation.  Nothing in this Compact shall be deemed to authorize the State to regulate the Tribe's government, including the TCA, or to interfere in any way with the Tribe's selection of its governmental officers, including members of the TCA.

## PART 8:     JURISDICTION

**A.**     Subject to Parts 5 and 6 of this Compact, this Compact shall not be construed to alter Tribal, Federal or State civil adjudicatory or criminal jurisdiction.

## PART 9:     LICENSING

**A.**     Covered Game Employees.  Except as otherwise provided for herein, no Covered Game Employee shall be employed at a Facility or by an Enterprise unless such person is licensed in accordance with this Compact. In addition to the provisions of this Part which are applicable to the licensing of all Covered Game Employees, the requirements of 25 C.F.R., Part 556, background investigations for primary management officials and employees, and 25 C.F.R., Part 558, gaming licenses for employees and primary management officials, apply to employees and primary management officials of the Facility and Enterprise.

**1.**     Application. All prospective Covered Game Employees shall apply to the TCA for a license. Licenses shall be issued for periods of no more than two (2) years, after which they may be renewed only following review and update of the information upon which the

AR_0000058

license was based; provided, the TCA may extend the period in which the license is valid for a reasonable time pending the outcome of any investigation being conducted in connection with the renewal of such license. In the event the SCA contends that any such extension is unreasonable, it may seek resolution of that issue pursuant to Part 9(A)(6) of this Compact.

2.     Background Investigation. The application process shall require the TCA to obtain sufficient information and identification from the applicant to permit a background investigation to determine if a license should be issued in accordance with this Part and the Rules and Regulations. The TCA shall obtain information about a prospective Covered Game Employee that includes: **(i)** full name, including any aliases by which applicant has ever been known; **(ii)** social security number; **(iii)** date of birth; **(iv)** place of birth; **(v)** residential addresses for the past five (5) years; **(vi)** employment history for past five (5) years: **(vii)** driver's license number; **(viii)** all licenses issued and disciplinary charges filed, whether or not discipline was imposed, by any State, Federal, or Tribal regulatory authority; **(ix)** all criminal arrests and proceedings, except for minor traffic offenses, to which the applicant has been a party; **(x)** a set of fingerprints, which shall be used to conduct a criminal background check; **(xi)** current photograph; **(xii)** military service history; and **(xiii)** any other information the TCA determines is necessary to conduct a thorough background investigation.

3.     SCA Notification. Upon obtaining the information set forth in Part 9(A)(2) above from a prospective Covered Game Employee, the TCA shall forward a copy of such information to the SCA, along with any determinations made with respect to the issuance or denial of a temporary or permanent license. The SCA may conduct its own background investigation of the applicant at SCA expense, shall notify the TCA of such investigation within a reasonable time from initiation of the investigation, and shall provide a written report to the TCA of the outcome of such investigation within a reasonable time from the receipt of a request from the TCA for such information. SCA inspector field notes and the SCA inspector shall be available upon reasonable notice for TCA review and inquiry.

4.     Temporary Licensure. The TCA may issue a temporary license for a period not to exceed ninety (90) days, and the Enterprise may employ on a probationary basis, any prospective Covered Game Employee who represents in writing that he or she meets the standards set forth in this Part, provided the TCA or Enterprise is not in possession of information to the contrary. The temporary license shall expire at the end of the ninety-day period or upon issuance or denial of a permanent license, whichever event occurs first. Provided that the temporary license period may be extended at the discretion of the TCA so long as good faith efforts are being made by the applicant to provide required information, or the TCA is continuing to conduct its investigation or is waiting on information from others, and provided further that in the course of such temporary or extended temporary licensing period, no information has come to the attention of the TCA which, in the absence of countervailing information then in the record, would otherwise require denial of license. A permanent license shall be issued or denied within a reasonable time following the completion of the applicant's background investigation.

5.     Prohibited Persons. In Covered Gaming, the Tribe shall not employ and shall terminate, and the TCA shall not license and shall revoke a license previously issued to, any

AR_0000059

**THE OTOE-MISSOURIA TRIBE AND STATE OF OKLAHOMA GAMING COMPACT**

Covered Game Employee who: **(i)** has been convicted of any felony or an offense related to any Covered Games or other gaming activity; **(ii)** has knowingly and willfully provided false material, statements or information on his or her employment application; or **(iii)** is a person whose prior activities, criminal record, or reputation, habits, and associations pose a threat to the public interest or to the effective regulation and control of the conduct of Covered Games, or create or enhance the dangers of unsuitable, unfair, or illegal practices, methods, and activities in the conduct of Covered Games or the carrying on of the business and financial arrangements incidental thereto; provided, however, that members of the Tribe or other federally recognized tribes, shall not be disqualified from employment based on a prior felony conviction so long as the person is not seeking to be employed as a Covered Game Employee, and provided further that any person who has a felony conviction or offense involving alcohol or drugs shall not be employed in any position requiring operation of a vehicle.

   **6.** SCA Right to Object. The SCA may object to the employment of any individual by the Enterprise based upon the criteria set forth in paragraph 2 of subsection A of this Part. Such objection shall be in writing setting forth the basis of the objection. The SCA inspectors work papers, notes and exhibits which formed the SCA conclusion shall be available upon reasonable notice for TCA review. Within a reasonable time after such notification, the TCA shall report to the SCA on the outcome of its investigation and of any action taken or decision not to take action.

   **7.** Additional Background Investigation. The TCA shall have the discretion to initiate or continue a background investigation of any licensee or license applicant, and to take appropriate action with respect to the issuance or continued validity of any license at any time, including suspending or revoking such license.

   **8.** Identification. The TCA shall require all Covered Game Employees to wear, in plain view, identification cards issued by the TCA which include a photograph of the employee, his or her first name, a four-digit identification number unique to the license issued to the employee, a Tribal seal or signature verifying official issuance of the card, and a date of expiration, which shall not extend beyond such employee's license expiration date.

   **9.** Prohibition. The Enterprise shall not enter into, or continue to make payments pursuant to, any contract or agreement for the provision of goods or services with any person or entity who does not meet the requirements of this part including, but not limited to, any person or entity whose application to the TCA for a license has been denied, or whose license has expired or been suspended or revoked.

  **B.** Management Contracts. Pursuant to 25 C.F.R., Part 533, all management contracts must be approved by the Chair of the NIGC. The SCA shall be notified in writing by the TCA promptly after any such approval.

  **C.** Financing Agreements. Any person or entity extending financing, directly or indirectly, to the Facility or Enterprise in excess of Fifty Thousand Dollars ($50,000.00) in any twelve-month period shall be licensed prior to providing such financing. Principals thereof shall be subjected to background investigations and determinations in accordance with the procedures

AR_0000060

## THE OTOE-MISSOURIA TRIBE AND STATE OF OKLAHOMA GAMING COMPACT

and standards set forth in subsection A of this Part. Licenses issued under this section shall be reviewed at least every two (2) years for continuing compliance, and shall be promptly revoked if the licensee is determined to be in violation of the standards set forth in subsection A of this Part. In connection with such a review, the TCA shall require the person or entity to update all information provided in the previous application.

        **1.**      <u>SCA Notification</u>. The SCA shall be notified of all financing and loan transactions with respect to Covered Games or supplies in which the amount exceeds Fifty Thousand Dollars ($50,000.00) in any twelve (12) month period, and shall be entitled to review copies of all agreements and Documents in connection therewith.

        **2.**      <u>Exception</u>. Financing provided by a federally regulated or State-regulated bank, savings and loan, or trust, or other federally or State-regulated lending institution; any agency of the federal, State, Tribal or local government; or any person or entity, including, but not limited to, an institutional investor who, alone or in conjunction with others, lends money through publicly or commercially traded bonds or other commercially traded instruments, including but not limited to the holders of such bonds or instruments or their assignees or transferees, or which bonds or commercially traded instruments are underwritten by any entity whose shares are publicly traded or which underwriter, at the time of the underwriting, has assets in excess of One Hundred Million Dollars ($100,000,000.00), shall be exempt from the licensing and background investigation requirements in subsections A and B of this Part, as well as this subsection.

        **D.**      <u>TCA Reporting</u>. The TCA shall report to SCA all issued licenses by Licensee name and whether temporary no less than quarterly and shall only include those licenses issued since the TCA's most recent report.

        **E.**      <u>Violations of Part 9</u>. Violations of this Part shall result in a penalty of Five Thousand Dollars ($5,000.00) per violation to be remitted to the SCA for purposes of deposit and expenditure in connection with Part 10(C) of this Compact, unless otherwise agreed to by the Parties. Such penalty shall be in addition to the Annual Oversight Assessment amount set forth in Part 10(C) of this Compact.

## PART 10:    SUBSTANTIAL    EXCLUSIVITY;    ASSOCIATED    FEES    AND    ASSESSMENTS

        **A.**      <u>Acknowledgment</u>. The Parties acknowledge and agree that this Compact provides the Tribe with substantial exclusivity over class III Covered Gaming consistent with the goals of IGRA.

        **B.**      <u>Substantial Exclusivity Fees</u>. In consideration of the Acknowledgement set forth in subsection A of this Part, the adequacy of which is hereby agreed to, and pursuant to the terms of this valid Compact, the Tribe agrees to pay the following Substantial Exclusivity Fees as provided for below:

AR_0000061

## THE OTOE-MISSOURIA TRIBE AND STATE OF OKLAHOMA GAMING COMPACT

1.      Amount – Covered Games Less and Except Event Wagering.  The Tribe shall remit Substantial Exclusivity Fees to the State on Covered Games, less and except Event Wagering, as follows:

a.      Existing Facilities.  For Existing Facilities, the Tribe shall remit Substantial Exclusivity Fees to the State on Covered Games, less and except Event Wagering, in the amount of Four and One Half Percent (4.50%) of the Adjusted Net Win, until the Section 20 Approval Trigger, as defined in Part 3(D) of this Compact. Following the Section 20 Approval Trigger, the Tribe shall remit Substantial Exclusivity Fees to the State on Covered Games, less and except Event Wagering, in the amount of Six Percent (6.00%) of the Adjusted Net Win for Existing Facilities.

b.      New Facilities.  For the New Facilities described in Part 4(J)(2) of this Compact, the Tribe shall remit Substantial Exclusivity Fees to the State on Covered Games, less and except Event Wagering, as follows:

i.For the Logan County Facility, Substantial Exclusivity Fees in the amount of Twelve Percent (12.00%) of the Adjusted Net Win;

ii.For the Noble County Facility, Substantial Exclusivity Fees in the amount of Eight Percent (8.00%) of the Adjusted Net Win; *and*

iii.For the Payne County Facility, Substantial Exclusivity Fees in the amount of Eight Percent (8.00%) of the Adjusted Net Win.

c.      Reevaluation Trigger.  Should the Tribe's annual Adjusted Net Win revenue exceed $300,000,000.00, the Parties shall reevaluate the Substantial Exclusivity Fees by utilizing the procedure provided for under subsection (B)(5)(e) of this Part, subject to the terms provided for therein.

2.      Amounts – Event Wagering.  In addition to the Substantial Exclusivity Fees, the Tribe shall remit fees to the State on Event Wagering as follows:

a.      For Event Wagering, 1.10% of the Patron's Event Wagering transaction total, to be assessed in addition to the transaction total and calculated on a per wager basis.

3.      Manner; Form.  Such fees shall be paid no later than the twentieth (20th) day of each calendar month for revenues received by the Tribe in the preceding month.  Payment of such fees shall be made to the Treasurer of the State. Nothing herein shall require the allocation of such fees to particular State purposes, including, but not limited to, the actual costs of performing the State's regulatory responsibilities hereunder.

4.      Violation for Failure to Remit.  A single failure to remit exclusivity fees as provided for in subsection B of this Part shall result in a penalty of Five Thousand Dollars

Page **24** of **30**

AR_0000062

**THE OTOE-MISSOURIA TRIBE AND STATE OF OKLAHOMA GAMING COMPACT**

($5,000.00) to be remitted to the SCA for purposes of deposit and expenditure in connection with subsection C of this Part for each thirty (30) day period the fee(s) remain outstanding. Such penalty shall be in addition to the Annual Oversight Assessment amount set forth in subsection C of this Part. Multiple uncured violations in a single calendar year shall constitute a material breach, which may result in termination of this Compact, unless otherwise agreed to in writing by the Parties.

      **5.**    <u>Market Valuation of Substantial Exclusivity</u>. The right of substantial exclusivity provided for under subsection (B) of this Part will have a definite term, as provided for in Part 12(B) of this Compact. Subject to a written agreement between the Parties, such term may renew by way of amendment for another fifteen (15) year term pursuant to the following:

      **a.**    <u>Good Faith Meet and Confer</u>. Within eighteen (18) months prior to expiration of the Compact, the Parties shall meet and confer in good faith for the purpose of setting substantial exclusivity rates under the Compact to reflect the value of substantial exclusivity granted for the renewal term.

      **b.**    <u>Panel Composition and Valuation</u>. If, following the good faith meet and confer described in subsection (B)(5)(a) of this Part, but not later than twelve (12) months prior to expiration of the Compact, no agreement is reached between the Parties, then the following binding procedure shall apply for the purpose of setting substantial exclusivity rates under the Compact to reflect the value of substantial exclusivity for the renewal term of the Compact:

      **i.**<u>Rules</u>. Revenue-sharing rates shall be determined by an independent Panel, comprised of three (3) panelists to determine the substantial exclusivity rates. The proceeding shall be conducted consistent with the rules of commercial arbitration.

      **ii.**<u>The Panel</u>. The State shall select one (1) panelist who is an economist or who has judicial experience (the "*State Member*" or "*Panelist*"). The Tribe shall select one (1) panelist who is an economist or who has judicial experience (the "*Tribe Member*" or "*Panelist*"). The State and the Tribe shall jointly select one (1) panelist with business and Indian law experience (the "*Jointly Selected Member*" or "*Panelist*"). In the event the State and the Tribe cannot agree on the Jointly Selected Member, then the State Member and the Tribe Member shall select the Jointly Selected Member. The State Member, the Tribe Member, and the Jointly Selected Member shall collectively comprise the "*Panel*." Once a Panelist is selected, the Parties shall be prohibited from engaging in *ex parte* communications with that Panelist.

      **iii.**<u>Evidence</u>. Each Party shall have the right to present evidence as relevant and material to support their position, including through expert testimony. The Panel may determine the admissibility,

AR_0000063

**THE OTOE-MISSOURIA TRIBE AND STATE OF OKLAHOMA GAMING COMPACT**

relevance, and materiality of evidence, and may exclude evidence deemed to be cumulative or irrelevant.

iv. <u>Discovery</u>. The Parties shall have the opportunity to conduct reasonable discovery, including through the use of interrogatories, depositions, requests for production, and similar tools of discovery. Discovery disputes shall be resolved by the Panel. At the request of any Party, the Panel may subpoena witnesses or documents. All principles of legal privilege, including but not limited to the attorney–client privilege, shall apply.

v. <u>Briefing</u>. The Parties shall simultaneously submit opening briefs on a date agreed to by the Parties. If the Parties cannot agree to a date for the submission of opening briefs, the Panel shall determine the date. Each Party shall have the right to file a response brief within ten (10) days of the opposing Party's opening brief. There shall be no page limit to the submission of briefs.

vi. <u>Hearing</u>. Following the submission of briefs, the Panel shall hold a hearing and allow each Party to provide legal argument, present evidence and examine and cross-examine witnesses. At least ten (10) days prior to the hearing, the Parties shall exchange copies of exhibits and witness lists.

vii. <u>Analysis of Data</u>. The Panel's determination of revenue-sharing rates shall be based on an analysis of all data pertinent to assess market valuation of the substantial exclusivity granted for the renewal term.

viii. <u>Written Opinion</u>. The Panel shall issue its decision in a written and reasoned opinion. If the Panel rules that substantial exclusivity rates should be revised, its opinion may be cited and relied upon if and when the Parties seek approval of the new rates from the Department of the Interior.

c.    The State and the Tribe agree to be bound by the substantial exclusivity rates established by a majority of the Panel for the renewal term.

d.    The process described in subsection (B)(5) of this Part shall take into account the Existing Facilities, as well as the Logan County Facility, the Noble County Facility, and the Payne County Facility, and there shall be no requirement that the Facilities all be subject to a uniform substantial exclusivity rate.

e.    <u>Substantial Exclusivity Rate Reevaluation</u>. Should the Tribe's annual Adjusted Net Win exceed $300,000,000.00, the Parties agree that new

AR_0000064

**THE OTOE-MISSOURIA TRIBE AND STATE OF OKLAHOMA GAMING COMPACT**

substantial exclusivity fees shall be established. The Parties agree to the procedure provided for under subsection (B)(5) of this Part, subject to the exception that the good faith meet and confer described therein between the Parties shall be limited to sixty (60) days. Should the Parties fail to reach an agreement within sixty (60) days, then they shall proceed to the Panel valuation procedure provided for pursuant to subsection (B)(5) of this Part, and that process shall be concluded by the Panel within ninety (90) days, or such longer time as agreed to by the Parties.

      **f.**    <u>Panel Fees and Costs</u>. The State shall be responsible for paying the State Member's costs and fees. The Tribe shall be responsible for paying the Tribe Member's costs and fees. The remaining costs and fees incurred by the Panel, including the Jointly Selected Member's costs and fees, shall be equally divided between the State and the Tribe.

    **C.**    <u>Annual Oversight Assessment</u>. In addition to Substantial Exclusivity Fees, the State shall be entitled to payment for its costs incurred in connection with the oversight of Covered Games to the extent provided herein, Annual Oversight Assessment. The Annual Oversight Assessment, as more particularly described below, shall be paid in advance on a fiscal year basis for each twelve (12) months ending on June 30 of each year, in accordance with the Schedule set forth below.

      **1.**    <u>Schedule</u>. The Annual Oversight Assessment Schedule shall be:

        **i.**    $25,000.00 Annual Oversight Assessment: $0.01 to $15,000,000.00 in annual revenue from the play of Covered Games.

        **ii.**    $50,000.00 Annual Oversight Assessment: $15,000,001.00 to $50,000,000.00 in annual revenue from the play of Covered Games.

        **iii.**    $75,000.00 Annual Oversight Assessment: $50,000,001.00 to $100,000,000.00 in annual revenue from the play of Covered Games.

        **iv.**    $100,000.00 Annual Oversight Assessment: $100,000,001.00 to $150,000,000.00 in annual revenue from the play of Covered Games.

        **v.**    $125,000.00 Annual Oversight Assessment: $150,000,001.00 to $750,000,000.00 in annual revenue from the play of Covered Games.

        **vi.**    $250,000.00 Annual Oversight Assessment: equal to or in excess of $750,000,001.00 in annual revenue from the play of Covered Games.

**PART 11:**    **NOTICES**

    **A.**    <u>Manner and Form</u>. All notices required under this Compact shall be given by certified mail, return receipt requested, commercial overnight courier service, to the Governor of the State and Chairperson (or Chief Executive designee) of the Tribe.

AR_0000065

## THE OTOE-MISSOURIA TRIBE AND STATE OF OKLAHOMA GAMING COMPACT

**PART 12:    DURATION & TERMINATION**

    **A.**    Effective Date. The previous gaming compact entered into by and between the Tribe and the State, which was approved by the Department of the Interior and published in the *Federal Register*, is hereby agreed and stipulated by the Parties to be superseded by this Compact, and this Compact is the sole effective Compact between the Parties, constituting the entire agreement between the Parties, from and after the Effective Date hereof. This Compact will become effective upon the occurrence of all of the following:

    **1.**    The Compact is approved by action of the Tribe necessary to authorize the signing of the Compact on behalf of the Tribe and render the signature effective, including any tribal resolution or other action by the Tribe conducted in compliance with tribal procedures;

    **2.**    The Compact is executed by the Governor on behalf of the State; *and*

    **3.**    The Compact is approved as a Tribal-State compact within the meaning of IGRA by the Secretary of the Department of the Interior and notice of that approval is published in the *Federal Register*.

    **B.**    Term. The term of this Compact shall be begin on the Effective Date and end at 11:59 p.m. (CST) on December 31, 2035, unless otherwise agreed to in writing by the Parties.

    **C.**    Effect of Termination on Class III Gaming. The Tribe may continue to operate Covered Games after expiration of the term described in subsection (B) of this Part. However, in the absence of an effective gaming compact, the State shall no longer be required to provide the Tribe with substantial exclusivity for class III Covered Games.

    **D.**    Termination by Mutual Consent. The Compact may be terminated before the end of a term of the Compact by the mutual written consent of the Parties.

**PART 13:    ADDITIONAL TERMS & CONDITIONS**

    **A.**    Amendments. This Compact shall not be amended or modified except by a writing executed by all the Parties.

    **B.**    Entire Agreement; Severability. This Compact constitutes the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior and contemporaneous oral and written negotiations. If any clause or provision of this Compact is subsequently determined by any federal court to be invalid or unenforceable under any present or future law, including but not limited to the scope of Covered Games, the remainder of this Compact shall not be affected thereby. It is the intention of the Parties that if any such provision is held to be illegal, invalid or unenforceable, there will be added in lieu thereof a provision as similar to such provision as is possible to be legal, valid and enforceable.

AR_0000066

**THE OTOE-MISSOURIA TRIBE AND STATE OF OKLAHOMA GAMING COMPACT**

**C.**  <u>No Construction Against the Drafter.</u>  Both the Tribe and the State have cooperated in the drafting and preparation of this Compact.  Hence, in any construction to be made of this Compact, the same shall not be construed for or against either the Tribe or the State.

**D.**  <u>Section Headings.</u>  The titles and headings of any provision herein exist for convenience and clarity only and in no way shall restrict or modify this Compact.

**E.**  <u>Agreement to Defend.</u>  Each Party hereto agrees to defend the validity of this Compact against challenges or attacks from non-signatories hereto.

**F.**  <u>Survival.</u>  This Compact shall constitute a binding agreement between the parties and shall survive any repeal or amendment of the State-Tribal Gaming Act, 3A O.S. § 260 *et seq.*

**G.**  <u>Federal Approval.</u>  The Parties shall cooperate in seeking approval of this Compact from an appropriate federal agency as a tribal-state compact under IGRA.

**H.**  <u>Delay in Compliance for Existing Facilities.</u>  For Existing Facilities, the insurance requirements imposed by Part 5(D) and the Central Computer monitoring requirements set forth under Part 7(B) shall not take effect until thirty (30) days from and after the Effective Date of this Compact.

**I.**  <u>Most Favored Nation.</u>  With the exception of Part 3(D) of this Compact, Part 4(J)(2) of this Compact, and Part 10(B) of this Compact, any concessions, privileges, or other contractual rights granted in Tribal-State gaming compacts to other Oklahoma tribes must be made available to the Tribe.

## PART 14:    EXECUTION

This Compact, when signed by the Governor of the State of Oklahoma, is approved by the State of Oklahoma.  No further action by the State or any State official is necessary for this Compact to take effect upon approval by the Secretary of the Interior.  The undersigned represent that they are duly authorized and have the authority to execute this Compact on behalf of the Party for whom they are signing.

**[NEXT PAGE FOR SIGNATURES]**

AR_0000067

## THE OTOE-MISSOURIA TRIBE AND STATE OF OKLAHOMA GAMING COMPACT

IN WITNESS WHEREOF, the Parties have caused this Compact to be executed by their authorized representatives, who are deemed to have set their hand as of the Effective Date.

**EXECUTED BY AND BETWEEN:**

**THE STATE OF OKLAHOMA**

_____
Governor J. Kevin Stitt
State of Oklahoma

This the _18_ of April, 2020.

**THE OTOE-MISSOURIA TRIBE**

_____
Chairman John R. Shotton
The Otoe-Missouria Tribe

This the _18_ of April, 2020.

Page **30** of **30**

AR_0000068

**From:** "Caulum, Andrew S" <Andrew.Caulum@sol.doi.gov>
**To:** "Oakes, Morgan A" <Morgan.Oakes@bia.gov>, "Woodward, Troy" <Troy.Woodward@bia.gov>, "Deleon, Debra A" <Debra.Deleon@bia.gov>, "Hart, Paula" <Paula.Hart@bia.gov>, "Shepard, Eric N" <eric.shepard@sol.doi.gov>, "Ervin, Femila N" <femila.ervin@sol.doi.gov>, "Scherer, Kyle" <Kyle.Scherer@sol.doi.gov>, "Kelly, Matthew" <Matthew.Kelly@bia.gov>, "Myers, Richard G" <RichardG.Myers@bia.gov>
**Subject:** RE: Incoming Oklahoma Gaming Compacts
**Date:** 2020-04-23 14:59:12 -0400

---

Morgan – Thank you for sending this along; much appreciated.

Stay well,

Andy C.


Andrew S. Caulum
Attorney-Advisor
Branch of Self-Governance & Economic Development
Office of the Solicitor - Division of Indian Affairs
United States Department of the Interior
Direct Line (202) 208-7024
E-mail Andrew.Caulum@sol.doi.gov

*Please note: National Capital Region employees are currently on a full-time telework schedule until further notice.*


**NOTICE**: This message (including any attachments) is intended exclusively for the addressee(s). The message may be protected by attorney/client, work-product and/or deliberative process privileges.  It may contain information that is confidential or otherwise protected by law.  If you are not the addressee, or an employee or agent of the addressee, you are not authorized to read, print, retain, distribute, copy or use this message or any part of it.  If you receive this message in error, please notify me immediately and please destroy all copies of the message.  Thank you.

**From:** Oakes, Morgan A <Morgan.Oakes@bia.gov>
**Sent:** Thursday, April 23, 2020 2:29 PM
**To:** Woodward, Troy <Troy.Woodward@bia.gov>; Deleon, Debra A <Debra.Deleon@bia.gov>; Hart, Paula <Paula.Hart@bia.gov>; Shepard, Eric N <eric.shepard@sol.doi.gov>; Ervin, Femila N <femila.ervin@sol.doi.gov>; Scherer, Kyle <Kyle.Scherer@sol.doi.gov>; Kelly, Matthew <Matthew.Kelly@bia.gov>; Myers, Richard G <RichardG.Myers@bia.gov>; Caulum, Andrew S <Andrew.Caulum@sol.doi.gov>
**Subject:** Incoming Oklahoma Gaming Compacts

Hi All,
I have attached the two incoming Oklahoma Gaming compacts from Otoe-Missouria and Comanche, the 45th day is **Sunday**, June 7th.


Thanks,
Morgan

Branch of Self-Governance & Economic Development
Office of the Solicitor - Division of Indian Affairs
United States Department of the Interior
Direct Line (202) 208-7024
E-mail Andrew.Caulum@sol.doi.gov

*Please note: National Capital Region employees are currently on a full-time telework schedule until further notice.*

**NOTICE**: This message (including any attachments) is intended exclusively for the addressee(s). The message may be protected by attorney/client, work-product and/or deliberative process privileges.  It may contain information that is confidential or otherwise protected by law.  If you are not the addressee, or an employee or agent of the addressee, you are not authorized to read, print, retain, distribute, copy or use this message or any part of it.  If you receive this message in error, please notify me immediately and please destroy all copies of the message.  Thank you.

**From:** Oakes, Morgan A <Morgan.Oakes@bia.gov>
**Sent:** Thursday, April 23, 2020 2:29 PM
**To:** Woodward, Troy <Troy.Woodward@bia.gov>; Deleon, Debra A <Debra.Deleon@bia.gov>; Hart, Paula <Paula.Hart@bia.gov>; Shepard, Eric N <eric.shepard@sol.doi.gov>; Ervin, Femila N <femila.ervin@sol.doi.gov>; Scherer, Kyle <Kyle.Scherer@sol.doi.gov>; Kelly, Matthew <Matthew.Kelly@bia.gov>; Myers, Richard G <RichardG.Myers@bia.gov>; Caulum, Andrew S <Andrew.Caulum@sol.doi.gov>
**Subject:** Incoming Oklahoma Gaming Compacts

Hi All,
I have attached the two incoming Oklahoma Gaming compacts from Otoe-Missouria and Comanche, the 45th day is **Sunday**, June 7th.

Thanks,
Morgan

AR_0000071

**From:** Mark Burget <Mark.Burget@gov.ok.gov>

**To:** "paula.hart@bia.gov" <paula.hart@bia.gov>

**Cc:** "pwhaley@ryanwhaley.com" <pwhaley@ryanwhaley.com>, Dan Webber <dwebber@ryanwhaley.com>, Matthew Felty <mkfelty@lytlesoule.com>, "Steven Mullins" <mullins@lytlesoule.com>, "Okediji, Ruth" <rokediji@law.harvard.edu>, "Kevin R. Wisner" <kw@wisnerlaw.net>, "Jeffrey Cartmell" <Jeffrey.Cartmell@gov.ok.gov>, Michael Junk <Michael.Junk@gov.ok.gov>, Michael Rogers <Michael.Rogers@sos.ok.gov>, Charlie Hannema <Charlie.Hannema@gov.ok.gov>, Baylee Lakey <Baylee.Lakey@gov.ok.gov>, Donelle Harder <donelle.harder@gmail.com>

**Subject:** [EXTERNAL] Memorandum from the Governor's Office - State of Oklahoma re authority of Governor to sign compacts executed April 18, 2020

**Date:** 2020-04-24 16:46:41 -0400

**Attachments:** Memo_re_compacts_-_clean_final.docx

**Inline-Images:** image001.png

---

Director Hart,

The Governor of the State of Oklahoma asked me to convey the attached Memorandum to you regarding his authority to execute new gaming compacts between the State of Oklahoma and 2 Indian Tribes in our State, which compacts were executed on April 18, 2020.  We believe the Memorandum was necessary, and wanted to send to you, because of certain questions raised in our State by legislative leadership following the signing of the compacts.  Should you or any of your staff have any questions concerning the Memorandum, please do not hesitate to contact our office.  Thank you for your time and attention.

Mark Burget



## MARK BURGET

**General Counsel | Office of Governor J. Kevin Stitt**

**Phone:** 405-522-8821
**Email:** Mark.Burget@gov.ok.gov
**Address:** 2300 N. Lincoln Blvd.| Oklahoma City, OK | 73105

**Memorandum**

**To:**  Director Paula Hart, Office of Indian Gaming, U.S. Department of the Interior
**From:**  Office of the General Counsel, Oklahoma Governor's Office
**Date:**  April 24, 2020
**Re:** Authority of Governor of Oklahoma to negotiate and execute gaming compacts on behalf of the State with federally recognized Indian Tribes within the State, and the applicability of federal law and state law to such negotiations and execution.


**Issue:**  Does Federal and State Law permit the inclusion of Event Wagering in an Oklahoma Gaming Compact?


**Position of the Governor's Office of the State of Oklahoma:**  Federal and State Law permit the inclusion of Event Wagering in an Oklahoma Gaming Compact.

# Factual Background

**1.**      On December 17, 2019, following his withdrawal from representing the State of Oklahoma in compact negotiations with Oklahoma's Indian Tribes, the Oklahoma Attorney General's office released the following statement:

> Under Article VI, Section 8 of the Oklahoma Constitution and 74 0.S. Sec. 1221, the governor is given authority to enter into agreements with the federally recognized tribes.

**2.**      On April 18, 2020, the Governor of the State of Oklahoma, the Chairman of the Otoe-Missouria Tribe, and the Chairman of the Comanche Nation executed new gaming compacts. The Compacts authorize "Event Wagering" (a term defined in the new compacts) as one of the types of covered games.

**3.**      On April 21, 2020, the Governor of the State of Oklahoma, the Chairman of the Otoe-Missouria Tribe, and the Chairman of the Comanche Nation conducted a public signing ceremony at the State Capitol. Thereafter, the compacts were made public for the first time.

**4.**       Following the April 21, 2020, signing ceremony, the Oklahoma Attorney General confirmed: "The governor has the authority to negotiate compacts with the tribes on behalf of the state."

**5.**      On April 22, 2020, the office of the Governor of the State of Oklahoma issued the following statement:

1

AR_0000073

A number of legal experts thoroughly researched and considered the interpretation of federal law for negotiating Event Wagering, and the interpretation of State law regarding the authority and role of the Governor to compact with Tribes. They are confident in the Governor's authority and the validity of the compacts under both state and federal law, and are focused on the momentum established by the new gaming compacts which usher in a bright future for Oklahoma's gaming market, leave behind the one-size-fits-all approach to the old Model Gaming compact, and expands opportunities for all parties for generations to come.

6.    On April 23, 2020, Speaker of the House Charles A. McCall and President Pro Tempore Greg Treat submitted a letter to Governor Stitt, in which they averred the legislative branch's position "on actions taken [by the Governor] in negotiating and signing these purported "compacts." According to the Letter, the actions are "unauthorized by law and void without action by the Oklahoma Legislature." Such statements reflect fundamental misconceptions regarding the recent Compacts executed between the State and the Comanche Nation and Otoe-Missouria Tribe, respective tribal sovereigns in our State.

7.    Subsequently, various tribes adverse to the Governor and the State of Oklahoma have relied on that letter in pleadings filed in the federal litigation.

# Legal Analysis

## I.    The Governor Has Sole Authority to Negotiate and Execute Gaming Compacts in Oklahoma.

The Oklahoma Constitution, the Legislature, and the state Supreme Court have recognized that the Governor has the sole authority to compact with Indian tribes. Moreover, the constitution prohibits the Legislature from approving state-tribal compacts.

### 1.  All three branches recognize the Governor's power to compact with tribal sovereigns.

Consistent with the April 21, 2020, statement of the Attorney General of Oklahoma, it is undisputed that the Governor has the sole power in Oklahoma to compact with Oklahoma's tribal sovereigns. In fact, on this point, all three branches concur. Article 2, section 8 of the Oklahoma Constitution states:

"[t]he Governor shall cause the laws of the State to be faithfully executed, and shall conduct in person or **in such manner as may be prescribed by law, all intercourse and business of the State with other states and with the United States**, and he shall be a conservator of the peace throughout the State." (emphasis added).

The Oklahoma Constitution does not contain an "advice and consent" provision similar to the United States Constitution. Therefore, "any requirement that individual agreements or compacts negotiated by the Governor on behalf of the State with other sovereigns, such as Indian

2

tribes, be approved by the Legislature would violate the principles of separation of powers." 2004 OK AG 27.

The Oklahoma Legislature has recognized the Governor's constitutional authority to negotiate and enter into compacts with federally recognized Indian tribes. The Legislature codified this authority in 74 O.S. § 1221(C)(1), which states: "The Governor is authorized to negotiate and enter into cooperative agreements on behalf of this state with federally recognized Indian tribal governments." The Oklahoma Legislature has also specifically recognized the power of the Governor pursuant to the Oklahoma Constitution to compact for Class III gaming activities. It passed 3A O.S. 2011 § 280 (State Tribal Gaming Act) which reads: "The State of Oklahoma through the concurrence of the Governor after considering the executive prerogatives of that office and the power to negotiate the terms of a compact between the state and a tribe."[1]

In 2013, the Oklahoma Supreme Court held that "[t]he Executive Branch of the State of Oklahoma, specifically the Governor, has been and continues to be the party responsible for negotiating compacts with the sovereign nations of this state." *Sheffer v. Buffalo Run Casino*, 315 P.3d 359, 364 (Okla. 2013). The court then included footnote 18, which cites Okla. Const. art. VI, § 8 ("The Governor shall cause the laws of the State to be faithfully executed, and shall conduct in person or in such manner as may be prescribed by law, all intercourse and business of the State with other states and with the United States. . ." ); Okla. Const. art. VI, § 2 ("The Supreme Executive power shall be vested in a Chief Magistrate, who shall be styled 'The Governor of the State of Oklahoma.'").

### 2. The Legislature is constitutionally precluded from approving state-tribal compacts.

The April 23, 2020, letter from Speaker of the House Charles A. McCall and President Pro Tempore Greg Treat ("McCall/Treat Letter" or "Letter") to Governor Stitt states that the legislative branch's position is that the negotiation and signing of the compacts were actions "unauthorized by law" and that the compacts are "legally flawed." The Letter argues that the Governor "cannot unilaterally enter into the type of agreements signed [on April 22, 2020]" and that "the records of the Legislature and the law itself clearly show state-tribal gaming was always intended to be handled jointly, by both the legislative and executive branches of the State of Oklahoma. On this matter and many others, the legislative branch sets the policy and the executive branch executes the policy." These statements, and the conclusions they provoke, are unequivocally wrong.

The McCall/Treat Letter purports to derive its authority for such positions from a 2004 Oklahoma Attorney General Opinion. In selecting only parts of the Opinion, and quoting even those parts incompletely or out of context, the Letter paints an inaccurate picture of the Attorney General's Opinion. An excerpt from the Attorney General's Opinion, and its final conclusions, is set forth below:

---

[1] *See also* Oklahoma legislative leaders offer differing opinions on gaming compacts dispute, https://oklahoman.com/article/5649640/legislative-leaders-offer-differing-opinions-on-gaming-compacts-dispute ("We don't have any say in the negotiations on the compacts so I'm watching like all of you are." –Greg Treat) and ("I have full faith in our tribal leaders in the state of Oklahoma and in our governor that they'll get in there and get the deal put together" – Charles McCall).

3

[A]ny requirement that individual agreements or compacts negotiated by the Governor on behalf of the State with other sovereigns, such as Indian tribes, be approved by the Legislature would violate the principles of separation of powers. Any requirement that individual negotiated agreements have to be approved by the Legislature prior to becoming effective would. . .have the Legislature *carrying out* legislative policy and *applying it to various conditions*. Secondly, the power to approve individual contracts would result in complete control by the Legislature, and. . .result in a vehicle "by which the executive department is being subjected to the coercive influence of the legislative department."

In reaching this conclusion, we note that the Oklahoma Constitution does not contain a Treaty Advice and Consent Clause like Article II, Section 2 of the United States Constitution, which empowers the President to make Treaties "by and with the Advice and Consent of the Senate."

Finally, a requirement that each agreement negotiated by the Governor must be approved by the entire Legislature would place the Legislature not in a cooperative role, but in complete control over the approval process. Such legislative power . . . would violate the Separation of Powers provision of the Oklahoma Constitution.

It is, therefore, the official Opinion of the Attorney General that:

The Separation of Powers provisions in the Oklahoma Constitution, including Article IV, Section 1, are not violated when, without legislative approval of the specific agreements:

a. the Governor, under the powers vested in the Governor under Article VI, Section 8 of the Oklahoma Constitution, to conduct "all intercourse and business of the State with other states and with the United States," negotiates an agreement with other states or with the United States, or

b. the Governor, under the authority vested in the Governor at 74 O.S. 2001, § 1221(C)(1), enters into a cooperative agreement (sometimes referred to as a compact) on behalf of the State with a federally recognized Indian Tribal Government within this State.

*Oklahoma Attorney General Op. No. 2004 OK AG 27* (Aug. 26, 2004) (citations omitted). Accordingly, the legislature does not have a role in approving state-tribal compacts; the Governor has the exclusive authority.

II.     **The Indian Gaming Regulatory Act (IGRA) Controls the Procedures for Negotiating Gaming Compacts and the Scope of Their Contents.**

It is a well-established principle that federal law, not state law, sets the standards for gaming compact negotiations. The McCall/Treat Letter fails to consider the preemptive effects of

4

federal law and the norms that necessarily inform the limited role of Oklahoma law when assessing the legitimacy of gaming compacts negotiated by the Governor. The Indian Gaming Regulatory Act (IGRA), 25 U.S.C. §§ 2701 *et seq.*, not state law, controls the negotiation procedures and the scope of permissible subjects of compacts.

### 1. IGRA controls the procedures for negotiating gaming compacts.

Congress enacted IGRA in 1988, shortly after the Supreme Court's decision in *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987). In *Cabazon*, the Court held that Indian tribes were free to offer gaming on tribal lands subject only to federal regulation. The Court also held that state regulation did not control the scope of tribal gaming.

IGRA was Congress' compromise to the difficult questions involving Indian gaming. IGRA was enacted to provide "a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments" and "to shield [tribal gaming] from organized crime and other corrupting influences to ensure that the Indian tribe is the primary beneficiary of the gaming operation." 25 U.S.C. § 2702(1)–(2). IGRA is an example of "cooperative federalism" in that it clearly outlines the roles of the competing sovereign interests—the federal government, state governments, and Indian tribes.

The federally-mandated design of a state-tribal compact is key to understanding the various roles of the three sovereigns regarding Class III gaming under IGRA. The federal government permits states and Indian tribes to develop joint regulatory schemes through the compacting process, but only pursuant to IGRA standards. *See Keweenaw Bay Indian Community v. U.S.*, 136 F.3d 469, 472 (6th Cir. 1998). Section 11(d)(3)(A) of IGRA describes the process whereby the Indian tribe and the state may commence negotiations leading to a tribal-state compact: the tribe must "request" that the state "enter into negotiations," and, on receiving such request, the state must proceed to "negotiate with the Indian tribe in good faith." 25 U.S.C. § 2710(d)(3)(A). *See Kan. ex rel. Schmidt v. Zinke*, 861 F.3d 1024 (10th Cir. 2017) ("IGRA itself imposes an obligation on the State to negotiate a gaming compact in good faith at the Tribe's request. . .The only condition under the statute triggering this obligation is a tribe's request to enter into such negotiations.").

The McCall/Treat Letter omits this federal requirement to negotiate a compact pursuant to IGRA standards. The Letter states that "[r]egarding state-tribal gaming law, the records of the Legislature and the law itself clearly show state-tribal gaming was always intended to be handled jointly, by both the legislative and executive branches of the State of Oklahoma. On this matter and many others, **the legislative branch sets the policy and the executive branch executes the policy**." (emphasis added). This assertion is flatly erroneous. Section 11(d)(1) of IGRA unequivocally declares that "[c]lass III gaming activities" are "lawful. . .only if such activities are. . .conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State." 25 U.S.C. § 2710(d)(1). Moreover, a compact takes effect *only* when approved by the Secretary of the Interior. 25 U.S.C. § 2710(d)(3)(B). When a compact is negotiated and approved pursuant to the process outlined in the act, IGRA – not the state – legalizes gaming by the tribe.

In sum, IGRA, as mandated by the *Cabazon* court, specifically rejects the notion that state law controls the procedures for authorizing gaming on Indian lands.

5

**2. IGRA defines the scope of appropriate subject matter for Tribal-State compact negotiations.**

The McCall/Treat Letter suggests that the subject compacts are not properly negotiated since "Event Wagering", as defined in the new compacts, is not specifically permitted as a covered game in the Oklahoma gaming statute. This view is also wrong. Instead of adopting state law as the standard for Indian gaming, IGRA adopts an approach that looks to broad classes of gaming that are permitted within the negotiating state. IGRA states that if a type of gaming is permitted within a state, any similar type of gaming is permitted as part of the compact negotiation process. 25 U.S.C. § 2710(d)(1)(B); *see also N. Arapaho Tribe v. State of Wyoming*, 389 F.3d 1308, 1313 (10th Cir. 2004) (holding that a state "ha[s] a duty to negotiate for terms beyond those [state] law expressly permits"). In fact, the Governor's obligation to negotiate in good faith with the tribes requires meaningful effort to negotiate over subject matters permitted by IGRA and of interest to the tribes. *See N. Arapaho Tribe*, 398 F.3d at 1313 ("When a state refuses to negotiate beyond state law limitations concerning a game that it permits, the state cannot be said to have negotiated in good faith under the IGRA given the plain language of the statute.").

IGRA provides that gaming activities that may be included in a compact are those types of general categories of games that a state "permits. . .for any purpose by any person, organization, or entity." 25 U.S.C. § 2710(d)(1)(B). This provision is a form of 'national treatment' clause designed to protect tribes from discriminatory treatment in regards to gaming. The plain language of § 2710(d)(1)(B) is best understood as allowing class III gaming compacts in states that permit that kind of gaming for at least one purpose, by at least one person, organization, or entity. *See e.g.*, *American Greyhound Racing, Inc. v. Hull*, 146 F. Supp. 2d 1012, 1067 (D. Ariz. 2001); *Dalton v. Pataki*, 835 N.E.2d 1180, (N.Y. 2005), cert. denied, 546 U.S. 1032 (2005). Under §2710(d)(1)(B), the state may grant a tribe exclusive Class III gaming rights if state law permits *similar* Class III gaming for at least one purpose for at least one person, organization, or entity.

In sum, for an Indian tribe to lawfully operate a particular form of gaming, IGRA only requires that "such gaming" be permitted "for any purpose by any person, organization, or entity." 25 U.S.C. § 2710(d)(l)(B). And since Congress structured the requirement to provide states and tribes with maximum flexibility to fashion a Class III gaming compact, *see Artichoke Joe's v. Norton*, 216 F. Supp. 2d 1084, 1122–23 (E.D. Cal. 2002), if the State of Oklahoma permits even one person to engage in a similar form of gaming, then that form of gaming, in its various iterations, may be made available to the tribe through the compact negotiating process.

**III.    "Event Wagering" is Already Permitted in Oklahoma.**

In Oklahoma, pari-mutuel betting on events where the physical skills of a participant are the subject of betting is already broadly regulated and permitted. The subject compacts define "Event Wagering" as "the placing of a wager on the outcome of a Sport event, including E-Sports, or any other events." The new compacts further define a "Sport" as the following:

> [A] contest (i) having a defined set of rules, (ii) requiring participant skill, (iii) requiring physical skill, (iv) having a broad public appeal, and (v) having achieved

6

institutional stability where social institutions have rules which regulate it, stabilizing it as an important social practice. This shall include, but not be limited to, football, basketball, baseball, golf, tennis, hockey, boxing, mixed martial arts, wrestling, athletic contests recognized by the Olympics, and car racing.

Although all sports, and other events, have not been the subject of gaming in Oklahoma in the past, this kind of gaming has long been specifically authorized in Oklahoma law.

### 1. Horse racing—a type of event wagering—is widely permitted in Oklahoma.

Speaker McCall and President Pro Tempore Treat ignore the State Tribal Gaming Act, 3A O.S. §§ 261-281, which specifically provides for wagering on such sporting events. The State Tribal Gaming Act states that the "Oklahoma Horse Racing Commission shall approve the transfer of purse money generated for races for Thoroughbred horses, races for Quarter Horses or races for Paint and Appaloosa horses pursuant to this section." 3A O.S. § 265. Similarly, the State Tribal Gaming Act provides for wagering on horse races not located in Oklahoma. Section 266 states:

Notwithstanding the provisions of Section 205.7 of Title 3A of the Oklahoma Statutes, an organization licensee may conduct, for any year in which the organization licensee meets the requirements to conduct authorized gaming, an unlimited number of out-of-state full card simulcast races for an unlimited number of days during that calendar year. An organization which is licensed under Section 208.2 of Title 3A of the Oklahoma Statutes may also conduct an unlimited number of out-of-state full card simulcast races for an unlimited number of days, provided that such licensee conducts, in such year, no less than four hundred (400) total races, which shall include conducting no fewer than an average of four (4) races per day for Thoroughbred horses.

3A O.S. § 266. In addition, the Oklahoma Horse Racing Act, 3A O.S. §§ 200–282, provides for a full authorized system of pari-mutuel wagering. *See* 3A O.S. § 205.6.

### 2. To the extent state law is construed to override IGRA, such law is preempted.

The Tenth Circuit has specifically rejected arguments like those advanced in the McCall/Treat Letter. These arguments seek to entrench state law as the dominant framework for the negotiating scope of tribal compacts.

In *N. Arapaho Tribe*, 389 F.3d at 1311-12*,* the court stated:

The state argues that the district court erred in concluding that IGRA requires the state to negotiate with the Tribe. . .without regard to the limitations of Wyoming law. If the state's approach were correct, however, "the compact process that Congress established as the centerpiece of the IGRA's regulation of Class III gaming would thus become a dead letter; there would be nothing to negotiate, and no meaningful compact would be possible." *Mashantucket Pequot Tribe*, 913 F.2d at 1031.

7

AR_0000079

Moreover, the court in *Dewberry v. Kulongoski*, 406 F. Supp. 2d 1136, 1152–53 (D. Or. 2005), stated:

> An argument similar to plaintiffs was raised recently in *Dalton v. Pataki*, 5 N.Y.3d 243, 835 N.E.2d 1180, 802 N.Y.S.2d 72 (N.Y. 2005). There, the New York Court of Appeals addressed the issue of whether the state could allow the governor to enter into tribal-state gaming compacts when the state constitution prohibited commercial gambling generally. *Id.* at 1186. The court rejected the plaintiffs' argument that the state constitution prohibition against commercial gaming rendered class III gaming on Indian lands unlawful, finding that "IGRA does not allow the state to consider the purpose behind the gaming." Id. at 1189. Noting that the statutory language makes clear that class III gaming is permitted on Indian lands "when located in a state that permits such gaming for any purpose by any person," the court held that "**since New York allows <u>some forms</u> of class III gaming – for charitable purposes – such gaming may lawfully be conducted on Indian lands** provided it is authorized by tribal ordinance and is carried out pursuant to a tribal-state compact."

*Id.* at 1152–53 (emphasis added).

If a type of game is regulated by the state and not otherwise prohibited, it is appropriate for compact negotiations. As stated in *U.S. v. Sisseton-Wahpeton Sioux Tribe*, "the legislative history [of IGRA] reveals that Congress intended to permit a particular gaming activity, even if conducted in a manner inconsistent with state law, if the state law merely regulated, as opposed to completely barred, that particular gaming activity." 897 F.2d 358, 365 (8th Cir. 1990).

### 3. The Oklahoma Legislature has authorized certain sports betting.

Speaker McCall and President Pro Tempore Treat assert unequivocally that "the Legislature has not yet authorized sports betting in Oklahoma." This is an incomplete representation of the legal state of affairs in Oklahoma. To be sure, the United States Department of the Interior has long recognized that a state is not required to negotiate over a type of game if all forms of that game are prohibited by state law. For example, the "Secretarial Procedures" regulations stated:

> IGRA thus makes it unlawful for Tribes to operate particular Class III games that State law completely and affirmatively prohibits. . .In other words, if a State prohibits **an entire class** of traditional games, it need not negotiate over the particular games within that category. Consequently, such gaming would not be permitted under Secretarial procedures.

63 Fed. Reg. 3289, 3292–93 (Jan. 22, 1998) (emphasis added).

However, Oklahoma has not prohibited the entire class of "Event Wagering." The National Indian Gaming Commission (NIGC) has long recognized "Event Wagering" as an appropriate form of gaming in Oklahoma because event wagering is generally only **regulated**, not prohibited,

AR_0000080

by Oklahoma law. Almost all tribes in Oklahoma play versions of tournaments as Class III games. As a result, the NIGC has issued several opinion letters stating that under Oklahoma law, tournament play is legal and within the scope of compact negotiations since they are not prohibited by Oklahoma law. The NIGC observes that gambling tournament play is not prohibited in Oklahoma because Oklahoma specifically exempts tournaments from criminal gaming statutes by virtue of 21 O.S. § 981. Further, the NIGC has stated that although tournaments clearly involve gambling that would otherwise constitute prohibited gaming in Oklahoma, since it is an exempted area in Oklahoma for participant betting, it also is an appropriate subject for tribal gaming. In short, because Oklahoma has chosen to exempt tournaments – which may require an entry fee and award a pool prize to individual participants – from the definition of betting under state law, tournaments may be properly authorized for Class III gaming.

### 4. Athletic events are proper subjects of compact negotiations.

Oklahoma law not only exempts betting on tournaments but also betting on athletic events if done in a pool betting format. 21 O.S. § 981. Participants are allowed to bet on athletic events through pool wagering. Oklahoma's prohibition on betting is not a complete ban but merely a form of strict regulation. The exemptions demonstrate that betting on athletic events is not fully prohibited in Oklahoma. Section 981 states:

> **A "bet" is a bargain in which the parties agree that, dependent upon chance**, or in which one of the parties to the transaction has valid reason to believe that it is dependent upon chance, one stands to win or lose something of value specified in the agreement. **A bet does not include**. . .
>
> > c. **offers of purses**, prizes or premiums to the actual **participants in public and semipublic events**, as follows, to wit: **Rodeos**, animal shows, hunting, fishing or shooting competitions, expositions, fairs, **athletic events**, tournaments and other shows and contests where the participants qualify for a monetary prize or other recognition. This subparagraph further excepts an entry fee from the definition of "a bet" as applied to enumerated public and semipublic events.

21 O.S. §981 (emphasis added).

Under established IGRA precedent and Oklahoma law, it is clear that athletic events are proper matters for compact negotiations should the Tribes and State choose to negotiate such matters.  The arguments presented by Speaker McCall and President Pro Tempore Treat are factually incorrect and legally infirm. The Oklahoma Governor is compelled, pursuant to his obligation to deal with the Tribes in good faith, to negotiate "Event Wagering" issues at the Tribes' request, as was the case in these compacts.  It is an unmistakable error to state so unambiguously, as the McCall/Treat Letter purports to do, that "Event Wagering" is not a proper subject for compact negotiation.

### IV.    The Compacts Were Flexibly Drafted to Withstand Challenges and Should Be Forwarded to the Secretary of the Interior for Approval.

9

Had Speaker McCall and President Pro Tempore carefully reviewed the terms of the compacts prior to issuing their respective missives, they might have been assured by the fact that the compacts **on their face** address any concerns about the legality of event wagering. The compacts define "Event Wagering" as "the placing of a wager on the outcome of a Sport event, including E-Sports and daily fantasy sports, or any other events, **to the extent such wagers are authorized by applicable State law**." (emphasis added). If certain event wagering activities are not authorized by applicable State law as Speaker McCall and President Pro Tempore argue, the compacts have anticipated this question. To the degree State law would operate to the contrary, such operation would narrow, not wholly eliminate, the event wagering recognized by the compact.

Moreover, the compacts include severability clauses which allow for the Secretary of the Interior to sever portions of the compact deemed incompatible with IGRA or relevant state law. Part 13.B of each compact states:

> Entire Agreement; Severability. This Compact constitutes the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior and contemporaneous oral and written negotiations. If any clause or provision of this Compact is subsequently determined by any federal court to be invalid or unenforceable under any present or future law, including but not limited to the scope of Covered Games, the remainder of this Compact shall not be affected thereby. It is the intention of the Parties that if any such provision is held to be illegal, invalid or unenforceable, there will be added in lieu thereof a provision as similar to such provision as is possible to be legal, valid and enforceable.

In other words, in the unlikely event of a judicial holding that sports betting is per se outside the permissible negotiating scope of Oklahoma tribal-state compacts, such a decision would have no effect on the efficacy of the compacts. The Department of the Interior honored such severability clauses with the original Tribal Gaming Compact. Part 15(D) of the original Compact outlined a termination procedure. Part 15(D) also included a severability provision which read:

> The state hereby agrees that this subsection is severable from this Compact and shall automatically be severed from this Compact in the event that the United States Department of the Interior determines that these provisions exceed the states authority under IGRA.

Upon review by the Department of the Interior, the termination provision was deemed improper and, pursuant to the severability clause, independently severed from the Compact. Part 13.D of these compacts mirrors this construction. Accordingly, these compacts were flexibly drafted to accommodate potential challenges.

Therefore, the compacts between the State of Oklahoma and the Otoe-Missouria Tribe, and between the State of Oklahoma and the Comanche Nation, are legally enforceable compacts subject only to the approval of the Secretary of the Interior prior to taking effect. A careful reading

10

of the express terms in the two compacts may have avoided the unfortunately misleading communication from Speaker McCall and President Pro Tempore Treat.

The compacts are valid, with or without the event wagering clause, and the obligations therein are binding to both the State and the Tribes who each must perform their respective contractual obligations.

# Conclusion

The right to game on tribal land is a matter of federal law, and a state statute cannot control the scope of compact negotiations. Compact negotiations are both encouraged and mandated on any class of games that are permitted to anyone in the State of Oklahoma. Event Wagering is permitted in the form of horse racing, tournaments, and sporting events in Oklahoma by both individual participants and large groups of gamblers. Such event wagering on local, national, and international events is permitted by Oklahoma law. Denying Tribes the opportunity to engage in event wagering for sports, particularly when certain sports are already the subject of gaming, flies in the face of IGRA and undermines the objectives for which gaming relations have become a central pillar of tribal-state relations.

These compacts between the State and the Otoe-Missouria Tribe and between the State and the Comanche Nation are undeniably a legitimate expression of sovereign-to-sovereign negotiations governed by federal law and concluded pursuant to the prerogative established in the Oklahoma Constitution, which vests the Governor with the sole authority to negotiate with Indian Tribes. Specifically, Article VI, Section 8 of the Oklahoma Constitution empowers the Governor:

> **The Governor shall** cause the laws of the State to be faithfully executed, and **shall conduct in person or in such manner as may be prescribed by law**, all **intercourse and business of the State with other states** and with the United States*,* and he shall be a conservator of the peace throughout the State.

*Id.* (emphasis added). Promoting the "business of the State" with other sovereigns and serving as "a conservator of the peace" is exactly what these compacts have done.

11

AR_0000083

**Memorandum**

**To:**  Director Paula Hart, Office of Indian Gaming, U.S. Department of the Interior
**From:**  Office of the General Counsel, Oklahoma Governor's Office
**Date:**  April 24, 2020
**Re:** Authority of Governor of Oklahoma to negotiate and execute gaming compacts on behalf of the State with federally recognized Indian Tribes within the State, and the applicability of federal law and state law to such negotiations and execution.


**Issue:**  Does Federal and State Law permit the inclusion of Event Wagering in an Oklahoma Gaming Compact?

**Position of the Governor's Office of the State of Oklahoma:**  Federal and State Law permit the inclusion of Event Wagering in an Oklahoma Gaming Compact.

# Factual Background

1.      On December 17, 2019, following his withdrawal from representing the State of Oklahoma in compact negotiations with Oklahoma's Indian Tribes, the Oklahoma Attorney General's office released the following statement:

> Under Article VI, Section 8 of the Oklahoma Constitution and 74 0.S. Sec. 1221, the governor is given authority to enter into agreements with the federally recognized tribes.

2.      On April 18, 2020, the Governor of the State of Oklahoma, the Chairman of the Otoe-Missouria Tribe, and the Chairman of the Comanche Nation executed new gaming compacts. The Compacts authorize "Event Wagering" (a term defined in the new compacts) as one of the types of covered games.

3.      On April 21, 2020, the Governor of the State of Oklahoma, the Chairman of the Otoe-Missouria Tribe, and the Chairman of the Comanche Nation conducted a public signing ceremony at the State Capitol. Thereafter, the compacts were made public for the first time.

4.       Following the April 21, 2020, signing ceremony, the Oklahoma Attorney General confirmed: "The governor has the authority to negotiate compacts with the tribes on behalf of the state."

5.      On April 22, 2020, the office of the Governor of the State of Oklahoma issued the following statement:

AR_0000085

> A number of legal experts thoroughly researched and considered the interpretation of federal law for negotiating Event Wagering, and the interpretation of State law regarding the authority and role of the Governor to compact with Tribes. They are confident in the Governor's authority and the validity of the compacts under both state and federal law, and are focused on the momentum established by the new gaming compacts which usher in a bright future for Oklahoma's gaming market, leave behind the one-size-fits-all approach to the old Model Gaming compact, and expands opportunities for all parties for generations to come.

6.     On April 23, 2020, Speaker of the House Charles A. McCall and President Pro Tempore Greg Treat submitted a letter to Governor Stitt, in which they averred the legislative branch's position "on actions taken [by the Governor] in negotiating and signing these purported "compacts." According to the Letter, the actions are "unauthorized by law and void without action by the Oklahoma Legislature."  Such statements reflect fundamental misconceptions regarding the recent Compacts executed between the State and the Comanche Nation and Otoe-Missouria Tribe, respective tribal sovereigns in our State.

7.     Subsequently, various tribes adverse to the Governor and the State of Oklahoma have relied on that letter in pleadings filed in the federal litigation.

# Legal Analysis

I.     **The Governor Has Sole Authority to Negotiate and Execute Gaming Compacts in Oklahoma.**

The Oklahoma Constitution, the Legislature, and the state Supreme Court have recognized that the Governor has the sole authority to compact with Indian tribes. Moreover, the constitution prohibits the Legislature from approving state-tribal compacts.

1.  **All three branches recognize the Governor's power to compact with tribal sovereigns.**

Consistent with the April 21, 2020, statement of the Attorney General of Oklahoma, it is undisputed that the Governor has the sole power in Oklahoma to compact with Oklahoma's tribal sovereigns. In fact, on this point, all three branches concur. Article 2, section 8 of the Oklahoma Constitution states:

> "[t]he Governor shall cause the laws of the State to be faithfully executed, and shall conduct in person or **in such manner as may be prescribed by law, all intercourse and business of the State with other states and with the United States**, and he shall be a conservator of the peace throughout the State."  (emphasis added).

The Oklahoma Constitution does not contain an "advice and consent" provision similar to the United States Constitution. Therefore, "any requirement that individual agreements or compacts negotiated by the Governor on behalf of the State with other sovereigns, such as Indian

2

tribes, be approved by the Legislature would violate the principles of separation of powers." 2004 OK AG 27.

The Oklahoma Legislature has recognized the Governor's constitutional authority to negotiate and enter into compacts with federally recognized Indian tribes. The Legislature codified this authority in 74 O.S. § 1221(C)(1), which states: "The Governor is authorized to negotiate and enter into cooperative agreements on behalf of this state with federally recognized Indian tribal governments." The Oklahoma Legislature has also specifically recognized the power of the Governor pursuant to the Oklahoma Constitution to compact for Class III gaming activities. It passed 3A O.S. 2011 § 280 (State Tribal Gaming Act) which reads: "The State of Oklahoma through the concurrence of the Governor after considering the executive prerogatives of that office and the power to negotiate the terms of a compact between the state and a tribe."[1]

In 2013, the Oklahoma Supreme Court held that "[t]he Executive Branch of the State of Oklahoma, specifically the Governor, has been and continues to be the party responsible for negotiating compacts with the sovereign nations of this state." *Sheffer v. Buffalo Run Casino*, 315 P.3d 359, 364 (Okla. 2013). The court then included footnote 18, which cites Okla. Const. art. VI, § 8 ("The Governor shall cause the laws of the State to be faithfully executed, and shall conduct in person or in such manner as may be prescribed by law, all intercourse and business of the State with other states and with the United States. . ." ); Okla. Const. art. VI, § 2 ("The Supreme Executive power shall be vested in a Chief Magistrate, who shall be styled 'The Governor of the State of Oklahoma.'").

## 2.  The Legislature is constitutionally precluded from approving state-tribal compacts.

The April 23, 2020, letter from Speaker of the House Charles A. McCall and President Pro Tempore Greg Treat ("McCall/Treat Letter" or "Letter") to Governor Stitt states that the legislative branch's position is that the negotiation and signing of the compacts were actions "unauthorized by law" and that the compacts are "legally flawed." The Letter argues that the Governor "cannot unilaterally enter into the type of agreements signed [on April 22, 2020]" and that "the records of the Legislature and the law itself clearly show state-tribal gaming was always intended to be handled jointly, by both the legislative and executive branches of the State of Oklahoma. On this matter and many others, the legislative branch sets the policy and the executive branch executes the policy." These statements, and the conclusions they provoke, are unequivocally wrong.

The McCall/Treat Letter purports to derive its authority for such positions from a 2004 Oklahoma Attorney General Opinion.  In selecting only parts of the Opinion, and quoting even those parts incompletely or out of context, the Letter paints an inaccurate picture of the Attorney General's Opinion. An excerpt from the Attorney General's Opinion, and its final conclusions, is set forth below:

---

[1] *See also* <u>Oklahoma legislative leaders offer differing opinions on gaming compacts dispute</u>, https://oklahoman.com/article/5649640/legislative-leaders-offer-differing-opinions-on-gaming-compacts-dispute ("We don't have any say in the negotiations on the compacts so I'm watching like all of you are." –Greg Treat) and ("I have full faith in our tribal leaders in the state of Oklahoma and in our governor that they'll get in there and get the deal put together" – Charles McCall).

3

[A]ny requirement that individual agreements or compacts negotiated by the Governor on behalf of the State with other sovereigns, such as Indian tribes, be approved by the Legislature would violate the principles of separation of powers. Any requirement that individual negotiated agreements have to be approved by the Legislature prior to becoming effective would. . .have the Legislature *carrying out* legislative policy and *applying it to various conditions*. Secondly, the power to approve individual contracts would result in complete control by the Legislature, and. . .result in a vehicle "by which the executive department is being subjected to the coercive influence of the legislative department."

In reaching this conclusion, we note that the Oklahoma Constitution does not contain a Treaty Advice and Consent Clause like Article II, Section 2 of the United States Constitution, which empowers the President to make Treaties "by and with the Advice and Consent of the Senate."

Finally, a requirement that each agreement negotiated by the Governor must be approved by the entire Legislature would place the Legislature not in a cooperative role, but in complete control over the approval process. Such legislative power . . . would violate the Separation of Powers provision of the Oklahoma Constitution.

> It is, therefore, the official Opinion of the Attorney General that:
>
> The Separation of Powers provisions in the Oklahoma Constitution, including Article IV, Section 1, are not violated when, without legislative approval of the specific agreements:
>
> a. the Governor, under the powers vested in the Governor under Article VI, Section 8 of the Oklahoma Constitution, to conduct "all intercourse and business of the State with other states and with the United States," negotiates an agreement with other states or with the United States, or
>
> b. the Governor, under the authority vested in the Governor at 74 O.S. 2001, § 1221(C)(1), enters into a cooperative agreement (sometimes referred to as a compact) on behalf of the State with a federally recognized Indian Tribal Government within this State.

*Oklahoma Attorney General Op. No. 2004 OK AG 27* (Aug. 26, 2004) (citations omitted). Accordingly, the legislature does not have a role in approving state-tribal compacts; the Governor has the exclusive authority.

## II.    The Indian Gaming Regulatory Act (IGRA) Controls the Procedures for Negotiating Gaming Compacts and the Scope of Their Contents.

It is a well-established principle that federal law, not state law, sets the standards for gaming compact negotiations. The McCall/Treat Letter fails to consider the preemptive effects of

4

federal law and the norms that necessarily inform the limited role of Oklahoma law when assessing the legitimacy of gaming compacts negotiated by the Governor. The Indian Gaming Regulatory Act (IGRA), 25 U.S.C. §§ 2701 *et seq.*, not state law, controls the negotiation procedures and the scope of permissible subjects of compacts.

### 1. IGRA controls the procedures for negotiating gaming compacts.

Congress enacted IGRA in 1988, shortly after the Supreme Court's decision in *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987). In *Cabazon*, the Court held that Indian tribes were free to offer gaming on tribal lands subject only to federal regulation. The Court also held that state regulation did not control the scope of tribal gaming.

IGRA was Congress' compromise to the difficult questions involving Indian gaming. IGRA was enacted to provide "a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments" and "to shield [tribal gaming] from organized crime and other corrupting influences to ensure that the Indian tribe is the primary beneficiary of the gaming operation." 25 U.S.C. § 2702(1)–(2). IGRA is an example of "cooperative federalism" in that it clearly outlines the roles of the competing sovereign interests—the federal government, state governments, and Indian tribes.

The federally-mandated design of a state-tribal compact is key to understanding the various roles of the three sovereigns regarding Class III gaming under IGRA. The federal government permits states and Indian tribes to develop joint regulatory schemes through the compacting process, but only pursuant to IGRA standards. *See Keweenaw Bay Indian Community v. U.S.*, 136 F.3d 469, 472 (6th Cir. 1998). Section 11(d)(3)(A) of IGRA describes the process whereby the Indian tribe and the state may commence negotiations leading to a tribal-state compact: the tribe must "request" that the state "enter into negotiations," and, on receiving such request, the state must proceed to "negotiate with the Indian tribe in good faith." 25 U.S.C. § 2710(d)(3)(A). *See Kan. ex rel. Schmidt v. Zinke*, 861 F.3d 1024 (10th Cir. 2017) ("IGRA itself imposes an obligation on the State to negotiate a gaming compact in good faith at the Tribe's request. . .The only condition under the statute triggering this obligation is a tribe's request to enter into such negotiations.").

The McCall/Treat Letter omits this federal requirement to negotiate a compact pursuant to IGRA standards. The Letter states that "[r]egarding state-tribal gaming law, the records of the Legislature and the law itself clearly show state-tribal gaming was always intended to be handled jointly, by both the legislative and executive branches of the State of Oklahoma. On this matter and many others, **the legislative branch sets the policy and the executive branch executes the policy**." (emphasis added). This assertion is flatly erroneous. Section 11(d)(1) of IGRA unequivocally declares that "[c]lass III gaming activities" are "lawful. . .only if such activities are. . .conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State." 25 U.S.C. § 2710(d)(1). Moreover, a compact takes effect *only* when approved by the Secretary of the Interior. 25 U.S.C. § 2710(d)(3)(B). When a compact is negotiated and approved pursuant to the process outlined in the act, IGRA – not the state – legalizes gaming by the tribe.

In sum, IGRA, as mandated by the *Cabazon* court, specifically rejects the notion that state law controls the procedures for authorizing gaming on Indian lands.

5

AR_0000089

**2. IGRA defines the scope of appropriate subject matter for Tribal-State compact negotiations.**

The McCall/Treat Letter suggests that the subject compacts are not properly negotiated since "Event Wagering", as defined in the new compacts, is not specifically permitted as a covered game in the Oklahoma gaming statute. This view is also wrong.  Instead of adopting state law as the standard for Indian gaming, IGRA adopts an approach that looks to broad classes of gaming that are permitted within the negotiating state. IGRA states that if a type of gaming is permitted within a state, any similar type of gaming is permitted as part of the compact negotiation process. 25 U.S.C. § 2710(d)(1)(B);  *see also N. Arapaho Tribe v. State of Wyoming*, 389 F.3d 1308, 1313 (10th Cir. 2004) (holding that a state "ha[s] a duty to negotiate for terms beyond those [state] law expressly permits"). In fact, the Governor's obligation to negotiate in good faith with the tribes requires meaningful effort to negotiate over subject matters permitted by IGRA and of interest to the tribes. *See N. Arapaho Tribe*, 398 F.3d at 1313 ("When a state refuses to negotiate beyond state law limitations concerning a game that it permits, the state cannot be said to have negotiated in good faith under the IGRA given the plain language of the statute.").

IGRA provides that gaming activities that may be included in a compact are those types of general categories of games that a state "permits. . .for any purpose by any person, organization, or entity." 25 U.S.C. § 2710(d)(1)(B). This provision is a form of 'national treatment' clause designed to protect tribes from discriminatory treatment in regards to gaming. The plain language of § 2710(d)(1)(B) is best understood as allowing class III gaming compacts in states that permit that kind of gaming for at least one purpose, by at least one person, organization, or entity. *See e.g.*, *American Greyhound Racing, Inc. v. Hull*, 146 F. Supp. 2d 1012, 1067 (D. Ariz. 2001); *Dalton v. Pataki*, 835 N.E.2d 1180, (N.Y. 2005), cert. denied, 546 U.S. 1032 (2005). Under §2710(d)(1)(B), the state may grant a tribe exclusive Class III gaming rights if state law permits *similar* Class III gaming for at least one purpose for at least one person, organization, or entity.

In sum, for an Indian tribe to lawfully operate a particular form of gaming, IGRA only requires that "such gaming" be permitted "for any purpose by any person, organization, or entity." 25 U.S.C. § 2710(d)(l)(B). And since Congress structured the requirement to provide states and tribes with maximum flexibility to fashion a Class III gaming compact, *see Artichoke Joe's v. Norton*, 216 F. Supp. 2d 1084, 1122–23 (E.D. Cal. 2002), if the State of Oklahoma permits even one person to engage in a similar form of gaming, then that form of gaming, in its various iterations, may be made available to the tribe through the compact negotiating process.

**III.   "Event Wagering" is Already Permitted in Oklahoma.**

In Oklahoma, pari-mutuel betting on events where the physical skills of a participant are the subject of betting is already broadly regulated and permitted. The subject compacts define "Event Wagering" as "the placing of a wager on the outcome of a Sport event, including E-Sports, or any other events." The new compacts further define a "Sport" as the following:

[A] contest (i) having a defined set of rules, (ii) requiring participant skill, (iii) requiring physical skill, (iv) having a broad public appeal, and (v) having achieved

6

institutional stability where social institutions have rules which regulate it, stabilizing it as an important social practice. This shall include, but not be limited to, football, basketball, baseball, golf, tennis, hockey, boxing, mixed martial arts, wrestling, athletic contests recognized by the Olympics, and car racing.

Although all sports, and other events, have not been the subject of gaming in Oklahoma in the past, this kind of gaming has long been specifically authorized in Oklahoma law.

### 1. Horse racing—a type of event wagering—is widely permitted in Oklahoma.

Speaker McCall and President Pro Tempore Treat ignore the State Tribal Gaming Act, 3A O.S. §§ 261-281, which specifically provides for wagering on such sporting events. The State Tribal Gaming Act states that the "Oklahoma Horse Racing Commission shall approve the transfer of purse money generated for races for Thoroughbred horses, races for Quarter Horses or races for Paint and Appaloosa horses pursuant to this section." 3A O.S. § 265. Similarly, the State Tribal Gaming Act provides for wagering on horse races not located in Oklahoma. Section 266 states:

Notwithstanding the provisions of Section 205.7 of Title 3A of the Oklahoma Statutes, an organization licensee may conduct, for any year in which the organization licensee meets the requirements to conduct authorized gaming, an unlimited number of out-of-state full card simulcast races for an unlimited number of days during that calendar year. An organization which is licensed under Section 208.2 of Title 3A of the Oklahoma Statutes may also conduct an unlimited number of out-of-state full card simulcast races for an unlimited number of days, provided that such licensee conducts, in such year, no less than four hundred (400) total races, which shall include conducting no fewer than an average of four (4) races per day for Thoroughbred horses.

3A O.S. § 266. In addition, the Oklahoma Horse Racing Act, 3A O.S. §§ 200–282, provides for a full authorized system of pari-mutuel wagering. *See* 3A O.S. § 205.6.

### 2. To the extent state law is construed to override IGRA, such law is preempted.

The Tenth Circuit has specifically rejected arguments like those advanced in the McCall/Treat Letter. These arguments seek to entrench state law as the dominant framework for the negotiating scope of tribal compacts.

In *N. Arapaho Tribe*, 389 F.3d at 1311-12, the court stated:

The state argues that the district court erred in concluding that IGRA requires the state to negotiate with the Tribe. . .without regard to the limitations of Wyoming law. If the state's approach were correct, however, "the compact process that Congress established as the centerpiece of the IGRA's regulation of Class III gaming would thus become a dead letter; there would be nothing to negotiate, and no meaningful compact would be possible." *Mashantucket Pequot Tribe*, 913 F.2d at 1031.

7

Moreover, the court in *Dewberry v. Kulongoski*, 406 F. Supp. 2d 1136, 1152–53 (D. Or. 2005), stated:

> An argument similar to plaintiffs was raised recently in *Dalton v. Pataki*, 5 N.Y.3d 243, 835 N.E.2d 1180, 802 N.Y.S.2d 72 (N.Y. 2005). There, the New York Court of Appeals addressed the issue of whether the state could allow the governor to enter into tribal-state gaming compacts when the state constitution prohibited commercial gambling generally. *Id.* at 1186. The court rejected the plaintiffs' argument that the state constitution prohibition against commercial gaming rendered class III gaming on Indian lands unlawful, finding that "IGRA does not allow the state to consider the purpose behind the gaming." Id. at 1189. Noting that the statutory language makes clear that class III gaming is permitted on Indian lands "when located in a state that permits such gaming for any purpose by any person," the court held that "**since New York allows <u>some forms</u> of class III gaming – for charitable purposes – such gaming may lawfully be conducted on Indian lands** provided it is authorized by tribal ordinance and is carried out pursuant to a tribal-state compact."

*Id.* at 1152–53 (emphasis added).

If a type of game is regulated by the state and not otherwise prohibited, it is appropriate for compact negotiations. As stated in *U.S. v. Sisseton-Wahpeton Sioux Tribe*, "the legislative history [of IGRA] reveals that Congress intended to permit a particular gaming activity, even if conducted in a manner inconsistent with state law, if the state law merely regulated, as opposed to completely barred, that particular gaming activity." 897 F.2d 358, 365 (8th Cir. 1990).

### 3. The Oklahoma Legislature has authorized certain sports betting.

Speaker McCall and President Pro Tempore Treat assert unequivocally that "the Legislature has not yet authorized sports betting in Oklahoma." This is an incomplete representation of the legal state of affairs in Oklahoma. To be sure, the United States Department of the Interior has long recognized that a state is not required to negotiate over a type of game if all forms of that game are prohibited by state law. For example, the "Secretarial Procedures" regulations stated:

> IGRA thus makes it unlawful for Tribes to operate particular Class III games that State law completely and affirmatively prohibits. . .In other words, if a State prohibits **an entire class** of traditional games, it need not negotiate over the particular games within that category. Consequently, such gaming would not be permitted under Secretarial procedures.

63 Fed. Reg. 3289, 3292–93 (Jan. 22, 1998) (emphasis added).

However, Oklahoma has not prohibited the entire class of "Event Wagering." The National Indian Gaming Commission (NIGC) has long recognized "Event Wagering" as an appropriate form of gaming in Oklahoma because event wagering is generally only **regulated**, not prohibited,

8

AR_0000092

by Oklahoma law. Almost all tribes in Oklahoma play versions of tournaments as Class III games. As a result, the NIGC has issued several opinion letters stating that under Oklahoma law, tournament play is legal and within the scope of compact negotiations since they are not prohibited by Oklahoma law. The NIGC observes that gambling tournament play is not prohibited in Oklahoma because Oklahoma specifically exempts tournaments from criminal gaming statutes by virtue of 21 O.S. § 981. Further, the NIGC has stated that although tournaments clearly involve gambling that would otherwise constitute prohibited gaming in Oklahoma, since it is an exempted area in Oklahoma for participant betting, it also is an appropriate subject for tribal gaming. In short, because Oklahoma has chosen to exempt tournaments – which may require an entry fee and award a pool prize to individual participants – from the definition of betting under state law, tournaments may be properly authorized for Class III gaming.

### 4. Athletic events are proper subjects of compact negotiations.

Oklahoma law not only exempts betting on tournaments but also betting on athletic events if done in a pool betting format. 21 O.S. § 981. Participants are allowed to bet on athletic events through pool wagering. Oklahoma's prohibition on betting is not a complete ban but merely a form of strict regulation. The exemptions demonstrate that betting on athletic events is not fully prohibited in Oklahoma. Section 981 states:

> **A "bet" is a bargain in which the parties agree that, dependent upon chance**, or in which one of the parties to the transaction has valid reason to believe that it is dependent upon chance, one stands to win or lose something of value specified in the agreement. **A bet does not include**. . .
>
> > c. **offers of purses**, prizes or premiums to the actual **participants in public and semipublic events**, as follows, to wit: **Rodeos**, animal shows, hunting, fishing or shooting competitions, expositions, fairs, **athletic events**, tournaments and other shows and contests where the participants qualify for a monetary prize or other recognition. This subparagraph further excepts an entry fee from the definition of "a bet" as applied to enumerated public and semipublic events.

21 O.S. §981 (emphasis added).

Under established IGRA precedent and Oklahoma law, it is clear that athletic events are proper matters for compact negotiations should the Tribes and State choose to negotiate such matters. The arguments presented by Speaker McCall and President Pro Tempore Treat are factually incorrect and legally infirm. The Oklahoma Governor is compelled, pursuant to his obligation to deal with the Tribes in good faith, to negotiate "Event Wagering" issues at the Tribes' request, as was the case in these compacts. It is an unmistakable error to state so unambiguously, as the McCall/Treat Letter purports to do, that "Event Wagering" is not a proper subject for compact negotiation.

### IV. The Compacts Were Flexibly Drafted to Withstand Challenges and Should Be Forwarded to the Secretary of the Interior for Approval.

AR_0000093

Had Speaker McCall and President Pro Tempore carefully reviewed the terms of the compacts prior to issuing their respective missives, they might have been assured by the fact that the compacts **on their face** address any concerns about the legality of event wagering. The compacts define "Event Wagering" as "the placing of a wager on the outcome of a Sport event, including E-Sports and daily fantasy sports, or any other events, **to the extent such wagers are authorized by applicable State law**." (emphasis added). If certain event wagering activities are not authorized by applicable State law as Speaker McCall and President Pro Tempore argue, the compacts have anticipated this question. To the degree State law would operate to the contrary, such operation would narrow, not wholly eliminate, the event wagering recognized by the compact.

Moreover, the compacts include severability clauses which allow for the Secretary of the Interior to sever portions of the compact deemed incompatible with IGRA or relevant state law. Part 13.B of each compact states:

> Entire Agreement; Severability. This Compact constitutes the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior and contemporaneous oral and written negotiations. If any clause or provision of this Compact is subsequently determined by any federal court to be invalid or unenforceable under any present or future law, including but not limited to the scope of Covered Games, the remainder of this Compact shall not be affected thereby. It is the intention of the Parties that if any such provision is held to be illegal, invalid or unenforceable, there will be added in lieu thereof a provision as similar to such provision as is possible to be legal, valid and enforceable.

In other words, in the unlikely event of a judicial holding that sports betting is per se outside the permissible negotiating scope of Oklahoma tribal-state compacts, such a decision would have no effect on the efficacy of the compacts. The Department of the Interior honored such severability clauses with the original Tribal Gaming Compact. Part 15(D) of the original Compact outlined a termination procedure. Part 15(D) also included a severability provision which read:

> The state hereby agrees that this subsection is severable from this Compact and shall automatically be severed from this Compact in the event that the United States Department of the Interior determines that these provisions exceed the states authority under IGRA.

Upon review by the Department of the Interior, the termination provision was deemed improper and, pursuant to the severability clause, independently severed from the Compact. Part 13.D of these compacts mirrors this construction. Accordingly, these compacts were flexibly drafted to accommodate potential challenges.

Therefore, the compacts between the State of Oklahoma and the Otoe-Missouria Tribe, and between the State of Oklahoma and the Comanche Nation, are legally enforceable compacts subject only to the approval of the Secretary of the Interior prior to taking effect. A careful reading

10

of the express terms in the two compacts may have avoided the unfortunately misleading communication from Speaker McCall and President Pro Tempore Treat.

The compacts are valid, with or without the event wagering clause, and the obligations therein are binding to both the State and the Tribes who each must perform their respective contractual obligations.

# Conclusion

The right to game on tribal land is a matter of federal law, and a state statute cannot control the scope of compact negotiations. Compact negotiations are both encouraged and mandated on any class of games that are permitted to anyone in the State of Oklahoma. Event Wagering is permitted in the form of horse racing, tournaments, and sporting events in Oklahoma by both individual participants and large groups of gamblers. Such event wagering on local, national, and international events is permitted by Oklahoma law. Denying Tribes the opportunity to engage in event wagering for sports, particularly when certain sports are already the subject of gaming, flies in the face of IGRA and undermines the objectives for which gaming relations have become a central pillar of tribal-state relations.

These compacts between the State and the Otoe-Missouria Tribe and between the State and the Comanche Nation are undeniably a legitimate expression of sovereign-to-sovereign negotiations governed by federal law and concluded pursuant to the prerogative established in the Oklahoma Constitution, which vests the Governor with the sole authority to negotiate with Indian Tribes. Specifically, Article VI, Section 8 of the Oklahoma Constitution empowers the Governor:

> **The Governor shall** cause the laws of the State to be faithfully executed, and **shall conduct in person or in such manner as may be prescribed by law**, all **intercourse and business of the State with other states** and with the United States*,* and he shall be a conservator of the peace throughout the State.

*Id.* (emphasis added). Promoting the "business of the State" with other sovereigns and serving as "a conservator of the peace" is exactly what these compacts have done.

11

AR_0000095

**From:** "Hart, Paula" <Paula.Hart@bia.gov>
**To:** Mark Burget <Mark.Burget@gov.ok.gov>
**Cc:** "pwhaley@ryanwhaley.com" <pwhaley@ryanwhaley.com>, Dan Webber <dwebber@ryanwhaley.com>, Matthew Felty <mkfelty@lytlesoule.com>, "Steven Mullins" <mullins@lytlesoule.com>, "Okediji, Ruth" <rokediji@law.harvard.edu>, "Kevin R. Wisner" <kw@wisnerlaw.net>, "Jeffrey Cartmell" <Jeffrey.Cartmell@gov.ok.gov>, Michael Junk <Michael.Junk@gov.ok.gov>, Michael Rogers <Michael.Rogers@sos.ok.gov>, Charlie Hannema <Charlie.Hannema@gov.ok.gov>, Baylee Lakey <Baylee.Lakey@gov.ok.gov>, Donelle Harder <donelle.harder@gmail.com>, "Wiseman, Maria K" <Maria.Wiseman@bia.gov>, "Woodward, Troy" <Troy.Woodward@bia.gov>, "Oakes, Morgan A" <Morgan.Oakes@bia.gov>
**Subject:** Re: [EXTERNAL] Memorandum from the Governor's Office - State of Oklahoma re authority of Governor to sign compacts executed April 18, 2020
**Date:** 2020-04-24 16:51:15 -0400
**Inline-Images:** image001.png

---

Thank you Mr. Burget.  I will be in touch should I have any questions.

Paula L. Hart
Director, Office of Indian Gaming

---

**From:** Mark Burget <Mark.Burget@gov.ok.gov>
**Sent:** Friday, April 24, 2020 4:46 PM
**To:** Hart, Paula <Paula.Hart@bia.gov>
**Cc:** pwhaley@ryanwhaley.com <pwhaley@ryanwhaley.com>; Dan Webber <dwebber@ryanwhaley.com>; Matthew Felty <mkfelty@lytlesoule.com>; Steven Mullins <mullins@lytlesoule.com>; Okediji, Ruth <rokediji@law.harvard.edu>; Kevin R. Wisner <kw@wisnerlaw.net>; Jeffrey Cartmell <Jeffrey.Cartmell@gov.ok.gov>; Michael Junk <Michael.Junk@gov.ok.gov>; Michael Rogers <Michael.Rogers@sos.ok.gov>; Charlie Hannema <Charlie.Hannema@gov.ok.gov>; Baylee Lakey <Baylee.Lakey@gov.ok.gov>; Donelle Harder <donelle.harder@gmail.com>
**Subject:** [EXTERNAL] Memorandum from the Governor's Office - State of Oklahoma re authority of Governor to sign compacts executed April 18, 2020

Director Hart,

The Governor of the State of Oklahoma asked me to convey the attached Memorandum to you regarding his authority to execute new gaming compacts between the State of Oklahoma and 2 Indian Tribes in our State, which compacts were executed on April 18, 2020.  We believe the Memorandum was necessary, and wanted to send to you, because of certain questions raised in our State by legislative leadership following the signing of the compacts.  Should you or any of your staff have any questions concerning the Memorandum, please do not hesitate to contact our office.  Thank you for your time and attention.

Mark Burget

## MARK BURGET

**General Counsel | Office of Governor J. Kevin Stitt**

**Phone:** 405-522-8821
**Email:** Mark.Burget@gov.ok.gov

AR_0000096

**Address:** 2300 N. Lincoln Blvd. **|** Oklahoma City, OK **|** 73105

AR_0000097

**From:** Mark Burget <Mark.Burget@gov.ok.gov>
**To:** "Hart, Paula" <Paula.Hart@bia.gov>
**Subject:** RE: [EXTERNAL] Memorandum from the Governor's Office - State of Oklahoma re authority of Governor to sign compacts executed April 18, 2020
**Date:** 2020-04-24 16:52:36 -0400
**Inline-Images:** image001.png

---

Thank you.

---

**From:** Hart, Paula <Paula.Hart@bia.gov>
**Sent:** Friday, April 24, 2020 3:51 PM
**To:** Mark Burget <Mark.Burget@gov.ok.gov>
**Cc:** pwhaley@ryanwhaley.com; Dan Webber <dwebber@ryanwhaley.com>; Matthew Felty <mkfelty@lytlesoule.com>; Steven Mullins <mullins@lytlesoule.com>; Okediji, Ruth <rokediji@law.harvard.edu>; Kevin R. Wisner <kw@wisnerlaw.net>; Jeffrey Cartmell <Jeffrey.Cartmell@gov.ok.gov>; Michael Junk <Michael.Junk@gov.ok.gov>; Michael Rogers <Michael.Rogers@sos.ok.gov>; Charlie Hannema <Charlie.Hannema@gov.ok.gov>; Baylee Lakey <Baylee.Lakey@gov.ok.gov>; Donelle Harder <donelle.harder@gmail.com>; Wiseman, Maria K <Maria.Wiseman@bia.gov>; Woodward, Troy <Troy.Woodward@bia.gov>; Oakes, Morgan A <Morgan.Oakes@bia.gov>
**Subject:** Re: [EXTERNAL] Memorandum from the Governor's Office - State of Oklahoma re authority of Governor to sign compacts executed April 18, 2020

Thank you Mr. Burget.  I will be in touch should I have any questions.

Paula L. Hart
Director, Office of Indian Gaming

---

**From:** Mark Burget <Mark.Burget@gov.ok.gov>
**Sent:** Friday, April 24, 2020 4:46 PM
**To:** Hart, Paula <Paula.Hart@bia.gov>
**Cc:** pwhaley@ryanwhaley.com <pwhaley@ryanwhaley.com>; Dan Webber <dwebber@ryanwhaley.com>; Matthew Felty <mkfelty@lytlesoule.com>; Steven Mullins <mullins@lytlesoule.com>; Okediji, Ruth <rokediji@law.harvard.edu>; Kevin R. Wisner <kw@wisnerlaw.net>; Jeffrey Cartmell <Jeffrey.Cartmell@gov.ok.gov>; Michael Junk <Michael.Junk@gov.ok.gov>; Michael Rogers <Michael.Rogers@sos.ok.gov>; Charlie Hannema <Charlie.Hannema@gov.ok.gov>; Baylee Lakey <Baylee.Lakey@gov.ok.gov>; Donelle Harder <donelle.harder@gmail.com>
**Subject:** [EXTERNAL] Memorandum from the Governor's Office - State of Oklahoma re authority of Governor to sign compacts executed April 18, 2020

Director Hart,
The Governor of the State of Oklahoma asked me to convey the attached Memorandum to you regarding his authority to execute new gaming compacts between the State of Oklahoma and 2 Indian Tribes in our State, which compacts were executed on April 18, 2020.  We believe the Memorandum was necessary, and wanted to send to you, because of certain questions raised in our State by legislative leadership following the signing of the compacts.  Should you or any of your staff have any questions concerning the Memorandum, please do not hesitate to contact our office.  Thank you for your time and attention.
Mark Burget

AR_0000098



## MARK BURGET

**General Counsel | Office of Governor J. Kevin Stitt**

**Phone:** 405-522-8821
**Email:** Mark.Burget@gov.ok.gov
**Address:** 2300 N. Lincoln Blvd.**|** Oklahoma City, OK **|** 73105

AR_0000099

Charles A. McCall
State Representative
Atoka, Garvin, Johnson &
Murray Counties
House District 22
Atoka, OK

State Capitol Room 401
2300 N. Lincoln Blvd.
Oklahoma City, OK 73105
Office 405-557-7412
Charles.McCall@okhouse.gov



*House of Representatives*
*Office of the Speaker*
*State of Oklahoma*

April 22, 2020

The Honorable Kevin J. Stitt
Governor, State of Oklahoma
2300 N. Lincoln Blvd., Room 212
Oklahoma City, OK 73105

Governor Stitt,

Regarding your assertion yesterday of a gaming agreement with two sovereign tribal nations, we feel it prudent to inform you of the legislative branch's position on actions taken by you in negotiating and signing these purported "compacts." In short, we find these actions unauthorized by law and void without action by the Oklahoma Legislature.

During a meeting with you yesterday when we learned of this for the first-time (moments before your public announcement), we were not provided with key details or the documents themselves. Now that we have been able to review the documents and details within them, we are better prepared to provide you the feedback you may have been seeking yesterday via this letter.

First, we agree with the assessment of Oklahoma Attorney General Mike Hunter, who stated yesterday:

> "*The agreements signed today between the governor, the Otoe-Missouria Tribe and the Comanche Nation are not authorized by the state Tribal Gaming Act, Title 3A, Section 261 et. sec. The governor has the authority to negotiate with tribes on behalf of the state. However, only gaming activities authorized by the act may be the subject of a tribal gaming compact. Sports betting is not a prescribed 'covered game' under the act.*"

Regarding state-tribal gaming law, the records of the Legislature and the law itself clearly show state-tribal gaming was always intended to be handled jointly, by both the legislative and executive branches of the State of Oklahoma. On this matter and many

AR_0000104

others, the legislative branch sets the policy and the executive branch executes the policy. The policy the Legislature has set at this time does not grant the executive the authority to unilaterally enter into the type of agreements signed yesterday.

For some historical context, there is a reason gaming policy was set up in this manner. That reason is separation of powers. Article 4, Section 1 of the Oklahoma Constitution is the most authoritative state law pronouncement on the subject which the Oklahoma Attorney General has interpreted in this very context. Attorney General Opinion 2004-27 addressed whether "[i]n light of the Oklahoma Constitution's Separation of Powers provision at Article IV, Section 1, . . . the Governor [can] compact with Indian tribes or other governmental entities and in doing so bind the State, without the approval of each compact by the Legislature." *Oklahoma Attorney General Op. No. 2004 OK AG 27* (Aug. 26, 2004).The Attorney General concluded:

   a. The executive powers of the Governor under the Oklahoma Constitution are more limited than those exercised by the President under the United States Constitution; and

   b. While the Oklahoma Constitution vests the Governor with power to "conduct intercourse and business with the other states and the United States," the Governor's authority to enter into cooperative agreements with Tribes arises from statute, *not* the Oklahoma Constitution. *See id.* ("Under the above-quoted constitutional and statutory provisions, the Governor is *constitutionally* vested with the power to enter into agreements with other states and the United States Government, and is *statutorily* vested with the power to enter into agreements with federally recognized Indian Tribes.").

Even so, the Attorney General's opinion observed the Governor's authority remains limited by the Oklahoma Constitution: "Of course, any agreement negotiated by the Governor must conform to the public policy enacted into law by the Legislature, as the role of the Legislative Branch is to establish public policy, and the role of the Executive Branch is to execute that policy." *Id.* (citing *Tweedy v. Oklahoma Bar Ass'n*, 624 P.2d 1049, 1054 (Okla. 1981)).[1]

---

[1] As Attorney General Op. No. 2004 OK AG 27 explains, "the distinction among the three branches," i.e., the precise delineation of Executive, Legislative, and Judicial powers, cannot be carried out with 'mathematical precision,' nor is it possible to divide the branches into 'watertight compartments,'" quoting *Bailey v. State Bd. of Pub. Affairs*, 153 P.2d 235, 239 (Okla. 1944). While particular exercises of those powers may appropriately blend, Attorney General Op. No. 2004 OK AG 27 n.3 explicitly provides the Oklahoma Governor may not lawfully disregard Oklahoma law when entering a cooperative agreement. Cf. also Oklahoma Attorney General Op. No. 93-685 (informal) (concluding "[a]s the Cherokee Law Enforcement Agreement does not alter or change the Bureau's existing powers and duties, the Governor, in entering into the compact, did not violate the Legislature's prerogative of establishing the duties and responsibilities of the Bureau, in violation of the Oklahoma Constitution's separation of powers provision, article IV, section 1 of the State Constitution"). Accordingly, Oklahoma law can place matters or certain details out of the Governor's reach with respect to forming cooperative agreements. An Oklahoma Governor cannot make legal that which a statute makes illegal.

In light of the above, please be advised the Legislature has not yet authorized sports betting in Oklahoma. As such, your unilateral attempt in yesterday's documents to make legal that which is not legal attempts to exercise power that belongs solely to the legislative branch of Oklahoma government. The covered games authorized by the Legislature under the State-Tribal Gaming Act are clearly listed in 3A O.S. Section 281. Legislation authorizing sports betting that was filed in the 2018 session (HB 3375 and SB 1195) did not advance, and no active legislation exists on sports betting this session. As a result, sports betting remains unauthorized in Oklahoma, even following the U.S. Supreme Court's ruling in *Murphy v. NCAA*, 138 S. Ct. 1461 (2018) that granted states the ability to set their own policies on sports betting, which the Oklahoma Legislature has not yet done.

The inclusion of sports betting is one of a number of flaws found in our preliminary review of the documents signed yesterday. While we appreciate you making us aware of your intention to sign these documents just moments before your public announcement, had you consulted us earlier we could have provided this information to you earlier.

The Otoe-Missouria Tribe and the Comanche Nation are essential parts of the fabric of the State of Oklahoma, each vested with their own sovereignty. In collaborating on this matter with you, they were looking out for each of their best interests, and we respect their right and ability to do so. We are disappointed Oklahoma's executive branch made a promise it could not legally keep under current law. Sovereign nations deserve promises Oklahoma can keep.

The Legislature is interested in gaming agreements that truly unite the State of Oklahoma with all tribal nations. Sadly, the documents signed yesterday are legally flawed and sow more division than unity. For those reasons, we do not see a path forward for the legislative action necessary to finalize them and ask that you respect the Oklahoma Constitution and the Oklahoma Legislature's law-making power by refraining from submitting or allowing these documents to be submitted to the Department of the Interior for review. Any submittal at this time would be untimely, inappropriate, and a waste of resources.

As always, we share our perspective with you in a spirit of cooperation, with hopes you find it helpful in your decision making. Thank you, as always, for your consideration of our perspective.

Respectfully,

Charles A. McCall
Speaker of the House

Greg Treat
President Pro Tempore

Press reports indicate the tribes will be paying more money to the State and will be able to offer expanded games.  If that's the case, we may ask for an economic analysis to determine whether the state is giving a valuable concession in exchange for higher payments from the Tribes.  But we need to see the documents before we make that decision.

Going forward, please address any correspondence to Paula L. Hart, Director, Office of Indian Gaming, and copy me on emails.

Thanks again,


Troy M. Woodward
Senior Policy Advisor
Office of Indian Gaming
202.219.4066


---

**From:** Wyatt Rosette <wrosette@rosettelaw.com>
**Sent:** Wednesday, April 22, 2020 10:08 AM
**To:** Woodward, Troy <Troy.Woodward@bia.gov>
**Cc:** Jeffrey Cartmell <Jeffrey.Cartmell@gov.ok.gov>; Rob Rosette <rosette@rosettelaw.com>
**Subject:** [EXTERNAL] Oklahoma Compacts

Troy,

I hope you are doing well.  I wanted to let you know the Otoe-Missouria Tribe and the Comanche Nation agreed to gaming compacts with the State of Oklahoma.  I have mailed hard copies of the approving resolutions and executed compacts to your office.  The Governor and the tribal chairman were wanting to see if they could set up an appointment with you and Director Hart to go over the terms of the compact and address any questions.  What does your schedule look like over the next two weeks?  How does COVID-19 impact any potential meetings?  The Governor would be willing to travel to DC next week.  I have copied Jeffrey Cartmell who works directly with the Governor to this email.

Respectfully,

Wyatt Rosette
Rosette, LLP
Attorneys at Law
4111 Perimeter Center Place
Oklahoma City, OK 73112
Mobile: (480) 309-4087
Office: (480) 889-8990
Fax: (480) 889-8997
wrosette@rosettelaw.com


CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF RECEIVED IN ERROR, PLEASE NOTIFY SENDER IMMEDIATELY AND DELETE THIS MESSAGE.  THANK YOU FOR YOUR COOPERATION.

**THE OTOE-MISSOURIA TRIBE AND STATE OF OKLAHOMA GAMING COMPACT**

**PART 12:    DURATION & TERMINATION**

A.    <u>Effective Date</u>.  The previous gaming compact entered into by and between the Tribe and the State, which was approved by the Department of the Interior and published in the *Federal Register*, is hereby agreed and stipulated by the Parties to be superseded by this Compact, and this Compact is the sole effective Compact between the Parties, constituting the entire agreement between the Parties, from and after the Effective Date hereof.  This Compact will become effective upon the occurrence of all of the following:

1.    The Compact is approved by action of the Tribe necessary to authorize the signing of the Compact on behalf of the Tribe and render the signature effective, including any tribal resolution or other action by the Tribe conducted in compliance with tribal procedures;

2.    The Compact is executed by the Governor on behalf of the State; *and*

3.    The Compact is approved as a Tribal-State compact within the meaning of IGRA by the Secretary of the Department of the Interior and notice of that approval is published in the *Federal Register*.

B.    <u>Term</u>.  The term of this Compact shall be begin on the Effective Date and end at 11:59 p.m. (CST) on December 31, 2035, unless otherwise agreed to in writing by the Parties.

C.    <u>Effect of Termination on Class III Gaming</u>.  The Tribe may continue to operate Covered Games after expiration of the term described in subsection (B) of this Part.  However, in the absence of an effective gaming compact, the State shall no longer be required to provide the Tribe with substantial exclusivity for class III Covered Games.

D.    <u>Termination by Mutual Consent</u>.  The Compact may be terminated before the end of a term of the Compact by the mutual written consent of the Parties.

**PART 13:    ADDITIONAL TERMS & CONDITIONS**

A.    <u>Amendments</u>.  This Compact shall not be amended or modified except by a writing executed by all the Parties.

B.    <u>Entire Agreement; Severability</u>.  This Compact constitutes the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior and contemporaneous oral and written negotiations.  If any clause or provision of this Compact is subsequently determined by any federal court to be invalid or unenforceable under any present or future law, including but not limited to the scope of Covered Games, the remainder of this Compact shall not be affected thereby.  It is the intention of the Parties that if any such provision is held to be illegal, invalid or unenforceable, there will be added in lieu thereof a provision as similar to such provision as is possible to be legal, valid and enforceable.

AR_0000188



**OFFICE OF THE GOVERNOR**
The Chickasaw Nation
Post Office Box 1548 • Ada, Oklahoma 74821
(580) 436-2603 • Fax (580) 436-4287
http://www.chickasaw.net

BILL ANOATUBBY
GOVERNOR

May 1, 2020

The Honorable David Bernhardt
Office of the Secretary
U.S. Department of the Interior
1849 C Street N.W.
Washington, D.C. 20240

Dear Secretary Bernhardt:

The Chickasaw Nation empathically calls on the Department of Interior to disapprove Governor Kevin Stitt's agreements with the Comanche Nation and Otoe-Missouria Tribe, which we understand he submitted April 23 for review under the Indian Gaming Regulatory Act. As explained in the attached legal analysis, his agreements are critically flawed.

Governor Stitt's announcement of these agreements sparked immediate controversy within state government. We join Oklahoma Attorney General Mike Hunter, the Oklahoma Senate President *Pro Tempore* Greg Treat, Oklahoma House Speaker Charles McCall, and other Oklahoma Tribes in rebuking the Governor for his unlawful overreach, but as to the Comanche agreement's provocative attack on Chickasaw Nation sovereignty, we particularly object.

In Parts 2 and 4 of the Comanche agreement, Governor Stitt purports to pre-approve future and hypothetical off-reservation trust land acquisitions for purposes of Comanche gaming *within* the Chickasaw Nation. Similar provisions put at risk the jurisdictional integrity of other Tribes, including the Caddo, Citizen Potawatomi, Delaware, Iowa, Ponca, Sac & Fox, and Wichita & Affiliated. Off-reservation trust acquisitions are always controversial, but these unlawful provisions seem designed to provoke discord and to disrupt Oklahoma Indian country. While Governor Stitt may offer his pre-approval of these possible future proposals, purportedly on behalf of Oklahoma, the Chickasaw Nation shall protect its jurisdictional integrity and not offer its approval, now or ever, 25 C.F.R. § 151.8. Furthermore, none of us, today, can say what the views of other local governments might be, 25 C.F.R. § 151.11(d).

The Honorable David Bernhardt                    2                          May 1, 2020

        Consistent with its trust duty and other Federal law, we ask that the Department to immediately disapprove and reject these agreements as improvidently submitted and invalid.

                                                Sincerely,

                                                *Bill Anoatubby*

                                                Bill Anoatubby, Governor
                                                The Chickasaw Nation


Enclosure:    As stated

cc:    Assistant Secretary Tara Sweeney, U.S. Department of the Interior
       Director Paula Hart, Office of Indian Gaming, U.S. Department of the Interior

AR_0000210



**CHICKASAW NATION**
OFFICE OF SENIOR COUNSEL
CHICKASAW NATION OKLAHOMA CITY REGIONAL OFFICES
4001 NORTH LINCOLN BOULEVARD
OKLAHOMA CITY, OKLAHOMA 73105
(580) 272-5236

To:      Governor Bill Anoatubby
From:    Undersecretary Stephen Greetham (Senior Counsel)
Date:    April 30, 2020
Re:      Comments concerning the lawfulness of the "compacts" signed by Governor Stitt, Comanche Nation Chairman Nelson, and Otoe-Missouria Tribe Chairman Shotten

**CONTENTS**

**INTRODUCTION** ……………………..……………………………………………..….……2

**FACTS** ……………..…………………………………………………….……3

**SUMMARY OF DISCUSSION** ……………………………………………………………..…...4
    **(a) *Defects in formation*** ……………………………………………….…...…4
    **(b) *Unlawful taxation*** ……………………………………………………………4
    **(c) *Unlawful provision for off-reservation trust land acquisitions*** ……………...…..………….4
    **(d) *Breach of trust*** ………....……………………………………………………5

**DISCUSSION** ……………………………………………………………..…...5
    **A. DOI Review of Compacts Under IGRA** ………………..……….…………………5

    **B. Defects Compelling Disapproval of the New Agreements** ……..…………………6

        **1. *The agreements should be disapproved on two Federal law questions that are informed by consideration of State law: (a) whether the agreements would operate to allow forms of gaming expressly prohibited by Oklahoma law; and (b) whether the State of Oklahoma has validly "entered into" the agreements*** ………………………………………………………..6
            a. *The agreements purport to allow forms of Class III gaming expressly prohibited by Oklahoma law* ………..…………………………………6
            b. *Oklahoma has not validly "entered into" the agreements* ………...………….9
            c. *Even if DOI opts not to disapprove the agreements, it should take no action nor publish any notice or other statement that could be construed as signaling Federal ratification or cure for the defects in Governor Stitt's agreements* ……………………….……12

        **2. *Oklahoma Governor Stitt's proposed agreements should be disapproved for attempting to impose a Tribal revenue-share obligation without offering a meaningful State concession of significant economic benefit to the Tribes***…………13
            a. *DOI approved the revenue-share obligations in our current compact as reasonably justified based on a meaningful concession by Oklahoma that provided significant benefit to the Chickasaw Nation* ………………….13

AR_0000211

b.  *Oklahoma Governor Stitt's new agreements would impose a revenue-*
*share obligation on the Tribes with no commensurate meaningful*
*concession by the State and no legitimate benefit for the Tribes*………..……16
(i)  *The new agreements include no Tribal "exclusivity" protections*
*or enforcement mechanisms while, instead, expressly authorizing*
*expansions of State gaming*        ………..……………………………..16
(ii)  *The new agreements do not lawfully authorize any new forms of*
*gaming for either Tribe and would otherwise impose an unjustifiable*
*and usurious revenue-share rate of approximately 22% on*
*"event wagering."*        …...…………...……………………………..17
(iii)  *The new agreements offer no valid consideration with respect to*
*hypothetical future off-reservation trust land acquisitions*  ………...…19

3.  ***Oklahoma Governor Stitt's proposed agreements should be disapproved for their***
***inclusion of provisions that invite DOI to breach its fiduciary obligations to Tribes***…..20
a.  *The purported Oklahoma pre-approvals of hypothetical off-reservation*
*trust land acquisitions for Comanche gaming operations within the*
*Chickasaw Nation's jurisdictional territory should be struck as unlawful*…….20
b.  *The agreements should be disapproved for, inter alia, subjecting the*
*Comanche and Otoe-Missouria to the material risk of being left without*
*any lawful Class III gaming compact with Oklahoma*        …………….…..22

CONCLUSION   …………………………………………………………………………....…22

--------------

## INTRODUCTION

We understand Oklahoma Governor Stitt has submitted to the Department of the Interior (DOI) two new agreements for approval as "compacts" under the Indian Gaming Regulatory Act (IGRA). We understand DOI received the documentation for review on April 23 and that, per IGRA, its administrative review and decision will be completed by June 7.

As analyzed in this memorandum, the Chickasaw Nation urges DOI to disapprove the submitted agreements as invalid under Federal and State law, as violative of IGRA, and as inviting DOI to breach its trust duties to the Chickasaw Nation and other Tribes. DOI approval of the agreements would, of course, not cure those defects,[1] but we nonetheless call on the Federal trustee to avoid unnecessary waste of Tribal, Federal, and State resources by immediately disapproving the agreements as improvidently submitted. If the government opts instead to approve them or to treat them as "considered to have been approved," we would urge DOI to, at minimum, sever the off-reservation trust land provisions and make clear in any published notice that it offers no opinion, whatsoever, as to the agreements' underlying validity and that its action should not be construed as curing or ratifying any defect in their formation or otherwise.

---

[1] *Pueblo of Santa Ana v. Kelly*, 104 F.3d 1546, 1553-57 (10th Cir. 1997) (rejecting contention that DOI approval is all that is necessary to render a Tribal-State compact valid under IGRA).

AR_0000212

The Chickasaw Nation has organized its comments to provide DOI officials a brief statement of facts, a summary of our analytical discussion, an analytical discussion of our substantive concerns, and a brief conclusion. Sources, throughout, are referenced in footnote.

### FACTS

On Tuesday April 22, 2020, Oklahoma Governor J. Kevin Stitt hosted a press conference to announce his having reached terms with Chairman William Nelson of the Comanche Nation and Chairman John Shotten of the Otoe-Missouria Tribe on new "gaming compacts."[2] His event concluded with a signing ceremony and Governor Stitt's pledge to send the documents to DOI for review and approval under IGRA. DOI received the signed documents on April 23.

Governor Stitt's event drew an immediate rebuke from Oklahoma Attorney General Mike Hunter[3] as well as Oklahoma Senate President *Pro Tempore* Greg Treat and Oklahoma House Speaker Charles McCall.[4] These officials indicated they had been neither consulted nor given advance notice of Governor Stitt's actions, and each expressed the opinion Governor Stitt lacked the authority to lawfully bind Oklahoma to his new agreements. The sharp and public divisions within State government over these new agreements have garnered broad attention and concern.[5] Notwithstanding the controversy, Governor Stitt continues to pursue DOI approval.

Separately, our Federal court litigation concerning the January 1, 2020, automatic renewal of our *current* gaming compact proceeds.[6] The Comanche Nation and Otoe-Missouria Tribe (Tribes) have been party-intervenors,[7] but last week, they cited their new agreements and joined with Governor Stitt in moving for their dismissal with prejudice.[8] Seven other Tribal parties, including the Chickasaw Nation, filed a conditional objection,[9] and on Friday, with

---

[2] Oklahoma Governor Kevin Stitt press release (with embedded links to press conference video and the Comanche Nation and Oto-Missouria Tribe agreements) (Apr. 22, 2020), available at https://www.governor.ok.gov/articles/press_releases/governor-stitt-signs-two-new-gaming-compacts.

[3] E.g., Randy Krehbiel, "Oklahoma AG Mike Hunter says Gov. Stitt's new tribal gaming compacts 'not authorized' by state law," *TULSA WORLD* (Apr. 22, 2020), available at https://www.tulsaworld.com/news/local/government-and-politics/oklahoma-ag-mike-hunter-says-gov-stitts-new-tribal-gaming-compacts-not-authorized-by-state/article_1e9bd0d3-3d50-50c0-8233-a3d924f01f44.html.

[4] E.g., Randy Krehbiel, "Oklahoma's legislative leaders tell Gov. Stitt his new tribal gaming compacts are invalid," *TULSA WORLD* (Apr. 22, 2020), available at https://www.tulsaworld.com/news/local/government-and-politics/oklahomas-legislative-leaders-tell-gov-stitt-his-new-tribal-gaming-compacts-are-invalid/article_958c7b77-5573-50d5-96bf-a0c57dfb8203.html.

[5] E.g., Editorial, "Progress on Oklahoma gaming compacts, or more problems?," *OKLAHOMAN* (Apr. 26, 2020), available at https://oklahoman.com/article/5660872/progress-on-oklahoma-gaming-compacts-or-more-problems.

[6] Cherokee Nation, et al. v. Stitt, Civ. No. 19-1198 (W.D. Okla.) ("Compact Litigation").

[7] Compact Litigation, doc. nos. 72 & 73 (Apr. 22, 2020).

[8] Compact Litigation, doc. no. 120 (Apr. 22, 2020).

[9] Compact Litigation, doc. no. 123 (Apr. 24, 2020).

AR_0000213

express reference to our objection, the Court dismissed the Comanche and Otoe-Missouria but made clear it was doing so without reviewing the claimed settlement, a copy of which was not filed with the court, or expressing any view on its substance or validity.[10]

### SUMMARY OF DISCUSSION

(a) *Defects in formation.*  Governor Stitt's new "gaming compacts" are defective under both Federal and State law. IGRA establishes a Federal law framework that provides for Tribal conduct of Class III gaming that is, among other things, legal under the laws of the State in which the Tribe is located. IGRA further requires Tribal conduct of Class III gaming to conform with the terms of a compact validly "entered into" by the Tribe and State. In the new agreements, Governor Stitt and the Tribes ignore this framework in favor of new "law" apparently enacted under the claimed authority, for the State's part, of the Oklahoma Governor's signature. Accordingly, these are *Governor Stitt's* compacts, <u>not</u> *Oklahoma's*, and his overreach renders them fatally flawed in their basic formation.

(b) *Unlawful taxation.*  IGRA expressly prohibits a State from seeking to impose a tax on Tribal gaming. DOI implements this prohibition by disapproving proposed compacts that would impose Tribal revenue-sharing obligations unaccompanied by any commensurate and meaningful State concession. The current Tribal-State gaming compacts in Oklahoma establish a revenue-share obligation of 4%-10% that is expressly tied to the State's obligation to maintain "substantial exclusivity" for Tribal gaming operations. The State's exclusivity obligation prohibits it from authorizing additional forms of non-Tribal gaming, and the compact otherwise mandates liquidated damages in the event of its breach of this obligation. In approving this exchange, DOI recognized the Tribal revenue-share obligation was premised on an appropriately meaningful State concession of significant benefit to the compacting Tribes.

In contrast, the new agreements would continue Tribal revenue-sharing while relieving the State from any enforceable exclusivity obligation. Further, it would reduce Tribal exclusivity by allowing the State to license new non-Tribal gaming even as it imposed new regulatory limitations, burdens, and penalties on Tribal gaming. We understand the Tribes see items in the new agreements as representing subjective value, e.g., access to new forms of gaming and pre-approval of theoretical off-reservation trust land acquisitions for gaming purposes. However, to the extent these items *do* represent value, it is illusory at best, and the agreement lacks any provision that could otherwise justify the electronic and table game revenue-share rates of 4.5%-13% and a rate of as much of 22% of Tribal revenues from "events wagering."

(c) *Unlawful provision for off-reservation trust land acquisitions.*  The assault the proposed Comanche Nation agreement attempts to launch on Chickasaw Nation sovereignty represents a particularly troubling aspect of these flawed deals. In his agreement, Governor Stitt purports to pre-approve hypothetical future off-reservation trust land acquisitions for purposes of Comanche gaming enterprises *within* the Chickasaw Nation's recognized jurisdictional area. These provisions represent nothing short of attempted "state"-sponsored reservation shopping. It is contrary to law and Federal policy and will do nothing but prompt unnecessary inter-Tribal and other local conflict. We wish to be plain on this point: *The off-reservation trust land*

---

[10] Compact Litigation, doc. no. 124 (Apr. 24, 2020).

AR_0000214

*acquisition provisions represent a bad faith attempt to disrupt Tribal gaming operations, revenue streams, and sovereign rights, and DOI's facilitation of this scheme would violate Federal law and breach Federal trust obligations to protect Chickasaw Nation jurisdictional integrity, contrary to IGRA.* No matter what else DOI might do, we call on our trustee to reject and sever these off-reservation trust land provisions from the proposed agreements.

**(d)** ***Breach of trust.*** Finally, in addition to breach of trust implications for the Chickasaw Nation and other Tribes whose jurisdictional integrity is attacked in these agreements, DOI approval of these agreements may also breach its duties to the Comanche and Otoe-Missouria. In these new agreements, the Tribes have agreed that DOI approval would result in the effective nullification of their existing Class III gaming compacts. Given the many defects in these new agreements and the parties' careful provision for severance without risk to the broader agreement, it is likely DOI approval would result in the Tribes having *no* Class III compact after the new agreements are struck down or rendered legally ineffective. At minimum, DOI should ascertain whether the Tribes are knowingly and voluntarily putting their existing compacts at risk for these defective deals.

**DISCUSSION**

### A.  DOI Review of Compacts Under IGRA

The Secretary must approve a Tribal-State gaming compact before it can have legal effect under IGRA.[11] The Secretary may disapprove a compact if it "violates" any provision of IGRA, "any other provision of Federal law that does not relate to jurisdiction over gaming on Indian lands, or the trust obligations of the United States to Indians."[12] DOI's regulations do not provide for third-party notice or opportunity to be heard on proposed compacts, but neither do they preclude administrative consideration of relevant comment.

IGRA requires the Secretary to approve or disapprove a proposed compact within forty-five (45) days of submittal.[13] Since DOI received Governor Stitt's new agreements on April 23, the administrative review should be finalized and acted on by June 8. IGRA further requires the Secretary to "publish in the Federal Register notice of any Tribal-State compact that is approved, or considered to have been approved, under this paragraph."[14]

---

[11] See 25 U.S.C. § 2710(d)(3)(B). Regulations controlling DOI review of compacts under IGRA can be found at 25 C.F.R. §§ 293.1-293.16.

[12] See 25 U.S.C. § 2710(d)(8)(B).

[13] 25 U.S.C. § 2710(d)(8)(C). If the Secretary takes no action on a compact, it "shall be considered to have been approved . . . but only to the extent the compact is consistent with the provisions of this chapter." Id. DOI approval, alone, is insufficient for purposes of a Tribal-State compact's being considered valid and enforceable under IGRA. See also *Santa Ana Pueblo*, 104 F.3d at 1555 (reviewing case law addressing question of whether "validity of a compact under state law is a separate requirement from Secretarial approval" and "conclude[ing] that the 'entered into language' imposes an independent requirement and the compact must be validly entered into by a state before it can go into effect, via Secretarial approval, under IGRA").

[14] 25 U.S.C. § 2710(d)(8)(D).

AR_0000215

### B.  Defects Compelling Disapproval of the New Agreements

1. *The agreements should be disapproved on two Federal law questions that are informed by consideration of State law:  (a) whether the agreements would operate to allow forms of gaming expressly prohibited by Oklahoma law; and (b) whether the State of Oklahoma has validly "entered into" the agreements.*

Tribal governments regulate gaming conducted within their jurisdictions through the lawful exercise of inherent sovereignty and associated rights to self-government.[15] In enacting IGRA, Congress affirmed the relationship between Tribal sovereignty and Tribal government gaming[16] but imposed limits on the conduct of certain forms of gaming.[17] Specifically, a Tribal government's conduct of Class III gaming within its jurisdiction and pursuant to its duly formed laws is lawful *only* if it occurs within "a state that *permits such gaming* for any purpose by any person, organization, or entity" and the conduct is "in conformance with a Tribal-State compact *entered into by the Indian tribe and the State*" which is "in effect" under IGRA.[18]

Thus, as a threshold matter, IGRA requires inquiry into two matters of Federal law that rest on analyses of State law:  *First*, whether the *form of gaming* purported to be allowed under these agreements would be otherwise lawful under Oklahoma law, and *second*, whether the *State of Oklahoma has validly "entered into"* these agreements under IGRA.[19] As explained below, the agreements are defective under both inquiries.

a. *The agreements purport to allow forms of Class III gaming expressly prohibited by Oklahoma law.*

With respect to the question of whether Oklahoma law "permits" the gaming purportedly allowed under Governor Stitt's agreements "by any person, organization, or entity," Governor Stitt has offered an unsigned, weakly sourced, and general legal memorandum presenting an extended and inferential argument that "event wagering" (or sports betting) actually *is* permitted under Oklahoma law for IGRA purposes.[20] He is wrong.

---

[15] See generally *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 207 (1987). Accord *Navajo Nation v. Dalley*, 896 F.3d 1196, 1200 (10th Cir. 2018) (recognizing Cabazon as barring States from regulating gaming on Tribal lands "without Congressional authorization").

[16] 25 U.S.C. § 2702.

[17] 25 U.S.C. § 2710(d)(1).

[18] 25 U.S.C. § 2710(d)(1) (emphasis added). With respect to the compacting requirement, see also *Pueblo of Santa Ana*, 104 F.3d at 1557 (holding State's entry to a compact must be valid under State law for entry to be legally effective under IGRA).

[19] *Pueblo of Santa Ana*, 104 F.3d at 1557-58 (addressing interplay of Federal and State law in inquiry as to whether a compact is validly in effect).

[20] Memorandum to Paula Hart, Director of DOI Office of Indian Gaming, from Office of the General Counsel, Oklahoma Governor's Office (Apr. 24, 2020), available at https://www.governor.ok.gov/static-assets/documents/gamingcompacts/Memorandum_from_General_Counsel.pdf.

AR_0000216

Immediately following Governor Stitt's surprise announcements of his new "compacts," Oklahoma's chief legal officer rejected them as inconsistent with Oklahoma law. In public statements following the signing ceremony, Oklahoma Attorney General Mike Hunter said—

> The agreements signed today between the governor, the Otoe-Missouria Tribe and the Comanche Nation are not authorized by the state Tribal Gaming Act, Title 3A, Section 261 et sec. The governor has the authority to negotiate with Tribes on behalf of the state. However, only gaming activities authorized by the act may be the subject of a tribal gaming compact. Sports betting is not a prescribed "covered game" under the act.[21]

*Pro Tem* Treat and Speaker McCall echoed Attorney General Hunter's position in their own letter to Governor Stitt,[22] and each is correct that sports betting is prohibited by Oklahoma law.

But so, too, are other games purportedly allowed under Governor Stitt's agreements.

Oklahoma's State-Tribal Gaming Act empowers the Oklahoma Horse Racing Commission to license the *only* non-Tribal gaming allowed under Oklahoma law and provides—

> This act is game-specific and shall not be construed to allow the operation of any other form of gaming unless specifically allowed by this act. This act shall not permit the operation of slot machines, *house-banked card games*, *house-banked table games*, or *games where winners are determined by the outcome of a sports contest*.[23]

In violation of this plain statutory language, Governor Stitt's new agreements purport to authorize betting on sports contests *as well as* house-banked card and table gaming.

Finally, even the Tribes who signed his new agreement do not agree with Governor Stitt. Following the Attorney General's announcement, Comanche Nation Chairman Nelson and Otoe-Missouria Chairman Shotten issued a joint statement acknowledging Oklahoma law "*currently*

---

[21] Randy Krehbiel, "Oklahoma AG Mike Hunter says Gov. Stitt's new tribal gaming compacts 'not authorized' by state law," *TULSA WORLD* (Apr. 22, 2020), available at https://www.tulsaworld.com/news/local/government-and-politics/oklahoma-ag-mike-hunter-says-gov-stitts-new-tribal-gaming-compacts-not-authorized-by-state/article_1e9bd0d3-3d50-50c0-8233-a3d924f01f44.html.

[22] Letter to Oklahoma Governor Kevin Stitt from Oklahoma House Speaker Charles McCall and Oklahoma Senate President *Pro Tempore* Greg Treat (Apr. 23, 2020), available at http://s3.amazonaws.com/content.newsok.com/documents/McCall%20Treat%20ltr%20to%20Stitt%2004222020[1].pdf; see also Randy Krehbiel, "Oklahoma's legislative leaders tell Gov. Stitt his new tribal gaming compacts are invalid," *TULSA WORLD* (Apr. 22, 2020), available at https://www.tulsaworld.com/news/local/government-and-politics/oklahomas-legislative-leaders-tell-gov-stitt-his-new-tribal-gaming-compacts-are-invalid/article_958c7b77-5573-50d5-96bf-a0c57dfb8203.html.

[23] 3A O.S. § 262(H) (emphasis added). It also bears noting that the Oklahoma Legislature in recent years has consistently rejected or otherwise failed to act on proposals to legalize sports betting in Oklahoma. E.g., Sean Murphy, "Oklahoma tribes, lawmakers eye way toward sports betting," *ENID NEWS & EAGLE* (Jun. 5, 2018), available at https://www.enidnews.com/news/state/oklahoma-tribes-lawmakers-eye-way-toward-sports-betting/article_28e05733-0360-5eda-85c7-40774879d840.html.

AR_0000217

*does not authorize event wagering*" and that they entered these agreements in the hope that "the state legislature will *eventually* see event wagering as an important source of revenue, and *authorize the activity* accordingly."[24] Counsel for the two Tribes, Rob Rosette, likewise demonstrated a certain aspirational noncommittal on the subject, telling reporters "the tribes could operate under other provisions of the compacts and add sports betting *if it should ever be approved by the Legislature*"[25] and that sports book is "not an issue we'll fight about."[26]

The facts and law accordingly show Governor Stitt's claim that Oklahoma law already allows for "event wagering" is contradicted by the Oklahoma Attorney General, leadership of the Oklahoma Legislature, the plain text of Oklahoma statute, and the Tribes with whom he signed his new agreements.

In short, Governor Stitt stands completely alone on this legal issue.

Seemingly undaunted, he attempts to supplement his position with the alternative claim that IGRA preempts him from declining to negotiate on matters that may go beyond Oklahoma law.[27] As an abstract principle, he may not be wrong, but as applied to these new agreements, the argument ignores that the reach of his negotiations cannot exceed the grasp of his office's authority to bind Oklahoma.

The question is not whether a State may *negotiate* for terms that depart from what State law presently allows. The very nature of intergovernmental compacting encourages such approach. The problem is not in the *negotiating* but in the *entering*. IGRA requires Tribes to enter compacts with *States*, not *State governors*,[28] and to be valid, a compact must be validly

---

[24] Staff, "Tribal Leaders Respond to Assertions by Okla. Legislators That New Gaming Compacts Are 'Legally Flawed,'" *NATIVE BUSINESS MAG* (Apr. 24, 2020) (emphasis added), available at https://www.nativebusinessmag.com/tribal-leaders-respond-to-assertions-by-okla-legislators-that-new-gaming-compacts-are-legally-flawed/. See also Staff, "Tribes Defend New Compacts," *THE MCCARVILLE REPORT* (Apr. 24, 2020), available at http://mccarvillereport.com/archives/52649; Staff Report, "Otoe-Missouria Tribe Chairman John Shotten and Comanche Nation Chairman William Nelson, Sr., comment on perspectives of both governor and attorney general; nuanced analysis offered," *THE CITY SENTINEL* (Apr. 23, 2020), available at http://city-sentinel.com/2020/04/otoe-missouria-tribe-chairman-john-r-shotton-and-comanche-nation-chairman-william-nelson-sr-comment-on-perspectives-of-both-governor-and-attorney-general-nuanced-analysis-offered/.

[25] Randy Ellis, "Week's events make future of Oklahoma tribal gaming murkier," *OKLAHOMAN* (Apr. 26, 2020) (emphasis added), available at https://oklahoman.com/article/5660907/weeks-events-make-future-of-oklahoma-tribal-gaming-murkier.

[26] Randy Krehbiel, "Tribes won't press sports betting issue, attorney says," *TULSA WORLD* (Apr. 25, 2020), available at https://www.tulsaworld.com/news/local/government-and-politics/tribes-wont-press-sports-betting-issue-attorney-says/article_fecee9ed-0798-5aba-9abf-bf4f367e4806.html.

[27] Memorandum to Paula Hart, Director of DOI Office of Indian Gaming, from Office of the General Counsel, Oklahoma Governor's Office at 5-6 (Apr. 24, 2020), available at https://www.governor.ok.gov/static-assets/documents/gamingcompacts/Memorandum_from_General_Counsel.pdf.

[28] Cf. *Estom Yumeka Maidu Tribe v. California*, 163 F. Supp. 3d 769, 780 (E.D. Calif. 2016) ("The Court is bound to evaluate negotiation as described in the broad sense under the IGRA, *which refers only to the state, not the governor or the legislature*." (Emphasis added.)).

*entered* by those officials who have the authority to bind their respective governments to the mutual exchange of promises the compact represents.[29] If the parties negotiating lack that authority, then their terms must be ratified by others who do; after all, as a form of intergovernmental contract, "a compact is not *valid* unless properly authorized,"[30] and as with all such agreements, "parties entering into one must assure themselves that each contracting party is authorized to enter into the contract."[31] While the new agreements represent their *signatories* have authority to bind the *parties*, the facts and law do not bear that representation out, as discussed in the next section.

        b.  *Oklahoma has not validly "entered into" the agreements*.

In submitting the new agreements, Governor Stitt argues his office has the authority not only *to negotiate compacts* with Tribes but also *to bind Oklahoma to them without the engagement of any other official or branch of State government*. His implementation of this position can be found at Part 14 of the proposed agreements—

> This Compact, when signed by the Governor of the State of Oklahoma, is approved by the State of Oklahoma. No further action by the State or any State official is necessary for this Compact to take effect upon approval by the Secretary of the Interior. The undersigned represent that they are duly authorized and have the authority to execute the Compact on behalf of the Party for whom they are signing.[32]

In support of his position, he claims that some number of unspecified non-gaming compacts have been negotiated and entered between Oklahoma governors and Tribes "and none of which were approved by the legislature."[33] While it may be true that an Oklahoma governor *may* enter a compact with a Tribe without approval of any other official or branch of State government and that governors *have* indeed done so in the past, *that has never been the process by which Oklahoma has bound itself to a Tribal-State gaming compact.*

The State has entered into gaming compacts with Tribes by only two means: <u>Either</u> by codified offer of a model compact that was approved by a voter referendum,[34] which offer

---

[29] *Santa Ana Pueblo*, 104 F.3d at 1556.

[30] Id. at 1557.

[31] Id. at 1556.

[32] E.g., Comanche agreement at Part 14.

[33] Letter to Oklahoma Speaker Charles McCall and Oklahoma President *Pro Tempore* Greg Treat from Oklahoma Governor Kevin Stitt (Apr. 24, 2020), available at https://www.governor.ok.gov/static-assets/documents/gaming compacts/JKS_Ltr_to_House_and_Senate_Leadership.pdf.

[34] Enrolled Senate Bill No. 1252, enacted by the 2nd Regular Session of the 49 Legislature of the State of Oklahoma, State Question Number 712 and Legislative Referendum Number 335 (May 19, 2004), available at https://www.sos.ok.gov/documents/questions/712.pdf. See, e.g., Tribal Gaming Compact Between the Chickasaw Nation and the State of Oklahoma, as approved by DOI, 70 Fed. Reg. 6725 (Feb. 8, 2005), available at https://www. sos.ok.gov/documents/filelog/63568.pdf.

AR_0000219

memorializes the management of separation of powers issues under the Oklahoma Constitution,[35] *or* the Oklahoma Governor has negotiated and entered the agreement that was then submitted to and approved by the Oklahoma Legislature's Joint Committee on Tribal-State Relations.[36] In the ongoing gaming compact litigation, in fact, Governor Stitt has argued that "[t]he only Tribal-State gaming compacts by and between the State and the Tribes in effect are compacts for interstate common pari-mutuel pool under Off-Track Watering Compacts,"[37] *which are the very compacts approved by the Joint Committee*. Governor Stitt's affirmation of these legislatively approved gaming compacts as lawful is impossible to square with the argument his unnamed attorney makes to DOI's Office of Indian Gaming.[38]

In short, Governor Stitt points neither to an affirmative basis for his claim to exclusive executive authority nor to a single example of this having ever been done before. Oklahoma's entire and established record of entering gaming compacts with Tribes, in fact, cuts directly against him. His argument, frankly, just shoots wide of the mark: The fight he has picked with the Oklahoma Legislature is not some abstract debate over whether some hypothetical compact requires legislative approval to be lawful but turns, instead, on whether an Oklahoma Governor, by compact entered under claim of exclusive executive authority, may disregard or overrule existing statute and create durable substantive law on behalf of Oklahoma.

Plainly, he cannot.

As *Pro Tem* Treat and Speaker McCall put it, Governor Stitt "cannot make legal that which statute makes illegal."[39] He cannot do so by compact or otherwise. Instead, when negotiating any agreement, "the Governor must conform to the public policy enacted into law by the Legislature, as the role of the Legislative Branch is to establish public policy, and the role of

---

[35] See 3A O.S. § 280 ("The State of Oklahoma through the concurrence of the Governor after considering the executive prerogatives of that office and the power to negotiate the terms of a compact between the state and a tribe, and by means of the execution of the State-Tribal Gaming Act, and with the concurrence of the State Legislature through the enactment of the State-Tribal Gaming Act, hereby makes the following offer of a model tribal gaming compact regarding gaming to all federally recognized Indian tribes [in Oklahoma].").

[36] See generally 74 O.S. §§ 1221, 1223; see, e.g., State of Oklahoma Chickasaw Nation Off-Track Wagering Compact, as approved by DOI, 69 Fed. Reg. 34,686 (Jun. 22, 2004), available at https://www.sos.ok.gov/documents/filelog/62519.pdf.

[37] Compact Litigation, doc. no. 15 at 22 (Jan. 22, 2020).

[38] Memorandum to Paula Hart, Director of DOI Office of Indian Gaming, from Office of the General Counsel, Oklahoma Governor's Office at 5-6 (Apr. 24, 2020), available at https://www.governor.ok.gov/static-assets/documents/gamingcompacts/Memorandum_from_General_Counsel.pdf.

[39] Letter to Oklahoma Governor Kevin Stitt from Oklahoma House Speaker Charles McCall and Oklahoma Senate President *Pro Tempore* Greg Treat (Apr. 23, 2020), available at http://s3.amazonaws.com/content.newsok.com/documents/McCall%20Treat%20ltr%20to%20Stitt%2004222020[1].pdf; see also Randy Krehbiel, "Oklahoma's legislative leaders tell Gov. Stitt his new tribal gaming compacts are invalid," *TULSA WORLD* (Apr. 22, 2020), available at https://www.tulsaworld.com/news/local/government-and-politics/oklahomas-legislative-leaders-tell-gov-stitt-his-new-tribal-gaming-compacts-are-invalid/article_958c7b77-5573-50d5-96bf-a0c57dfb8203.html.

AR_0000220

the Executive Branch is to execute that policy."[40] Indeed, fundamental to Governor Stitt's obligations under the Oklahoma Constitution is to "cause the laws of the State to be faithfully executed."[41] His pretending to the powers of a self-proclaimed "lawmaker" ignore this duty.

As already noted, Governor Stitt exceeds his State law authority by seeking to "make legal that which statute makes illegal"—namely, the conduct of "events wagering" and house-banked games. But his overreach goes further. Consider, for example, the following nonexhaustive list of other durable provisions of law he seeks to create in his agreements—

- Provision of five (5) licenses for State conduct of "event wagering," including prescription of terms and conditions relating to exercise those licenses, such as substantive and geographic constraints on their exercise—notwithstanding, *inter alia*, statutory prohibition against the State licensure of "games where winners are determined by the outcome of a sports contest" and constitutional limits on his authority;[42]

- Vesting "Governor of the State" with power to approve new games for Tribal play under compact—notwithstanding, *inter alia*, express prohibitions codified in the Oklahoma State-Tribal Gaming Act and constitutional limits on the powers of the Oklahoma Governor;[43]

- Establishment of a complex mediation and arbitration procedure for purposes of revising revenue-share rates in fifteen (15) years—notwithstanding, *inter alia*, the Oklahoma Governor's limited role with respect to any renegotiations of revenue-share rates under Oklahoma's only codified gaming compact offer;[44] and

- Vesting "Governor for the State" with "exclusive authority to settle and negotiate any dispute arising under the Compact pursuant to Article 6, Section 8 of the Oklahoma Constitution"—notwithstanding, *inter alia*, the Oklahoma Attorney General's constitutional and statutory authority to act as Oklahoma's chief legal officer in all matters involving the State.[45]

---

[40] Oklahoma Attorney General Op. No. 2004 OK AG 27 (Aug. 26, 2004) (citing *Tweedy v. Oklahoma Bar Ass'n*, 624 P.2d 1049, 1054 (Okla. 1981)).

[41] OKLA. CONST., art. 6, § 8.

[42] Compare, e.g., Comanche agreement at Part 2.A.13.b. (reserving licenses and appearing to subject exercise of all "event wagering" license rights, whether State or Tribal, to specific locational restrictions) with 3A O.S. § 262(H).

[43] Compare, e.g., Comanche agreement at Part 3.F. (providing "new games may be authorized in an appendix approved by the Governor of the State") with 3A O.S. § 262(H).

[44] Compare, e.g., Comanche agreement at Part 10.B.5. (requiring affirmative and binding renegotiation of revenue-share rates with provision for determination by extra-governmental "panel") with Oklahoma Model State-Tribal Gaming Compact at Part 15.B., codified at 3A O.S. § 281 (providing with specific time restrictions that "the state, acting through its Governor, may request to renegotiate" the compact's revenue-share and exclusivity provisions).

[45] Compare, e.g., Comanche agreement at Part 6.F. with Okla. Const., art. 6, § 1 and 74 O.S. § 18b(A)(1) through -(3). Accord *State, ex rel. Derryberry v. Kerr-McGee Corp.*, 516 P.2d 813, 1973 OK 132, ¶¶20-27 ("We conclude . . .

Locally, Governor Stitt's actions have sparked conflict over whether he will be allowed to transcend the constitutional bounds of his office. We take no issue with his apparent belief that Oklahoma Governors may enter *certain* intergovernmental compacts *without* the involvement of other Oklahoma officials, but this belief is not relevant to the defective agreements he submitted to DOI on April 23. And please remember: On this point, you do not need to take just our word for it, since you have as well the public objections of other constitutional officers of Oklahoma government. For purposes of IGRA, the Governor's agreements simply are *not* valid compacts.[46]

        c.    *Even if DOI opts not to disapprove the agreements, it should take no action nor publish any notice or other statement that could be construed as signaling Federal ratification or cure for the defects in Governor Stitt's agreements.*

Of course, the "the Secretary is not expected to *resolve* state law issues" such as these.[47] However, neither can it be expected to *ignore* them. We believe a proper application of law and policy compel disapproval of these compacts, but at minimum, we believe DOI should avoid taking *any* action or offering *any* public notice or statement that could be construed as ratifying or curing *any* defect in Governor Stitt's formation of these agreements.[48]

For example, we refer you to a recent order entered by Judge DeGiusti in the ongoing gaming compact litigation, Cherokee Nation, et al., v. Stitt, Civ. No. 19-1198 (W. Dist. Okla.). Immediately prior to the public announcement of their new agreements, Governor Stitt, the Comanche Nation, and the Otoe-Missouria Tribe moved for the two Tribes' dismissal from the suit claiming a full and final settlement of their respective claims against one another. Judge DeGiusti granted dismissal with prejudice but, importantly, did so "without any review or approval of the settlement agreements (which the movants have not requested)," i.e., without ratifying or endorsing the agreements the parties claimed to have reached.[49]

Likewise, while the submitted agreements merit DOI's issuing a *disapproval* letter, we believe, no matter what action DOI takes, it must take pains *not* to intimate that it agrees with or endorses Governor Stitt's arguments regarding Oklahoma law or that it otherwise ratifies these agreements as lawfully entered and valid under IGRA.

---

the Attorney General's powers are as broad as the common law unless restricted or modified by statute, and that his authority to dismiss, settle or compromise the litigation, in the absence of fraud or collusion, is undisputed."); *State, ex rel. Nesbitt v. District Court of Mayes County*, 440 P.2d 700, 1967 OK 228, ¶17 ("In the absence of explicit legislative or constitutional expression to the contrary, the attorney general possesses complete dominion over every litigation in which he properly appears in the interest of the state whether or not there is a relator or some other nominal party.").

[46] Cf. generally *Pueblo of Santa Ana*, *supra*. at n.1.

[47] E.g., Id. at 1557.

[48] E.g., Id. at 1557 (rejecting argument that secretarial approval of compacts "cured" any state law defects or otherwise "ratif[ied] or authorize[d] an unauthorized state actor's conduct").

[49] Compact Litigation, doc. no. 124 (Apr. 24, 2020). Accord id. at 3 (observing "the terms of their settlement agreements (which are not before the Court)").

AR_0000222

**2.** ***Oklahoma Governor Stitt's proposed agreements should be disapproved for attempting to impose a Tribal revenue-share obligation without offering a meaningful State concession of significant economic benefit to the Tribes.***

In addition to the defects outlined above, DOI should disapprove these compacts for seeking to impose a Tribal revenue-share obligation without Oklahoma's offering any meaningful concession in exchange. As the U.S. Government Accounting Office has found, this defect is the leading cause for administrative disapproval of proposed agreements—

> In [DOI] decision letters we reviewed, the most common reason for disapproving compacts was that the contained revenue sharing provisions Interior found to be inconsistent with IGRA. For example, Interior found that the concessions offered by the state in some compacts were not proportional to the value of the revenues the state sought from the tribe. Interior disapproved these compacts because they did not eliminate or sufficiently reduce the tribe's payment to the state if the tribe's exclusivity ended or was diminished in the future. In addition, Interior found the revenue sharing payment to the state in some compacts to be a tax, fee, charge, or assessment on the tribe, which is prohibited by IGRA.[50]

Governor Stitt's agreements merit disapproval on these grounds. To explain our analysis, we will start with a summary of the revenue-share/"substantial exclusivity" provisions of our own recently renewed gaming compact, explicate DOI's analysis of it, and apply DOI's analysis to Governor Stitt's proposed agreements.

      a. *DOI approved the revenue-share obligations in our current compact as reasonably justified based on a meaningful concession by Oklahoma that provided significant benefit to the Chickasaw Nation.*

Under our current "covered games" compact,[51] we are obliged to make revenue-share payments to Oklahoma of 4%-10% with respect to our conduct of "covered games," which is a defined subset of Class III gaming activities. We have taken on this obligation in exchange for the State's guarantee of "substantial exclusivity" for Tribal gaming within the Oklahoma market. And to be clear:  There is no *inferred* relationship between these elements, as it is *explicitly stated*—

> The parties acknowledge and recognize that this Compact provides tribes with substantial exclusivity and, consistent with the goals of IGRA, special opportunities for tribal economic opportunity through gaming within the external boundaries of Oklahoma in respect to the covered games. *In consideration thereof, so long as the state does not change its laws after the effective date of this Compact to permit the operation of any additional form of gaming by any [non-*

---

[50] U.S. GAO, *INDIAN GAMING:  REGULATION AND OVERSIGHT BY THE FEDERAL GOVERNMENT, STATES, AND TRIBES*, GAO-15-355 at 20 (Jun. 2015) (footnotes omitted), available at https://www.gao.gov/assets/680/670603.pdf.

[51] Tribal Gaming Compact Between the Chickasaw Nation and the State of Oklahoma, as approved by DOI, 70 Fed. Reg. 6725 (Feb. 8, 2005), available at https://www.sos.ok.gov/documents/filelog/63568.pdf.

AR_0000223

> *Tribal licensee of the Oklahoma Horse Racing Commission], or change its laws*
> *to permit any additional electronic or machine gaming within Oklahoma, the tribe*
> *agrees to pay the following fees . . . .*[52]

Our current compact also provides—

> *In consideration for the covenants and agreements contained herein, the state*
> *agrees that it will not, during the term of this Compact, permit the nontribal*
> *operation of any machines or devices to play covered games or electronic or*
> *mechanical gaming devices otherwise presently prohibited by law within the state*
> *in excess of the number and outside of the designated locations authorized by the*
> *State-Tribal Gaming Act.*[53]

In approving this revenue-share/"substantial exclusivity" structure, the Bush Administration's DOI laid out its controlling legal inquiry and concluded as follows—

> Our analysis of this revenue sharing agreement begins with section 25 U.S.C.
> 2710(d)(4). This section provides that "nothing in this section shall be interpreted
> as conferring upon a State or any of its political subdivisions authority to impose
> any tax, fee, charge or other assessment upon an Indian tribe . . . to engage in
> Class III gaming activity." *As a result, the Department of the Interior has sharply*
> *limited the circumstances under which Indian tribes can make direct payments to*
> *a state for purposes other than defraying the costs of regulating Class III gaming*
> *activities*.

> As our previous compact decision letters have stated, in order to determine
> whether revenue sharing violates 25 USC 2710(d)(4), *we first look to whether the*
> *State has offered meaningful concessions*. We have traditionally viewed this
> concept as one where the State concedes something that it was otherwise not
> required to negotiate that provides a benefit to the Nation, i.e., exclusivity or some
> other benefit. *In other words, we examine whether the State has made meaningful*
> *and significant concessions in exchange for receiving revenue sharing.*

> *The next step in our analysis is to determine whether these concessions result in a*
> *substantial economic benefit to the Nation*. The payment to the state must be
> appropriate in light of the value of the economic benefit conferred on the Nation.
> This analysis (meaningful concessions by the State and substantial economic
> benefit conferred on the tribe) allows us to ascertain that revenue-sharing
> payments are the product of arms-length negotiations, and not tantamount to the
> imposition of a tax, fee, charge or other assessment prohibited under 25 U.S.C.
> 2710(d)(4).

---

[52] Tribal Gaming Compact Between the Chickasaw Nation and the State of Oklahoma at Part 11.A. (emphasis added), as approved by DOI, 70 Fed. Reg. 6725 (Feb. 8, 2005), available at https://www.sos.ok.gov/documents/filelog/63568.pdf. Accord 3A O.S. § 280 at Part 11.A. (codifying Oklahoma's model compact offer).

[53] Id. at Part 11.E. (emphasis added); 3A O.S. § 280 at Part 11.A. (codifying Oklahoma's model compact offer).

Under the first prong of our analysis, we believe that the State has made meaningful concessions. It has authorized Class III gaming for tribes, provided for a zone of exclusivity, and limited non-tribal gaming. Under the second prong of our analysis, we believe that these concessions provide a substantial economic benefit to the tribe. . . . [Based on DOI's economic analysis over the compact's first 15-year term], *we conclude that broader access to Class III electronic games, meaningful restrictions on the number of non-Indian facilities with access to Class III gaming devices, as well as meaningful limits on the number of such devices and exclusive rights over Class III card games are significant concessions by the State which offer the Nation substantial economic benefits. [And in reaching this conclusion, we] note that Part 11 also provides for a payment from the State to eligible tribes in the amount of 50% of any increase in the non-tribal entities' adjusted gross revenues following the addition of machines in excess of the statutory limit to a non-tribal operation, and both the Nation and State agree that it provides for the cessation of revenue-sharing payments to the State should the exclusive rights of compacting tribes to operate covered games be diminished.*[54]

In short, citing IGRA's prohibition against State taxation of Tribal gaming,[55] DOI explained that it "has sharply limited the circumstances" under which it will approve Tribal revenue-share obligations in Tribal-State gaming compacts. This is a standard DOI analysis, generally applied to proposed IGRA compacts. DOI's adherence to it prevents bad faith efforts to extort value from Tribes by leveraging compacts for inappropriate purposes,[56] and this is not some archaic hold-over of past generation's paternalism. It is, instead, affirmation of a policy that serves Federal self-interest in the success of IGRA, which was enacted as a means for providing a stable regulatory environment so Tribes could develop revenues necessary for economic self-sufficiency and self-government. Anything that inappropriately reduces those revenues increases the Federal government's financial burdens in Indian country.

To implement this analysis, DOI accordingly relies on a common sense test:  Has the State offered a "meaningful concession" in exchange for the Tribal revenue-share obligation, and do those concessions represent "substantial economic benefit" to the compacting Tribe such that DOI can reasonably conclude the Tribal obligation is not merely a State effort to "tax" Tribal gaming. Ultimately, the goal is to ascertain an

---

[54] Letter to Governor Bill Anoatubby from U.S. Department of the Interior Principal Deputy Assistant Secretary for Indian Affairs Mike Olsen at 1-3 (Jan. 12, 2005) (emphasis added), available at https://www.bia.gov/sites/bia.gov/files/assets/as-ia/oig/oig/pdf/idc-038409.pdf.

[55] 25 U.S.C. § 2710(d)(4).

[56] E.g., generally *Rincon Band v. Schwarzenegger*, 602 F.3d 1019, 1036 (9th Cir. 2010) ("Because we hold above that general fund revenue sharing is neither authorized by IGRA nor reconcilable with its purposes, it is difficult to imagine what concessions the State could offer to rebut the strong suggestion of bad faith arising from such demands. But even if it were possible to conjure up an exceptional circumstance where such would be the case, where, as here, the State demands significant taxes and fails to offer any "meaningful concessions" in return, a finding of bad faith is the only reasonable conclusion.").

AR_0000225

objective basis for concluding that a compact was produced by "arms-length negotiations" and is not premised on some ephemeral or subjective "want" or "value."[57]

Governor Stitt's agreements fail to satisfy this established test under IGRA.

        b.    *Oklahoma Governor Stitt's new agreements would impose a revenue-share obligation on the Tribes with no commensurate meaningful concession by the State and no legitimate benefit for the Tribes.*

After signing the new agreement, Chairman Shotten of the Otoe-Missouria Tribe said his Tribe continued to "stand in unity with the other tribes that the prior compact automatically renewed,"[58] and prior to signing Governor Stitt's agreement, Comanche Nation Chairman Nelson affirmed "the Nation unequivocally believes the compacts automatically renew at the end of the year."[59] Notwithstanding this position, both Tribal leaders have said they saw the new agreements as representing an opportunity to do more for their Tribes,[60] which means the current compacts should be taken as the baseline against which the new agreements should be judged. In making a comparison, three measures seem relevant: (i) exclusivity, (ii) new games, and (iii) new facilities.

        (i)    <u>*The new agreements include no Tribal "exclusivity" protections or enforcement mechanisms while, instead, expressly authorizing expansions of State gaming*</u>.

In comparing the revenue-share/"substantial exclusivity" provisions under the current compacts and Governor Stitt's agreement, the new agreement eviscerates the State's obligations and provides virtually no value to the Tribes. As outlined above, the current compacts' provisions impose an express prohibition against the State's authorizing additional forms of gaming that would intrude on Tribal exclusivity,[61] which

---

[57] U.S. GAO, *INDIAN GAMING: REGULATION AND OVERSIGHT BY THE FEDERAL GOVERNMENT, STATES, AND TRIBES*, GAO-15-355 at 20 (Jun. 2015) (footnotes omitted), available at https://www.gao.gov/assets/680/670603.pdf (noting DOI rejection of, for example, State support for trust land acquisition as failing to "provide a quantifiable economic benefit that justified the proposed revenue sharing payments" and resulting in DOI's viewing "the payment to the state as a tax or other assessment in violation of IGRA").

[58] Editor, "Otoe-Missouria Tribe signs new gaming compact with state," *THE NEWKIRK HERALD JOURNAL* (Apr. 30, 2020), available at https://www.newkirkherald.com/2020/04/30/otoe-missouria-tribe-signs-new-gaming-compact-with-state/.

[59] Comanche Nation (press release), "Comanche Nation Statement From Chairman William Nelson, Sr." (Sep. 16, 2019), available at https://www.prnewswire.com/news-releases/comanche-nation-statement-from-chairman-william-nelson-sr-300918866.html.

[60] E.g., *NEWKIRK HERALD JOURNAL*, supra ("[W]e saw negotiating a new compact as something that was in the best interest of our tribe."); Kyle Payne, "Comanche Nation leaders discuss new Gaming Compact," *KSWO 7NEWS* (Apr. 22, 2020) ("They gave us an incentive, no ante on poker games and that's really good."), available at https://www.kswo.com/2020/04/22/comanche-nation-leaders-discuss-new-gaming-compact/.

[61] Supra at 13-16.

prohibition is made enforceable by express language that, *one*, conditions Tribal payments on State compliance and, two, imposes liquidated damages in the event of certain breaches. The new agreement includes no such comparable provisions.

In the new agreement, the entirety of the State's "obligations" regarding exclusivity can be found at Part 10.A., which summarily recites:  "The Parties acknowledge and agree that this Compact provides the Tribe with substantial exclusivity over class III Covered Gaming consistent with the goals of IGRA."[62] Based thereon, Part 10.B. provides that "[i]n consideration of the Acknowledgement set forth in subsection A of this Part, the adequacy of which is hereby agreed to, and pursuant to the terms of this valid Compact, the Tribe agrees to pay the following Substantial Exclusivity fees . . . ."[63] Nowhere in this rote tautology can be found any binding obligation on Oklahoma to refrain from allowing additional non-Tribal gaming; in fact, it does not even provide an elementary definition of what the parties mean by the term. And given that Part 12 goes on to provide that the Tribes' prior compacts will be superseded by this new agreement once it is approved by DOI, any "substantial exclusivity" obligation Oklahoma previously owed the Tribes would be nullified.

What is more, while the new agreements expressly limit the Tribes to gaming under the terms of this new "compact," they include also the Tribes' express acknowledgements that Oklahoma may expand a new internet-facilitated "iLottery" gaming system and hold five (5) State "event wagering" licenses without infringing on any State exclusivity obligation.[64]

Accordingly, under these agreements, the Tribes would give up the "substantial exclusivity" secured under the prior compact, "acknowledge and agree" to some sort of exclusivity that is neither described nor made enforceable, and then agree to the State's expansion of its own gaming operations. As such, "exclusivity" cannot *reasonably* serve as a legitimate basis for *any* Tribal revenue-sharing obligations in this new agreement.

> (ii)  *The new agreements do not lawfully authorize any new forms of gaming for either Tribe and would otherwise impose an unjustifiable and usurious revenue-share rate of approximately 22% on "event wagering.*"

As already discussed, the new agreements purport to authorize new forms of gaming, including house-banked gaming and "event wagering."[65] It may be reasonable, assuming some effective "exclusivity" mechanism, for a new game to justify a revenue-share obligation with respect to the conduct of the new game, itself. In fact, this is the

---

[62] E.g., Comanche agreement at Part 10.A.

[63] E.g., Comanche agreement at Part 10.B.

[64] Compare, e.g., Comanche agreement at Part 3.A. with, e.g., Comanche agreement at Part 3.B. and Part 2.A.13.b.

[65] E.g., Comanche agreement at Parts 2.A.7., -.13., -.22., & -.23 and Part 3.

AR_0000227

model Oklahoma used in 2018 when it authorized the inclusion of certain new table games as "covered games" under the existing compacts; it authorized the new game by statute and extended a supplemental compact offer to the Tribes, which offer was contingent on the accepting-Tribes' (i) conducting the game in accord with all terms and conditions of the existing compact and (ii) paying a ten percent (10%) exclusivity-based revenue-share.[66]

However, with respect to the alleged expansion of authorized table games here, no new rate is proposed. Instead, those table games are lumped in with *all* "covered games," including games otherwise authorized under Oklahoma' State-Tribal Gaming Act, and subjected to a single rate structure. It is, accordingly, difficult to determine what value to ascribe to the alleged expansion of authorized table games.

With respect to the alleged authorization of "event wagering," there *is* a game-specific rate, i.e., one and one-tenth percent (1.1%) of, essentially, coin-in.[67] It is generally accepted that the house's margin on sports betting is five percent (5%). To the extent that is accurate, a rate of one and one-tenth percent (1.1%) on coin-in would amount to twenty-two percent (22%) of each Tribe's post-payout earnings! Such rate is more than twice the current compact's maximum rate and would be among the highest revenue-share rate paid by any Tribe in the country.[68] Furthermore, depending on how they plan to operate sports book, a rate this high could result in Oklahoma's earning more from the conduct of the game than the Tribes would themselves.

The prior Oklahoma administration also attempted to impose a rate like this. In a proposed settlement of its disputes with the Cheyenne and Arapaho Tribes, the State and those Tribes executed an amendment to their current compact to provide for international internet-based gaming. In that amendment, those Tribes were to pay Oklahoma twenty percent (20%) of the revenues from those games. In disapproving the amendment, DOI applied "great scrutiny" and the analysis outlined above and concluded it could determine no reasonable basis for accepting such a high rate, noting also that the parties had provided none.[69] Likewise, Governor Stitt's new agreements merit disapproval.

---

[66] 3A O.S. § 280.1 (codifying Oklahoma's "Gaming Compact Supplements" to allow for additional "covered games" under existing compacts); e.g., Chickasaw Nation and State of Oklahoma Gaming Compact Non-House Banked Table Games Supplement, as approved by DOI (Aug. 9, 2018), available at https://www.sos.ok.gov/documents/filelog/92595.pdf.

[67] E.g., Comanche agreement at 10.B.2.a.

[68] U.S. GAO, *INDIAN GAMING: REGULATION AND OVERSIGHT BY THE FEDERAL GOVERNMENT, STATES, AND TRIBES*, GAO-15-355 at 19, fig.5 (Jun. 2015) (footnotes omitted), available at https://www.gao.gov/assets/680/670603.pdf. Accord Duke Chen, "Tribal Casino Revenue Sharing in Other States," 2019-R-0135, Office of Legislative Research (Connecticut) (Aug. 13, 2019), available at https://www.cga.ct.gov/2019/rpt/pdf/2019-R-0135.pdf.

[69] Letter to Cheyenne and Arapaho Tribes Governor Janice Prairie Chief-Boswell from U.S. Department of the Interior Assistant Secretary for Indian Affairs Kevin Washburn (Aug. 1, 2013), available at https://www.bia.gov/sites/bia.gov/files/assets/as-ia/oig/pdf/idc1-028608.pdf.

AR_0000228

All this aside, of course, these "new" games represent only illusory value, as both forms are illegal under Oklahoma law and Governor Stitt lacks the authority to bind the State to the promises he attempts to make.[70] Accordingly, neither house-banked games nor "event wagering" could be considered elements of value (let alone "substantial economic benefit") to the Tribes in relation to the revenue-share duty they would take on under the new agreements. Similarly, when reviewing a re-submittal of the prior Oklahoma administration's settlement with the Cheyenne and Arapahoe Tribes, DOI characterized the State's "offer" of international internet-based gaming as presenting only "illusory" concession to those Tribes given the State's inability to "control, or even offer, exclusive access to a market of patrons located entirely outside the United States and its territories."[71]

As Oklahoma Senate *Pro Tempore* Treat and Oklahoma House Speaker McCall said in their rebuke of Governor Stitt over these agreements:  "We are disappointed Oklahoma's executive branch made a promise it could not legally keep under current law. Sovereign nations deserve promises Oklahoma can keep."[72] They are correct, and their disappointment is well founded.

"Illusory" concessions simply cannot be the basis for a valid compact under IGRA. And even if the Oklahoma Legislature were to ratify *post hoc* Governor Stitt's offer of these games per the terms of these new agreements, something legislative leaders have said they will not do,[73] there is absolutely no value in this agreements that could justify a twenty-two percent (22%) revenue-share rate.

> (iii)   *The new agreements offer no valid consideration with respect to hypothetical future off-reservation trust land acquisitions*.

The new agreements include unusual provisions relating to off-reservation trust acquisitions for gaming purposes.[74] Not only are there no applications apparently submitted to DOI at this time for any of the acquisitions mentioned, but the agreements fail to indicate anything other than the most general of locations—e.g., "within one (1) mile of a state or federal highway or turnpike running through Love County."[75] There

---

[70] See supra. 6-9.

[71] Letter to Cheyenne and Arapaho Tribes Governor Janice Prairie Chief-Boswell from U.S. Department of the Interior Assistant Secretary for Indian Affairs Kevin Washburn (Nov. 6, 2013), available at https://www.bia.gov/sites/bia.gov/files/assets/as-ia/oig/pdf/idc1-024222.pdf.

[72] Letter to Oklahoma Governor Kevin Stitt from Oklahoma House Speaker Charles McCall and Oklahoma Senate President *Pro Tempore* Greg Treat (Apr. 23, 2020), available at http://s3.amazonaws.com/content.newsok.com/documents/McCall%20Treat%20ltr%20to%20Stitt%2004222020[1].pdf.

[73] Id.

[74] Comanche agreement at Part 4.J.2.a.; Otoe-Missouria agreement at Part J.2.a.

[75] Comanche agreement at Part 2.A.27.

AR_0000229

appears to be no evidence that these acquisitions are anything other than fantasy and hope, and as such, Governor Stitt's purported approval of them is meaningless and cannot be construed as meaningfully binding the State or anyone who succeeds Governor Stitt to his office.[76] And to the extent such future acquisitions would be for locations within the territorial jurisdiction of another Tribe, which would unavoidably be the case with at least one of them, Governor Stitt's concurrence would not save the acquisition from Tribal objection.[77] Nor would it foreclose other local governments from mounting objections.[78]

These provisions are accordingly of wholly illusory value and cannot be factored into DOI's analysis as a "meaningful concession" by the State or as conveying any objective economic benefit to either Tribe.

3.   ***Oklahoma Governor Stitt's proposed agreements should be disapproved for their inclusion of provisions that invite DOI to breach its fiduciary obligation to Tribes.***

IGRA's provision for DOI disapproval based on "the trust obligations of the United States to Indians" is, perhaps, the broadest but least defined basis for disapproving any proposed gaming compact. To the extent a proposed compact is supported by a Tribal signatory, DOI must still scrutinize the submittal with the interests of other Tribes in mind and should disapprove those agreements that suggest material injury to another Tribal sovereign. Furthermore, regardless of Tribal support, DOI should keep an eye on its established precedent and the consistent development of administrative law to protect the stable exercise of Tribal sovereignty and the Federal interest therein. Agreements that would do violence to understood legal principles introduce instability and conflict, into both the law and intergovernmental relations, and should not lightly be approved. Finally, even with respect to Tribal signatories to a proposed compact, DOI should still review the document and ascertain that the Tribe is knowingly putting rights or interests it may have at risk by entering a particular agreement.

When such scrutiny is applied to these proposed agreement, administrative disapproval under IGRA is justified.

a.   *The purported Oklahoma pre-approvals of hypothetical off-reservation trust land acquisitions for Comanche gaming operations within the Chickasaw Nation's jurisdictional territory should be struck as unlawful.*

Apart from all the other defects in these new agreements, the Chickasaw Nation takes *particular exception* to the Comanche Nation's attempt to mount a direct assault on Chickasaw sovereignty. These provisions are superficial and illusory in the value they purport to represent,

---

[76] Cf. Letter to Cheyenne and Arapaho Tribes Governor Janice Prairie Chief-Boswell from U.S. Department of the Interior Assistant Secretary for Indian Affairs Kevin Washburn (Nov. 6, 2013), available at https://www.bia.gov/sites/bia.gov/files/assets/as-ia/oig/pdf/idc1-024222.pdf (disapproving proposed amendment to IGRA compact for "illusory" nature of State's purported "concession").

[77] 25 C.F.R. § 151.8.

[78] 25 C.F.R. § 151.11(d).

AR_0000230

but they also signal a profound disrespect for Tribes and Tribal sovereignty, on the part of both Governor Stitt and, unfortunately, the Comanche Nation.

In Parts 2 and 4 of the Comanche agreement, Governor Stitt offers pre-approval of future and hypothetical off-reservation trust land acquisitions for purposes of Comanche gaming *within* the Chickasaw Nation.[79] Similar provisions in both the Comanche and Otoe-Missouria agreements put at risk the jurisdictional integrity of other Tribes, including the Caddo, Citizen Potawatomi, Delaware, Iowa, Ponca, Sac & Fox, and Wichita & Affiliated.[80]

Off-reservation trust acquisitions are always controversial, but these provisions seem particularly designed to provoke discord and to disrupt Oklahoma Indian country. While Governor Stitt may offer his pre-approval of these possible future proposals, purportedly on behalf of Oklahoma, the Chickasaw Nation will protect its jurisdictional integrity and not offer its approval.[81] Furthermore, none of us, today, can say what the views of other local governments might be.[82] In the meantime, we ask DOI—no matter what else it may do with these defective "compacts"—to strike these provisions as unlawful, inappropriate for inclusion in a compact under IGRA, and as an unjustifiable intrusion on Chickasaw Nation sovereignty. Likewise, we suggest the similar provisions in the Otoe-Missouria agreement be struck. In support of our position, we urge DOI to take seriously its trust obligations to Tribes and to stand with us in protecting Tribal jurisdictional integrity against such flagrant and unlawful "reservation shopping."

---

[79] Comanche agreement at Part 2.A.21. (defining "Grady County Facility," which is predominantly located within the Chickasaw Nation but partially, as well, within the jurisdictional territory of the Caddo, Delaware, and Wichita & Affiliated Tribes), Part 2.A.27. (defining "Love County Facility," which is located entirely within the Chickasaw Nation and is the location of the Nation's single largest gaming facility), and Part 4.J.2.a. (purporting to offer Oklahoma concurrence "in any determination by the Secretary of the Interior that lands relating to the . . . Grady County Facility and the Love County Facility, should be taken into trust for gaming purposes, and such lands are eligible for gaming under 25 U.S.C. § 2719(b)(1)(A)" and further providing that "[t]he Parties agree that no other action from the State is required for approval of those lands' eligibility for gaming").

[80] Id. at Part 2.A.5. (defining "Cleveland County Facility," which includes lands of the Citizen Potawatomi Nation and the Absentee Shawnee Tribe); see also Otoe-Missouria agreement at Part 2.A.25. (defining "Logan County Facility," which includes lands of the Iowa Nation), Part 2.A.28. (defining "Noble County Facility," which includes lands of the Ponca Tribe), Part 2.A.32. (defining "Payne County Facility," which includes lands of the Iowa Nation and Sac & Fox Nation); and Part 4.J.2.a. (purporting to offer Oklahoma concurrence "in any determination by the Secretary of the Interior that lands relating to the Logan County Facility, the Noble County Facility, and the Payne County Facility, should be taken into trust for gaming purposes, and such lands are eligible for gaming under 25 U.S.C. § 2719(b)(1)(A)" and further providing that "[t]he Parties agree that no other action from the State is required for approval of those lands' eligibility for gaming").

[81] 25 C.F.R. § 151.8.

[82] 25 C.F.R. § 151.11(d).

AR_0000231

  b.  *The agreements should be disapproved for subjecting the Comanche and Otoe-Missouria to the material risk of being left without any lawful Class III gaming compact with Oklahoma.*

   Finally, in addition to the trust implications arising from the proposed intrusions on other Tribes' jurisdictional integrity, DOI approval of these agreements would also risk breach of its duties to the Comanche and Otoe-Missouria.

   As already noted, the new agreements offer no protection for Tribal exclusivity, nor do they offer any measurable value, let alone a meaningful concession of significant economic benefit, to either Tribe. Approval in this context turns IGRA on its head and would allow Governor Stitt to leverage "compact approval" to the detriment of Tribal and Federal interest. But with respect to the Tribes that have signed his new agreement, the problem runs deeper.

   At Part 12.A., both Tribes have "agreed and stipulated" that upon DOI approval and publication of notice in the Federal Register, this agreement shall be "the sole effective Compact between the Parties, constituting the entire agreement between the Parties . . . ." Given the many and manifest defects in these agreements and the signatories' express and careful provision for severance of provisions without risk of cancelling the broader agreement,[83] it is likely DOI approval would result in the Tribes having *no* Class III compact after the new agreements are struck down or rendered legally ineffective. We believe DOI's trust obligations would require disapproval of these "compacts" as contrary to Federal interest in protecting Tribal sovereignty and the interests of Tribal peoples. That is, of course, an awkward point to make when it is the signatory Tribes who would be adversely affected by approval. All the same, we urge DOI to ascertain whether and to what extent the Tribes have evaluated these risks and have knowingly and voluntarily put their existing compacts in jeopardy in exchange for these defective deals.

## CONCLUSION

   For these reasons, the Chickasaw Nation strongly urges DOI to disapprove Governor Stitt's new agreements as invalid under Federal and State law, as violative of IGRA, and as inviting DOI to breach its trust duties to the Chickasaw Nation and other Tribes. DOI approval of the agreements would, of course, not cure those defects,[84] but we nonetheless call on the Federal trustee to avoid unnecessary waste of Tribal, Federal, and State resources by immediately disapproving the agreements as improvidently submitted. If the government opts instead to approve them or to treat them as "considered to have been approved," we would urge DOI to, at minimum, sever the off-reservation trust land provisions and make clear in any published notice that it offers no opinion, whatsoever, as to the agreements' underlying validity and that its action should not be construed as curing or ratifying any defect in their formation or otherwise.

---

[83] E.g., Comanche agreement at Part 13.B.

[84] *Pueblo of Santa Ana*, 104 F.3d at 1553-57 (rejecting contention that DOI approval is all that is necessary to render a Tribal-State compact valid under IGRA).

AR_0000232

**From:** STEPHEN GREETHAM <Stephen.Greetham@chickasaw.net>

**To:** "tara_sweeney@ios.doi.gov" <tara_sweeney@ios.doi.gov>, "john_tahsuda@ios.doi.gov" <john_tahsuda@ios.doi.gov>, "paula.hart@bia.gov" <paula.hart@bia.gov>

**Cc:** Tammy Gray <Tammy.Gray@chickasaw.net>, Deborah Hamilton <DEBORAH.HAMILTON@chickasaw.net>

**Subject:** Oklahoma Gaming: Chickasaw Nation comments re proposed "Tribal-State gaming compacts" submitted by Oklahoma Governor Kevin Stitt for Department review under IGRA

**Date:** 2020-05-01 18:18:12 -0400

**Importance:** High

**Attachments:** ltr_-_2020-05-01_-_gaming_(gba-sdb_re_oklahoma_agreements_with_comanche_and_otoe)_(w_att).pdf

---

Dear Assistant Secretary Sweeney
Principal Deputy Assistant Secretary Tahsuda, and
Director Hart:

Attached, please find attached a letter Chickasaw Nation Governor Bill Anoatubby sent, by hard copy earlier today, to U.S. Department of the Interior Secretary David Bernhardt. Governor Anoatubby submits this letter, and the legal memorandum accompanying it, as comment requested to be considered in the Department's review of agreements we understand Oklahoma Governor J. Kevin Stitt has submitted for review as "Tribal-State gaming compacts" under the Indian Gaming Regulatory Act.

Thank you for your time, attention, and work on behalf of the United States and Indian country. If I can be of any assistance or if you have any questions or concerns relating to these materials, please do not hesitate to contact me.

Take care.

Stephen Greetham, Senior Counsel
Chickasaw Nation
4001 N. Lincoln Boulevard
Oklahoma City, Oklahoma 73105
(o) (580) 272-5236
(c) (580) 399-6989

CONFIDENTIAL COMMUNICATION: This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is confidential, proprietary, privileged, and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any reading, dissemination, distribution or copying of this communication, including any attachment hereto, is strictly prohibited. If you have received this communication in error, please notify us immediately at the above phone number and delete the original message. If you are the intended recipient of this message, we remind you that electronic mail on the internet may not be secure and that this message was not and future messages will not be encrypted or otherwise protected, unless specifically requested, in which case, special arrangements will be made.

AR_0000234



**OFFICE OF THE GOVERNOR**

The Chickasaw Nation

Post Office Box 1548 • Ada, Oklahoma 74821

(580) 436-2603 • Fax (580) 436-4287

http://www.chickasaw.net

BILL ANOATUBBY
GOVERNOR

May 1, 2020

The Honorable David Bernhardt
Office of the Secretary
U.S. Department of the Interior
1849 C Street N.W.
Washington, D.C. 20240

Dear Secretary Bernhardt:

The Chickasaw Nation empathically calls on the Department of Interior to disapprove Governor Kevin Stitt's agreements with the Comanche Nation and Otoe-Missouria Tribe, which we understand he submitted April 23 for review under the Indian Gaming Regulatory Act. As explained in the attached legal analysis, his agreements are critically flawed.

Governor Stitt's announcement of these agreements sparked immediate controversy within state government. We join Oklahoma Attorney General Mike Hunter, the Oklahoma Senate President *Pro Tempore* Greg Treat, Oklahoma House Speaker Charles McCall, and other Oklahoma Tribes in rebuking the Governor for his unlawful overreach, but as to the Comanche agreement's provocative attack on Chickasaw Nation sovereignty, we particularly object.

In Parts 2 and 4 of the Comanche agreement, Governor Stitt purports to pre-approve future and hypothetical off-reservation trust land acquisitions for purposes of Comanche gaming *within* the Chickasaw Nation. Similar provisions put at risk the jurisdictional integrity of other Tribes, including the Caddo, Citizen Potawatomi, Delaware, Iowa, Ponca, Sac & Fox, and Wichita & Affiliated. Off-reservation trust acquisitions are always controversial, but these unlawful provisions seem designed to provoke discord and to disrupt Oklahoma Indian country. While Governor Stitt may offer his pre-approval of these possible future proposals, purportedly on behalf of Oklahoma, the Chickasaw Nation shall protect its jurisdictional integrity and not offer its approval, now or ever, 25 C.F.R. § 151.8. Furthermore, none of us, today, can say what the views of other local governments might be, 25 C.F.R. § 151.11(d).

AR_0000235

The Honorable David Bernhardt                    2                              May 1, 2020

    Consistent with its trust duty and other Federal law, we ask that the Department to immediately disapprove and reject these agreements as improvidently submitted and invalid.

                                                Sincerely,

                                                *Bill Anoatubby*

                                                Bill Anoatubby, Governor
                                                The Chickasaw Nation


Enclosure:    As stated

cc:    Assistant Secretary Tara Sweeney, U.S. Department of the Interior
       Director Paula Hart, Office of Indian Gaming, U.S. Department of the Interior

AR_0000236



**CHICKASAW NATION**
OFFICE OF SENIOR COUNSEL
CHICKASAW NATION OKLAHOMA CITY REGIONAL OFFICES
4001 NORTH LINCOLN BOULEVARD
OKLAHOMA CITY, OKLAHOMA 73105
(580) 272-5236

To:      Governor Bill Anoatubby
From:    Undersecretary Stephen Greetham (Senior Counsel)
Date:    April 30, 2020
Re:      Comments concerning the lawfulness of the "compacts" signed by Governor Stitt, Comanche Nation Chairman Nelson, and Otoe-Missouria Tribe Chairman Shotten

### CONTENTS

**INTRODUCTION** ……………………..……………………………………………..…..……2

**FACTS** …………..…………………………………………………….……3

**SUMMARY OF DISCUSSION** ………………………………………………………...4
    **(a) *Defects in formation*** ………………………………………………..……..4
    **(b) *Unlawful taxation*** …………………………………………………………4
    **(c) *Unlawful provision for off-reservation trust land acquisitions*** ……………...…..………..4
    **(d) *Breach of trust*** ……….....…………………………………………….5

**DISCUSSION** ………..…………………………………………………..5
    **A.  DOI Review of Compacts Under IGRA** ……………..……..……………………5

    **B.  Defects Compelling Disapproval of the New Agreements** ……..………………………6

        1.  *The agreements should be disapproved on two Federal law questions that are informed by consideration of State law:  (a) whether the agreements would operate to allow forms of gaming expressly prohibited by Oklahoma law; and (b) whether the State of Oklahoma has validly "entered into" the agreements* ……………………………………………………………..6
            a.  *The agreements purport to allow forms of Class III gaming expressly prohibited by Oklahoma law* ………..……………………………………6
            b.  *Oklahoma has not validly "entered into" the agreements* ………...………….9
            c.  *Even if DOI opts not to disapprove the agreements, it should take no action nor publish any notice or other statement that could be construed as signaling Federal ratification or cure for the defects in Governor Stitt's agreements* ……………………….……12

        2.  *Oklahoma Governor Stitt's proposed agreements should be disapproved for attempting to impose a Tribal revenue-share obligation without offering a meaningful State concession of significant economic benefit to the Tribes*…………13
            a.  *DOI approved the revenue-share obligations in our current compact as reasonably justified based on a meaningful concession by Oklahoma that provided significant benefit to the Chickasaw Nation* …………………13

AR_0000237

b. *Oklahoma Governor Stitt's new agreements would impose a revenue-share obligation on the Tribes with no commensurate meaningful concession by the State and no legitimate benefit for the Tribes*……….……16

(i) *The new agreements include no Tribal "exclusivity" protections or enforcement mechanisms while, instead, expressly authorizing expansions of State gaming* ………..………………………..16

(ii) *The new agreements do not lawfully authorize any new forms of gaming for either Tribe and would otherwise impose an unjustifiable and usurious revenue-share rate of approximately 22% on "event wagering."* …...…………...……………………………..17

(iii) *The new agreements offer no valid consideration with respect to hypothetical future off-reservation trust land acquisitions* ………...…19

3. ***Oklahoma Governor Stitt's proposed agreements should be disapproved for their inclusion of provisions that invite DOI to breach its fiduciary obligations to Tribes*…..20**

a. *The purported Oklahoma pre-approvals of hypothetical off-reservation trust land acquisitions for Comanche gaming operations within the Chickasaw Nation's jurisdictional territory should be struck as unlawful*…….20

b. *The agreements should be disapproved for, inter alia, subjecting the Comanche and Otoe-Missouria to the material risk of being left without any lawful Class III gaming compact with Oklahoma* …………….….22

**CONCLUSION** …………………………………………………………………………....…22

\-\-\-\-\-\-\-\-\-\-\-\-\-\-

## INTRODUCTION

We understand Oklahoma Governor Stitt has submitted to the Department of the Interior (DOI) two new agreements for approval as "compacts" under the Indian Gaming Regulatory Act (IGRA). We understand DOI received the documentation for review on April 23 and that, per IGRA, its administrative review and decision will be completed by June 7.

As analyzed in this memorandum, the Chickasaw Nation urges DOI to disapprove the submitted agreements as invalid under Federal and State law, as violative of IGRA, and as inviting DOI to breach its trust duties to the Chickasaw Nation and other Tribes. DOI approval of the agreements would, of course, not cure those defects,[1] but we nonetheless call on the Federal trustee to avoid unnecessary waste of Tribal, Federal, and State resources by immediately disapproving the agreements as improvidently submitted. If the government opts instead to approve them or to treat them as "considered to have been approved," we would urge DOI to, at minimum, sever the off-reservation trust land provisions and make clear in any published notice that it offers no opinion, whatsoever, as to the agreements' underlying validity and that its action should not be construed as curing or ratifying any defect in their formation or otherwise.

---

[1] *Pueblo of Santa Ana v. Kelly*, 104 F.3d 1546, 1553-57 (10th Cir. 1997) (rejecting contention that DOI approval is all that is necessary to render a Tribal-State compact valid under IGRA).

AR_0000238

The Chickasaw Nation has organized its comments to provide DOI officials a brief statement of facts, a summary of our analytical discussion, an analytical discussion of our substantive concerns, and a brief conclusion. Sources, throughout, are referenced in footnote.

### FACTS

On Tuesday April 22, 2020, Oklahoma Governor J. Kevin Stitt hosted a press conference to announce his having reached terms with Chairman William Nelson of the Comanche Nation and Chairman John Shotten of the Otoe-Missouria Tribe on new "gaming compacts."[2] His event concluded with a signing ceremony and Governor Stitt's pledge to send the documents to DOI for review and approval under IGRA. DOI received the signed documents on April 23.

Governor Stitt's event drew an immediate rebuke from Oklahoma Attorney General Mike Hunter[3] as well as Oklahoma Senate President *Pro Tempore* Greg Treat and Oklahoma House Speaker Charles McCall.[4] These officials indicated they had been neither consulted nor given advance notice of Governor Stitt's actions, and each expressed the opinion Governor Stitt lacked the authority to lawfully bind Oklahoma to his new agreements. The sharp and public divisions within State government over these new agreements have garnered broad attention and concern.[5] Notwithstanding the controversy, Governor Stitt continues to pursue DOI approval.

Separately, our Federal court litigation concerning the January 1, 2020, automatic renewal of our *current* gaming compact proceeds.[6] The Comanche Nation and Otoe-Missouria Tribe (Tribes) have been party-intervenors,[7] but last week, they cited their new agreements and joined with Governor Stitt in moving for their dismissal with prejudice.[8] Seven other Tribal parties, including the Chickasaw Nation, filed a conditional objection,[9] and on Friday, with

---

[2] Oklahoma Governor Kevin Stitt press release (with embedded links to press conference video and the Comanche Nation and Oto-Missouria Tribe agreements) (Apr. 22, 2020), available at https://www.governor.ok.gov/articles/ press_releases/governor-stitt-signs-two-new-gaming-compacts.

[3] E.g., Randy Krehbiel, "Oklahoma AG Mike Hunter says Gov. Stitt's new tribal gaming compacts 'not authorized' by state law," *TULSA WORLD* (Apr. 22, 2020), available at https://www.tulsaworld.com/news/local/government-and-politics/oklahoma-ag-mike-hunter-says-gov-stitts-new-tribal-gaming-compacts-not-authorized-by-state/article_ 1e9bd0d3-3d50-50c0-8233-a3d924f01f44.html.

[4] E.g., Randy Krehbiel, "Oklahoma's legislative leaders tell Gov. Stitt his new tribal gaming compacts are invalid," *TULSA WORLD* (Apr. 22, 2020), available at https://www.tulsaworld.com/news/local/government-and-politics/oklahomas-legislative-leaders-tell-gov-stitt-his-new-tribal-gaming-compacts-are-invalid/article_958c7b77-5573-50d5-96bf-a0c57dfb8203.html.

[5] E.g., Editorial, "Progress on Oklahoma gaming compacts, or more problems?," *OKLAHOMAN* (Apr. 26, 2020), available at https://oklahoman.com/article/5660872/progress-on-oklahoma-gaming-compacts-or-more-problems.

[6] Cherokee Nation, et al. v. Stitt, Civ. No. 19-1198 (W.D. Okla.) ("Compact Litigation").

[7] Compact Litigation, doc. nos. 72 & 73 (Apr. 22, 2020).

[8] Compact Litigation, doc. no. 120 (Apr. 22, 2020).

[9] Compact Litigation, doc. no. 123 (Apr. 24, 2020).

AR_0000239

express reference to our objection, the Court dismissed the Comanche and Otoe-Missouria but made clear it was doing so without reviewing the claimed settlement, a copy of which was not filed with the court, or expressing any view on its substance or validity.[10]

### SUMMARY OF DISCUSSION

**(a)** *Defects in formation***.**  Governor Stitt's new "gaming compacts" are defective under both Federal and State law. IGRA establishes a Federal law framework that provides for Tribal conduct of Class III gaming that is, among other things, legal under the laws of the State in which the Tribe is located. IGRA further requires Tribal conduct of Class III gaming to conform with the terms of a compact validly "entered into" by the Tribe and State. In the new agreements, Governor Stitt and the Tribes ignore this framework in favor of new "law" apparently enacted under the claimed authority, for the State's part, of the Oklahoma Governor's signature. Accordingly, these are *Governor Stitt's* compacts, <u>not</u> *Oklahoma's*, and his overreach renders them fatally flawed in their basic formation.

**(b)** *Unlawful taxation***.**  IGRA expressly prohibits a State from seeking to impose a tax on Tribal gaming. DOI implements this prohibition by disapproving proposed compacts that would impose Tribal revenue-sharing obligations unaccompanied by any commensurate and meaningful State concession. The current Tribal-State gaming compacts in Oklahoma establish a revenue-share obligation of 4%-10% that is expressly tied to the State's obligation to maintain "substantial exclusivity" for Tribal gaming operations. The State's exclusivity obligation prohibits it from authorizing additional forms of non-Tribal gaming, and the compact otherwise mandates liquidated damages in the event of its breach of this obligation. In approving this exchange, DOI recognized the Tribal revenue-share obligation was premised on an appropriately meaningful State concession of significant benefit to the compacting Tribes.

In contrast, the new agreements would continue Tribal revenue-sharing while relieving the State from any enforceable exclusivity obligation. Further, it would reduce Tribal exclusivity by allowing the State to license new non-Tribal gaming even as it imposed new regulatory limitations, burdens, and penalties on Tribal gaming. We understand the Tribes see items in the new agreements as representing subjective value, e.g., access to new forms of gaming and pre-approval of theoretical off-reservation trust land acquisitions for gaming purposes. However, to the extent these items *do* represent value, it is illusory at best, and the agreement lacks any provision that could otherwise justify the electronic and table game revenue-share rates of 4.5%-13% and a rate of as much of 22% of Tribal revenues from "events wagering."

**(c)** *Unlawful provision for off-reservation trust land acquisitions***.**  The assault the proposed Comanche Nation agreement attempts to launch on Chickasaw Nation sovereignty represents a particularly troubling aspect of these flawed deals. In his agreement, Governor Stitt purports to pre-approve hypothetical future off-reservation trust land acquisitions for purposes of Comanche gaming enterprises *within* the Chickasaw Nation's recognized jurisdictional area. These provisions represent nothing short of attempted "state"-sponsored reservation shopping. It is contrary to law and Federal policy and will do nothing but prompt unnecessary inter-Tribal and other local conflict. We wish to be plain on this point: *The off-reservation trust land*

---

[10] Compact Litigation, doc. no. 124 (Apr. 24, 2020).

*acquisition provisions represent a bad faith attempt to disrupt Tribal gaming operations, revenue streams, and sovereign rights, and DOI's facilitation of this scheme would violate Federal law and breach Federal trust obligations to protect Chickasaw Nation jurisdictional integrity, contrary to IGRA.* No matter what else DOI might do, we call on our trustee to reject and sever these off-reservation trust land provisions from the proposed agreements.

**(d) *Breach of trust*.**  Finally, in addition to breach of trust implications for the Chickasaw Nation and other Tribes whose jurisdictional integrity is attacked in these agreements, DOI approval of these agreements may also breach its duties to the Comanche and Otoe-Missouria. In these new agreements, the Tribes have agreed that DOI approval would result in the effective nullification of their existing Class III gaming compacts. Given the many defects in these new agreements and the parties' careful provision for severance without risk to the broader agreement, it is likely DOI approval would result in the Tribes having *no* Class III compact after the new agreements are struck down or rendered legally ineffective. At minimum, DOI should ascertain whether the Tribes are knowingly and voluntarily putting their existing compacts at risk for these defective deals.

**DISCUSSION**

## A.  DOI Review of Compacts Under IGRA

The Secretary must approve a Tribal-State gaming compact before it can have legal effect under IGRA.[11] The Secretary may disapprove a compact if it "violates" any provision of IGRA, "any other provision of Federal law that does not relate to jurisdiction over gaming on Indian lands, or the trust obligations of the United States to Indians."[12] DOI's regulations do not provide for third-party notice or opportunity to be heard on proposed compacts, but neither do they preclude administrative consideration of relevant comment.

IGRA requires the Secretary to approve or disapprove a proposed compact within forty-five (45) days of submittal.[13] Since DOI received Governor Stitt's new agreements on April 23, the administrative review should be finalized and acted on by June 8. IGRA further requires the Secretary to "publish in the Federal Register notice of any Tribal-State compact that is approved, or considered to have been approved, under this paragraph."[14]

---

[11] See 25 U.S.C. § 2710(d)(3)(B). Regulations controlling DOI review of compacts under IGRA can be found at 25 C.F.R. §§ 293.1-293.16.

[12] See 25 U.S.C. § 2710(d)(8)(B).

[13] 25 U.S.C. § 2710(d)(8)(C). If the Secretary takes no action on a compact, it "shall be considered to have been approved . . . but only to the extent the compact is consistent with the provisions of this chapter." Id. DOI approval, alone, is insufficient for purposes of a Tribal-State compact's being considered valid and enforceable under IGRA. See also *Santa Ana Pueblo*, 104 F.3d at 1555 (reviewing case law addressing question of whether "validity of a compact under state law is a separate requirement from Secretarial approval" and "conclude[ing] that the 'entered into language' imposes an independent requirement and the compact must be validly entered into by a state before it can go into effect, via Secretarial approval, under IGRA").

[14] 25 U.S.C. § 2710(d)(8)(D).

AR_0000241

## B.  Defects Compelling Disapproval of the New Agreements

**1.**  ***The agreements should be disapproved on two Federal law questions that are informed by consideration of State law:  (a) whether the agreements would operate to allow forms of gaming expressly prohibited by Oklahoma law; and (b) whether the State of Oklahoma has validly "entered into" the agreements.***

Tribal governments regulate gaming conducted within their jurisdictions through the lawful exercise of inherent sovereignty and associated rights to self-government.[15] In enacting IGRA, Congress affirmed the relationship between Tribal sovereignty and Tribal government gaming[16] but imposed limits on the conduct of certain forms of gaming.[17] Specifically, a Tribal government's conduct of Class III gaming within its jurisdiction and pursuant to its duly formed laws is lawful *only* if it occurs within "a state that *permits such gaming* for any purpose by any person, organization, or entity" and the conduct is "in conformance with a Tribal-State compact *entered into by the Indian tribe and the State*" which is "in effect" under IGRA.[18]

Thus, as a threshold matter, IGRA requires inquiry into two matters of Federal law that rest on analyses of State law:  *First*, whether the *form of gaming* purported to be allowed under these agreements would be otherwise lawful under Oklahoma law, and *second*, whether the *State of Oklahoma has validly "entered into"* these agreements under IGRA.[19] As explained below, the agreements are defective under both inquiries.

a.  *The agreements purport to allow forms of Class III gaming expressly prohibited by Oklahoma law.*

With respect to the question of whether Oklahoma law "permits" the gaming purportedly allowed under Governor Stitt's agreements "by any person, organization, or entity," Governor Stitt has offered an unsigned, weakly sourced, and general legal memorandum presenting an extended and inferential argument that "event wagering" (or sports betting) actually *is* permitted under Oklahoma law for IGRA purposes.[20] He is wrong.

---

[15] See generally *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 207 (1987). Accord *Navajo Nation v. Dalley*, 896 F.3d 1196, 1200 (10th Cir. 2018) (recognizing Cabazon as barring States from regulating gaming on Tribal lands "without Congressional authorization").

[16] 25 U.S.C. § 2702.

[17] 25 U.S.C. § 2710(d)(1).

[18] 25 U.S.C. § 2710(d)(1) (emphasis added). With respect to the compacting requirement, see also *Pueblo of Santa Ana*, 104 F.3d at 1557 (holding State's entry to a compact must be valid under State law for entry to be legally effective under IGRA).

[19] *Pueblo of Santa Ana*, 104 F.3d at 1557-58 (addressing interplay of Federal and State law in inquiry as to whether a compact is validly in effect).

[20] Memorandum to Paula Hart, Director of DOI Office of Indian Gaming, from Office of the General Counsel, Oklahoma Governor's Office (Apr. 24, 2020), available at https://www.governor.ok.gov/static-assets/documents/gamingcompacts/Memorandum_from_General_Counsel.pdf.

AR_0000242

Immediately following Governor Stitt's surprise announcements of his new "compacts," Oklahoma's chief legal officer rejected them as inconsistent with Oklahoma law. In public statements following the signing ceremony, Oklahoma Attorney General Mike Hunter said—

> The agreements signed today between the governor, the Otoe-Missouria Tribe and the Comanche Nation are not authorized by the state Tribal Gaming Act, Title 3A, Section 261 et sec. The governor has the authority to negotiate with Tribes on behalf of the state. However, only gaming activities authorized by the act may be the subject of a tribal gaming compact. Sports betting is not a prescribed "covered game" under the act.[21]

*Pro Tem* Treat and Speaker McCall echoed Attorney General Hunter's position in their own letter to Governor Stitt,[22] and each is correct that sports betting is prohibited by Oklahoma law.

But so, too, are other games purportedly allowed under Governor Stitt's agreements.

Oklahoma's State-Tribal Gaming Act empowers the Oklahoma Horse Racing Commission to license the *only* non-Tribal gaming allowed under Oklahoma law and provides—

> This act is game-specific and shall not be construed to allow the operation of any other form of gaming unless specifically allowed by this act. This act shall not permit the operation of slot machines, *house-banked card games*, *house-banked table games*, or *games where winners are determined by the outcome of a sports contest*.[23]

In violation of this plain statutory language, Governor Stitt's new agreements purport to authorize betting on sports contests *as well as* house-banked card and table gaming.

Finally, even the Tribes who signed his new agreement do not agree with Governor Stitt. Following the Attorney General's announcement, Comanche Nation Chairman Nelson and Otoe-Missouria Chairman Shotten issued a joint statement acknowledging Oklahoma law "*currently*

---

[21] Randy Krehbiel, "Oklahoma AG Mike Hunter says Gov. Stitt's new tribal gaming compacts 'not authorized' by state law," *TULSA WORLD* (Apr. 22, 2020), available at https://www.tulsaworld.com/news/local/government-and-politics/oklahoma-ag-mike-hunter-says-gov-stitts-new-tribal-gaming-compacts-not-authorized-by-state/article_1e9bd0d3-3d50-50c0-8233-a3d924f01f44.html.

[22] Letter to Oklahoma Governor Kevin Stitt from Oklahoma House Speaker Charles McCall and Oklahoma Senate President *Pro Tempore* Greg Treat (Apr. 23, 2020), available at http://s3.amazonaws.com/content.newsok.com/documents/McCall%20Treat%20ltr%20to%20Stitt%2004222020[1].pdf; see also Randy Krehbiel, "Oklahoma's legislative leaders tell Gov. Stitt his new tribal gaming compacts are invalid," *TULSA WORLD* (Apr. 22, 2020), available at https://www.tulsaworld.com/news/local/government-and-politics/oklahomas-legislative-leaders-tell-gov-stitt-his-new-tribal-gaming-compacts-are-invalid/article_958c7b77-5573-50d5-96bf-a0c57dfb8203.html.

[23] 3A O.S. § 262(H) (emphasis added). It also bears noting that the Oklahoma Legislature in recent years has consistently rejected or otherwise failed to act on proposals to legalize sports betting in Oklahoma. E.g., Sean Murphy, "Oklahoma tribes, lawmakers eye way toward sports betting," *ENID NEWS & EAGLE* (Jun. 5, 2018), available at https://www.enidnews.com/news/state/oklahoma-tribes-lawmakers-eye-way-toward-sports-betting/article_28e05733-0360-5eda-85c7-40774879d840.html.

AR_0000243

*does not authorize event wagering*" and that they entered these agreements in the hope that "the state legislature will *eventually* see event wagering as an important source of revenue, and *authorize the activity* accordingly."[24] Counsel for the two Tribes, Rob Rosette, likewise demonstrated a certain aspirational noncommittal on the subject, telling reporters "the tribes could operate under other provisions of the compacts and add sports betting *if it should ever be approved by the Legislature*"[25] and that sports book is "not an issue we'll fight about."[26]

The facts and law accordingly show Governor Stitt's claim that Oklahoma law already allows for "event wagering" is contradicted by the Oklahoma Attorney General, leadership of the Oklahoma Legislature, the plain text of Oklahoma statute, and the Tribes with whom he signed his new agreements.

In short, Governor Stitt stands completely alone on this legal issue.

Seemingly undaunted, he attempts to supplement his position with the alternative claim that IGRA preempts him from declining to negotiate on matters that may go beyond Oklahoma law.[27] As an abstract principle, he may not be wrong, but as applied to these new agreements, the argument ignores that the reach of his negotiations cannot exceed the grasp of his office's authority to bind Oklahoma.

The question is not whether a State may *negotiate* for terms that depart from what State law presently allows. The very nature of intergovernmental compacting encourages such approach. The problem is not in the *negotiating* but in the *entering*. IGRA requires Tribes to enter compacts with *States*, not *State governors*,[28] and to be valid, a compact must be validly

---

[24] Staff, "Tribal Leaders Respond to Assertions by Okla. Legislators That New Gaming Compacts Are 'Legally Flawed,'" NATIVE BUSINESS MAG (Apr. 24, 2020) (emphasis added), available at https://www.nativebusinessmag.com/tribal-leaders-respond-to-assertions-by-okla-legislators-that-new-gaming-compacts-are-legally-flawed/. See also Staff, "Tribes Defend New Compacts," THE MCCARVILLE REPORT (Apr. 24, 2020), available at http://mccarvillereport.com/archives/52649; Staff Report, "Otoe-Missouria Tribe Chairman John Shotten and Comanche Nation Chairman William Nelson, Sr., comment on perspectives of both governor and attorney general; nuanced analysis offered," THE CITY SENTINEL (Apr. 23, 2020), available at http://city-sentinel.com/2020/04/otoe-missouria-tribe-chairman-john-r-shotton-and-comanche-nation-chairman-william-nelson-sr-comment-on-perspectives-of-both-governor-and-attorney-general-nuanced-analysis-offered/.

[25] Randy Ellis, "Week's events make future of Oklahoma tribal gaming murkier," OKLAHOMAN (Apr. 26, 2020) (emphasis added), available at https://oklahoman.com/article/5660907/weeks-events-make-future-of-oklahoma-tribal-gaming-murkier.

[26] Randy Krehbiel, "Tribes won't press sports betting issue, attorney says," TULSA WORLD (Apr. 25, 2020), available at https://www.tulsaworld.com/news/local/government-and-politics/tribes-wont-press-sports-betting-issue-attorney-says/article_fecee9ed-0798-5aba-9abf-bf4f367e4806.html.

[27] Memorandum to Paula Hart, Director of DOI Office of Indian Gaming, from Office of the General Counsel, Oklahoma Governor's Office at 5-6 (Apr. 24, 2020), available at https://www.governor.ok.gov/static-assets/documents/gamingcompacts/Memorandum_from_General_Counsel.pdf.

[28] Cf. *Estom Yumeka Maidu Tribe v. California*, 163 F. Supp. 3d 769, 780 (E.D. Calif. 2016) ("The Court is bound to evaluate negotiation as described in the broad sense under the IGRA, *which refers only to the state, not the governor or the legislature*." (Emphasis added.)).

*entered* by those officials who have the authority to bind their respective governments to the mutual exchange of promises the compact represents.[29] If the parties negotiating lack that authority, then their terms must be ratified by others who do; after all, as a form of intergovernmental contract, "a compact is not *valid* unless properly authorized,"[30] and as with all such agreements, "parties entering into one must assure themselves that each contracting party is authorized to enter into the contract."[31] While the new agreements represent their *signatories* have authority to bind the *parties*, the facts and law do not bear that representation out, as discussed in the next section.

> b.   *Oklahoma has not validly "entered into" the agreements.*

In submitting the new agreements, Governor Stitt argues his office has the authority not only *to negotiate compacts* with Tribes but also *to bind Oklahoma to them without the engagement of any other official or branch of State government*. His implementation of this position can be found at Part 14 of the proposed agreements—

> This Compact, when signed by the Governor of the State of Oklahoma, is approved by the State of Oklahoma. No further action by the State or any State official is necessary for this Compact to take effect upon approval by the Secretary of the Interior. The undersigned represent that they are duly authorized and have the authority to execute the Compact on behalf of the Party for whom they are signing.[32]

In support of his position, he claims that some number of unspecified non-gaming compacts have been negotiated and entered between Oklahoma governors and Tribes "and none of which were approved by the legislature."[33] While it may be true that an Oklahoma governor *may* enter a compact with a Tribe without approval of any other official or branch of State government and that governors *have* indeed done so in the past, *that has never been the process by which Oklahoma has bound itself to a Tribal-State gaming compact.*

The State has entered into gaming compacts with Tribes by only two means:  *Either* by codified offer of a model compact that was approved by a voter referendum,[34] which offer

---

[29] *Santa Ana Pueblo*, 104 F.3d at 1556.

[30] Id. at 1557.

[31] Id. at 1556.

[32] E.g., Comanche agreement at Part 14.

[33] Letter to Oklahoma Speaker Charles McCall and Oklahoma President *Pro Tempore* Greg Treat from Oklahoma Governor Kevin Stitt (Apr. 24, 2020), available at https://www.governor.ok.gov/static-assets/documents/gaming compacts/JKS_Ltr_to_House_and_Senate_Leadership.pdf.

[34] Enrolled Senate Bill No. 1252, enacted by the 2nd Regular Session of the 49 Legislature of the State of Oklahoma, State Question Number 712 and Legislative Referendum Number 335 (May 19, 2004), available at https://www.sos.ok.gov/documents/questions/712.pdf. See, e.g., Tribal Gaming Compact Between the Chickasaw Nation and the State of Oklahoma, as approved by DOI, 70 Fed. Reg. 6725 (Feb. 8, 2005), available at https://www. sos.ok.gov/documents/filelog/63568.pdf.

memorializes the management of separation of powers issues under the Oklahoma Constitution,[35] *or* the Oklahoma Governor has negotiated and entered the agreement that was then submitted to and approved by the Oklahoma Legislature's Joint Committee on Tribal-State Relations.[36] In the ongoing gaming compact litigation, in fact, Governor Stitt has argued that "[t]he only Tribal-State gaming compacts by and between the State and the Tribes in effect are compacts for interstate common pari-mutuel pool under Off-Track Watering Compacts," [37] *which are the very compacts approved by the Joint Committee*. Governor Stitt's affirmation of these legislatively approved gaming compacts as lawful is impossible to square with the argument his unnamed attorney makes to DOI's Office of Indian Gaming.[38]

In short, Governor Stitt points neither to an affirmative basis for his claim to exclusive executive authority nor to a single example of this having ever been done before. Oklahoma's entire and established record of entering gaming compacts with Tribes, in fact, cuts directly against him. His argument, frankly, just shoots wide of the mark:  The fight he has picked with the Oklahoma Legislature is not some abstract debate over whether some hypothetical compact requires legislative approval to be lawful but turns, instead, on whether an Oklahoma Governor, by compact entered under claim of exclusive executive authority, may disregard or overrule existing statute and create durable substantive law on behalf of Oklahoma.

Plainly, he cannot.

As *Pro Tem* Treat and Speaker McCall put it, Governor Stitt "cannot make legal that which statute makes illegal."[39] He cannot do so by compact or otherwise. Instead, when negotiating any agreement, "the Governor must conform to the public policy enacted into law by the Legislature, as the role of the Legislative Branch is to establish public policy, and the role of

---

[35] See 3A O.S. § 280 ("The State of Oklahoma through the concurrence of the Governor after considering the executive prerogatives of that office and the power to negotiate the terms of a compact between the state and a tribe, and by means of the execution of the State-Tribal Gaming Act, and with the concurrence of the State Legislature through the enactment of the State-Tribal Gaming Act, hereby makes the following offer of a model tribal gaming compact regarding gaming to all federally recognized Indian tribes [in Oklahoma].").

[36] See generally 74 O.S. §§ 1221, 1223; see, e.g., State of Oklahoma Chickasaw Nation Off-Track Wagering Compact, as approved by DOI, 69 Fed. Reg. 34,686 (Jun. 22, 2004), available at https://www.sos.ok.gov/documents/filelog/62519.pdf.

[37] Compact Litigation, doc. no. 15 at 22 (Jan. 22, 2020).

[38] Memorandum to Paula Hart, Director of DOI Office of Indian Gaming, from Office of the General Counsel, Oklahoma Governor's Office at 5-6 (Apr. 24, 2020), available at https://www.governor.ok.gov/static-assets/documents/gamingcompacts/Memorandum_from_General_Counsel.pdf.

[39] Letter to Oklahoma Governor Kevin Stitt from Oklahoma House Speaker Charles McCall and Oklahoma Senate President *Pro Tempore* Greg Treat (Apr. 23, 2020), available at http://s3.amazonaws.com/content.newsok.com/documents/McCall%20Treat%20ltr%20to%20Stitt%2004222020[1].pdf; see also Randy Krehbiel, "Oklahoma's legislative leaders tell Gov. Stitt his new tribal gaming compacts are invalid," *TULSA WORLD* (Apr. 22, 2020), available at https://www.tulsaworld.com/news/local/government-and-politics/oklahomas-legislative-leaders-tell-gov-stitt-his-new-tribal-gaming-compacts-are-invalid/article_958c7b77-5573-50d5-96bf-a0c57dfb8203.html.

AR_0000246

the Executive Branch is to execute that policy."[40] Indeed, fundamental to Governor Stitt's obligations under the Oklahoma Constitution is to "cause the laws of the State to be faithfully executed."[41] His pretending to the powers of a self-proclaimed "lawmaker" ignore this duty.

As already noted, Governor Stitt exceeds his State law authority by seeking to "make legal that which statute makes illegal"—namely, the conduct of "events wagering" and house-banked games. But his overreach goes further. Consider, for example, the following nonexhaustive list of other durable provisions of law he seeks to create in his agreements—

– Provision of five (5) licenses for State conduct of "event wagering," including prescription of terms and conditions relating to exercise those licenses, such as substantive and geographic constraints on their exercise—notwithstanding, *inter alia*, statutory prohibition against the State licensure of "games where winners are determined by the outcome of a sports contest" and constitutional limits on his authority;[42]

– Vesting "Governor of the State" with power to approve new games for Tribal play under compact—notwithstanding, *inter alia*, express prohibitions codified in the Oklahoma State-Tribal Gaming Act and constitutional limits on the powers of the Oklahoma Governor;[43]

– Establishment of a complex mediation and arbitration procedure for purposes of revising revenue-share rates in fifteen (15) years—notwithstanding, *inter alia*, the Oklahoma Governor's limited role with respect to any renegotiations of revenue-share rates under Oklahoma's only codified gaming compact offer;[44] and

– Vesting "Governor for the State" with "exclusive authority to settle and negotiate any dispute arising under the Compact pursuant to Article 6, Section 8 of the Oklahoma Constitution"—notwithstanding, *inter alia*, the Oklahoma Attorney General's constitutional and statutory authority to act as Oklahoma's chief legal officer in all matters involving the State.[45]

---

[40] Oklahoma Attorney General Op. No. 2004 OK AG 27 (Aug. 26, 2004) (citing *Tweedy v. Oklahoma Bar Ass'n*, 624 P.2d 1049, 1054 (Okla. 1981)).

[41] OKLA. CONST., art. 6, § 8.

[42] Compare, e.g., Comanche agreement at Part 2.A.13.b. (reserving licenses and appearing to subject exercise of all "event wagering" license rights, whether State or Tribal, to specific locational restrictions) with 3A O.S. § 262(H).

[43] Compare, e.g., Comanche agreement at Part 3.F. (providing "new games may be authorized in an appendix approved by the Governor of the State") with 3A O.S. § 262(H).

[44] Compare, e.g., Comanche agreement at Part 10.B.5. (requiring affirmative and binding renegotiation of revenue-share rates with provision for determination by extra-governmental "panel") with Oklahoma Model State-Tribal Gaming Compact at Part 15.B., codified at 3A O.S. § 281 (providing with specific time restrictions that "the state, acting through its Governor, may request to renegotiate" the compact's revenue-share and exclusivity provisions).

[45] Compare, e.g., Comanche agreement at Part 6.F. with Okla. Const., art. 6, § 1 and 74 O.S. § 18b(A)(1) through -(3). Accord *State, ex rel. Derryberry v. Kerr-McGee Corp.*, 516 P.2d 813, 1973 OK 132, ¶¶20-27 ("We conclude . . .

AR_0000247

Locally, Governor Stitt's actions have sparked conflict over whether he will be allowed to transcend the constitutional bounds of his office. We take no issue with his apparent belief that Oklahoma Governors may enter *certain* intergovernmental compacts *without* the involvement of other Oklahoma officials, but this belief is not relevant to the defective agreements he submitted to DOI on April 23. And please remember:  On this point, you do not need to take just our word for it, since you have as well the public objections of other constitutional officers of Oklahoma government. For purposes of IGRA, the Governor's agreements simply are *not* valid compacts.[46]

> c. *Even if DOI opts not to disapprove the agreements, it should take no action nor publish any notice or other statement that could be construed as signaling Federal ratification or cure for the defects in Governor Stitt's agreements.*

Of course, the "the Secretary is not expected to *resolve* state law issues" such as these.[47] However, neither can it be expected to *ignore* them. We believe a proper application of law and policy compel disapproval of these compacts, but at minimum, we believe DOI should avoid taking *any* action or offering *any* public notice or statement that could be construed as ratifying or curing *any* defect in Governor Stitt's formation of these agreements.[48]

For example, we refer you to a recent order entered by Judge DeGiusti in the ongoing gaming compact litigation, Cherokee Nation, et al., v. Stitt, Civ. No. 19-1198 (W. Dist. Okla.). Immediately prior to the public announcement of their new agreements, Governor Stitt, the Comanche Nation, and the Otoe-Missouria Tribe moved for the two Tribes' dismissal from the suit claiming a full and final settlement of their respective claims against one another. Judge DeGiusti granted dismissal with prejudice but, importantly, did so "without any review or approval of the settlement agreements (which the movants have not requested)," i.e., without ratifying or endorsing the agreements the parties claimed to have reached.[49]

Likewise, while the submitted agreements merit DOI's issuing a *disapproval* letter, we believe, no matter what action DOI takes, it must take pains *not* to intimate that it agrees with or endorses Governor Stitt's arguments regarding Oklahoma law or that it otherwise ratifies these agreements as lawfully entered and valid under IGRA.

---

the Attorney General's powers are as broad as the common law unless restricted or modified by statute, and that his authority to dismiss, settle or compromise the litigation, in the absence of fraud or collusion, is undisputed."); *State, ex rel. Nesbitt v. District Court of Mayes County*, 440 P.2d 700, 1967 OK 228, ¶17 ("In the absence of explicit legislative or constitutional expression to the contrary, the attorney general possesses complete dominion over every litigation in which he properly appears in the interest of the state whether or not there is a relator or some other nominal party.").

[46] Cf. generally *Pueblo of Santa Ana*, *supra*. at n.1.

[47] E.g., Id. at 1557.

[48] E.g., Id. at 1557 (rejecting argument that secretarial approval of compacts "cured" any state law defects or otherwise "ratif[ied] or authorize[d] an unauthorized state actor's conduct").

[49] Compact Litigation, doc. no. 124 (Apr. 24, 2020). Accord id. at 3 (observing "the terms of their settlement agreements (which are not before the Court)").

AR_0000248

**2.**    ***Oklahoma Governor Stitt's proposed agreements should be disapproved for attempting to impose a Tribal revenue-share obligation without offering a meaningful State concession of significant economic benefit to the Tribes.***

In addition to the defects outlined above, DOI should disapprove these compacts for seeking to impose a Tribal revenue-share obligation without Oklahoma's offering any meaningful concession in exchange. As the U.S. Government Accounting Office has found, this defect is the leading cause for administrative disapproval of proposed agreements—

> In [DOI] decision letters we reviewed, the most common reason for disapproving compacts was that the contained revenue sharing provisions Interior found to be inconsistent with IGRA. For example, Interior found that the concessions offered by the state in some compacts were not proportional to the value of the revenues the state sought from the tribe. Interior disapproved these compacts because they did not eliminate or sufficiently reduce the tribe's payment to the state if the tribe's exclusivity ended or was diminished in the future. In addition, Interior found the revenue sharing payment to the state in some compacts to be a tax, fee, charge, or assessment on the tribe, which is prohibited by IGRA.[50]

Governor Stitt's agreements merit disapproval on these grounds. To explain our analysis, we will start with a summary of the revenue-share/"substantial exclusivity" provisions of our own recently renewed gaming compact, explicate DOI's analysis of it, and apply DOI's analysis to Governor Stitt's proposed agreements.

a.    *DOI approved the revenue-share obligations in our current compact as reasonably justified based on a meaningful concession by Oklahoma that provided significant benefit to the Chickasaw Nation.*

Under our current "covered games" compact,[51] we are obliged to make revenue-share payments to Oklahoma of 4%-10% with respect to our conduct of "covered games," which is a defined subset of Class III gaming activities. We have taken on this obligation in exchange for the State's guarantee of "substantial exclusivity" for Tribal gaming within the Oklahoma market. And to be clear:  There is no *inferred* relationship between these elements, as it is *explicitly stated*—

> The parties acknowledge and recognize that this Compact provides tribes with substantial exclusivity and, consistent with the goals of IGRA, special opportunities for tribal economic opportunity through gaming within the external boundaries of Oklahoma in respect to the covered games. *In consideration thereof, so long as the state does not change its laws after the effective date of this Compact to permit the operation of any additional form of gaming by any [non-*

---

[50] U.S. GAO, *INDIAN GAMING:  REGULATION AND OVERSIGHT BY THE FEDERAL GOVERNMENT, STATES, AND TRIBES*, GAO-15-355 at 20 (Jun. 2015) (footnotes omitted), available at https://www.gao.gov/assets/680/670603.pdf.

[51] Tribal Gaming Compact Between the Chickasaw Nation and the State of Oklahoma, as approved by DOI, 70 Fed. Reg. 6725 (Feb. 8, 2005), available at https://www.sos.ok.gov/documents/filelog/63568.pdf.

AR_0000249

> *Tribal licensee of the Oklahoma Horse Racing Commission], or change its laws to permit any additional electronic or machine gaming within Oklahoma, the tribe agrees to pay the following fees . . . .*[52]

Our current compact also provides—

> *In consideration for the covenants and agreements contained herein, the state agrees that it will not, during the term of this Compact, permit the nontribal operation of any machines or devices to play covered games or electronic or mechanical gaming devices otherwise presently prohibited by law within the state in excess of the number and outside of the designated locations authorized by the State-Tribal Gaming Act.*[53]

In approving this revenue-share/"substantial exclusivity" structure, the Bush Administration's DOI laid out its controlling legal inquiry and concluded as follows—

> Our analysis of this revenue sharing agreement begins with section 25 U.S.C. 2710(d)(4). This section provides that "nothing in this section shall be interpreted as conferring upon a State or any of its political subdivisions authority to impose any tax, fee, charge or other assessment upon an Indian tribe . . . to engage in Class III gaming activity." *As a result, the Department of the Interior has sharply limited the circumstances under which Indian tribes can make direct payments to a state for purposes other than defraying the costs of regulating Class III gaming activities.*
>
> As our previous compact decision letters have stated, in order to determine whether revenue sharing violates 25 USC 2710(d)(4), *we first look to whether the State has offered meaningful concessions.* We have traditionally viewed this concept as one where the State concedes something that it was otherwise not required to negotiate that provides a benefit to the Nation, i.e., exclusivity or some other benefit. *In other words, we examine whether the State has made meaningful and significant concessions in exchange for receiving revenue sharing.*
>
> *The next step in our analysis is to determine whether these concessions result in a substantial economic benefit to the Nation.* The payment to the state must be appropriate in light of the value of the economic benefit conferred on the Nation. This analysis (meaningful concessions by the State and substantial economic benefit conferred on the tribe) allows us to ascertain that revenue-sharing payments are the product of arms-length negotiations, and not tantamount to the imposition of a tax, fee, charge or other assessment prohibited under 25 U.S.C. 2710(d)(4).

---

[52] Tribal Gaming Compact Between the Chickasaw Nation and the State of Oklahoma at Part 11.A. (emphasis added), as approved by DOI, 70 Fed. Reg. 6725 (Feb. 8, 2005), available at https://www.sos.ok.gov/documents/filelog/63568.pdf. Accord 3A O.S. § 280 at Part 11.A. (codifying Oklahoma's model compact offer).

[53] Id. at Part 11.E. (emphasis added); 3A O.S. § 280 at Part 11.A. (codifying Oklahoma's model compact offer).

AR_0000250

Under the first prong of our analysis, we believe that the State has made meaningful concessions. It has authorized Class III gaming for tribes, provided for a zone of exclusivity, and limited non-tribal gaming. Under the second prong of our analysis, we believe that these concessions provide a substantial economic benefit to the tribe. . . . [Based on DOI's economic analysis over the compact's first 15-year term], *we conclude that broader access to Class III electronic games, meaningful restrictions on the number of non-Indian facilities with access to Class III gaming devices, as well as meaningful limits on the number of such devices and exclusive rights over Class III card games are significant concessions by the State which offer the Nation substantial economic benefits. [And in reaching this conclusion, we] note that Part 11 also provides for a payment from the State to eligible tribes in the amount of 50% of any increase in the non-tribal entities' adjusted gross revenues following the addition of machines in excess of the statutory limit to a non-tribal operation, and both the Nation and State agree that it provides for the cessation of revenue-sharing payments to the State should the exclusive rights of compacting tribes to operate covered games be diminished.*[54]

In short, citing IGRA's prohibition against State taxation of Tribal gaming,[55] DOI explained that it "has sharply limited the circumstances" under which it will approve Tribal revenue-share obligations in Tribal-State gaming compacts. This is a standard DOI analysis, generally applied to proposed IGRA compacts. DOI's adherence to it prevents bad faith efforts to extort value from Tribes by leveraging compacts for inappropriate purposes,[56] and this is not some archaic hold-over of past generation's paternalism. It is, instead, affirmation of a policy that serves Federal self-interest in the success of IGRA, which was enacted as a means for providing a stable regulatory environment so Tribes could develop revenues necessary for economic self-sufficiency and self-government. Anything that inappropriately reduces those revenues increases the Federal government's financial burdens in Indian country.

To implement this analysis, DOI accordingly relies on a common sense test: Has the State offered a "meaningful concession" in exchange for the Tribal revenue-share obligation, and do those concessions represent "substantial economic benefit" to the compacting Tribe such that DOI can reasonably conclude the Tribal obligation is not merely a State effort to "tax" Tribal gaming. Ultimately, the goal is to ascertain an

---

[54] Letter to Governor Bill Anoatubby from U.S. Department of the Interior Principal Deputy Assistant Secretary for Indian Affairs Mike Olsen at 1-3 (Jan. 12, 2005) (emphasis added), available at https://www.bia.gov/sites/bia.gov/files/assets/as-ia/oig/oig/pdf/idc-038409.pdf.

[55] 25 U.S.C. § 2710(d)(4).

[56] E.g., generally *Rincon Band v. Schwarzenegger*, 602 F.3d 1019, 1036 (9th Cir. 2010) ("Because we hold above that general fund revenue sharing is neither authorized by IGRA nor reconcilable with its purposes, it is difficult to imagine what concessions the State could offer to rebut the strong suggestion of bad faith arising from such demands. But even if it were possible to conjure up an exceptional circumstance where such would be the case, where, as here, the State demands significant taxes and fails to offer any "meaningful concessions" in return, a finding of bad faith is the only reasonable conclusion.").

AR_0000251

objective basis for concluding that a compact was produced by "arms-length negotiations" and is not premised on some ephemeral or subjective "want" or "value."[57]

Governor Stitt's agreements fail to satisfy this established test under IGRA.

b. *Oklahoma Governor Stitt's new agreements would impose a revenue-share obligation on the Tribes with no commensurate meaningful concession by the State and no legitimate benefit for the Tribes.*

After signing the new agreement, Chairman Shotten of the Otoe-Missouria Tribe said his Tribe continued to "stand in unity with the other tribes that the prior compact automatically renewed,"[58] and prior to signing Governor Stitt's agreement, Comanche Nation Chairman Nelson affirmed "the Nation unequivocally believes the compacts automatically renew at the end of the year."[59] Notwithstanding this position, both Tribal leaders have said they saw the new agreements as representing an opportunity to do more for their Tribes,[60] which means the current compacts should be taken as the baseline against which the new agreements should be judged. In making a comparison, three measures seem relevant: (i) exclusivity, (ii) new games, and (iii) new facilities.

(i)    *The new agreements include no Tribal "exclusivity" protections or enforcement mechanisms while, instead, expressly authorizing expansions of State gaming.*

In comparing the revenue-share/"substantial exclusivity" provisions under the current compacts and Governor Stitt's agreement, the new agreement eviscerates the State's obligations and provides virtually no value to the Tribes. As outlined above, the current compacts' provisions impose an express prohibition against the State's authorizing additional forms of gaming that would intrude on Tribal exclusivity,[61] which

---

[57] U.S. GAO, *INDIAN GAMING: REGULATION AND OVERSIGHT BY THE FEDERAL GOVERNMENT, STATES, AND TRIBES*, GAO-15-355 at 20 (Jun. 2015) (footnotes omitted), available at https://www.gao.gov/assets/680/670603.pdf (noting DOI rejection of, for example, State support for trust land acquisition as failing to "provide a quantifiable economic benefit that justified the proposed revenue sharing payments" and resulting in DOI's viewing "the payment to the state as a tax or other assessment in violation of IGRA").

[58] Editor, "Otoe-Missouria Tribe signs new gaming compact with state," *THE NEWKIRK HERALD JOURNAL* (Apr. 30, 2020), available at https://www.newkirkherald.com/2020/04/30/otoe-missouria-tribe-signs-new-gaming-compact-with-state/.

[59] Comanche Nation (press release), "Comanche Nation Statement From Chairman William Nelson, Sr." (Sep. 16, 2019), available at https://www.prnewswire.com/news-releases/comanche-nation-statement-from-chairman-william-nelson-sr-300918866.html.

[60] E.g., *NEWKIRK HERALD JOURNAL*, supra ("[W]e saw negotiating a new compact as something that was in the best interest of our tribe."); Kyle Payne, "Comanche Nation leaders discuss new Gaming Compact," *KSWO 7NEWS* (Apr. 22, 2020) ("They gave us an incentive, no ante on poker games and that's really good."), available at https://www.kswo.com/2020/04/22/comanche-nation-leaders-discuss-new-gaming-compact/.

[61] Supra at 13-16.

AR_0000252

prohibition is made enforceable by express language that, *one*, conditions Tribal payments on State compliance and, two, imposes liquidated damages in the event of certain breaches. The new agreement includes no such comparable provisions.

In the new agreement, the entirety of the State's "obligations" regarding exclusivity can be found at Part 10.A., which summarily recites:  "The Parties acknowledge and agree that this Compact provides the Tribe with substantial exclusivity over class III Covered Gaming consistent with the goals of IGRA."[62] Based thereon, Part 10.B. provides that "[i]n consideration of the Acknowledgement set forth in subsection A of this Part, the adequacy of which is hereby agreed to, and pursuant to the terms of this valid Compact, the Tribe agrees to pay the following Substantial Exclusivity fees . . . ."[63] Nowhere in this rote tautology can be found any binding obligation on Oklahoma to refrain from allowing additional non-Tribal gaming; in fact, it does not even provide an elementary definition of what the parties mean by the term. And given that Part 12 goes on to provide that the Tribes' prior compacts will be superseded by this new agreement once it is approved by DOI, any "substantial exclusivity" obligation Oklahoma previously owed the Tribes would be nullified.

What is more, while the new agreements expressly limit the Tribes to gaming under the terms of this new "compact," they include also the Tribes' express acknowledgements that Oklahoma may expand a new internet-facilitated "iLottery" gaming system and hold five (5) State "event wagering" licenses without infringing on any State exclusivity obligation.[64]

Accordingly, under these agreements, the Tribes would give up the "substantial exclusivity" secured under the prior compact, "acknowledge and agree" to some sort of exclusivity that is neither described nor made enforceable, and then agree to the State's expansion of its own gaming operations. As such, "exclusivity" cannot *reasonably* serve as a legitimate basis for *any* Tribal revenue-sharing obligations in this new agreement.

        (ii)     *The new agreements do not lawfully authorize any new forms of gaming for either Tribe and would otherwise impose an unjustifiable and usurious revenue-share rate of approximately 22% on "event wagering*."

As already discussed, the new agreements purport to authorize new forms of gaming, including house-banked gaming and "event wagering."[65] It may be reasonable, assuming some effective "exclusivity" mechanism, for a new game to justify a revenue-share obligation with respect to the conduct of the new game, itself. In fact, this is the

---

[62] E.g., Comanche agreement at Part 10.A.

[63] E.g., Comanche agreement at Part 10.B.

[64] Compare, e.g., Comanche agreement at Part 3.A. with, e.g., Comanche agreement at Part 3.B. and Part 2.A.13.b.

[65] E.g., Comanche agreement at Parts 2.A.7., -.13., -.22., & -.23 and Part 3.

model Oklahoma used in 2018 when it authorized the inclusion of certain new table games as "covered games" under the existing compacts; it authorized the new game by statute and extended a supplemental compact offer to the Tribes, which offer was contingent on the accepting-Tribes' (i) conducting the game in accord with all terms and conditions of the existing compact and (ii) paying a ten percent (10%) exclusivity-based revenue-share.[66]

However, with respect to the alleged expansion of authorized table games here, no new rate is proposed. Instead, those table games are lumped in with *all* "covered games," including games otherwise authorized under Oklahoma' State-Tribal Gaming Act, and subjected to a single rate structure. It is, accordingly, difficult to determine what value to ascribe to the alleged expansion of authorized table games.

With respect to the alleged authorization of "event wagering," there *is* a game-specific rate, i.e., one and one-tenth percent (1.1%) of, essentially, coin-in.[67] It is generally accepted that the house's margin on sports betting is five percent (5%). To the extent that is accurate, a rate of one and one-tenth percent (1.1%) on coin-in would amount to twenty-two percent (22%) of each Tribe's post-payout earnings! Such rate is more than twice the current compact's maximum rate and would be among the highest revenue-share rate paid by any Tribe in the country.[68] Furthermore, depending on how they plan to operate sports book, a rate this high could result in Oklahoma's earning more from the conduct of the game than the Tribes would themselves.

The prior Oklahoma administration also attempted to impose a rate like this. In a proposed settlement of its disputes with the Cheyenne and Arapaho Tribes, the State and those Tribes executed an amendment to their current compact to provide for international internet-based gaming. In that amendment, those Tribes were to pay Oklahoma twenty percent (20%) of the revenues from those games. In disapproving the amendment, DOI applied "great scrutiny" and the analysis outlined above and concluded it could determine no reasonable basis for accepting such a high rate, noting also that the parties had provided none.[69] Likewise, Governor Stitt's new agreements merit disapproval.

---

[66] 3A O.S. § 280.1 (codifying Oklahoma's "Gaming Compact Supplements" to allow for additional "covered games" under existing compacts); e.g., Chickasaw Nation and State of Oklahoma Gaming Compact Non-House Banked Table Games Supplement, as approved by DOI (Aug. 9, 2018), available at https://www.sos.ok.gov/documents/filelog/92595.pdf.

[67] E.g., Comanche agreement at 10.B.2.a.

[68] U.S. GAO, *INDIAN GAMING: REGULATION AND OVERSIGHT BY THE FEDERAL GOVERNMENT, STATES, AND TRIBES*, GAO-15-355 at 19, fig.5 (Jun. 2015) (footnotes omitted), available at https://www.gao.gov/assets/680/670603.pdf. Accord Duke Chen, "Tribal Casino Revenue Sharing in Other States," 2019-R-0135, Office of Legislative Research (Connecticut) (Aug. 13, 2019), available at https://www.cga.ct.gov/2019/rpt/pdf/2019-R-0135.pdf.

[69] Letter to Cheyenne and Arapaho Tribes Governor Janice Prairie Chief-Boswell from U.S. Department of the Interior Assistant Secretary for Indian Affairs Kevin Washburn (Aug. 1, 2013), available at https://www.bia.gov/sites/bia.gov/files/assets/as-ia/oig/pdf/idc1-028608.pdf.

AR_0000254

All this aside, of course, these "new" games represent only illusory value, as both forms are illegal under Oklahoma law and Governor Stitt lacks the authority to bind the State to the promises he attempts to make.[70] Accordingly, neither house-banked games nor "event wagering" could be considered elements of value (let alone "substantial economic benefit") to the Tribes in relation to the revenue-share duty they would take on under the new agreements. Similarly, when reviewing a re-submittal of the prior Oklahoma administration's settlement with the Cheyenne and Arapahoe Tribes, DOI characterized the State's "offer" of international internet-based gaming as presenting only "illusory" concession to those Tribes given the State's inability to "control, or even offer, exclusive access to a market of patrons located entirely outside the United States and its territories."[71]

As Oklahoma Senate *Pro Tempore* Treat and Oklahoma House Speaker McCall said in their rebuke of Governor Stitt over these agreements: "We are disappointed Oklahoma's executive branch made a promise it could not legally keep under current law. Sovereign nations deserve promises Oklahoma can keep."[72] They are correct, and their disappointment is well founded.

"Illusory" concessions simply cannot be the basis for a valid compact under IGRA. And even if the Oklahoma Legislature were to ratify *post hoc* Governor Stitt's offer of these games per the terms of these new agreements, something legislative leaders have said they will not do,[73] there is absolutely no value in this agreements that could justify a twenty-two percent (22%) revenue-share rate.

> (iii)   *The new agreements offer no valid consideration with respect to hypothetical future off-reservation trust land acquisitions.*

The new agreements include unusual provisions relating to off-reservation trust acquisitions for gaming purposes.[74] Not only are there no applications apparently submitted to DOI at this time for any of the acquisitions mentioned, but the agreements fail to indicate anything other than the most general of locations—e.g., "within one (1) mile of a state or federal highway or turnpike running through Love County."[75] There

---

[70] See supra. 6-9.

[71] Letter to Cheyenne and Arapaho Tribes Governor Janice Prairie Chief-Boswell from U.S. Department of the Interior Assistant Secretary for Indian Affairs Kevin Washburn (Nov. 6, 2013), available at https://www.bia.gov/sites/bia.gov/files/assets/as-ia/oig/pdf/idc1-024222.pdf.

[72] Letter to Oklahoma Governor Kevin Stitt from Oklahoma House Speaker Charles McCall and Oklahoma Senate President *Pro Tempore* Greg Treat (Apr. 23, 2020), available at http://s3.amazonaws.com/content.newsok.com/documents/McCall%20Treat%20ltr%20to%20Stitt%2004222020[1].pdf.

[73] Id.

[74] Comanche agreement at Part 4.J.2.a.; Otoe-Missouria agreement at Part J.2.a.

[75] Comanche agreement at Part 2.A.27.

AR_0000255

appears to be no evidence that these acquisitions are anything other than fantasy and hope, and as such, Governor Stitt's purported approval of them is meaningless and cannot be construed as meaningfully binding the State or anyone who succeeds Governor Stitt to his office.[76] And to the extent such future acquisitions would be for locations within the territorial jurisdiction of another Tribe, which would unavoidably be the case with at least one of them, Governor Stitt's concurrence would not save the acquisition from Tribal objection.[77] Nor would it foreclose other local governments from mounting objections.[78]

These provisions are accordingly of wholly illusory value and cannot be factored into DOI's analysis as a "meaningful concession" by the State or as conveying any objective economic benefit to either Tribe.

**3.** ***Oklahoma Governor Stitt's proposed agreements should be disapproved for their inclusion of provisions that invite DOI to breach its fiduciary obligation to Tribes.***

IGRA's provision for DOI disapproval based on "the trust obligations of the United States to Indians" is, perhaps, the broadest but least defined basis for disapproving any proposed gaming compact. To the extent a proposed compact is supported by a Tribal signatory, DOI must still scrutinize the submittal with the interests of other Tribes in mind and should disapprove those agreements that suggest material injury to another Tribal sovereign. Furthermore, regardless of Tribal support, DOI should keep an eye on its established precedent and the consistent development of administrative law to protect the stable exercise of Tribal sovereignty and the Federal interest therein. Agreements that would do violence to understood legal principles introduce instability and conflict, into both the law and intergovernmental relations, and should not lightly be approved. Finally, even with respect to Tribal signatories to a proposed compact, DOI should still review the document and ascertain that the Tribe is knowingly putting rights or interests it may have at risk by entering a particular agreement.

When such scrutiny is applied to these proposed agreement, administrative disapproval under IGRA is justified.

      a. *The purported Oklahoma pre-approvals of hypothetical off-reservation trust land acquisitions for Comanche gaming operations within the Chickasaw Nation's jurisdictional territory should be struck as unlawful.*

Apart from all the other defects in these new agreements, the Chickasaw Nation takes *particular exception* to the Comanche Nation's attempt to mount a direct assault on Chickasaw sovereignty. These provisions are superficial and illusory in the value they purport to represent,

---

[76] Cf. Letter to Cheyenne and Arapaho Tribes Governor Janice Prairie Chief-Boswell from U.S. Department of the Interior Assistant Secretary for Indian Affairs Kevin Washburn (Nov. 6, 2013), available at https://www.bia.gov/sites/bia.gov/files/assets/as-ia/oig/pdf/idc1-024222.pdf (disapproving proposed amendment to IGRA compact for "illusory" nature of State's purported "concession").

[77] 25 C.F.R. § 151.8.

[78] 25 C.F.R. § 151.11(d).

AR_0000256

but they also signal a profound disrespect for Tribes and Tribal sovereignty, on the part of both Governor Stitt and, unfortunately, the Comanche Nation.

In Parts 2 and 4 of the Comanche agreement, Governor Stitt offers pre-approval of future and hypothetical off-reservation trust land acquisitions for purposes of Comanche gaming *within* the Chickasaw Nation.[79] Similar provisions in both the Comanche and Otoe-Missouria agreements put at risk the jurisdictional integrity of other Tribes, including the Caddo, Citizen Potawatomi, Delaware, Iowa, Ponca, Sac & Fox, and Wichita & Affiliated.[80]

Off-reservation trust acquisitions are always controversial, but these provisions seem particularly designed to provoke discord and to disrupt Oklahoma Indian country. While Governor Stitt may offer his pre-approval of these possible future proposals, purportedly on behalf of Oklahoma, the Chickasaw Nation will protect its jurisdictional integrity and not offer its approval.[81] Furthermore, none of us, today, can say what the views of other local governments might be.[82] In the meantime, we ask DOI—no matter what else it may do with these defective "compacts"—to strike these provisions as unlawful, inappropriate for inclusion in a compact under IGRA, and as an unjustifiable intrusion on Chickasaw Nation sovereignty. Likewise, we suggest the similar provisions in the Otoe-Missouria agreement be struck. In support of our position, we urge DOI to take seriously its trust obligations to Tribes and to stand with us in protecting Tribal jurisdictional integrity against such flagrant and unlawful "reservation shopping."

---

[79] Comanche agreement at Part 2.A.21. (defining "Grady County Facility," which is predominantly located within the Chickasaw Nation but partially, as well, within the jurisdictional territory of the Caddo, Delaware, and Wichita & Affiliated Tribes), Part 2.A.27. (defining "Love County Facility," which is located entirely within the Chickasaw Nation and is the location of the Nation's single largest gaming facility), and Part 4.J.2.a. (purporting to offer Oklahoma concurrence "in any determination by the Secretary of the Interior that lands relating to the . . . Grady County Facility and the Love County Facility, should be taken into trust for gaming purposes, and such lands are eligible for gaming under 25 U.S.C. § 2719(b)(1)(A)" and further providing that "[t]he Parties agree that no other action from the State is required for approval of those lands' eligibility for gaming").

[80] Id. at Part 2.A.5. (defining "Cleveland County Facility," which includes lands of the Citizen Potawatomi Nation and the Absentee Shawnee Tribe); see also Otoe-Missouria agreement at Part 2.A.25. (defining "Logan County Facility," which includes lands of the Iowa Nation), Part 2.A.28. (defining "Noble County Facility," which includes lands of the Ponca Tribe), Part 2.A.32. (defining "Payne County Facility," which includes lands of the Iowa Nation and Sac & Fox Nation); and Part 4.J.2.a. (purporting to offer Oklahoma concurrence "in any determination by the Secretary of the Interior that lands relating to the Logan County Facility, the Noble County Facility, and the Payne County Facility, should be taken into trust for gaming purposes, and such lands are eligible for gaming under 25 U.S.C. § 2719(b)(1)(A)" and further providing that "[t]he Parties agree that no other action from the State is required for approval of those lands' eligibility for gaming").

[81] 25 C.F.R. § 151.8.

[82] 25 C.F.R. § 151.11(d).

AR_0000257

     b.   *The agreements should be disapproved for subjecting the Comanche and Otoe-Missouria to the material risk of being left without any lawful Class III gaming compact with Oklahoma.*

Finally, in addition to the trust implications arising from the proposed intrusions on other Tribes' jurisdictional integrity, DOI approval of these agreements would also risk breach of its duties to the Comanche and Otoe-Missouria.

As already noted, the new agreements offer no protection for Tribal exclusivity, nor do they offer any measurable value, let alone a meaningful concession of significant economic benefit, to either Tribe. Approval in this context turns IGRA on its head and would allow Governor Stitt to leverage "compact approval" to the detriment of Tribal and Federal interest. But with respect to the Tribes that have signed his new agreement, the problem runs deeper.

At Part 12.A., both Tribes have "agreed and stipulated" that upon DOI approval and publication of notice in the Federal Register, this agreement shall be "the sole effective Compact between the Parties, constituting the entire agreement between the Parties . . . ." Given the many and manifest defects in these agreements and the signatories' express and careful provision for severance of provisions without risk of cancelling the broader agreement,[83] it is likely DOI approval would result in the Tribes having *no* Class III compact after the new agreements are struck down or rendered legally ineffective. We believe DOI's trust obligations would require disapproval of these "compacts" as contrary to Federal interest in protecting Tribal sovereignty and the interests of Tribal peoples. That is, of course, an awkward point to make when it is the signatory Tribes who would be adversely affected by approval. All the same, we urge DOI to ascertain whether and to what extent the Tribes have evaluated these risks and have knowingly and voluntarily put their existing compacts in jeopardy in exchange for these defective deals.

## CONCLUSION

For these reasons, the Chickasaw Nation strongly urges DOI to disapprove Governor Stitt's new agreements as invalid under Federal and State law, as violative of IGRA, and as inviting DOI to breach its trust duties to the Chickasaw Nation and other Tribes. DOI approval of the agreements would, of course, not cure those defects,[84] but we nonetheless call on the Federal trustee to avoid unnecessary waste of Tribal, Federal, and State resources by immediately disapproving the agreements as improvidently submitted. If the government opts instead to approve them or to treat them as "considered to have been approved," we would urge DOI to, at minimum, sever the off-reservation trust land provisions and make clear in any published notice that it offers no opinion, whatsoever, as to the agreements' underlying validity and that its action should not be construed as curing or ratifying any defect in their formation or otherwise.

---

[83] E.g., Comanche agreement at Part 13.B.

[84] *Pueblo of Santa Ana*, 104 F.3d at 1553-57 (rejecting contention that DOI approval is all that is necessary to render a Tribal-State compact valid under IGRA).

AR_0000258

**From:** "Hart, Paula" <Paula.Hart@bia.gov>
**To:** "Wiseman, Maria K" <Maria.Wiseman@bia.gov>, "Woodward, Troy" <Troy.Woodward@bia.gov>, "Oakes, Morgan A" <Morgan.Oakes@bia.gov>
**Subject:** Fw: [EXTERNAL] Correspondence
**Date:** 2020-05-05 11:33:57 -0400
**Attachments:** 20200505_Letter_to_Secretary_Bernhardt_and_AG_Opinion_2020-8.pdf

---

FYI, please forward to all compact reviewers. Thanks Paula

---

**From:** Mike Hunter <mike.hunter@oag.ok.gov>
**Sent:** Tuesday, May 5, 2020 11:24 AM
**To:** Sweeney, Tara M <Tara_Sweeney@ios.doi.gov>; john_tahsuda@ios.ok.gov <john_tahsuda@ios.ok.gov>; Hart, Paula <Paula.Hart@bia.gov>
**Subject:** [EXTERNAL] Correspondence

Please see the attached letter to Secretary Bernhardt and Official Attorney General Opinion issued today May 5, 2020.

Thank you,
Mike Hunter
Oklahoma Attorney General
O. lahoma Office of the Attorne￼ General

313 NE 21st Street, Oklahoma City, OK 73105
Tel: (405)522-4391   Fax: (405)522-0669



## MIKE HUNTER
### ATTORNEY GENERAL

May 5, 2020

The Honorable David Bernhardt
Secretary of the Interior
U.S. Department of the Interior
1849 C Street N.W.
Washington, D.C. 20240

Dear Secretary Bernhardt,

I write concerning the agreements between Oklahoma Governor Kevin Stitt and the Comanche Nation and Otoe-Missouria Tribe submitted to you on April 23, 2020 for purposes of approval as a state-tribal gaming compact under the Indian Gaming Regulatory Act (IGRA). I respectfully request that you disapprove these agreements because they are not authorized by IGRA and out of deference to determinations of state law made by the legal officials of the state.

In particular, I attach an official Attorney General Opinion I issued today that concludes Governor Stitt was without legal authority to bind the State of Oklahoma to these agreements and therefore it cannot be said that the State has entered into a new gaming compact with these tribal nations. I reach this conclusion because, under the statutes and Constitution of Oklahoma, the Governor cannot authorize the violation of state law through a compact with an Indian tribe. While Oklahoma's State-Tribal Gaming Act exempts from the State's criminal prohibitions on gambling certain gaming conducted by tribes that validly enter into the Act's model gaming compact, the agreements forwarded to you by Governor Stitt deviate from the model gaming compact, including by authorizing forms of gaming prohibited by state law and not exempted by the State-Tribal Gaming Act.

Because the Governor lacks authority to "enter into" the agreements he has sent to you, those agreements fail to meet the requirements of IGRA to constitute a valid gaming compact under federal law. 25 U.S.C. § 2710(d)(1)(C), (3)(B). How a state enters into a gaming compact with a tribe, including whether the Governor may do so unilaterally in contravention of state statute, is a core concern of the state's constitutional structure and is therefore a matter of state law. *See Pueblo of Santa Ana v. Kelly*, 104 F.3d 1546 (10th Cir. 1997). In issuing the attached Opinion on the permissibility of the Governor's actions under state law, I act in a quasi-judicial capacity and "state officers are bound by these Attorney General opinions until relieved of that duty" by the courts of Oklahoma. *State ex rel. York v. Turpen*, 681 P.2d 763, 767 (Okla. 1984).

Oklahoma deeply values its relationship with the tribal nations that reside within its borders. They are an integral part of our community, history, culture, economy, and way of life. Their importance demands the respect of knowing that, when state officials make promises to Indian tribes, those officials have the authority to bind the State to such agreements. To do otherwise undermines the

---

313 N.E. 21ST STREET • OKLAHOMA CITY, OK 73105 • (405) 521-3921 • FAX: (405) 521-6246

 recycled paper

credibility and honor of the State when engaging in these sensitive inter-sovereign relations. Unfortunately, I fear the agreements sent recently to you by the Governor will only have the effect of damaging the relationship between the State and these two tribes. Moreover, for all tribes in Oklahoma, approval of these agreements as gaming compacts will only cause greater confusion and uncertainty about how state-tribal relations should be appropriately conducted.

For these reasons, and for the reasons expressed in the attached Attorney General Opinion, I humbly urge you to disapprove for purposes of IGRA Governor Stitt's agreements with the Comanche Nation and the Otoe-Missouria tribe.

Sincerely,

Mike Hunter
OKLAHOMA ATTORNEY GENERAL

Enclosure: Oklahoma Attorney General Opinion 2020-8.

cc:    Assistant Secretary of the Interior Tara Sweeney
       Director Paula Hart, Office of Indian Gaming, Department of the Interior

AR_0000495



## Mike Hunter
## Attorney General

### Attorney General Opinion
### 2020-8

The Honorable Greg Treat
President Pro Tempore
Oklahoma State Senate
2300 N. Lincoln Blvd., Room 422
Oklahoma City, OK 73105

May 5, 2020

The Honorable Charles McCall
Speaker
Oklahoma House of Representatives
2300 N. Lincoln Blvd., Room 401
Oklahoma City, OK 73105

Dear President Pro Tempore Treat and Speaker McCall:

This office has received your request for an official Attorney General Opinion in which you ask, in effect, the following question:

> **What authority does the Governor have to enter into new compacts with tribes which contain gaming activities that are expressly prohibited by Oklahoma Statute?**

### I.
### Background

**A. The State-Tribal Gaming Act.**

In 2004, the Legislature referred State Question 712 to the people, who approved the measure in a referendum that enacted the State-Tribal Gaming Act ("the Act"). *See* 2004 Okla. Sess. Laws ch. 316 (codified at 3A O.S.2011 & Supp.2019, §§ 261 *et seq.*). Although the terms of the tribal gaming compacts were initially formulated in discussions between the Governor and Tribal Nations in Oklahoma, it was through this exercise of legislative power that the State offered a model tribal gaming compact to all federally-recognized Indian tribes in the state. 3A O.S.Supp.2019, § 280. If that offer was accepted by a Tribe, "[n]o further action by the Governor or the state is required before the compact can take effect," though approval by the Secretary of the Interior is still necessary under federal law. *Id.* The Act offers the model compact on behalf of the State "through the concurrence of the Governor after considering the executive prerogatives of that office and the power to negotiate the terms of a compact between the state and a tribe, and by

313 N.E. 21st Street • Oklahoma City, OK 73105 • (405) 521-3921 • Fax: (405) 521-6246

♻ recycled paper

AR_0000496

means of the execution of the State-Tribal Gaming Act, and with the concurrence of the State Legislature through the enactment of the State-Tribal Gaming Act." *Id.* The Act further provides that "[n]o tribe shall be required to agree to terms different than the terms set forth in the Model Tribal Gaming Compact." *Id.*

Oklahoma law for over a century has generally prohibited gambling, but under the Act "the conducting of and the participation in any game authorized by the model compact . . . are lawful when played pursuant to a compact," notwithstanding the criminal laws prohibiting gambling found in Title 21, Sections 941 through 988. *Id.*; *see also id.* § 262(A) (providing same exception to criminal prohibitions for "gaming in accordance with the provisions of this act or the model compact set forth in Section 281"). But the Act "is game-specific and shall not be construed to allow the operation of any other form of gaming unless specifically allowed by this act," and the "act shall not permit the operation of slot machines, house-banked card games, house-banked table games involving dice or roulette wheels, or games where winners are determined by the outcome of a sports contest." *Id.* § 262(H).

The model compact sets out numerous parameters for tribal gaming, including standards and regulations for conducting games, independent game testing, mechanisms to ensure oversight and compliance with the compact's terms such as monitoring, recordkeeping and auditing, permitted locations for gaming facilities, licensing for gaming facility employees and vendors, and dispute resolution. *Id.* § 281. The model compact also acknowledges that it "provides tribes with substantial exclusivity" in conducting gaming in Oklahoma that is otherwise subject to criminal prohibition and, in consideration for that exclusivity, provides for the payment of fees by the Tribe to the State from a share of gaming revenues. *Id.* § 281, Part 11. The model compact states the following as the "authority to execute" the compact on behalf of the State: "as an enactment of the people of Oklahoma, [the compact] is deemed approved by the State of Oklahoma." *Id.* § 281, Part 16.

Like the rest of the Act, the model compact allows compacting tribes to conduct "covered game[s]" only in conformity with the compact. *Id.* § 281, Part 4(A). This includes specifically enumerated games as well as games "approved by state legislation for use by any person or entity" or "approved by amendment of the State-Tribal Gaming Act." *Id.* § 281, Part 3(5).[1] In 2018 the Legislature amended the Act to include additional covered games (specifically, non-house-banked table games) that a Tribe could conduct if a Tribe elects to accept the offer, agrees to a written supplement to an existing compact, and receives approval of the supplement by the Secretary of the Interior. *Id.* § 280.1. Again, gaming played pursuant to such a compact supplement is not subject to Oklahoma's general criminal prohibitions on gambling. *Id.* § 280.1(G).[2]

---

[1] Other non-enumerated games that are permitted include those "approved by the Oklahoma Horse Racing Commission for use by an organizational licensee" and "upon election by the tribe by written supplement to this Compact, any Class II game in use by the tribe." *Id.*

[2] This 2018 legislation also amended Section 262(H) of Title 3A, which is quoted above, to alter the list of games not permitted by the Act. *See* 2018 Sess. Laws. chp. 11, § 1.

## B.  Recent developments related to Oklahoma tribal gaming compacts.

Many Tribes accepted the State's offer of the model compact, but recently a dispute between the Governor and many of those Tribes has arisen about whether those compacts are still in force after January 1, 2020 pursuant to Part 15(B) of the model compact. *See* 2020 OK AG 3, ¶¶ 2-6. Because it is currently the subject of active litigation in federal court, this Opinion takes no position on the issues raised in that dispute. *See id.* ¶ 6 (citing *Cherokee Nation et al. v. Stitt*, No. CIV-19-1198 (W.D. Okla.)).

In the midst of this litigation, the Governor of Oklahoma and two of the litigating tribes (the Comanche Nation and the Otoe-Missouria Tribe) reached an agreement on new gaming compacts.[3] These compacts do not conform to the model compact set forth in the Act. For example, the new compacts include covered games not included in the model compacts or authorized by the Act, such as house-banked card games, house-banked table games, and event wagering. Event wagering is defined in Part 2 of these new compacts as "the placing of a wager on the outcome of a Sport event, including E-Sports, or any other events, to the extent such wagers are authorized by law," excepting intercollegiate sports involving either schools or events within the state. The new compacts also deviate from the model compact in that they have different exclusivity fee rates, different processes for adding new games, a different dispute resolution clause, and different audit and compliance provisions, among many other differences. Unlike the model compacts, the new compacts purport to vest all state authority related to the compacts with the Governor alone.

The question you ask is whether the Governor has authority to unilaterally bind the State to these new gaming compacts that purport to authorize gaming activity prohibited by state law.

**II.**
**DISCUSSION**

## A.  The Governor's authority to negotiate compacts with Indian tribes

Your question implicates core notions of our constitutional structure: both the separation of powers between branches of state government as well as the checks and balances that those branches can impose on each other. The legislative branch sets the public policy of the State by enacting law not in conflict with the Constitution. OKLA. CONST. art. V, § 1. The Governor has a role in setting that policy through his function in the legislative process, such as signing or vetoing bills, *Id.* art. VI, § 11, but his primary role is in taking care that the law is faithfully executed, *id.* art. VI, § 8.[4] This division of powers creates the ability of one branch to check the excesses of the other: the Governor can veto bills passed by the Legislature, for example, while the Governor cannot act

---

[3] *Available at* https://www.governor.ok.gov/static-assets/documents/gamingcompacts/gaming_compact_comanche_nation.pdf (last visited May 1, 2020) *and* https://www.governor.ok.gov/static-assets/documents/gamingcompacts/gaming_compact_otoe_missouria.pdf (last visited May 1, 2020).

[4] Of course, the Governor is not the only officer of the executive branch and therefore does not possess exclusive authority to execute the law. *See* OKLA. CONST. art. VI, § 1; *Wentz v. Thomas*, 1932 OK 636, ¶ 27, 15 P.2d 65, 69.

contrary to the constitutional laws enacted by the Legislature. *See Coffee v. Henry*, 2010 OK 4, ¶ 5, 240 P.3d 1056, 1057; *Dank v. Benson*, 2000 OK 40, ¶ 6 n.12, 5 P.3d 1088, 1091 n.12.

This Office examined the separation of powers as it relates to compacts between the State and the Tribes in Oklahoma Attorney General Opinion 2004-27. The Opinion began by noting the Governor's power under Article VI, Section 8 to "conduct in person or in such manner as may be prescribed by law, all intercourse and business of the State with other states and with the United States." 2004 OK AG 27, ¶ 7 (quoting OKLA. CONST. art. VI, § 8). Thus, "as a matter of State Constitutional law, it is the Governor who is empowered to conduct intercourse and business with the other states and with the United States." *Id.* ¶¶ 7-8. In contrast, the opinion continued, "the power of the Governor to contract with Indian tribes is not derived from the Constitution; it is derived from statutes," specifically citing Section 1221(C)(1) of Title 74, which states: "The Governor is authorized to negotiate and enter into cooperative agreements on behalf of this state with federally recognized Indian tribal governments within this state to address issues of mutual interest." *Id.* ¶ 9.

The opinion then evaluated case law on the separation of powers principle restricting the Legislature's ability to control the exercise of executive authority via requirements of *post-hoc* legislative approval. *Id.* ¶¶ 22-26 (examining *In re Okla. Dep't of Transp.*, 2002 OK 74, 64 P.3d 546). Based on this case law, the opinion concluded: "[A]ny requirement that individual agreements or compacts negotiated by the Governor on behalf of the State with other sovereigns, such as Indian tribes, be approved by the Legislature would violate the principles of separation of powers . . . . Such requirements . . . would have the Legislature carrying out legislative policy and applying it to various conditions." *Id.* ¶ 27. But the opinion also recognized the balance created by the Legislature's proper role: "Of course, any agreement negotiated by the Governor must conform to the public policy enacted into law by the Legislature, as the role of the Legislative Branch is to establish public policy, and the role of the Executive Branch is to execute that policy." *Id.* ¶ 30, n.3 (citing *Tweedy v. Okla. Bar Ass'n*, 1981 OK 12, 624 P.2d 1049, 1054).

In short, our previous opinion recognizes the Governor's authority to negotiate compacts with Indian tribes without the need to secure later approval by the Legislature *provided that* any such compacts conform to (and not conflict with) the laws duly enacted by the legislative branch.

AR_0000499

## B. The Governor lacks the authority to unilaterally bind the State to compacts with Indian tribes that authorize activity prohibited by state law.

Under the framework embraced by Attorney General Opinion 2004-27, the Governor currently lacks the authority to bind the State to the compacts he recently negotiated with the Comanche Nation and the Otoe-Missouria Tribe. These compacts purport to grant the State's consent to conduct gambling activities that are prohibited by state criminal law, *see* 21 O.S.2011 & Supp.2019, §§ 941–988. State law permits gaming conducted by Indian tribes, but only if that gaming is "in accordance with the provisions of [the State-Tribal Gaming Act] or the model compact set forth in Section 281" of the Act. 3A O.S.Supp.2019, § 262(A); *see also id.* § 280. Gaming under these new compacts cannot be said to be in accordance with the model gaming compact offered by the Act because their terms differ considerably. Were the Governor able to unilaterally authorize gaming, it would render superfluous the provisions in the Act allowing gaming under the model compact "[n]otwithstanding the provisions of Sections 941 through 988 of Title 21 of the Oklahoma Statutes." *Id.* § 280; *see also id.* § 262(A); *Odom v. Penske Truck Leasing Co.*, 2018 OK 23, ¶ 36, 415 P.3d 521, 532 ("Statutes must be read to render every part operative, and to avoid rendering it superfluous or useless.").

Although the new compacts differ from the model compacts in many respects, the clearest instance of conflict with state law is in the scope of covered games. The new compacts authorize gaming such as house-banked card and table games, as well as event wagering, that are prohibited by state criminal law and not exempted by the Act.[5] Nor can it be said that because the Act permits *some* Class III gaming by compacting tribes, *all* such gaming can be authorized by a compact. Again, the State-Tribal Gaming Act "is game-specific and shall not be construed to allow the operation of any other form of gaming unless specifically allowed by this act"; specifically, the "act shall not permit the operation of . . . house-banked card games, house-banked table games involving dice or roulette wheels, or games where winners are determined by the outcome of a sports contest." 3A O.S.Supp.2019, § 262(H). Thus, these new compacts do not "conform to the public policy enacted into law by the Legislature" and as such the Governor lacks the authority to enter into them on behalf of the State. 2004 OK AG 27, ¶ 30, n.3.[6]

---

[5] While the new compacts define event wagering as placing a wager only "to the extent such wagers are authorized by law," such that it could be argued the new compacts do not authorize activity prohibited by state law, this qualifying language does not exist with respect to house-banked table and card games. Further, the new compacts permit "gaming machines," which is a term that may not be coextensive with the gaming allowed by the Act, and therefore may also encompass types of gambling prohibited by Oklahoma law. Thus, even setting aside the issue of event wagering, the new compacts purport to authorize activity prohibited by state law.

[6] Because of this clear deviation from state law, we need not analyze whether compacts that differ from the model compact in other respects—such as audit and compliance measures, permitted locations for gaming facilities, or dispute resolution—would be permitted by state law. Nor need we determine whether the Governor could unilaterally enter into new gaming compacts that differ from the model compact only with respect to gaming exclusivity and exclusivity fees, pursuant to the model compact's provision allowing the Governor to "request to renegotiate the terms of subsections A and E of Part 11 of this Compact." 3A O.S.Supp.2019, § 281, Part 15(B). And while the new compacts contain a severability clause, it only applies if "any federal court" declares a provision invalid, which does not impact our analysis of state law and in any event may be of limited relevance because the new compacts depart from the State-Tribal Gaming Act in so many different respects.

Notably, the exemptions from the State's criminal prohibitions on gambling in the Act are not only for "the conducting of" gaming by an Indian tribe on Indian lands, but also "the participation in" such gaming by any person, including non-Indians. 3A O.S.Supp.2019, §§ 262(A), 280. So even if sovereign immunity would preclude the State from prosecuting tribes conducting gaming in violation of state law, nonmembers would still be subject to prosecution for participating in such gaming—and the Governor lacks authority to unilaterally declare their actions are legal by means of a tribal compact. The Governor can no more permit gambling prohibited by state criminal law via unilateral compact than he could agree to allow a Tribe to sell illicit controlled substances to members of the public in Indian country.

This plain reading of the text of the law and our previous opinion on the topic is supported by historical practice. *See N.L.R.B. v. Noel Canning*, 573 U.S. 513, 524 (2014) (holding in separation of powers case that the Court "put[s] significant weight upon historical practice" when interpreting the Constitution). History confirms that although the Governor has the authority to enter into negotiations with Indian tribes, any compact resulting from those negotiations can be agreed to on behalf of the State only if consistent with state law or if authorized by state law enacted for that purpose. The model compacts were initially drafted pursuant to talks between the Governor and tribal nations. *See* 3A O.S.Supp.2019, § 280 (recognizing the Governor's "power to negotiate the terms of a compact between the state and a tribe"). But the State only entered into them "through the concurrence of the Governor . . . by means of the execution of the State-Tribal Gaming Act, and with the concurrence of the State Legislature through the enactment of the State-Tribal Gaming Act." *Id.* § 280. The model gaming compact itself states the "authority to execute" the compact on behalf of the State is based on the fact that, "as an enactment of the people of Oklahoma, [it] is deemed approved by the State of Oklahoma." *Id.* § 281, Part 16. And when in the past the State and the Tribes sought to expand the scope of covered games authorized by state law and the gaming compacts, they did so pursuant to the model compact's authorization of games "approved by amendment of the State-Tribal Gaming Act," *id.* § 281, Part 3(5). Specifically, the Legislature and Governor enacted a law in 2018 that amended the Act and provided for supplements to the model compact that tribes could agree to in order to permit non-house-banked table games. *Id.* § 280.1. In contrast, the new forms of gaming contemplated in the compacts negotiated with the Comanche Nation and the Otoe-Missouria Tribe have not been authorized by state law and so cannot be said to have been agreed to by the State, nor is the State validly bound to those compacts.[7]

---

[7] Many other state-tribal compacts are specifically contemplated by, or at least not in conflict with, state law. *See, e.g.*, 68 O.S. 2011 & Supp. 2019, §§ 346 *et seq.* (taxes on cigarette sales); 68 O.S.2011, § 500.63 (taxes on motor fuel sales); 47 O.S.2011, § 2-108.3 (tribal license plates); 70 O.S.Supp.2019, § 3311.4 (cross-deputization agreements); 21 O.S.Supp.2019, § 99a (same); 21 O.S.2011, § 648 (same). The existence of compacts entered into by the Governor without approval by the Legislature does not undermine our conclusion here because such compacts do not authorize activity prohibited by state law, but instead promote compliance with state law. *Cf.* Informal Op. by A.A.G. Neal Leader, 93-685 (agreement with Cherokee to promote cooperative law enforcement did not constitute exercise of legislative authority and thus did not interfere with the separation of powers).

## C. Federal law does not determine how the State can consent to a tribal gaming compact, nor can it dictate the allocation of power within state government.

The federal law governing state-tribal gaming compacts—the Indian Gaming Regulatory Act ("IGRA")—does not alter this analysis. "IGRA creates a cooperative federal-state-tribal scheme for regulation of gaming hosted by federally recognized Indian tribes on Indian land." *KG Urban Enterprises, LLC v. Patrick*, 693 F.3d 1, 7 (1st Cir. 2012). Under IGRA, Class III tribal gaming is lawful only if authorized by tribal ordinance, "located in a State that permits such gaming for any purpose by any person, organization, or entity," and "conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State." 25 U.S.C. § 2710(d)(1). Upon request from a tribe to negotiate a gaming compact, "the State shall negotiate with the Indian tribe in good faith to enter into such a compact." *Id.* at § 2710(d)(3)(A). These compacts take effect only if approved by the Secretary of the Interior. *Id.* at § 2710(d)(3)(B). Nothing in this law attempts to dictate *how* a state's government agrees to the terms of a compact, whether by executive action alone, legislative action, or the concurrence of the two.

While IGRA purports to require states to enter into good-faith compact negotiations on Class III gaming, it only authorizes tribal Class III gaming if state law "permits such gaming for any purpose by any person, organization, or entity." *Id.* at § 2710(d)(1)(B). In other words, "where a state does not 'permit' gaming activities sought by a tribe, the tribe has no right to engage in these activities, and the state thus has no duty to negotiate with respect to them." *Rumsey Indian Rancheria of Wintun Indians v. Wilson*, 64 F.3d 1250, 1256 (9th Cir. 1994). "The State must first legalize a game, even if only for tribes, before it can become a compact term." *American Greyhound Racing, Inc. v. Hull*, 146 F. Supp. 2d 1012, 1067 (D. Ariz. 2001), *vacated on other grounds*, 305 F.3d 1015 (9th Cir. 2002). Thus, "[i]n order to determine the appropriate scope of negotiations between the Tribe and the state . . . , it is critical to determine the scope of gaming permitted by state law." *N. Arapaho Tribe v. State of Wyoming*, 389 F.3d 1308, 1311 (10th Cir. 2004). IGRA does not preempt a state's decision to prohibit specific types of Class III gaming, nor require a state to enter into a compact permitting a specific type of Class III gaming that is prohibited by state law. Rather, in determining the proper scope of a federally-authorized compact, IGRA *defers* to state law. *See also Rumsey*, 64 F.3d at 1258 ("[A] state need only allow Indian Tribes to operate games that others can operate, but need not give tribes what others cannot have.").[8]

This approach, like the provisions of the State-Tribal Gaming Act, is game-specific. IGRA "requires a particularized inquiry into the proposed gambling activity" and "look[s] at the state's public policy toward the specific gaming activities proposed by the tribes." *Seminole Tribe of Fla. v. State of Fla.*, No. 91-cv-6756, 1993 WL 475999, at *8 & n.1 (S.D. Fla. Sept. 22, 1993). The relevant inquiry is "whether applicable state law permits a specific type of game rather than a broad category of gaming," and "if the state entirely prohibits a particular game, the state is not required to negotiate with a tribe to permit that game, even if the state permits other games in the same

---

[8] If state law permits a specific type of gaming but only under certain conditions or regulations, IGRA contemplates that a state will in good-faith negotiate with a tribe to conduct that same type of gaming even if conducted in a manner that state law would otherwise prohibit. *N. Arapaho Tribe*, 389 F.3d at 1311-13. Thus, for example, if state law permitted pari-mutuel wagering on horse races but limited the commercial organizer's profits to 25% of the total wagers, gaming compact negotiations on pari-mutuel wagering on horse races need not impose that same profit limitation on the compacting tribe. *Id.*

AR_0000502

classification." *Dewberry v. Kulongoski*, 406 F. Supp. 2d 1136, 1151 (D. Or. 2005); *see also Cheyenne River Sioux Tribe v. State of S.D.*, 3 F.3d 273, 278-79 (8th Cir. 1993) (merely because state law permitted video keno does not mean the state was required to negotiate a compact whereby a tribe could conduct traditional keno). Here, merely because Oklahoma has permitted pari-mutuel wagering on horse racing does not mean that the State has broadly authorized *all* forms of event wagering, such as betting on the outcomes of local elections, professional basketball games, high school football matches, or little-league baseball games.[9] Similarly, merely because the Act has permitted non-house-banked table and card games does not mean the State has broadly authorized all forms of table and card games, including house-banked games. *See Rumsey*, 64 F.3d at 1256-58 (holding that though state permitted nonbanked card gaming, it was not required to negotiate banked card gaming).

In any event, the relevant question here is **not** the proper scope of IGRA *negotiations* between Oklahoma and tribal nations, it is whether the Governor can unilaterally *enter into* compacts on behalf of the State in a manner that is contrary to state law. Even if IGRA required that certain games be part of good-faith negotiations with tribes desiring to enter into gaming compacts, nothing in IGRA authorizes the Governor to unilaterally bind the State to a compact when agreeing to its terms conflicts with the public policy of the State as expressed in statute, permits activity criminalized by state law, or undermines our Constitution's separation of powers and system of checks and balances. IGRA creates a framework for states, tribes, and the federal government to cooperate in the regulation of tribal gaming, but *state law* determines when and how the State consents to a compact negotiated within IGRA's framework. These issues were extensively discussed by the Tenth Circuit in the analogous case of *Pueblo of Santa Ana v. Kelly*, 104 F.3d 1546 (10th Cir. 1997). That court's careful and well-reasoned decision obviates the need to further discuss the relevant law here.

Nor could IGRA constitutionally compel the State to legalize specific forms of gaming or dictate which branches of state government may enter into a compact on behalf of the State. The Tenth Amendment recognizes a federal constitutional structure that, under the anticommandeering doctrine, prohibits the national government from forcing arms of state governments to carry out federal law or enact specific legislation into state law. *See Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1475 (2018); *Printz v. United States*, 521 U.S. 898, 924 (1997) ("[E]ven where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts.") (citation omitted); *New York v. United States*, 505 U.S. 144, 145 (1992) ("Congress may not commandeer the States' legislative processes by directly compelling them to enact and enforce a federal regulatory program."). In *Murphy*, for example, the U.S. Supreme Court held that a federal law making it unlawful for a State to authorize sports gambling violates the anticommandeering

---

[9] Nor is it the case that, because the State has authorized certain activities at sporting events that are *outside* the definition of wagering, the State has thereby authorized a form of sports wagering. *See* 2005 OK AG 18, ¶¶ 14-23 (discussing the exclusion of "purses, prizes, or premiums" from the statutory definition of "bet" in 21 O.S.2011, § 981); 1999 OK AG 5 (same); 1995 OK AG 6 (same).

AR_0000503

doctrine because the law "unequivocally dictates what a state legislature may and may not do." *Id.* at 1478. The federal law unconstitutionally "put [state legislatures] under the direct control of Congress. It is as if federal officers were installed in state legislative chambers and were armed with the authority to stop legislators from voting on any offending proposals." *Id.*

For these reasons, the Oklahoma Constitution's separation of powers and system of checks and balances is not altered by federal law in the context of tribal gaming compacts, nor does IGRA change how the State decides whether to enter into a gaming compact. This Office's longstanding analysis of state law endures: the Governor has the authority to negotiate compacts with Indian tribes but he cannot bind the state to any such compact if doing so authorizes activity prohibited by state law or would otherwise be contrary to state law.

**It is, therefore, the official Opinion of the Attorney General that:**

**The Governor lacks authority to enter into and bind the State to compacts with Indian tribes that authorize gaming activity prohibited by state law.**

MIKE HUNTER
ATTORNEY GENERAL OF OKLAHOMA

MITHUN MANSINGHANI
SOLICITOR GENERAL OF OKLAHOMA

ATTORNEY GENERAL OF OKLAHOMA
APPROVED IN CONFERENCE
Official Copy

AR_0000504



**MIKE HUNTER**
**ATTORNEY GENERAL**

**ATTORNEY GENERAL OPINION**
**2020-8**

The Honorable Greg Treat                                      May 5, 2020
President Pro Tempore
Oklahoma State Senate
2300 N. Lincoln Blvd., Room 422
Oklahoma City, OK 73105

The Honorable Charles McCall
Speaker
Oklahoma House of Representatives
2300 N. Lincoln Blvd., Room 401
Oklahoma City, OK 73105

Dear President Pro Tempore Treat and Speaker McCall:

This office has received your request for an official Attorney General Opinion in which you ask, in effect, the following question:

> **What authority does the Governor have to enter into new compacts with tribes which contain gaming activities that are expressly prohibited by Oklahoma Statute?**

**I.**
**BACKGROUND**

**A. The State-Tribal Gaming Act.**

In 2004, the Legislature referred State Question 712 to the people, who approved the measure in a referendum that enacted the State-Tribal Gaming Act ("the Act"). *See* 2004 Okla. Sess. Laws ch. 316 (codified at 3A O.S.2011 & Supp.2019, §§ 261 *et seq.*). Although the terms of the tribal gaming compacts were initially formulated in discussions between the Governor and Tribal Nations in Oklahoma, it was through this exercise of legislative power that the State offered a model tribal gaming compact to all federally-recognized Indian tribes in the state. 3A O.S.Supp.2019, § 280. If that offer was accepted by a Tribe, "[n]o further action by the Governor or the state is required before the compact can take effect," though approval by the Secretary of the Interior is still necessary under federal law. *Id.* The Act offers the model compact on behalf of the State "through the concurrence of the Governor after considering the executive prerogatives of that office and the power to negotiate the terms of a compact between the state and a tribe, and by

313 N.E. 21ST STREET • OKLAHOMA CITY, OK 73105 • (405) 521-3921 • FAX: (405) 521-6246

recycled paper

AR_0000508

means of the execution of the State-Tribal Gaming Act, and with the concurrence of the State Legislature through the enactment of the State-Tribal Gaming Act." *Id.* The Act further provides that "[n]o tribe shall be required to agree to terms different than the terms set forth in the Model Tribal Gaming Compact." *Id.*

Oklahoma law for over a century has generally prohibited gambling, but under the Act "the conducting of and the participation in any game authorized by the model compact . . . are lawful when played pursuant to a compact," notwithstanding the criminal laws prohibiting gambling found in Title 21, Sections 941 through 988. *Id.*; *see also id.* § 262(A) (providing same exception to criminal prohibitions for "gaming in accordance with the provisions of this act or the model compact set forth in Section 281"). But the Act "is game-specific and shall not be construed to allow the operation of any other form of gaming unless specifically allowed by this act," and the "act shall not permit the operation of slot machines, house-banked card games, house-banked table games involving dice or roulette wheels, or games where winners are determined by the outcome of a sports contest." *Id.* § 262(H).

The model compact sets out numerous parameters for tribal gaming, including standards and regulations for conducting games, independent game testing, mechanisms to ensure oversight and compliance with the compact's terms such as monitoring, recordkeeping and auditing, permitted locations for gaming facilities, licensing for gaming facility employees and vendors, and dispute resolution. *Id.* § 281. The model compact also acknowledges that it "provides tribes with substantial exclusivity" in conducting gaming in Oklahoma that is otherwise subject to criminal prohibition and, in consideration for that exclusivity, provides for the payment of fees by the Tribe to the State from a share of gaming revenues. *Id.* § 281, Part 11. The model compact states the following as the "authority to execute" the compact on behalf of the State: "as an enactment of the people of Oklahoma, [the compact] is deemed approved by the State of Oklahoma." *Id.* § 281, Part 16.

Like the rest of the Act, the model compact allows compacting tribes to conduct "covered game[s]" only in conformity with the compact. *Id.* § 281, Part 4(A). This includes specifically enumerated games as well as games "approved by state legislation for use by any person or entity" or "approved by amendment of the State-Tribal Gaming Act." *Id.* § 281, Part 3(5).[1] In 2018 the Legislature amended the Act to include additional covered games (specifically, non-house-banked table games) that a Tribe could conduct if a Tribe elects to accept the offer, agrees to a written supplement to an existing compact, and receives approval of the supplement by the Secretary of the Interior. *Id.* § 280.1. Again, gaming played pursuant to such a compact supplement is not subject to Oklahoma's general criminal prohibitions on gambling. *Id.* § 280.1(G).[2]

---

[1] Other non-enumerated games that are permitted include those "approved by the Oklahoma Horse Racing Commission for use by an organizational licensee" and "upon election by the tribe by written supplement to this Compact, any Class II game in use by the tribe." *Id.*

[2] This 2018 legislation also amended Section 262(H) of Title 3A, which is quoted above, to alter the list of games not permitted by the Act. *See* 2018 Sess. Laws. chp. 11, § 1.

## B. Recent developments related to Oklahoma tribal gaming compacts.

Many Tribes accepted the State's offer of the model compact, but recently a dispute between the Governor and many of those Tribes has arisen about whether those compacts are still in force after January 1, 2020 pursuant to Part 15(B) of the model compact. *See* 2020 OK AG 3, ¶¶ 2-6. Because it is currently the subject of active litigation in federal court, this Opinion takes no position on the issues raised in that dispute. *See id.* ¶ 6 (citing *Cherokee Nation et al. v. Stitt*, No. CIV-19-1198 (W.D. Okla.)).

In the midst of this litigation, the Governor of Oklahoma and two of the litigating tribes (the Comanche Nation and the Otoe-Missouria Tribe) reached an agreement on new gaming compacts.[3] These compacts do not conform to the model compact set forth in the Act. For example, the new compacts include covered games not included in the model compacts or authorized by the Act, such as house-banked card games, house-banked table games, and event wagering. Event wagering is defined in Part 2 of these new compacts as "the placing of a wager on the outcome of a Sport event, including E-Sports, or any other events, to the extent such wagers are authorized by law," excepting intercollegiate sports involving either schools or events within the state. The new compacts also deviate from the model compact in that they have different exclusivity fee rates, different processes for adding new games, a different dispute resolution clause, and different audit and compliance provisions, among many other differences. Unlike the model compacts, the new compacts purport to vest all state authority related to the compacts with the Governor alone.

The question you ask is whether the Governor has authority to unilaterally bind the State to these new gaming compacts that purport to authorize gaming activity prohibited by state law.

## II.
### DISCUSSION

## A. The Governor's authority to negotiate compacts with Indian tribes

Your question implicates core notions of our constitutional structure: both the separation of powers between branches of state government as well as the checks and balances that those branches can impose on each other. The legislative branch sets the public policy of the State by enacting law not in conflict with the Constitution. OKLA. CONST. art. V, § 1. The Governor has a role in setting that policy through his function in the legislative process, such as signing or vetoing bills, *Id.* art. VI, § 11, but his primary role is in taking care that the law is faithfully executed, *id.* art. VI, § 8.[4] This division of powers creates the ability of one branch to check the excesses of the other: the Governor can veto bills passed by the Legislature, for example, while the Governor cannot act

---

[3] *Available at* https://www.governor.ok.gov/static-assets/documents/gamingcompacts/gaming_compact_comanche_nation.pdf (last visited May 1, 2020) *and* https://www.governor.ok.gov/static-assets/documents/gamingcompacts/gaming_compact_otoe_missouria.pdf (last visited May 1, 2020).

[4] Of course, the Governor is not the only officer of the executive branch and therefore does not possess exclusive authority to execute the law. *See* OKLA. CONST. art. VI, § 1; *Wentz v. Thomas*, 1932 OK 636, ¶ 27, 15 P.2d 65, 69.

contrary to the constitutional laws enacted by the Legislature. *See Coffee v. Henry*, 2010 OK 4, ¶ 5, 240 P.3d 1056, 1057; *Dank v. Benson*, 2000 OK 40, ¶ 6 n.12, 5 P.3d 1088, 1091 n.12.

This Office examined the separation of powers as it relates to compacts between the State and the Tribes in Oklahoma Attorney General Opinion 2004-27. The Opinion began by noting the Governor's power under Article VI, Section 8 to "conduct in person or in such manner as may be prescribed by law, all intercourse and business of the State with other states and with the United States." 2004 OK AG 27, ¶ 7 (quoting OKLA. CONST. art. VI, § 8). Thus, "as a matter of State Constitutional law, it is the Governor who is empowered to conduct intercourse and business with the other states and with the United States." *Id.* ¶¶ 7-8. In contrast, the opinion continued, "the power of the Governor to contract with Indian tribes is not derived from the Constitution; it is derived from statutes," specifically citing Section 1221(C)(1) of Title 74, which states: "The Governor is authorized to negotiate and enter into cooperative agreements on behalf of this state with federally recognized Indian tribal governments within this state to address issues of mutual interest." *Id.* ¶ 9.

The opinion then evaluated case law on the separation of powers principle restricting the Legislature's ability to control the exercise of executive authority via requirements of *post-hoc* legislative approval. *Id.* ¶¶ 22-26 (examining *In re Okla. Dep't of Transp.*, 2002 OK 74, 64 P.3d 546). Based on this case law, the opinion concluded: "[A]ny requirement that individual agreements or compacts negotiated by the Governor on behalf of the State with other sovereigns, such as Indian tribes, be approved by the Legislature would violate the principles of separation of powers . . . . Such requirements . . . would have the Legislature carrying out legislative policy and applying it to various conditions." *Id.* ¶ 27. But the opinion also recognized the balance created by the Legislature's proper role: "Of course, any agreement negotiated by the Governor must conform to the public policy enacted into law by the Legislature, as the role of the Legislative Branch is to establish public policy, and the role of the Executive Branch is to execute that policy." *Id.* ¶ 30, n.3 (citing *Tweedy v. Okla. Bar Ass'n*, 1981 OK 12, 624 P.2d 1049, 1054).

In short, our previous opinion recognizes the Governor's authority to negotiate compacts with Indian tribes without the need to secure later approval by the Legislature *provided that* any such compacts conform to (and not conflict with) the laws duly enacted by the legislative branch.

**B.  The Governor lacks the authority to unilaterally bind the State to compacts with Indian tribes that authorize activity prohibited by state law.**

Under the framework embraced by Attorney General Opinion 2004-27, the Governor currently lacks the authority to bind the State to the compacts he recently negotiated with the Comanche Nation and the Otoe-Missouria Tribe. These compacts purport to grant the State's consent to conduct gambling activities that are prohibited by state criminal law, *see* 21 O.S.2011 & Supp.2019, §§ 941–988. State law permits gaming conducted by Indian tribes, but only if that gaming is "in accordance with the provisions of [the State-Tribal Gaming Act] or the model compact set forth in Section 281" of the Act. 3A O.S.Supp.2019, § 262(A); *see also id.* § 280. Gaming under these new compacts cannot be said to be in accordance with the model gaming compact offered by the Act because their terms differ considerably. Were the Governor able to unilaterally authorize gaming, it would render superfluous the provisions in the Act allowing gaming under the model compact "[n]otwithstanding the provisions of Sections 941 through 988 of Title 21 of the Oklahoma Statutes." *Id.* § 280; *see also id.* § 262(A); *Odom v. Penske Truck Leasing Co.*, 2018 OK 23, ¶ 36, 415 P.3d 521, 532 ("Statutes must be read to render every part operative, and to avoid rendering it superfluous or useless.").

Although the new compacts differ from the model compacts in many respects, the clearest instance of conflict with state law is in the scope of covered games. The new compacts authorize gaming such as house-banked card and table games, as well as event wagering, that are prohibited by state criminal law and not exempted by the Act.[5] Nor can it be said that because the Act permits *some* Class III gaming by compacting tribes, *all* such gaming can be authorized by a compact. Again, the State-Tribal Gaming Act "is game-specific and shall not be construed to allow the operation of any other form of gaming unless specifically allowed by this act"; specifically, the "act shall not permit the operation of . . . house-banked card games, house-banked table games involving dice or roulette wheels, or games where winners are determined by the outcome of a sports contest." 3A O.S.Supp.2019, § 262(H). Thus, these new compacts do not "conform to the public policy enacted into law by the Legislature" and as such the Governor lacks the authority to enter into them on behalf of the State. 2004 OK AG 27, ¶ 30, n.3.[6]

---

[5] While the new compacts define event wagering as placing a wager only "to the extent such wagers are authorized by law," such that it could be argued the new compacts do not authorize activity prohibited by state law, this qualifying language does not exist with respect to house-banked table and card games. Further, the new compacts permit "gaming machines," which is a term that may not be coextensive with the gaming allowed by the Act, and therefore may also encompass types of gambling prohibited by Oklahoma law. Thus, even setting aside the issue of event wagering, the new compacts purport to authorize activity prohibited by state law.

[6] Because of this clear deviation from state law, we need not analyze whether compacts that differ from the model compact in other respects—such as audit and compliance measures, permitted locations for gaming facilities, or dispute resolution—would be permitted by state law. Nor need we determine whether the Governor could unilaterally enter into new gaming compacts that differ from the model compact only with respect to gaming exclusivity and exclusivity fees, pursuant to the model compact's provision allowing the Governor to "request to renegotiate the terms of subsections A and E of Part 11 of this Compact." 3A O.S.Supp.2019, § 281, Part 15(B). And while the new compacts contain a severability clause, it only applies if "any federal court" declares a provision invalid, which does not impact our analysis of state law and in any event may be of limited relevance because the new compacts depart from the State-Tribal Gaming Act in so many different respects.

AR_0000512

Notably, the exemptions from the State's criminal prohibitions on gambling in the Act are not only for "the conducting of" gaming by an Indian tribe on Indian lands, but also "the participation in" such gaming by any person, including non-Indians. 3A O.S.Supp.2019, §§ 262(A), 280. So even if sovereign immunity would preclude the State from prosecuting tribes conducting gaming in violation of state law, nonmembers would still be subject to prosecution for participating in such gaming—and the Governor lacks authority to unilaterally declare their actions are legal by means of a tribal compact. The Governor can no more permit gambling prohibited by state criminal law via unilateral compact than he could agree to allow a Tribe to sell illicit controlled substances to members of the public in Indian country.

This plain reading of the text of the law and our previous opinion on the topic is supported by historical practice. See N.L.R.B. v. Noel Canning, 573 U.S. 513, 524 (2014) (holding in separation of powers case that the Court "put[s] significant weight upon historical practice" when interpreting the Constitution). History confirms that although the Governor has the authority to enter into negotiations with Indian tribes, any compact resulting from those negotiations can be agreed to on behalf of the State only if consistent with state law or if authorized by state law enacted for that purpose. The model compacts were initially drafted pursuant to talks between the Governor and tribal nations. See 3A O.S.Supp.2019, § 280 (recognizing the Governor's "power to negotiate the terms of a compact between the state and a tribe"). But the State only entered into them "through the concurrence of the Governor . . . by means of the execution of the State-Tribal Gaming Act, and with the concurrence of the State Legislature through the enactment of the State-Tribal Gaming Act." Id. § 280. The model gaming compact itself states the "authority to execute" the compact on behalf of the State is based on the fact that, "as an enactment of the people of Oklahoma, [it] is deemed approved by the State of Oklahoma." Id. § 281, Part 16. And when in the past the State and the Tribes sought to expand the scope of covered games authorized by state law and the gaming compacts, they did so pursuant to the model compact's authorization of games "approved by amendment of the State-Tribal Gaming Act," id. § 281, Part 3(5). Specifically, the Legislature and Governor enacted a law in 2018 that amended the Act and provided for supplements to the model compact that tribes could agree to in order to permit non-house-banked table games. Id. § 280.1. In contrast, the new forms of gaming contemplated in the compacts negotiated with the Comanche Nation and the Otoe-Missouria Tribe have not been authorized by state law and so cannot be said to have been agreed to by the State, nor is the State validly bound to those compacts.[7]

---

[7] Many other state-tribal compacts are specifically contemplated by, or at least not in conflict with, state law. See, e.g., 68 O.S. 2011 & Supp. 2019, §§ 346 et seq. (taxes on cigarette sales); 68 O.S.2011, § 500.63 (taxes on motor fuel sales); 47 O.S.2011, § 2-108.3 (tribal license plates); 70 O.S.Supp.2019, § 3311.4 (cross-deputization agreements); 21 O.S.Supp.2019, § 99a (same); 21 O.S.2011, § 648 (same). The existence of compacts entered into by the Governor without approval by the Legislature does not undermine our conclusion here because such compacts do not authorize activity prohibited by state law, but instead promote compliance with state law. Cf. Informal Op. by A.A.G. Neal Leader, 93-685 (agreement with Cherokee to promote cooperative law enforcement did not constitute exercise of legislative authority and thus did not interfere with the separation of powers).

### C. Federal law does not determine how the State can consent to a tribal gaming compact, nor can it dictate the allocation of power within state government.

The federal law governing state-tribal gaming compacts—the Indian Gaming Regulatory Act ("IGRA")—does not alter this analysis. "IGRA creates a cooperative federal-state-tribal scheme for regulation of gaming hosted by federally recognized Indian tribes on Indian land." *KG Urban Enterprises, LLC v. Patrick*, 693 F.3d 1, 7 (1st Cir. 2012). Under IGRA, Class III tribal gaming is lawful only if authorized by tribal ordinance, "located in a State that permits such gaming for any purpose by any person, organization, or entity," and "conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State." 25 U.S.C. § 2710(d)(1). Upon request from a tribe to negotiate a gaming compact, "the State shall negotiate with the Indian tribe in good faith to enter into such a compact." *Id.* at § 2710(d)(3)(A). These compacts take effect only if approved by the Secretary of the Interior. *Id.* at § 2710(d)(3)(B). Nothing in this law attempts to dictate *how* a state's government agrees to the terms of a compact, whether by executive action alone, legislative action, or the concurrence of the two.

While IGRA purports to require states to enter into good-faith compact negotiations on Class III gaming, it only authorizes tribal Class III gaming if state law "permits such gaming for any purpose by any person, organization, or entity." *Id.* at § 2710(d)(1)(B). In other words, "where a state does not 'permit' gaming activities sought by a tribe, the tribe has no right to engage in these activities, and the state thus has no duty to negotiate with respect to them." *Rumsey Indian Rancheria of Wintun Indians v. Wilson*, 64 F.3d 1250, 1256 (9th Cir. 1994). "The State must first legalize a game, even if only for tribes, before it can become a compact term." *American Greyhound Racing, Inc. v. Hull*, 146 F. Supp. 2d 1012, 1067 (D. Ariz. 2001), *vacated on other grounds*, 305 F.3d 1015 (9th Cir. 2002). Thus, "[i]n order to determine the appropriate scope of negotiations between the Tribe and the state . . . , it is critical to determine the scope of gaming permitted by state law." *N. Arapaho Tribe v. State of Wyoming*, 389 F.3d 1308, 1311 (10th Cir. 2004). IGRA does not preempt a state's decision to prohibit specific types of Class III gaming, nor require a state to enter into a compact permitting a specific type of Class III gaming that is prohibited by state law. Rather, in determining the proper scope of a federally-authorized compact, IGRA *defers* to state law. *See also Rumsey*, 64 F.3d at 1258 ("[A] state need only allow Indian Tribes to operate games that others can operate, but need not give tribes what others cannot have.").[8]

This approach, like the provisions of the State-Tribal Gaming Act, is game-specific. IGRA "requires a particularized inquiry into the proposed gambling activity" and "look[s] at the state's public policy toward the specific gaming activities proposed by the tribes." *Seminole Tribe of Fla. v. State of Fla.*, No. 91-cv-6756, 1993 WL 475999, at *8 & n.1 (S.D. Fla. Sept. 22, 1993). The relevant inquiry is "whether applicable state law permits a specific type of game rather than a broad category of gaming," and "if the state entirely prohibits a particular game, the state is not required to negotiate with a tribe to permit that game, even if the state permits other games in the same

---

[8] If state law permits a specific type of gaming but only under certain conditions or regulations, IGRA contemplates that a state will in good-faith negotiate with a tribe to conduct that same type of gaming even if conducted in a manner that state law would otherwise prohibit. *N. Arapaho Tribe*, 389 F.3d at 1311-13. Thus, for example, if state law permitted pari-mutuel wagering on horse races but limited the commercial organizer's profits to 25% of the total wagers, gaming compact negotiations on pari-mutuel wagering on horse races need not impose that same profit limitation on the compacting tribe. *Id.*

classification." *Dewberry v. Kulongoski*, 406 F. Supp. 2d 1136, 1151 (D. Or. 2005); *see also Cheyenne River Sioux Tribe v. State of S.D.*, 3 F.3d 273, 278-79 (8th Cir. 1993) (merely because state law permitted video keno does not mean the state was required to negotiate a compact whereby a tribe could conduct traditional keno). Here, merely because Oklahoma has permitted pari-mutuel wagering on horse racing does not mean that the State has broadly authorized *all* forms of event wagering, such as betting on the outcomes of local elections, professional basketball games, high school football matches, or little-league baseball games.[9] Similarly, merely because the Act has permitted non-house-banked table and card games does not mean the State has broadly authorized all forms of table and card games, including house-banked games. *See Rumsey*, 64 F.3d at 1256-58 (holding that though state permitted nonbanked card gaming, it was not required to negotiate banked card gaming).

In any event, the relevant question here is **not** the proper scope of IGRA *negotiations* between Oklahoma and tribal nations, it is whether the Governor can unilaterally *enter into* compacts on behalf of the State in a manner that is contrary to state law. Even if IGRA required that certain games be part of good-faith negotiations with tribes desiring to enter into gaming compacts, nothing in IGRA authorizes the Governor to unilaterally bind the State to a compact when agreeing to its terms conflicts with the public policy of the State as expressed in statute, permits activity criminalized by state law, or undermines our Constitution's separation of powers and system of checks and balances. IGRA creates a framework for states, tribes, and the federal government to cooperate in the regulation of tribal gaming, but *state law* determines when and how the State consents to a compact negotiated within IGRA's framework. These issues were extensively discussed by the Tenth Circuit in the analogous case of *Pueblo of Santa Ana v. Kelly*, 104 F.3d 1546 (10th Cir. 1997). That court's careful and well-reasoned decision obviates the need to further discuss the relevant law here.

Nor could IGRA constitutionally compel the State to legalize specific forms of gaming or dictate which branches of state government may enter into a compact on behalf of the State. The Tenth Amendment recognizes a federal constitutional structure that, under the anticommandeering doctrine, prohibits the national government from forcing arms of state governments to carry out federal law or enact specific legislation into state law. *See Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1475 (2018); *Printz v. United States*, 521 U.S. 898, 924 (1997) ("[E]ven where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts.") (citation omitted); *New York v. United States*, 505 U.S. 144, 145 (1992) ("Congress may not commandeer the States' legislative processes by directly compelling them to enact and enforce a federal regulatory program."). In *Murphy*, for example, the U.S. Supreme Court held that a federal law making it unlawful for a State to authorize sports gambling violates the anticommandeering

---

[9] Nor is it the case that, because the State has authorized certain activities at sporting events that are *outside* the definition of wagering, the State has thereby authorized a form of sports wagering. *See* 2005 OK AG 18, ¶¶ 14-23 (discussing the exclusion of "purses, prizes, or premiums" from the statutory definition of "bet" in 21 O.S.2011, § 981); 1999 OK AG 5 (same); 1995 OK AG 6 (same).

doctrine because the law "unequivocally dictates what a state legislature may and may not do." *Id.* at 1478. The federal law unconstitutionally "put [state legislatures] under the direct control of Congress. It is as if federal officers were installed in state legislative chambers and were armed with the authority to stop legislators from voting on any offending proposals." *Id.*

For these reasons, the Oklahoma Constitution's separation of powers and system of checks and balances is not altered by federal law in the context of tribal gaming compacts, nor does IGRA change how the State decides whether to enter into a gaming compact. This Office's longstanding analysis of state law endures: the Governor has the authority to negotiate compacts with Indian tribes but he cannot bind the state to any such compact if doing so authorizes activity prohibited by state law or would otherwise be contrary to state law.

**It is, therefore, the official Opinion of the Attorney General that:**

**The Governor lacks authority to enter into and bind the State to compacts with Indian tribes that authorize gaming activity prohibited by state law.**

MIKE HUNTER
ATTORNEY GENERAL OF OKLAHOMA

MITHUN MANSINGHANI
SOLICITOR GENERAL OF OKLAHOMA

AR_0000516



# MIKE HUNTER
## ATTORNEY GENERAL

May 5, 2020

The Honorable David Bernhardt
Secretary of the Interior
U.S. Department of the Interior
1849 C Street N.W.
Washington, D.C. 20240

Dear Secretary Bernhardt,

I write concerning the agreements between Oklahoma Governor Kevin Stitt and the Comanche Nation and Otoe-Missouria Tribe submitted to you on April 23, 2020 for purposes of approval as a state-tribal gaming compact under the Indian Gaming Regulatory Act (IGRA). I respectfully request that you disapprove these agreements because they are not authorized by IGRA and out of deference to determinations of state law made by the legal officials of the state.

In particular, I attach an official Attorney General Opinion I issued today that concludes Governor Stitt was without legal authority to bind the State of Oklahoma to these agreements and therefore it cannot be said that the State has entered into a new gaming compact with these tribal nations. I reach this conclusion because, under the statutes and Constitution of Oklahoma, the Governor cannot authorize the violation of state law through a compact with an Indian tribe. While Oklahoma's State-Tribal Gaming Act exempts from the State's criminal prohibitions on gambling certain gaming conducted by tribes that validly enter into the Act's model gaming compact, the agreements forwarded to you by Governor Stitt deviate from the model gaming compact, including by authorizing forms of gaming prohibited by state law and not exempted by the State-Tribal Gaming Act.

Because the Governor lacks authority to "enter into" the agreements he has sent to you, those agreements fail to meet the requirements of IGRA to constitute a valid gaming compact under federal law. 25 U.S.C. § 2710(d)(1)(C), (3)(B). How a state enters into a gaming compact with a tribe, including whether the Governor may do so unilaterally in contravention of state statute, is a core concern of the state's constitutional structure and is therefore a matter of state law. *See Pueblo of Santa Ana v. Kelly*, 104 F.3d 1546 (10th Cir. 1997). In issuing the attached Opinion on the permissibility of the Governor's actions under state law, I act in a quasi-judicial capacity and "state officers are bound by these Attorney General opinions until relieved of that duty" by the courts of Oklahoma. *State ex rel. York v. Turpen*, 681 P.2d 763, 767 (Okla. 1984).

Oklahoma deeply values its relationship with the tribal nations that reside within its borders. They are an integral part of our community, history, culture, economy, and way of life. Their importance demands the respect of knowing that, when state officials make promises to Indian tribes, those officials have the authority to bind the State to such agreements. To do otherwise undermines the

313 N.E. 21st Street • Oklahoma City, OK 73105 • (405) 521-3921 • Fax: (405) 521-6246

 recycled paper

AR_0000518

credibility and honor of the State when engaging in these sensitive inter-sovereign relations. Unfortunately, I fear the agreements sent recently to you by the Governor will only have the effect of damaging the relationship between the State and these two tribes. Moreover, for all tribes in Oklahoma, approval of these agreements as gaming compacts will only cause greater confusion and uncertainty about how state-tribal relations should be appropriately conducted.

For these reasons, and for the reasons expressed in the attached Attorney General Opinion, I humbly urge you to disapprove for purposes of IGRA Governor Stitt's agreements with the Comanche Nation and the Otoe-Missouria tribe.

Sincerely,

Mike Hunter
OKLAHOMA ATTORNEY GENERAL

Enclosure: Oklahoma Attorney General Opinion 2020-8.

cc:     Assistant Secretary of the Interior Tara Sweeney
        Director Paula Hart, Office of Indian Gaming, Department of the Interior

AR_0000519



## Mike Hunter
### Attorney General

### Attorney General Opinion
### 2020-8

The Honorable Greg Treat
President Pro Tempore
Oklahoma State Senate
2300 N. Lincoln Blvd., Room 422
Oklahoma City, OK 73105

May 5, 2020

The Honorable Charles McCall
Speaker
Oklahoma House of Representatives
2300 N. Lincoln Blvd., Room 401
Oklahoma City, OK 73105

Dear President Pro Tempore Treat and Speaker McCall:

This office has received your request for an official Attorney General Opinion in which you ask, in effect, the following question:

> **What authority does the Governor have to enter into new compacts with tribes which contain gaming activities that are expressly prohibited by Oklahoma Statute?**

### I.
### Background

**A. The State-Tribal Gaming Act.**

In 2004, the Legislature referred State Question 712 to the people, who approved the measure in a referendum that enacted the State-Tribal Gaming Act ("the Act"). *See* 2004 Okla. Sess. Laws ch. 316 (codified at 3A O.S.2011 & Supp.2019, §§ 261 *et seq.*). Although the terms of the tribal gaming compacts were initially formulated in discussions between the Governor and Tribal Nations in Oklahoma, it was through this exercise of legislative power that the State offered a model tribal gaming compact to all federally-recognized Indian tribes in the state. 3A O.S.Supp.2019, § 280. If that offer was accepted by a Tribe, "[n]o further action by the Governor or the state is required before the compact can take effect," though approval by the Secretary of the Interior is still necessary under federal law. *Id.* The Act offers the model compact on behalf of the State "through the concurrence of the Governor after considering the executive prerogatives of that office and the power to negotiate the terms of a compact between the state and a tribe, and by

313 N.E. 21st Street • Oklahoma City, OK 73105 • (405) 521-3921 • Fax: (405) 521-6246


recycled paper

AR_0000520

means of the execution of the State-Tribal Gaming Act, and with the concurrence of the State Legislature through the enactment of the State-Tribal Gaming Act." *Id.* The Act further provides that "[n]o tribe shall be required to agree to terms different than the terms set forth in the Model Tribal Gaming Compact." *Id.*

Oklahoma law for over a century has generally prohibited gambling, but under the Act "the conducting of and the participation in any game authorized by the model compact . . . are lawful when played pursuant to a compact," notwithstanding the criminal laws prohibiting gambling found in Title 21, Sections 941 through 988. *Id.*; *see also id.* § 262(A) (providing same exception to criminal prohibitions for "gaming in accordance with the provisions of this act or the model compact set forth in Section 281"). But the Act "is game-specific and shall not be construed to allow the operation of any other form of gaming unless specifically allowed by this act," and the "act shall not permit the operation of slot machines, house-banked card games, house-banked table games involving dice or roulette wheels, or games where winners are determined by the outcome of a sports contest." *Id.* § 262(H).

The model compact sets out numerous parameters for tribal gaming, including standards and regulations for conducting games, independent game testing, mechanisms to ensure oversight and compliance with the compact's terms such as monitoring, recordkeeping and auditing, permitted locations for gaming facilities, licensing for gaming facility employees and vendors, and dispute resolution. *Id.* § 281. The model compact also acknowledges that it "provides tribes with substantial exclusivity" in conducting gaming in Oklahoma that is otherwise subject to criminal prohibition and, in consideration for that exclusivity, provides for the payment of fees by the Tribe to the State from a share of gaming revenues. *Id.* § 281, Part 11. The model compact states the following as the "authority to execute" the compact on behalf of the State: "as an enactment of the people of Oklahoma, [the compact] is deemed approved by the State of Oklahoma." *Id.* § 281, Part 16.

Like the rest of the Act, the model compact allows compacting tribes to conduct "covered game[s]" only in conformity with the compact. *Id.* § 281, Part 4(A). This includes specifically enumerated games as well as games "approved by state legislation for use by any person or entity" or "approved by amendment of the State-Tribal Gaming Act." *Id.* § 281, Part 3(5).[1] In 2018 the Legislature amended the Act to include additional covered games (specifically, non-house-banked table games) that a Tribe could conduct if a Tribe elects to accept the offer, agrees to a written supplement to an existing compact, and receives approval of the supplement by the Secretary of the Interior. *Id.* § 280.1. Again, gaming played pursuant to such a compact supplement is not subject to Oklahoma's general criminal prohibitions on gambling. *Id.* § 280.1(G).[2]

---

[1] Other non-enumerated games that are permitted include those "approved by the Oklahoma Horse Racing Commission for use by an organizational licensee" and "upon election by the tribe by written supplement to this Compact, any Class II game in use by the tribe." *Id.*

[2] This 2018 legislation also amended Section 262(H) of Title 3A, which is quoted above, to alter the list of games not permitted by the Act. *See* 2018 Sess. Laws. chp. 11, § 1.

AR_0000521

## B.  Recent developments related to Oklahoma tribal gaming compacts.

Many Tribes accepted the State's offer of the model compact, but recently a dispute between the Governor and many of those Tribes has arisen about whether those compacts are still in force after January 1, 2020 pursuant to Part 15(B) of the model compact. *See* 2020 OK AG 3, ¶¶ 2-6. Because it is currently the subject of active litigation in federal court, this Opinion takes no position on the issues raised in that dispute. *See id.* ¶ 6 (citing *Cherokee Nation et al. v. Stitt*, No. CIV-19-1198 (W.D. Okla.)).

In the midst of this litigation, the Governor of Oklahoma and two of the litigating tribes (the Comanche Nation and the Otoe-Missouria Tribe) reached an agreement on new gaming compacts.[3] These compacts do not conform to the model compact set forth in the Act. For example, the new compacts include covered games not included in the model compacts or authorized by the Act, such as house-banked card games, house-banked table games, and event wagering. Event wagering is defined in Part 2 of these new compacts as "the placing of a wager on the outcome of a Sport event, including E-Sports, or any other events, to the extent such wagers are authorized by law," excepting intercollegiate sports involving either schools or events within the state. The new compacts also deviate from the model compact in that they have different exclusivity fee rates, different processes for adding new games, a different dispute resolution clause, and different audit and compliance provisions, among many other differences. Unlike the model compacts, the new compacts purport to vest all state authority related to the compacts with the Governor alone.

The question you ask is whether the Governor has authority to unilaterally bind the State to these new gaming compacts that purport to authorize gaming activity prohibited by state law.

## II.
### DISCUSSION

## A.  The Governor's authority to negotiate compacts with Indian tribes

Your question implicates core notions of our constitutional structure: both the separation of powers between branches of state government as well as the checks and balances that those branches can impose on each other. The legislative branch sets the public policy of the State by enacting law not in conflict with the Constitution. OKLA. CONST. art. V, § 1. The Governor has a role in setting that policy through his function in the legislative process, such as signing or vetoing bills, *Id.* art. VI, § 11, but his primary role is in taking care that the law is faithfully executed, *id.* art. VI, § 8.[4] This division of powers creates the ability of one branch to check the excesses of the other: the Governor can veto bills passed by the Legislature, for example, while the Governor cannot act

---

[3] *Available at* https://www.governor.ok.gov/static-assets/documents/gamingcompacts/gaming_compact_comanche_nation.pdf (last visited May 1, 2020) *and* https://www.governor.ok.gov/static-assets/documents/gamingcompacts/gaming_compact_otoe_missouria.pdf (last visited May 1, 2020).

[4] Of course, the Governor is not the only officer of the executive branch and therefore does not possess exclusive authority to execute the law. *See* OKLA. CONST. art. VI, § 1; *Wentz v. Thomas*, 1932 OK 636, ¶ 27, 15 P.2d 65, 69.

contrary to the constitutional laws enacted by the Legislature. *See Coffee v. Henry*, 2010 OK 4, ¶ 5, 240 P.3d 1056, 1057; *Dank v. Benson*, 2000 OK 40, ¶ 6 n.12, 5 P.3d 1088, 1091 n.12.

This Office examined the separation of powers as it relates to compacts between the State and the Tribes in Oklahoma Attorney General Opinion 2004-27. The Opinion began by noting the Governor's power under Article VI, Section 8 to "conduct in person or in such manner as may be prescribed by law, all intercourse and business of the State with other states and with the United States." 2004 OK AG 27, ¶ 7 (quoting OKLA. CONST. art. VI, § 8). Thus, "as a matter of State Constitutional law, it is the Governor who is empowered to conduct intercourse and business with the other states and with the United States." *Id.* ¶¶ 7-8. In contrast, the opinion continued, "the power of the Governor to contract with Indian tribes is not derived from the Constitution; it is derived from statutes," specifically citing Section 1221(C)(1) of Title 74, which states: "The Governor is authorized to negotiate and enter into cooperative agreements on behalf of this state with federally recognized Indian tribal governments within this state to address issues of mutual interest." *Id.* ¶ 9.

The opinion then evaluated case law on the separation of powers principle restricting the Legislature's ability to control the exercise of executive authority via requirements of *post-hoc* legislative approval. *Id.* ¶¶ 22-26 (examining *In re Okla. Dep't of Transp.*, 2002 OK 74, 64 P.3d 546). Based on this case law, the opinion concluded: "[A]ny requirement that individual agreements or compacts negotiated by the Governor on behalf of the State with other sovereigns, such as Indian tribes, be approved by the Legislature would violate the principles of separation of powers . . . . Such requirements . . . would have the Legislature carrying out legislative policy and applying it to various conditions." *Id.* ¶ 27. But the opinion also recognized the balance created by the Legislature's proper role: "Of course, any agreement negotiated by the Governor must conform to the public policy enacted into law by the Legislature, as the role of the Legislative Branch is to establish public policy, and the role of the Executive Branch is to execute that policy." *Id.* ¶ 30, n.3 (citing *Tweedy v. Okla. Bar Ass'n*, 1981 OK 12, 624 P.2d 1049, 1054).

In short, our previous opinion recognizes the Governor's authority to negotiate compacts with Indian tribes without the need to secure later approval by the Legislature *provided that* any such compacts conform to (and not conflict with) the laws duly enacted by the legislative branch.

AR_0000523

**B. The Governor lacks the authority to unilaterally bind the State to compacts with Indian tribes that authorize activity prohibited by state law.**

Under the framework embraced by Attorney General Opinion 2004-27, the Governor currently lacks the authority to bind the State to the compacts he recently negotiated with the Comanche Nation and the Otoe-Missouria Tribe. These compacts purport to grant the State's consent to conduct gambling activities that are prohibited by state criminal law, *see* 21 O.S.2011 & Supp.2019, §§ 941–988. State law permits gaming conducted by Indian tribes, but only if that gaming is "in accordance with the provisions of [the State-Tribal Gaming Act] or the model compact set forth in Section 281" of the Act. 3A O.S.Supp.2019, § 262(A); *see also id.* § 280. Gaming under these new compacts cannot be said to be in accordance with the model gaming compact offered by the Act because their terms differ considerably. Were the Governor able to unilaterally authorize gaming, it would render superfluous the provisions in the Act allowing gaming under the model compact "[n]otwithstanding the provisions of Sections 941 through 988 of Title 21 of the Oklahoma Statutes." *Id.* § 280; *see also id.* § 262(A); *Odom v. Penske Truck Leasing Co.*, 2018 OK 23, ¶ 36, 415 P.3d 521, 532 ("Statutes must be read to render every part operative, and to avoid rendering it superfluous or useless.").

Although the new compacts differ from the model compacts in many respects, the clearest instance of conflict with state law is in the scope of covered games. The new compacts authorize gaming such as house-banked card and table games, as well as event wagering, that are prohibited by state criminal law and not exempted by the Act.[5] Nor can it be said that because the Act permits *some* Class III gaming by compacting tribes, *all* such gaming can be authorized by a compact. Again, the State-Tribal Gaming Act "is game-specific and shall not be construed to allow the operation of any other form of gaming unless specifically allowed by this act"; specifically, the "act shall not permit the operation of . . . house-banked card games, house-banked table games involving dice or roulette wheels, or games where winners are determined by the outcome of a sports contest." 3A O.S.Supp.2019, § 262(H). Thus, these new compacts do not "conform to the public policy enacted into law by the Legislature" and as such the Governor lacks the authority to enter into them on behalf of the State. 2004 OK AG 27, ¶ 30, n.3.[6]

---

[5] While the new compacts define event wagering as placing a wager only "to the extent such wagers are authorized by law," such that it could be argued the new compacts do not authorize activity prohibited by state law, this qualifying language does not exist with respect to house-banked table and card games. Further, the new compacts permit "gaming machines," which is a term that may not be coextensive with the gaming allowed by the Act, and therefore may also encompass types of gambling prohibited by Oklahoma law. Thus, even setting aside the issue of event wagering, the new compacts purport to authorize activity prohibited by state law.

[6] Because of this clear deviation from state law, we need not analyze whether compacts that differ from the model compact in other respects—such as audit and compliance measures, permitted locations for gaming facilities, or dispute resolution—would be permitted by state law. Nor need we determine whether the Governor could unilaterally enter into new gaming compacts that differ from the model compact only with respect to gaming exclusivity and exclusivity fees, pursuant to the model compact's provision allowing the Governor to "request to renegotiate the terms of subsections A and E of Part 11 of this Compact." 3A O.S.Supp.2019, § 281, Part 15(B). And while the new compacts contain a severability clause, it only applies if "any federal court" declares a provision invalid, which does not impact our analysis of state law and in any event may be of limited relevance because the new compacts depart from the State-Tribal Gaming Act in so many different respects.

AR_0000524

Notably, the exemptions from the State's criminal prohibitions on gambling in the Act are not only for "the conducting of" gaming by an Indian tribe on Indian lands, but also "the participation in" such gaming by any person, including non-Indians. 3A O.S.Supp.2019, §§ 262(A), 280. So even if sovereign immunity would preclude the State from prosecuting tribes conducting gaming in violation of state law, nonmembers would still be subject to prosecution for participating in such gaming—and the Governor lacks authority to unilaterally declare their actions are legal by means of a tribal compact. The Governor can no more permit gambling prohibited by state criminal law via unilateral compact than he could agree to allow a Tribe to sell illicit controlled substances to members of the public in Indian country.

This plain reading of the text of the law and our previous opinion on the topic is supported by historical practice. *See N.L.R.B. v. Noel Canning*, 573 U.S. 513, 524 (2014) (holding in separation of powers case that the Court "put[s] significant weight upon historical practice" when interpreting the Constitution). History confirms that although the Governor has the authority to enter into negotiations with Indian tribes, any compact resulting from those negotiations can be agreed to on behalf of the State only if consistent with state law or if authorized by state law enacted for that purpose. The model compacts were initially drafted pursuant to talks between the Governor and tribal nations. *See* 3A O.S.Supp.2019, § 280 (recognizing the Governor's "power to negotiate the terms of a compact between the state and a tribe"). But the State only entered into them "through the concurrence of the Governor . . . by means of the execution of the State-Tribal Gaming Act, and with the concurrence of the State Legislature through the enactment of the State-Tribal Gaming Act." *Id.* § 280. The model gaming compact itself states the "authority to execute" the compact on behalf of the State is based on the fact that, "as an enactment of the people of Oklahoma, [it] is deemed approved by the State of Oklahoma." *Id.* § 281, Part 16. And when in the past the State and the Tribes sought to expand the scope of covered games authorized by state law and the gaming compacts, they did so pursuant to the model compact's authorization of games "approved by amendment of the State-Tribal Gaming Act," *id.* § 281, Part 3(5). Specifically, the Legislature and Governor enacted a law in 2018 that amended the Act and provided for supplements to the model compact that tribes could agree to in order to permit non-house-banked table games. *Id.* § 280.1. In contrast, the new forms of gaming contemplated in the compacts negotiated with the Comanche Nation and the Otoe-Missouria Tribe have not been authorized by state law and so cannot be said to have been agreed to by the State, nor is the State validly bound to those compacts.[7]

---

[7] Many other state-tribal compacts are specifically contemplated by, or at least not in conflict with, state law. *See, e.g.*, 68 O.S. 2011 & Supp. 2019, §§ 346 *et seq.* (taxes on cigarette sales); 68 O.S.2011, § 500.63 (taxes on motor fuel sales); 47 O.S.2011, § 2-108.3 (tribal license plates); 70 O.S.Supp.2019, § 3311.4 (cross-deputization agreements); 21 O.S.Supp.2019, § 99a (same); 21 O.S.2011, § 648 (same). The existence of compacts entered into by the Governor without approval by the Legislature does not undermine our conclusion here because such compacts do not authorize activity prohibited by state law, but instead promote compliance with state law. *Cf.* Informal Op. by A.A.G. Neal Leader, 93-685 (agreement with Cherokee to promote cooperative law enforcement did not constitute exercise of legislative authority and thus did not interfere with the separation of powers).

### C. Federal law does not determine how the State can consent to a tribal gaming compact, nor can it dictate the allocation of power within state government.

The federal law governing state-tribal gaming compacts—the Indian Gaming Regulatory Act ("IGRA")—does not alter this analysis. "IGRA creates a cooperative federal-state-tribal scheme for regulation of gaming hosted by federally recognized Indian tribes on Indian land." *KG Urban Enterprises, LLC v. Patrick*, 693 F.3d 1, 7 (1st Cir. 2012). Under IGRA, Class III tribal gaming is lawful only if authorized by tribal ordinance, "located in a State that permits such gaming for any purpose by any person, organization, or entity," and "conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State." 25 U.S.C. § 2710(d)(1). Upon request from a tribe to negotiate a gaming compact, "the State shall negotiate with the Indian tribe in good faith to enter into such a compact." *Id.* at § 2710(d)(3)(A). These compacts take effect only if approved by the Secretary of the Interior. *Id.* at § 2710(d)(3)(B). Nothing in this law attempts to dictate *how* a state's government agrees to the terms of a compact, whether by executive action alone, legislative action, or the concurrence of the two.

While IGRA purports to require states to enter into good-faith compact negotiations on Class III gaming, it only authorizes tribal Class III gaming if state law "permits such gaming for any purpose by any person, organization, or entity." *Id.* at § 2710(d)(1)(B). In other words, "where a state does not 'permit' gaming activities sought by a tribe, the tribe has no right to engage in these activities, and the state thus has no duty to negotiate with respect to them." *Rumsey Indian Rancheria of Wintun Indians v. Wilson*, 64 F.3d 1250, 1256 (9th Cir. 1994). "The State must first legalize a game, even if only for tribes, before it can become a compact term." *American Greyhound Racing, Inc. v. Hull*, 146 F. Supp. 2d 1012, 1067 (D. Ariz. 2001), *vacated on other grounds*, 305 F.3d 1015 (9th Cir. 2002). Thus, "[i]n order to determine the appropriate scope of negotiations between the Tribe and the state . . . , it is critical to determine the scope of gaming permitted by state law." *N. Arapaho Tribe v. State of Wyoming*, 389 F.3d 1308, 1311 (10th Cir. 2004). IGRA does not preempt a state's decision to prohibit specific types of Class III gaming, nor require a state to enter into a compact permitting a specific type of Class III gaming that is prohibited by state law. Rather, in determining the proper scope of a federally-authorized compact, IGRA *defers* to state law. *See also Rumsey*, 64 F.3d at 1258 ("[A] state need only allow Indian Tribes to operate games that others can operate, but need not give tribes what others cannot have.").[8]

This approach, like the provisions of the State-Tribal Gaming Act, is game-specific. IGRA "requires a particularized inquiry into the proposed gambling activity" and "look[s] at the state's public policy toward the specific gaming activities proposed by the tribes." *Seminole Tribe of Fla. v. State of Fla.*, No. 91-cv-6756, 1993 WL 475999, at *8 & n.1 (S.D. Fla. Sept. 22, 1993). The relevant inquiry is "whether applicable state law permits a specific type of game rather than a broad category of gaming," and "if the state entirely prohibits a particular game, the state is not required to negotiate with a tribe to permit that game, even if the state permits other games in the same

---

[8] If state law permits a specific type of gaming but only under certain conditions or regulations, IGRA contemplates that a state will in good-faith negotiate with a tribe to conduct that same type of gaming even if conducted in a manner that state law would otherwise prohibit. *N. Arapaho Tribe*, 389 F.3d at 1311-13. Thus, for example, if state law permitted pari-mutuel wagering on horse races but limited the commercial organizer's profits to 25% of the total wagers, gaming compact negotiations on pari-mutuel wagering on horse races need not impose that same profit limitation on the compacting tribe. *Id.*

AR_0000526

classification." *Dewberry v. Kulongoski*, 406 F. Supp. 2d 1136, 1151 (D. Or. 2005); *see also Cheyenne River Sioux Tribe v. State of S.D.*, 3 F.3d 273, 278-79 (8th Cir. 1993) (merely because state law permitted video keno does not mean the state was required to negotiate a compact whereby a tribe could conduct traditional keno). Here, merely because Oklahoma has permitted pari-mutuel wagering on horse racing does not mean that the State has broadly authorized *all* forms of event wagering, such as betting on the outcomes of local elections, professional basketball games, high school football matches, or little-league baseball games.[9] Similarly, merely because the Act has permitted non-house-banked table and card games does not mean the State has broadly authorized all forms of table and card games, including house-banked games. *See Rumsey*, 64 F.3d at 1256-58 (holding that though state permitted nonbanked card gaming, it was not required to negotiate banked card gaming).

In any event, the relevant question here is **not** the proper scope of IGRA *negotiations* between Oklahoma and tribal nations, it is whether the Governor can unilaterally *enter into* compacts on behalf of the State in a manner that is contrary to state law. Even if IGRA required that certain games be part of good-faith negotiations with tribes desiring to enter into gaming compacts, nothing in IGRA authorizes the Governor to unilaterally bind the State to a compact when agreeing to its terms conflicts with the public policy of the State as expressed in statute, permits activity criminalized by state law, or undermines our Constitution's separation of powers and system of checks and balances. IGRA creates a framework for states, tribes, and the federal government to cooperate in the regulation of tribal gaming, but *state law* determines when and how the State consents to a compact negotiated within IGRA's framework. These issues were extensively discussed by the Tenth Circuit in the analogous case of *Pueblo of Santa Ana v. Kelly*, 104 F.3d 1546 (10th Cir. 1997). That court's careful and well-reasoned decision obviates the need to further discuss the relevant law here.

Nor could IGRA constitutionally compel the State to legalize specific forms of gaming or dictate which branches of state government may enter into a compact on behalf of the State. The Tenth Amendment recognizes a federal constitutional structure that, under the anticommandeering doctrine, prohibits the national government from forcing arms of state governments to carry out federal law or enact specific legislation into state law. *See Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1475 (2018); *Printz v. United States*, 521 U.S. 898, 924 (1997) ("[E]ven where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts.") (citation omitted); *New York v. United States*, 505 U.S. 144, 145 (1992) ("Congress may not commandeer the States' legislative processes by directly compelling them to enact and enforce a federal regulatory program."). In *Murphy*, for example, the U.S. Supreme Court held that a federal law making it unlawful for a State to authorize sports gambling violates the anticommandeering

---

[9] Nor is it the case that, because the State has authorized certain activities at sporting events that are *outside* the definition of wagering, the State has thereby authorized a form of sports wagering. *See* 2005 OK AG 18, ¶¶ 14-23 (discussing the exclusion of "purses, prizes, or premiums" from the statutory definition of "bet" in 21 O.S.2011, § 981); 1999 OK AG 5 (same); 1995 OK AG 6 (same).

doctrine because the law "unequivocally dictates what a state legislature may and may not do." *Id.* at 1478. The federal law unconstitutionally "put [state legislatures] under the direct control of Congress. It is as if federal officers were installed in state legislative chambers and were armed with the authority to stop legislators from voting on any offending proposals." *Id.*

For these reasons, the Oklahoma Constitution's separation of powers and system of checks and balances is not altered by federal law in the context of tribal gaming compacts, nor does IGRA change how the State decides whether to enter into a gaming compact. This Office's longstanding analysis of state law endures: the Governor has the authority to negotiate compacts with Indian tribes but he cannot bind the state to any such compact if doing so authorizes activity prohibited by state law or would otherwise be contrary to state law.

**It is, therefore, the official Opinion of the Attorney General that:**

**The Governor lacks authority to enter into and bind the State to compacts with Indian tribes that authorize gaming activity prohibited by state law.**

MIKE HUNTER
ATTORNEY GENERAL OF OKLAHOMA

MITHUN MANSINGHANI
SOLICITOR GENERAL OF OKLAHOMA

APPROVED
IN
CONFERENCE

ATTORNEY GENERAL OF OKLAHOMA
Official Copy

**From:** "Cardinale, Richard" <Richard_Cardinale@ios.doi.gov>
**To:** "Tahsuda, John" <John_Tahsuda@ios.doi.gov>
**Cc:** "Bernhardt, David L" <dwbernhardt@ios.doi.gov>
**Subject:** RE: [EXTERNAL] Correspondence
**Date:** 2020-05-05 13:11:35 -0400

---

Will do, John.  Thanks.

Rich

---

**From:** Tahsuda, John <John_Tahsuda@ios.doi.gov>
**Sent:** Tuesday, May 5, 2020 12:30 PM
**To:** Cardinale, Richard <Richard_Cardinale@ios.doi.gov>
**Cc:** Bernhardt, David L <dwbernhardt@ios.doi.gov>
**Subject:** FW: [EXTERNAL] Correspondence
**Importance:** High

Rich, please route this accordingly, including to the office of Indian Gaming.

*John Tahsuda*
*Senior Counselor to the Secretary*
*Department of the Interior*

---

**From:** Mike Hunter <mike.hunter@oag.ok.gov>
**Sent:** Tuesday, May 5, 2020 12:13 PM
**To:** Tahsuda, John <John_Tahsuda@ios.doi.gov>
**Subject:** [EXTERNAL] Correspondence
**Importance:** High

Please see the attached letter to Secretary Bernhardt and Official Attorney General Opinion issued today May 5, 2020.

Thank you,
Mike Hunter
Oklahoma Attorney General
O. LAHOMA OFFICE OF THE ATTORNE☐ GENERAL
313 NE 21st Street, Oklahoma City, OK 73105
Tel: (405)522-4391   Fax: (405)522-0669

AR_0000529

101 Park Avenue, Suite 700    **T** 405.602.9425    **HOBBSSTRAUS.COM**
Oklahoma City, OK 73102    **F** 405.602.9426

## Compact Terms

| | **Model Tribal Gaming Compact** | **Comanche/Otoe Compact** | **Comment** |
|---|---|---|---|
| **Parties** | The Tribe and the State of Oklahoma | See comment. | • The Oklahoma Attorney General and the State Legislature have indicated the Governor does *not* have the authority to enter into the compacts on behalf of the State |
| **Duration and Termination** | | | |
| **Duration** | 15 years, automatically renewable (already renewed to January 1, 2035) Part 15(B). | 15 years, to December 31, 2035 (no automatic renewal) Part 12(B).[1] | • The compact does *not* have an indefinite term; it has a duration of about 15 years, expiring on December 31, 2035<br>• It may be terminated sooner by mutual consent *or unilaterally by the State* |
| **Early Termination** | Mutual consent of the parties; *no other way* for the compact to terminate Part 15(C). | • Tribe's uncured violations of Part 4 (Rules and Regulations)<br>• Tribe's failure to properly remit fees two or more times in a calendar year<br>• Mutual consent of the parties Parts 3(E), 10(B)(4), 12(D). | • If the Tribe fails to cure any violation of Part 4 within 30 days, then the State may terminate the compact<br>• Part 4 addresses rules and regulations, auditing, and minimum operational requirements<br>• The State may also terminate the compact if the Tribe fails to properly remit fees two or more times a year |
| **Renewal** | Automatic, Conditional Renewal Part 15(B). | None | • The compact does *not* provide for any automatic or conditional renewal.<br>• Renewal of the compact requires a separate, written agreement.  Part 10(B)(5) ("*Subject to a written agreement* between the parties, such term *may renew by way of amendment* for another fifteen (15) year term … .").<br>• There are no limitations on the subject matter of the new written agreement, likely leading to full compact renegotiation. |

---

[1] Citations are to the Comanche Compact.

**HOBBS STRAUS DEAN & WALKER, LLP**    WASHINGTON, DC  |  PORTLAND, OR  |  OKLAHOMA CITY, OK  |  SACRAMENTO, CA  |  ANCHORAGE, AK

AR_0000544

From: "Caulum, Andrew S" <Andrew.Caulum@sol.doi.gov>
To: "Woodward, Troy" <Troy.Woodward@bia.gov>
Subject: Re: Incoming Oklahoma compact dispute letter
Date: 2020-05-06 12:22:34 -0400

---

Troy - Can you give me a call on my cell as soon as you have an opportunity? It's .

Thanks,

Andy C.

On: 05 May 2020 11:53,
"Oakes, Morgan A" <Morgan.Oakes@bia.gov> wrote:

Please see attached for the incoming Oklahoma Attorney General opinion regarding Otoe-Missouria and Comanche compact.

From: Oakes, Morgan A <Morgan.Oakes@bia.gov>
Sent: Monday, May 4, 2020 1:39 PM
To: Woodward, Troy <Troy.Woodward@bia.gov>; Deleon, Debra A <Debra.Deleon@bia.gov>; Hart, Paula <Paula.Hart@bia.gov>; Kelly, Matthew <Matthew.Kelly@bia.gov>; Caulum, Andrew S <Andrew.Caulum@sol.doi.gov>; Shepard, Eric N <eric.shepard@sol.doi.gov>; Myers, Richard G <RichardG.Myers@bia.gov>; Scherer, Kyle <Kyle.Scherer@sol.doi.gov>
Subject: Re: Incoming Oklahoma compact dispute letter

Please see attached for the Oklahoma Indian Gaming Commission's letter regarding the compact dispute.

From: Oakes, Morgan A
Sent: Monday, May 4, 2020 10:42 AM
To: Woodward, Troy <Troy.Woodward@bia.gov>; Deleon, Debra A <Debra.Deleon@bia.gov>; Hart, Paula <Paula.Hart@bia.gov>; Kelly, Matthew <Matthew.Kelly@bia.gov>; Caulum, Andrew S <Andrew.Caulum@sol.doi.gov>; Shepard, Eric N <eric.shepard@sol.doi.gov>; Myers, Richard G <RichardG.Myers@bia.gov>; Scherer, Kyle <Kyle.Scherer@sol.doi.gov>
Subject: Incoming Oklahoma compact dispute letter

Good Morning All,
Paula has asked that I circulate this incoming letter from the Chickasaw Nation regarding the Oklahoma compact dispute.

Thank You,
Morgan

AR_0000590

**From:** Kim Teehee <kim-teehee@cherokee.org>
**To:** "tara_sweeney@ios.doi.gov" <tara_sweeney@ios.doi.gov>
**Subject:** Cherokee Nation letter re: Oklahoma Gaming Compact with Otoe-Missouria and Comanche Tribes
**Date:** 2020-05-07 17:01:07 -0400
**Attachments:** Scanned_from_Cherokee_Nation_Admin.pdf; 2020_05_07_Memorandum_Final.pdf

---

ASIA Sweeney,

Hope you're well. Please see attached a letter from Chief Chuck Hoskin to Secretary Bernhardt regarding recent gaming compacts for the Otoe-Missouria and Comanche tribes that were signed by Oklahoma Governor Stitt. Also attached is a memo from our Attorney General Sara Hill. Please let me know if you have any questions or need additional information.

Warmly,

Kim



GWY.9 DBP
# CHEROKEE NATION®
P.O. Box 948 • Tahlequah, OK 74465-0948
918-453-5000 • www.cherokee.org

Office of the Chief

**Chuck Hoskin Jr.**
*Principal Chief*

**Bryan Warner**
*Deputy Principal Chief*

May 7, 2020

The Honorable David Bernhardt
Office of the Secretary
U.S. Department of the Interior
1849 C Street N.W.
Washington, D.C. 20240

Dear Secretary Bernhardt:

As Principal Chief of the Cherokee Nation, I am writing you today regarding the "compacts" that have recently been submitted to your office between Oklahoma Governor Kevin Stitt and the Comanche Nation and Otoe-Missouria Tribe. These purported compacts were negotiated by Governor Stitt without authority or approval by the Oklahoma legislature, which is required under the law. In addition to that, these compacts – by their terms – violate not only state law, but also federal law because they lack substantial concessions by the state.

Of course, Oklahoma Indian tribes are not the only ones sounding the alarm about the legal flaws in these purported compacts. Within hours of the Governor's unveiling of these purported compacts, Oklahoma's legislative leaders - including Speaker of the House and President Pro Tempore of the Senate - had publicly stated that Governor Stitt lacked authority to execute these compacts without legislative approval. In addition, the Attorney General has recently issued an official opinion that further establishes that the Governor cannot unilaterally execute gaming compacts when state law sets forth a role for the legislature in that process.

Rather than negotiating within the framework set forth by statute and building consensus with state and tribal leaders statewide, Governor Stitt has chosen to execute "compacts" outside the existing legislative framework. It is clear that these purported compacts violate state laws, and as the memo enclosed with this letter demonstrates, these

compacts violate the Indian Gaming Regulatory Act ("IGRA") and other federal laws as well.

Both Oklahoma Indian tribes and the state have benefitted from the tribal-state compacts executed pursuant to the Tribal-State Gaming Act approved by Oklahoma voters in 2004. The major purpose of IGRA was "to provide a statutory foundation for Indian gambling operations as a means of promoting economic development, self-sufficiency and strong tribal government." Tribal-state gaming compacts must adhere to these statutory foundations, and because the Comanche and Otoe-Missouria compacts fail to do so they should not be approved or 'deemed approved', but rejected outright for the reasons set forth in the letter and the attached memorandum.

Sincerely,

Chuck Hoskin, Jr.
Principal Chief
Cherokee Nation



**CHEROKEE NATION**
**OFFICE OF THE ATTORNEY GENERAL**

**Sara Hill**
**Attorney General**

**P.O. Box 1533**
**Tahlequah, OK  74465-0948**
**918-453-5000**

April 7, 2019

To:        Principal Chief Chuck Hoskin, Jr.
From:    Attorney General Sara Hill
Date:     May 7, 2020
Re:        Comments regarding purported compacts executed by Governor Stitt and
            the Comanche Nation and Otoe-Missouria Tribe.

### A.  Introduction.

The Otoe-Missouria Tribe and the Comanche Nation are both gaming tribes located within the State of Oklahoma ("State"). The Otoe-Missouria Tribe entered into a gaming compact with the State that was deemed approved by the Department of the Interior ("DOI") on March 28, 2005. The Comanche Nation's gaming compact with the State was deemed approved by the DOI on December 23, 2005. Both tribes built gaming enterprises over the next fifteen years. These two tribes employ thousands of Oklahomans in their gaming operations. On April 22, 2020, both of these tribes were reported to have entered into new compacts with Governor Stitt. Those were subsequently submitted to the Secretary for approval on April 23, 2020.

### B.  Gaming Compacts in Oklahoma.

Since 2005, Oklahoma has had a model compact for tribes interested in operating Class III gaming across the state[1]. The model compact has been joined by additional

---

[1] 3A O.S. § 280 *et seq.*, (codifying the model compact approved by voter referendum).

Page 1 of 8

gaming compacts that govern the conduct of off-track wagering[2], and there was a supplement to the model compact in 2018 to allow tribes to offer wheel and ball and dice games.[3] To date, all tribal gaming in the state conducted pursuant to a tribal-state compact has been authorized by legislative action. For the initial model compact, the legislative action came about through voter referendum[4]. The wheel and ball dice supplement was approved via a vote of the Oklahoma Legislature. For off-track wagering, the compacts were submitted to the Joint Committee on Tribal-State Relations[5], a committee created by Oklahoma statute. Oklahoma law acknowledges a role for the Governor in negotiating compacts with Indian tribes, but states that such agreements shall only become "effective upon approval by the Joint Committee on State-Tribal Relations[6]."

### C. Analysis

1) <u>Issues arising under state law.</u>

The Indian Gaming Regulatory Act[7] ("IGRA") requires that compacts be validly entered into between the Tribe and the State. Indian tribes, acting pursuant to their own

---

[2] Off-track Wagering Compact between the Cherokee Nation and the state of Oklahoma. Accessible at: https://www.sos.ok.gov/documents/filelog/87330.pdf

[3] 3A O.S. § 280.1.

[4] Enrolled Senate Bill No. 1252, enacted by the 2nd Regular Session of the 49 Legislature of the State of Oklahoma, State Question Number 712 and Legislative Referendum Number 335 (May 19, 2004).

[5] 74 O.S. §§ 1221, 1223.

[6] *Id*. at 1221(C)(1).

[7] 25 U.S.C. § 2701 et seq.

Page 2 of 8

AR_0000595

laws, began tribal gaming as it exists today. Congress, though IGRA, further empowered the tribes to conduct gaming and created a limited role for state governments to share in the revenue being created by tribal gaming. Congress created opportunities for tribes and states to collaborate and work out unique solutions to their challenges, but only in ways consistent with federal law.

The compacts currently under consideration by the Secretary have gone far outside the clear requirements of federal law. First, the Oklahoma Attorney General has determined that Governor Stitt lacked authority to enter into these compacts with the Comanche Nation and the Otoe-Missouria Tribe[8]. The Attorney General is the chief legal officer of Oklahoma[9]. The Attorney General's opinions are binding on state officials unless the opinion is inconsistent with a final determination of a court of competent jurisdiction[10]. Although Governor Stitt's submission of the Comanche and Otoe-Missouria compacts to DOI contained an unsigned legal analysis asserting his authority to enter into these

---

[8] Oklahoma Attorney General Opinion 2020-08 available at http://www.oag.ok.gov/Websites/oag/images/AG%20Opinion%202020-8%20(W-7).pdf

[9] 74 O.S. §18.

[10] 74 O.S. §18b ; see also *Rasure v. Sparks*, 1919 OK 231, 183 P. 495; Grand River *Dam Authority v. State*, 1982 OK 60, 645 P.2d 1011 (holding: In this state it has been held that such an opinion is binding on the officials affected by it. The basis rationale for this is that an official who has sought an opinion from the attorney general should, even though not compelled to do so by statute, follow the advice which is given to him. This duty extends only until the public official is relieved thereof by a court of competent jurisdiction or until this court holds otherwise than the attorney's general opinion.)

AR_0000596

compacts, the analysis provided has been gutted by the overriding and contrary legal opinion issued by the Oklahoma Attorney General.

IGRA requires that compacts be properly entered into under state law, and further requires that the compact "must also be in effect" pursuant to Secretarial approval[11]. In the Tenth Circuit, Secretarial approval of a compact does not "give life to a compact which was void from its inception." [12] These compacts were submitted not by the State of Oklahoma, but by Governor Stitt. The Oklahoma Attorney General has issued an opinion that these compacts were not executed in accordance with state law. The Attorney General opinion is binding on Governor Stitt and makes the compacts he signed a legal nullity which should be summarily rejected by the Secretary, who only has the "authority to approve compacts or amendments 'entered into' by an Indian tribe and a State[13]." Furthermore, neither the tribes nor the state should offer to the Secretary for approval any compact that has not been legally entered into by both parties and it can be rejected even from consideration for that reason as well.[14]

This issue of state law – whether the Governor can bind the state to the compacts he signed with the Comanche and Otoe-Missouria – is a fundamental problem that fractures these compacts regardless of what other terms they may contain. In addition to that issue,

---

[11] *Pueblo of Santa Ana v. Kelly*, 104 F.3d 1546. (10th Cir. 1997).

[12] *Id*. at 1546-8.

[13] 25 C.F.R. § 293.3

[14] 25 C.F.R. § 239.7

AR_0000597

though, there are additional problems with the types of games authorized by the compacts, which likewise have not been approved by the Oklahoma legislature.

The model compact, approved by the Secretary initially fifteen years ago, specifically defined "covered games" and exempted those games from general state laws that prohibited gambling[15]. State law does not permit, and has never permitted, house-banked card games, sports betting, or house-banked table games. Governor Stitt argues that as the chief executive he can somehow permit violations of state law so long as a tribal compact is involved. His reasoning for this is unclear; but it is clear that Oklahoma's Attorney General does not agree with this unusual view of executive authority, and it is Attorney General's legal opinion that is binding on state officials[16].

2) Issues arising under IGRA.

The scope of Secretarial review is limited[17]. However, one of the primary purposes of the review is to ensure compliance with IGRA and other relevant federal law. IGRA is the primary federal legal authority for tribal gaming, and a principal goal of both Federal Indian

---

[15] There is a discussion of this topic in the Oklahoma Attorney General's opinion OAG 2020-08.

[16] *Id*. at Paragraph B.

[17] The Secretary may disapprove a compact or amendment only if it violates: (a) Any provision of the Indian Gaming Regulatory Act; (b) Any other provision of Federal law that does not relate to jurisdiction over gaming on Indian lands; or (c) The trust obligations of the United States to Indians. 25 C.F.R. § 293.14.

AR_0000598

policy and IGRA is to benefit tribal economic development, increase tribal self-sufficiency, and assist tribal governments.[18]

One of the ways IGRA works to ensure that tribal governments benefit from tribal gaming is ensuring that states do not tax that gaming revenue. Under IGRA, no state is permitted to impose any type of fee or tax on Indian gaming except to directly cover the costs of regulating Class III games. The payment of any revenue-share by a tribe must be in exchange for a meaningful concession by the state[19].

The Comanche and Otoe-Missouria compacts are devoid of any of meaningful concession by the state. Each compact mentions exclusivity in broad terms, but it neither defines exclusivity nor provides any mechanism for the tribe to enforce any promise of exclusivity by the state[20]. As established by the Attorney General opinion cited above, the expanded gaming opportunities promised the tribes is illegal in Oklahoma, so it is moot whether or not such games could theoretically serve as a meaningful concession by the state. In exchange for these empty promises, Governor Stitt has convinced the Comanche and Otoe-Missouria to walk away from valid and approved compacts that permitted them to operate Class III gaming in Oklahoma with enforceable and substantial exclusivity provisions and a reasonable revenue share payment of 4% to 10%[21].

---

[18] 25 U.S.C. § 2701.

[19] See *Rincon Band of Luiseno Mission Indians of Rincon Reservation v. Schwarzenegger*, 602 F.3d 1019, 1033 (9th Cir. 2010).

[20] Comanche agreement at Part 10.A.

[21] See 3A O.S. § 280 at Part 11.A.

AR_0000599

Adding to the ever-growing list of empty promises, Governor Stitt also pledged to consent to Comanche and Otoe-Missouria off-reservation trust acquisitions. "Off-reservation" may be something of a misnomer under these circumstances, since while the areas targeted for land acquisition by the Comanche and Otoe-Missouria are very much off their own reservations, those lands are within the reservations of other tribes.[22] The purported compacts signed by the Comanche and Otoe-Missouria do not identify any particular parcel or identify any pending trust application, and Governor Stitt's promise to consent to land into trust acquisition on their behalf in these counties is completely unenforceable. This promise, too, cannot bear the weight required to serve as a meaningful concession by the state.

What the state receives under this new agreement is the right to expand its iLottery electronic gaming system[23] without concern for substantial tribal exclusivity, five non-tribal sports book licenses[24], and a 22% revenue share rate on all Comanche[25] and Otoe-Missouria post-payout sports book. This compact is devoid of any meaningful concession that could support these payments, which means it should be construed as a tax on tribal gaming and disapproved by the Secretary.

### D. Conclusion.

The Comanche Nation and the Otoe-Missouria Tribe have the right to negotiate and execute gaming compacts for their respective tribes. However, when approving the compacts, the

---

[22] The Comanche Nation, for instance, has identified Love County as a county where they would be attempting to take land into trust for gaming purposes. Love County is entirely within the Chickasaw Nation's reservation. Comanche agreement at Part 2.A.21.

[23] Comanche agreement at Part 3.A.

[24] Comanche agreement at Part 3.B.

[25] Comanche agreement at Part 10.B.2.a.

AR_0000600

Secretary must exercise his trust responsibility and ensure that the compacts are not taxing tribal gaming or violating other applicable federal law. If the Secretary approves these compacts, or allows them to be deemed approved, it will have the effect of nullifying the Comanche and Otoe's existing compacts[26], which have been approved by the Secretary and created the businesses upon which both tribes depend. When their purported compacts with the Governor Stitt are later nullified as well due to his lack of authority to execute the compact, these two tribes will not only be prohibited from conducting class three gaming under the "new" compacts, they will not be able to revert to the use of the current compact.

It is the responsibility and the burden of the Secretary to examine these compacts carefully, and serve as a conscientious trustee for these tribes. In this case, that means rejecting these purported compacts and sending all the parties "back to the drawing board" so the tribes can either continue under the renewed model compact, or enter into new compacts that are consistent with state and federal law.

---

[26] Both tribal agreements state that upon the fulfillment of certain triggering events – the last of which would be DOI approval – the new agreements would supersede their existing compacts. Comanche agreement at Part 13.B.

AR_0000601

laws, began tribal gaming as it exists today. Congress, though IGRA, further empowered the tribes to conduct gaming and created a limited role for state governments to share in the revenue being created by tribal gaming. Congress created opportunities for tribes and states to collaborate and work out unique solutions to their challenges, but only in ways consistent with federal law.

The compacts currently under consideration by the Secretary have gone far outside the clear requirements of federal law. First, the Oklahoma Attorney General has determined that Governor Stitt lacked authority to enter into these compacts with the Comanche Nation and the Otoe-Missouria Tribe[8]. The Attorney General is the chief legal officer of Oklahoma[9]. The Attorney General's opinions are binding on state officials unless the opinion is inconsistent with a final determination of a court of competent jurisdiction[10]. Although Governor Stitt's submission of the Comanche and Otoe-Missouria compacts to DOI contained an unsigned legal analysis asserting his authority to enter into these

---

[8] Oklahoma Attorney General Opinion 2020-08 available at
http://www.oag.ok.gov/Websites/oag/images/AG%20Opinion%202020-8%20(W-7).pdf

[9] 74 O.S. §18.

[10]  74 O.S. §18b ; see also *Rasure v. Sparks*, 1919 OK 231, 183 P. 495; Grand River *Dam Authority v. State*, 1982 OK 60, 645 P.2d 1011 (holding: In this state it has been held that such an opinion is binding on the officials affected by it. The basis rationale for this is that an official who has sought an opinion from the attorney general should, even though not compelled to do so by statute, follow the advice which is given to him. This duty extends only until the public official is relieved thereof by a court of competent jurisdiction or until this court holds otherwise than the attorney's general opinion.)

AR_0000607

compacts, the analysis provided has been gutted by the overriding and contrary legal opinion issued by the Oklahoma Attorney General.

IGRA requires that compacts be properly entered into under state law, and further requires that the compact "must also be in effect" pursuant to Secretarial approval[11]. In the Tenth Circuit, Secretarial approval of a compact does not "give life to a compact which was void from its inception." [12] These compacts were submitted not by the State of Oklahoma, but by Governor Stitt. The Oklahoma Attorney General has issued an opinion that these compacts were not executed in accordance with state law. The Attorney General opinion is binding on Governor Stitt and makes the compacts he signed a legal nullity which should be summarily rejected by the Secretary, who only has the "authority to approve compacts or amendments 'entered into' by an Indian tribe and a State[13]." Furthermore, neither the tribes nor the state should offer to the Secretary for approval any compact that has not been legally entered into by both parties and it can be rejected even from consideration for that reason as well.[14]

This issue of state law – whether the Governor can bind the state to the compacts he signed with the Comanche and Otoe-Missouria – is a fundamental problem that fractures these compacts regardless of what other terms they may contain. In addition to that issue,

---

[11] *Pueblo of Santa Ana v. Kelly*, 104 F.3d 1546. (10th Cir. 1997).

[12] *Id*. at 1546-8.

[13] 25 C.F.R. § 293.3

[14] 25 C.F.R. § 239.7

AR_0000608

**RECEIVED**

*By Office of Indian Gaming at 8:59 am, May 14, 2020*

 

The Honorable David Bernhardt
Secretary of the Interior
U.S. Department of the Interior
1849 C St., NW
Washington, D.C. 20240

> **Re:    *Response to Opinion from Oklahoma Attorney General Michael Hunter***

As elected leaders of the Comanche Nation and the Otoe–Missouria Tribe of Indians (collectively, "the Tribes"), we write to you in response to Oklahoma Attorney General Opinion 2020-8 ("AG Opinion"), in which Oklahoma Attorney General Michael Hunter requests that the U.S. Department of the Interior ("Department") disapprove the Tribal–State Compacts lawfully entered into between the State of Oklahoma and the Tribes (the "Compacts"). As explained herein, the Compacts are clearly legal under both the Indian Gaming Regulatory Act ("IGRA") and Oklahoma law, and they should be approved accordingly.

## I.    Background

Although the AG Opinion captures some of the relevant timeline, it omits key elements of the background necessary to understand the legal issues presented. This background section provides additional pertinent details.

### A.  *The Indian Gaming Regulatory Act*

Congress enacted IGRA in 1988, shortly following the U.S. Supreme Court's decision in *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987), where the Court held that the State of California lacked jurisdiction to regulate on-reservation gaming activity. The Department is well-versed with IGRA, and its full history and structure need not be elaborated herein. However, certain provisions governing tribal–state gaming compacts do require particular attention.

IGRA permits tribes to engage in class III gaming only upon certain conditions, including the condition that such gaming be "conducted in conformance with a Tribal–State compact entered into by the Indian tribe and the State . . . ." 25 U.S.C. § 2710(d)(1)(C). The compact may include provisions relating to, *inter alia*, the applicability of certain state or tribal laws, the assessment of fees necessary to defray state regulatory costs, standards for the operation of gaming activities, and "any other subjects that are directly related to the operation of gaming activities." § 2710(d)(3)(C)(i)–(vii).

AR_0000695

Upon submission, the Department has 45 days to approve or disapprove a compact. If no action is taken within those 45 days, "the compact shall be deemed approved by the Secretary, but only to the extent the compact is consistent with [IGRA]." § 2710(d)(8)(C).

## B. The State–Tribal Gaming Act

In 2004, the Oklahoma legislature (through a state ballot question) enacted the State-Tribal Gaming Act, 3A O.S. §§ 261 *et seq.* This legislation offered a "Model Tribal Gaming Compact" ("Model Compact") to every federally recognized tribe in the State. § 281. Though embodied in legislation, the offer was made "through the concurrence of the Governor after considering the executive prerogatives of that office and the power to negotiate the terms of a compact between the state and a tribe." § 280.

The Model Compact authorizes compacting tribes to offer "covered games," and defines that term as:

> an electronic bonanza-style bingo game, an electronic amusement game, an electronic instant bingo game, nonhouse-banked card games; any other game, if the operation of such game by a tribe would require a compact and if such game has been: (i) approved by the Oklahoma Horse Racing Commission for use by an organizational licensee, (ii) approved by state legislation for use by any person or entity, or (iii) approved by amendment of the State-Tribal Gaming Act; and upon election by the tribe by written supplement to this Compact, any Class II game in use by the tribe, provided that no exclusivity payments shall be required for the operation of such Class II game.

Model Compact, Part 3(5).

Importantly, although most Oklahoma tribes have adopted the Model Compact, there is no requirement under state or federal law that compacts in Oklahoma be one-size-fits-all.

## C. Recent compact litigation

The Compacts now at issue came about in the wake of a larger dispute as to whether the Tribes' previous Model Compacts—entered into pursuant to the State-Tribal Gaming Act—expired at the end of the 2019. As the Department may be aware, the previous compacts provided for a term ending on January 1, 2020; however, there was a clause specifying that they "shall automatically renew" under certain conditions.

The Tribes—and several other tribes in the State—were part of a suit brought in the U.S. District Court for the Western District of Oklahoma seeking a declaratory judgment that the Model Compacts did in fact automatically renew. The dispute was ordered to mediation by the Court. The proceedings in mediation were (and remain) confidential, but the important point for the purposes of this memorandum is that the Tribes resolved their dispute through a good-faith negotiation with the State, having entered into the Compacts now before the Department.

2

AR_0000696

### D. *The Compacts*

On April 21, 2020,[1] the Tribes and Governor J. Kevin Stitt signed and executed the Compacts and submitted the Compacts to the Office of Indian Gaming. In doing so, the parties put an end to the long-running dispute, settled the pending litigation, and reached an agreement that would benefit the Tribes, the State, and the local communities.

The Compacts reflect significant modernization in tribal gaming in Oklahoma. They fundamentally reform the valuation of "substantial exclusivity" for the purposes of revenue sharing. To that end, they recognize that the value of substantial exclusivity has a significant geographic component. The Tribes will each pay 4.5% of adjusted net win from class III gaming to the State (less than their existing compacts) on their current facilities, but agree to pay higher amounts if and when new casinos in more geographically desirable locations are approved. The Tribes agree to maintain at least 45% of their gaming revenues from class III gaming, a ratio that will be raised to 50% if the new sites are approved.[2] Part 3.D.

The Compacts also discuss expanded forms of class III gaming beyond what most Oklahoma tribes currently operate. The Compacts at Part 2.A.7 define the term "Covered Game" as follows:

> "*Covered Game*" or any derivative thereof means all Gaming Machines, House-banked Card Games, Nonhouse-Banked Card Games, House-banked Table Games, Nonhouse-banked Table Games, and Event Wagering, which are conducted in accordance with the Standards, as applicable, if the operation of such game by the Tribe would require a Compact and if such game has been approved by the SCA [State Compliance Agency]. Class II gaming, as defined by IGRA, is expressly excluded from this definition.

Part 2.A.7 (emphasis added)

The Compacts thus explicitly address House-banked Card and Table Games—matters that have not previously been expressly discussed. Also, Part 2.A.13 of the Compacts discusses event wagering, e.g., sportsbooks. That section begins with a definition of "Event Wagering," which provides:

> "*Event Wagering*" means the placing of a wager on the outcome of a Sport event, including E-Sports, or any other events, to the extent such wagers are authorized by law, subject to the following terms and conditions. . . .

---

[1] The Compacts were actually signed privately by each party on Saturday, April 18; however, the signing ceremony and submission to the Office of Indian Gaming did not take place until the following Tuesday.

[2] To be clear, although the Tribes must certify a certain percentage of revenue coming from class III gaming, the Compacts in no way limit the Tribes' ability to engage in *class II* gaming. By way of comparison, whereas compacts in the State of Arizona provide that tribes generally cannot have more than forty (40) class II machines, the Comanche Nation and the Otoe-Missouria Tribe may operate as many class II machines as they wish, so long as over 45% of revenue is derived from class III gaming.

AR_0000697

Part 2.A.13 (emphasis added). Numerous subsections follow in which the Compact lays out various "terms and conditions" governing the conduct of Event Wagering. For example, the Tribes can each offer Event Wagering at two locations; such wagering cannot include Oklahoma intercollegiate events; and wagers may be accepted either over-the-counter or on a mobile device, but in no event from any further than 1,000 feet of the physical facility. The State may conduct Event Wagering at five locations, but only in accordance with the same terms and conditions applicable to the Tribes. *See id.* at Part 2.A.13(a)–(g). Of course, these subsections all relate back to the definition of "Event Wagering," i.e., the terms and conditions come into effect only "to the extent such wagers are authorized by law."

### E.  The AG Opinion

Shortly after the Compacts were signed and submitted to the Office of Indian Gaming, the Attorney General publicly challenged their legality, stating: "The governor has the authority to negotiate compacts with the tribes on behalf of the state. However, only gaming activities authority by the [State-Tribal Gaming Act] may be the subject of a tribal gaming compact. Sports betting is not a prescribed 'covered game' under the act."[3]

Two weeks later, the Attorney General issued the AG Opinion, again dialing in on the Event Wagering provisions of the Compacts. The general focus of the AG Opinion was whether the Governor had authority to enter into the Compacts given their discussion of such new forms of gaming activity. The Attorney General concluded that the Governor lacks such authority, relying on the premise (which, as explained below, we submit is false) that the Compacts "authorize gaming activity prohibited by state law."

Around the same time as the AG Opinion, letters were also sent to the Department from the Chickasaw Nation, the Quapaw Nation, and the Wichita & Affiliated Tribes requesting that the Department disapprove the Compacts.[4] We intend to address the concerns of these tribes in a separate memorandum, as they involve different legal issues—primarily the Compacts' section regarding a concurrence from the Governor that lands be taken into trust for the purposes of gaming under Section 20 of IGRA.

With all due respect to the Attorney General, we fundamentally disagree with his analysis. We have thus prepared this memorandum explaining the legality of the challenged compact provisions in the AG's Opinion and letter.

### II.    Analysis

Essentially, as this memorandum explains, there is nothing wrong with the Event Wagering or House-banked Card or Table Games provisions of the Compacts. To the extent the Attorney General challenges the Event Wagering, Gaming Machine and house-banked game provisions, his Opinion relies entirely on a false premise—that the Compacts in and of themselves will authorize event wagering and house-banked gaming and certain Gaming Machines in the State of Oklahoma.

---

[3] https://www.tulsaworld.com/news/local/government-and-politics/oklahoma-ag-mike-hunter-says-gov-stitts-new-tribal-gaming-compacts-not-authorized-by-state/article_1e9bd0d3-3d50-50c0-8233-a3d924f01f44.html

[4] The Chickasaw Nation, the Quapaw Nation, and the Wichita and Affiliated Tribes remain parties in the lawsuit discussed in Part I.C herein.

4

That is not what the Compacts do. The definition of "Covered Game" only includes games that are approved by the State Compliance Agency. The State Compliance Agency does not have the power to approve games that are unlawful. Further, the Compacts' definition of event wagering further states that such gaming must be authorized by law, i.e., state law. It was fully within the Governor's authority to enter into such Compacts. These provisions reflect common practice in the tribal–state compacting process. The Compacts are fully consistent with IGRA and Oklahoma law, and the Department should approve the Compacts accordingly.

### A.    The Governor has authority to enter into Compacts on behalf of the State.

The Tribes agree with much of Part II.A of the AG Opinion insofar as that section recognizes the Governor's authority to negotiate and enter into compacts with tribes on behalf of the State.

However, the Tribes strongly disagree with the Attorney General's apparent position that the Governor's authority has no grounding in the State Constitution. To be sure, while the Oklahoma Constitution vests the Governor with explicit authority to conduct "all intercourse and business of the State with other states and with the United States," there is no specific reference to such authority vis-à-vis Indian tribes. See Okla. Const. Art. VI, § 8. Nonetheless, contrary to the Attorney General's position, the Oklahoma Supreme Court has relied on that constitutional provision as a basis to hold that the Governor "has been and continues to be the party responsible for negotiating compacts with the sovereign nations of this state." See Sheffer v. Buffalo Run Casino, 315 P.3d 359, 364 & n.18 (Okla. 2013) (citing Article VI, § 8 of the Oklahoma Constitution).

In any event, regardless of state constitutional law, even the Attorney General admits that the Governor has a statutory authority to negotiate and enter into compacts with Indian tribes. Indeed, by Oklahoma statute, "[t]he Governor is authorized to negotiate and enter into cooperative agreements on behalf of this state with federally recognized Indian tribal governments within this state to address issues of mutual interest." 74 O.S. § 1221(C)(1). Furthermore, as the Attorney General also agrees, any "requirement that individual agreements or compacts negotiated by the Governor on behalf of the State with other sovereigns, such as Indian tribes, be approved by the Legislature would violate the principles of separation of powers." See AG Op. at 4 (citing omitted).

Where the Tribes fundamentally disagree with the AG Opinion is with regard to the implication that the Compacts "conflict with[] the laws duly enacted by the legislative branch." See AG Op. at 4. To the contrary, as explained below, the Compacts are entirely consistent with state and federal law.

### B.    Compacts under IGRA can, and often do, address forms of gaming that are not currently allowed under State law.

In entering into the Compacts, the Tribes and the State took initiative to conditionally address games that may not be currently authorized by law, but may be authorized in the future. While it is true that Oklahoma legislation does not explicitly authorize event wagering, house-banked games and certain gaming machines, nothing in IGRA prohibits an Indian tribe and a State

5

from establishing guidelines as to how certain gaming activities might be conducted in the future, even when those activities are not currently addressed under State statutes.

Indeed, it is not uncommon for a tribal–state compact to address forms of gaming that the state legislature has yet to explicitly authorize, and such compacts are routinely approved. The following are just a few examples:

- The State of Arizona entered into compacts with numerous tribes in 2002–2003 in which the compacts address Internet gaming, a form of gaming that had yet to be permitted under state law. The compacts state: "The Tribe shall not be permitted to conduct gaming on the Internet unless Persons other than Indian tribes within the State or the State are authorized by State law to conduct gaming on the Internet." *See, e.g.*, Compact between the State of Arizona and the Havasupai Indian Tribe, § 3(y) (2002) (emphasis added).

- In 2003, the State of California entered into a compact with the Iipay Nation of Santa Ysabel addressing Internet gaming in somewhat similar terms, providing that the tribe "will not offer [certain lottery games] through use of the Internet unless others in the state are permitted to do so under state and federal law." Compact between the State of California and the Iipay Nation of Santa Ysabel, § 4.1(c) (2003).

- In 2013, the State of Massachusetts entered into a compact with the Mashpee Wampanoag Tribe, which also addressed Internet gaming, but in much more detail. That compact stated in relevant part:

  > 4.3.2. The Tribe will not offer any form of Internet Gaming regulated by the Commonwealth unless Internet Gaming is authorized under Commonwealth and federal law, and provided that in such case:
  >
  > (a)    If Internet Gaming is authorized by the Commonwealth, and only the Massachusetts State Lottery or any other governmental agency of the Commonwealth is permitted to conduct Internet Gaming, the parties recognize and agree that: (i) the Tribe is permitted under IGRA to conduct Internet Gaming pursuant to a tribal state compact; (ii) the parties will negotiate in good faith for a tribal state compact, or amendment to this Compact, to implement the Tribe's conduct of Internet Gaming; and (iii) the Tribe may conduct Internet Gaming only in accordance with such compact or amendment.
  >
  > (b)    If Internet Gaming is authorized by the Commonwealth and permitted to be conducted by any Category 1 Licensee or other commercial entity licensed by the Commonwealth, the Tribe may conduct Internet Gaming in the same manner and to the same extent that Internet Gaming is permitted to be conducted in the Commonwealth by any Category 1 Licensee or other licensed

6

commercial entity, provided the Tribe first complies with subpart 4.4 of this Compact.

All three of these compacts were approved by the Department, and in none of the approvals did the Department find the Internet gaming provisions to be problematic, much less a basis for disapproval.

The fact that these examples involve Internet gaming (as opposed to event wagering) is immaterial. Nor is it material that these examples are framed in the negative tense—i.e., that the activity is prohibited "unless" certain preconditions occur. After all, once those preconditions occur, the path would be clear for those tribes to engage in Internet gaming activity. The relevant point is that they clearly prove that compacts can address a form of gaming that is not *currently* authorized under state law but which *might* be authorized in the future. And as particularly demonstrated by the Mashpee Wampanoag Compact, such prospective gaming activity can be addressed in detail, even if it is dependent on future legislation.

Of course, in submitting this memorandum, we do not concede that event wagering, house-banked games or certain gaming machines are currently unlawful in the State of Oklahoma.[5] But ultimately, even if there is a debate among the executive and legislative branches of Oklahoma government as to whether event wagering is legal, that is an internal state-law matter, and should not prevent the Department from approving the Compacts. Indeed, the Department has made it clear that an intrastate dispute over the legality of certain games is no reason for disapproval. Take for example the 2003 amendments to the compact between the Sokaogon Chippewa Community and the State of Wisconsin. Those amendments authorized additional forms of class III gaming, including electronic keno, roulette, craps, and poker. At the time the amendments were submitted to the Department, there was an ongoing dispute as to whether such games can be lawfully compacted for. *See* Letter from Acting Assistant Secretary A. Martin to Chairwoman S. Rachal (Aug. 13, 2003); *see also Dairyland Greyhound Park v. Doyle*, 295 Wis. 2d 1 (2006). Instead of trying to resolve the intrastate dispute, the Department determined that the best course of action was to allow the amendments to take effect. *Id.*

These examples all reflect a commonsense legal principle: it is entirely appropriate for a compact to include provisions regarding forms of gaming that are not *yet* legal (but may be in the future) or that are the subject of ongoing internal state-based debate over their legality.

### C.    *The Compacts are entirely consistent with state law.*

As stated above, there is nothing inappropriate about a compact that addresses new forms of gaming, and there is a deeply rooted historical practice in doing so. With these precedents, the Department should not hesitate to approve the Compacts.

As to the Event Wagering provision, it clearly states that the Tribes can conduct Event Wagering only "to the extent such wagers are authorized by law." Hence, if it turns out that such wagers are *not* authorized by law, then the Tribes cannot conduct such Event Wagering. It is that

---

[5] Indeed, in his memorandum recently submitted to the Department, the Governor has set forth cogent reasons as to why such gaming can be offered under existing state law.

7

simple. And the detailed framework for Event Wagering does not change the analysis, as all of the provisions ultimately rely on the criterion that such wagers be authorized by law.

Furthermore, although the AG Opinion only references house-banked card and table games in a single footnote, *see* AG Op. at 5 n.5, it is worth noting that similar analysis applies to those games as well.[6] House-banked card and table games (like Event Wagering) are part of the broader definition of "Covered Games" That definition provides:

> "*Covered Game*" or any derivative thereof means all Gaming Machines, House-banked Card Games, Nonhouse-banked Card Games, House-banked Table Games, Nonhouse-banked Table Games, and Event Wagering, which are conducted in accordance with the Standards, as applicable, if the operation of such game by the Tribe would require a Compact and if such game has been approved by the SCA. Class II gaming, as defined by IGRA, is expressly excluded from this definition.

Part 2.A.7. As clearly stated, a Class III game is only a "Covered Game" "if such game has been approved by the SCA" (i.e., the State of Oklahoma Office of Enterprise and Management Services). The SCA does not have authority to approve unlawful games. Indeed both federal law and Oklahoma law impose a legal presumption that the SCA will not approve games that are unlawful under the Oklahoma law. *Tecom, Inc. v. United States*, 66 Fed. Cl. 736, 758 (2005) (government officials must be presumed to act lawfully) (citing *President, Directors & Co. of Bank v. Dandridge*, 25 U.S. 64, 69-70(1827); *Habeas Corpus of Langley v. Travers*, 325 P.2d 1094, 1116 (OK 1958) ("It has been held repeatedly that there is a presumption that [public] officers will act lawfully") (Nix, J. dissenting). Such legal presumption also binds the Department. Accordingly, the Department must presume that the SCA will only approve games that are lawful in the State.

Additionally, the Compact's definition of "Covered Game" is substantively the same as the Model Compact definition, which was approved by the Department. Specifically, the Model Compact broadly includes *all* games which may be later authorized by Oklahoma Law.[7] Thus under the Model Compact, "Covered Game" could be interpreted to include house banked card games and event wagering. Here, the Compacts' express reference to a game is not different than the Department-approved Model Compact definition which included *any* game. Furthermore, like the Model Compact, the Compacts require any "Covered Game" to be approved by Oklahoma Law.[8]

Ultimately, the Compacts merely address new forms of gaming that were not part of the prior compacts and that would be innovative in the state—a practice that the Department has long

---

[6] Of course, the Tribes do not concede that such gaming would currently be illegal. But even if there are debates regarding their legality, such debate does not prevent approval of the Compacts.

[7] Model Compact, Part 3(5) (defining "Covered Game" in part to include "*any other game*, if the operation of such game by a tribe would require a compact and if such game has been. . . [approved by the Oklahoma Horse Racing Commission, state legislation, or amendment to the State Tribal Gaming Act]").

[8] Compacts, 2.A.7 (requiring "Covered Game" to be authorized by Oklahoma law since SCA must approve the game and SCA may only approve games authorized by Oklahoma law).

8

AR_0000702

approved. There is no irreconcilable conflict between the Compacts and state law, as the Compacts clearly incorporate state law to the extent it is applicable. The Department should thus approve the Compacts.

### D.    The Compacts are the product of a good faith settlement of ongoing litigation, and thus present unique circumstances in favor of approval.

As the Department is aware, these Compacts were entered into as the result of a good faith negotiated settlement between the Tribes and the State to resolve their dispute in ongoing litigation over whether the existing compacts automatically renewed. Because these Compacts embody the settlement of contentious federal court litigation, there are unique circumstances justifying their approval.

The ongoing litigation has caused substantial disruption to the Oklahoma Indian gaming industry, and there is no clear end in sight. Summary judgment proceedings are poised to begin, but there is certainly no guarantee that adjudication of the cross-motions for summary judgment will put an end to the case. Indeed, the far more likely scenario is years of appeals, cross-appeals, remands, further appeals, with all types of prolonged motion practice along the way. Meanwhile, the tribes and the State will spend millions in attorneys' fees—funds that can be much better spent on important tribal and state governmental programs and services.

To be clear, the Tribes have always believed—and continue to believe—that our existing compacts automatically renewed. And we also felt confident that our legal position regarding automatic renewal would (eventually) prevail. But notwithstanding that legal position, we felt that the wiser course of action was to put aside our differences and negotiate a good faith settlement with the State. This was purely an exercise of sovereignty.

Of course, the Compacts do not put an end to the ongoing litigation, as multiple other tribes continue to have a live dispute with the State. However, if the Department were to disapprove the Compacts, it would strongly discourage any settlement discussions with the State. These are important considerations that the Department should take into account.

Indeed, the Department has traditionally been deferential to compacts that result from negotiated settlements of litigation. For instance, in 2008, on review of an amendment to the compacts between the State of Michigan and the Little Traverse Bay Bands of Odawa Indians and the Little River Band of Ottawa Indians, the Department noted that the amendment was "entered into in connection with the settlement of pending litigation and thus presents a set of unique circumstances," and therefore the Department deemed it prudent to simply allow the amendment to go into effect. *See* 73 Fed. Reg. 21361 (April 21, 2008). *See also,* 73 Fed Reg. 58617 (Regarding gaming compact between Nez Perce Tribe and State of Idaho, stating "This Compact is entered into in connection with the state lottery litigation between the parties and thus presents unique circumstances resulting in our decision to neither approve nor disapprove the Compact within the 45-day statutory time frame").

In short, disapproval of these Compacts would substantially reduce the chance of the ongoing litigation ever settling. These unique circumstances weigh strongly in favor of approving the Compacts—or at a minimum, allowing them to be deemed approved.

9

## Conclusion

We have a deep well of respect for Attorney General Hunter, but his grievances with the Compacts are simply not well-founded. The Compacts are the product of good-faith negotiations with the State. They comply entirely with federal and state law, and they should be approved.


Sincerely,


William Nelson, Sr.
Chairman
Comanche Nation

John Shotton
Chairman
Otoe-Missouria Tribe


cc:

Paula Hart
paula.hart@bia.gov

Troy Woodward
troy.woodward@bia.gov

Maria Wiseman
maria.wiseman@bia.gov

10

AR_0000704

**RECEIVED**

*By Office of Indian Gaming at 8:40 am, May 22, 2020*

 

The Honorable David Bernhardt
Secretary of the Interior
U.S. Department of the Interior
1849 C St., NW
Washington, D.C. 20240

> **Re:    *Response to Tribal Opposition Letters***

We write to you in response to letters sent to your office from the Chickasaw Nation, the Quapaw Nation, and the Wichita & Affiliated Tribes, all of which request that the U.S. Department of the Interior ("Department") disapprove the Tribal–State Compacts (the "Compacts") lawfully entered into between the State of Oklahoma and the Comanche Nation and the Otoe–Missouria Tribe (collectively, the "Tribes").

As explained herein, with all due respect to our sister tribes, their arguments are not well-founded. Absolutely nothing in the Compacts breaks any new ground whatsoever. Each and every feature of the Compacts has been part of previously approved compacts, in some shape or form, over the last several decades. Indeed, as the examples cited in this memorandum make clear, these Compacts are squarely within agency precedent. They were negotiated in good faith and are in full compliance with federal and state law. They should be approved accordingly.

## I.    Background

Before delving into the objections raised by the Chickasaw Nation, Quapaw Nation, and Wichita & Affiliated Tribes, it is important to recognize circumstances under which our Compacts were entered into.

As the Department is aware, the existing compacts between Oklahoma tribes and the State are the subject of ongoing and contentious federal court litigation. *See Cherokee Nation et al. v. Stitt*, No. 19-cv-1198 (W.D. Okla.). The lawsuit was filed on December 31, 2019, by the Chickasaw, Cherokee, and Choctaw Nations, and the primary issue in litigation is whether the compacts automatically renewed on January 1, 2020 at the end of their initial fifteen-year term. We agreed—and continue to agree—with their central argument, as the compacts contain a renewal clause that was clearly triggered under the circumstances. But we nonetheless remained on the sideline during the initial pleading stages, as we did not find the need to intervene in the dispute.

However, once Judge DeGiusti ordered the case into mediation, we intervened out of concern that the proceedings would no longer be public. We wanted a seat at the table for any settlement discussions. Of course, we cannot disclose what happened in that mediation, but we can say that we embraced the opportunity to negotiate in good faith with the State to reach a fair

1

AR_0000819

resolution to the dispute that would inure to the benefit of our tribal members. Indeed, our negotiations with the State were solely about reaching an agreement that would be a positive step forward for the Comanche and Otoe-Missouria people. Although we firmly believed (and still believe) that our compacts automatically renewed, it simply did not make sense for us to try and stick with those compacts if better opportunities were available.

These Compacts are thus the product of the most fundamental aspects of tribal sovereignty. After all, every sovereign tribe has the right to enter into intergovernmental negotiations with the State, and every sovereign tribe has the right to choose what is best for its tribal members. We were faced with a fairly simple decision: (A) continue litigation against the State and thus remain in our current compacts; or (B) engage in good-faith negotiations with the State in an attempt to secure better opportunities to improve the well-being of our tribal members. We chose the latter option.

## II.    The Compacts are entirely legal and should be approved.

The letters of opposition from the Chickasaw Nation, Quapaw Nation, and Wichita & Affiliated Tribes present roughly five main lines of argument: (1) the Compacts were invalidly formed; (2) the State has not provided any meaningful concessions; (3) the Compacts erode tribal sovereignty; (4) the Compacts unlawfully include Section 20 concurrences; and (5) approval would breach the federal trust responsibility. These arguments have no basis in law, logic, or policy. The Compacts are fully compliant with all applicable laws, and they should be approved.

### A. The Compacts were validly formed.

The Chickasaw Nation, Quapaw Nation, and Wichita & Affiliated Tribes all echo the arguments made in the Opinion recently issued by Oklahoma Attorney General Michael Hunter—that the Governor could not legally enter into the Compacts on the theory that they improperly authorize illegal gaming activity. This argument was thoroughly rebutted in our memorandum submitted to your office on May 13, 2020, and our complete legal analysis on that issue will not be reproduced herein. That said, the Chickasaw Nation has raised two points on this subject that we wish to address.

First, while the Chickasaw Nation expressly recognizes that "an Oklahoma governor may enter into a compact with a Tribe without approval of any other official or branch of State government," they nonetheless make much of the fact that the model compact was offered through legislation and previously "approved" by either a voter referendum or the Joint Committee on Tribal–State Relations. *See* Chickasaw Mem. at 9–10. In other words, they posit that even though the Governor has the clear authority to enter into compacts with tribes, his authority with respect to *gaming* compacts must be limited because of two previous instances in which the legislature played a role in the offer. This simply cannot be the case. Nothing in Oklahoma law restricts the Governor's compacting authority with respect to gaming compacts. In fact, the Supreme Court of Oklahoma has explicitly recognized that the Governor "has been and continues to be the party responsible for negotiating compacts with the sovereign nations of this state." *See Sheffer v. Buffalo Run Casino, PTE, Inc.*, 315 P.3d 359, 364 (Okla. 2013). For all its other analytical weaknesses, even the AG Opinion recognizes that "any requirements that individual agreements or compacts negotiated by the Governor on behalf of the State with other sovereigns, such as Indian

2

tribes, be approved by the Legislature would violate the principles of separation of powers." *See* AG Opinion at 4.

Second, the Chickasaw Nation places undue emphasis on the Oklahoma Attorney General's "constitutional and statutory authority to act as Oklahoma's chief legal officer in all matters involving the State," and to that end, instructs the Department to "please remember" the "public objections of other constitutional officers of Oklahoma government." *See* Chickasaw Mem. at 11–12. Of course, while every Oklahoma government officer (including the Attorney General) has the right to speak their mind, the fact remains that the *Governor* is the chief magistrate of the State and the only party authorized to negotiate compacts with the tribes. *See* Okla. Const. art. VI, § 2; *see also* 74 O.S. § 1221(C)(1). Neither the Attorney General nor two individual state legislators have the capability to override his decisions.

In short, as explained in our response to the AG Opinion, the Governor clearly had authority under Oklahoma law to negotiate and enter into the Compacts. To the extent three of his colleagues have a difference of opinion, their opinions are legally inapposite.

### B. The Compacts include meaningful concessions from the State.

The second line of argument in the tribal opposition letters is that the Compacts allow for "unlawful taxation" by the State on the theory that there is no "meaningful concession in exchange." *See, e.g.,* Chickasaw Mem. at 13. Yet, the Compacts are strikingly similar to the previous compacts, and no party alleges that *those* agreements lacked any meaningful concessions. And even taking the Compacts' modernizations into account, the numerous concessions made by the State are clear. There is no unlawful taxation in the Compacts.

Perhaps the most glaring defect in the opposing tribes' argument is that the Compacts actually *reduce* the revenue-share payments that we would make to the State. If we are paying less to the State than we did before, it is hard to envision how this would constitute "unlawful taxation." In fact, using real-world figures, comparing our current revenue-sharing payments to the amounts we would pay under the Compacts, the savings are significant.

As the Department is aware, under the current compact, for electronic games, the revenue-sharing fees are 4% of the first ten (10) million dollars, 5% of the next ten (10) million, and 6% of all subsequent revenues. *See* Part 11.A.2. For table games, the revenue-sharing fees are 10% of net win. *Id.* Under the Compacts that we submitted for approval, we would pay a flat 4.5% for all class III revenues. The numbers speak for themselves:

Over the past year, the Comanche Nation's casinos earned adjusted gross revenues of about $59,128,561 on electronic games and $2,513,196 on table games. This resulted in total payments to the State of $3,648,711—i.e., a blended revenue-sharing rate of about 5.92%. If Comanche had been paying 4.5%, the revenue-sharing payments would have been $2,773,879—**an annual savings of $874,832, or about 24%.**

The Otoe-Missouria Tribe would also save a significant amount. Their 2019 revenues were $35,468,663 for electronic games and $2,614,981 for table games. The total revenue sharing payments to the State (under the existing agreement) were $2,089,618—a blended rate of about

3

5.49%. If Otoe-Missouria had been paying 4.5%, their revenue sharing payments to the State would total $1,713,763—**an annual savings of $375,854, or about 18%.**

As these numbers plainly illustrate,[1] the Comanche Nation and the Otoe-Missouria Tribe will benefit immensely from this new revenue-share structure. Indeed, once the Compacts go into effect, the Tribes will immediately begin to save hundreds of thousands of dollars that can be spent on important tribal programs.

In light of the fact that the Compacts provide for a substantial *reduction* in revenue-sharing fees, Chickasaw focuses primarily on a theory that the State offers nothing meaningful in return for those fees. This is likewise a flawed argument. The State offers everything that it offered in the previous compact, and then some.

As in our previous compact, the Tribes agree to pay these fees on the condition that the State provide "substantial exclusivity." *See* Compact at 23. The Chickasaw Nation apparently takes the position that this obligation is not spelled out with enough detail, but this argument has no basis in any commonsense reading of the Compacts. After all, the Compacts plainly provide that the Tribes will only pay the revenue-sharing fees "[i]n consideration of [the State's agreement to provide substantial exclusivity]." *Id.* Part 10(B). If the State does not provide substantial exclusivity, the Tribes will not be obligated to pay the associated fees. Any other reading of "exclusivity" would render the term a nullity.

Nor do the Compacts unlawfully authorize an expansion of non-tribal gaming, such as non-tribal event wagering. As thoroughly explained in our response to the AG Opinion, the Compacts only permit so-called "new" forms of gaming to the extent such gaming is "authorized by law." So, if it turns out that any of the forms of gaming that Chickasaw complains about are not "authorized by law," then the Compacts would not permit such gaming to take place. And if the gaming *can* take place, it would not be a one-sided benefit, as Comanche and Otoe-Missouria would be permitted to engage in event wagering as well.

Expanding their attack on the event wagering provision, the Chickasaw Nation also alleges that the Compacts allow an "unjustifiable and usurious revenue-share rate of approximately 22%." However, no authority whatsoever is cited in support of this arithmetic. Chickasaw Mem. at 18. The number appears to be pulled out of thin air.

All told, the Compacts provide all of the concessions that were included in the previous compacts while *lowering* the revenue-sharing payments. And while the revenue-sharing percentage may increase in the future, that increase would only occur if and when the Tribes are able to build casinos in certain geographically desirable locations. Of course, substantial exclusivity will be more valuable when new facilities are taken into account, which is why the Compacts allow for a reasonable rate increase at that point in time. And in case those facilities never come to fruition, the Compacts include a built-in protection against the rate increase. With this fee structure, it is clear that the revenue-share payments are justified by a meaningful concession from the State.

---

[1] Documentation of these figures can be made available if the Department requests.

4

### C. The Compacts do not erode tribal sovereignty.

The Quapaw Nation has listed a litany of features of the Compacts which in their view "erode tribal sovereignty." *See* Quapaw Letter at 2. None of these features erode sovereignty in even the slightest sense, and in fact, all of these features have either been approved in prior compacts or do not effect any change in the Tribes' existing obligations.

First, Quapaw objects to the fact that the Compacts "waive sovereign immunity." *See* Quapaw Letter at 2. To be sure, the Compacts do waive sovereign immunity for the resolution of tort and prize claims, as well as for disputes with the State. But none of these waivers erodes tribal sovereignty whatsoever. There is nothing inherently troublesome about a tribe waiving sovereign immunity, and Quapaw can provide no rationale to support its theory that a waiver of immunity itself constitutes an erosion of sovereignty. To the contrary, by waiving its immunity for tort and prize claims, we are simply ensuring that our casino patrons have a forum to equitably resolve disputes. Moreover, the waiver of immunity for tort and prize claims is already part of the current compact, so it is hard to see why Quapaw all of a sudden thinks such a waiver is so terrible. *See, e.g.*, Compact between the Quapaw Nation and the State of Oklahoma, Part 6(A)(2) ("The tribe consents to suit on a limited basis with respect to tort claims . . . ."). And with respect to the waiver of sovereign immunity for disputes with the State, the waivers are mutual—both the Tribes and the State have waived immunity to the extent necessary to enforce the Compacts. It cannot reasonably be said that a mutual waiver of immunity to resolve compact disputes constitutes an erosion of tribal sovereignty.[2]

Second, Quapaw complains that the Compacts "concede tribal court jurisdiction over tort claims." *See* Quapaw Letter at 2. This complaint is similarly without merit. The Compacts allow tort claims to be adjudicated in arbitration, and it can hardly be an erosion of tribal sovereignty for a tribe to agree to arbitration. Indeed, numerous existing compacts do just that. For example, many of the California compacts include the following provision:

> (ii)    The Tribe shall maintain in continuous force its Tort Liability Ordinance which shall, prior to the effective date of this Amendment and at all times hereafter, continuously provide at least the following:
>
>> (A)    *That California tort law shall govern all claims* of bodily injury, property damage, or personally injury arising out of, connected with, or relating to the operation of the Gaming Facility or the Gaming Activities, including, but not limited to, injuries resulting from entry onto the Tribe's land for the purposes of patronizing the Gaming Facility or providing goods or services to the Gaming Facility, provided that any and all laws governing punitive damages need not be a part of the Ordinance.

---

[2] In any event, the Tribes' waiver of sovereign immunity in favor of the State is essentially redundant, as IGRA already abrogates tribal sovereign immunity for most actions brought by a state to enforce the provisions of a tribal–state compact. *See* 25 U.S.C. § 2710(d)(7)(A)(ii).

5

AR_0000823

(B)    *The ordinance shall expressly provide that the Tribe waives its right to assert sovereign immunity* with respect to the arbitration and court review of such claims but only up to the limits of the Policy; provided, however, such waiver shall not be deemed to waive or otherwise limit the Tribe's sovereign immunity beyond the Policy limits.

(C)    *The ordinance shall provide that the Tribe consents to binding arbitration before a single arbitrator*, who shall be a retired judge, in accordance with the comprehensive arbitration rules and procedures of JAMS . . . . *To effectuate its consent to the foregoing arbitration procedure, the Tribe shall, in the exercise of its sovereignty, waive its right to assert its sovereign immunity* in connection with the arbitrator's jurisdiction and in any action brought [to enforce arbitration].

*See, e.g.*, First Amendment to the Tribal–State Compact Between the State of California and the Agua Caliente Band of Cahuilla Indians, VII.B (2007) (emphasis added). These compacts were approved without any apprehension as to the above provisions. Department precedent thus clearly indicates that there is nothing objectionable about a compact in which the tribe agrees to waive its immunity to the extent necessary to allow patrons to assert tort claims in arbitration.

Third, Quapaw complains that the Compacts require the Tribes to comply with the Oklahoma alcoholic beverage code. *See* Quapaw Letter at 2. This argument has no merit. For one, the current compact already provides that tribes can serve alcoholic beverages only if "*in compliance with state, federal and tribal law*," so the Compacts effect no substantive change in the Tribes' obligations at all. *See* Compact between the Quapaw Nation and the State of Oklahoma, Part 5(I). But even if the Compacts' language regarding alcoholic beverages was substantively different than the prior version, it is well-established that tribes are *already* subject to state liquor control laws. *Rice v. Rehner*, 463 U.S. 713, 726 (1983); *see also* 18 U.S.C. § 1161. The Compacts thus simply memorialize an existing legal obligation.

Fourth, Quapaw complains that the Compacts provide that the Tribes "consent to state law for *any* disputes arising out of the gaming compact." *See* Quapaw Letter at 2 (emphasis in original). Because Quapaw does not provide more detail to this objection, it is hard to tell what provision they are referring to. But the fact is, the Compacts only provide for the application of state common law for prize and tort claims—not "any" dispute. And the application of state law for prize and tort claims is in no way an erosion of tribal sovereignty; effectively, this provision simply provides standards for the applicable elements of a patron's claim, e.g., negligence standards. The Department has routinely approved compacts with such terms, as shown in the California example *supra*.

Finally, Quapaw complains that the Compacts' provision requiring the Tribes to certify that 45% of their revenue comes from class III gaming gives the State "pervasive control" over tribal gaming. This is a completely untrue characterization of the Compacts. The Compacts solely regulate "Covered Games," a category that specifically *excludes* class II gaming. *See* Part 2(A)(7).

6

Indeed, the Compacts explicitly state that *"nothing in this Compact shall limit the Tribe's right to operate any game that is class II under IGRA." See* Part 3(A) (emphasis added). Nothing about the requirement that the Tribes certify that 45% of their revenue be derived from class III gaming limits the Tribes' right to engage in class II gaming.[3]

Thus, contrary to all of Quapaw's concerns, the Compacts do not erode tribal sovereignty in even the slightest.

### D. The Section 20 Concurrence is lawful and in accordance with precedent.

Chickasaw, Quapaw, and Wichita have all taken particular grievance with the fact that the Compacts include a provision in which the Governor concurs in a two-part determination under IGRA that lands in six counties (three for the Comanche Nation, three for the Otoe-Missouria Tribe) can be taken into trust for gaming purposes. Such provision is entirely lawful under IGRA. Compacts including such provisions have been previously approved by the Department, and the Department should approve these Compacts as well.

Section 20 of IGRA refers to gaming on lands acquired in trust after October 17, 1988. Presumptively, such lands are ineligible for gaming. 25 U.S.C. § 2719(a). But Section 20 contains an important exception to that rule; specifically, it sets forth a process known as a "two-part determination" in which later-acquired land can be put into trust for gaming. The exception applies under the following statutory conditions:

> [T]he Secretary, after consultation with the Indian tribe and appropriate State and local officials, including officials of other nearby Indian tribes, determines that a gaming establishment on newly acquired lands would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community, but only if the Governor of the State in which the gaming activity is to be conducted concurs in the Secretary's determination[.]

25 U.S.C. § 2719(b)(1)(A).

Chickasaw, Quapaw, and Wichita appear to oppose the Compacts mainly on the basis of the Section 20 concurrence. But those objections have no bearing on the legality of the Compact. The actual taking of land into trust under Section 20 is entirely separate and apart from the Compacts themselves. Moreover, the land-into-trust process under Section 20 allows for input from neighboring tribes. *See id.* Thus, when that process moves forward, Chickasaw, Quapaw,

---

[3] In fact, even if the Compacts did include limitations on the amount of class II gaming that the Tribes can engage in—which they do not—the Department has previously approved compacts that do just that. For example, in Arizona, the tribal–state compacts generally do not allow tribes to operate more than forty (40) class II gaming machines. *See, e.g.,* Compact between the State of Arizona and the Ak-Chin Indian Community, § 3(c) (2003). These compacts were approved by the Department without any objection to the limitation on class II gaming machines. Of course, under our Compacts, there is no limit to the number of class II gaming machines that we can operate, so there should be no problem with the requirement that we certify 45% of gaming revenue as coming from class III gaming. (And as a practical matter, both the Comanche Nation and the Otoe-Missouria Tribe already earn more than 45% of their revenue from class III gaming anyway, so this certification would change nothing.)

7

Wichita, and any other interested tribe will undoubtedly be allowed to have their voices be heard. But their complaint about the potential acquisition of trust land has nothing to do with the Compacts' legality.

Indeed, the presence of a Section 20 concurrence in the Compacts is not an unusual feature at all, as demonstrated in prior compacts that the Department has affirmatively approved. For instance, in 2005, the Department approved a compact between the State of California and the Fort Mojave Tribe. That compact referred to a proposed gaming facility on a 300-acre parcel of land that would be ineligible for gaming but for approval under the two-part determination process. In furtherance of this project, the compact explicitly provided that "[t]he Governor intends to grant his concurrence [under the two-part determination]." *See* Compact between the State of California and the Fort Mojave Tribe, Preamble(I) (2004). The compact was affirmatively approved by the Department, without any objection to the provision setting forth the Governor's intent to concur in the two-part determination.

Wichita cites four disapproved compacts in furtherance of their position that the Section 20 concurrence mandates disapproval. But those examples are inapposite. This is because it does not matter if the Section 20 concurrence in and of itself is a meaningful concession, because even if the Section 20 approvals never occur, the Tribes will *still* benefit from the same substantial exclusivity that was sufficient to justify the revenue-sharing rates under the prior compact—and as explained above, those rates have been reduced significantly. In other words, the Section 20 concurrence is not the legal footing upon which the revenue-sharing rates rely, so it cannot be a basis for disapproval.

That said, although the State has clearly made meaningful concessions that are wholly apart from the Section 20 concurrence, Wichita is incorrect in suggesting that the Section 20 concurrence is without value. Indeed, the Section 20 concurrence is a highly desirable feature of the Compacts, and it is something that the State was plainly under no obligation to provide. It is also a feature that encompasses value in a way that is distinguishable from the examples cited by Wichita. Those examples are fundamentally different in that those compacts effectively *required* the Section 20 process to move forward, or the Section 20 process was the central purpose of the entire compact. The Warm Springs compact is especially illustrative, as that compact was essentially an agreement for the tribe to move its existing casino (on its reservation lands) to a site that was then ineligible for gaming. *See* Art. V.C ("The Gaming Facility authorized by this Compact *shall* be located on the Cascase Lockes Land.") (emphasis added). Here, in contrast, the Compacts are broader agreements that address numerous facilities. The State has agreed to decrease the prior revenue share to 4.5%. Meanwhile, the State still provides the same substantial exclusivity as earlier, but *also* agrees to concur in any Section 20 process. If that process successfully results in new lands becoming eligible for gaming, it will then be evident that the State's concurrence was immensely valuable. Hence, *at that point*, the Compacts allow for a reasonable increase in the revenue-share rates.

In sum, the Section 20 concurrence poses no legal hurdle to this Department's approval of the Compacts.[4] It is a valuable feature of the Compacts, without which casino development would

---

[4] It is worth briefly nothing that while the Wichita & Affiliated Tribes allege that the Compacts' reference to the Section 20 concurrence somehow limits the Tribes' right to open new facilities on their existing Indian lands, that is

AR_0000826

be substantially more difficult. Other tribes may disagree with our proposed acquisition of trust land under Section 20, but their complaint is no basis to withhold approval. We urge the Department to approve the Compacts in their current form.

### E. Approval of the Compacts would not be a breach of the trust responsibility.

Finally, the Chickasaw Nation argues that approval of our Compacts would constitute a breach of the Department's trust responsibility. This is categorically untrue.

The primary basis for Chickasaw's allegation that approval would be a breach of trust is that the Compacts include the above-described Section 20 concurrence for new gaming facilities in Cleveland, Grady, and Love Counties. To be sure, Chickasaw (and perhaps other tribes) may have lands in those counties. But these counties *also* contain lands with a deep historical nexus to the Comanche Nation—lands that were clearly part of their vast aboriginal territory. The same goes for the Otoe-Missouria Tribe and the Section 20 concurrence associated with Logan, Payne, and Noble Counties. The Otoe-Missouria Tribe has a longstanding historical tie to lands in those counties. The Section 20 concurrence is thus entirely appropriate.

In any event, approval of the Compacts alone does not make lands in those counties eligible for gaming. We would still have to go through the entire Section 20 process. That process is separate and apart from the Compact approval issue. Insofar as Chickasaw and other tribes object to our future land acquisitions, they can raise their voices at that time. For now, the hypothetical land acquisitions pose no reason for disapproving the Compacts.[5]

If anything, the only prospective breach of the trust responsibility would be if the Department *disapproved* the Compacts. Disapproval would have the immediate and direct consequence of requiring the Tribes to pay more money to the State than what we have already negotiated in good faith. The Department has a fiduciary obligation to protect the best interests of the Tribes, including in the approval of lawful gaming compacts—a duty that has been expressly codified in statute. *See* 25 U.S.C. § 2710(d)(8)(B)(iii). Here, wrongful disapproval would cause significant economic harm—to the tune of over a million dollars per year. These are undeniably substantial damages that would clearly constitute a breach of the Department's trust responsibility.

### Conclusion

We are gravely disappointed that certain Oklahoma tribes have chosen to oppose the approval of our Compacts. But it should be noted that their complaints include no legitimate legal basis for disapproving the Compacts. The Compacts are legal, they were negotiated in good faith, and they should be approved.

---

simply not the case. *See* Wichita Letter at 7. It suffices to say that Wichita can point to no language whatsoever in the Compacts that prevent the Tribes' from opening new facilities on their existing Indian lands. There is no such limitation in the Compacts.

[5] As one last-ditch effort to persuade the Department to disapprove the Compacts, the Chickasaw Nation claims that the Compacts create a "material risk" that we would be "left without any lawful Class III gaming compact with Oklahoma." *See* Chickasaw Mem. at 22. This argument has no legal grounding. If the Compacts were approved by the Department, and then later happened to be wholly invalidated in a federal court, the subsequent nullification would likely extend to the *entire* Compact, including the provision that the Compact supersedes the prior version.

AR_0000827

Sincerely,

William Nelson, Sr.
Chairman
Comanche Nation

John Shotton
Chairman
Otoe-Missouria Tribe

cc:

Tara Sweeney
tara.sweeney@bia.gov

Paula Hart
paula.hart@bia.gov

Troy Woodward
troy.woodward@bia.gov

Maria Wiseman
maria.wiseman@bia.gov

10

AR_0000828

**From:** "Hart, Paula" <Paula.Hart@bia.gov>
**To:** "Oakes, Morgan A" <Morgan.Oakes@bia.gov>
**Cc:** "Wiseman, Maria K" <Maria.Wiseman@bia.gov>, "Woodward, Troy" <Troy.Woodward@bia.gov>
**Subject:** Fw: [EXTERNAL] Gaming: Notice of Original Jurisdiction Action in the Oklahoma Supreme Court Concerning Class III Gaming Agreements under DOI Review
**Date:** 2020-06-04 14:07:53 -0400
**Attachments:** Letter_to_DOI_6-4-20.pdf; Application_to_Assume_OJ_-_Treat_McCall_v._Stitt.pdf; Brief_in_Support_-_Treat_McCall_v._Stitt.pdf
**Inline-Images:** image001.png

---

Morgan please log in and circulate.

Troy you may want to talk with Matt about this latest submission.

Paula

---

**From:** Cara Rodriguez <cara@glenncoffee.com>
**Sent:** Thursday, June 4, 2020 2:02 PM
**To:** Hart, Paula <Paula.Hart@bia.gov>; tara_sweeney@iosdoi.gov <tara_sweeney@iosdoi.gov>; Tahsuda, John <John_Tahsuda@ios.doi.gov>
**Cc:** Glenn Coffee <gcoffee@glenncoffee.com>
**Subject:** [EXTERNAL] Gaming: Notice of Original Jurisdiction Action in the Oklahoma Supreme Court Concerning Class III Gaming Agreements under DOI Review

Dear Director Hart, Assistant Secretary Sweeney, and Principal Deputy Assistant Secretary Tahsuda,
Please see the attached cover letter and pleadings that were filed in cause 118,829 in the Oklahoma Supreme Court today.
Thank you,
**Cara N. Rodriguez**
Attorney at Law
Glenn Coffee & Associates, PLLC
915 N. Robinson
Oklahoma City, OK 73102
405.601.1616
cara@glenncoffee.com



*NOTICE: CONFIDENTIAL AND PRIVILEGED COMMUNICATION: The information in this electronic mail, including any attachments, is sent by or on behalf of an attorney and is intended to be confidential and for the use of the intended recipient only. The information contained in this transmission and any attached documents or previous emails may be protected by the attorney-client privilege, work product doctrine, or otherwise legally privileged. If the reader of this message is not the intended recipient, you are notified that retention, use, dissemination, distribution, or copying of this message or any attachments hereto is strictly prohibited. If you received this electronic mail in error, please notify us immediately by reply and destroy the original transmission and its attachments without reading them or saving them to a disk. Thank you.*



915 N. Robinson  |  Oklahoma City, OK 73102  |  405.601.1616          MAILING ADDRESS  |  PO BOX 437  |  Oklahoma City, OK 73101

June 4, 2020

The Honorable David Bernhardt
Office of the Secretary
U.S. Department of the Interior
1849 C Street N.W.
Washington, D.C. 20240

Dear Secretary Bernhardt:

Included with this letter is a copy of an Original Jurisdiction action which is being filed in the Oklahoma Supreme Court today. As explained in the Brief in Support, the Honorable Greg Treat, President Pro Tempore of the Senate, and the Honorable Charles McCall, Speaker of the House of Representatives, urge the Court to declare Governor J. Kevin Stitt's actions in negotiating and entering into new gaming agreements with the Comanche Nation and Otoe-Missouria Tribes *ultra vires* and to declare that those agreements do not validly bind the State. President Pro Tempore Treat and Speaker McCall thus urge the Department of the Interior to disapprove the agreements.

Sincerely,

V. Glenn Coffee

Enclosure

glenncoffee.com

AR_0002526

# IN THE SUPREME COURT OF THE STATE OF OKLAHOMA

(1) THE HONORABLE GREG TREAT,      )
Senate President Pro Tempore, in his      )
official capacity, and      )
(2) THE HONORABLE CHARLES MCCALL,      )
Speaker of the House, in his official capacity,      )
      )
                  *Petitioners,*      )
      )
v.      )      Case No. _____
      )
THE HONORABLE J. KEVIN STITT,      )
Governor of the State of Oklahoma,      )
in his official capacity,      )
      )
                  *Respondent.*      )

---

## APPLICATION TO ASSUME ORIGINAL JURISDICTION AND PETITION FOR DECLARATORY RELIEF

---

V. GLENN COFFEE, OBA # 14563
CARA RODRIGUEZ, OBA #21794
DENISE LAWSON, OBA #31532
GLENN COFFEE & ASSOC., PLLC
P.O. Box 437
Oklahoma City, OK 73101
Phone: (405) 601-1616
gcoffee@glenncoffee.com
cara@glenncoffee.com
denise@glenncoffee.com

***ATTORNEYS FOR PETITIONERS***

JUNE 4, 2020

AR_0002527

Petitioners the Honorable Greg Treat, Senate President Pro Tempore, in his official capacity, and the Honorable Charles McCall, Speaker of the House, in his official capacity, come now, respectfully asking this Court to assume original jurisdiction and to declare that state law does not authorize the Governor to unilaterally enter into gaming agreements incorporating provisions violative of state law.

## I.
## BACKGROUND

1.      On April 22, 2020, Oklahoma Governor J. Kevin Stitt, Respondent, entered into new gaming agreements purportedly constituting Tribal-State compacts ("Agreements") with the Comanche Nation and Otoe-Missouria Tribes.

2.      The contents of the Agreements contain numerous provisions prohibited by state law.

3.      Further, the Agreements were not lawfully executed by the Governor as neither was negotiated and entered into pursuant to the State-Tribal Gaming Act ("Act"), 3A O.S. 2011 & Supp. 2019, §§ 261, *et seq*, nor approved by the Joint Committee on State-Tribal Relations pursuant to the requirements of 74 O.S. § 1221.

4.      Notwithstanding the above, Governor Stitt submitted the Agreements to the Department of the Interior ("DOI") for approval on April 23, 2020.

## II.
## PARTIES

5.      Petitioner Greg Treat is President Pro Tempore of the Oklahoma State Senate.

6.      Petitioner Charles McCall is Speaker of the Oklahoma House of Representatives.

7.      Respondent J. Kevin Stitt is Governor of the State of Oklahoma.

1

AR_0002528

## III.
## JURISDICTION

8.      This is indisputably a matter of *publici juris*.  In executing and submitting the Agreements to the DOI, the Governor has unlawfully usurped the power of the Legislature.

9.      "Jurisdiction to grant declaratory relief may be assumed (1) in matters of public interest where there is (2) an element of urgency or pressing need for an early decision." *Fent v. Contingency Rev. Bd.*, 2007 OK 27, ¶ 11, 163 P.3d 512, 521.

10.      The fundamental question presented in this action represents an attempt by the executive branch to unilaterally *bind* the State to gaming activity prohibited by current state law. As such, it implicates the "core notions of our constitutional structure: both the separation of powers between branches of state government as well as the checks and balances that those branches can impose on each other." 2020 OK AG 8, p. 3.

11.      Declaratory relief is the appropriate remedy to "resolve intolerable conflicts" that "amount to a gridlock" between "co-ordinate branches of state government" and is "within the discretionary superintending jurisdiction of this court." *Ethics Comm'n of State of Okla. v. Cullison*, 1993 OK 37, ¶ 7; *Coffee v. Henry*, 2010 OK 4, ¶ 6.

## IV.
## MERITS

12.      The Governor's authority to negotiate and enter into compacts with Indian tribes is statutory—not constitutional. 74 O.S. § 1221(C)(1); 3A O.S. § 280. And legality is a condition precedent to tribal gaming compacts. As such, any attempt by the Executive Branch to legislate by means of entering into gaming compacts prohibited by state law violates Articles 4, Sections 1 and 36 of the Oklahoma Constitution.

13.      Further, such action violates the Governor's independent constitutional duty to cause "all laws of the State to be faithfully executed." OKLA. CONST. art. 6, § 8.

2

14. Finally, by neglecting to follow either of the statutory processes for legislative approval (*see* 3A O.S. § 281 and 74 O.S. § 1221), but nonetheless submitting the Agreements to the DOI for approval, Governor Stitt has unilaterally and without authority attempted to bind the State of Oklahoma to new law of his own creation.

## V.
## CONCLUSION

For the reasons stated above and for the reasons set forth in the accompanying Brief in Support, Petitioners ask this Court to assume original jurisdiction and to declare that the Governor was without the authority to enter into the Agreements on behalf of the State and that the Agreements do not validly bind the State.

Respectfully submitted,

V. GLENN COFFEE, OBA # 14563
CARA RODRIGUEZ, OBA #21794
DENISE LAWSON, OBA #31532
GLENN COFFEE & ASSOCIATES, PLLC
P.O. Box 437
Oklahoma City, OK 73101
Phone: (405) 601-1616
gcoffee@glenncoffee.com
cara@glenncoffee.com
denise@glenncoffee.com

***ATTORNEYS FOR PETITIONERS***

3

AR_0002530

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of June 2020, a true and correct copy of the foregoing was mailed by Certified Mail, Return Receipt Requested and electronic mail to the following:

The Honorable J. Kevin Stitt
Governor, State of Oklahoma
Oklahoma State Capitol
2300 North Lincoln Boulevard, Room 212
Oklahoma City, OK 73105

_V. Glenn Coffee_

4

AR_0002531

# IN THE SUPREME COURT OF THE STATE OF OKLAHOMA

(1) THE HONORABLE GREG TREAT, )
Senate President Pro Tempore, in his )
official capacity, and )
(2) THE HONORABLE CHARLES MCCALL, )
Speaker of the House, in his official capacity, )
  )
                   *Petitioners,* )
  )
v. )     Case No. _____
  )
THE HONORABLE J. KEVIN STITT, )
Governor of the State of Oklahoma, )
in his official capacity, )
  )
                   *Respondent.* )

---

## BRIEF IN SUPPORT OF APPLICATION TO ASSUME ORIGINAL JURISDICTION AND PETITION FOR DECLARATORY RELIEF

---

V. GLENN COFFEE, OBA # 14563
CARA RODRIGUEZ, OBA #21794
DENISE LAWSON, OBA #31532
GLENN COFFEE & ASSOC., PLLC
P.O. Box 437
Oklahoma City, OK 73101
Phone: (405) 601-1616
gcoffee@glenncoffee.com
cara@glenncoffee.com
denise@glenncoffee.com

***ATTORNEYS FOR PETITIONERS***

JUNE 4, 2020

AR_0002532

## TABLE OF AUTHORITIES AND CONTENTS

I. INTRODUCTION................................................................................................ 1

        25 U.S.C. §§ 2701-21............................................................................ 1

        2020 OK AG 8 ............................................................................... *passim*

II. BACKGROUND ............................................................................................ 3

        25 U.S.C. § 2710(d)(8)(C) .................................................................... 4

        3A O.S. § 281 ................................................................................... 3, 8

III. DISCUSSION................................................................................................. 5

        *Bailey v. State Board of Public Affairs,*
              194 Okl. 495, 153 P.2d 235 (1944)............................................... 5

        *Hart v. Warner,*
              2017 OK CIV APP 29, 395 P.3d 861 ........................................ 6

        *State ex rel. Okla. Tax Comm'n v. Daxon,*
              1980 OK 28, 607 P.2d 683 ......................................................... 6

        *State ex rel. York v. Turpen,*
              1984 OK 26, 681 P.2d 763 ......................................................... 5

        Article 4, § 1, Oklahoma Constitution............................................... 5

        Article 5, § 1, Oklahoma Constitution........................................... 5, 6

        Article 5, § 36, Oklahoma Constitution ...................................... 5, 6, 7

        Article 6, § 1, Oklahoma Constitution............................................... 5

        Article 6, § 2, Oklahoma Constitution............................................... 5

        Article 6, § 8, Oklahoma Constitution................................... 5, 7, 8, 15

    A. State—not federal—law controls who has the authority to negotiate and enter into binding compacts with Indian tribes, the authority Oklahoma law vests in the Governor to conduct such business *solely* derives from statute ...................................... 6

AR_0002533

*Odom* v. *Penske Truck Leasing Co.*,
2018 OK 23, 415 P.3d 521 ........................................................................ 8

*Griffith v. Choctaw Casino of Pocola*,
2009 OK 51, 230 P.3d 488 .......................................................... 7, 8, 9, 11

*Pueblo of Santa Ana v. Kelly*,
104 F.3d 1546 (10th Cir. 1997) ................................................................ 6

*Sheffer v. Buffalo Run Casino, PTE, INC.*,
2013 OK 77, 315 P.3d 359 ........................................................................ 7

*Tweedy v. Okla. Bar Ass'n*,
1981 OK 12, 6224 P.2d 1049 ..................................................................... 7

Article 5, § 36, Oklahoma Constitution ....................................................... 5, 6, 7

Article 6, § 8, Oklahoma Constitution ...................................................... 5, 7, 8, 15

2004 OK AG 27 ................................................................................... *passim*

2020 OK AG 8 .................................................................................... *passim*

B.  Under state law, the Governor can negotiate and enter into gaming compacts by one of two methods: (1) pursuant to the Model Tribal Gaming Act, or (2) via 74 O.S. § 1221 and after approval by the Joint Committee on State-Tribal Relations ........... 8

*Griffith v. Choctaw Casino of Pocola*,
2009 OK 51, 230 P.3d 488 .......................................................... 7, 8, 9, 11

*Muhammad v. Comanche Nation Casino*,
CIV-09-968, 2010 WL 4365568, (W.D. Okla. Oct. 27, 2010) ...... 11, 12

*State ex rel. Clark v. Johnson*,
120 N.M. 562, 904 P.2d 11 ...................................................... 11, 13, 15

Article II, § 2, United States Constitution ..................................................... 10, 11

3A O.S. § 280 ................................................................................................ 9, 14

3A O.S. § 281 .................................................................................................. 3, 8

74 O.S. § 1221 ....................................................................................... 8, 9, 10, 11

74 O.S. § 1222 ............................................................................................... 10, 11

2004 OK AG 27 ................................................................................... *passim*

AR_0002534

2006 OK AG 39..................................................................................................................11

C.  Regardless how the Governor negotiates and enters into compacts with tribes,
    he simply lacks any unilateral authority to bind the State to terms that would
    otherwise be prohibited by state law ............................................................................12

  *Rumsey Indian Rancheria of Wintun Indians v. Wilson,*
      64 F.3d 1250 (9th Cir. 1994) .......................................................................12

  *Seminole Tribe of Fla. v. State of Fla.,*
      No. 91-cv-6756, 1993 WL 475999 (S.D. Fla. Sep. 22, 1993)...............12

  *State ex rel. Clark v. Johnson,*
      120 N.M. 562, 904 P.2d 11 ........................................................ 11, 13, 15

  *State ex rel. Stephan v. Finney,*
      836 P.2d 1169 (Kan. 1992) .......................................................................13

  25 U.S.C. §§ 2701(d)(1)...........................................................................................12

  3A O.S. § 262(A) ......................................................................................................14

  3A O.S. § 262(H) ................................................................................................12, 13

  3A O.S. § 280 .........................................................................................................9, 14

  3A O.S. § 280.1 .........................................................................................................13

D.  Here, because the Agreements were not entered into by the State according to
    either compacting method and because the Governor included unauthorized
    forms of gaming violative of public policy, no amount of severance can correct
    these egregious separation of powers violations...........................................................14

  *State ex rel. Clark v. Johnson,*
      120 N.M. 562, 904 P.2d 11 ........................................................ 11, 13, 15

  Article 6, § 8, Oklahoma Constitution................................................... 6, 7, 8, 15

  2020 OK AG 8 ...............................................................................................*passim*

IV. CONCLUSION................................................................................................................15

AR_0002535

# I.
# INTRODUCTION

On April 21, 2020, Oklahoma Governor J. Kevin Stitt announced[1] that he had reached terms with the Comanche Nation and Otoe-Missouria Tribes ("Otoe and Comanche Nations") on new gaming agreements ("Agreements"), which according to the Governor constituted Tribal-State compacts entered into under the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701-21.[2] Governor Stitt's execution of these Agreements exceeded his authority under the Oklahoma Constitution, rendering them void as a matter of Oklahoma law.

In forming these Agreements, Governor Stitt disregarded Oklahoma's legislatively-established two-track system for establishing Tribal-State compacts, for IGRA or any other purpose, that effectively bind the State to their terms. And the Agreements provide several illustrations of the problems inherent in executive overreach. Among other things, they "include covered games . . . such as house-banked card games, house-banked table games, and event wagering . . . ." 2020 OK AG 8. *As such, the Governor purports, by his unilateral approval of the terms he negotiated, to authorize forms of gaming that are expressly prohibited by Oklahoma law.*

The Agreements garnered immediate rebuke from state leaders including Petitioners and Attorney General Mike Hunter.[3] *See* Letter from President Pro Tempore Treat and

---

[1] *See* App. 1, Oklahoma Governor Kevin Stitt press release (with embedded links to press conference video and the Agreements), Apr. 21, 2020, available at https://www.governor.ok.gov/articles/press_releases/governor-stitt-signs-two-new-gaming-compacts.

[2] *See* App. 2, "Comanche Nation and State of Oklahoma Gaming Compact" and "Otoe-Missouria Tribe and State of Oklahoma Gaming Compact."

[3] *See* App. 3, Randy Krehbiel, "Oklahoma's legislative leaders tell Gov. Stitt his new tribal gaming compacts are invalid," *TULSA WORLD* (Apr. 22, 2020), available at https://www.tulsaworld.com/news/local/government-and-politics/oklahomas-legislative-leaders-tell-gov-stitt-his-new-tribal-gaming-compacts-are-invalid/article_958c7b77-5573-50d5-96bf-a0c57dfb8203.html; Randy Krehbiel, "Oklahoma AG Mike Hunter says Gov. Stitt's new tribal gaming compacts 'not authorized' by state law," *TULSA WORLD* (Apr. 22, 2020), available at https://www.tulsaworld.com/news/local/government-and-politics/oklahoma-ag-mike-hunter-says-gov-stitts-new-tribal-gaming-compacts-not-authorized-by-state/article_1e9bd0d3-3d50-50c0-8233-a3d924f01f44.html.

1

AR_0002536

Speaker McCall to Governor Stitt, App. 4. Further, on May 5, 2020, Attorney General Hunter issued Attorney General Opinion 2020-8, opining that "[t]he Governor lacks authority to enter into and bind the State to compacts with Indian tribes that authorize gaming activity prohibited by state law." *See* 2020 OK AG 8, ¶ 22, App. 5. And that same day, Attorney General Hunter sent a letter to the Secretary of the Department of Interior ("DOI"), David Bernhardt, asking the DOI to disapprove the Agreements based upon the reasons expressed in his opinion. *See* Letter from Hunter to DOI, App. 6.

State officials were not alone in their rebuke. Governor Bill Anoatubby, Governor of the Chickasaw Nation, has sent multiple letters and memoranda to the DOI, asking for the Agreements to be disapproved because of inconsistency with state law requirements. Likewise, the Quapaw Nation and the Wichita and Affiliated Tribes have also requested the DOI to disapprove the Agreements. *See* Letters from Chickasaw Nation, Wichita and Affiliated Tribes, and Quapaw Nation to DOI, App. 7.

Nevertheless, Governor Stitt has continued to assert that he—and he alone—has the authority to bind the State to tribal gaming compacts, even to the extent of including gaming prohibited by state law. *See* Mem. of J. Kevin Stitt, App. 8, at 2; Okla.'s Mot. to Clarify Parties' Authority to Comply with Court's Mediation Order and Br. in Supp., App. 9, at 10. But Governor Stitt's go-it-alone brand of state policymaking does not comport with the Oklahoma Constitution, IGRA, or state statutes. This unilateral power grab also places him at odds with the legislative branch, the Attorney General, and even tribes who might otherwise benefit from his claims of expanded gaming in Oklahoma. Petitioners the Honorable Greg Treat, President Pro Tempore of the Senate, and the Honorable Charles McCall, Speaker of the House of Representatives, thus ask this Court to declare that state law does not authorize the Governor to enter into the Agreements on behalf of the State.

2

AR_0002537

## II.
## BACKGROUND

This case presents a straightforward question regarding the Governor's authority, but its genesis is complex. On July 8, 2019, Governor Stitt surprised tribal leaders—and possibly members of his own Cabinet—with a *Tulsa World* Op Ed, in which he stated that model compacts currently in effect between the State and signatory tribes terminate as of January 1, 2020.[4] He vowed to do the "hard work of closely reviewing and negotiating new compacts that reflect the state of affairs today." *Id.* Though negotiations between the tribes and the Governor commenced through the work of the Attorney General during the summer of 2019, the parties were still unable to reach an agreement after a meeting on October 28 of that year.[5] Thereafter, Attorney General Hunter withdrew as the State's representative with respect to gaming negotiations, and identified the Governor's office as the entity continuing negotiations.[6] Ultimately, on December 31, 2019, the Cherokee, Chickasaw, and Choctaw Nations filed suit against Governor Stitt in federal court, seeking a declaration that the compacts automatically renewed on January 1, 2020, pursuant to Part 15(B) of the Model Tribal Gaming Compact ("Model Compact"), 3A O.S. § 281.[7]

But on April 21, 2020, Governor Stitt and the Otoe and Comanche Nations—parties to the federal action—filed a Joint Motion for Leave of Court to File Stipulations of Dismissals with Prejudice.[8] Simultaneous with the filing, Governor Stitt and the Otoe and Comanche Nations purported to enter into the Agreements. Eight of the tribes remaining in the federal action

---

[4] *See* App. 10, Gov. Kevin Stitt, "Gov. Kevin Stitt: New Gaming Compacts must protect the interests of the tribes and the state," *Tulsa World* (July 8, 2019), available at https://www.tulsaworld.com/opinion/columnists/gov-kevin-stitt-new-gaming-compacts-must-protect-the-interests/article_ae5596f7-e9e5-5613-9bbb-c6341af9259f.html.

[5] *See* App. 11, Barbara Hoberock, "State, tribes hold historic meeting on gaming compacts: 'You have to walk before you can run,'" *TULSA WORLD* (Apr. 22, 2020), available at https://www.tulsaworld.com/news/local/government-and-politics/state-tribes-hold-historic-meeting-on-gaming-compacts-you-have/article_5eb79db2-4cdc-595f-ae50-d01178f2b1b0.html.

[6] *See* App. 12, Tres Savage, "Stitt pitch to tribes: Sign temporary gaming extension" *NONDOC* (Dec. 17, 2019), available at https://nondoc.com/2019/12/17/stitt-pitches-temporary-gaming-extension/.

[7] *See Cherokee Nation et al. v. Stitt,* Civ. No. 19-1198 (W.D. Okla.).

[8] *Id.* (Doc. No. 120).

AR_0002538

filed a "qualified objection" to the dismissal, arguing among other things that movants had not submitted their purported settlements and, thus, they could not meaningfully evaluate whether the settlements would prejudice their interests.[9] The federal court dismissed the Comanche and Otoe Nations.

On May 28, 2020, notwithstanding his prior statements of confidence in his claimed authority, Governor Stitt filed a Motion to Clarify Parties' Authority to Comply with Court's Mediation Order and Brief in Support ("Motion to Clarify") in the federal action, purportedly seeking "*clarification*" as to whether he has "the authority to bind the State to compact provisions related to exclusivity, rates, covered games, and other significant subjects that differ from or are not found in the Model Compact."[10]

Undeterred by the questions of his own authority he admits exist, however, Governor Stitt had already submitted the Agreements to the DOI for review and approval under IGRA, and the Secretary of the Interior's decision to approve or disapprove a proposed compact, which must be made within forty-five (45) days of a proposed compact's submission, is expected imminently. 25 U.S.C. § 2710(d)(8)(C).

Thus, notwithstanding (1) the objections raised by Petitioners herein through public statements; (2) the objections raised by the Attorney General through public statements and the issuance of an Official Opinion of the Attorney General; and (3) the Governor's own pursuit of clarification regarding his authority to negotiate brand new compacts that include class III gaming he acknowledges is prohibited by state law, Governor Stitt has yet to indicate any intention of withdrawing the Agreements now pending before the DOI. As explained below, Governor Stitt's

---

[9] *Id.* (Doc. No. 123) at ¶ 7.
[10] *Id.* (Doc. No 131) at ¶ 12.

4

AR_0002539

questions properly lie before this Court as they squarely and exclusively present matters of state law, which law emphatically counsels against the Governor's actions here.

## III.
## DISCUSSION

The distribution of governmental powers into three separate departments is a bedrock of our constitutional system. Article 4, Section 1 of the Oklahoma Constitution provides:

> The powers of the government of the State of Oklahoma shall be divided into three separate departments: The Legislative, Executive, and Judicial; and except as provided in this Constitution, the Legislative, Executive, and Judicial departments of government shall be separate and distinct, and neither shall exercise the powers properly belonging to either of the others.

In addressing the importance of the separation of powers, this Court has opined that "[t]he true import of the doctrine . . . is that the whole power of one department shall not be exercised by the same hands which possess the whole power of either of the other departments; and that no one department ought to possess *directly* or *indirectly* an overruling influence over the others." *State ex rel. York v. Turpen*, 1984 OK 26, 681 P.2d 763, 767 *(citing Bailey v. State Bd. of Public Affairs*, 194 Okl. 495, 153 P.2d 235 (1944)).

Article 6, Section 1 of the Oklahoma Constitution vests the executive power of the State in various officers—the Governor chief among them. Further, the Governor has a constitutionally-prescribed duty to cause "all laws of the State to be faithfully executed." OKLA. CONST. art. 6, §§ 2, 8. The Governor is also constitutionally empowered to "conduct . . . all intercourse and business of the State with other states and with the United States." OKLA. CONST. art. 6, § 8.

Article 5, Section 1 of the Oklahoma Constitution, on the other hand, identifies the legislative branch as the one that sets the public policy of the State by enacting law not in conflict with the Constitution. Further, Article 5, Section 36 of the Oklahoma Constitution provides:

5

> The authority of the Legislature shall extend to all rightful subjects of legislation, and any specific grant of authority in this Constitution, upon any subject whatsoever, shall not work a restriction, limitation, or exclusion of such authority upon the same or any other subject or subjects whatsoever.

This Court has held that the Legislature is vested via Section 36 with "a supreme legislative power" that is "rebutted only when either the State Constitution or federal law prohibits that enactment." *Hart v. Warner*, 2017 OK CIV APP 29, ¶ 3, 395 P.3d 861, 864; *see State ex rel. Okla. Tax Comm'n v. Daxon*, 1980 OK 28, ¶ 16 (providing that "the legislature of the state of Oklahoma is constitutionally vested with the power and authority to pass legislation on any subject not withheld" by either the state or federal constitutions).

It is against this backdrop—the demarcation between executive and legislative constitutional authority—that we address the Governor's authority with respect to gaming compacts.

### A. State—not federal—law controls who has the authority to negotiate and enter into binding compacts with Indian tribes, and the authority Oklahoma law vests in the Governor to conduct such business *solely* derives from statute.

IGRA provides a "comprehensive regulatory framework for gaming activities on Indian lands" which "seeks to balance the interests of tribal governments, the states, and the federal government." *Pueblo of Santa Ana v. Kelly*, 104 F.3d 1546, 1548 (10th Cir. 1997). And while "IGRA creates the framework for state, tribes and the federal government to cooperate in the regulation of tribal gaming, [] *state law* determines when and how the State consents to a compact negotiated within IGRA's framework." 2020 OK AG 8, ¶ 19 (emphasis in original); *see also Kelly*, 104 F.3d at 1553 (providing that "state law determines the procedures by which a state may validly enter into a compact" under IGRA).

Indeed, consistent with IGRA, this Court has acknowledged that state law controls with respect to who is authorized to conduct business with the tribes:

6

> The U.S. Supreme Court has not determined *where the authority lies* within a state's governmental framework to compact with Indian tribes. *It has ruled that where the involved federal statute is silent on the issue of state authority, that issue will be determined under state law. . . . IGRA is silent* as to where state authority lies to enter into gaming compacts with Indian tribes.

*Griffith v. Choctaw Casino of Pocola*, 2009 OK 51, ¶ 12 n.10 (abrogated on other grounds by *Sheffer v. Buffalo Run Casino, PTE, INC.*, 2013 OK 77) (emphasis added). The questions raised herein are thus squarely questions of state law.

Although the Governor maintains constitutional authority to conduct business *with other States and the United States*, OKLA. CONST. art 6, § 8, he has no independent, constitutional authority to do so *with the tribes*. Instead, the Governor's authority to negotiate and enter into binding compacts with the tribes is entirely statutory:

> While the Oklahoma Constitution at Article VI, Section 8 empowers the Governor to 'conduct in person or in such manner as may be prescribed by law, all intercourse and business of the State with other states and with the United States,' it does not address who in state government shall conduct business and intercourse with Indian tribes. *Rather, such matters are left to the Legislature to determine.*

2004 OK AG 27, ¶ 17 (emphasis added). That is, because our Constitution does not authorize the Governor to conduct business with the tribes, the power to make laws respecting that authority falls to the Legislature by operation of Article 5, Section 36 of that document.

Clearly then, because the only source of the Governor's authority to conduct business with the tribes is statutory—not constitutional—the use of such authority must be in conformity with statute. And when the Governor exercises this authority, what he negotiates must comport with the public policy of the State. "Of course, any agreement negotiated by the Governor must conform to the public policy enacted into law by the Legislature, as the role of the Legislative Branch is to establish public policy, and the role of the Executive Branch is to execute that policy." 2004 OK AG 27, ¶ 30, n.3 (citing *Tweedy v. Okla. Bar Ass'n,* 1981 OK 12, ¶ 9).

AR_0002542

Indeed, "[s]tatutes must be read to render every part operative, and to avoid rendering it superfluous or useless." *Odom* v. *Penske Truck Leasing Co.,* 2018 OK 23, ¶ 36. It would thus be a strange outcome were the Governor statutorily authorized to negotiate and enter into agreements that violated other statutes. Further, the Governor himself is duty-bound to act consistently with the laws of the State by virtue of his duty to faithfully execute the laws under Article 6, Section 8 of the Oklahoma Constitution. Negotiating and entering into a compact that is not authorized by law is a serious dereliction of such duty. Put simply, when the Governor purports to enter into agreements that authorize violations of state statutes, he is not "executing" the law, he is attempting to legislate. That is not the function of the executive branch.

Thus, contrary to his assertions, the Governor's authority to negotiate and bind the state to his Agreements is a state law question. In Oklahoma, the Legislature has delineated the Governor's authority regarding gaming compacts in statute, and as is discussed below, the Governor is entirely incorrect in asserting that he—and he alone—has the authority to bind the State to such compacts.

**B.      Under state law, the Governor can negotiate and enter into gaming compacts by one of two methods: (1) pursuant to the Model Tribal Gaming Act, or (2) via 74 O.S. § 1221 and after approval by the Joint Committee on State-Tribal Relations.**

Because the Governor's authority to negotiate and enter into gaming compacts is by operation of statute, the Governor must exercise authority pursuant to statute. The current statutory scheme dictates that the Governor's authority related to tribal gaming compacts can be exercised in one of two ways: via the Model Tribal Gaming Act ("Act") or via the Joint Committee on State-Tribal Relations ("Joint Committee"). With respect to the Agreements, the Governor followed neither path.

First, in 2004, the Legislature passed the Act and sent it to a vote of the people. Section 281 of that Act included the Model Compact. 3A O.S. § 281. The Model Compact "may not be

8

viewed as an ordinary private contract because it is a voter-approved statute codified in the Oklahoma Statutes." *Griffith*, 2009 OK 51, ¶ 7. The Model Compact is an "all or none" offer to the tribes, "which if accepted, constitutes the gaming compact between this state and the accepting tribe for purposes of IGRA without any further action on behalf of the State." *Id.* ¶ 14.

Acceptance of the Model Compact by a tribe requires no further action from the States because:

> [t]he State of Oklahoma through the concurrence of the Governor after considering the executive prerogatives of that office and the power to negotiate the terms of a compact between the state and a tribe, **and by means of the execution of the State-Tribal Gaming Act, and with the concurrence of the State Legislature through the enactment of the State-Tribal Gaming Act**, hereby makes the following offer of a model tribal gaming compact regarding gaming . . . .

3A O.S. § 280 (emphasis added). Plainly, then, while the Governor's executive prerogatives are noted in the statement of Oklahoma's compact offer to the tribes, the State bound itself to the Model Compact's offer by (1) enactment of legislation and (2) approval of the terms of the offer by a vote of the people, which resulted in formal codification of those terms in state statute. The Act nowhere indicates that the Governor has the discretion to conduct business with the tribes however he sees fit and, moreover, entirely on his own, and in conflict with existing state law.

Second, prior to enactment of the Act, the Legislature in 1988 "authorized the Governor to negotiate and enter into cooperative agreements with federally recognized Indian tribes in furtherance of federal policy and state-tribal relations, subject to approval by a legislative Joint Committee on State-Tribal Relations." *Griffith*, 2009 OK 51, ¶ 12. Title 74, Section 1221 of the Oklahoma Statutes provides, in relevant part:

> C. 1. **The Governor,** or named designee, is **authorized** to **negotiate** and **enter into cooperative agreements on behalf of this state with federally recognized Indian Tribal Governments within this state** to address issues of mutual interest. Except as otherwise provided by this subsection, **such agreements shall become effective upon approval by the Joint Committee on State-Tribal Relations.**

9

AR_0002544

(emphasis added). The Joint Committee consists of five members from the Senate appointed by the President Pro Tempore and five members from the House of Representatives appointed by the Speaker, and acts upon a majority vote of a quorum of the members present. 74 O.S. § 1222(A), (D). And beyond doubt, the Joint Committee's authority to approve compacts extends to gaming compacts. *See* 74 O.S. § 1221(C), 1223.

Further, the Joint Committee is still active and has continued to approve gaming compacts since the Act was passed. *See* App. 13, State of Oklahoma, Cherokee Nation Off-Track Wagering Compact (May 2010). Consequently, if a proposed gaming compact does not meet the statutory requirements of the Model Compact, it must be negotiated and approved pursuant to 74 O.S. § 1221.

Nevertheless, in the Memorandum of J. Kevin Stitt, *See* App. 8, at 3, the Governor asserts in reliance on Attorney General Opinion 2004-27, that approval by the Legislature of agreements negotiated by the Governor would violate the separation of powers provision. The Governor relies heavily on that opinion's explanation that Oklahoma's Constitution does not contain an Advice and Consent Clause like Article II, Section 2 of the United States Constitution.

But the Governor reads the 2004 Attorney General opinion far too broadly. That opinion references review by "the Legislature" multiple times, 2004 OK AG 27, ¶¶ 27, 29, going so far as to state that approval "by the *entire* Legislature would place the Legislature not in a cooperative role . . . ." *Id.* ¶ 29 (emphasis added). Perhaps sensing this, the Governor refined his argument in his Motion to Clarify, there contending that "the tribes seem to suggest that the full Oklahoma Legislature must be present at the bargaining table (contrary to a prior AG opinion)." App. 14, at 8.

But the Joint Committee does not constitute approval by the entire Legislature. On the contrary, ratification through approval of a quorum of the Joint Committee exemplifies the

10

AR_0002545

cooperative nature the Legislature was striving to codify. Further, there would be no need to apply an Advice and Consent Clause like that of the United States Constitution which requires presentment of treaties to the entire Senate and concurrence of two-thirds of the body then present, *see* U.S. CONST. art. II, § 2, when an entire body of even one house is not required under 74 O.S. § 1222.

Moreover, the Joint Committee is referenced numerous times by the federal court, this Court, and even in the 2004 Attorney General opinion upon which the Governor relies and without so much as a passing reference to a separation of powers problem posed by that entity. *See Muhammad v. Comanche Nation Casino*, CIV-09-968-D, 2010 WL 4365568, at *11 (W.D. Okla. Oct. 27, 2010); *Griffith*, 2009 OK 51, ¶ 12; 2006 OK AG 39, ¶ 17; 2004 OK AG 27, ¶ 4. And *State ex rel. Clark v. Johnson*, 904 P.2d 11 (N.M. 1995), strongly supports the constitutionality of such a body when, as there, the Supreme Court of New Mexico noted that the Governor could not enter into a compact solely on his own authority, but "the legislature might authorize the Governor to enter into a gaming compact or ratify his actions with respect to a compact he has negotiated." *Id.* at 23. Indeed, Oklahoma's two-track statutory method by which the Governor can negotiate and enter into compacts with the tribes is well-supported by the methods adopted in other States.

Finally, if 74 O.S. § 1221 is unconstitutional, then the governor has *no* independent statutory authority to negotiate and enter into compacts. After all, the Legislature granted the Governor compacting authority only if exercised in conjunction with the Joint Committee, so if the statute giving the Joint Committee such power is unconstitutional, the Governor loses the power granted by that same statute. This would mean that the *only* authorized gaming compacts under state law are those entered into in conformity with the Act.

In sum, the Governor could have negotiated and entered into compacts in accordance with the Act or through approval by the Joint Committee. He followed neither process with

11

respect to the Agreements. And because the Governor has no independent constitutional authority to conduct such business, his actions were *ultra vires.*

## C.    Regardless how the Governor negotiates and enters into compacts with tribes, he simply lacks any unilateral authority to bind the State to terms that would otherwise be prohibited by state law.

Regardless of the method by which the Governor conducts business with the tribes, the Governor cannot negotiate and enter into compacts which include provisions prohibited by state law. For example, and in addition to other problematic provisions in the Agreements, Class III gaming is only lawful under the terms of IGRA if authorized by tribal ordinance and "located within a State that permits such gaming for any purpose by any person, organization or entity" and is "conducted in conformance with a Tribal-State compact entered into by the Indian tribe and State . . . that is in effect." 25 U.S.C. § 2701(d)(1).

Just as IGRA points to state law for a determination regarding who is authorized to negotiate with the tribes, IGRA points to state law for a determination of what gaming is permitted under state law. IGRA examines "the state's public policy toward the specific gaming activities proposed by the tribes." *Seminole Tribe of Fla. v. State of Fla.*, No. 91-cv-6756, 1993 WL 475999, at *8 & n.1 (S.D. Fla. Sep. 22, 1993). And "where a state does not 'permit' gaming activities sought by a tribe, the tribe has no right to engage in these activities, and the state thus has no duty to negotiate with respect to them." *Rumsey Indian Rancheria of Wintun Indians v. Wilson*, 64 F.3d 1250, 1256 (9th Cir. 1994).

In Oklahoma, permitted gaming is game-specific. The Act provides that (1) "the operation of *slot machines, house-banked card games, house-banked-table games involving dice or roulette wheels, or games where winners are determined by the outcome of a sports contest" ("unauthorized forms of gaming") is not permitted* and (2) the operation of any other form of gaming shall not be construed as permitted "unless specifically allowed by this act."

12

3A O.S. § 262(H). For that reason, the Act was amended in 2018 to include an additional form of covered game—non-house-banked table games—and necessitated compacting tribes to enter into a written supplement to the Model Compact. 3A O.S. § 280.1.

The unauthorized forms of gaming included in the Agreements—house-banked card and table games and event wagering—are unequivocally not authorized under Oklahoma law. Simply because Oklahoma has compacted to permit pari-mutuel horserace wagering does not mean that event wagering, for example, has been authorized. If it were, the Oklahoma Legislature would not have had cause to consider event wagering yet decline to enact it in the 2018 legislative session. *See* App. 14, HB 3375 (Enrolled), HB 3375 (Introduced).

The Governor's inclusion of unauthorized forms of gaming, in addition to other problematic provisions, stands as a reason for which legislative ratification on the back-end as by the Joint Committee is required. Indeed, returning to the Supreme Court of New Mexico:

> If the entry into the compacts reasonably can be viewed as the execution of law, we would have no difficulty recognizing the attempt as within the Governor's authority as the State's chief executive officer. If, on the other hand, his actions in fact conflict with or infringe upon what is the essence of legislative authority—the making of law—then the Governor has exceeded his authority. . . . We have no doubt that the compact . . . does not execute existing New Mexico statutory or case law, but that it is instead an attempt to create new law.

*Clark*, 904 P.2d at 22; *see also State ex rel. Stephan v. Finney*, 836 P.2d 1169, 1178 (Kan. 1992) (finding the Governor's "*carte blanche* interpretation" of his authority problematic). So too here.

In his Motion to Clarify, the Governor contends that "[n]othing in the 2020 Compacts makes any change to state legislation; the compacts affect activities conducted by Tribes on Indian lands." *See* App 9 at 25. But even if this were so and the Agreements did not invade the legislative prerogative—they do—the Governor is wrong. Persons who are not members of Indian tribes routinely participate in the gaming offered on Indian lands, and nonmembers participating in gaming prohibited by state law remain subject to criminal prosecution unless such gaming is in

13

conformity with the Model Compact. 3A O.S. §§ 262(A), 280. The Governor cannot immunize such persons from alleged violations of state law, yet that is essentially what he claims the power to do. Thus, contrary to his assertions, the Governor has attempted to cram down a substantive change in Oklahoma law, and his attempt to do so is a violation of the separation of powers principles identified at Part III(A) above.

**D.     Here, because the Agreements were not entered by the State according to either compacting method and because the Governor included unauthorized forms of gaming violative of public policy, no amount of severance can correct these egregious separation of powers violations.**

Finally, the Agreements contain a severance clause that states, in relevant part: "If any clause or provision of this Compact is subsequently determined by any *federal court* to be invalid or unenforceable under any present or future law, including but not limited to the scope of Covered Games, the remainder of this Compact shall not be affected thereby."[11] (emphasis added). Curiously, according to the Governor, the only available mechanism for severance is a *federal court determination of a state law issue*. By its terms, it would thus seem that a determination by this Court on a matter of state law would not, according to the Governor, warrant severance of an offending provision. Moreover, as an expression of the contracting parties' intent, the parties did not apparently intend for a state court determination that the Governor lacked authority to negotiate and enter into the Agreements to allow for remedy by severance. That being so, the entire document should be declared invalid and unenforceable.

Additionally, because the Agreements included unauthorized forms of gaming and because the Governor failed to follow the public policy established by the Legislature as well as the two-track statutory method for negotiating and entering into gaming compacts, no amount of severance can correct the Agreements. The Governor does not have the authority to execute a

---

[11] *See* App. 1, Comanche Compact, Part 13(B); Otoe-Missouria Tribe Compact, Part 13(B).

14

gaming compact that offends existing state statutes. *See* 2020 OK AG 8; *see also Clark*, 904 P.2d at 21 ("The legislature of this State has unequivocally expressed a public policy against unrestricted gaming, and the Governor has taken a course contrary to that expressed policy. . . we conclude that the Governor of New Mexico negotiated and executed a tribal-state compact that exceeded his authority as chief executive officer.") In Oklahoma, sports betting—like other of the unauthorized forms of gaming—is prohibited. The Governor has a duty to ensure that the laws of this State are faithfully executed; he thus has no authority to negotiate and enter into a gaming compact inclusive of prohibited law and contrary to the State's public policy. Coupled with the fact that the Governor's only power to conduct business with the tribes is statutorily set and that the Governor wholly failed to follow the statutes pertaining thereto, he had no authority to negotiate and enter into the Agreements. No amount of severance can save compacts that were unlawful from inception.

In short, Governor Stitt believes that he can compact for prohibited provisions, follow his own extra-statutory procedure for doing so, and remove any question regarding the validity of such actions to a federal court. This does not comport with his duties under Article 6, Section 8 of the Oklahoma Constitution and usurps the role of the Legislature in setting the public policy of the State. The only remedy is for this Court to declare the contracts void.

## V.
## CONCLUSION

Based on the above, Petitioners the Honorable Greg Treat, President Pro Tempore of the Senate, and the Honorable Charles McCall, Speaker of the House of Representatives, ask this Court to assume original jurisdiction and to issue a judgment declaring that the Governor acted *ultra vires* when he purported to enter into the Agreements and that the Agreements do not validly bind the State.

15

AR_0002550

Respectfully submitted,

_____

V. GLENN COFFEE, OBA # 14563
CARA RODRIGUEZ, OBA #21794
DENISE LAWSON, OBA #31532
GLENN COFFEE & ASSOCIATES, PLLC
P.O. Box 437
Oklahoma City, OK 73101
Phone: (405) 601-1616
gcoffee@glenncoffee.com
cara@glenncoffee.com
denise@glenncoffee.com

***ATTORNEYS FOR PETITIONERS***

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of June 2020, a true and correct copy of the foregoing was mailed by Certified Mail, Return Receipt Requested and electronic mail to the following:

The Honorable J. Kevin Stitt
Governor, State of Oklahoma
Oklahoma State Capitol
2300 North Lincoln Boulevard, Room 212
Oklahoma City, OK 73105

_____

16



**RECEIVED**

**By Office of Indian Gaming at 2:17 pm, Jun 04, 2020**

915 N. Robinson | Oklahoma City, OK 73102 | 405.601.1616          MAILING ADDRESS | PO BOX 437 | Oklahoma City, OK 73101

June 4, 2020

The Honorable David Bernhardt
Office of the Secretary
U.S. Department of the Interior
1849 C Street N.W.
Washington, D.C. 20240

Dear Secretary Bernhardt:

Included with this letter is a copy of an Original Jurisdiction action which is being filed in the Oklahoma Supreme Court today. As explained in the Brief in Support, the Honorable Greg Treat, President Pro Tempore of the Senate, and the Honorable Charles McCall, Speaker of the House of Representatives, urge the Court to declare Governor J. Kevin Stitt's actions in negotiating and entering into new gaming agreements with the Comanche Nation and Otoe-Missouria Tribes *ultra vires* and to declare that those agreements do not validly bind the State. President Pro Tempore Treat and Speaker McCall thus urge the Department of the Interior to disapprove the agreements.

Sincerely,

V. Glenn Coffee

Enclosure

glenncoffee.com

AR_0002612

**From:** "Tahsuda, John" <John_Tahsuda@ios.doi.gov>
**To:** "Kelly, Matthew" <Matthew.Kelly@bia.gov>, "Cruz, Mark A" <Mark_Cruz@ios.doi.gov>
**Subject:** RE: Incoming Oklahoma compact dispute letter
**Date:** 2020-06-04 15:18:12 -0400

---

Saw that.  The fun continues

*John Tahsuda*
*Senior Counselor to the Secretary*
*Department of the Interior*

---

**From:** Kelly, Matthew <Matthew.Kelly@bia.gov>
**Sent:** Thursday, June 4, 2020 2:43 PM
**To:** Tahsuda, John <John_Tahsuda@ios.doi.gov>; Cruz, Mark A <Mark_Cruz@ios.doi.gov>
**Subject:** FW: Incoming Oklahoma compact dispute letter

FYSA. The Oklahoma Senate President and House Speaker have filed suit in the State Supreme Court seeking to declare the Governor's efforts to enter compacts with Comanche and Otoe-Missouria ultra vires.

---

**From:** Oakes, Morgan A <Morgan.Oakes@bia.gov>
**Sent:** Thursday, June 4, 2020 2:24 PM
**To:** Woodward, Troy <Troy.Woodward@bia.gov>; Deleon, Debra A <Debra.Deleon@bia.gov>; Hart, Paula <Paula.Hart@bia.gov>; Kelly, Matthew <Matthew.Kelly@bia.gov>; Caulum, Andrew S <Andrew.Caulum@sol.doi.gov>; Shepard, Eric N <eric.shepard@sol.doi.gov>; Myers, Richard G <RichardG.Myers@bia.gov>; Scherer, Kyle <Kyle.Scherer@sol.doi.gov>; Ervin, Femila N <femila.ervin@sol.doi.gov>
**Subject:** Re: Incoming Oklahoma compact dispute letter

Please see the attached for the latest submission regarding the Oklahoma compact dispute.

Thank You,
Morgan Oakes

---

**From:** Oakes, Morgan A <Morgan.Oakes@bia.gov>
**Sent:** Wednesday, June 3, 2020 9:41 AM
**To:** Woodward, Troy <Troy.Woodward@bia.gov>; Deleon, Debra A <Debra.Deleon@bia.gov>; Hart, Paula <Paula.Hart@bia.gov>; Kelly, Matthew <Matthew.Kelly@bia.gov>; Caulum, Andrew S <Andrew.Caulum@sol.doi.gov>; Shepard, Eric N <eric.shepard@sol.doi.gov>; Myers, Richard G <RichardG.Myers@bia.gov>; Scherer, Kyle <Kyle.Scherer@sol.doi.gov>; Ervin, Femila N <femila.ervin@sol.doi.gov>
**Subject:** Re: Incoming Oklahoma compact dispute letter

Please see the attached for comment letters from the Wichita and Affiliated Tribe and the Comanche Nation and Otoe-Missouria Tribe.

---

**From:** Oakes, Morgan A <Morgan.Oakes@bia.gov>
**Sent:** Tuesday, June 2, 2020 8:22 AM
**To:** Woodward, Troy <Troy.Woodward@bia.gov>; Deleon, Debra A <Debra.Deleon@bia.gov>; Hart, Paula <Paula.Hart@bia.gov>; Kelly, Matthew <Matthew.Kelly@bia.gov>; Caulum, Andrew S <Andrew.Caulum@sol.doi.gov>; Shepard, Eric N <eric.shepard@sol.doi.gov>; Myers, Richard G <RichardG.Myers@bia.gov>; Scherer, Kyle <Kyle.Scherer@sol.doi.gov>; Ervin, Femila N <femila.ervin@sol.doi.gov>
**Subject:** Re: Incoming Oklahoma compact dispute letter

CHAIRMAN
John A. Barrett

VICE CHAIRMAN
Linda Capps

SECRETARY-TREASURER
D. Wayne Trousdale



Jbarrett@potawatomi.org

Lcapps@potawatomi.org

Dtrousdale@potawatomi.org

## CITIZEN POTAWATOMI NATION

April 28, 2020

<u>Via Electronic and Regular Mail</u>
Secretary David Bernhardt
United States Department of the Interior
1849 C Street NW
Washington, DC 20240
feedback@ios.doi.gov

Tara Katuk Mac Lean Sweeney
Assistant Secretary – Indian Affairs
United States Department of the Interior
1849 "C" Street, NW (MS-4141-MIB)
Washington, D.C. 20240

    *Re: Purported Gaming Compacts of Otoe-Missouria Tribe and Comanche Nation*

Secretary Bernhardt and Assistant Secretary Sweeney:

    I write this communication in my capacity as Tribal Chairman of the Citizen Potawatomi Nation, a federally recognized Native American Tribe.

    The Citizen Potawatomi Nation is informed that the Otoe-Missouria Tribe ("OMT") and the Comanche Nation ("CN") have entered into purported gaming compacts with the Governor of the State of Oklahoma, and that they have submitted these compacts to the Department of Interior for approval. This communication is to urge the Secretary to disapprove of these purported compacts both because they were not approved by the State of Oklahoma and because they contain many provisions which violate the Indian Gaming Regulatory Act ("IGRA")

AR_0002697

The IGRA, at 25 U.S.C. § 2710(d)(8)(A-B),[1] provides:

(A)The Secretary is authorized to approve any Tribal-State compact entered into between an Indian tribe and a State governing gaming on Indian lands of such Indian tribe.
(B)The Secretary may disapprove a compact described in subparagraph (A) only if such compact violates—
    (i) any provision of this chapter,
    (ii) any other provision of Federal law that does not relate to jurisdiction over gaming on Indian lands, or
    (iii) the trust obligations of the United States to Indians.

In communications with the press, both Oklahoma Governor Kevin Stitt and representatives of the OMT and CN announced on April 21, 2020 that they had entered into gaming compacts that would be submitted to you for approval.[2] Appended hereto are copies of the purported agreements.[3]

## THE PURPORTED COMPACTS ARE NOT "ENTERED INTO" BY THE STATE OF OKLAHOMA

Shortly after the announcement of the purported compacts, both Oklahoma's Attorney General and the leadership of both the Oklahoma House of Representatives and the Oklahoma Senate issued statements that determined that the purported compacts were violative of Oklahoma law and beyond the authority of the Office of the Governor to unilaterally offer or accept.

Oklahoma Attorney General Mike Hunter stated on April 21, 2020:

The agreements signed today between the governor, the Otoe-Missouria Tribe and the Comanche Nation are not authorized by the state Tribal Gaming Act, Title 3A, Section 261 et seq. The governor has the authority to negotiate with tribes on behalf of the state. However, only gaming activities authorized by the act may be the subject of a tribal gaming compact. Sports betting is not a prescribed 'covered game' under the act.[4]

Oklahoma's Legislative Leadership cited the Oklahoma Attorney General's opinion on April 22, 2020, and further stated:

---

[1] See also 25 CFR 293.14.
[2] Attachment 1, Press Release, Gov. Stitt Signs Two New Gaming Compacts with the Otoe-Missouria Tribe and Comanche Nation (Apr. 21, 2020). https://www.governor.ok.gov/articles/press_releases/governor-stitt-signs-two-new-gaming-compacts
[3] Attachments 2 & 3, purported OMT and CN gaming compacts. The Nation does not have access to the OMT's or CN's actual submissions to the Secretary. The Nation acts under the presumption that the OMT and CN or perhaps Governor of Oklahoma submitted Attachments 2 & 3, as they have publically maintained.
[4] Attachment 4, AG Hunter statement, Apr. 21, 2020.

CITIZEN POTAWATOMI NATION

AR_0002698

The inclusion of sports betting is one of a number of flaws found in our preliminary review of the documents signed yesterday. While we appreciate you making us aware of your intention to sign these documents just moments before your public announcement, had you consulted us earlier we could have provided this information to you earlier.

The Otoe-Missouria Tribe and the Comanche Nation are essential parts of the fabric of the State of Oklahoma, each vested with their own sovereignty. In collaborating on this matter with you, they were looking out for each of their best interests, and we respect their right and ability to do so. We are disappointed Oklahoma's executive branch made a promise it could not legally keep under current law. Sovereign nations deserve promises Oklahoma can keep.

The Legislature is interested in gaming agreements that truly unite the State of Oklahoma with all tribal nations. Sadly, the documents signed yesterday are legally flawed and sow more division than unity. For those reasons, we do not see a path forward for the legislative action necessary to finalize them and ask that you respect the Oklahoma Constitution and the Oklahoma Legislature's law-making power by refraining from submitting or allowing these documents to be submitted to the Department of the Interior for review. Any submittal at this time would be untimely, inappropriate, and a waste of resources.[5]

IGRA requires that a valid class III gaming compact be "entered into" by a compacting State.[6] In *Pueblo of Santa Ana v. Kelly*, 104 F.3d 1546, 1558 (10th Cir. 1997), the Tenth Circuit Court of Appeals held that state law determines the procedures by which a state government may validly enter into an IGRA gaming compact with a tribal government. If a state Governor lacks authority under state law to bind a state government to a gaming compact, such a compact is not validly "entered into" by the state and as a result, does not comply with IGRA.[7]

As recounted in detail by Oklahoma's Legislative Leadership, with the concurrence of Oklahoma's Attorney General, Oklahoma's Constitution does not vest the office of the Governor with the power to enter into compacts with Tribal Nations. Instead, the Governor has a generalized statutory power to enter into agreements with tribes per 74 O.S. § 1221(C)(1):

The Governor is authorized to negotiate and enter into cooperative agreements on behalf of this state with federally recognized Indian tribal governments within this state to address issues of mutual interest. The Governor may elect to name a designee who shall have authority to negotiate and enter into cooperative agreements on behalf of the state with federally recognized Indian tribes as provided for in this section. Except as otherwise provided by this subsection, such agreements shall become effective upon approval by the Joint Committee on State-Tribal Relations.

---

[5] Attachment 5. Statement of Charles A McCall, Speaker of the Oklahoma House, and Greg Treat, President Pro Tempore of the Oklahoma Senate, Apr. 22, 2020.

[6] 25 U.S.C. § 2710(d)(1)(C).

[7] *Kelly*, 104 F.3d at 1559.

AR_0002699

However, this general authority is limited by existing statutory limitations and public policy, which may only be established by the state's Legislature.[8] Oklahoma's Constitution establishes a familiar separation of powers wherein the executive branch cannot unilaterally amend or repeal a legislative action.[9]

In 2004, after approval by referendum, the Oklahoma State Tribal Gaming Act, 3A O.S. §§ 261 *et seq.*, was enacted as an Oklahoma statute. Included in this Act was an offer of a gaming compact to Oklahoma Tribal Nations. The governor's ability to offer a gaming compact to Tribal Nations was circumscribed by this Act, which provides in pertinent part:

> The State of Oklahoma through the concurrence of the Governor after considering the executive prerogatives of that office and the power to negotiate the terms of a compact between the state and a tribe, and by means of the execution of the State-Tribal Gaming Act, and with the concurrence of the State Legislature through the enactment of the State-Tribal Gaming Act, hereby makes the following offer of a model tribal gaming compact regarding gaming to all federally recognized Indian tribes ... if accepted, shall constitute a gaming compact between this state and the accepting tribe for purposes of the Indian Gaming Regulatory Act.[10]

Oklahoma has continued this course of conduct. In 2018, the State offered Oklahoma Tribal Nations a gaming compact supplement through a statute enacted by the Legislature and signed by the then-Governor.[11]

The OMT's and CN's purported compacts were offered unilaterally by Oklahoma's Governor without the knowledge, much less the consent, of the Oklahoma Legislature or the Oklahoma electorate. The Governor did not seek or obtain approval of the purported compacts by the Joint Committee on State-Tribal Relations. The Governor's Office lacks authority to unilaterally bind the State of Oklahoma to a gaming compact and so the purported compacts, in their entirety, do not comply with IGRA and should be disapproved per IGRA 2710(B)(i).

Furthermore, the purported compacts contain multiple instances of gubernatorial intrusion into the legislative prerogative that, again, do not bind the State of Oklahoma and so constitute violations of IGRA. These include, but are not limited to:

- Offering additional games (Part 2(6, 12))
- Expanding games offered by the Oklahoma Lottery Commission (Part 2(23))
- Expressing (implicitly) an ongoing State policy for offering class III games (Part 3A)

---

[8] Okla. AG Opin, 2004 OK AG 27 (Aug. 26, 2004).

[9] Okla. Const. art 5, § 1; *Tweedy v. Okla. Bar Ass'n*, 624 P.2d 1049, 1054 (Okla. 1981).

[10] 3A O.S. § 280.

[11] 3A O.S. § 280.1. The Citizen Potawatomi Nation accepted the offered amendment, and it was approved by the Secretary. See 83 Fed. Reg. 45958 (Sept. 11, 2018).

AR_0002700

- Empowering the Office of the Governor to approve new games (Part 3F)
- Altering the calculation of exclusivity fees (Part 10B)
- Altering the calculation of oversight fees (Part 10C)
- Altering the appropriation of fees received (Part 10(B)(3))
- Appropriating fines to the Office of Management and Enterprise Services (Parts 4(J)(3), 4(J)(K), 9E, 10(B)(4), 10C)
- Empowering third parties to recalculate tribal exclusivity fees (Part 10(B)(5))
- Empowering the Office of the Governor to settle gaming compact disputes (Part 6F)
- Expanding scope of the Office of Management and Enterprise Services' jurisdiction (See e.g. Parts 5-6)
- Waiving the State's immunity from suit (Part 6E)
- Offering prospective concurrences for future, speculative Secretarial determinations of off-reservation trust lands for gaming (Part 4(J)(2)(a))

For all these reasons, the Secretary should disapprove of these purported compacts because they are violative of IGRA.

## THE PURPORTED COMPACTS VIOLATE IGRA IN MANY RESPECTS

Even if the governor had the unilateral authority to offer or accept the purported compacts on behalf of the State of Oklahoma, the purported compacts contain multiple provisions that are violative of IGRA, violative of other federal laws, and violative of the trust obligations of the United States to the OMT and CN, as well as violative of the United States' trust obligations to the Citizen Potawatomi Nation and other Oklahoma Tribal Nations.

### The Purported Compacts Mandate a Share of Tribal Gaming Revenue Share Without Any Meaningful Concession by the State of the Oklahoma

The purported compacts mandate that the OMT and CN pay a share of class III gaming revenue as an exclusivity fee to the State of Oklahoma in order to conduct class III games, while greatly diminishing the tribes' existing exclusivity to conduct class III games.

IGRA's express terms bar a state government from conditioning a class III gaming compact on the tribal payment of any tax, fee, charge or other assessment.[12] Accordingly, a revenue share payment must meet three criteria: a) payments must be directly related to the operation of gaming activities; b) payments must be consistent with the purposes of IGRA; and c) the parties must have negotiated a bargain permitting such payments in return for meaningful concessions from the state.[13]

---

[12] 25 U.S.C. § 2710(d)(4)

[13] *Pueblo of Isleta v. Lujan Grisham*, No. 17-654 KG/KK, 2019 WL 1429586 at *19 (D.N.M. Mar. 30, 2019)(quoting *Rincon Band of Luiseno Mission Indians of Rincon Reservation v. Schwarzenegger*, 602 F.3d 1019, 1033 (9th Cir. 2010); *City of Duluth v. Fond du Lac Band of Lake Superior Chippewa*, 785 F.3d 1207, 1210 (8th Cir. 2015); *Idaho v. Shoshone-Bannock Tribes*, 465 F.3d 1095, 1101-02 (9th Cir. 2006)).

AR_0002701

The OMT and CN's existing gaming compacts with the State of Oklahoma require a revenue share payment by tribes in exchange for substantial exclusivity over limited kinds of class III gaming.[14] This revenue share was approved by the Secretary as permissible due to meaningful concessions by the state.[15]

The new purported compacts' terms are so packed with tribal concessions to the state and so lacking in any state concessions to the tribes that it is difficult to catalogue them all.

The purported compacts contain an offering of sports gaming and expanded casino-style gaming to the OMT and CN.[16] These are coupled with a requirement that the state share in the revenue of these games.

Even if the state was bound to offer the games contemplated by the purported compacts, which it is not, the terms allow both tribes and non-tribal entities to conduct sports gaming and greatly expand the ability of the Oklahoma Lottery Commission to offer internet gaming without any concomitant offering to tribes.[17]

The purported compacts are rife with expansions of the authority of the state and diminishment of authority of OMT and CN. These include, but are not limited to:

- Subjecting the OMT and CN to Oklahoma's entire state law alcoholic beverage sale regime (Part 4G)
- Depriving tribal governments of jurisdiction over patron tort/prize claims (Part 5)
- Broad intrusion of state regulation of tribal gaming operations (See e.g. Parts 7-9)
- Consent to state law for any dispute arising out of the purported compacts (Part 6(B)(2))

Additionally, the purported compacts contain a promise of gubernatorial concurrence in future, speculative determinations by your office for off-reservation lands in trust for gaming.[18] Governor Stitt cannot bind the State of Oklahoma, successors in his office, or even himself to this promise.[19] Governor Stitt likewise cannot bind the Secretary's office to any decision regarding an

---

[14] See Part 11 of existing gaming compacts. The offered terms are at 3A O.S. § 281. The CN Gaming Compact is at https://www.sos.ok.gov/documents/filelog/63569.pdf and the OMT Gaming Compact is at https://www.sos.ok.gov/documents/filelog/63805.pdf

[15] See e.g. OMT Compact Approval Notice at 70 Fed. Reg. 36407 (June 23, 2005); CN Compact Approval at 70 Fed. Reg. 3942 (Jan. 27, 2005).

[16] Purported Compacts Part 2(6, 12). Although, as to sports wagering, the purported compacts do not clarify the scope of gaming in which the tribes may engage or limit with clarity the scope of gaming for non-tribal enterprises, either now or in the future.

[17] Purported Compacts Part 2(23).

[18] Purported Compacts Part 4(J)(2)(a).

[19] See e.g. Letter from Kevin K. Washburn, Assistant Secretary of Indian Affairs, U.S. Dept. of the Interior to Chairman Gary Besaw, Chairman of Menominee Indian Tribe of Wisconsin (Mar. 12, 2015).

AR_0002702

off-reservation trust parcel. That there have been no off-reservation parcels as-yet identified by either the OMT or CN makes this promise especially illusory.

The OMT's and CN's existing compacts contain an automatic renewal clause and may only be terminated by mutual consent of the parties,[20] but the purported compacts expire within fifteen years and may be terminated by the state if it determines there are violations by the tribes.[21]

The OMT's and CN's existing compacts contain no limitation on the number of facilities which the tribes may operate, but the purported compacts limit the tribes to their existing facilities and to an illusory promise of three speculative off-reservation facilities.[22]

The OMT's and CN's existing compacts contain penalties for the state if it permits nontribal gaming,[23] but the purported compacts contain no penalties whatsoever if the state violates its already diminished exclusivity obligation, or any other obligation or duty. However, the purported compacts contain the possibility of myriad penalties against the OMT and CN for compact violations relating to disclosures, reporting, licensing, and fee payments, among other subjects.[24]

Furthermore, the purported compacts contain a provision to hold OMT and CN harmless should the purported compacts be determined to be violative of the exclusivity clauses in the gaming compacts of other Oklahoma Tribal Nations.[25] The OMT's and CN's existing compacts impose a duty on the state to defend their validity,[26] but the purported compacts contain a duty on the state to defend their validity only as against non-signatories.[27] The bad faith inherent in such language is apparent.

If these terms contain any concessions, they are made by the OMT and CN, not by the State of Oklahoma. Taken as a whole, the raft of concessions made by the OMT and CN and the illusory promises by the governor do not justify the revenue share contemplated by the purported compacts. The Assistant Secretary's Office has previously rejected proposed gaming compacts with the State of Oklahoma on just such a basis,[28] and should do so here.

---

[20] Existing Compacts at Part 15.

[21] Purported Compacts at Parts 3E, 10(B)(4) and 12D.

[22] Purported Compacts at Part 4(J)(1-2).

[23] Existing Compacts at Part 11(A and E).

[24] Purported Compacts at Parts 4(J)(3), 4K, 9E and 10(B)(4).

[25] Purported Compacts at Part 2(12)(b).

[26] Existing Compacts at Part 13B.

[27] Purported Compacts at Part 13E.

[28] Letter from Kevin K. Washburn, Assistant Secretary-Indian Affairs, U.S. Dep't of the Interior, to Honorable Janice Prairie Chief-Boswell, Governor, Cheyenne and Arapaho Tribes (Nov. 6, 2013).

AR_0002703

### The Purported Compacts Contain Plain Violations of IGRA

It is settled law that class II gaming is not a permissible subject of tribal-state gaming compact.[29] The purported compacts sets a limitation on the amount of revenue the OMT and CN may receive from class II games.[30] Beyond creating a practically impossible duty to predict and maintain a revenue balance from class II and class III games, and thus, a great difficulty for the OMT and CN to avoid a breach, this is a plain violation of IGRA.

The purported compacts also empower a third-party panel to review and approve any alteration in revenue sharing rates paid by the OMT and CN to the state.[31] IGRA vests the duty to review and approve revenue sharing rates with the Secretary of the Interior, and any attempt to divest the Secretary of such a duty is unlawful.[32]

The purported compacts should be disapproved as both unlawful and violative of the trust obligations of the United States to the OMT and CN.

### The Purported Compacts Are Violative of the Trust Obligations of the United States to the Citizen Potawatomi Nation and Other Oklahoma Tribal Nations

As noted above, the purported compacts contain an illusory promise by Governor Stitt to concur in a Secretarial approval of up to three off-reservation gaming trust parcels each for the OMT and CN. No discrete parcels have been identified. Instead, the promise of concurrence is for one location per county in up to three counties per tribe.

For the OMT, these parcels must be within one mile of a state or federal highway and within the counties of Noble, Payne, and Logan.[33] The portions of Noble County that are outside of the OMT reservation boundaries are within the boundaries of the Ponca Tribe of Indians of Oklahoma and Pawnee Nation of Oklahoma. Portions of Payne and Logan counties are within the reservation boundaries of the Pawnee Nation of Oklahoma, the Iowa Tribe of Oklahoma, and the Sac and Fox Nation.

For the CN, these parcels must be within one mile of a state or federal highway and within the counties of Love, Grady, and Cleveland.[34] Love County is entirely within the reservation boundaries of the Chickasaw Nation. The portions of Grady County not within the reservation boundaries of the Comanche Nation are within the boundaries of the Wichita and Affiliated Tribes,

---

[29] *Seneca Cayuga Tribe of Okla. v. National Indian Gaming Comm'n*, 327 F.3d 1019 (10th Cir. 2003). See also Letter from Acting Deputy Assistant Secretary – Policy and Economic Development, U.S. Dept. of Interior to Brad Henry, Governor of Oklahoma (Jan. 6, 2005)("It is our view that class III gaming compacts can only regulate class III games and cannot regulate class II games under IGRA.")

[30] Purported Compacts at Part 3C.

[31] Purported Compacts at Part 10(B)(5).

[32] 25 U.S.C. § 2710(d).

[33] Purported OMT Compact at Part 2(25, 28, 32)

[34] Purported CN Compact at Part 2(5, 21, 27)

AR_0002704

the Caddo Nation of Oklahoma, the Delaware Nation, and the Chickasaw Nation. Cleveland County does not abut the boundaries of the CN's reservation, but portions of Cleveland County are within the boundaries of the Citizen Potawatomi Nation's reservation.

As noted above, these promises are illusory, but they demonstrate an attempt by Governor Stitt to violate the sovereignty of the Citizen Potawatomi Nation and other tribes in ways that are painfully transparent.

Furthermore, as demonstrated above, should the purported compacts be effective, they would constitute immediate violations of the exclusivity clauses of the existing gaming compacts of the Citizen Potawatomi Nation and other Oklahoma Tribal Nations. This would lead to an escalation of an already existing conflict over gaming compacts between Governor Stitt's office and Oklahoma Tribal Nations. The Secretary's office should decline to work a detriment to the Citizen Potawatomi Nation and other Oklahoma Tribal Nations by enabling such a course of conduct.

As your office has observed many times, the purpose of its review of gaming compacts is to fulfill its trust responsibility to tribes, protect tribal authority to govern their own affairs, and to ensure compliance with IGRA. The purported compacts work contrary to these stated aims not just for the Otoe-Missouria Tribe and the Comanche Nation, but for the Citizen Potawatomi Nation and all other Oklahoma Tribal Nations. For all these reasons, the Citizen Potawatomi Nation respectfully requests that you affirmatively reject the purported compacts.

Sincerely,

John A. Barrett,
Tribal Chairman

CITIZEN POTAWATOMI NATION

AR_0002705

HOME / GOV. STITT SIGNS TWO NEW GAMING COMPACTS WITH THE OTOE-MISSOURIA TRIBE AND COMANCHE NATION

# Press Release

April 21, 2020

# GOV. STITT SIGNS TWO NEW GAMING COMPACTS WITH THE OTOE-MISSOURIA TRIBE AND COMANCHE NATION



State of Oklahoma, Comanche Nation, Oto...

**OKLAHOMA CITY (April 21, 2020)** – Governor Kevin Stitt joined Otoe-Missouria Tribe Chairman John Shotton and Comanche Nation Chairman William Nelson today in signing two new gaming compacts.

Each new compact establishes clarity and certainty for each sovereign party; expands gaming opportunities for the Comanche Nation and Otoe-Missouria Tribe, keeping in mind the dynamic, evolving nature of the gaming industry; provides for meaningful consideration for the State's fee structure for class III games and table games for new locations; and strengthens compact transparency with clear auditing guidance and with new dispute resolution provisions.

Click here to view the compact between the state and the Otoe-Missouria Tribe.

Click here to view the compact between the state and the Comanche Nation

The following are the Governor's remarks at the signing ceremony as prepared for delivery:

Governor Stitt's remarks for the Otoe-Missouria Tribe Signing Ceremony

1/3

AR_0002832

This is a historic day for the State of Oklahoma and for our tribal partners who are here with me today. As an Oklahoman and a tribal citizen, it has been my heart's desire to provide a level playing field for all 4 million Oklahomans and to ensure meaningful opportunities for all 38 federally recognized tribes that call our state home.

Today the State is announcing that we have reached two agreements for new gaming compacts. The first is with the Otoe-Missouria Tribe and Chairman John Shotton.

Chairman Shotton, thank you for being here today.

The OtoeTribe has called Oklahoma home for more than a century. This tribe of 3,000 citizens is known for their resilience and deep faith. Chairman Shotton has led his tribe for more than 13 years, and his entrepreneurial spirit has allowed the Otoes to build a strong economic engine for all its citizens through banking, retail ventures, agriculture and more.

The State is grateful and honored to partner the Otoe-Missouria Tribe as we establish a modernized gaming compact:

- that expands opportunities for our tribal partners,
- that enhances revenue for the State from Class III and Covered Games, and
- that will strengthen State-Tribal relations for generations to come.

From day one, I have said that I want a win-win for everyone in Oklahoma. With the new gaming compact, we have accomplished four central goals:

- first, to create certainty and clarity around the value of exclusivity;
- second, to establish competitive, market fees that benefit both the tribes and the State;
- third, to expand gaming in a responsible way that allows tribes to maximize new technology and enhancements utilized in gaming markets across the nation;
- and fourth, to establish clear rules of the road for how each party is to comply with the compact, thereby keeping healthy relationships between the State and the Tribes.

This was not a take it or leave it compact from the State or the Tribe; it was a negotiated compact.

I want to introduce Chairman Shotton to deliver a few words before we sign our new gaming compact.

**Governor Stitt's remarks for the Comanche Nation Signing Ceremony**

Today, the State is also honored to welcome the Comanche Nation, the Comanche Nation's tribal leaders, Chairman William Nelson, and Vice Chairwoman LaNora Parker.

Thank you, all, for being here today as we sign this historic gaming compact between the State and the Comanche Nation.

The Comanche Nation is often characterized as "Lord of the Plains." They are a dominant empire that ruled over much of the plains across Western Oklahoma and into the Texas Panhandle. They are the historical stewards of these lands. Today, the Comanche Nation recognizes 10,000 tribal citizens and has been a leader in economic development in Lawton, Oklahoma and the surrounding region.

It is no coincidence that standing here today are two tribes, who together, reflect the broad diversity of Oklahoma's tribal citizens and demonstrate the importance of the State's recognition of each 38-federally recognized tribe as an equal Sovereign.

As I mentioned a moment ago, this modernized gaming compact expands opportunities for our tribal partners, enhances revenue for the State from Class III and Covered Games, and will strengthen State-Tribal relations for generations to come.

Each gaming compact has unique elements, to include individual flat-rate gaming fees on Class III games and Covered Games. This new fee structure recognizes the dynamic nature of each tribe's market share, recognizing their geographic location and access to population centers.

Moving forward, the State will continue to negotiate with individual tribes, leaving behind the one-size-fits-all approach to the Model Gaming Compact.

It is important to me that Oklahoma is a Top Ten state. This will require for us to eliminate the well-meaning, but ineffective, systems that end up benefiting only a few. I am working to guarantee that every Oklahoman and every tribe has access to opportunities that are obtainable when we work together.

Today, we will be sending these two new gaming compacts to the Department of Interior to be ratified. And as we wait, I am committed to continuing productive conversations with all of Oklahoma's tribes.

I appreciate the federal court extending mediation to last until May 31, and I am hopeful that we can and should accomplish more over the next few weeks.

2/3

I believe that together we can build a stronger future for Oklahoma's 4 million residents and for all the tribal citizens that call our great State home.

Thank you.

State Agencies

Elected Officials

Service Desk

State Employees

Accessibility

Policies & Disclaimers

Security

CONNECT:

2020 State of Oklahoma. All Rights Reserved. Privacy Policy

AR_0002834

The IGRA, at 25 U.S.C. § 2710(d)(8)(A-B),[1] provides:

(A) The Secretary is authorized to approve any Tribal-State compact entered into between an Indian tribe and a State governing gaming on Indian lands of such Indian tribe.

(B) The Secretary may disapprove a compact described in subparagraph (A) only if such compact violates—

 (i) any provision of this chapter,

 (ii) any other provision of Federal law that does not relate to jurisdiction over gaming on Indian lands, or

 (iii) the trust obligations of the United States to Indians.

In communications with the press, both Oklahoma Governor Kevin Stitt and representatives of the OMT and CN announced on April 21, 2020 that they had entered into gaming compacts that would be submitted to you for approval.[2] Appended hereto are copies of the purported agreements.[3]

## THE PURPORTED COMPACTS ARE NOT "ENTERED INTO" BY THE STATE OF OKLAHOMA

Shortly after the announcement of the purported compacts, both Oklahoma's Attorney General and the leadership of both the Oklahoma House of Representatives and the Oklahoma Senate issued statements that determined that the purported compacts were violative of Oklahoma law and beyond the authority of the Office of the Governor to unilaterally offer or accept.

Oklahoma Attorney General Mike Hunter stated on April 21, 2020:

The agreements signed today between the governor, the Otoe-Missouria Tribe and the Comanche Nation are not authorized by the state Tribal Gaming Act, Title 3A, Section 261 et seq. The governor has the authority to negotiate with tribes on behalf of the state. However, only gaming activities authorized by the act may be the subject of a tribal gaming compact. Sports betting is not a prescribed 'covered game' under the act.[4]

Oklahoma's Legislative Leadership cited the Oklahoma Attorney General's opinion on April 22, 2020, and further stated:

---

[1] See also 25 CFR 293.14.

[2] Attachment 1, Press Release, Gov. Stitt Signs Two New Gaming Compacts with the Otoe-Missouria Tribe and Comanche Nation (Apr. 21, 2020). https://www.governor.ok.gov/articles/press_releases/governor-stitt-signs-two-new-gaming-compacts

[3] Attachments 2 & 3, purported OMT and CN gaming compacts. The Nation does not have access to the OMT's or CN's actual submissions to the Secretary. The Nation acts under the presumption that the OMT and CN or perhaps Governor of Oklahoma submitted Attachments 2 & 3, as they have publically maintained.

[4] Attachment 4, AG Hunter statement, Apr. 21, 2020.

  CITIZEN POTAWATOMI NATION

AR_0002866