**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CHEROKEE NATION et al.,<br>*Plaintiffs*,<br>v.<br>UNITED STATES DEPARTMENT OF THE INTERIOR et al.,<br>*Defendants*. | Civil Action No. 20-2167 (TJK) |

**MEMORANDUM OPINION**

Plaintiffs are four Indian Tribes who operate casinos in Oklahoma under tribal-state gaming compacts: essentially, contracts between the tribe and the state that regulate the terms under which tribes may offer gaming. Under the Indian Gaming Regulatory Act, or IGRA, the U.S. Secretary of the Interior must approve these compacts before they take effect. Plaintiffs sue officials at the Interior Department, the leaders of two other Tribes, and the Governor of Oklahoma, challenging tribal-state compacts the Secretary approved in 2020. These compacts, Plaintiffs allege, violate IGRA for a host of reasons and they say that the Secretary violated IGRA when he approved them. They ask the Court to vacate the Secretary's decision. The parties now cross-move for summary judgment, with some Defendants challenging Plaintiffs' standing to bring suit. The Court concludes that on the record before it, Plaintiffs have not satisfied their burden to show that they have standing. Accordingly, it will dismiss the case for lack of subject matter jurisdiction.

# I. Background

## A. Statutory Background

### 1. Indian Gaming Regulatory Act

Congress enacted IGRA "to provide a statutory basis for the regulation of gaming" on Indian lands and to give states some measure of authority over gaming on Indian lands. 25 U.S.C. § 2702(2).[1] IGRA divides gaming into three classes. *Id.* § 2703. "Class I gaming" entails "social games solely for prizes of minimal value or traditional forms of Indian gaming engaged in by individuals as a part of, or in connection with, tribal ceremonies or celebrations." *Id.* § 2703(6). "Class II" gaming consists of "the game of chance commonly known as bingo," "games similar to bingo," and certain card games. *Id.* § 2703(7)(A). "Class III gaming" is "all forms of gaming that are not class I gaming or class II gaming," and includes most conventional casino games as well as sports betting and lotteries. *Id.* § 2703(8); *Amador Cnty. v. Salazar*, 640 F.3d 373, 376 (D.C. Cir. 2011); 25 C.F.R. § 502.4.

IGRA's regulatory scheme applies differently to different classes of gaming. Class I gaming is "within the exclusive jurisdiction of the Indian tribes" and "not . . . subject to the provisions of [IGRA]." 25 U.S.C. § 2710(a)(1). Class II gaming is also "within the jurisdiction of the Indian tribes" but *is* subject to regulation through IGRA. *Id.* § 2710(a)(2). Class III gaming is regulated both by IGRA and by state law. *See id.* § 2710(d)(1). Under IGRA, tribes seeking to authorize Class III gaming must meet three requirements. First, they must secure tribal "ordinance or resolution" approving the gaming by the chairperson of the National Indian Gaming Commission (a

[1] The Court assumes familiarity with the general contours of IGRA, 25 U.S.C. § 2701 *et seq.*, set out in detail in the Court's prior Memorandum Opinion and Order, *Cherokee Nation v. Dep't of Interior*, 643 F. Supp. 3d 90 (D.D.C. 2022), but will focus on those provisions relevant to the dispute at hand.

body set up by IGRA). *Id.* § 2710(d)(1)(A). Second, they must be "located in a State that permits such gaming for any purpose by any person, organization, or entity." *Id.* § 2710(d)(1)(B). And, finally, Class III gaming must be "conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State" and approved by the U.S. Secretary of the Interior ("the Secretary"). *Id.* §§ 2710(d)(1)(C), (d)(3)(B).

IGRA establishes parameters for a tribal-state compact to authorize Class III gaming. For one, IGRA specifies the subjects that may be negotiated between the tribe and the state in the compacting process. *See* 25 U.S.C. §§ 2710(d)(3)(C)(i)–(vii). "But at the same time, IGRA does not *prohibit* a gaming compact—which is, at bottom, an agreement between a tribe and a state—from discussing other topics." *W. Flagler Assocs., Ltd. v. Haaland*, 71 F.4th 1059, 1062 (D.C. Cir. 2023). IGRA also forbids states from imposing "any tax, fee, charge, or other assessment upon an Indian tribe" for engaging in Class III gaming, except for an "assessment . . . in such amounts as are necessary to defray the costs of regulating" the Class III gaming. 25 U.S.C. §§ 2710(d)(4), (3)(C)(iii).

Under IGRA's requirements for Class III gaming, "[a]ny State and any Indian tribe may enter into a Tribal-State compact governing gaming activities on the Indian lands of the Indian tribe, but such compact shall take effect only when notice of approval by the Secretary of such compact has been published by the Secretary in the Federal Register." 25 U.S.C. § 2710(d)(3)(B); *see also Amador Cnty.*, 640 F.3d at 377. The tribe and the state must submit the proposed compact to the Secretary for review. Once that happens, the Secretary "has three choices" set out in §§ 2710(d)(8)(A)–(C). *Amador Cnty.*, 640 F.3d at 377. First, he may approve the compact. 25 U.S.C. § 2710(d)(8)(A). Second, he "may disapprove a compact," but "only if such compact violates" IGRA, another federal law, or "the trust obligations of the United States to Indians." *Id.*

§ 2710(d)(8)(B). Third, he "may choose to do nothing, in which case the compact is deemed approved after forty-five days." *Id.* § 2710(d)(8)(C); *Amador Cnty.*, 640 F.3d at 377. This third option is known as a "no-action approval." *See Amador Cnty.*, 640 F.3d at 378. If the Secretary no-action approves the compact, it "shall be considered to have been approved . . . only to the extent the compact is consistent with the provisions of [IGRA]." 25 U.S.C. § 2710(d)(8)(C). This provision "impos[es] an obligation on the Secretary to affirmatively disapprove any compact exceeding th[e] limit" of IGRA. *Amador Cnty.*, 640 F.3d at 382. If the Secretary approves or no-action approves the compact, then he must publish in the Federal Register a "notice of approval" of the compact. 25 U.S.C. §§ 2710(d)(3)(B), (d)(8)(D). At that time, the compact takes effect. *See id.* § 2710(d)(3)(B).

### 2. Relevant Oklahoma Law

Under Oklahoma law, a tribe may enter into a tribal-state compact to permit Class III gaming in two ways. The first is through the "model tribal gaming compact," as set out in Oklahoma's State-Tribal Gaming Act ("STGA"), Okla. Stat. tit. 3A, §§ 261–282. *Id.* § 281. As the name suggests, Oklahoma's model compact is one that the state will enter into with any tribe, and for which the tribe does not need further approval from the state before it may be presented to the Secretary for approval under IGRA. *See id.* §§ 280–281; *Treat v. Stitt* ("*Treat II*"), 481 P.3d 240, 242 (Okla. 2021) (describing model contract as an "'all or none' offer to the Tribes"). The model compact authorizes tribes to conduct Class III gaming that is otherwise permitted on non-tribal land in the state. *See* Okla. Stat. tit. 3A, §§ 280–281; *see also Sheffer v. Buffalo Run Casino, PTE, Inc.*, 315 P.3d 359, 361 (Okla. 2013). While Oklahoma's executive has some authority to negotiate provisions of the model compact related to "fees and exclusivity," that authority is "limited" and "does not extend to modifying other terms or provisions of the Model Compact." *Treat II*, 481 P.3d at 242.

The second way a tribe may enter into a gaming compact in Oklahoma is by approval of the Oklahoma Joint Committee on State-Tribal Relations, a committee of the Oklahoma legislature. *See* Okla. Stat. tit. 74, §§ 1221(C)(1)–(2), 1222(A); *Treat II*, 481 P.3d at 243. The Governor holds general authority to "enter into cooperative agreements on behalf of th[e] state with federally recognized Indian tribal governments." Okla. Stat. tit. 74, § 1221(C)(1). That authority is limited, however, by the Joint Committee's role in "oversee[ing] agreements between the Tribes and the State, which includes tribal gaming compacts." *Treat II*, 481 P.3d at 243. The Joint Committee must approve compacts negotiated through this general authority before the tribe may submit them to the Secretary for approval under IGRA. *Id.*

The STGA also makes clear that its provisions "shall not permit the operation of slot machines, house-banked card games, house-banked table games involving dice or roulette wheels, or games where winners are determined by the outcome of a sports contest."[2] Okla. Stat. tit. 3a, § 262(H). Those games remain unauthorized under Oklahoma law. *See Treat v. Stitt* ("*Treat I*"), 473 P.3d 43, 45 (Okla. 2020) ("The [Oklahoma] Legislature has yet to amend the [STGA] to include house-banked card and table games and event wagering as covered games.").

**B. Factual Background**

Plaintiffs are four Indian Tribes—the Cherokee Nation, Chickasaw Nation, Choctaw Nation, and Citizen Potawatomi Nation—with tribal land in Oklahoma. After Oklahoma enacted the STGA and established the state's model compact, Plaintiffs, as well as the Comanche Nation and the Otoe-Missouria Tribe—in other words, all six Tribes involved in this action—all agreed to the model compacts, and the Secretary approved them. Indian Gaming, 70 Fed. Reg. 3942-01 (Jan.

[2] A "house-banked" game is one where the tribe "has an interest in the outcome of the game"—that is, one where it maintains the 'house' from which players' winnings are retired and into which players' losses are deposited. *See* Administrative Record ("AR") 10.

27, 2005) (Cherokee and Comanche); Indian Gaming, 70 Fed. Reg. 6725-01 (Feb. 8, 2005) (Chickasaw); Indian Gaming, 70 Fed. Reg. 6903-01 (Feb. 9, 2005) (Choctaw and Citizen Potawatomi); Indian Gaming, 70 Fed. Reg. 36,407-03 (June 23, 2005) (Otoe-Missouria); *see also*, *e.g.*, ECF No. 223-3 (Cherokee model compact). After the model compacts took effect, all six Tribes conducted Class III gaming in Oklahoma subject to their conditions. The model compacts had an expiration date of January 1, 2020, but provided for automatic renewal under certain circumstances. *See* ECF No. 223-3 at 28.

Years later, as the model compacts were nearing their expiration date, the Cherokee Nation, Choctaw Nation, and Chickasaw Nation sued the Governor of Oklahoma, J. Kevin Stitt, in the Western District of Oklahoma, seeking a declaratory judgment that the model compacts would auto-renew. Complaint, *Cherokee Nation v. Stitt*, 475 F. Supp. 3d 1277 (W.D. Okla. 2020) (No. 19-cv-1198), ECF No. 1. The Citizen Potawatomi Nation, Comanche Nation, and Otoe-Missouria Tribe later moved to intervene in the suit and asserted identical claims based on their own model compacts. *See* Motions to Intervene, *id.*, ECF Nos. 21, 43, 48.

But in April 2020, the Comanche Nation and Otoe Missouria Tribe notified the court that they had reached a settlement with Governor Stitt. Joint Motion to File Stipulations of Dismissal with Prejudice, *Cherokee Nation v. Stitt*, 475 F. Supp. 3d 1277 (No. 19-cv-1198), ECF No. 120. And they moved to dismiss their claims against him. *Id.* These Tribes had reached agreements to enter into new gaming compacts with Governor Stitt that differed from the model compact, relying on the Governor's general authority to negotiate with tribes under Oklahoma law. *See* Administrative Record ("AR") 32, 68; Okla. Stat. tit. 74, § 1221(C)(1). The Comanche Nation and Otoe Missouria Tribe's leaders and Governor Stitt signed the new compacts on April 18, 2020. AR 32, 68. The Court refers to these two compacts as the "Subject Compacts" and the Comanche Nation

and Otoe Missouria Tribe as the "Subject Tribes." On April 23, 2020, the Subject Tribes sent the Subject Compacts to the Department of the Interior, seeking the Secretary's approval under IGRA so that they could take effect. *See id.* 1.

The Subject Compacts deviate from the model compact in several important ways. First, they include as "covered games" several games not mentioned in the model compact, including house-banked card games, house-banked table games, and "event wagering," or sports betting. AR 8, 41. Still, the Subject Compacts cabin their authorization of these games, allowing them only to the extent "authorized by law" or approved by a state regulatory body. *Id.* 8, 41–42. By contrast, the model compact allows only "an electronic bonanza-style bingo game, an electronic amusement game, an electronic instant bingo game, nonhouse-banked card games," and other games subsequently approved by the Oklahoma Horse Racing Commission or the Oklahoma legislature, subject to certain conditions. *See* ECF No. 223-3 at 3.

Second, the Subject Compacts contain modified revenue-sharing provisions between the Subject Tribes and Oklahoma. While the model compact imposes progressive fee rates of between 4–6% of revenue on electronic gaming and a flat fee of 10% for card and table games, the Subject Compacts set a flat fee of 4.5% for all games except for event wagering at the Subject Tribes' existing casinos. *Compare* AR 27–31, 61–65 *with* ECF No. 223-3 at 23. Fees for gaming at newly built casinos established under the Subject Compacts are higher still. *See* AR 61–65.

Third, the Subject Compacts impose a reporting requirement on the Subject Tribes regarding Class II as well as Class III games. *See* AR 19, 53. Under the Subject Compacts, the Subject Tribes must report quarterly to a state agency "the number of Covered Games and class II devices in each Facility" or face criminal penalties. *Id.* 19. The model compact does not have a similar provision.

Fourth, the Subject Compacts assure the Subject Tribes of the Governor's concurrence in certain new gaming facilities. The Comanche Nation's compact gives the Governor's prospective concurrence in constructing three new facilities dubbed the Cleveland County Facility, the Grady County Facility, and the Love County Facility, "subject to the land being taken into trust pursuant to 25 U.S.C. § 2719(b)(1)(A)." AR 19. The Otoe-Missouria Tribe Compact gives the Governor's prospective concurrence in three new facilities dubbed the Logan County Facility, the Noble County Facility, and the Payne County Facility, subject to the same conditions. *Id.* 53.

The Department of the Interior received the Subject Compacts on April 23, 2020. AR 1. So, under § 2710(d)(8) of IGRA, the last day on which the Secretary could act to approve or disapprove them before they would be no-action approved was June 7, 2020. During the intervening comment period, several interested parties sent the Secretary letters and memoranda on whether the Subject Compact were valid. *See, e.g.*, AR 101–03, 209–12, 591–601, 720–28, 805–07, 2142–44, 2865–73. The Secretary took no action on the Subject Compacts within 45 days. Accordingly, on June 7, 2020, the Secretary no-action approved them. Notice was published in the Federal Register and the Subject Compacts took effect under IGRA on June 29, 2020. 85 Fed. Reg. 38,919-01 (June 29, 2020).

A month later, the court in the Western District of Oklahoma returned its decision in *Cherokee Nation v. Stitt* on the renewal provisions of the model compact. 475 F. Supp. 3d at 1279. On July 28, 2020, the district court held that the plaintiffs' and intervenor tribes' model compacts "automatically renewed for an additional 15-year term on January 1, 2020, by operation of the unambiguous terms of Part 15(B)" of the model compact. *Id.* at 1283.

Meanwhile, during the Secretary's review period of the Subject Compacts, the Speaker of the House and the President Pro Tempore of the Oklahoma legislature had petitioned the

Oklahoma Supreme Court for a ruling that the Subject Compacts were unlawful under Oklahoma law. Petition, *Treat I*, 473 P.3d 43 (No. 118,829). In August 2020, after the Subject Compacts had taken effect, the Oklahoma Supreme Court returned its verdict, holding that, under Oklahoma law, "the Governor must negotiate the compacts within the bounds of the laws enacted by the Legislature, including the State-Tribal Gaming Act." *Treat I*, 473 P.3d at 44. Because the Subject Compacts "authorize[d] types of Class III gaming expressly prohibited by the [STGA]," the Subject Compacts were thus "invalid under Oklahoma law." *Id.* at 45. It concluded that "Oklahoma is not and cannot be legally bound by those compacts until such time as the Legislature enacts laws to allow the specific Class III gaming at issue."[3] *Id.*

### C. Procedural History

In August 2020, shortly after the Subject Compacts had taken effect, Plaintiffs sued the U.S. Department of the Interior, the Secretary of the Interior, the Assistant Secretary of the Interior for Indian Affairs (collectively, Federal Defendants); Chairman Forrest Tahdooahnippah of the Business Committee of the Comanche Nation and Chairman John Shotton of the Tribal Council of the Otoe-Missouria Tribe of Indians (collectively, Tribal Leader Defendants); and Governor Stitt.[4] ECF No. 1. Plaintiffs alleged that the Secretary's no-action approval of the Subject Compacts was unlawful, and that Tribal Leader Defendants were violating IGRA by gaming under the

[3] The following year, the Oklahoma Supreme Court reached a similar conclusion in *Treat II*, a nearly identical case brought by the President Pro Tempore of the Oklahoma Senate and the Speaker of the Oklahoma House, in which they challenged the legality of gaming compacts between Governor Stitt and the United Keetoowah Band of Cherokee Indians and the Kialegee Tribal Town. 481 P.3d at 241. The Oklahoma Supreme Court held that the contracts at issue were invalid because of Governor Stitt's failure to present the compact to the Joint Committee on State-Tribal Relations for approval. *See id.*

[4] While tribal immunity bars suits against tribes themselves without their consent, under *Ex parte Young*, 209 U.S. 123 (1908), tribal immunity does not bar a claim against a tribal officer for prospective relief. *See Vann v. Kempthorne*, 534 F.3d 741, 749–56 (D.C. Cir. 2008).

Subject Compacts. *See generally id.* Plaintiffs amended their complaint soon after, adding two Defendants: Chief Joe Bunch of the United Keetoowah Band of Cherokee Indians and Mekko—or Chief Executive Officer—Brian Givens of the Kialegee Tribal Town. ECF No. 26. The Amended Complaint alleged that those Tribes, too, had entered into unlawful compacts with Governor Stitt, which the Secretary had also no-action approved. *See generally id*. After Defendants responded to the Amended Complaint, *see* ECF Nos. 43, 53–56, Plaintiffs again amended their complaint with the Court's leave in September 2021, which the Court refers to as the Operative Complaint, ECF No. 104.[5]

Defendants answered, moved to dismiss, moved for judgment on the pleadings, or raised a counterclaim in response to the Operative Complaint. ECF Nos. 106–10, 154. Plaintiffs, Chief Bunch, and Mekko Givens also cross-moved for partial summary judgment. ECF Nos. 135, 136. The Court ruled on all outstanding motions in November 2022. It dismissed all claims in the Operative Complaint based on the United Keetoowah Band and Kialegee Tribal Town's compacts for lack of standing and therefore dismissed Chief Bunch and Mekko Givens. ECF No. 157. It also denied as moot or denied without prejudice Plaintiffs' Partial Motion for Summary Judgment and Governor Stitt's Motion for Judgment on the Pleadings, dismissed Chairman Shotton's counterclaim, and denied other outstanding motions. Minute Order of Nov. 23, 2022; ECF No. 157.

In January 2023, the Court entered a briefing schedule that provided for the filing of the administrative record and—presuming no disputes over its contents arose—a schedule for summary judgment briefing on Plaintiffs' remaining claims. Minute Order of Jan. 3, 2023. In March

[5] The Operative Complaint names Mark Woommavovah, who succeeded Chairman Tahdooahnippah in 2021, as the Comanche Nation Chairman. ECF No. 104 at 3 n.1. But since the filing of the Operative Complaint, Chairman Tahdooahnippah has become Comanche Nation Chairman once more.

2023, Federal Defendants served the administrative record on all parties. ECF No. 164. Plaintiffs soon moved to compel production of additional documents not included in the administrative record. ECF No. 166. They sought an order compelling Federal Defendants to provide certain documents they claimed were missing from the record, as well as to produce documents withheld based on privilege or else provide a privilege log. *See id.*

While Plaintiffs' Motion to Compel was pending, the Attorney General and Solicitor General of Oklahoma purported to enter their appearances for Governor Stitt, who had been represented by private counsel. ECF Nos. 176, 177. The Attorney General and Solicitor General claimed that, under Oklahoma law, they were entitled to take and assume control of the defense of Oklahoma's interests in this action. ECF Nos. 176, 177. Governor Stitt moved to strike their notices of appearance, asserting that he had the right to be represented by counsel of his choosing. ECF No. 178. The Court, on its own initiative, certified the question of whether the Attorney General could do so under the circumstances here to the Supreme Court of Oklahoma, and stayed the case pending its response. ECF No. 195. In March 2025, the Supreme Court of Oklahoma returned its answer, holding that the Attorney General and Solicitor General of Oklahoma were not entitled to represent Governor Stitt without his consent. ECF No. 205.

The Court then lifted the stay and denied the outstanding Motion to Compel, concluding that Plaintiffs had not met their burden to show "bad faith or improper behavior" by Federal Defendants in their compilation of the administrative record. ECF No. 215 at 5. The Court then entered a briefing schedule for summary judgment motions among all parties. Minute Order of Aug. 14, 2025. The Oklahoma Attorney General moved for leave to file an amicus brief, which the Court allowed. ECF No. 220; Minute Order of Aug. 30, 2025.

The parties now cross-move for summary judgment on the Operative Complaint. ECF Nos. 223, 226, 229, 230, 233. Left remaining in the case are three sets of Defendants: (1) Federal Defendants; (2) Tribal Leader Defendants; and (3) Governor Stitt. *See* ECF No. 104 ¶¶ 12–19. Plaintiffs assert eight counts, claiming that the Subject Compacts are illegal and invalid for several reasons. The first seven counts allege that Federal Defendants violated IGRA through the Administrative Procedure Act when the Secretary no-action approved the Subject Compacts. Count Eight brings a claim for declaratory relief against Tribal Leader Defendants. *See* ECF No. 104 ¶¶ 232–268.

More specifically, Count One alleges that the Secretary's "consideration" of the Subject Compacts was arbitrary, capricious, contrary to IGRA, and without observance of procedure required by IGRA, "because [the Subject Compacts] had not been legally entered into by both parties when considered by the Secretary." ECF No. 104 ¶¶ 232–235. Count Two alleges that the Secretary acted arbitrarily, capriciously, contrary to IGRA, and without observance of procedure required by IGRA, by failing to consider whether the Subject Compacts were not legally "entered into" or were otherwise contrary to IGRA before no-action approving them. *Id.* ¶¶ 236–240. Count Three alleges that the Secretary's no-action approvals were arbitrary, capricious, and contrary to IGRA because the Subject Compacts were not validly "entered into" under state law. *Id.* ¶¶ 241–244. Count Four alleges that the Secretary's no-action approvals of the Subject Compacts were arbitrary, capricious, and contrary to IGRA because they authorize Class III gaming that is not legal in Oklahoma. *Id.* ¶¶ 245–250. Count Five alleges that the Secretary's no-action approvals were arbitrary, capricious, and contrary to IGRA because the Subject Compacts contain revenue-sharing provisions that impose an impermissible tax. *Id.* ¶¶ 251–256. Count Six alleges that the Secretary's no-action approvals were arbitrary, capricious, and contrary to IGRA because the

Subject Compacts impermissibly regulate Class II gaming. *Id.* ¶¶ 257–261. Count Seven alleges that the Secretary's no-action approvals were arbitrary, capricious, and contrary to IGRA because the Subject Compacts contain provisions on land acquisitions that violate the "federal trust obligation" and are not permissible subjects of IGRA compacts. *Id.* ¶¶ 262–265. Finally, Count Eight requests a declaratory judgment that Defendant Tribal Leaders' "efforts to implement" the Subject Compacts violate IGRA.[6] *Id.* ¶¶ 266–268. Because all counts allege violations based on *both* Subject Compacts, Plaintiffs effectively bring sixteen separate claims: eight based on the Comanche Nation's compact, and eight based on the Otoe Missouria Tribe's compact.

In their cross-motions for summary judgment, among other arguments, Federal Defendants and Chairman Tahdooahnippah challenge Plaintiffs' standing as to all counts. *See generally* ECF Nos. 226-1, 230-1. Chairman Shotton also challenges Plaintiffs' standing as to Count Six only. *See* ECF No. 229-1 at 41–44.

## II. Legal Standard

A federal court's subject matter jurisdiction extends only to cases and controversies of the "justiciable sort referred to in Article III"—in other words, claims a plaintiff can show he has "standing" to bring. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "[T]he irreducible constitutional minimum of standing" is that (1) "the plaintiff must have suffered an injury in fact" that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (2) "there must be a causal connection between the injury and the conduct complained of"

[6] The Court notes that Count Eight—the only count not raising an APA challenge to the Secretary's no-action approval—names only Defendant Tribal Leaders. As such, it appears that Governor Stitt has not been accused of unlawful conduct in any of the eight counts in the Operative Complaint, although he is referenced throughout its general factual allegations. At any rate, Governor Stitt makes no jurisdictional argument on summary judgment. *See* ECF No. 233. Because the Court dismisses the case for lack of standing without reaching the merits, it need not determine the effect of the Operative Complaint's apparent oversight as to Governor Stitt.

that is "fairly traceable to the challenged action of the defendant"; and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 560–61 (cleaned up). Moreover, "standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). At the summary judgment stage, the plaintiff bears the burden of showing standing, and it "must set forth by affidavit or other evidence specific facts" that prove standing. *Defs. of Wildlife*, 504 U.S. at 561.

## III. Analysis

The Court concludes that Plaintiffs lack standing for any of their claims because they have failed to show that they have suffered a redressable injury in fact that was caused by the Secretary's approval of the Subject Compacts. Plaintiffs assert several possible theories of standing to challenge the Secretary's approval of the Subject Compacts—competitor standing, equal footing standing, and economic harm—but each comes up short. Because the Court lacks subject matter jurisdiction, the case must be dismissed.

### A. Plaintiffs Have Not Shown an Injury in Fact Through Competitor Standing

When, as here, "the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Defs. of Wildlife*, 504 U.S. at 562. One way around this substantial hurdle is through a showing of competitor standing. "The doctrine of competitor standing addresses the first requirement [of standing] by recognizing that economic actors suffer an injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition against them." *Sherley v. Sebelius*, 610 F.3d 69, 72 (D.C. Cir. 2010) (cleaned up). At heart, "the basic requirement common to all [competitor standing] cases is that the complainant show an actual or imminent increase in competition, which increase . . . will almost certainly cause an injury in fact."

*Id.* at 73. Examples of competitor standing "include orders permitting a new entrant into a fixed market or allowing a rival to sell a fungible good at a lower price." *PSSI Glob. Servs., LLC v. Fed. Commc'ns Comm'n*, 983 F.3d 1, 11 (D.C. Cir. 2020) (internal citations omitted). Still, it is not enough to merely claim that "a rival's favorable regulatory treatment has created a skewed playing field" or an "unfair competitive atmosphere." *Id.* (quotation omitted). Likewise, "a competitor's receipt of a windfall, by itself, is not enough, to demonstrate the actual or imminent increase in competition required before a plaintiff may invoke competitor standing." *Air Excursions LLC v. Yellen*, 66 F.4th 272, 281 (D.C. Cir. 2023) (internal citations omitted). To show competitor standing at summary judgment, the plaintiff must put forward "evidence" that the challenged action has "adversely affected [its] financial interest." *KERM, Inc. v. FCC*, 353 F.3d 57, 61 (D.C. Cir. 2004). And it may not rest on "bare allegations" of injury. *Id.* (quoting *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002)).

Plaintiffs assert several arguments for how the Subject Compacts have increased competition against them, but as described below, none meet the standard set out above.

**1. Plaintiffs Have Failed to Show an Overall Increase in Competition Due to the Subject Compacts**

First, Plaintiffs assert that the Subject Compacts allow the Subject Tribes to "participate in the Class III gaming market" as Plaintiffs' competitors. ECF No. 223-1 at 22. Plaintiffs point to an expert report conducted by Dr. Brian Wyman, who analyzed Plaintiffs' and the Subject Tribes' gaming activity in Oklahoma and the dynamics of that market. *See generally* ECF No. 223-29 ("Wyman Report"). The Wyman Report concluded that the Subject Tribes' casinos "function as centers of gravity that currently divert demand from [Plaintiffs'] casinos" and "attract gaming demand from their surrounding populations and travel corridors," including attracting "consumers who would otherwise visit [Plaintiffs'] casinos." *Id.* at 22. Plaintiffs then argue that, because the

Subject Tribes "repudiated their prior [model] compacts," they are competing with Plaintiffs' casinos only because of the Subject Compacts. ECF No. 223-1 at 22. In other words, Plaintiffs contend, absent the Secretary's approval of the Subject Compacts, the Subject Tribes would "have [had] no legal right to conduct that gaming." *Id.* So, they say, any current participation in Class III gaming by the Subject Tribes "increases competition for Plaintiff Nations" because the Subject Tribes' casinos attract customers who would otherwise patronize Plaintiffs' casinos. *Id.*

This is not a valid theory of competitor standing on the facts here. The baseline against which Plaintiffs have to show an increase in competition is the status quo ante—the time before the Secretary no-action approved the Subject Compacts—not a hypothetical counterfactual in which the Subject Tribes exited the market. The number of participants in the Class III market has not changed since the Subject Compacts were no-action approved. Thus, Plaintiffs have not shown *any* increase in competition at all through this theory, and it cannot serve to show standing on a competitor standing theory.[7]

**2. Plaintiffs Have Not Shown Standing Based on the Subject Compact's Provisions**

Plaintiffs next argue that the Subject Compacts cause them competitive injury because they offer the Subject Tribes more favorable terms through three supposedly unlawful provisions.[8]

[7] Plaintiffs have also not carried their burden on this theory to the extent that it requires a showing that the Subject Tribes permanently "repudiated" the model contacts. As detailed more below, Tribal Leader Defendants and Federal Defendants maintain that the Subject Tribes would be able to revert to the model compacts (or establish new compacts with Oklahoma) if the Subject Compacts were invalidated. ECF No. 230-1 at 24; ECF No. 226-2 ¶¶ 16–18; *see also* ECF No. 229-2 ¶ 29 (arguing that the Western District of Oklahoma's decision in *Cherokee Nation v. Stitt* applies to interpret the language of the STGA and may bind the Subject Tribes in the future).

[8] The Operative Complaint challenges four provisions in the Subject Compacts as unlawful. ECF No. 104 ¶¶ 245–265. But so far as the Court can tell, Plaintiffs raise no illegal competition argument based on the provision they challenge in Count Six: that the Subject Compacts impermissibly regulate Class II gaming. *Id.* ¶¶ 257–261.

First, they argue that one such provision allows the Subject Tribes to "offer Class III games that Plaintiff Nations cannot offer under their Compacts," which increases competition against Plaintiffs' casinos. ECF No. 223-1 at 22. And—the Court cannot emphasize this enough—if Plaintiffs were right that the Subject Compacts permitted the Subject Tribes' casinos to immediately offer games unavailable in Plaintiffs' casinos, that would almost surely lead to increased competition, and thus, a competitive injury affecting Plaintiffs' bottom line. *See Shays v. Fed. Election Comm'n*, 414 F.3d 76, 86 (D.C. Cir. 2005) (finding competitor standing when plaintiffs faced "intensified competition" as a result of the challenged policy); *United Transp. Union v. ICC*, 891 F.2d 908, 912 n.7 (D.C. Cir. 1989) (stating that allegations founded on "basic economic logic" may establish competitor standing). But the Subject Compacts *don't* permit the Subject Tribes to offer these kinds of games, at least not now.

Recall that the Subject Compacts include authorizations to offer some new games, including sports betting, but only to the extent that those games are authorized by state law and regulations. AR 8, 41–42. The games at issue here are not legal in Oklahoma under the STGA. Okla. Stat. tit. 3a, § 262(H); *see also Treat I*, 473 P.3d at 45. Accordingly, since the Operative Complaint was filed, the Subject Tribes cannot lawfully offer—and so are not offering—any additional games. *See* ECF No. 228-1 ¶ 54. So this provision in the Subject Compacts, standing alone, is not enough to show an injury in fact. "When the prospect and nature of future competition remains indeterminable and amorphous pending future clarifying events that postdate the filing of the complaint . . . the competitive injury requirement is not satisfied." *Delta Air Lines, Inc. v. Exp.-Imp. Bank of United States*, 85 F. Supp. 3d 250, 267 (D.D.C. 2015). That is the case here. Plaintiffs' economic injury is contingent on an independent action—a change in Oklahoma law—that might (or might not) ever happen. So their injury in fact "simply too attenuated and speculative" to

support competitor standing. *State Nat. Bank of Big Spring v. Lew*, 795 F.3d 48, 55 (D.C. Cir. 2015). And Plaintiffs may not rest competitive standing on the fact that the Subject Compacts allow the Subject Tribes to "mov[e] one step closer to competing with, and therefore economically injuring," Plaintiffs. *New World Radio, Inc. v FCC*, 294 F.3d 164, 170–71 (D.C. Cir. 2002) ("[The plaintiff] does not, and cannot, allege that granting [competitor's] application . . . will, standing alone, "financially injure" [the plaintiff's] position in [its] marketplace.").[9]

Second, Plaintiffs point to six additional casinos they claim the Subject Tribes may construct under the Subject Compacts. *See* ECF No. 223-1 at 23. And, again, this would be a winning standing argument if there was evidence in the record to show that any new casinos were "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402 (2013). But there is not. In fact, the construction of any new casino depends on another intervening development: the land being "taken into trust" for the Subject Tribes. *See* AR 19. And this is a lengthy process which requires the consent of the Secretary, would likely face legal challenge, and has not begun. *See, e.g.*, *Yocha Dehe. v. Dep't of Interior*, 3 F.4th 427, 431 (D.C. Cir. 2021). Thus, this harm is also too far removed from the actions challenged in this suit—the Secretary's no-action approvals of the Subject Contracts—to constitute an injury in fact. *See Delta Air Lines*, 85 F. Supp. 3d at 267. Indeed, the Court rejected this very argument as to the United Keetoowah Band and the Kialegee Tribal Town's compacts at the motion-to-dismiss stage. *See Cherokee Nation v. Dep't of Interior*, 643 F. Supp. 3d 90, 112 (D.D.C. 2022).

[9] In response, Plaintiffs argue that their prospective injury does not depend on a change in Oklahoma law because the Subject Tribes could, at any time, change their minds and decide that the Subject Compacts do in fact provide them authority to offer new games, even though those games are illegal under Oklahoma law. ECF No. 239 at 24. But in the Court's view, the prospect of such a change in position—contradicted by both Tribal Leader Defendants' representations in this case and of otherwise dubious plausibility—is no less speculative than the possibility of an intervening change in Oklahoma law.

Third, Plaintiffs point to the "lower substantial exclusivity fee" that the Subject Tribes pay to Oklahoma under the Subject Compacts. ECF No. 223-1 at 22. Plaintiffs argue that this provision causes them competitive injury because the lower fees the Subject Tribes pay will lead to "increased profitability" of the Subject Tribes' casinos. ECF No. 239 at 23 n.8. This increased profitability, Plaintiffs say, will cause the Subject Tribes to "increase[] jackpots, buy[] more attractive equipment, or offer[] better amenities," thereby increasing competition against Plaintiffs' own casino enterprises and harming Plaintiffs' bottom line. *Id.*

To establish competitor standing, though, Plaintiffs must do more than show that the challenged action has provided a financial advantage to a competitor—they must show a likelihood that such advantage will lead to increased competition in the marketplace. One does not always lead to the other, as several D.C. Circuit cases illustrate.

In *Air Excursions*, the Circuit held that the plaintiffs did not have standing to challenge a competitor's receipt of COVID loan disbursements despite the plaintiffs' claim that the funds would lead to increased competition by allowing the competitor to "capture market share, prevent entry of competitors and impede competitors in the market." 66 F.4th at 276. The Circuit found that asserting a competitor received a "bare regulatory windfall" is not enough to show competitor standing because such windfall "does not necessarily influence the competitor's pricing decisions or otherwise result in increased competition in the industry." *Id.* at 281. While the competitor standing doctrine provides the "link between increased competition and tangible injury," it does not "supply the link between the challenged action and increased competition." *Id.* Similarly, in *Mobil Relay Associates v. FCC*, the Circuit found that the plaintiffs lacked competitor standing to challenge the Federal Communication Commission's undervaluation of a spectrum license to a competitor's advantage. 457 F.3d 1, 13 (D.C. Cir. 2006). There too, the Circuit found that the

plaintiffs lacked standing because they "failed to make a concrete showing that they [were] likely to suffer financial injury" because of the undervaluation. *Id*. Overall, the Circuit held, the creation of a "skewed playing field," without a concrete showing of how a competitor's windfall will lead to increased competition that affects the plaintiffs, does not create competitor standing. *Id*.

So too here. Plaintiffs have the burden to establish standing, and at this stage they must rest on more than "bare allegations" of increased competition to do so. *KERM*, 353 F.3d at 61. Even assuming that Plaintiffs have shown that the Subject Compacts' fee provisions may give the Subject Tribes a windfall, they have proffered no evidence to supply the link between those provisions and increased competition in the gaming market. They merely assert that the Subject Compacts "allow[]" the Subject Tribes "to offer larger jackpots or cheaper amenities to patrons than they would under the Model Compact." ECF No. 223-1 at 22. These assertions are not enough.

To satisfy their burden on summary judgment, Plaintiffs must provide some evidence that shows that the Subject Tribes' purported increase in gaming revenue under the Subject Compacts is likely to lead to the sort of casino improvements mentioned or otherwise create increased competition in the gaming market. Candidly, they have not even tried to do so. Their proffered evidence in support of competitor standing—limited to the Wyman Report—makes no mention of the likely effects of the new fee provisions. And they present no evidence elsewhere that the Subject Tribes are likely to re-invest increased revenues into casino improvements such as increased jackpots and cheaper amenities, or that whatever improvements the Subject Tribes might make would lead to more competition. For that reason alone, Plaintiffs have failed to meet their burden to show standing based on the fee provisions of the Subject Compacts.

On top of all that, representations by Tribal Leader Defendants push the logic of Plaintiffs' claimed fee provision injuries further into speculative territory. For one, Chairman

Tahdooahnippah asserts that, under Comanche Nation law, all gaming revenue is strictly apportioned in advance, with revenue directed back to the general operating budgets and used to fund per capita payments to tribal citizens. ECF No. 228-1 ¶ 66. The Comanche Nation "can only utilize gaming revenues for certain specified governmental purposes including 10% for tribal government operations and administration, 25% for economic development, 25% for community services and programs and 40% for annual distribution to the Nation's citizens on a per capita basis." ECF No. 228-2 ¶ 20. To fund new games or make investments in substantial casino improvements, the Comanche Nation would need to amend its law to provide for a Capital Expenditure Reserve fund, which is currently not in place. *Id.* ¶ 22. Chairman Tahdooahnippah asserts that the Subject Compacts' fee provisions "ha[ve] no connection to patron behavior, gaming amenities, facility improvements, or any other factor affecting competition among gaming facilities." ECF No. 228-1 ¶ 66. Similarly, Chairman Shotton asserts that any increase in revenue to the Otoe-Missouria Tribe is directed to the Tribe's overall operating budget as well as funding services, including per capita payments, to tribal citizens. *See* ECF No. 229-1 at 41; *cf. Financial Assistance*, Otoe-Missouri Tribe, https://perma.cc/KJN4-SFJP.[10]

### 3. Plaintiffs Have Not Established Standing Based on Unlawful Transactions

Plaintiffs also advance a fallback position that, even if the Subject Compacts foster no imminent increase in competition and even if the Subject Tribes could revert to the model

[10] Finally, to underscore the speculative nature of Plaintiffs' claim of a link between increased gaming revenue from the fee provision and improved casino amenities that could drive increased competition, the Court notes that the Tribal Leader Defendants are not the heads of for-profit gambling businesses. Plaintiffs appear to ask the Court to infer that the Subject Tribes will re-invest any increased revenue to try to gain a competitive advantage over Plaintiffs. But the logic of such an inference—even if the Court could make it under any circumstances when evaluating competitor standing—is especially weak here, given that the Tribal Leader Defendants are leaders of sovereign Nations beholden to their citizens, not the heads of corporations.

compacts, Plaintiffs still suffer a competitive injury. That is because, Plaintiffs assert, "[a]ll Class III gaming that Defendant Chairmen's Tribes are currently conducting is unlawful because it is conducted without a valid compact," and such illegal gaming "is enough for Plaintiff Nations' competitor standing." ECF No. 239 at 23. In so arguing, Plaintiffs rely on a passage from *Associated Gas Distributors v. FERC* that "[t]hose who must compete with allegedly illegal commercial transactions have Article III standing to challenge a regulatory order authorizing the transactions." 899 F.2d 1250, 1258 (D.C. Cir. 1990); *see* ECF No. 223-1 at 20–21. But again, competitor standing depends on a close causal relationship between the challenged action and an increase in competition. So in *Associated Gas Distributors*, like in most cases where the Circuit has found competitor standing, the challenged regulatory order opened the market to *new* competitors. *See* 899 F.2d at 1258. A similar relationship does not exist here, where the Subject Tribes were competing with Plaintiffs in the same Class III gaming market in the same way they do now even before the Secretary no-action approved the Subject Compacts.

* * *

The Court notes that, at the motion-to-dismiss stage, it found that Plaintiffs had cleared their bar to show competitor standing by alleging that the Subject Compacts led to an increase in competition in their markets. But as the Court stressed then, Plaintiffs were "protected from an evidentiary attack on their asserted theory of injury." *Cherokee Nation v. Dep't of Interior*, 643 F. Supp. 3d at 104 (quotation omitted). Thus, it accepted the "general factual allegations" setting out Plaintiffs' illegal-competition injury. *Id*. at 108. These allegations included Plaintiffs' assertion that the Subject Tribes would, under the Subject Compacts, "use business practices or access geographic locations that give those tribes significant competitive advantages over Plaintiff Nations." ECF No. 104 ¶ 129. The Court also credited Plaintiffs' allegation that, "under [its Subject

Compact], the Comanche Nation has expanded its class III gaming to a new location." *Cherokee Nation*, 643 F. Supp. 3d at 111 (citing ECF No. 104 ¶ 231.r). But on summary judgment, a different standard governs. And now, Plaintiffs have failed to put forth evidence that meets their burden of showing that the Subject Compacts have caused these advantages for their competitors, leading to increased competition for them in the Oklahoma gaming market, or that this increased competition is at least imminent or certainly impending. Thus, under the D.C. Circuit precedent explained above, they have not shown that they have competitor standing.

**B. Plaintiffs' Remaining Theories of Standing Fail**

Plaintiffs' other asserted bases for standing likewise fail. First, they argue that they suffered an injury in fact through "equal footing" standing. That theory of standing allows a plaintiff to show an injury in fact "[w]hen the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group." *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993). In such cases, the relevant injury in fact is "the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Id.* Plaintiffs claim that they have suffered an equal footing injury because the preferential terms of the Subject Compacts render them unable to compete on an even playing field with the Subject Tribes' casinos. *See* ECF No. 223-1 at 18–19.

But the equal footing theory of standing does not fit here. Plaintiffs do not, and cannot, claim that they sought a government benefit and that the Secretary somehow enacted a barrier restricting them from receiving it. They have not asserted, for instance, that they tried to receive approval from the Secretary for new versions of their own compacts with similar terms to the Subject Compacts but were refused, or that their own attempts to conduct gaming under the model compacts have been stymied by the Secretary's action. To the extent that Plaintiffs assert that they

have been unable to "compete on equal footing in the Oklahoma gaming market," ECF No. 223-1 at 19, because of the Secretary's no-action approval of the Subject Compacts, their argument is merely a repackaging of their competitor standing argument that Court has already rejected. And to the extent that Plaintiffs argue that they have "a legally-protected interest in the Secretary only authorizing Indian tribes to conduct Class III gaming in accordance with IGRA," *id.*, this is also not an equal footing argument; it is closer to an admission that they simply lack an injury in fact that would suffice to show standing.[11]

Finally, Plaintiffs suggest a more traditional economic injury as their basis for standing, one not dependent on any increased competition under a theory of competitor standing, but that still echoes some of their earlier arguments. They say that the Subject Tribes' "conduct of gaming under the Agreements causes Plaintiff Nations direct economic harm by dividing their patrons' spending, which reduces Plaintiff Nations' gaming revenues." ECF No. 223-1 at 22. And because the Subject Tribes are only gaming subject to the Secretary's no-action approval of the Subject

[11] The cases cited by Plaintiffs do not help their case, either. In *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, the plaintiff challenged the Secretary's no-action approval of a compact that required Wisconsin to consult with and indemnify the Ho-Chunk Nation before approving any other tribes' applications for new casinos that would compete with Ho-Chunk casinos. 422 F.3d 490, 494 (7th Cir. 2005). In that case, the Seventh Circuit found that the plaintiff suffered an equal footing injury because the requirement for Wisconsin to request the Ho-Chunk Nation's concurrence to new casino construction presented a barrier to the plaintiff receiving a government benefit. *Id.* at 497–98 ("[The plaintiff's] harm lies in . . . being forced to seek approval under the cloud created by the amended compact."). Nothing along those lines has happened here. Similarly, in *Forest County Potawatomi Community v. United States*, the court found that an intervenor tribe had standing because the plaintiff sought to enforce a gaming compact establishing a "non-competition zone" around the plaintiff's gaming facility. 317 F.R.D. 6, 12 (D.D.C. 2016). Because the compact at issue—which would similarly require the state to compensate the plaintiff for any revenue lost from approving competing facilities—constituted a government-imposed barrier, the court found that the intervenor tribe had equal footing standing. *Id.* In both cases, the challenged gaming compacts had the direct effect of imposing a barrier on the ability of other tribes to expand their gaming facilities. The same is not true here.

Compacts, Plaintiffs argue that this economic injury is fairly traceable to the challenged action and redressable by this Court. *Id.*

But even if Plaintiffs could show an economic injury merely because of this competition, they run into problems on those last two elements of standing: demonstrating that their injury is "fairly traceable to the challenged action of the defendant" and that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Defs. of Wildlife*, 504 U.S. at 561 (cleaned up). Recall that standing is "ordinarily substantially more difficult to establish" when, as here, the plaintiffs challenge the government regulation of a third party. *Id.* at 562 (cleaned up). This is because, in such cases, "causation and redressability ordinarily hinge on the response of the . . . third party to the government action or inaction—and perhaps on the response of others as well." *Id.* With these elements of standing thus dependent "on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict," plaintiffs face a higher burden to "adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury." *Id.* (quotation omitted). Plaintiffs have not met that burden here.

To begin, take the "fairly traceable" causation requirement. In general, "[t]he proper comparison for determining causation is not between what the agency did and the status quo before the agency acted. Rather, the proper comparison is between what the agency did and what the plaintiffs allege the agency should have done under the statute." *Animal Legal Def. Fund, Inc. v. Glickman*, 154 F.3d 426, 441 (D.C. Cir. 1998). However, the application of that maxim is complicated here because Plaintiffs do not assert—at least, not in advancing this theory of standing—that the Secretary caused any change to the status quo by no-action approving the Subject Compacts. *See*

ECF No. 223-1 at 22–23. In other words, Plaintiffs do not base this final theory of standing on any change in competitive conditions from the period before 2020 (when the Subject Tribes were offering gaming under the model compacts) to the time after 2020 (when they were offering gaming under the Subject Compacts). Rather, Plaintiffs' argument hinges on the theory that, had the Secretary disapproved the Subject Compacts in 2020—the action Plaintiffs assert the agency should have taken under IGRA—the Subject Tribes would not have been unable to offer any gaming *at all*, their casinos would have shut down, and participants in the gaming the market would have increased their patronage of Plaintiffs' casinos. *Id.* at 24–25.

Plaintiffs have failed to carry their burden to show that this asserted current "injury," dependent as it is on the actions and discretion of third parties, is fairly traceable to the Secretary's action. In other words, their assertion that the Subject Tribes would have lost their ability to offer *any* gaming if the Secretary had rejected the Subject Compacts in 2020 is too speculative to support standing. Indeed, the Subject Tribes had been gaming under the model compacts for well over a decade before negotiating the Subject Compacts with Governor Stitt. And Federal Defendants and Defendant Tribal Leaders provide several reasons why the Subject Tribes could have continued to offer gaming if the Secretary had disapproved the Subject Compacts. They assert, first, that the Subject Tribes could have returned to the model compacts, relying on the Western District of Oklahoma's decision in *Cherokee Nation v. Stitt* that the model compacts auto-renewed in 2020 for an additional 15-year term.[12] ECF No. 229-2 ¶ 29; ECF No. 230-1 at 23–24; ECF No. 244 at 11–

[12] Plaintiffs' retort to this argument—that such claims would be barred by claim preclusion, ECF No. 223-1 at 25 n.6—likewise hinges on a speculative chain of events, because claim preclusion is an affirmative defense that Governor Stitt or the State of Oklahoma would need to raise, *see Lynch v. Nat'l Prescription Adm'rs, Inc.*, 787 F.3d 868, 872 (8th Cir. 2015). And Chairman Tahdooahnippah, for his part, raises colorable challenges to whether claim preclusion would even apply to the facts at hand, *see* ECF No. 226-1 at 25–28.

12. Chairman Tahdooahnippah also argues that, because the Subject Compacts contain a clause stating that they "supersede" the model compacts, any voiding of the Subject Compacts would have automatically returned the parties to their prior position under the model compacts as a matter of Oklahoma common law. ECF No. 226-1 at 28–29 (citing AR 32). Chairman Tahdooahnippah and Federal Defendants also argue that the Subject Tribes could have returned to gaming by negotiating a new compact with Oklahoma if the Subject Compacts were disapproved. ECF No. 230-1 at 24; ECF No. 244 at 11.

Thus, this theory of standing hinges on *all* these possible avenues for the Subject Tribes to continue offer gaming to have failed—and thus, for their casinos to have been shuttered—if the Secretary had rejected the Subject Compacts. Again, this hypothetical is far too speculative. The Subject Tribes' casinos were operating before the Secretary acted, they suggest several plausible pathways for them to have continued even if the Secretary had disapproved the Subject Compacts, and in the end, Plaintiffs ask the Court to rely on Plaintiffs' predictions as to the "anticipated action of unrelated third parties."[13] *Arpaio v. Obama*, 797 F.3d 11, 20 (D.C. Cir. 2015); *see also Mideast Sys. & China Civil Const. Saipan Joint Venture, Inc. v. Hodel,* 792 F.2d 1172, 1178 (D.C.Cir.1986) ("[T]he mere possibility that causation is present is not enough; the presence of an independent variable between either the harm and the relief or the harm and the conduct makes causation sufficiently tenuous that standing should be denied."); *Clapper*, 568 U.S. at 414 (describing the Supreme Court's "reluctance to endorse standing theories that rests on speculation about the decisions of independent actors"). On this record, then, the Court cannot conclude that the operation of the

[13] For instance, Plaintiffs' theory of causation asks the Court to predict the actions of the Subject Tribes, who are not a party to this litigation, as well as the Western District of Oklahoma, and to predict the outcome of the Subject Tribes' attempts to rejoin the model compacts based on Oklahoma common law.

Subject Tribes' casinos, and thus any resulting economic injury to Plaintiffs, is "fairly traceable" to the action of the Secretary to approve the Subject Compacts.

Same too for redressability. Similar to causation, Plaintiffs' redressability argument relies on a speculative chain of events: that if the Court were to vacate the Subject Compacts' approval or direct the Secretary to disapprove them, the Subject Tribes would being unable to continue operating their casinos through any of the plausible pathways they suggest. For the reasons already mentioned, on this record, the Court cannot conclude that Plaintiffs have demonstrated that such a result is "likely, as opposed to merely speculative." *Defs. of Wildlife*, 504 U.S. at 561 (cleaned up).[14]

## IV. Conclusion

For all the above reasons, the Court will deny Plaintiffs' Motion for Summary Judgment, grant the Motions for Summary Judgment filed by Chairman Tahdooahnippah and Federal Defendants —the only Defendants to advance standing arguments for all Counts—and dismiss the case for lack of subject matter jurisdiction. A separate order will issue.

[14] Plaintiffs also argue that the Subject Tribes' casinos would be unable to operate for at least *some* time after the Court acted, while they attempted to re-join the model compacts or establish new compacts, and so the Court would at least be able to provide them *some* temporary redress. *See* ECF No. 223-1 at 25 n.7. The Court is also unpersuaded that is likely. In so arguing, Plaintiffs rely on an Opinion by the Oklahoma Attorney General about another tribe's attempt to enter into the model compact after 2020. *Id.* (citing Attorney General Opinion No. 2025-7, 2025 WL 1674874, at *1 (Okla. Att'y Gen. June 9, 2025)). But—aside from providing scant support for Plaintiffs' argument that renegotiations mean that a gap in compact coverage *must* arise—the Opinion appears inapplicable here because the Attorney General based it on that tribe's lack of a "Model Compact in place on January 1, 2020," which is not the case for the Subject Tribes. *Id.* Moreover, Plaintiffs' argument on this point is belied by the apparent fact that they kept operating their casinos in 2020, even while they sought to retroactively confirm the auto-renewal of the model compacts through the litigation in the Western District of Oklahoma. *Casinos Still Open Despite Gov. Stitt's Warning*, KJRH News Oklahoma (Jan. 2, 2020, 9:34 a.m.), https://perma.cc/P85Z-UPLC.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: September 21, 2026